IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., INC. | ) | |
| a subsidiary of LG Electronics, Inc., | ) | |
| a Korean company | ) | |
| | ) | Civil Action No.: 08 C 242 |
| Plaintiff/Counterdefendant, | ) | |
| | ) | Judge St. Eve |
| v. | ) | |
| | ) | Magistrate Judge Mason |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Defendant/Counterplaintiff. | ) | |

**[REDACTED]**
**WHIRLPOOL CORPORATION'S MEMORANDUM OF LAW OPPOSING LG'S**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... iii

I.  INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF FACTS ............................................................................................... 2

    A. The Whirlpool Duet® Steam Dryer .......................................................................... 2

        1. Overview ............................................................................................................. 2

        2. Development of the Duet® Steam Dryer .............................................................. 2

        3. Launch of the Duet® Steam Dryer ...................................................................... 3

        4. The Duet® Steam Dryer Receives Favorable Reviews ....................................... 3

    B. The Whirlpool Duet® Steam Dryer Uses Steam by Any Definition ................................ 4

        1. The Definition of "Steam" Is Broader Than LG Claims In This Litigation ................ 4

            a. LG's Use of the Word Steam Outside this Litigation ............................................. 4

            b. Correct Technical and Common Use Definitions Consistent with
               Whirlpool's Technology .......................................................................................... 5

            c. Other Appliances Use "Steam" in the Common, Consumer Sense ...................... 6

        2. Whirlpool's Duet® Steam Dryer Meets Even LG's Definition of Steam .................. 6

    C. The Disadvantages of LG's Steam Technology ........................................................... 7

    D. LG's "Steam" in the Dryer Drum is the Same as Whirlpool's ..................................... 8

    E. LG's Delay in Filing Suit ............................................................................................. 8

III. ARGUMENT .................................................................................................................. 9

    A. Legal Standard ........................................................................................................... 9

    B. LG Has No Likelihood of Success on the Merits ......................................................... 10

        1. LG Cannot Succeed On its Lanham Act Claim ..................................................... 10

            a. Whirlpool's Advertising Is Not False ................................................................... 10

            b. Whirlpool's Advertising Does Not Confuse Consumers ...................................... 11

            c. Whirlpool's Advertising Claims Are Not Materially False In the
               Consumer Context .............................................................................................. 12

        2. LG Cannot Succeed On Its Claims Under Illinois State Law .................................. 14

            a. The Alleged Wrongful Conduct Did Not Take Place Predominantly In
               Illinois ................................................................................................................. 14

            b. LG's Inability To Succeed On Its Lanham Act Claim Dooms Its Claims
               Under Illinois Law ............................................................................................... 15

Page

  c. LG Is Unable to Satisfy the Elements of Its Claims Under Illinois Law..............15

C. LG Has Suffered and Will Suffer No Irreparable Harm to Its Goodwill..........................15

D. Balance Of The Harms.................................................................................................17

 1. LG Has Less than a Negligible Likelihood of Success................................17

 2. Whirlpool Will Suffer Substantial, Irreparable Harm if an Injunction is Granted.......................................................................................................18

  a. Whirlpool Has Made Substantial Investment in Developing Good Will in the Duet® Steam Dryer .................................................................18

  b. An Injunction Would Irreparably Harm Whirlpool's Reputation in the Home Appliance Industry ......................................................................19

  c. The Harm Whirlpool Faces Is Enhanced by LG's Delay ....................20

  d. LG Fails to Show Any Significant Harm...............................................21

E. Granting An Injunction Would Be Against The Public Interest.......................................21

IV. CONCLUSION.............................................................................................................22

# TABLE OF AUTHORITIES

Page

## Federal Cases

*Abbott Labs v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ................................................................. 9, 13, 16, 19, 21

*Alabama v. Army Corps of Engineers*,
   424 F.3d 1127 (11th Cir. 2005) .................................................................... 9

*Allen Organ Co. v. Galanti Organ Builders, Inc.*,
   798 F. Supp. 1162 (E.D. Pa. 1992), *aff'd*, 995 F.2d 215 (3d Cir. 1993)................. 13

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
   168 F.3d 967 (7th Cir. 1999) ...................................................................... 12

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
   258 F.3d 578 (7th Cir. 2001) ...................................................................... 12

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)................................................................................... 16

*Borden, Inc. v. Kraft, Inc.*,
   No. 84 C 5295, 1984 WL 1458 (N.D. Ill. Sept. 28, 1984)..................................... 17

*Earth Island Institute v. U.S. Forest Serv.*,
   442 F.3d 1147 (9th Cir. 2006) ...................................................................... 9

*Eldon Industries, Inc. v. Rubbermaid, Inc.*,
   735 F. Supp. 786 (N.D. Ill. 1990) ................................................................ 18

*First Health Group Corp. v. BCE Emergis Corp.*,
   269 F.3d 800 (7th Cir. 2001) .................................................................. 11, 12

*First Health Group Corp. v. United Payors & United Providers, Inc.*,
   95 F. Supp. 2d 845 (N.D. Ill. 2000), *aff'd sub nom. First Health Group
   Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) ................................. 11

*Gimix, Inc. v. JS & A Group, Inc.*,
   699 F.2d 901 (7th Cir. 1983) ...................................................................... 15

*Goodman v. Illinois Dep't of Financial & Prof'l Regulation*,
   430 F.3d 432 (7th Cir. 2006) ....................................................................... 9

*Health O Meter, Inc. v. Terraillon Corp.*,
   873 F. Supp. 1160 (N.D. Ill. 1995) .............................................................. 18

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
   191 F.3d 813 (7th Cir. 1999) ...................................................................... 10

Page

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
   27 F. Supp. 2d 1043 (N.D. Ill 1998) ................................................................. 13

*Ideal Industries, Inc. v. Gardner Bender, Inc.*,
   612 F.2d 1018 (7th Cir. 1979) ........................................................................... 17

*Johnson Pub. Co., Inc. v. Willitts Designs Intern., Inc.*,
   No. 98 C 2653, 1998 WL 341618 (N.D. Ill. Jun. 22, 1998) .................................. 20

*Lancaster Foundation, Inc. v. Skolnick*,
   No. 92 C 4175, 1992 WL 211063 (N.D. Ill. Aug. 21, 1992) .................................. 17

*MB Financial Bank, N.A. v. MB Real Estate Services, L.L.C.*,
   No. 02 C 5925, 2003 WL 21462501 (N.D. Ill. Jun. 23, 2003) ............................... 17

*McNeilab, Inc. v. Am. Home Prods. Corp.*,
   848 F.2d 34 (2d Cir. 1988) ......................................................................... 15, 16

*MJ & Partners Rest. Ltd. P'ship v. Zadikoff*,
   10 F. Supp. 2d 922 (N.D. Ill. 1998) .................................................................. 15

*Nav-Aids, Ltd. v. Nav-Aids USA, Inc.*,
   No. 01 C 0051, 2001 WL 1298719 (N.D. Ill. Oct. 25, 2001) ................................ 18

*Ohio Art Co. v. Lewis Galoob Toys, Inc.*,
   799 F. Supp. 870 (N.D. Ill. 1992) .................................................................... 17

*PCI Transp., Inc. v. Forth Worth & W. R.R. Co.*,
   418 F.3d 535 (5th Cir. 2005) ............................................................................. 9

*Planned Parenthood of Wisconsin v. Doyle*,
   162 F.3d 463 (7th Cir. 1998) ............................................................................. 9

*Reins of Life, Inc. v. Vanity Fair Corp.*,
   5 F. Supp. 2d 629 (N.D. Ind. 1997) .................................................................. 20

*Republic Tobacco L.P. v. North Atlantic Trading Co.*,
   2007 WL 1424093 (N.D. Ill. May 10, 2007) ....................................................... 10

*Rock & Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*,
   134 F.3d 749 (6th Cir. 1998) ............................................................................. 9

*SB Designs v. Reebok Int'l, Ltd.*,
   338 F. Supp. 2d 904 (N.D. Ill. 2004) ................................................................ 15

