**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LG ELECTRONICS U.S.A., INC.,** | ) | |
| a subsidiary of  LG Electronics, Inc., | ) | |
| a Korean company | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.  08 C 242** |
| **v.** | ) | |
| | ) | **Judge St. Eve** |
| **WHIRLPOOL CORPORATION,** | ) | |
| | ) | **Magistrate Judge Mason** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF LG ELECTRONICS U.S.A., INC.'S REPLY IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Ronald Y. Rothstein
rrothstein@winston.com
Bryna J. Dahlin
bdahlin@winston.com
David A. Latchana
dlatchana@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
(312) 558-5600 – telephone
(312) 558-5700 – facsimile

*Counsel for LG Electronics
U.S.A., Inc.*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 4

I.   LG USA Is Likely to Succeed on the Merits ....................................................... 4

A.  The Benefits and Importance of Real Steam ................................................. 5

B.  Whirlpool's Dryer Cannot Create Steam ....................................................... 5

C.  Whirlpool is Responsible for All Reasonable Interpretations of Its Advertising .............. 7

D.  Dr. Malladi's "Tests" Fail to Establish that the Duet® Steam Dryer Creates Steam ......... 8

1.  The Court Should Decline to Accept Whirlpool's Invitation to Act as Standard-Bearer for the Laundry Care Industry ................................ 9

2.  Dr. Malladi's Testing Methodology is Unreliable .................................... 10

a.  Dr. Malladi's Testing Bears None of the Hallmarks of Good Science ................ 11

b.  Dr. Malladi's Testing is Riddled With Errors ..................................... 12

3.  Whirlpool's Duet® Steam Dryer Does Not Create Steam Under *Any* Definition Advanced In This Litigation ................................................. 13

4.  As a Matter of Law, Whirlpool Cannot Claim its Cold Water Mist System is Steam Merely Because it May Provide Some of the Same Benefits as Steam ..................... 15

E.  Alternate Definitions and Uses of the Word "Steam" are Irrelevant and Do Not Demonstrate that the Duet® Steam Dryer Creates Steam ............................... 17

1.  Dr. Levi's Report Is Wholly Irrelevant ................................................... 17

2.  Press Releases from Other Countries are Irrelevant ............................... 18

3.  Terms in Patents and Patent Applications are Likewise Irrelevant ........... 19

F.  LG USA Need Not Demonstrate Consumer Confusion ............................... 19

G.  Whirlpool's False Advertising is Material, and is Likely to Influence Purchasing Decisions ................................................. 20

II.  LG USA Is Suffering Substantial Irreparable Harm ........................................... 21

A.  LG USA Is Entitled to the Presumption of Irreparable Harm ...................... 21

B.  LG USA Has Conclusively Demonstrated Irreparable Harm ....................... 22

C.  There Was No Delay by LG USA in Bringing its Preliminary Injunction Motion .......... 22

III. The Harm to Whirlpool Would Be Minimal ........................................................ 23

IV.  The Public Interest Is Best Served By Prohibiting False Advertising .................. 25

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

*Abbott Labs. v. Mead Johnson & Co.,*
    971 F.2d 6 (7th Cir. 1992) ............................................................... 21, 22, 23, 25

*Alpo Petfoods, Inc. v. Ralston Purina Co.,*
    720 F. Supp. 194 (D.D.C. 1989) ............................................................... 10, 13

*Anheuser-Busch, Inc. v. The Stroh Brewery Co.,*
    750 F.2d 631 (8th Cir. 1984) ............................................................... 18

*Avon Products v. S.C. Johnson & Sons,*
    984 F. Supp. 758 (S.D.N.Y. 1997) ............................................................... 10

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,*
    168 F.3d 967 (7th Cir. 1999) ............................................................... 20

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,*
    258 F.3d 578 (7th Cir. 2001) ............................................................... 20

*Brown & Brown, Inc. v. Ali,*
    494 F. Supp. 2d 943 (N.D. Ill. 2007) ............................................................... 4

*Castrol v. Pennzoil Co.,*
    799 F. Supp. 424 (D.N.J. 1992) ............................................................... 9

*Derby Industries, Inc. v. Chestnut Ridge Foam, Inc.,*
    202 F. Supp. 2d 818 (N.D. Ind. 2002) ............................................................... 20

*Eldon Industries, Inc. v. Rubbermaid, Inc.,*
    735 F. Supp. 786 (N.D. Ill. 1990) ............................................................... 24

*Eli Lilly & Co. v. Natural Answers, Inc.,*
    233 F.3d 456 (7th Cir. 2000) ............................................................... 23

*Ellipse Corp. v. Ford Motor Co.,*
    452 F.2d 163 (7th Cir. 1971) ............................................................... 19

*First Health Group Corp. v. BCE Emergis Corp.,*
    269 F.3d 800 (7th Cir. 2001) ............................................................... 20

*Health O Meter v. Terraillon Corp.,*
    873 F. Supp. 1160 (N.D. Ill. 1995) ............................................................... 22

Table of Authorities
(continued)

Page

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999)......................................................................................20, 21

*Ideal Indus., Inc. v. Gardner Bender, Inc.*,
    612 F.2d 1018 (7th Cir. 1979)................................................................................... 23

*Ind. Civ. Liberties Union v. O'Bannon*,
    259 F.3d 766 (7th Cir. 2001)......................................................................................... 4

*JR Tobacco v of America v. Davidoff of Geneva*,
    957 F. Supp. 426 (S.D.N.Y. 1997) .............................................................................16, 17

*Leonard v. United Air Lines*,
    972 F.2d 155 (7th Cir. 1992)....................................................................................... 23

*Lockformer Co. v. PPG Indus.*,
    264 F. Supp. 2d 622 (N.D. Ill. 2003) ............................................................................ 19

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)..................................................................................................... 19

*Maytag Corp. v. Whirlpool Corp.*,
    95 F. Supp. 2d 888 (N.D. Ill. 2000)................................................................................ 19

*Mead Johnson & Co. v. Abbott Labs.*,
    41 F. Supp. 2d 879 (N.D. Ill. 1999)................................................................................ 22

*Merisant Co. v. McNeil Nutritionals, LLC*,
    242 F.R.D. 315 (E.D. Pa. 2007) .............................................................................10, 12, 18

*National Com. on Egg Nutrition v. FTC*,
    570 F.2d 157 (7th Cir. 1977)......................................................................................... 7

*Nilssen v. Motorola, Inc.*,
    80 F. Supp. 2d 921 (N.D. Ill. 2000)................................................................................ 19

*Novartis Consumers Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002)........................................................................................... 8

*Planned Parenthood of Wisconsin v. Doyle*,
    162 F.3d 463 (7th Cir. 1998)........................................................................................ 4

*Promatek Indus., Ltd. v. Equitrac Corp.*,
    300 F.3d 808 (7th Cir. 2002).......................................................................................... 21

Table of Authorities
(continued)

Page

*S.C. Johnson & Sons v. Clorox Co.*,
   930 F. Supp. 753 (S.D.N.Y. 1996) ................................................................... 11

*Sherrell Perfumers, Inc. v. Revlon, Inc.*,
   483 F. Supp. 188 (S.D.N.Y. 1980) ................................................................... 16

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997).......................................................... 10, 11, 12, 13

*Ty, Inc., v. Jones Group Inc.*,
   237 F.3d 891 (7th Cir. 2001)............................................................................ 23

*W.L. Gore & Assoc. v. Totes, Inc.*,
   788 F. Supp. 800 (D. Del. 1992) ..................................................................16, 17


**STATE CASES**

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   216 Ill. 2d 100 (Ill. 2005)................................................................................. 25

*Barbara's Sales, Inc. v. Intel Corp.*,
   227 Ill. 2d 45 (Ill. 2007).................................................................................. 25


**DOCKETED CASES**

*Energizer Holdings, Inc. v. Duracell, Inc.*,
   No. 01 C 9720, 2002 WL 1067688 (N.D. Ill. May 28, 2002)............................. 20

*Logan Graphic Products, Inc. v. Textus USA, Inc.*,
   No. 02 C 1823, 2002 WL 31507174 (N.D. Ill. Nov. 8, 2002) ........................... 20

*Nat'l Council of YMCA v. Human Kinetics Publishers, Inc.*,
   No. 05 C 5034, 2006 WL 752950 (N.D. Ill. Mar. 15, 2006) ............................. 22

*Republic Tobacco L.P. v. North Atlantic Trading Co.*,
   No. 06 C 2738, 2007 WL 1424093 (N.D. Ill. May 10, 2007)............................. 20

*ZCM Asset Holding Co. (Bermuda) Ltd. v. Allamian*,
   No. 01 C 6250, 2002 U.S. Dist. Lexis 24471 (N.D. Ill. December 19, 2002) ........................ 4

Table of Authorities
(continued)