*Schrier v. Univ. of Colorado*,
   427 F.3d 1253 (10th Cir. 2005) .......................................................................... 9

*Schwarz v. Nat'l Van Lines, Inc.*,
   375 F. Supp. 2d 690 (N.D. Ill. 2005) ................................................................ 15

Page

*Stokely-Van Camp, Inc. v. The Coca-Cola Co.*,
   No. 86 C 6159, 1987 WL 6300 (N.D. Ill. Jan. 30, 1987) ........................................................ 20

*Storck USA, L.P. v. Farley Candy Co.*,
   14 F.3d 311 (7th Cir. 1994) .............................................................................. 17, 18, 19, 21

*Two Pesos v. Taco Cabana*,
   505 U.S. 763 (1992) ........................................................................................................ 11

*Ty, Inc. v. Jones Group, Inc.*,
   237 F.3d 891 (7th Cir. 2001) ........................................................................................... 17

*Vogel v. American Soc. of Appraisers*,
   744 F.2d 598 (7th Cir. 1984) ........................................................................................... 17

### State Cases

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   216 Ill. 2d 100, 835 N.W.2d 801 (Ill. 2005) ................................................................. 14, 15

*Dur-Ite Co. v. Indus. Comm'n*,
   394 Ill. 338, 68 N.E.2d 717 (Ill. 1964) .......................................................................... 14

*Phillips v. Bally Total Fitness Holding Corp.*,
   372 Ill. App. 3d 53, 865 N.E.2d 310 (1st Dist. 2007) ...................................................... 14

### Statutes

815 ILCS 510/2 ..................................................................................................................... 15

### Other Authorities

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27.30 (2007) ......... 16

## I.  INTRODUCTION

LG Electronics U.S.A., Inc. ("LG") moves for the extraordinary remedy of a preliminary injunction to enjoin Whirlpool Corporation ("Whirlpool") from using the word "steam" in connection with its Duet® Steam Dryer.  LG's motion should be denied because LG has less than a negligible likelihood of establishing that Whirlpool's claims with respect to steam are false, and LG cannot satisfy the other requirements for obtaining a preliminary injunction.

First, LG advocates an erroneous and overly narrow definition of the word steam for this case.  Whirlpool's use of the word steam is consistent with the commonly-understood definition, which consumers understand and use.  Even LG, outside the context of this litigation, uses the more common definition in its advertising and patent applications.  Indeed, LG's use of the term steam in these other contexts is an admission that the word has a much broader definition than the extremely narrow one that LG asks the Court to adopt for purposes of this lawsuit.  Second, the Duet® Steam Dryer generates steam, even under LG's excessively narrow definition.  The dryer injects a fine mist of water into a drum where Whirlpool *and* LG have measured air temperatures that exceed the boiling point for water, thus creating steam under any definition of the word.  Third, there is no deception, since, as LG acknowledges, Whirlpool has candidly disclosed how it makes steam in the Duet® Steam Dryer.  Moreover, it is undisputed that Whirlpool delivers the *benefits* of steam, which is what ultimately drives consumers' purchase decisions.[1]

LG's claim of urgency is also inconsistent with its own conduct.  LG had notice of Whirlpool's advertising claims in March 2007, but chose not to seek injunctive relief until after it launched its own steam dryer in January 2008.  Such delay undermines LG's claim of "immediate" harm, and it ensures that any injunctive relief would inflict maximum financial and reputational harm to Whirlpool, forcing the removal of thousands of units in the distribution network, and the retraining of thousands of sales associates who sell this product on trade customers' showroom floors.  Whirlpool respectfully requests that the Court deny LG's motion and allow this dispute to be resolved where it belongs—in the showroom, not the courtroom.

---

[1] Ironically, the form of the "steam" that actually refreshes the clothes in LG's Steam Dryer is in a similar form as Whirlpool's.  (Malladi Expert Decl. ¶¶ 11, 45.)  Both LG *and* Whirlpool deliver a similar consumer benefit with steam that LG claims is not really steam for purposes of this lawsuit.

## II.  STATEMENT OF FACTS

A.     **The Whirlpool Duet® Steam Dryer**

    1.     **Overview**

Whirlpool's steam dryer technology was the first to be launched in the United States.[2] (Rogers Decl. ¶ 7.)  The Duet® Steam Dryer's technology provides consumers with benefits that include refreshing clothes that otherwise would need to be rewashed or dry cleaned.  (*Id.* ¶ 8.) The Duet® Steam Dryer generates steam by injecting a fine mist of water into a heated dryer drum.  (*Id.* ¶ 9.)  Temperatures inside the drum, as measured both by Whirlpool and LG, range from less than 100 degrees Celsius, to much greater; the mist mixes with the heat to create steam under any definition of the word.  (Malladi Expert Decl. ¶ 20-36.)  The steam penetrates the clothing to reduce odors and relax wrinkles, much like hanging a wrinkled shirt in a hot and steamy bathroom.[3]  (Rogers Decl. ¶ 9.)  A key feature is the Duet® Steam Dryer's direct connection to the main water source of customers' homes; there is no need to refill a water reservoir in the dryer, as is required in LG's design.

    2.     **Development of the Duet® Steam Dryer**

Whirlpool designed its steam technology with the consumer's ultimate goal in mind:  to save time and money by refreshing clothes in the dryer that might otherwise need to be rewashed or dry cleaned.  (Rogers Decl. ¶ 8.)  Whirlpool's steam technology offers greater ease and convenience than home remedies in applying steam to better penetrate the clothes and more effectively release wrinkles and reduce odors while protecting fabric from shrinkage.  (*Id.* ¶ 9.) The Duet® Steam Dryer confers these benefits in just 15-20 minutes, depending on the size of the load.  (*Id.* ¶ 10.)

During its development, engineering and product development teams held discussions about what the steam dryer should ultimately be called and how to describe it.[4]  (Rogers Decl.

---

[2] Sears' Kenmore® Elite HE5 Steam™ Dryer, which is manufactured by Whirlpool and uses the same steam technology as the Duet® Steam Dryer, actually reached showroom floors shortly before the Duet®.

[3] Whirlpool encouraged salespeople to use the shower analogy in explaining Whirlpool's technology. (Rogers Decl. ¶ 15.)

[4] Internally, the project name for the development of the Duet® Steam Dryer was "Mystique."  Whirlpool, like many companies, uses project names while a product is under development so it can refer to the

¶ 14.)  Whirlpool decided that the word steam was the best way to convey the technology used in the product and the benefits it conferred.  (*Id.*)  The team also concluded that the word steam, in this context, would be especially intuitive to consumers, as it is consistent with many consumers' experiences of hanging clothing in a steamy bathroom to release wrinkles and reduce odors. (*Id.*)  Whirlpool also conducted extensive performance testing as part of Whirlpool's rigorous process for all advertising claims, and it substantiated that the dryer does use steam to effectively relax wrinkles and remove odors.  (Rogers Decl. ¶¶ 16, 30-31.)

### 3.    Launch of the Duet® Steam Dryer

Whirlpool announced the Duet® Steam Dryer on March 19, 2007, through a press release that accurately described the steam technology as "a gentle, but powerful combination of mist and heat in the dryer."  (Rogers Decl. ¶¶ 17, 20.)  Test sells of Whirlpool's steam technology were run in the Kenmore® brand steam dryer in late May and early June 2007, and in the Whirlpool brand in mid-July to mid-September.  Customers reacted favorably to the test sells. (*Id.* ¶¶ 22-23.)  Whirlpool officially launched the product nationally in mid-October 2007 (*id.* ¶ 27), and currently, more than 9,000 retail stores nationwide offer it (*id.*).  Until LG introduced the Tromm Steam Dryer in January 2008, the Kenmore® and Duet® steam dryers were the only steam dryers available in the U.S.  (*Id.* ¶ 28.)