Page

**OTHER AUTHORITIES**

*Bayer Corporation (Aleve)*,
   NAD Case No. 4126 (December 2003) ................................................................. 7

*Discover Card Cash Rewards Program*,
   NAD Case No. 4779 (January 2008) ................................................................. 7

*McCarthy on Trademarks and Unfair Competition* § 27.30 (2007) ......................................... 21

*McNeil, PPC, Inc.*,
   NAD Case No. 4248 (November 2004) ................................................................. 7

*Natural White, Inc.*
   NAD Case No. 3995 (January 2003) ................................................................. 7

*Whirlpool Corp.*,
   NAD Case No. 3252 (November 1995) ................................................................. 7

## INTRODUCTION

Whirlpool's Opposition is a remarkable attempt at obfuscation and is littered with disingenuous assertions regarding the claims at issue in this case. Whirlpool has attempted, through blatant mischaracterization, to pigeonhole LG USA's argument and erect a straw man: if there is only one common and ordinary meaning of steam, LG USA wins; if there are several, Whirlpool wins. Contrary to Whirlpool's self-serving construction of the issues in this case, LG USA has never confined itself or Whirlpool to restrictive definitions known only to scientists hiding in sterile laboratories conspiring to re-write the English dictionary. The problem Whirlpool faces is that its system does not create steam by any reasonable definition contained in any dictionary or encyclopedia.

The real issue in this case is whether the Court should accept Whirlpool's junk science slapped together in a desperate attempt to save its advertising claims in the weeks after LG USA's filing of this lawsuit in January 2008. Whirlpool freely admits it relies on no science or testing conducted prior to LG USA's filing of this case. It is apparent from Whirlpool's documents produced that the reason is simple: none existed. Instead, Whirlpool launched its Duet® Steam Dryer in October 2007 with no actual proof that steam was being created. Simply put, every shred of evidence relied on by Whirlpool was created just weeks ago in response to this motion.

The Court must now assess whether Whirlpool's expert, Dr. Subbaiah Malladi, possessing no experience with dryer technology, no prior industry involvement,[1] no prior publications on thermodynamics or steam creation, and a doctoral thesis on "flame spreading" is competent to create an *ad hoc* test to conclusively establish that steam is created, as an incidental phenomenon, in Whirlpool's system. There is a fundamental problem with his approach. He points to no engineering documents created during the development of the Duet® Steam Dryer that support his theories on how steam is created in the machine or that Whirlpool intended to create steam in the way he argues it is created. In other words, Malladi's approach is merely the result of *post hoc* brainstorming. One thing is clear: the Duet® Steam Dryer was not designed to create steam the way Malladi argues it creates steam.

---

[1] He appears to have been involved in a consumer class action several years ago involving a defective washing machine, but clearly nothing relevant to the issues in the present case.

Whirlpool compounds the issue by asking the Court to, in effect, create a *de facto* testing standard for steam creation in the laundry care industry.  Whirlpool's invitation to the Court is a complicated one, as it will require deciphering a hastily thrown together skeletal protocol and incompetent scientific methodology.  Whirlpool's hubris leads it impose an unfair imposition on the Court.  If Whirlpool wants to thrust its junk science on the industry, it should do so before the appropriate industry group, in this case, the Association of Home Appliance Manufacturers ("AHAM").  LG USA is confident this will never happen, as the protocol and methodology would never pass muster.

The issues in this case are remarkably simple.  First, the Whirlpool Duet® Steam Washer and the LG Tromm Steam Washer and Steam Dryer possess steam generators that boil water and blow steam into the machine.  Steam in each of these machines qualifies as steam under any definition of the word and the creation of real steam was integral to their design.  No elaborate testing or strained interpretations are necessary to make this determination.  The point of departure is Whirlpool's Duet® Steam Dryer that is sold as a pair with the Duet® Steam Washer, which allegedly creates steam in an entirely different way.  Yet, nowhere in any of its advertising or in the comprehensive video on the Whirlpool web site describing the Duet® pair does Whirlpool own up to the discrepancy.  Instead, consumers are left with the unmistakable, but false, impression that the new steam innovation for the Duet® pair is based on similar technology.  Whirlpool buries its head in the sand on this issue as it is nowhere addressed in its Opposition brief.

Second, under any definition of the term, steam is not created by the Whirlpool steam dryer.  Whirlpool's system is technologically simple, involving the ejection of cold water from a hose with a spray nozzle attachment.  The water hits the clothes and is then evaporated the same way a conventional dryer dries clothes.  The mist of cold water sprayed into the dryer would never be mistaken by consumers as steam under any definition.

Dr. Malladi rests his entire approach on the erroneous belief that because incidental, microscopic amounts of water are retrained in the region within a few cubic inches of the heater, the machine is capable of creating steam.  Dr. Malladi incorrectly calls this "flash vaporization."[2]

---

[2] Dr. Malladi confuses his terminology erroneously calling some sort of instantaneous conversion of water to steam from exposure to heat "flash vaporization." (*See* discussion *infra* Part I.D.3.)  This term, in reality, means something entirely different. Perhaps he used it because it sounds good.

However, this is not what Whirlpool had in mind when it developed and launched its dryer and Dr. Malladi does not point to a single document created by Whirlpool validating his approach. If Whirlpool's dryer were really capable of creating the heat necessary for what he erroneously calls flash vaporization, it would cause the clothing to catch on fire.[3] With his true expertise lying in flame spreading, Dr. Malladi ought to know this.

LG USA has endeavored to thoroughly rebut Whirlpool's *post hoc* junk science that bears no relation to the way the Duet® Steam Dryer is intended to work. However, this case does not require the Court to deconstruct Dr. Malladi's *ad hoc* complex experiments and decide whether Whirlpool's machine creates steam. Dr. Malladi's tests were simply not designed to determine whether the Whirlpool dryer really creates steam as his protocol is devoid of any such reference. He merely takes disconnected measurements of temperature and dew points and determines through deductive logic that, *in theory*, Whirlpool's dryer can create steam, even if it is at the microscopic level. This is simply not sufficient to support aggressive advertising claims like "the pure power of steam" and "naturally steam away wrinkles." Whatever Dr. Malladi alleges Whirlpool's machine does in the nether region of the dryer drum is totally irrelevant to the proper functioning of the so-called steaming process that the dryer employs.

Whirlpool contends an injunction should not ensue based on the erroneous assumption that LG USA has suffered and will suffer no harm due to its false advertising. But when advertising claims are literally false—as are Whirlpool's here—irreparable harm to the plaintiff is presumed. Even if there were no presumption, LG USA has demonstrated irreparable harm to its brand reputation and irreparable harm from price erosion, neither of which can be compensated for by money damages alone. In comparison, any harm inflicted upon Whirlpool by being forced to cease its false advertising would be relatively minimal, and would not require removing its product from the market. Finally, the public interest is well-served by the removal of patently false advertising like that of Whirlpool's, a goal that is at the heart of the Lanham Act.

---

[3] Dryers have temperature sensors in the exhaust duct that cause the heat to shut off when the internal temperature of the drum gets too hot so as to prevent fires from starting. (*See* Supplemental Expert Declaration of Chul Jin Choi ("Choi Decl.") ¶ 12, attached as Ex. 1).

For all these reasons, as well as those set forth below, LG USA requests and is entitled to a preliminary injunction to remove literally false advertising from the marketplace and to prevent further irreparable harm.

## ARGUMENT

The standard in the Seventh Circuit for obtaining a preliminary injunction is clear: a party must demonstrate that it (1) has some likelihood of success on the merits; and (2) would suffer irreparable harm if preliminary relief is denied. *See Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 949 (N.D. Ill. 2007); *Ind. Civ. Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001).  The Court may then consider (3) the balance of harms between the two parties, and (4) the consequences to the public in granting or denying the requested relief.  *Brown*, 494 F. Supp. 2d at 949; *O'Bannon*, 259 F.3d at 770.  Whirlpool's attempt to foist a different standard on LG USA has no basis in law.[4]  Each of the four factors weighs heavily in favor of granting LG USA's motion and enjoining Whirlpool from its false advertising campaign.

## I.    LG USA Is Likely to Succeed on the Merits

In its Opening Memorandum, LG USA established that each of the "steam" advertising claims made by Whirlpool is literally false, as the Duet® Steam Dryer neither possesses a steam generator or any other means to create steam.  (LG USA's Mem. of Law in Support (Docket #s 12, 24)).  Instead, Whirlpool's machine simply injects a cold water mist into the drum that hits the clothes and then evaporates.  In an attempt to dodge the obvious—that its cold water mist system is not steam—Whirlpool crafts a series of red herring arguments lacking in factual relevance, legal merit, and scientific basis.  These will each be addressed in turn.