Whirlpool engaged in a massive media and public relations campaign to describe how the dryer created steam.  (Reed-Granger Decl. ¶¶ 10-15.)  Whirlpool's internal sales force worked with retail sales associates nationwide to educate and train them on the key benefits of the Duet® Steam Dryer, such as "the water line from the washer" and using "water vapor" to lift odors and relax wrinkles.  (Rogers Decl. ¶ 24.)  The campaign also made the case for using steam in a dryer, publicity that benefits not only Whirlpool, but any other manufacturer or retailer marketing a steam dryer to consumers.  (Reed-Granger Decl. ¶ 15.)

### 4.    The Duet® Steam Dryer Receives Favorable Reviews.

The Duet® Steam Dryer has been a hit with consumers and retailers, with more than ████ units sold in the first four months of the national launch.  (Rogers Decl. ¶ 33.) Whirlpool is not aware of any retailer suggesting that the Duet® Steam Dryer does not have

---

project without compromising the confidentiality of its research and development process.  Over time, the project name was shortened simply to "Myst."  (Rogers Decl. ¶ 13.)

steam, or that it does not deliver the benefits of wrinkle relaxation and odor reduction.  (*Id.*)  The launch of the Duet® Steam Dryer was widely reported in consumer and trade media.  (Reed-Granger Decl. ¶¶ 11, 13.)  In February 2008, *Consumer Reports* confirmed that the Duet® Steam Dryer provides real consumer benefits, and it did not question whether the technology of a direct water hookup and heat created steam:

> We also tested the steam settings of Kenmore's and Whirlpool's matching dryers.  Both <u>use a water hookup and heat to get rid of wrinkles and odors, and they mostly did so</u> with the shirt we tested.

(Rogers Decl. ¶ 29 and Ex. E thereto (emphasis added).)  *Consumer Reports* rated both the Kenmore® and Duet® steam dryers "excellent," and it gave the Sears Kenmore® Elite HE5 Steam™ dryer the second highest rating of all dryers.  (*Id.* at Ex. E.)

**B.     The Whirlpool Duet® Steam Dryer Uses Steam by Any Definition.**

This lawsuit appears to be the *only* place in which LG insists that the word steam refers exclusively to an invisible gas that can only exist at a temperature of 100 degrees Celsius, or "dry steam."  (LG Mem. of Law at 4; Jacobi Expert Decl. ¶¶ 15-17.)  Everywhere else, LG uses the word steam the same way Whirlpool does in its advertising, and the way it is commonly used in public discourse.  In any event, the Duet® Steam Dryer generates steam under any definition, including the narrow one that LG urges here.

**1.     The Definition of "Steam" Is Broader Than LG Claims In This Litigation.**

**a.     LG's Use of the Word Steam Outside this Litigation**

When it is not suing Whirlpool, LG uses the word steam as it is commonly understood by people generally, not in the narrow sense of Dr. Jacobi's invisible "dry steam."

First, eight days after filing its Complaint, LG issued a press release for a combination washer and dryer, touting a "condensing dryer, which evaporates moisture from damp clothing then cools and condenses the *steam* so that it does not recirculate into the room."  (1/24/08 LG Press Release (emphasis added), Exhibit 1.)  The press release refers to "steam" generated from the interaction of dryer heat and the moisture of "damp clothing."  (*Id.*)  LG's own use of the term steam in advertising is therefore an admission that the word steam accurately describes an environment similar to the Duet® Steam Dryer, and, therefore, that Whirlpool's claims are not false.

Second, LG's use of the word steam in its patent documents is also consistent with the

way Whirlpool uses the word to describe the steam generated in the Duet® Steam Dryer. (Malladi Expert Decl. ¶ 7(c)):

- LG's US Patent Application US 2005/0223504 describes how steam can be generated in a combination washer/dryer when a mist of water is sprayed into hot air.  (*Id.* ¶ 12(f).);
- LG's US Patent Applications 2006/0086001 and 2006/0101589 uses the word steam to describe the water vapor above hot (but not boiling) water in a washing machine.  (*Id.* ¶ 12(d), (e).);
- LG's US Patent 6,941,674 describes steam in a clothes dryer consistent with the common usage of the word steam to depict what LG dismisses as "warm humid air" and "hot, moist air" when describing the operation of the Duet® Steam Dryer in this litigation.  (*Id.* ¶ 12(a).);
- LG's US Patent 7,020,982 explicitly states that steam is generated during the clothes drying process by introducing hot air into the dryer drum.[5]  (*Id.* ¶ 12(b).);
- And LG's US Patent 7,216,654 describes steam caused by passing hot air over wet surfaces in a dishwasher.  (*Id.* ¶ 12(c).)

LG's patent filings are further admissions that its cramped definition of steam in this litigation is artificial and, therefore, that Whirlpool's claims are not false.

Third, LG does not define steam as an invisible gas when describing its steam dryer to consumers.  In marketing materials related to LG's Tromm Steam Washer and Steam Dryer, LG depicts steam as a visible, billowy white vapor.  (LG Marketing Slides, Exhibit 2.)  Nowhere does LG state that the visible steam is not actually steam.  LG also uses a logo mark on the Tromm Steam Dryer that looks like visible, billowy white steam.  (LG Logo, Exhibit 3.)  Such visible, billowy white steam is inconsistent with the definition LG asserts in this lawsuit, i.e., that steam is necessarily an *invisible* gas created by boiling water.

### b.    Correct Technical and Common Use Definitions Consistent with Whirlpool's Technology

Numerous authoritative and peer-reviewed references, including technical and scientific authorities, establish that the word steam has several meanings relating to water, and that the

---

[5] One of LG's arguments is that "any traditional non-steam dryer could claim to be a 'steam' dryer simply by virtue of the fact that water evaporates within the dryer drum from wet clothing."  (LG Mem. of Law at 11.)  This argument ignores that in the case of the Duet® Steam Dryer, *dry*, odoriferous and wrinkled clothing can enjoy the benefits of steam refreshing, a capability conventional dryers lack.  (Malladi Expert Decl. ¶ 15.)

word steam "is not restricted to water vapor at or above 100 C as asserted by LG in this litigation." (Malladi Expert Decl. ¶¶ 8-9; *accord* Levi Expert Decl. ¶¶ 74-75.) LG's expert, Dr. Jacobi, refers to "dry steam," but fails to consider other forms of steam, such as "wet steam." (Malladi Expert Decl. ¶ 9.) The New Oxford American Dictionary describes steam as "a white *mist* of minute water droplets in the air." (Levi. Expert Aff. ¶ 74 (emphasis added).) Numerous other standard American dictionaries define the word steam to include the concept of "visible steam." (*Id.* ¶¶ 74-75.) Further, in an extensive survey of the use of the word steam in the English language by linguistics professor Dr. Judith Levi, it is clearly demonstrated that LG's definition of steam as exclusively an "invisible gas" is artificially narrow. (*Id.* ¶¶ 8-9.) The word steam has multiple meanings, including the visible phenomenon LG calls "mist," and, when used as an adjective, air that is "hot and humid." (*Id.* ¶¶ 37-68.) This explains why people commonly report seeing steam in environments where temperatures are below the boiling point of water, including steam rooms, the shower, and even the outdoors. (*Id.* ¶¶ 52-55.) Clearly, the word steam, as commonly used in the English language, has a much broader definition than an invisible gas above 100 degrees Celsius.

### c.    Other Appliances Use "Steam" in the Common, Consumer Sense.

There are numerous other consumer products, from many different manufacturers, that use the word steam to describe how they operate, even though water temperatures do not reach 100 degrees Celsius. (Malladi Expert Aff. ¶ 18.) Such products include the Dryel clothes refreshing system for use in a dryer, JS Dyna-Tech's Eutopa Steam Tower (a steam bath generator), Bissell's QuickSteamer®, and Edgestar's combination washer dryer. (*Id.*) "The prevalence of the use of the word 'steam' to denote hot water vapor or mists containing mixtures of condensed water droplets in a mixture of air and water vapor are consistent with conventional definitions of the words 'steam'." (*Id.* ¶ 19.)