---

[4] This Court has adopted the same standard, although worded slightly differently.  *See, e.g., ZCM Asset Holding Co. (Bermuda) Ltd. v. Allamian*, No. 01 C 6250, 2002 U.S. Dist. Lexis 24471, at *14 (N.D. Ill. December 19, 2002), citing *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474 (7th Cir. 2001).  Whirlpool is wrong that a preliminary injunction may issue only when it is "highly likely" that a plaintiff will succeed on the merits.  (Def. Opp. 9).  That has never been the law in this Circuit, and Whirlpool mischaracterizes *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463 (7th Cir. 1998), to imply that it is.  Instead, the full passage from *Planned Parenthood* discusses the appropriate appellate standard of review after the trial court has completed a balancing of the traditional preliminary injunction factors: "But when it is clear that the plaintiff is both highly likely to prevail when the case is tried in full and is more likely to be harmed by the denial of preliminary relief than the defendant is to be harmed by its grant, we reverse." *Id.* at 465-66.  Although it need not meet this higher burden, LG USA does indeed demonstrate a high likelihood of success on the merits.

### A.    The Benefits and Importance of Real Steam

The critical aspect that differentiates steam dryers and conventional dryers is that steam dryers rely on hot steam to raise the temperature of the clothes and air in the drum.  (Ex. 1, Choi Dec. ¶ 13).  Conventional dryers, on the other hand, rely exclusively on the heater to raise the temperature of the clothes and air in the drum.  *(Id.)*.  The reason steam is so important in the laundry care industry is that real steam is packed with heat energy, which, upon contact with clothes, either in a washer or dryer, has an immediate impact on cleaning efficacy and removal of wrinkles and odors from clothing.  *(Id.)*.  Odors reside inside the multiple fibers that exist in clothes rather than solely on the surface of clothes.  (*Id.*).  A mist of water cannot penetrate deep into the fibers of the clothing to remove odors.  (*Id.*).

For example, the LG USA Tromm Steam Dryer injects real steam into the dryer drum while the drum is not rotating (so there is no air flow to exhaust the steam).  (*Id.* ¶ 25).  The steam then releases highly concentrated heat energy, causing the temperature of the clothes and air in the drum to increase and then condense into visible white billowy moisture, thoroughly infusing the clothes with steam.  (*Id.* ¶ 26).  When looking through the glass door of LG USA's Tromm Steam Dryer, this plume of white, billowy steam is readily visible to the consumer.  *(Id.)*.

### B.    Whirlpool's Dryer Cannot Create Steam

Whirlpool's dryer, on the other hand, merely sprays cold water onto clothes and the dryer heater warms the water on the clothes.  (*Id.* ¶ 17).  The process employed by Whirlpool is no different than spraying cold water using a spray bottle onto clothes and throwing them into the dryer for 20 minutes.  (*Id.* ¶ 20).  No consumer would mistake this for steam under any definition of the term.  *(Id.)*.

Specifically, the Whirlpool Duet® Steam Dryer operates by tumbling the dryer for several minutes and by intermittently blowing in warm air to heat the clothes, with a total cycle time of fifteen (15) to forty (40) minutes.  (*Id.* ¶ 17).  Cold water is then sprayed onto the clothes to saturate the fibers in the clothes.  *(Id.)*.  Whirlpool's web site video on the operation of the Duet® dryer at www.whirlpool.com explains:

> Just place one to three garments into the dryer.  Set the cycle to refresh.  Water vapor gently saturates fabrics to lift out odors.  **And while drying, wrinkles are relaxed.**

(*See* Declaration of Martin Block ("Block Decl.") ¶ 11, attached as Ex. 2) (emphasis added). This cold water has little to no heat energy. (Ex. 1, Choi Decl. ¶ 17). As a result, it cannot raise the temperature of the air or clothes in the drum. (*Id.*). Heat energy, the critical component of steam in a steam dryer, cannot be duplicated at the relatively low temperatures that exist in a conventional dryer while clothes are tumbled. (*Id.* ¶ 14). In fact, the cold water that hits the clothes in Whirlpool's dryer substantially cools the clothes before they heat up again when warm air is intermittently blown into the dryer. (*Id.* ¶ 17).

The Whirlpool system then continues to tumble the clothes and draw in warm air. (*Id.* ¶ 19). According to Whirlpool's own web site video, the clothes then heat up and this warm moisture on the clothes is intended to relax the fibers and remove odors. (*Id.*). The water on the clothes eventually evaporates and is pulled out of the dryer by the exhaust system. (*Id.*). This is no different from a conventional dryer and would never be mistaken by a consumer for steam. (*Id.* ¶¶ 19, 20). It certainly does not contain the white billowy appearance characteristic of visible steam described by Dr. Judith Levi, Whirlpool's linguist. (*Id.* ¶ 42).

The Whirlpool system is unquestionably a low-tech and inexpensive addition to the dryer, with cold water sprayed into the dryer drum by a nozzle connected to a hose. (*Id.* ¶¶ 18, 20). This is akin to spraying cold water from a garden hose through a spray nozzle with a mist setting into the air on a warm summer day. (*Id.* ¶ 18). No consumer would ever mistake the cold water mist spraying out of the nozzle attachment as steam. (*Id.*).

The water that Dr. Malladi claims gets entrained within inches of the heated air inlet, and that he falsely contends creates steam, has no bearing on the way the Whirlpool system works to accomplish the goals of wrinkle removal and odor removal. (*Id.* ¶ 21). This is simply a red-herring argument to justify Whirlpool's alleged creation of steam. It is irrelevant to the proper functioning of the Whirlpool system. (*Id.*).

The fallacy in Dr. Malladi's opinion is that the temperature inside the dryer drum, with the exception of a few cubic inches around the air inlet, operates in the range of approximately 50ºC to 75ºC with the water on and 65ºC to 90ºC with the water off. (*Id.* ¶ 22) (citing Expert Declaration of Dr. Subbaiah Malladi ("Malladi Decl.") Ex. D-1 at 9-10 (Docket # 55-6)). The water that is sprayed onto the clothes and exposed to this warm air is never intended to convert suddenly to steam before hitting the clothes. (*Id.* ¶ 22). The simple explanation for this is that the water does not absorb enough heat energy before hitting the clothes to transform into steam

under any definition of the term. (*Id.*). What Dr. Malladi fails to acknowledge is that Whirlpool's Dryer was never designed to function this way and what he calls "flash vaporization" is definitely not occurring. (*Id.*).

Finally, spraying cold water into a dryer drum that is being heated only by the dryer's heat source is a far less efficient process in terms of energy consumption and time. (*Id.* ¶ 23). Injecting real steam, however, is far more efficient at raising the temperature of the clothes and air in order to remove wrinkles and odors. (*Id.*). Efficiency realized by using real steam cannot be realized by Whirlpool's cold water mist system. (*Id.*).

**C.    Whirlpool is Responsible for All Reasonable Interpretations of Its Advertising**

Whirlpool's system cannot create steam under any definition of the term. Whirlpool goes to great lengths, however, without any support from any case law, to try and pigeonhole LG USA's argument and erect a straw man that LG can win if there is only one common and ordinary meaning of steam. What Whirlpool conveniently ignores is that it is axiomatic in advertising law that an advertiser is obligated to support all reasonable interpretations of the claims made in its advertising. *National Com. on Egg Nutrition v. FTC*, 570 F.2d 157, 161 (7th Cir. 1977) (declining to disturb the finding of the FTC that "where an advertisement conveys more than one meaning, one of which is false, the advertiser is liable for the misleading variation"). The National Advertising Division of the Better Business Bureaus (the "NAD") also requires that advertisers be responsible for all reasonable interpretations.[5]

Whirlpool is well aware of this obligation, as it was the advertiser in a proceeding before the NAD where an advertisement for one of its washing machines could be interpreted in one of two ways – either that the machine enjoyed a lower service incidence than its competitors, or that it enjoyed cleaning superiority over them. *Whirlpool Corp.*, NAD Case No. 3252 (November 1995). Faced with these circumstances, the NAD wrote that Whirlpool "must be able to support all reasonable interpretations of its claims, express or implied, written or visual," and found that Whirlpool had failed to do so. *Id.* The same result applies here.

---

[5] The NAD has required this standard in well over 100 cases. *See, e.g., Discover Card Cash Rewards Program*, NAD Case No. 4779 (January 2008) ("[A]n advertiser is responsible for all reasonable interpretations of its claims, not simply the messages it intended to convey."); *McNeil, PPC, Inc.*, NAD Case No. 4248 (November 2004); *Bayer Corporation (Aleve)*, NAD Case No. 4126 (December 2003); *Natural White, Inc.* NAD Case No. 3995 (January 2003); *Whirlpool Corp.*, NAD Case No. 3252 (November 1995). (NAD decisions and search result attached as Group Ex. 3).