In sum, LG (in its patent and advertising material outside of this lawsuit), the consumer appliance industry, and the public generally all regularly use the word steam in the same way that Whirlpool does. There is nothing unfounded about Whirlpool's claim to use the word steam in the Duet® Steam Dryer.

### 2.    Whirlpool's Duet® Steam Dryer Meets Even LG's Definition of Steam.

Still, LG claims that the Duet® Steam Dryer does not create steam, because the dryer does not raise the water temperature to 100 degrees Celsius, at 1 atmosphere of pressure. That

allegation is demonstrably false.  Dr. Malladi's testing confirms that "the Duet does, in fact, generate 'steam' in the narrow thermodynamic definition provided by Dr. Jacobi."  (*Id.* ¶ 7(e).)  The testing "conclusively demonstrates that air temperatures within several regions of the Duet® Steam dryer drum are well over 100 degrees C.  This is true before, during, and after the spray period, and both with and without clothing in the dryer."  (*Id.* ¶ 22.)  During the spraying of water, the temperature decreases, "because the water droplets inside the drum are evaporating."  (*Id.* ¶ 25.)  "This is direct evidence that steam, even in the narrow thermodynamic definition asserted by LG in this litigation, exists in the Whirlpool Duet® dryer."  (*Id.*)

Inexplicably, LG's outside engineering expert concluded that the Duet® Steam Dryer does not have "dry steam" based on his "understanding" that the operating temperature of the Duet®'s dryer drum never reaches 100 degrees Celsius.  (Jacobi Expert Aff. ¶ 22.)  Not only is this understanding contradicted by Dr. Malladi's research, *it conflicts with the results of LG's own research engineer*, Dr. Choi, who reported measurements of 123.5° Celsius in the Duet® Steam Dryer, and a temperature of 105.5° Celsius even after water spray.  (Malladi Expert Decl. ¶ 7(f).)  "Dr. Jacobi's conclusions are partly based on a faulty understanding of the operation of the Whirlpool Duet® Steam dryer."  (*Id.* ¶ 29.)  Moreover, LG "did not position its temperature sensors in the hottest parts of the drum."  (*Id.* ¶ 30.)  "If LG performed more meticulous experiments, or carefully reviewed the temperature data they had collected, they would have learned that the Duet® Steam dryer does, in fact, generate 'steam' even in the narrow thermodynamic definition provided by Dr. Jacobi."  (*Id.*)  Dr. Malladi concludes that "[t]he Duet® Steam dryer generates steam in several forms, including the narrow thermodynamic definition of the word 'steam' adopted by LG in this litigation and the common usage of 'steam' found elsewhere, including some of LG's patent applications."  (*Id.* ¶ 37.)

## C.     The Disadvantages of LG's Steam Technology

Unlike the Duet® Steam Dryer, LG's Tromm Steam Dryer generates steam by heating water inside a reservoir.  (Malladi Expert Decl. ¶ 24.)  This technology has at least three distinct disadvantages compared to the technology that Whirlpool uses.  First, it increases the dryer's cost to consumers.  (Compl. ¶¶ 24, 42.)  Second, the rate of steam generation is limited by the heater's ability to transfer heat to the water; "[t]he advantage to the spray process is that the steam is generated almost instantly."  (Malladi Expert Decl. ¶ 24.)  Third, the consumer has to repeatedly refill the water reservoir.  (Rogers Decl. ¶ 11.)

**D.    LG's "Steam" in the Dryer Drum is the Same as Whirlpool's.**

By the time the steam generated by LG's technology travels down a 17-inch length of unheated tubing and enters the dryer drum, it is no longer the invisible gas Dr. Jacobi calls "dry steam."  (Malladi Expert Decl. ¶ 45.)  The vapor has already cooled, evidenced in the LG steam dryer "by water dripping down the back of the drum from the nozzle."  (*Id.* ¶¶ 7(i); 11, 43-45.) As a result, "[c]lothing in the drum of the LG SteamDryer™ is exposed to a mixture of water vapor, water mist and air at temperatures well below 100 C" (*id.* ¶ 7(i)), just like clothing in the Duet® Steam Dryer.  In other words, "[c]lothing in the LG SteamDryer™ experiences warm moist air, and not the narrow thermodynamic definition of 'steam' asserted by LG in this litigation."  (*Id.* ¶ 45.)  Thus, while LG's Dr. Jacobi "correctly asserts that a mist of water is thermodynamically different than dry steam, LG's product does not expose clothing to dry steam."  (*Id.* ¶ 11.)  Quite simply, both LG's and Whirlpool's steam dryers refresh clothes with "wet steam," but Whirlpool generates the steam with less cost and added convenience (no need to fill the water reservoir).  Yet LG is asking the Court to enter an order prohibiting appliance manufacturers from using the word steam unless they make steam using a variation of LG's inferior technology.

**E.    LG's Delay in Filing Suit**

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████ (LG E-mail, LG000243, Exhibit 5; Rogers Decl. at Ex. A.)  ██████████████████████████████████████████████████

██████████████████████ (LG000215, Exhibit 6.)  LG planned to launch its own steam dryer, so July 2007 would have been a logical time to raise an objection to the Duet® Steam Dryer. Instead, LG waited until December 17, 2007, to send Whirlpool a "cease and desist" letter. (12/17/07 Ltr., Exhibit 7.)  Whirlpool responded, explaining that the Duet® Steam Dryer forms steam "when mist is sprayed into the dryer drum where hot air exceeding 100° C is introduced" (1/9/08 Ltr., Exhibit 8), a position that LG refuses to accept despite the confirmatory testing of its own research engineer (Malladi Expert Decl. ¶ 7(f)).  LG filed its Complaint on January 10, 2008, garnering media attention that coincided with LG's launch of its own steam dryer.  By that time, Whirlpool and national retailers had invested significantly in marketing, sales training, and

advertising to build the brand, not only of its new steam dryer, but of the Duet® family of appliances (Rogers Decl. ¶¶ 34-47), and Whirlpool successfully obtained prime floor spots for the Duet® Steam Dryer at thousands of retailers nationwide (*id.* ¶ 37).  Whirlpool had also made the case for using steam in a dryer (Reed-Granger Decl. ¶ 15), publicity from which LG benefited through its delay.

An injunction at this late date would require Whirlpool to replace advertising and point of purchase marketing material at thousands of locations (Rogers Decl. ¶ 36); remove and replace thousands of dryer units on retail sales floors and in warehouses and distribution centers (*id.* ¶ 37); and retrain its own internal field sales training force and then the thousands of retail sales associates who sell the product on trade customers' showroom floors (*id.* ¶ 41).  It would also result in fewer sales of the Duet® Steam Washer, as at least ███% of those who purchased the Duet® Steam Dryer since September 2007 also purchased the Steam Washer.  (*Id.* ¶ 44.)

### III. ARGUMENT

**A.    Legal Standard**

The Seventh Circuit has repeatedly acknowledged that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Goodman v. Illinois Dep't of Financial & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quotation omitted).  A movant is therefore entitled to a preliminary injunction only when its eventual success on the merits is "highly likely," *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463, 465-66 (7th Cir. 1998), a standard that has been adopted, in substance, by most other federal circuits.  *See, e.g, Earth Island Institute v. U.S. Forest Serv.*, 442 F.3d 1147, 1158 (9th Cir. 2006), and *Rock & Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998) ("strong likelihood" of success); *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005), *PCI Transp., Inc. v. Forth Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005), and *Alabama v. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005) ("substantial likelihood" of success).  Though some Seventh Circuit decisions appear to apply a more relaxed standard of proof, requiring the movant to show only "some" likelihood of success, *see, e.g., Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992), the drastic nature of preliminary injunctions makes the more stringent standard of proof the most appropriate.

The Duet® Steam Dryer satisfies LG's overly narrow definition. More importantly, it satisfies the more common consumer definition. Thus, LG cannot prove a likelihood of success under any standard.