Here, LG USA has established that a reasonable definition—indeed the common and ordinary meaning— of steam in the context of: (1) "steaming" clothes, (2) having "the power of steam," and (3) "naturally steaming away wrinkles" is that the product must actually generate real steam, which is achieved by heating water to the boiling point.  It is undisputed that Whirlpool's steam dryer, unlike LG USA's steam washer and dryer and Whirlpool's Duet® steam washer, utilizes a cold water mist, and not steam created by a generator that heats the water to the boiling point before being injected into the machine.  Whirlpool has failed to support this most reasonable interpretation of the word "steam."

**D.    Dr. Malladi's "Tests" Fail to Establish that the Duet® Steam Dryer Creates Steam**

Whirlpool alleges that it conducted extensive performance testing prior to launch to substantiate "that the dryer does use steam to effectively relax wrinkles and remove odors." (Def. Opp. 3).  Unfortunately, Whirlpool failed to produce such testing in discovery and nowhere relies on it in its Opposition or accompanying declarations.  Since Whirlpool can point to no evidence that it went to market with substantiation for its steam claims, they are *per se* false. *Novartis Consumers Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co*., 290 F.3d 578, 590 (3d Cir. 2002) (totally unsubstantiated claims are *per se* false).  In sole support of its claim that the Duet® Steam Dryer creates steam on some level, Whirlpool relies upon the hastily slapped-together testing of Dr. Malladi.  He describes in his Declaration various "tests" he performed that supposedly prove Whirlpool's Dryer might in fact create some steam.  (*See generally* Malladi Decl. (Docket # 55)).  However, his tests relate only to an incidental process rather than the way Whirlpool's system operates, and is intended to operate.

There are several fatal problems with Dr. Malladi's "proof."  His *ad hoc* "methodology" is not reliable from a scientific standpoint.  (Declaration of Timothy McGrady ("McGrady Decl.") ¶¶ 14-22, attached as Ex. 4).  Accepting Dr. Malladi's ill-founded opinion would force the Court into the role of industry standard-bearer, sanctioning the creation of a wholly new industry standard test.  (*Id*. ¶¶ 13, 21).  For these reasons alone, the Court should decline to consider his findings.  Even if the Court were to consider Dr. Malladi's "tests," they do not demonstrate the existence of steam in *any* sense of the word.  (*See id*. ¶ 22).  Whirlpool remains with nothing to demonstrate that its cold water mist system in fact creates or uses steam.  *See Novartis,* 290 F.3d at 590.

8

1.    **The Court Should Decline to Accept Whirlpool's Invitation to Act as Standard-Bearer for the Laundry Care Industry**

The laundry care industry is overseen by the Association of Home Appliance Manufacturers ("AHAM").  (Ex. 4, McGrady Decl. ¶ 9).[6]  AHAM maintains twenty-five standards, many of which are approved by ANSI as American National Standards through the consensus approval process.  (*Id.*).  Standards are adopted voluntarily by AHAM members in the public interest, to establish common understanding between manufacturers and consumers and to assist consumers in comparing appliances before purchases.  (*Id.*).

Industry groups create testing standards through consensus of the industry participants. (*Id.* ¶ 9).  Creation of these testing standards takes years of drafting and modification by independent and industry expert participants to ensure that the tests are appropriate for the relevant application.  (*Id.*).

Whirlpool asks this Court to accept Dr. Malladi's tests as proof that steam is created in Whirlpool's dryer.  But the industry—here, the laundry care segment of the home appliance industry—has never been shown such tests and would never accept such tests.  (*Id.* ¶ 12).  With respect to washers and dryers, the *de facto* industry standard is that steam creation in washers and dryers is done by a steam generator capable of heating the water before injection into the drum.  (*Id.*).  No tests are required to prove that a steam generator that boils water actually creates steam.  (*Id.*).  Whirlpool's Duet® steam washer, and LG USA's Tromm steam washer and dryer all use this system.  (*Id.*).  The parties are in agreement about this fact.  The cold mist substitute employed by Whirlpool has never been determined by the laundry care industry to be capable of creating steam.  (*Id.*).  Since Whirlpool concedes that its dryer fails to conform to this *de facto* industry standard, its use of the term steam in its name and advertising are literally false. *See Castrol v. Pennzoil Co.*, 799 F. Supp. 424, 437-38 (D.N.J. 1992) (holding that defendant's claims failed under the only "meaningful and accepted" industry standards, and were therefore false).

---

[6]  AHAM is an American National Standards Institute ("ANSI") accredited Standards Development Organization that develops and maintains technical standards for various appliances to provide uniform, repeatable procedures for measuring specific product characteristics and performance features.  (*Id.* ¶ 11).  AHAM standards also are recognized by many regulatory agencies including the U.S. Department of Energy.  (*Id.*).

### 2.    Dr. Malladi's Testing Methodology is Unreliable

Even if the Court were inclined to step into the shoes of the industry, it should still disregard Dr. Malladi's opinions, as his testing methodology is wholly unreliable.  In false advertising cases, where a defendant utilizes product testing to dispute falsity, a plaintiff may "demonstrate that such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made.'"  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citing *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991)).  This task can be accomplished "either by attacking the validity of the defendant's tests directly or by showing that the defendant's tests are contradicted or unsupported by other scientific tests."  *Id.*

When an expert testifies to "scientific knowledge," the expert's opinions must be based on the "methods and procedures of science" and the expert "must have 'good grounds' for his or her belief."  *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 318 (E.D. Pa. 2007) (citing *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 601-02 (E.D. Pa. 2002)).  These "good grounds" include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.*  Further, in order to show the reliability of tests, the testing procedures and results must be reproducible and repeatable in order to eliminate the possibility of results being skewed by conditions specific to the time and laboratory that the test was first conducted.  *Avon Products v. S.C. Johnson & Sons,* 984 F. Supp. 758, 787 (S.D.N.Y. 1997).  Finally, it is not the role of court under the Lanham Act to determine whether research will eventually support the challenged claims, but whether the claims were supported by evidence available "at the time they were made."  *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F. Supp. 194, 205 (D.D.C. 1989), *modified*, No. CIV. A. 86-2728, 1991 WL 25793 (D.D.C. Feb 08, 1991).

As discussed below, the multitude of problems with the methodology employed by Dr. Malladi are "sufficiently material as to render the defendant's reliance thereon objectively

unreasonable." *S.C. Johnson & Sons v. Clorox Co.*, 930 F. Supp. 753, 780 (S.D.N.Y. 1996). Dr. Malladi's testing is precisely the type of junk science that courts routinely disregard.

        a.      **Dr. Malladi's Testing Bears None of the Hallmarks of Good Science**

When performing product testing, appropriate, well-controlled tests always use a written protocol. (Ex. 4, McGrady Decl. ¶ 16). This protocol describes the objectives of the testing, the hypothesis to be proven, and the methodology employed, with any derivations from the protocol recorded. (*Id.*). In order to show the reliability of tests, the testing procedures and results must be reproducible and repeatable in order to eliminate the possibility of results being skewed by conditions specific to the time and laboratory that the test was first conducted. (*Id.*). Methodology and reasoning used by the tester must be scientifically valid and generally accepted by the industry and any conclusions reached by the tester must be based on well-founded methodology. (*Id.*).

Dr. Malladi's testing lacked an appropriate protocol and scientific controls. (*Id.* ¶ 17). His Declaration contains no appropriate discussion of the experimental methodology and controls or lack thereof. (*Id.*). Nowhere in his report is there even a mention of the objectives for his testing or the hypothesis that he is seeking to prove or disprove. (*Id.*). His protocol is similarly lacking an explanation of his methods of observation, describing the steps he took to minimize bias, and summarizing the methods of analysis, including any appropriate statistical methods. (*Id.*). Finally, his testing contains no statistical analysis whatsoever and his results can in no way be considered "statistically significant" or even consumer relevant. (*Id.*).

Moreover, Dr. Malladi's testing is not based on scientifically valid principles.[7] (*Id.* ¶ 18). Dr. Malladi has not shown that his testing grew out of pre-litigation research (it did not), shown that his testing has been subjected to normal scientific scrutiny through peer review and publication (it has not), nor can he explain precisely how the conclusions were reached and point to some objective source to show that the conclusions would be accepted in the industry (he cannot). (*Id.*). Dr. Malladi's conclusions would never be accepted by the laundry care industry

---

[7] To satisfy the burden of establishing that the evidence is scientifically valid, there must be a showing, among other things, that the evidence grew out of pre-litigation research that was subjected to normal scientific scrutiny through peer review and publication. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1141 (9th Cir. 1997).

because his conclusions do not rely on testing that could possibly prove that steam is created in the Whirlpool dryer. (*Id.*).