**B.    LG Has No Likelihood of Success On the Merits.**

**1.    LG Cannot Succeed On its Lanham Act Claim.**

LG will not prevail on the merits of its Lanham Act claim for three basic reasons: LG has failed to establish that Whirlpool's advertising is literally false, that consumers have been confused, or that any alleged false statements were material.

**a.    Whirlpool's Advertising Is Not False.**

LG has the burden of proving that Whirlpool's advertising is false, *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *Republic Tobacco L.P. v. North Atlantic Trading Co.*, 2007 WL 1424093, at *4 (N.D. Ill. May 10, 2007), something LG cannot do. The only way LG can even suggest that the Duet® Steam Dryer does not have steam is to insist that steam is an invisible gas above 100 degrees Celsius. Clearly, steam has a broader definition than that. Ultimately, however, the Duet® Steam Dryer has this type of steam, as well. By any definition, then, the Duet® Steam Dryer uses steam:

- The "common usage definition of the word steam" (which LG itself uses in its advertising and patents) "encompasses the environment inside the Duet® Steam dryer." (Malladi Expert Aff. ¶ 16.)
- The broad meaning of the word steam includes "visible steam" (necessarily non-gaseous and containing fine water droplets) and hot and humid environments where temperatures do not reach the boiling point. (Levi Expert Decl. ¶¶ 37-68.) This common understanding is consistent with Whirlpool's interpretation of the word steam, and inconsistent with LG's assertion that steam can only mean "invisible steam." (*Id.*)
- Testing "conclusively demonstrates that air temperatures within several regions of the Duet® Steam dryer drum are well over 100 degrees C. This is true before, during, and after the spray period, and both with and without clothing in the dryer." (Malladi Expert Aff. ¶ 22.) During the spraying of water, the temperature drops, because the water droplets inside the drum are evaporating. (*Id.* ¶ 25.) "This is direct evidence that steam, in the narrow thermodynamic definition asserted by LG in this litigation, exists in the Whirlpool Duet® dryer." (*Id.*)

In sum, there should be no dispute that "[t]he Duet® Steam dryer generates steam in several forms, including the narrow thermodynamic definition of the word 'steam' adopted by LG in this litigation and the common usage of 'steam' found elsewhere, including some of LG's patent

applications." (*Id.* ¶ 37.)

The word "steam" clearly has a broad range of meaning. Where a word does not have a fixed definition, courts should be especially reluctant to enjoin an alleged misuse of that word. *First Health Group Corp. v. United Payors & United Providers, Inc.*, 95 F. Supp. 2d 845, 851 (N.D. Ill. 2000), *aff'd sub nom. First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) (refusing to enjoin defendant's use of the phrase "preferred provider organization," or PPO, where that word did not have a fixed definition). To paraphrase the Seventh Circuit, "[w]hat [LG] wants—a judicial decree that only [dryers] using a [boiler] can employ the word ["steam"]—is nothing less than an order establishing property rights in the language. . . . [LG] should have turned to an advertising agency, not to a court . . . ." *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 804-05 (7th Cir. 2001).[6] Because steam has a broader meaning than LG asserts—as confirmed by LG's own use of the word in patent documents and advertising—LG cannot establish literal falsity, and the Court should peremptorily deny LG's request for a preliminary injunction.

**b.    Whirlpool's Advertising Does Not Confuse Consumers.**

Whirlpool has consistently and accurately described how the Duet® Steam Dryer works in its advertising materials and media statements. Whirlpool would never claim its steam dryer contained inferior technology such as a remote boiler to generate steam; rather, Whirlpool has repeatedly disclosed that its steam is created by spraying a fine water mist into a dryer drum infused with heat. (Rogers Decl. ¶¶ 20, 24-25; Reed-Granger Decl. ¶ 12.) LG wrongly asserts that Whirlpool must generate steam like that required to power a locomotive to have the privilege of using the word steam (Compl. ¶ 20), when steam generated by a more efficient and effective technology works at least as well. There is no dispute that the Duet® Steam Dryer

---

[6] Ironically, LG *has* sought to obtain trademark rights in the term "steam" in 20 LG trademark applications, including for steam dryers. (Exhibit 4.) Trademarks must generally be distinctive; a descriptive mark is not granted protection except through long-standing, exclusive use by which it acquires secondary meaning. *Two Pesos v. Taco Cabana*, 505 U.S. 763, 768-69 (1992). When filing for each trademark, LG made a statement, under oath, in which it indicated that LG believed the term "steam" does not describe a function of the product. LG cannot have it both ways – claiming in this lawsuit that Whirlpool's first-to-market "steam" is not descriptive of steam that satisfies LG's overly narrow definition, and in trademark applications that the term "steam" is *not a descriptive term*.

delivers real benefits of steam to consumer — it reduces wrinkles and removes odors. (Rogers Decl. ¶¶ 30-31; *Consumer Reports*.) There is no evidence of confusion to consumers.

LG cites *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967 (7th Cir. 1999), to argue that when an advertising claim is actually false, the plaintiff "does not need to show that the consumers were actually or likely deceived by the statement." (LG Mem. of Law at 9 (citations omitted).) However, *Sanfield* quoted only a rule and provided no analysis. In a later decision in the same case, Judge Easterbrook, writing for a unanimous panel, repudiated that overly simplified statement because *without proof of consumer confusion*, there is no link between an allegedly false ad and a plaintiff's alleged damages. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 258 F.3d 578, 581-82 (7th Cir. 2001). "Proof of likely confusion is <u>essential</u> to show injury—actual or potential—without which there is not even a case or controversy." *First Health*, 269 F.3d at 806 (emphasis added).

Here, LG has failed to offer any evidence of consumer confusion, much less carried its burden of proof. Accordingly, LG is unable to establish that it has suffered or will suffer any injury as a result of Whirlpool's advertising. Because a showing of harm is essential to the grant of an injunction and to the establishment of Article III standing, LG's request for a preliminary injunction should again be denied.

### c.      Whirlpool's Advertising Claims Are Not Materially False In the Consumer Context.

LG's basic position is that if consumers knew that the Duet® Steam Dryer did not use a boiler to generate "dry steam" as defined by a Professor Jacobi, then those consumers would buy LG's steam dryer rather than Whirlpool's. LG's allegation is disingenuous, since by the time LG's steam reaches the dryer drum and clothing, it is not "dry steam," but "warm moist air." (Malladi Expert Decl. ¶ 45.) There is no reason to believe that consumers would choose LG's dryer over Whirlpool's when both use the same form of steam to refresh clothes, simply because LG's steam is generated by a different method that creates "dry steam" *before* it reaches the clothes. (Malladi Expert Decl. ¶ 7(i), 11, 43-45.) This is especially true since Whirlpool generates the same form of steam in a more cost effective and convenient way. (Compl. ¶¶ 24, 42; Rogers Decl. ¶ 11.)

LG's position also ignores that materiality must be determined within the market context in which the alleged false statements are made. Because the Duet® Steam Dryer's steam

delivers the consumer benefit promised (Rogers Decl. ¶¶ 30-31; *Consumer Reports*), there is no ground for an injunction.

In *Abbott Labs*, the Seventh Circuit considered the relevant market for Abbott and Mead's competing products in analyzing the alleged false advertising in that case. 971 F.2d at 10 ("The OES market, unlike typical consumer product markets, is 'professionally driven,' meaning that Abbott and Mead do not promote their product directly to consumers, but rather to physicians and nurses, who in turn recommend them to consumers.") Accordingly, the Seventh Circuit determined that Mead's use of the term "rice carbohydrates" was literally false because its product, Ricelyte, used rice syrup solids, which, "while hydrolytically derived from rice carbohydrates, are not actually 'rice carbohydrates' *as the term is used in the scientific and medical communities*." *Id.* at 9. Moreover, the Seventh Circuit observed that Ricelyte had "few if any of the benefits of . . . rice carbohydrates." In the present case, the Whirlpool Duet® Steam Dryer provides exactly the benefits and characteristics of steam to relax wrinkles and remove odors from clothes, just like the way the steam works inside LG's steam dryer.