Furthermore, Dr. Malladi has provided no evidence that any of his tests are reproducible or repeatable. (*Id.* ¶ 19). His "protocols" are so cryptic, scant and lacking in description regarding how the methodology was carried out as to render them meaningless. (*Id.*). Dr. Malladi himself would have difficulty repeating his tests because of the poor description of the methodology and total absence of data showing that steam is created in the Whirlpool dryer. (*Id.*). LG USA is likewise not capable of reproducing these tests because he has not provided detailed step-by-step descriptions of his methodology that would inform another tester how to reproduce the tests. (*Id.*).

Thus, Dr. Malladi has failed to demonstrate that his testing is based on, among other things, (1) a testable hypothesis; (2) a method that has been subjected to peer review; (3) the known or potential rate of error; (4) the existence or maintenance of standards controlling the technique's operation; or (5) a generally accepted method. *Merisant*, 242 F.R.D. at 318. Without these essential elements, Dr. Malladi's junk science must be disregarded.

### b.    Dr. Malladi's Testing is Riddled With Errors

In addition to these general flaws in methodology, Dr. Malladi made a plethora of mistakes in his "tests." For example, as more fully set forth in the Supplemental Expert Declaration of Dr. Anthony M. Jacobi, while Dr. Malladi twice asserts that an "atomized mist" is applied within the drum of the Duet® Steam Dryer, he provides no supporting data on drop-size distribution. (Supplemental Expert Declaration of Dr. Anthony M. Jacobi ("Jacobi Decl.") ¶ 19, attached as Ex. 5). Without such data, Dr. Malladi cannot demonstrate what happens to this "mist" once it enters the dryer drum – and certainly cannot demonstrate that it becomes steam. (*Id.*). In addition, Dr. Malladi asserts that the Duet® Steam Dryer creates steam by "spraying water into a heated environment," but has provided no data or analysis to support his assertion that simply evaporating liquid water into moist air creates steam under any definition. (*Id.* ¶ 22(c)).

The data that Dr. Malladi does provide are of low veracity by the standards utilized by researchers in the thermodynamic sciences. (*Id.* ¶ 19). Indeed, his temperature measurements were taken near the hot surface of the dryer's air-supply grill, and in a region where large temperature differences occur. (*Id.*). Such a situation is widely known to cause measurement

errors, yet Dr. Malladi took no precautions to overcome or assess these errors. (*Id.*). Moreover, his "flow visualization" – allegedly showing the path of water droplets after they are sprayed into the dryer drum – is not capable of showing the location of the droplets, as the conventional camera that he used cannot provide depth information. (*Id.* ¶ 25).

Another way in which Dr. Malladi erred was to install a cage onto the dryer during his testing, which may alter the temperature and velocity fields. (*Id.* ¶ 31). Moreover, Dr. Malladi committed a fundamental error by conducting this grill experiment with the air heater turned off, as this is not representative of the conditions that prevail when the dryer operates in its usual, intended manner. (*Id.* ¶ 35).

Representations that are found to be "unsupported by accepted authority or research or which are contradicted by prevailing authority or research, may be deemed false on their face and actionable under Section 43(a) of the Lanham Act." *Alpo* 720 F. Supp. at 213. Since Dr. Malladi's testing does not even come close to being reliable in any way, it should not be considered.

### 3.     Whirlpool's Duet® Steam Dryer Does Not Create Steam Under *Any* Definition Advanced In This Litigation

Even if Dr. Malladi's methodology were found to be "reliable," if LG USA can show that the tests do not establish the proposition asserted by the defendant, it has "obviously" met its burden of demonstrating literal falsity. *Southland Sod Farms*, 108 F.3d at 1139. Here, Dr. Malladi's tests fall far short of demonstrating that the Duet® Dryer uses steam under any definition, let alone the plain and ordinary definition employed by the industry. Thermodynamically, steam is pure water vapor or dry steam. (Ex. 5, Jacobi Decl. ¶ 4(a)). When this pure water vapor is mixed with pure liquid water, wet steam is created. (*Id.* ¶ 4(b)). The Whirlpool machine, however, is not capable of creating pure water vapor, and therefore cannot create either dry steam or wet steam. (*Id.* ¶ 7). Indeed, it is undisputed that Whirlpool's Duet® Steam Dryer simply sprays a cold water mist into the dryer drum. (Def. Opp. 2). Once that mist enters the drum, it wets the clothes and then evaporates as in any standard dryer. (Ex. 1, Choi Decl. ¶¶ 14, 17-19). This evaporation process cannot and does not create dry *or* wet steam. (Ex. 5, Jacobi Decl. ¶ 10). Indeed, any other conclusion would be tantamount to stating that evaporation and steam are the same thing, which is patently false. (*Id.*).

Moreover, Whirlpool's Duet® Steam Dryer does not create steam even under the myriad definitions suggested by Dr. Malladi and Dr. Judith Levi.  (*E.g.*, Malladi Decl. ¶¶ 8, 12, 18 (Docket # 55)).  These loose or "lay" definitions, which Dr. Malladi mixes and matches with the thermodynamic definition of steam, revolve around the concept that steam "is the visible mist formed as water vapor cools."  (*Id.* ¶ 10).  What this concept refers to is condensation, which is a process that occurs when a clear water vapor condenses to form a visible mix of water droplets and gas.  (Ex. 5, Jacobi Decl. ¶ 9). It is reasonable that a lay person seeing this process might consider it to be "steam," but it is patently unreasonable to conclude that this occurs in Whirlpool's dryer.  (*Id.*).

Steam in Dr. Malladi's lay sense is *only* created when water vapor cools, condenses and becomes visible.  (*Id.* ¶ 14).  The Duet® Steam Dryer's cold water mist is colder than the air in the dryer and thus, by definition, does not cool when entering the dryer.  *(Id.)*.  Rather, it simply heats up and then evaporates.  (*Id.* ¶ 15(a)).  This evaporation process is invisible, and does not create the visual occurrence that a lay person might characterize as steam.  (*Id.* ¶ 8).  Thus, Dr. Malladi's assertion that the Duet® Steam Dryer is similar to a "steamed up" bathroom, steam room or kitchen is simply wrong – as each of them, unlike Whirlpool's machine, involve the cooling of water vapor, not the warming of cold mist.  (*Id.* ¶ 14).  Dr. Malladi's approach is a thinly-veiled attempt to obfuscate by combining technical definitions terms with non-technical definitions to arrive at a desired result and mislead the Court.

Furthermore, to the extent Dr. Malladi contends that flash vaporization occurs in the Whirlpool dryer, this is also patently false because flash vaporization can only occur when there is a sudden reduction in pressure.  (*Id.* ¶ 22(b)).  The concept that Dr. Malladi seems to be articulating is when cold water is thrown onto an extremely hot surface – such as water being thrown onto hot sauna rocks, steam might be created.  (*Id.*).  This process is not flash vaporization, however, and in any event does not occur inside the Whirlpool dryer.  (*Id.*).  If Whirlpool's machine were capable of the process Dr. Malladi erroneously calls flash vaporization, the clothes inside the dryer would start on fire.  (Ex. 1, Choi Decl. ¶ 32).  All that happens when the cold water mist is sprayed into the Duet® Steam Dryer is that it wets the clothes and then evaporates.  (Ex. 5, Jacobi Decl. ¶ 22(c)).  This is not steam under any definition advanced in this litigation.

Finally, Dr. Malladi's argument that steam is created simply because some portion of the Duet® Steam Dryer's drum might exceed 100 C for some portion of time is similarly misguided. (*Id.* ¶ 3). His data fail to provide any evidence that the cold water sprayed into the Whirlpool drum ever reaches the hot air grill, how much water reaches the grill, or than any drop of cold water ever reaches 100 C. (*Id.* ¶¶ 23, 25). Even if it did, however, it would not generate steam because: (1) it does not suddenly become pure water vapor (dry steam), and (2) it does not create condensation that an observer might consider to be steam. (*Id.* ¶ 10). In the end, all that happens when the cold water mist is sprayed into the Duet® Steam Dryer is that it wets the clothes and then evaporates. (*Id.* ¶ 15(a)).

Compounding Dr. Malladi's failure to demonstrate that Whirlpool's dryer actually uses steam is his deliberate ignorance of how the dryer actually works. Dr. Malladi conveniently disregards the fact that the heater turns on and off intermittently, including when the water is spraying into the drum. His failure to recognize this fact is fatal to his opinions because it proves Whirlpool never intended for steam to be created in this way. (Ex. 1, Choi Decl. ¶ 36). Not surprisingly, the water Dr. Malladi claims gets entrained within inches of the heater and that he falsely contends somehow creates steam has no bearing whatsoever on the way the Whirlpool system works to accomplish the goals of wrinkle and odor removal. (*Id.* ¶ 21). Dr. Malladi certainly does not provide a shred of evidence or a single Whirlpool document to show that Whirlpool designed its system to create steam consistent with his experiments. A comprehensive search of Whirlpool's 10,000 page document production resulted in no documents either. As such, Dr. Malladi's testing does not demonstrate that Whirlpool's advertising is truthful or supported by competent scientific evidence.