Where these dryers are advertised and marketed to consumers, not engineers, the materiality analysis is properly focused on whether Whirlpool has falsely represented that the Duet® Steam Dryer has certain qualities of steam that consumers consider relevant when purchasing a steam dryer and whether *consumers* consider it material to purchasing decisions whether the Duet® Steam Dryer generates steam in the narrow sense LG urges in this lawsuit. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 27 F. Supp. 2d 1043, 1048 (N.D. Ill 1998) (concluding that questions of fact remained as to whether defendant's advertising of its wax products "while not meeting the chemical definition of a wax - falsely represent that they have certain qualities that are material to a consumer's decision to purchase the product" because there were different understandings of the term "wax" in the car wash industry and among consumers); *see also Allen Organ Co. v. Galanti Organ Builders, Inc.*, 798 F. Supp. 1162, 1167-70 (E.D. Pa. 1992), *aff'd*, 995 F.2d 215 (3d Cir. 1993) (challenged advertising claims about the technology used in an electronic digital organ were not material to consumers). Here, the Duet® Steam Dryer provides the qualities of steam that consumers consider relevant to make a purchase decision. This reality is reflected in the recent *Consumer Reports* analysis of steam dryers, which focused on how the dryers performed, not the technology used in each dryer (unless the technology did not work). (*See Consumer Reports* Article, attached to Rogers Decl. as Ex. E.) A preliminary injunction is

wholly inappropriate, particularly where LG's own steam is not "dry steam" by the time it reaches the dryer drum and clothing, but "warm moist air." (Malladi Expert Decl. ¶ 45.)

### 2.    **LG Cannot Succeed On its Claims Under Illinois State Law.**

#### a.    **The Alleged Wrongful Conduct Did Not Take Place Predominantly In Illinois.**

LG's state law claims fail as a matter of law because the alleged wrongful conduct took place largely outside of Illinois. The Illinois Supreme Court has long recognized that its laws have no extraterritorial effect unless there is a "clear intent" to the contrary. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 184-85, 835 N.E.2d 801, 852 (Ill. 2005), citing *Dur-Ite Co. v. Indus. Comm'n*, 394 Ill. 338, 68 N.E.2d 717 (Ill. 1946) (recognizing state statutes are without extraterritorial effect unless "an intent to do so is clearly expressed"). Consistent with this principle, a plaintiff may pursue claims under the Illinois Consumer Fraud and Deceptive Business Practice ("Consumer Fraud Act") and the Illinois Deceptive Trade Practices Act ("Trade Practices Act") only "if the circumstances that relate to the disputed transaction occur *primarily and substantially in Illinois*." *Phillips v. Bally Total Fitness Holding Corp.*, 372 Ill. App. 3d 53, 58, 865 N.E.2d 310, 315 (1st Dist. 2007), quoting *Avery*, 216 Ill. 2d at 187, 835 N.E.2d at 854 (emphasis added). In applying this test (which the *Avery* court concluded was not formulaic), the court concluded that the nationwide class could not pursue claims under the Consumer Fraud Act because nearly all of the named plaintiffs resided outside Illinois and suffered damages outside the state, as well. *Id.* at 187-90, 835 N.E.2d at 853-55.

Similarly here, Illinois' connection to the transactions that underlie the parties' dispute is minimal at best. While both parties market and sell dryers in Illinois, they also market and sell dryers in every other state. Additionally, both parties' principal business operations are outside Illinois. In particular, LG's principal place of business is in New Jersey and, therefore, its alleged injuries occurred there. LG nevertheless filed this lawsuit in the Northern District of Illinois because the Seventh Circuit arguably offers a more favorable preliminary injunction standard. As discussed above, some Seventh Circuit panels have imposed a lower burden for proving the likelihood of success on the merits. But LG should not be rewarded for forum shopping. Because Illinois law bears little connection to the parties' dispute, LG's state law

claims (brought under Illinois law) should be dismissed.[7]

### b.    LG's Inability to Succeed On Its Lanham Act Claim Dooms Its Claims Under Illinois Law.

Even if applicable here, LG's state law claims rise and fall based on its Lanham Act action.  Where the factual allegations underlying a plaintiff's state law claims, such as the claims asserted here, form the basis for its claims under the Lanham Act, the legal inquiry is the same.[8] *SB Designs v. Reebok Int'l, Ltd.*, 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004), citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir. 1983); *see also MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998) (recognizing legal inquiry under Lanham Act mirrors that under Consumer Fraud Act and Trade Practices Act).  Because LG cannot succeed on its Lanham Act claim, its state law claims also fail and must be dismissed.  *Id.*

### c.    LG Is Unable to Satisfy the Elements of Its Claims Under Illinois Law.

To prevail in a private cause of action under the Consumer Fraud Act, LG must prove: (1) a deceptive act or practice, (2) Whirlpool's intent that LG rely on the deception, (3) the deceptive conduct involved commerce, (4) LG suffered actual damage, and (5) such damage was proximately caused by the deception.  *Avery*, 216 Ill. 2d at 190-91, 835 N.E.2d at 856.  Similarly, to prevail on its other state law claims (unfair competition and violation of the Trade Practices Act), LG must prove that Whirlpool engaged in trade practices that deceived consumers and caused harm to LG.  *See* 815 ILCS 510/2; *see also MJ & Partners*, 10 F. Supp. 2d at 929 (recognizing that Trade Practices Act codified common law unfair competition claim).  LG fails to provide evidence in support of these claims and, therefore, they fail as a matter of law.

### C.    LG Has Suffered and Will Suffer No Irreparable Harm to Its Goodwill.

LG asserts that injuries arising from Whirlpool's Lanham Act violations are irreparable because it is virtually impossible to ascertain the precise economic consequences of the damage

---

[7] While LG assumes, without analysis, that Illinois law applies to its state law claims, Whirlpool makes no such assumption.  In fact, based on its choice of law analysis, Michigan, not Illinois, law applies to these claims.  *E.g.*, *Schwarz v. Nat'l Van Lines, Inc.*, 375 F. Supp. 2d 690, 698-703 (N.D. Ill. 2005).

[8] Additionally, LG even concedes that the elements of a claim under the two Illinois statutes and Illinois common law "are substantially the same as a claim for relief under Section 43(a) of the Lanham Act." (LG Mem. of Law at 15, 17 (citations omitted).)

to LG's business reputation and goodwill.  (LG Mem. of Law. at 13-14 (citations omitted).)
What LG fails to acknowledge is that, according to the very case law LG cites, its rule applies
only to a false *comparative* advertising claim.  *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848
F.2d 34, 38 (2d Cir. 1988).[9]  In a case involving misleading, non-comparative advertising that
touts the benefits of the product advertised but makes no direct reference to any competitor's
product, there should be no presumption.  Thomas McCarthy, *McCarthy on Trademarks and
Unfair Competition* § 27.30 (2007) (presumption of harm is justified only in case of false
comparative advertising).

LG is forced to rely on a presumption of irreparable harm, because it has proffered no
evidence of damage or even the likelihood of damage to its goodwill and business reputation.
LG simply makes the unsupported statement that "Whirlpool's misleading television, print, and
online advertising stating that its Duet® Steam Dryer uses steam, that drying with steam is
superior, and that drying with steam was Whirlpool's 'innovation,'" diminishes LG USA's
goodwill . . . and tarnishes and diminishes LG USA's reputation."  (LG Mem. of Law at 14).
(LG also claims, without factual support, that Whirlpool's advertising diverts sales, which, even
if assumed true, shows that LG's harm is compensable and no preliminary injunction is
necessary.)  LG's unsupported assumption is not enough to show irreparable harm.

To begin, LG's argument that its goodwill and reputation will be harmed if Whirlpool is
not enjoined is entirely dependent on LG's claim that Whirlpool is making a literally false claim
about the Duet® Steam Dryer.  LG does not even attempt to explain why advertising that does
not even mention LG or LG's technology could possibly harm LG's goodwill or reputation.  In
any event, the Duet® Steam Dryer has steam by any definition.