**4.     As a Matter of Law, Whirlpool Cannot Claim its Cold Water Mist System is Steam Merely Because it May Provide Some of the Same Benefits as Steam**

Whirlpool, seemingly aware that its cold water mist system is not steam, sheepishly falls back on the claim that "Whirlpool delivers the *benefits* of steam, which is what ultimately drives consumers' purchase decisions." (Def. Opp. 1 (emphasis in original)). This misses the point completely.

Whirlpool has offered no proof that it provides the same benefits of real steam. It has conducted none of its own testing on the benefits of its system and reliance merely on Consumer

Reports is clearly inadequate.  *See General Mills Fiber One Cereal*, Report #4176, NAD Case Reports (May 2004) (consumer reports insufficient due to lack of information regarding testing protocols); *Justice Direct Partners, Inc.*, Report # 4210, NAD Case Reports (July 2004) ("anecdotal evidence (e.g., consumer reports of satisfaction with the product), as a general rule, are insufficient to support performance claims") (NAD Reports attached as Group Ex. 6).

At most, Whirlpool can claim its cold water mist system has some impact on wrinkle and odor removal.  (Ex. 1, Choi Decl. ¶¶ 13-15, 17-19).  However, without performing any of its own comparative testing, with appropriate protocols and statistical analysis, Whirlpool clearly cannot claim it delivers the benefits of real steam.  Whirlpool will never be able to argue that it provides the instant heat energy and efficiency of a real steam system.  While wetting clothes to relax wrinkles may provide some benefit, it is the same benefit that one would gain from using a spray bottle to spray clothes with water and then throwing them into the dryer for 20 minutes.  (*Id.* ¶ 20).  Nobody would mistake this for steam.  (*Id.* ¶¶ 13-15, 18-20) (describing how steam dryers work and the benefits conferred by steam dryers).  As such, Whirlpool's claims are literally false. *See Sherrell Perfumers, Inc. v. Revlon, Inc.*, 483 F. Supp. 188, 189 (S.D.N.Y. 1980) (finding that advertising that replica perfume was the same as the real thing, because they had merely some characteristics in common, violated the Lanham Act); *JR Tobacco v of America v. Davidoff of Geneva*, 957 F. Supp. 426, 433-36 (S.D.N.Y. 1997) (holding a cigar manufacturer's claims of having duplicated premium cigars were literally false when the evidence showed its cigars lacked essential characteristics of the premium cigars).

The case of *W.L. Gore & Assoc. v. Totes, Inc.*, 788 F. Supp. 800, 803 (D. Del. 1992) is particularly instructive on this point.  There, the court held that a manufacturer could not market its golf jackets as "waterproof" when they were merely "water resistant."  *Id.* at 814-815.  It held that the term waterproof carries with it a representation of a standard of quality, and products that fail to meet this standard cannot claim that they do.  *Id.* at 807.  The court in *Gore* held that the waterproof claim was "literally false because the suits are waterproof in only limited areas.  The claims are only partially correct, and therefore, they are literally false."  *Id.* at 809.  Finally, despite defendant's evidence of happy customers and its argument that they are the best judge of what is a true claim, it held "a false claim is still a false claim, even if customers do not think the false claim is important enough to complain about it."  *Id.*

The holdings in *Gore* are directly applicable to the instant case. Since Whirlpool has failed to prove its product produces steam to remove wrinkles and odors, it cannot use the term steam. *See Gore*, 788 F. 3d at 803. Although Whirlpool argues its cold mist system provides some of the same benefits of real steam, that is irrelevant as to whether its "steam" claims are false under the Lanham Act. *Id.* Moreover, Whirlpool's reliance on Consumer Reports is not sufficient. When the underlying claim is false, no amount of positive reviews or non-complaining customers makes the claim true. *Id.* at 809; *see also JR Tobacco*, 957 F. Supp. at 436 (holding that despite the fact some consumers would not be able to distinguish a copycat product from the real thing, the statement that they are equivalent is still literally false). Therefore, even if Whirlpool claims to provide some of the benefits of real steam with its cold mist system, this would at best render Whirlpool's claim only partially correct, and thus literally false. *See Gore*, 788 F. 3d at 809.

**E.     Alternate Definitions and Uses of the Word "Steam" are Irrelevant and Do Not Demonstrate that the Duet® Steam Dryer Creates Steam**

Whirlpool attempts to obfuscate the issues before this Court by arguing that steam in entirely different contexts can be defined many ways, and that LG USA itself has defined it in different ways. (Def. Opp. 4-7). These arguments are irrelevant, as they have nothing to do with the term "steam" placed in proper context. Even under the "visible" definitions of steam advanced by Dr. Levi, the Whirlpool's dryer still does not create steam. Moreover, LG USA's use of the word "steam" in foreign countries and patent applications is confined to those contexts and has no bearing whatsoever on Whirlpool's advertising claims.

**1.     Dr. Levi's Report Is Wholly Irrelevant**

First, Whirlpool relies on the declaration of Dr. Judith Levi, a linguistics professor, to support its argument that the Whirlpool dryer creates or uses steam. (Def. Opp. 6). This approach to the defense of a false advertising claim is unprecedented – exhaustive research has uncovered no case in which a defendant proffered, let alone a court accepted, the testimony of a linguistics expert in a false advertising case under the Lanham Act. Whirlpool's advertising claims are express claims and "steam" has an express meaning. Whirlpool's approach is a transparent attempt to request that the Court create new law, an attempt this Court should reject.

Even if this Court is inclined to consider Dr. Levi's Declaration, however, it does nothing to demonstrate that Whirlpool's dryer creates or uses steam. Indeed, while Dr. Levi ably (and

irrelevantly) recites various definitions of the word "steam," and specifically "visible steam," (Expert Declaration of Dr. Judith Levi ("Levi Decl.") ¶¶ 38, 57 (Docket # 53)), she wholly fails to consider how the word is used in the proper context.  (Declaration of Robert A. Leonard, Ph.D. ("Leonard Decl.") ¶¶ 30-32, attached as Ex. 7).  Context is key in this case, as the banal and irrelevant examples cited by Dr. Levi – including water rising off a river and one's breath on a cold day (Levi Decl. ¶ 55) – have nothing to do with the laundry products that are the focus of this litigation.  (*Id.* ¶¶ 30, 32, 34).  Dr. Levi's opinion is irrelevant because she fails to consider the appropriate context, including the fact that the Duet® steam dryer is paired with the Duet® Steam washer which creates steam using a real steam generator.

Her consideration of "visible steam," which she describes as Whirlpool's definition, has nothing to do with the claims at issue.  (*See* Levi Decl. ¶¶ 8, 38, 57).  Moreover, Whirlpool admittedly does not produce any "visible" steam in its dryer—the only thing "visible" is the cold water mist.  (Malladi Decl. fig.18 (Docket # 55)).  This is a far cry from the "steamy bathroom" environment that Whirlpool tells its potential customers that its dryer creates.  (Def. Opp. 2, 3).  Indeed, all of Dr. Levi's definitions of steam involve warm water introduced into a cooler environment, such as a "steamy" bathroom, and not cold water introduced into a warmer environment, which is how Whirlpool's dryer operates.  (Ex. 7, Leonard Decl. ¶¶ 35, 37).

### 2.      Press Releases from Other Countries are Irrelevant

Whirlpool attempts to cloud the issues before this Court by referring to LG USA's use of the word "steam" in contexts other than this litigation.  (Def. Opp. 4-5).  This argument too is unavailing, as the examples Whirlpool cites have no bearing on the issues before this Court. Indeed, a third party press release in New Zealand using steam in discussing an LG dryer is irrelevant to the issues in the present case.  *See Merisant,* 515 F. Supp. 2d at 533 (E.D. Pa. 2007) (noting that "documents and information related to products sold outside the United States are irrelevant" to Lanham Act false advertising claims); *see also Anheuser-Busch, Inc. v. The Stroh Brewery Co.*, 750 F.2d 631, 642 (8th Cir. 1984) (noting that how a term is used in Australia is irrelevant).  Perhaps even more troubling than Whirlpool's reliance on a Press Release from New Zealand is the fact that the New Zealand press release does indeed relate to a true LG steam washer and dryer. (Def. Opp.  4 and Ex. 1 thereto).

### 3.       Terms in Patents and Patent Applications are Likewise Irrelevant

Whirlpool's reliance on terms used in various patents and patent applications filed by LG USA is an unprecedented invitation to this Court to engage in *Markman* claims analyses in a false advertising case. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). Without one, there is no way to determine what the term actually means in the context of each of the patents and patent claims. *See id.* Not surprisingly, Whirlpool has cited no cases in support of its frivolous proposition that patent term definitions can be used in the context of false advertising cases.