In addition, any suggestion of irreparable harm is belied by the fact that, as early as
March 2007, and certainly no later than July 2007, LG knew the technology underlying
Whirlpool's claim to steam.  If LG was truly concerned about the irreparable harm to its
reputation and good will, it would have filed suit as soon as it learned of Whirlpool's claims.
*Blum v. Yaretsky*, 457 U.S. 991, 1000-01 (1982) ("'One does not have to await the

---

[9] The Seventh Circuit applied the presumption of irreparable harm in *Abbott* because there was "no doubt"
that the defendant's advertising campaign, which attempted to convince consumers that the plaintiff had
an inferior product, had dented the plaintiff's reputation.  971 F.2d at 16, citing *McNeilab*, 848 F.2d at 38.

consummation of threatened injury to obtain preventive relief.' '[T]he question becomes whether any perceived threat . . . is sufficiently real and immediate to show an existing controversy. . . .'")

This is especially true considering that LG itself alleges that a "key element" of its irreparable injury results from Whirlpool's claim that it was the innovator of the steam dryer. Such injury would have begun the moment Whirlpool began describing its new steam dryer to the market and was not contingent on LG's dryers being available in the marketplace. Instead, LG waited ten months, while Whirlpool invested in educating the market about the benefits of a steam dryer. (Reed-Granger Decl. ¶ 15.) LG's ten month delay in seeking a preliminary injunction calls into doubt LG's claim that it is experiencing *any* irreparable harm, and it certainly rebuts any theoretical presumption of such harm. *See*, *e.g.*, *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902-03 (7th Cir. 2001), citing *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979); *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F. Supp. 870, 887 (N.D. Ill. 1992); *Lancaster Foundation, Inc. v. Skolnick*, No. 92 C 4175, 1992 WL 211063, at *5 (N.D. Ill. Aug. 21, 1992); *Borden, Inc. v. Kraft, Inc.*, No. 84 C 5295, 1984 WL 1458, at *16-17 (N.D. Ill. Sept. 28, 1984). Even in comparative advertising cases, where irreparable harm is presumed, "that presumption is overcome where the plaintiff delays in seeking injunctive relief, and a court may infer from this delay that there is no threat of irreparable harm." *MB Financial Bank, N.A. v. MB Real Estate Services, L.L.C.*, No. 02 C 5925, 2003 WL 21462501, *19-21 (N.D. Ill. Jun. 23, 2003) (plaintiff failed to show irreparable harm, where plaintiff waited more than nine months to seek preliminary injunction after notice of alleged infringing activity).

## D.    <u>Balance Of The Harms</u>

The Court should only consider the balance of harms between the two parties if it is satisfied that LG has met its burden of proving the three threshold conditions for preliminary injunctive relief:  (1) a likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm if the injunction is not granted. *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir. 2001). For all the reasons discussed above, the Court's analysis should stop there since LG has failed to shoulder its burden. In addition, the balance of harms weighs heavily in Whirlpool's favor and against entry of a preliminary injunction.

### 1.    <u>LG Has Less than a Negligible Likelihood of Success</u>.

At the balancing stage, the Court must first decide how strong LG's likelihood of success

is. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994); *Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 600 (7th Cir. 1984). Where a plaintiff has shown little chance of success on the merits, the district court should require the plaintiff to make a stronger showing of irreparable harm in order to prevail in the balance of harms analysis. *Storck*, 14 F.3d at 314.

As explained above, LG has less than a negligible likelihood of success of prevailing in this case, and that is reason enough to deny the motion for preliminary injunction. *See*, *e.g.*, *Health O Meter, Inc. v. Terraillon Corp.*, 873 F. Supp. 1160, 1176 (N.D. Ill. 1995); *Nav-Aids, Ltd. v. Nav-Aids USA, Inc.*, No. 01 C 0051, 2001 WL 1298719, at *7 (N.D. Ill. Oct. 25, 2001). Because the likelihood is less than negligible of LG proving that Whirlpool's use of the word steam is misleading in any way, the balance of harms analysis weighs substantially in Whirlpool's favor.

>        2.       **Whirlpool Will Suffer Substantial, Irreparable Harm if an Injunction is Granted**.
>
>                 a.       **Whirlpool Has Made Substantial Investment in Developing Good Will in the Duet® Steam Dryer**.

Whirlpool would suffer significant irreparable harm if a preliminary injunction is issued. Whirlpool has been advertising and marketing its Duet® Steam Dryer since March 2007. (Rogers Decl. ¶¶ 17-20.). It has invested hundreds of thousands of dollars on its marketing strategy, product training literature, advertising campaign, and showroom floor placement. (*Id.* ¶¶ 36-38.) As a result of this strategy, consumers have embraced the Duet® Steam washer technology, purchasing more than ███████ units in the first four months. (*Id.* ¶ 33.) If Whirlpool were to suddenly pull all of its steam dryers out of retail stores, Whirlpool will lose the good will it has built with consumers and retailers, and Whirlpool's steam dryer offering will be permanently damaged, even if Whirlpool eventually prevails on the merits. (Reed-Granger Decl. ¶¶ 19-26.) *Eldon Industries, Inc. v. Rubbermaid, Inc.*, 735 F.Supp. 786, 826-27 (N.D. Ill. 1990) (harm to defendant's "reputation and credibility" from "being compelled abruptly to discontinue sales of two popular products should not be minimized."). LG should not be permitted to co-opt the benefits of Whirlpool's investment in educating the market on steam dryers and the good will associated with Whirlpool's steam dryer, and besmirch Whirlpool's reputation, based on an arguably frivolous advertising claim. This is especially true where, as here, LG does not even allege that Whirlpool's steam dryer does not perform the claimed benefits.

**b.**     **An Injunction Would Irreparably Harm Whirlpool's Reputation in the Home Appliance Industry.**

Moreover, in weighing the harm of an injunction to Whirlpool, the Court needs to consider the negative spillover an injunction concerning the Duet® Steam Dryer will have to Whirlpool's reputation generally and its other product lines, including its steam washer.  *See Abbott Laboratories*, 971 F.2d at 17; *Storck USA, L.P.*, 14 F.3d at 315-16.

An injunction would directly impact sales, not just of the Duet® Steam Dryer, but of the Duet® Steam Washer as well, in ways that will be difficult to quantify.  (Reed-Granger Decl. ¶ 22.)  In the laundry market, consumers typically make purchasing decisions about washers and dryers in combination.  (Rogers Decl. ¶ 19, 40.)  Inevitably, if consumers are unable to purchase a steam dryer from Whirlpool (either because the product has been pulled from the market or because Whirlpool is enjoined from marketing its product as a steam dryer), it will negatively affect the sales of Whirlpool's Duet® Steam Washer because no matching set would appear to be available.  (*Id.* ¶ 44.)  Since September 2007, at least ███% of those who purchased the Duet® Steam Dryer also purchased the matching Steam Washer.  (*Id.* ¶ 44.)

Moreover, granting LG's motion would act as a "virtual injunction" against Whirlpool's sale of steam dryers to Sears, which re-sells them under its Kenmore® brand, and create similar issues as those described above with respect to the Kenmore® brand steam dryer and steam washer.  (Rogers Decl. ¶ 42.)

In addition, the media, consumers, and competitors are likely to perceive any retraction of Whirlpool's message as an admission that the dryer is not effective or safe, or that it has other problems.  (Reed-Granger Decl. ¶ 20.)  This would create a negative image for Whirlpool about this product's quality even though LG has not challenged the Duet® Steam Dryer's effectiveness in reducing odors and relaxing wrinkles in clothing.  (*Id.*)  Whirlpool's credibility with media sources and endorsers would also be severely damaged.  Whirlpool would likely find it much more difficult to obtain positive media coverage of any of its future products or innovations, thus losing one of the most important tools for product marketing – not just for the Duet® Steam Dryer, but for all Whirlpool products.  (*Id.* ¶¶ 21-23.)