The reason for this is obvious: "a patentee is free to be his or her own lexicographer." *Ellipse Corp. v. Ford Motor Co.*, 452 F.2d 163, 170 (7th Cir. 1971). Thus, a party, like LG USA, is free to define patent terms as it wishes for purposes of its patents. Further, a patentee "may choose to use the same word in different ways in different patents." *Maytag Corp. v. Whirlpool Corp.*, 95 F. Supp. 2d 888, 893 (N.D. Ill. 2000). How a term is used in one patent is "quite irrelevant" to how it is used in a different patent. *Nilssen v. Motorola, Inc.*, 80 F. Supp. 2d 921, 932 (N.D. Ill. 2000). Given that LG USA's use of the word "steam" in a patent or patent application only has relevance to a particular patent, it cannot possibly qualify as evidence in other forums and clearly has no relevance in this case. Terms in patents are for the benefit of the patent examiner in the relevant government patent office and not consumers in advertising. Since courts do not even apply definitions of terms from one patent to another, it would hardly be appropriate to adopt Whirlpool's misguided logic in a false advertising case.

In any event, as explained above, the Court would have to determine what the term "steam" means in each of these five patents and patent applications. Such a task is unprecedented in a false advertising case, absurd on its face, and completely irrelevant to the issues at hand. *Lockformer Co. v. PPG Indus.*, 264 F. Supp. 2d 622, 625 (N.D. Ill. 2003) (St. Eve, J.) (describing results of *Markman* hearing to construe the term "adhesive"). Here again, Whirlpool is inviting the Court to create new law, something that it should not do in this case.

### F.       LG USA Need Not Demonstrate Consumer Confusion

As set forth above, LG USA has demonstrated that Whirlpool's dryer neither creates nor uses steam, even under the myriad *post hoc* definitions proffered by Whirlpool. Given this, Whirlpool's advertising claims are literally false under the Lanham Act, obviating the need for

LG USA to demonstrate that consumers were actually or likely deceived by the claims.  *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999); *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,*168 F.3d 967, 971 (7th Cir. 1999) ("*Sanfield I*").

In yet another effort to lead the Court astray, Whirlpool contends that contrary to this well-established proposition and despite its showing of literal falsity, LG USA nevertheless is required to demonstrate consumer confusion.  (Def. Opp. 12).  This argument is a red herring, as the cases Whirlpool cites in support of it – *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 258 F.3d 578 (7th Cir. 2001) ("*Sanfield II*") and *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) – say no such thing.  Rather, both cases stand for nothing more than the simple, uncontroversial proposition that a plaintiff must show that it has suffered an injury before it has standing to sue.  *Sanfield II*, 258 F.3d at 582 ("[A] private litigant must show injury, which [the plaintiff] did not."); *First Health*, 269 F.3d at 806 ("Section 43(a)(1)(B) offers relief only to one who 'is or is likely to be damaged by' the misrepresentation.").  Not surprisingly, then, courts in this Circuit have continuously held that when literally false claims are at issue, the plaintiff need not show that consumers were actually or likely deceived by the claims.[8]

### G.  Whirlpool's False Advertising is Material, and is Likely to Influence Purchasing Decisions

As set forth in LG USA's opening memorandum, there can be no doubt that Whirlpool's literally false claims regarding its Duet® Steam Dryer are material and would influence consumer purchasing decisions.  (LG Mem. at 11-12).  Whirlpool contends that its claims are not materially false "in the consumer context" because the Duet® Steam Dryer allegedly "delivers the consumer benefit promised."  (Def. Opp. 12-13).  This argument fails because, as explained in Section I(A) above, Whirlpool's cold mist system cannot replicate the benefits of real steam.

To the extent that Whirlpool contends that consumers perceive no difference between its cold mist system and real steam, Whirlpool has no data to validate this belief.  Whirlpool supplies no proof for this conclusion, such as testing comparing the benefits of its system to real steam technology.  Reliance on a Consumer Reports article is far from sufficient.  (*See* Group

---

[8] *See Republic Tobacco L.P. v. North Atlantic Trading Co.*, No. 06 C 2738, 2007 WL 1424093 at *4 (N.D. Ill. May 10, 2007); *Logan Graphic Products, Inc. v. Textus USA, Inc.*, No. 02 C 1823, 2002 WL 31507174, at *4 (N.D. Ill. Nov. 8, 2002); *Energizer Holdings, Inc. v. Duracell, Inc.*, No. 01 C 9720, 2002 WL 1067688, at *4 (N.D. Ill. May 28, 2002); *Derby Industries, Inc. v. Chestnut Ridge Foam, Inc.*, 202 F. Supp. 2d 818, 822 (N.D. Ind. 2002).

Ex. 6).  This is unlike *Hot Wax,* which is cited by Whirlpool.  In *Hot Wax*, neither party was able to provide conclusive evidence that the product in question was or was not "wax," so the court concluded that summary judgment was inappropriate.  *Hot Wax,* 27 F. Supp. 2d at 1048.  Here, Whirlpool's cold water mist does not meet *any* definition of steam, as LG USA has proven.  (*See* discussion *supra* Part I.B.).

In the end, Whirlpool cannot escape the conclusion that its literally false claims regarding its Duet® Steam Dryer are material and would influence consumer purchasing decisions.  LG USA has shown a strong likelihood of success on the merits and injunctive relief is appropriate given this and the other reasons set forth above.

## II.    LG USA Is Suffering Substantial Irreparable Harm

### A.    LG USA Is Entitled to the Presumption of Irreparable Harm

It is well settled that injuries arising from Lanham Act violations are presumed irreparable, even absent a showing of business loss.  *See Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 16 (7th Cir. 1992).  The *Abbott* Court explained the reasoning behind this presumption as "based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations."  *Id.  See also Promatek Indus., Ltd. v. Equitrac Corp*., 300 F.3d 808, 813 (7th Cir. 2002) ("it is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss").

Whirlpool claims that LG USA is not entitled to the presumption of irreparable harm because Whirlpool does not directly compare the Duet® Steam Dryer to LG USA's Tromm Steam Dryer, relying on *McCarthy on Trademarks and Unfair Competition* § 27.30 (2007). (Def. Opp. 16).  *McCarthy* merely states that "the Second Circuit in 1988 held that harm is presumed in cases of false comparative advertising."  *McCarthy on Trademarks and Unfair Competition* § 27.30.  This is not the Second Circuit, and no such limitation exists in the Seventh Circuit.  Whirlpool concedes as much when it acknowledges that the Seventh Circuit applied the presumption of irreparable harm in *Abbott*, where there was no comparative advertising claim. In fact, the *Abbott* trial court explicitly clarified that the presumption is *not* limited to those situations in which the advertising contains direct comparative claims.  *Mead Johnson & Co. v. Abbott Labs*., 41 F. Supp. 2d 879, 905 (N.D. Ill. 1999), *rev'd on other grounds*, 201 F.3d 883 (7th Cir. 1999) ("Abbott also argues that the presumption of irreparable harm applies only when

the advertising contains direct comparative claims.  Both the legal and factual premises of Abbott's argument are wrong.").  (Def. Opp. 16).  LG USA is presumed to have suffered an irreparable injury, and the Court need look no further in finding so.

### B.    LG USA Has Conclusively Demonstrated Irreparable Harm

LG USA has made a showing of irreparable harm even absent the presumption.  Dr. Mohan Rao, a Ph.D. economist, has determined that Whirlpool will suffer irreparable harm to its brand reputation and will suffer irreparable harm from price erosion. (Declaration of Mohan Rao, Ph.D. ("Rao Decl.") attached as Ex. 8).   These harms cannot be adequately compensated by money damages alone.  (*Id.* ¶¶ 22, 27).  *Health O Meter v. Terraillon Corp.*, 873 F. Supp. 1160, 1175 (N.D. Ill. 1995) (finding irreparable harm where injuries "cannot be adequately rectified by money damages").  The Report of Dr. Rao provides a thorough explanation of the irreparable harm LG USA is suffering in connection with Whirlpool's false advertising.  (*See* Ex. 8).

### C.    There Was No Delay by LG USA in Bringing its Preliminary Injunction Motion

Whirlpool attempts to negate the obvious harm to LG USA by alleging that if LG USA were really suffering irreparable harm, it would have filed suit in March 2007, when Whirlpool first began advertising the Duet® Steam Dryer, a full seven months before the product actually launched.  (Def. Opp. 16).  Whirlpool's argument is fatally flawed, as LG USA did not delay in bringing suit.