Finally, the Whirlpool Duet® is a flagship brand name for Whirlpool laundry, with a halo effect over all laundry products, driving more sales across product lines.  (Rogers Decl. ¶ 12.) An injunction and withdrawal from the market will negate the halo and create a long shadow that

will damage Whirlpool in many ways that have nothing to do with the steam dryer. (Reed-Granger Decl. ¶¶ 23-25.) That shadow is magnified by the power of the Internet, which, through message boards, social networking sites, blogs, and the like will cause Whirlpool substantial harm that is practically irreversible, even if Whirlpool ultimate prevails on the merits. (*Id.* ¶ 25.)

### c.     The Harm Whirlpool Faces Is Enhanced by LG's Delay.

The harm to Whirlpool is exacerbated by the fact that LG intentionally delayed seeking relief until after Whirlpool had invested substantial resources into developing its advertising and marketing messages with consumers, retailers, and media, and after Whirlpool had sold and distributed many thousands of the steam dryers to retailers throughout the country. LG, solely as a result of its own delay in bringing forward its objections, has unduly multiplied the potential harm to Whirlpool, including costs that arise from having to pull a product and a marketing campaign to which Whirlpool has associated its reputation for over ten months.

Wholly aside from Whirlpool's reputational damage, LG's delay has created a logistical nightmare. If enjoined, Whirlpool will have to remove point of purchase marketing material at thousands of locations (Rogers Decl. ¶ 36); remove and replace thousands of dryer units already in the distribution network (*id.* ¶ 37); and retrain not only its own field personnel, but the thousands of retail sales associates who sell the product on trade partners' showroom floors (*id.* ¶ 41). Replacing advertising and relabeling the dryers will cost ███████████ (*id.* ¶¶ 39-40), and it is unclear whether Whirlpool will ever be able to regain favorable locations in limited trade showrooms (*id.* ¶ 38.) And perversely, LG will have benefited from its delay because Whirlpool has already made the case to consumers why steam should be used in a dryer. (Reed-Granger Decl. ¶ 15.)

LG's delay in objecting to Whirlpool's campaign indicates that "the extraordinary remedy of a preliminary injunction" is both unnecessary and inappropriate. *Stokely-Van Camp, Inc. v. The Coca-Cola Co.*, No. 86 C 6159, 1987 WL 6300, at *2-3 (N.D. Ill. Jan. 30, 1987) (balance of hardships favored denying preliminary injunction where plaintiff waited three months before filing suit). In light of this delay, LG's "weak evidence of irreparable injury is easily overcome by the unrebutted evidence that [Whirlpool] would suffer great harm if an injunction were issued." *Johnson Pub. Co., Inc. v. Willitts Designs Intern., Inc.*, No. 98 C 2653, 1998 WL 341618, at *8-9 (N.D. Ill. Jun. 22, 1998) (four month delay by plaintiff in seeking injunction demonstrated lack of irreparable injury needed for preliminary relief); *Reins of Life,*

*Inc. v. Vanity Fair Corp.*, 5 F.Supp.2d 629, 632 (N.D. Ind. 1997) (balance of harms weighed "heavily" against preliminary relief where plaintiff delayed bringing request for injunction for months during which defendant's marketing campaign became entrenched).

### d.    LG Fails to Show Any Significant Harm.

As already noted, LG has no proof of actual harm if its motion for preliminary relief is denied.  Beyond a "presumed" harm to reputation and goodwill that is not recognized in this context and which is rebutted in any event, LG points to nothing concrete.  Indeed, LG's existing advertising and marketing is already designed to compare and distinguish the different steam generation technologies used in the two dryers, including the use of the mark TrueSteam™ to imply that its steam is somehow better than Whirlpool's steam (Rogers Decl. ¶ 21), even though LG's steam is the same as Whirlpool's by the time it reaches the clothing (Malladi Expert Decl. ¶ 45.)  If consumers want steam produced the way LG does it, they will buy the LG product.  If, instead, they care about getting the benefits of wrinkle relaxation and odor reduction most efficiently and economically, they will buy Whirlpool's product.  Additionally, as discussed above, sales of dryers are typically driven by sales of corresponding washers.  (Rogers Decl. ¶¶ 19, 44.)  Having failed to submit any evidence that Whirlpool's advertising is damaging or will damage LG's goodwill and business reputation, LG has failed to show any significant harm.

### E.    Granting An Injunction Would Be Against The Public Interest.

As the Seventh Circuit has observed, "[i]t is a rare case where purging a safe and effective product serves broad societal interests." *Abbott Laboratories*, 971 F.2d at 18-19.  That observation rings true with particular clarity here, where a judicially imposed and unnecessarily narrow definition of the word steam will result in higher consumer costs, fewer consumer choices, and less competitive innovation.

No one disputes that Whirlpool's technology provides the consumer benefits of refreshing clothes.  (Rogers Decl. ¶¶ 30-31; LG Resp. to Mot. to Compel at 1-2 (performance of the parties' respective dryers is not at issue).)  LG itself acknowledges that Whirlpool's technology is more cost efficient than LG's.  (Compl. ¶ 24, 42.)  It is contrary to the public interest to require consumers to pay more for a similar benefit based on an unfounded scientific definition that makes no difference to consumers.  *See Storck USA, L.P.*, 14 F.3d at 315-16.  It is unnecessary and inefficient to force manufacturers to invest in and consumers to pay for steam generated in the way used to power a train (Compl. ¶ 20), when the job at hand is refreshing clothes.

An injunction would also result in fewer technology choices for consumer. As Dr. Malladi reports, steam can be generated in more than one way, and there are advantages in addition to cost savings in the type of steam that Whirlpool's dryer generates, including speed (Malladi Expert Decl. ¶ 24), and efficiency (Rogers Decl. ¶ 11). Adopting LG's narrow definition of the word steam would also deprive consumers of the benefits of LG's technology, since it, too, provides consumers benefits with "wet steam." (Malladi Expert Decl. ¶ 7(i).)

Third, a narrow definition of steam would result in decreased innovation to provide steam technology beneficial to consumers in laundry and other product categories. As Dr. Malladi notes, there are many other appliances on the market that make use of the benefits of steam that is not generated by boiling water. (Malladi Expert Decl. ¶¶ 18-19.) The public's interest in inexpensive access to this technology also supports denying LG's request for injunctive relief.

Finally, an injunction against Whirlpool will also effectively operate as a virtual injunction against non-party Sears, interrupting the sales of the Kenmore® HE5 Steam™ dryer as well. (Rogers Decl. ¶ 42.) That result makes no sense, particularly where Sears has independently tested the technology and determined that use of the word steam is appropriate for labeling and advertising. (*Id.* ¶ 32.)

## IV.    <u>CONCLUSION</u>

The word steam has a broad definition, as confirmed by its use and meaning in public discourse, the consumer appliance industry, and in LG's own advertising and patent documents. The advertising for Whirlpool's Duet® Steam Dryer uses the word steam properly under any definition, even the narrow one LG advances in this lawsuit. An injunction prohibiting Whirlpool's use of the word steam would have grave consequences, not only for Whirlpool, but for consumers, who will be forced to pay for boilers when something much more simple will provide the steam that confers the benefits those consumers desire. Because this dispute is far better suited for the showroom, rather than the courtroom, Whirlpool respectfully requests that this Court deny LG's motion for a preliminary injunction.

Dated: February 11, 2008

Respectfully submitted,
WHIRLPOOL CORPORATION

/s/  Brian D. Roche
Brian D. Roche
Carey L. Bartell
Vanessa C. Martí
REED SMITH LLP
10 South Wacker Drive, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 207-1000

J. A. Cragwall, Jr.
John J. Bursch
Warner Norcross & Judd LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, Michigan 49503-2487
Telephone (616) 752-2000

Attorneys for Defendant, Whirlpool
Corporation