However, it is well settled that mere delay alone will not vitiate irreparable harm.  *See Nat'l Council of YMCA v. Human Kinetics Publishers, Inc.*, No. 05 C 5034, 2006 WL 752950, at *6 (N.D. Ill. Mar. 15, 2006) (noting that the Seventh Circuit does "not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for preliminary injunction" and citing *Ty, Inc. v. Jones Group, Inc.,* 98 F. Supp. 2d 988, 992 (N.D. Ill. 2000) (finding that plaintiff's eight-month delay was "minimal" because the defendant had not been "lulled into a false sense of security"), *aff'd*, 237 F.3d 891, 902-03 (7th Cir. 2001)).

 Regardless, LG USA determined that it would be ready to launch its Tromm Steam Dryer in late December 2007.  With the imminent launch of its competitive product, LG USA determined that a case and controversy then existed and on December 17, 2007 LG USA's counsel sent a cease and desist letter to Whirlpool.  The letter requested that Whirlpool cease and desist from any further use of the word "steam" in connection with its Duet® Steam Dryer, and requested a response by December 28, 2007.  (Ex. 2 to LG USA's Mem. of Law (Docket # 12-

3)). On December 20, LG USA received a request from Whirlpool's counsel for an extension of time, and Whirlpool agreed to an extension until January 9, at which time Whirlpool sent a response refusing to cease and desist making its false claims. *Id.* LG USA filed its preliminary injunction motion the very next day. (Docket # 10).

Good faith efforts to investigate the facts and pursue remedies outside of litigation do not constitute unreasonable delay and do not undermine a plaintiff's claim of irreparable harm. *See, e.g., Leonard v. United Air Lines*, 972 F.2d 155, 158 (7th Cir. 1992) ("Attempts to resolve a dispute without resorting to a court do not constitute unreasonable delay.").[9] An imagined "delay" on the part of LG USA has no place in this analysis.

## III.   The Harm to Whirlpool Would Be Minimal

The factors for an injunction are weighed on a "sliding scale approach," meaning "the more likely it is the plaintiff will succeed on the merits, the less balance of the irreparable harms need weigh towards its side." *Abbott Labs.*, 971 F.2d at 12; 237 F.3d 891, 902-03 (7th Cir. 2001); *Ty, Inc., v. Jones Group Inc.,* 237 F.3d 891, 895 (7th Cir. 2001); *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000). LG USA has shown a high likelihood of success on the merits, as well as irreparable harm if the injunction is granted. As such, little weight need be given to the harm to Whirlpool if the injunction is granted, especially in the face of the substantial harm that would be suffered by LG USA. *See* discussion *supra* Parts I-II.

Whirlpool's alleged harm from an injunction cannot outweigh the harm to LG USA if the injunction is denied. Whirlpool's parade of perceived horribles—from the damage caused by "pulling" the dryer from the market to the supposed "halo effect" such a pull would have on the rest of its products—are pure fiction.

First, Whirlpool erroneously relies on *Eldon Industries, Inc. v. Rubbermaid, Inc.*, 735 F. Supp. 786 (N.D. Ill. 1990) to claim that "[i]f Whirlpool were to suddenly pull all of its steam dryers out of retail stores, Whirlpool will lose the good will it has built with consumers and retailers . . . ." (Def. Opp. 18). LG USA's injunction does not ask for Whirlpool pull its Duet®

---

[9] Whirlpool's cited caselaw for its argument that LG USA's supposed "ten-month delay" somehow prevents LG USA from obtaining an injunction only manages to demonstrate the opposite. (Def. Opp. 17). In *Ty*, 237 F.3d at 902-03, for example, the court held an eight-month delay "minimal," finding that "Plaintiff stands to suffer significantly if a preliminary injunction is not entered, as Plaintiff could lose control of its reputation and goodwill." *See also Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979) (finding irreparable harm even though plaintiffs waited seven months to file

Steam Dryers, and indeed it would not need to take this step in order to comply with the injunction. (Ex. 2, Block Decl. ¶¶ 12, 14). Whirlpool's removal of the word "steam" from its Duet® Dryers is a short-term expense. (*Id.* ¶ 12). Name labels, point-of-purchase and collateral materials, and advertising would have to be changed. (*Id.*). Whirlpool's reliance on *Eldon* is irrelevant, as that case involved compelling the discontinuation of sales of a competing product. *Eldon,* 735 F. Supp. at 827.

Second, Whirlpool wrongly asserts that if an injunction were to ensue, consumers would be unable to purchase the Duet® Dryer, and therefore would not want the Duet® Washer because there would be "no matching set." (Def. Opp. 19). It is unclear as to why the washer and dryer would not "match" as the dryer would retain the same appearance and would still be available for purchase by consumers. In any event, Whirlpool has created its own dilemma by falsely partnering a steam-making washer with a "steam" dryer that lacks a steam generator or the capacity to create steam.

Third, Whirlpool provides no basis for its claim that consumers and competitors would "perceive any retraction of Whirlpool's message as an admission that the dryer is not effective or safe." (Def. Opp. 19). Any injunction would go largely unnoticed by the media and online communities, as the story lacks any emotional connection, such as personal injury, or endangering children, or any criminal activity, and is hardly an admission that the product is unsafe or ineffective. (Ex. 2, Block Decl. ¶ 14).

Fourth, Whirlpool provides no basis for its claim that the Duet® brand has a "halo effect" over all Whirlpool laundry products. (Def. Opp. 19-20). By relying on an unsubstantiated conclusion from a Whirlpool employee, Whirlpool falls fall short of establishing that such a halo effect even exists. (*See* Rogers Decl. ¶ 12 (Docket # 51)).

Ultimately, the impact of the injunction to Whirlpool would be negligible and would not attract the type of attention Whirlpool would like this Court to believe. This is a product that constitutes only a small portion of Whirlpool's total corporate revenue and Whirlpool will continue as a market leader in the washer and dryer category. (Ex. 2, Block Decl. ¶¶ 12-14). On balance, absent an injunction, the irreparable harm to LG USA will be far greater. *See* discussion *supra* Part II.

---

suit and eight months thereafter to move for a preliminary injunction because the plaintiffs suffered damage to its goodwill).

IV.     **The Public Interest Is Best Served By Prohibiting False Advertising**

The public will benefit if Whirlpool is enjoined from using the word "steam" to describe its Duet® Steam Dryer, as the public has an interest in truthful advertising. *Abbott*, 971 F.2d at 19. Citing *Abbott,* Whirlpool argues that it is a rare case where "purging a safe and effective product serves broad societal interests." (Def. Opp. 21) (quoting *Abbott*, 971 F.2d at 18-19). That case sought a wide variety of relief, including removal of the product from the market. *See Abbott*, 971 F.2d at 11. There is no "purging" here. LG USA merely requests that Whirlpool stop its false advertising. In fact, the Seventh Circuit stated that a remedy such as corrective advertising may have been exactly what was needed in *Abbott* and would best serve the public interest. *Abbott*, 971 F.2d at 19 (finding that eliminating the false aspects of defendant's campaign and issuing corrective advertising would have been an appropriate remedy). LG USA requests exactly what the Seventh Circuit recommends. Forcing Whirlpool to correct its false advertising would serve the "heart of the Lanham Act," and thus the public interest, and should be required in this instance. *See Abbott*, 971 F.2d at 19.[10]

**CONCLUSION**

For the foregoing reasons, LG USA requests that this Court grant its Motion for Preliminary Injunction.

Dated: February 26, 2008                    **LG ELECTRONICS U.S.A., INC.**

                                                                   By:  /s/Ronald Y. Rothstein
                                                                   rrothstein@winston.com

                                                                   WINSTON & STRAWN LLP
                                                                   35 West Wacker Drive
                                                                   Chicago, Illinois  60601
                                                                   (312) 558-5600 – telephone
                                                                   (312) 558-5700 – facsimile

---

[10] For the same reasons, LG USA is also entitled to a preliminary injunction under its common law and state law claims. Whirlpool incorrectly asserts that Illinois law cannot apply to Whirlpool's deceptive actions because LG USA alleges harm in every state, not solely Illinois. (Def. Opp. 14). The case of *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100 (Ill. 2005), recognized that in a misrepresentation case "there is no fraudulent transaction until the misrepresentation has been communicated." *Id.* at 186. When the actual deception occurs in Illinois, as it has here, Illinois law applies. *Id.* at 187; *see also Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45 (Ill. 2007) (allowing CFDBPA claim against defendant in relation to worldwide advertising campaign where harm occurred in Illinois among other states).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **Plaintiff LG Electronics U.S.A., Inc.'s Reply In Support Of Motion For Preliminary Injunction** has been served on the following counsel of record via the Court's electronic filing system this 26th day of February, 2008.

Brian D. Roche – broche@reedsmith.com
Carey L. Bartell – cbartell@reedsmith.com
Vanessa C. Martí – vmarti@reedsmith.com
REED SMITH LLP
10 South Wacker Drive, Suite 4000
Chicago, Illinois 60606

/s/Ronald Y. Rothstein_____

One of LG USA's Attorneys