# EXHIBIT

# 3A

*Case #3252 (11/01/95)*
**WHIRLPOOL CORPORATION**
**Washing Machines**
*D'Arcy Masius Benton & Bowles/New York, NY*

- **Comparative superiority claims must be supported by sufficiently reliable research**

- **An advertiser must possess reliable support for all reasonable interpretations of its claims**

**Basis of Inquiry:** Print, radio, point of purchase and brochure advertising for Whirlpool Corporation's ("Whirlpool") washing machines was brought to the attention of NAD by the Maytag Corporation ("Maytag"). Many of the express claims in the various advertising pieces are similar, if not identical, and are as follows:

• **Laundry Brochure:** Contains a graph with the headline "Repair History". Underneath the headline there is a bar graph which shows (on separate lines) "Whirlpool"; "Maytag - 25% More!"; and "G.E. - 31% Morel" The asterisked disclosure reads "Based on service incidence rates from July 1993 to Dec. 1994 Market Share Tracking Study, NPD Research Percentage of washers less than one year old receiving service in the past three months."

• BETTER QUALITY!"

• "A DECADE OF PROVEN PERFORMANCE!"

• **Print Advertisements:** All of the print advertisements, except the brochure, feature a visual of three variously soiled service person shirts with the logos of each of the three companies. The GE shirt is the most heavily soiled, the Maytag less so and the Whirlpool shirt is entirely clean.

• "TWICE AS CLEAN, BETTER QUALITY.*"

• The "TWICE AS CLEAN" claim is usually punctuated by and appears in conjunction with a cleaning graph that visually shows a superior soil index removal and contains a disclosure that reads "Based on I 31b. AHAM load" or words to than effect.

• The "BETTER QUALITY" claim is accompanied by a footnote disclosure that reads "Whirlpool Corporation: NPD Research, Jan-Dec. '94; based on machines less than a year old having service in the past three months."

• "Not only do current Whirlpool washers have a lower repair rate than G.E. and Maytag, they also get clothes cleaner."

•t"In fact, the bigger the load, the more you'll see how much better Whirlpool cleans."

•T"WHIRLPOOL SUPER 2OLB.* SUPER CAPACITY
PLUS WASHER. — The double asterisk refers no a footnote that reads "Refers to motor capacity only."

•**Radio Spot:** "Surveys show Whirlpool washers are more dependable than GE and even Maytag"

**Challenger's Position:** In was Maytag's position than the repair history superiority claim, which is based on data indicating that the claim is based on the percentage of washers less than one year old requiring service in the last three months, is misleading. The thrust of the position is that it is inherently misleading to claim a repair superiority on a three month window of service calls.

Maytag argued that the repair superiority claim is rendered more confusing by the accompanying headline (in the brochure) — "BETTER QUALITY! A DECADE OF PROVEN PERFORMANCE!." It argued that this headline copy, which is significantly larger than the qualifying language, suggests that Whirlpool has a repair superiority over a ten year period even though the data is based on a three month snapshot. Finally, Maytag noted, the claim is made even more confusing due to the fact that the text below the headlines talks about the transmission, rather than the product as a whole.

Moreover, it questioned the reliability of the results, that were only at a one-tail 90% confidence level. Maytag recalculated the results using a two-tail test and in determined that, the superiority claims would one be at an 85% two-tail confidence level, which is not enough to support such a claim.

As to the claimed cleaning advantage by Whirlpool, Maytag, after reviewing the AHAM testing in support of its "Twice as Clean" claim, asserted that Whirlpool failed to follow the protocol established by AHAM in that it only ran the test three times instead of the four specified by the protocol.

Furthermore, Maytag took exception to the visual of the three service repairmen shirts which displayed substantial dirt on the Maytag and GE servicemen shirts and none on the Whirlpool serviceman s shirt. Through conversations with Whirlpool prior to this inquiry, Maytag discovered that the visual was intended to show that Maytag and GE have higher service incidence rates than Whirlpool. Maytag argued that these shirts, which appear below the "Twice as Clean" headline, are clearly intended to represent that "these shirts represent Whirlpool's cleaning advantage over Maytag and GE."

Finally, Maytag questioned the claim, "In fact, the bigger the load, the more you'll see how much better Whirlpool cleans." On the one hand, Maytag argued, if this is a comparative claim, then Whirlpool's footnote states than its cleaning advantage is based on testing only at one size, 13 pounds. Another interpretation is that Whirlpool actually gets clothes cleaner as the load size increases. Maytag posited that the latter interpretation is more likely, especially because it is coupled with the statement "2OLB. SUPER CAPACITY PLUS WASHER." Maytag argued that "[b]ased on both our experience...as well as conventional wisdom, it is doubtful that the Whirlpool washes better as load size increases.

**Advertiser's Position:** Regarding its claim of better repair history (including the service incidence disclosure) than Maytag and GE, Whirlpool set forth the historical basis of how it eventually chose this claim.

The advertiser explained that in December 1989 it began an informational tracking program by using a large market research firm. The intent was to obtain "ongoing information concerning several key market measures." The program tracked: 1) Appliance ownership by brand broken down by age of machine into four groups including new to one year old and one nt four years old; 2) Appliance service rates for all brands; and 3) Consumer purchasing of appliances by brand. This was done by way of a mail panel, which is a group of people that have been recruited to participate in market research studies, and most of the contact with the panelists is via the mail.

From July of 1993 through December of 1994, the market research company did a monthly mailing to 15,000 nationally representative households or a total mailing of approximately 300,000 households. For the period of January 1994 through December 31, 1994 mailing were sent to about 200,000 households. There was a response rate of between 67% no 72% of those surveyed.

Whirlpool provided a summary of the results covering the eighteen months illustrated by the brochure graph an issue (or the twelve month period used in the print ad). The claimed differences in the service incidence between Whirlpool and GE and Maytag were statistically significant at a one-tail 90% confidence level.

As to Maytag's argument that it is misleading to claim a superior repair history based on a "three month window of service call experience" on "washers less than one year old," Whirlpool delineated a number of reasons in support of its use.

Whirlpool, in formulating the structure of the questionnaire, determined that using a three month window was more advantageous than using a six month window. When researching the issue, it was found that the question limited to "the past three month period" yielded better results as a person's memory about an event of this type tends to fade over a longer period of time. In other words, the shorter the recall period, the more accurate the information.

Whirlpool also argued that the use of the three month window also gave them additional flexibility by allowing in to obtain the most current information on new -models, information that may be used for various reasons including model changes.

As to the reason for using models that were less than one year old, Whirlpool argued that "[n]ew models are most indicative of current design, manufacturing processes, procured parts and materials, logistics execution, installations practices and customer instruction details...all factors which we feel influence the customer's satisfaction with the product and, consequently, their purchasing decision." In short, it was Whirlpool's position that its campaign is intended to focus on new models because that what it is currently selling and information about currently selling models is what is important to consumers.

As to the radio spot which includes the claim, "Surveys show Whirlpool washers are more dependable than GE and even Maytag," Whirlpool argued that in felt that this was a truthful and accurate claim that did not necessitate further disclosure as it was supported by the research submitted in support of the repair history claims.

As to the "BETTER QUALITY" and "A DECADE OF PROVEN PERFORMANCE" claims, Whirlpool argued that these are two separate and distinct claims as indicated by the fact that they are separated by being on different lines of copy.

The advertiser noted that the "Better Quality" claim is on the same line as the caption "Repair History." According to the advertiser, the reason the graph and disclosure relating to repair history was directly next to the "Better Quality" claim was to identify what was meant by its better quality claim, rather than leave it open to interpretation. Whirlpool further argued that neither the graph nor the disclosure were required under the circumstances because its survey results provided it with a reasonable basis to make a general repair history superiority claim.

As noted earlier the "A Decade of Proven Performance" claim is on a separate line from the "Better Quality." The advertiser argued that the "Decade" claim is immediately followed by language referring to the direct drive transmission of the Whirlpool machine. The advertiser submitted that "[h]eadlines should be read the context of the disclosures in the body of print advertisement immediately following them. The body of print immediately following this headline refers, as Maytag acknowledged, to the transmission." In short, it was Whirlpool's position that to reasonable reader would be confused into thinking that the "Decade" headline would refer to a repair history encompassing an 18 month window.

Rather, as stated above, the "Decade" refers to the direct drive transmission, the support for which comes by way of Whirlpool's program of changes made to its transmission over a ten year period. Whirlpool called these changes the LEAP program (which in instituted in 1985 when in converted from a belt drive system to a direct drive system). In brief, the LEAP design incorporated 30-40% fewer parts and a significant reduction in potential leak points. The benefits of the LEAP design are better cleaning performance and better quality.

As to the express and alleged implied claim arising from the "Twice as Clean" claim, both on its own (express) and in conjunction with the service person shirt visual (implied), the advertiser argued that the ads in which these claims appear have two separate themes — cleanability and quality/service incidence rates.

The service person shirts appear beneath the headline "TWICE AS CLEAN, BETTER QUALITY.*" The asterisk refers to a footnote relating to the service incidence rates data. The shirts, according to the advertiser, were intended to "further highlight Whirlpool's quality as reflected by its lower service incidence rate as compared to Maytag and GE. They were meant to portray in a pictorial manner the fact that a service person who is not required to make as many service calls due to the lower incidence rates would normally have a cleaner shirt." Conversely, Whirlpool noted than they were not intended to represent actual washing results.

In support of its "Twice as Clean" claim, the advertiser provided the protocol and results of its industry standard ANSI/AHAM HLW-l-1987. In the testing, three Whirlpool, three Maytag and three GE washers were run using 140 degree wash, 100 degree rinse and soft water with six grams of AHAM detergent per gallon of rinse fill and were each run an a twelve minute cycle. Each washer was run three times with twenty identical AHAM soil cloth swatches and each run consisted of a thirteen pound test load. A tristimulus colorimeter was used to measure light reflectance before and after the testing and a tergotometer test was run on the soil cloth lot. The results from the colorimeter and tergotometer test were used to determine the soil removal index.

The results were expressed in terms of soil removal as determined by the difference in the light reflected prior to and after being washed. They indicated that overall mean soil removal for all the Whirlpool runs was 38.0% whereas the mean overall average for all Maytag machines tested an 15.6%.

From these mean figures a soil removal index was determined by way of the tergotometer. As the advertiser explained, "the tergotometer provides a standard measurement for comparison purposes which becomes the basis for development of the soil removal index. By using the standard AHAM test procedure calculations, the comparative soil removal index for Whirlpool was 0.87 and 0.36 for Maytag. Thus, Whirlpool argued that it had provided a reasonable basis for ins "Twice As Clean" claim.

Moreover, Whirlpool noted that Maytag's standard deviation on every run was consistently higher than Whirlpool highest individual standard deviation between all runs. In other words, the testing indicated that Maytag did not wash as consistently even within a particular load as Whirlpool did. Whirlpool argued that the reason for this difference is primarily due to Maytag's inability to move clothes through the wash tub as well as the Whirlpool machines.

Finally, as to the claim, "In fact, the bigger the load, the more you'll see how much better Whirlpool cleans," Whirlpool argued that its machines do a better job cleaning than Maytag pound for pound. Whirlpool countered Maytag's arguments regarding this claim by stating it does not relate directly to the 13 pound load or "20lb. super capacity" claims.

Instead, Whirlpool argued that this claim "emphasize[d] Whirlpool's ability to wash 'larger' loads better than [its] major competitors." It contended that this was supported by the washer testing, discussed above, combined with the ability of a washer to "rollover" or move clothes through the wash tub better than Maytag or GE. It argued that a significant performance difference with the Maytag and the GE washer is that neither Maytag nor GE can achieve rollover on large loads such as the 13 pound load used in its testing. Whirlpool submitted lab testing that showed that the largest load that Maytag could rollover was 10 pounds while the GE only nine pounds, this is compared to the thirteen pound load that Whirlpool could rollover. Thus, because neither the GE or Maytag could rollover the 13 pound load, their washing ability on bigger loads is diminished.

Moreover, in its cleaning nesting, Whirlpool was able to achieve more consistency in its "cleanabiliny" because its machines were better able to move the swatches so that they came in more contact with the agitator where most of the cleaning occurs.

**Decision:** For the detailed reasons set forth below, NAD recommends that the advertiser modify or discontinue the subject advertisements.

First, in the brochure, there is the "REPAIR HISTORY*" graph/claim that appears along with the headlines "BETTER QUALITY" and "A DECADE OF PROVEN PERFORMANCE." For the reasons discussed below, NAD finds that the graph and claims therein are potentially misleading and recommends that it be modified or discontinued.

Initially, NAD is troubled by the "Repair History" headline. The graph is based on survey research data intended to determine the rate of service calls for new machines requiring service in the last three months. The survey did not ask whether the call was specifically for a repair. In other words, while a service call may indicate the necessity of a repair, a service call may also have to do with installation problems or consumer misuse. Thus, NAD finds that it is misleading to equate service incidence rates with repairs. This is especially so in the case of new machines, when installation problems would most likely occur.

As to the actual survey results, while NAD has never articulated a specific confidence level necessary to substantiate claims, a significant factor to be considered when determining what is necessary is the type of claim being made. Here, the graph claim is used in a highly comparative advertisement and is making a strong repair superiority history claim against two leading competitors. Forgetting for a moment that repair history does not necessarily equate with service call incidence, NAD finds that, as to the Maytag comparison in which the confidence level was 90%, the superior service incidence rate is not supported by the evidence. Even though there was a 67%-70% response rate from the eighteen month mailing, there were only about 2100 people who had bought Whirlpool machines in the last year and 1400 who had purchased Maytag. Thus, the service incidence numbers represented in the "25% More" claim reflects 64/2 109 or 3.0% for Whirlpool no 56/1437 or 3.9% for Maytag. Thus, by stating that Maytag required 25% more service calls overstates the significance of the difference, especially in light of the 90% confidence level, small sample size, short duration of recall and the fact that, in NAD's opinion, service calls are not synonymous with repairs.

For the reasons similar to those set forth above, NAD recommends that the advertiser modify or discontinue the radio claim, "Surveys show Whirlpool washers are more dependable than GE and even Maytag." NAD finds that the survey materials on machines less than one year old requiring service within the last three months does not support a broad, unqualified claim of "more dependable" than GE and Maytag. In addition to the fact that the survey data was unpersuasive, it is NAD's opinion that dependability goes far beyond short term service incidence rates.

Additionally, NAD recommends that the advertiser discontinue the use of the "BETTER QUALITY" claim in all of the print ads as it is problematic both on its own and in conjunction with the service incidence claims. As discussed above, even beyond the questionable reliability of the research results, it is NAD's opinion that "repair history" does not necessarily equate with service incidence. Along these lines, NAD feels that it is misleading to broadly claim "Better Quality" based on those same service incidence research findings. As said previously, service incidence, especially during the first year, could go beyond actual repair calls. The research did not probe into what was meant by "service call." In NAD's opinion, the "quality" of a washing machine is not something that could be judged on the basis of short term service incidence research on new machines since the "quality" of an appliance encompasses much more over the lifetime of the machine. To broadly claim a superior quality machine on questionable research is found to be potentially misleading to consumers.

Moreover, NAD finds that, contrary to the advertiser's argument that the better quality claim (in the brochure) only relates to the "Repair History" graph, it is not unreasonable to think that consumers would equate it with the "Decade" claim that appears in the same type face, color and size as the "Better Quality" headline and appears directly below it. Simply because it is on a different line from the "Decade" claim does not mean that the two will be read separately.

For the above reasons, NAD also recommends that any and all references to "BE'ITER QUALITY" (as in the print headline "TWICE AS CLEAN, BETTER QUALITY") and Whirlpool's lower repair rate (i.e., "Not only do current Whirlpool washers have a lower repair rate than G.E. and Maytag") be discontinued as they are not supported by the mail survey submitted by Whirlpool.

Furthermore, NAD recommends that the advertiser modify or discontinue the "A DECADE OF PROVEN PERFORMANCE" headline as it appears in the subject advertisement. Despite the advertiser's contention, it is not clear that this language relates simply to the direct drive transmission employed in the Whirlpool machines for the last ten years. While NAD was impressed with the design improvements made by Whirlpool, in the context of this advertisement, the "DECADE" claims in conjunction with the repair history and better quality claims takes on a potentially misleading comparative import that could mislead consumers to believe that the repair history and better quality claims refer to the past decade. In another context, in which the headline is unambiguously related to the direct drive transmission and not potentially related to other comparative performance claims, NAD would not be troubled by the claim. However, in this advertisement, we find it to be potentially misleading to consumers.

As to the print advertisement that features the "TWICE AS CLEAN" claim along with the service repairmen visual, NAD also requests that the advertiser modify or discontinue the advertising.

First, as to the service shirts, NAD was unpersuaded by the advertiser's argument that they clearly picture the fact that the Whirlpool machines require less service. Initially, NAD notes that the visual is directly beneath the headline that says "TWICE AS CLEAN, BETTER QUALITY" and next to (or above, depending on the ad) the ad copy that discusses the cleaning superiority over Maytag and GE. Granted, the copy also discusses the lower repair rates but this only furthers the ambiguity. At best, this visual is ambiguous as to whether it relates to the cleaning efficacy or the lower service incidence. At worst, it is a potentially misleading, undisclosed mock-up that could be interpreted to visually illustrate the claimed "twice as clean" cleaning advantage for Whirlpool. Either way, an advertiser must be able to support all reasonable interpretations of its claims, express or implied, written or visual. Having admitted that this visual was intended to illustrate a lower service incidence, Whirlpool has not supported the more likely interpretation of visually depicting the cleaning superiority. Accordingly, NAD recommends that this visual be discontinued.

As discussed in the advertiser's position, the "twice as clean" claim is based on testing that essentially follows the AHAM testing protocol. The one deviation from the recommended protocol is that the cleaning procedures were replicated three times, instead of the delineated standard of four. However, the advertiser made up for that by running the test three times on three different machines. Thus, there were nine repetitions instead of four. Other than this deviation, the advertiser followed the protocol in terms of testing procedures and determination of relative results. NAD finds that the deviation from the protocol is not fatal to the validity of the test and, accordingly, finds that the advertiser has a reasonable basis to make this claim as it is communicated in these ads by way of various charts and with the 13 1b. AHAM test load disclosure.

Likewise, NAD finds the claim, "In fact, the bigger the load, the more you'll see how much better Whirlpool cleans," is substantiated. This claim immediately follows the claim, "Not only do current Whirlpool washers have a lower repair rate than G.E. and Maytag, they also get clothes cleaner," thereby setting up the comparative nature of the claim (of course, most of the advertisement is comparative in nature). Thus, NAD is not persuaded by the challenger's assertion that the claim is monadic and intended to say that Whirlpool cleans bigger loads

better than small ones. Rather, it is NAD's opinion that the claim is comparative in nature and does accurately showcase Whirlpool's ability to wash larger loads better than its major competitors (as was shown by the AHAM testing). Although the advertiser did not test along the spectrum of wash load sizes, the claim is essentially saying that the differences will simply become more pronounced as load size increases. In other words, as load size gets smaller, so will the differences in comparative cleaning ability.

Finally, NAD recommends that the advertiser modify or discontinue the use of the copy stating "WHIRLPOOL SUPER 2OLB.* SUPER CAPACITY PLUS WASHER." NAD finds it highly likely that consumers would be misled into believing that this refers to how much clothes a washing machine could effectively handle, rather than what the motor of the machine could handle (i.e., that the machine will effectively clean 2Olbs. of clothes). NAD finds that the mouse type disclosure, "Refers no motor capacity only," does not rectify the potentially confusing consumer take away, especially in light of the large type size, bold type face and the cleaning efficacy context in which the headline appears. While motor capacity of a machine is a technical specification and is no doubt important to the effective functioning of a washer, it bears only an indirect relation to how big of a load a machine could handle. Thus, NAD recommends that the advertiser more clearly differentiate the amount of pound capacity for motor strength and amount of pound capacity for cleaning performance and make sure that the former in no way implies the latter.

NAD notes than the preceding decision primarily focused on the brochure, print and radio spots but acknowledges that there are a number of point of purchase materials that feature similar, if not identical, claims and combination of claims. Accordingly, it is NAD's position that the above concerns and recommendations be heeded, where applicable, to the point of purchase materials.

**Advertiser's Statement:** "Whirlpool is pleased that the NAD has accepted its support for the claims as made in its advertising that Whirlpool washing machines get clothes "twice as clean" as Maytag and that Whirlpool's superior cleaning is more readily apparent 'the bigger the load.'

"As to the remainder of the final case decision, Whirlpool respectfully disagrees with the NAD's findings for the reasons set forth in its communications to the NAD. In particular, we think the NAD took an overly broad position than the service incidence rates of new models measured on a short term basis cannot substantiate a quality claim since 'quality' encompasses much more over the machine's entire lifetime. This position fails to take into consideration, -among other things, the fact that manufacturers are continually implementing product changes. Consequently, information gained over the 'lifetime' of a product, may not be relevant to the 'changed' product sold today. In our opinion, it is the most recent service incidence rates that are most relevant and indicative of the quality found with respect no today's products."

Not withstanding this disagreement, Whirlpool strongly supports the self-regulatory process, and we did appreciate NAD's efforts to this manner. The radio spot completed its airing in September and the print ad completes its run in October. We have no plans to use either again. Whirlpool is in the process of revising its literature and point of purchase materials and will consider the NAD's views carefully in the creation of future advertising." (#3252 BSS, closed 9/21/95)

# EXHIBIT

# 3B

*Case #3995 (01/06/03)*
**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
*Advertising Agency:*        *In-House*
*Challenger:*            *Den-Mat Corporation*

- **In an NAD proceeding, the advertiser has an obligation to support any reasonable interpretations of its advertising claims not just the messages it intended to convey.**

**Basis of Inquiry:** Claims made by Natural White, Inc. for its Rapid White® Tooth Whitening System on its product packaging and website were challenged by the Den-Mat Corporation, manufacturer of Rembrandt Plus Superior Bleaching System, Rembrandt Dazzling White Tooth Bleaching Value Kit and other dental products. The following are representative of the claims that served as the basis for the instant inquiry:

"Whitens up to 7 shades in 7 days."

"Natural White, the leader in tooth whitening products provides the breakthrough technology of the Rapid White System; that 'WHITENS TEETH UP TO 7 SHADES LIGHTER IN ONLY ONE WEEK'* (used daily as directed)." "*Clinical tests have proven the efficacy of Rapid White, to whiten teeth up to 7 shades lighter in one week; some patients have experienced even greater results."

"It takes minutes a day to whiten your teeth up to 7 shades in 7 days."

"Whitens 3 times faster!*" "*As compared to many whitening products."

"Depending on the color of your teeth, you should start to see results after a few days."

"[M]any people may see demonstrable results within the first few applications . . ."

"Before" and "After" photos, with yellow teeth in the "Before" photo and white teeth in the "After" photo, and the caption "This is a dramatization of the results you can achieve by using our Rapid White Tooth Whitening Systems."

**The Challenger's Position:**

I.        "Whitens Up To 7 Shades in 7 Days."

According to the challenger, the advertiser makes objective claims that Rapid White whitens consumers' teeth seven shades in seven days, which must be supported by adequate and reliable scientific evidence. The challenger was unaware of any substantiation for these claims.

With respect to the singular Rapid White Pro Study[1] submitted by the advertiser in support of its claims, the challenger noted that this study tested a product called Rapid White *Pro* and there is no evidence that Rapid White Pro and Rapid White are the same or even similar products. Indeed, the challenger argued, a review of the study makes clear that such is not the case. The

---

[1] "Clinical Study to Prepare for the Launch of Rapid White Pro" (hereinafter, the "Rapid White Pro Study")

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 2**

subjects in the Rapid White Pro Study wore an upper and lower mouth tray, which was manually fabricated by each subject, in sharp contrast to the product at issue, which contains a pre-formed duplex mouth tray requiring no such fabrication. Further, Rapid White Pro's bleaching gel contains 2 applications per tube whereas the advertised Rapid White's bleaching gel contains 45 applications per tube. Moreover, Rapid White Pro contains two whitening gels (Level 1 Whitening Gel for Week 1 and Level 2 Whitening Gel for Week 2), while Rapid White contains only one whitening gel (Rapid White Whitening Gel).

The challenger noted that NAD requires testing on the current formulation of the actual product advertised to support specific performance claims.[2] Indeed, NAD has held that "[t]esting should be conducted on the actual product itself, with the same components and percentage of the elements that comprise the product, and the conclusion should support the claims as communicated in the advertising."[3] The challenger argued that it is clear that the product tested in the Rapid White Pro Study is not the challenged product. As such, the challenger maintained, the Rapid White Pro Study fails to provide substantiation for the advertiser's "seven shades in seven days claim" for Rapid White.

Further, even assuming *arguendo* that the studied and the advertised products were identical, the challenger argued that the Rapid White Pro Study still fails to support the advertiser's claims that its product can whiten teeth seven shades in seven days. In the first instance, the subjects' teeth were not examined until the end of a *two*-week period, which, the challenger contended, does not provide substantiation for a one-week claim. In fact, no tooth color measurements were taken after seven days. With respect to the advertiser's argument that because two of the 50 subjects' teeth changed ten shades after two weeks, it "believe[s] it is correct to say that . . . the teeth of one subject" probably changed seven shades by the end of the first week,[4] the challenger asserted that this is mere guesswork which is insufficient support for a product claim.[5] Thus, the challenger argued, the Rapid White Pro Study fails to provide any support for the "seven shades in seven days" claim.

Additionally, the challenger argued that based on the results of the Rapid White Pro Study, it is unlikely that the subjects would have obtained seven shade changes after seven days even if measurements *had* been taken after seven days. The modal value (the most commonly seen number of shades of whitening) after two weeks was 3 shades, which was experienced by nine of the 50 subjects.[6] The median number of shades of whitening after two weeks was 4 shades,[7] and

---

[2] Citing Bio-Foods, Inc./Balance Nutrition Bars, Report #3441, *NAD Case Reports* (Feb. 1998)

[3] Id., see also SlimAmerica, Inc.( Super Formula Weight-Loss Supplement), Report #3323, *NAD Case Reports* (August 1996); Gero Vita International (Gero Vita GH3 Anti-Aging Pills), Report #3206, *NAD Case Reports* (June 1995).

[4] Advertiser's Initial Reply at p. 2.

[5] See, University Medical Products, U.S.A., Inc. (Face Lift/Skin Care Products), Report #3311, *NAD Case Reports* (June 1996)

[6] Citing Rapid White Pro Study at pp. 37-8.

[7] Id.

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 3**

the mean shade change overall was reported as 4.45 shades.[8]  According to the challenger, these indicators of central tendency and typical results show that consumers should expect to achieve considerably less than seven shades of whitening, after two weeks of product use.  Thus, most consumers' teeth will not change seven shades in fourteen days, let alone in seven days.

The challenger also contended that, in addition to the foregoing, the Rapid White Pro Study was suffered from material flaws and inconsistencies – there was no control group to serve as a basis of comparison; there was no mention of whether the subjects' teeth were professionally cleaned at the beginning of the study to eliminate the possibility that any or all of the whitening achieved could be due to surface stain removal rather than actual whitening of the tooth structure; and the study explicitly states that it was not blind.[9]  Upon enrollment in the study, subjects read the following statement: "The purpose of this study is to confirm the whitening efficacy of Rapid White Pro, and collect information that will be used for marketing."[10]  Such a lack of blindness, the challenger posited, increases the likelihood of biased results.  Moreover, the challenger contended, the Rapid White Pro Study contains careless inconsistencies.[11]

II.      "WHITENS 3 TIMES FASTER!*  *As Compared To Many Whitening Products."

Again, the challenger argued, this is an unqualified, objective superiority claim, requiring substantiation by adequate and reliable (as well as consumer relevant) scientific evidence.[12]  The challenger was unaware of any substantiation for this claim.

The challenger rejected the advertiser's argument that this claim is "strictly a reference to time,"[13] and its position that because the instructions on the package advise consumers to wear the mouth tray for 10-20 minutes once or twice a day, such whitening is therefore 3 times faster than other whitening products, which generally require a minimum use of 30 minutes.  The challenger reiterated that the "Whitens 3 Times Faster" is an objective and quantifiable claim that must be supported by competent and reliable scientific evidence.

---

[8] Id. at p. 3.

[9] Citing Rapid White Pro Study at p. 14, the challenger noted that the protocol states that "The test products will be labeled Rapid White Pro."

[10] Id. at p. 54.

[11] For example, the Rapid White Pro Study contains a chart labeled "Final Color Evaluations Chart A-1" which shows patients Patti Darroch and Sandra Hyslup both going from Begin Shade D4 to Final Shade D2.  This represents four shades of whitening on the Vita shade guide.  See Chart A-1 on p.5 and Table 1 on page 36 of Exhibit A of the Natural White Response.  However, Patti Darroch is wrongly credited with seven shades of whitening, while Sandra Hyslup, with the identical before and after shades, is wrongly credited with six shades of whitening.

[12] See, The Hoover Company / Hoover SteamVac Widepath (Upright Deep Cleaner), Report # 3848, NAD Case Reports (December 2001).

[13] Rapid White Response, p. 1.

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 4**

The challenger noted that NAD has repeatedly stated that an advertiser is responsible for all reasonable interpretations of its claims, not just the messages it intends to convey.[14] Accordingly, the challenger asserted that one reasonable interpretation of the claim, "Whitens 3 Times Faster," is that Rapid White can whiten teeth the same amount of shades as other products, but three times as fast – an unqualified superiority claim requiring head-to-head testing against competitive products as substantiation.[15] Because the superiority claim is unqualified, the challenger argued that the substantiation must include testing against all or a significant portion of competitive products on the market.[16] Indeed, the challenger argued that, "it is incumbent upon advertisers making comparative performance claims, to routinely test the universe of competing products on the market to ensure the continued truthfulness and accuracy of the claims."[17]

Here, the challenger noted, the advertiser has not provided a study on Rapid White, let alone any studies comparing Rapid White to other tooth whitening products. Therefore, the advertiser has provided no support for its claim that Rapid White whitens teeth three times faster than other whitening products.

Further, even assuming *arguendo* that the advertiser's assertion that this claim is "strictly a reference to time" were a reasonable interpretation of the "Whitens 3 Times Faster" claim, the challenger noted that it failed to provide any support for this interpretation. The Rapid White Pro Study submitted by the advertiser was not only performed solely on the advertised product (and not on competing products), but the subjects therein were told to wear the tray for 20 minutes twice a day.[18] This is equivalent to 40 minutes a day and, therefore, actually more than the 30 minutes the advertiser claims is generally required by other leading tooth whitening products.[19]   Further, the challenger noted, at least five other tooth whitening products recommend as little as *five* minutes of application time.[20]   Accordingly, the challenger

---

[14] See, e.g., Nutramax Laboratories, Inc./Senior Moment Advanced Memory Enhancing Dietary Supplement, NAD Case Reports, April 2002 (#3899); Black & Decker, Inc./The Black & Decker "Spacemaker Optima" Coffeemaker, NAD Case Reports, Sept. 1998 (#3483).

[15] See, Brach & Brock Confections, Inc. (Smucker's Jelly Beans), Report #3372, *NAD Case Reports* (March 1997) "In the comparative context, . . . claims of overall superiority or superiority as to identified qualities . . . need head-to-head testing as support."; see also Ecofibers, Inc. d/b/a Precision Fibers (Hydroseeding Mulch), Report #3905, *NAD Case Reports* (May 2002); CCA Industries, Inc.(Plus+White Shades Whiter and Plus+White Plus Peroxide), Report # 3483, *NAD Case Reports* (September 1998).

[16] Den-Mat Corporation (Rembrandt Plus Superior Bleaching System and Dazzling White Tooth Bleaching Value Kit), Report #3814, NAD Case Reports (October 2001)("When making unqualified comparative product performance claims an advertiser has the burden to provide reliable data against all or a significant portion of competitive products on the market.").

[17] Duracell, Inc.(Duracell Ultra M3), Report #3771, *NAD Case Reports* (June 2001).

[18] Rapid White Pro Study at p. 29.

[19] Rapid White Response, p. 1.

[20] These products include Natural White 5-Minute Tooth Whitening System (5-15 minutes), Natural White 5-Minute Non-Peroxide Tooth Whitening System (5-10 minutes), Ultra Plus+White (5-15 minutes), Plus+White Complete (5-15 minutes), and Plus+White 5 Minute Teeth Whitener Gel (3-5 minutes).

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 5**

maintained, not only is the advertiser's time requirement (as required in the Rapid White Pro Study) not three times faster than other tooth whitening products in general, but it is actually longer than that required for other tooth whitening products.

III.   "Depending On The Color Of Your Teeth, You Should Start To See Results After A Few Days," and "Many people may see demonstrable results within the first few applications."

Turning to the product packaging claims that, "Depending on the color of your teeth, you should start to see results after a few days" and ". . . many people may see demonstrable results within the first few applications . . .," the challenger contended that the word "few" is commonly defined as three and, therefore, the message conveyed is that the product will visibly whiten teeth within three days.

The challenger then noted that the advertiser defended this claim solely with a general statement that:

> "All studies on tooth whitening demonstrate that whitening occurs gradually and that more noticeable results occur during the initial period of use. There is no dispute within the industry that all whitening products invariably see results in the first few days. This is an objective statement which is not really in dispute."[21]

Notwithstanding this assertion, the challenger argued that the advertiser has made an objective claim, which was expressly challenged, and for which adequate substantiation is required – substantiation cannot be deduced from vague unspecified studies. As with the other claims, the challenger contended, this claim must be supported by competent and reliable clinical studies testing the product's efficacy after a few days/applications of use. The challenger noted that the advertiser provided no such support. There is no evidence that the product tested in the advertiser's study is identical to Rapid White and no tooth color measurements were taken in the Rapid White Pro Study until after two weeks use. Thus, the challenger contended, the advertiser's study fails to provide the requisite support for this claim.

IV.   "Before" And "After Photographs/Dramatization

Although acknowledging that dramatizations are an acceptable way to convey a message, the challenger asserted that the message must still be true, accurate, and substantiated.[22]   The challenger argued that the "After" teeth are whiter than the whitest color on the Shade Guide provided in the package and, in fact, depict *more* than a seven shade improvement when comparing the photos to the Shade Guide.

---

[21] Advertiser's Response at p. 2.

[22] See, The Procter & Gamble Company (Crest Dual Action Whitening Toothpaste), Report #3874, *NAD Case Reports* (February 2002)( "When a product demonstration is presented as visual proof of how the product will perform, the demonstration must be presented accurately and any material conditions or limitations should be clearly disclosed.")

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 6**

It was the challenger's position that many consumers will reasonably interpret these depictions to mean that Rapid White can make their teeth just as white as the teeth in the "After" picture. Further, they may also believe that Rapid White can produce a shade change as great as that between the "Before" and the "After" pictures. As these are reasonable interpretations, they are objective claims for which the advertiser has failed to provide any competent and reliable scientific evidence as substantiation.

With respect to the advertiser's contention that the before and after photographs are consistent with a ten shade change, the challenger argued that, in order to include a ten shade change dramatization on its packaging, the advertiser must have evidence that Rapid White is clinically proven to whiten teeth ten shades. As previously discussed, the advertiser provided no such evidence, let alone evidence that Rapid White has been clinically proven to whiten teeth ten shades. The challenger noted that the author of the Rapid White Pro Study, states that "From chart A-1, there is a range from one shade change to a maximum of nine shade changes."[23] Thus, the challenger argued, the advertiser failed to provide support for its visual claim that Rapid White whitens teeth ten shades.

Although acknowledging that the Rapid White Pro Study detailed that two of the fifty subjects (4%) in the Rapid White Pro Study achieved a ten shade change,[24] the challenger asserted that, even if such were the case (or if Dr. Cervini is correct, and *none* of the subjects in the study achieved a ten shade change) clearly a ten shade change was not a typical result. The challenger noted that on the packaging, underneath the photographs is the statement, "This is a dramatization of the results you can achieve by using our Rapid White Tooth Whitening Systems."[25] By saying that "you" can achieve a ten shade improvement, the advertiser implies that the typical consumer can expect such a result. According to the study, however, the average shade change was 4.47 shades after two weeks.[26] Thus, even if the product tested is proven to be identical to the advertised product, it is clinically proven to whiten less than half the shades in twice the amount of time promised by the advertiser – a result that does not come close to supporting the ten shade change claim for Rapid White.

Lastly, the challenger contended, the photographs are designed to demonstrate the written claims made on the package and NAD has repeatedly stated that "in evaluating the potential messages communicated by the claims it was incumbent on NAD to review the claims in the context of

---

[23] Exhibit A of the Rapid White Response, p. 3.

[24] Citing Rapid White Pro Study, Appendix 2

[25] Exhibit 1 of the Den-Mat Challenge Letter, *supra* note 4. (Emphasis Added).

[26] The challenger noted that the average shade change is listed as different amounts throughout the study. The Rapid White Pro Study report states the average shade change was 4.76 shades (p. 37) as the advertiser asserts in its Response, but the report also states that the average shade change was 4.7 shades (p. 37) and 4.47 shades (p. 29), the cover letter states that the average shade change was 4.47 shades (p. 27), and the summary (p. 3) states the average shade change was 4.45 shades. Although over one third of the shade changes listed in Chart A-1 (p. 5) are incorrect, a simple calculation of the mean shade changes based on the listed shades show 4.79 shade changes.

NATURAL WHITE, INC.
Rapid White® Tooth Whitening System
Page 7

how they were presented in the advertising."[27]  Here, the challenger noted, the product packaging claims that Rapid White can whiten teeth up to seven shades in seven days. In this context, a reasonable interpretation of the dramatization is that the photographs depict a seven shade change after seven days. However, the challenger argued, the dramatization depicts a ten shade improvement after two weeks and, as such, is false, misleading, and deceptive.

**The Advertiser's Position:**

I.    "Whitens Up To 7 Shades in 7 Days."

The advertiser asserted that it has a reasonable basis for this claim in that it is based upon observations during competent and accurate clinical testing conducted by Dr. Gene Cervini and Dr. Salim Z. Nathoo in 1999[28], the results of which were compiled in a study entitled, "Clinical Study to Prepare for the Launch of Rapid White Pro." The advertiser asserted that this study, employing 50 participants demonstrates that, over a two-week period, significant shade changes were achieved through use of its product. Two of the subjects achieved shade changes of 10, while another nine achieved shade changes of 8-9. The mean shade change was 4.76 with a standard deviation of 2.56. Although the advertiser believed it is correct to say that this study reflected that the teeth of one subject were whitened up to 7 shades in only one week, it cannot be disputed that the study reflected shade changes of up to 10 shades over a two-week period.

The advertiser acknowledged that the product evaluated in this study "was not specifically the same product as the Rapid White Tooth Whitening system," but explained that the same active ingredient, the whitening gel, is used in both products and it has based its claims on this fact.

With respect to the challenger's comments regarding tube-size, the advertiser argued that, contrary to the challenger's comments, the number of applications in each tube are a matter of the size of the container and do not impact the efficacy of the whitening gel. Further, the fabricated mouthpiece, although adding to consumer comfort, was not believed to have a significant impact on the product's performance.

The advertiser noted that the results in the study were recorded at the end of the 14-day test period and indicated that several patients experienced shade changes of up to ten shades. According to the advertiser, discussions with clinicians performing the test indicated that the greatest changes in whitening would likely occur in the first days of product use and that a claim of seven shades is reasonable. Although acknowledging that specific clinical evaluation of the exact product was not undertaken, the advertiser believed this claim to be accurate.

---

[27] Den-Mat Corporation (Rembrandt Plus Superior Bleaching System and Dazzling White Tooth Bleaching Value Kit), Report #3814, NAD Case Reports (October 2001; see also The Procter & Gamble Company (Pampers Baby Fresh Wipes with Moisture Pillow Quilting), Report #3565, *NAD Case Reports* (July 1999).

[28] The advertiser stated that this study has never before been challenged as to its basis or its results.

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 8**

In any event, the advertiser stated that it intended to contact the University of New Jersey (Drs. Cervini and Nathoo) to complete specific tests, which will verify this claim. Should testing fail to verify this claim, the advertiser noted that it would undertake to modify this claim.

II.    "WHITENS 3 TIMES FASTER!*  *As Compared To Many Whitening Products."

The advertiser argued this claim is strictly a reference to *use* time. In order to compare the time elements of whitening kits, the advertiser compared the minimum wear time for its product to the average wear time advertised by competing products. The directions for Rapid White state "Wear the tray for 10-20 minutes, once or twice a day." The advertiser contended that its "3 times faster" claim is based upon its product's minimum requirement of ten minutes. The advertiser then noted that the minimum wear/use time on competitive products including the challenger's Rembrandt Dazzle White, Rembrandt PLU System, as well as other competing products such as Crest White Strips, and Biodent Opti-White, all require a minimum of 30 minutes use. As such, the advertiser argued the wear time for its product is clearly one-third that of its competitors and, thus, this claim is substantiated. The advertiser further noted that the wear time claim makes no reference to specific whitening results.

Accordingly, the advertiser posited, it is reasonable for it to advertise that its product whitens three times faster than its competitors.

III.    "Depending On The Color Of Your Teeth, You Should Start To See Results After A Few Days," and "Many people may see demonstrable results within the first few applications."

In support of its claim that results can been seen after a few days (or applications) of use of its product, the advertiser asserted that all studies on tooth whitening demonstrate that whitening with peroxide occurs gradually and that more noticeable results occur during the initial period of use. According to the advertiser, there is no dispute within the industry that all whitening products invariably see results in the first few days and that this is an objective statement that is not really in dispute. It was the advertiser's position that to require clinical support would represent needless additional costs to verify a generally known and accepted fact. Thus, the advertiser believed its claim to be reasonable. In the event that NAD disagrees, the advertiser stated that it would contract with appropriate clinicians to validate this fact or will research literature to support the claim.

IV.    "Before" And "After Photographs/Dramatization

The advertiser provided NAD with what it termed an industry-standard "Professional Tooth Shade Guide." According to the advertiser, a comparison of this guide with the photographs in the advertising material reflects that the photographs accurately reflect the ten-shade difference as supported by its study. As such, the advertiser asserted that the photographs/dramatization are not misleading but, rather, are accurate and substantiated.

In any event, the advertiser argued, a dramatization is not interpreted by consumers to mean that these are the results that they will *necessarily* obtain. If such were the case, the advertiser

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 9**

posited, then everyone would be thin, have a full head of hair, hard abs and hit a golf ball like professional golfers. The advertiser stated that it does *not* promise that *every* customer will achieve the same results. The advertiser believed its dramatization to be reasonable and that by clearly marking its untouched photographs as a "DRAMATIZATION," it believed consumers would understand the depictions to be a dramatic representation of results.

The advertiser concluded by stating that it would, "amend packaging claims to comply with specific product supported clinical evaluations or obtain such clinical support that clearly supports the advertising claims."

**Decision:**

An advertiser is obligated to support all reasonable interpretations of claims made in its advertising, not just messages it intended to convey.[29] As is all cases, NAD's concern is to ensure that the scope of the claims made in the challenged advertising is entirely consistent with the scope and specificity of the supporting data upon which the advertiser relied.

Preliminarily, NAD noted its appreciation of the advertiser's assurance that it has voluntarily undertaken to modify its product packaging, and that it is doing the same for its website and other advertising materials, for Rapid White (for reasons unrelated to the instant challenge), to reflect the discontinuance of the claims "whiten your teeth up to 7 shades in 7 days," and "WHITENS 3 TIMES FASTER!"[30] Notwithstanding these assurances, however, given that these claims had not been discontinued prior to the initiation of the instant proceedings, NAD addressed these two claims as raised by the challenger and defended by the advertiser.

I.      "Whitens Up To 7 Shades in 7 Days."

Advertising claims that do not match the supporting science submitted, no matter how sound that science is, are likely to be unsubstantiated. It is important that advertisers take care to make sure that the claims they make match the underlying support (i.e., that the research upon which they rely is relevant to the specific product being promoted and to the specific benefit being advertised).

With respect to the singular Rapid White Pro Study submitted by the advertiser in support of its claims, as the challenger noted, this study tested a product called Rapid White *Pro* and not the marketed formulation of Rapid White at issue in the instant challenge. While it may be true that the active ingredient in both products are the same, certain methodological aspects of Rapid White Pro Study make clear that use of this study as substantiation for the advertising claims made for Rapid White is inappropriate. For example, as the challenger pointed out, the subjects in the Rapid White Pro Study wore an upper and lower mouth tray, which was manually fabricated by each subject, in contrast to the pre-formed mouth tray in the advertised product requiring no such fabrication. Although the advertiser stated that the fabricated mouthpiece,

---

[29] See, Nutramax Laboratories, Inc. (Senior Moment), Report #3878, *NAD Case Reports* (February 2002); Thane International (BioSlim Weight Loss Program), Report #3557, *NAD Case Reports* (June 1999)

[30] The advertiser provided these assurances during its meeting with NAD.

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 10**

while adding to consumer comfort, but did not believe that impacted the product's performance, the advertiser offered no evidence in support of this supposition. NAD was particularly concerned about the impact that a form-fitting mouth tray (as opposed to a more generic mouth tray) would have on the distribution and coverage of the bleaching gel over the teeth. Given that the bleaching gel's contact with the tooth surface is a critical factor in whitening capability, a differently designed mouth tray could well produce different results. Additionally, NAD noted that the tested Rapid White Pro contained two whitening gels (Level 1 Whitening Gel for Week 1 and Level 2 Whitening Gel for Week 2), whereas the advertised Rapid White System contains a pre-whitening toothpaste and only one whitening gel (Rapid White Whitening Gel).

Generally, NAD requires testing on the current formulation of the actual product advertised to support specific performance claims made for that product.[31] "[T]esting should be conducted on the actual product itself, with the same components and percentage of the elements that comprise the product, and the conclusion should support the claims as communicated in the advertising."[32] Here, such was not the case.

Further, NAD noted that the advertiser explicitly claims that Rapid white can, "whiten your teeth up to 7 shades in 7 days," yet in the Rapid White Pro Study, the subjects' teeth were not examined until the end of a *two*-week period, and the advertiser acknowledged that no shade measurements were taken after seven days. Although the advertiser concluded that, given the fact that two of the 50 subjects' teeth changed ten shades after two weeks, it was fair to say that the teeth of one subject probably changed seven shades by the end of the first week, NAD found such a conclusion to be speculative and insufficient support for the specific product performance claimed. Indeed, NAD noted that the overall median shade change of 4.45 shades. While it is true that the advertiser claims "up to" 7 shades in 7 days, NAD concluded that, based on the supporting evidence provided by the advertiser, any such promised result after one-week was unsupported and, in fact, atypical.

Additionally, NAD noted certain methodological flaws in the advertiser's Rapid White Pro Study. The study failed to maintain a control group,[33] and, by its own admission, was not blinded.[34] Moreover, as the challenger pointed out, there was no mention of whether the subjects' teeth were professionally cleaned at the beginning of the study to eliminate the possibility that any or all of the whitening achieved could be due to surface stain removal rather than actual whitening of the tooth structure.

---

[31] Citing Bio-Foods, Inc./Balance Nutrition Bars, Report #3440, *NAD Case Reports* (Feb. 1998)

[32] Id., see also SlimAmerica, Inc.( Super Formula Weight-Loss Supplement), Report #3323, *NAD Case Reports* (August 1996); Gero Vita International (Gero Vita GH3 Anti-Aging Pills), Report #3206, *NAD Case Reports* (June 1995).

[33] See, e.g., Colgate-Palmolive Company (Colgate Total Toothpaste), Report #3611, *NAD Case Reports* (January 2000)

[34] John O. Butler Company (Secure Denture Adhesive Paste), Report #3259, *NAD Case Reports* (December 1995).

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 11**

NAD recognized and appreciates not only the advertiser's voluntarily undertaking to modify its product packaging and advertising materials to discontinue this claim, but its stated intention to contact the University of New Jersey (Drs. Cervini and Nathoo) to complete specific tests to verify the claim that Rapid White whitens teeth, "up to 7 shades in 7 days." Notwithstanding these actions on the part of the advertiser, however, NAD believes it important to stress that an advertiser is obligated to possess support for its claims *at the time it's advertising is disseminated to the public.*[35]

II.    WHITENS 3 TIMES FASTER!* *As Compared To Many Whitening Products."

Again, although the advertiser assured NAD that it has voluntarily undertaken to discontinue this claim on its product packaging, website and other advertising materials for Rapid White, as this claim was still appearing at the time of the initiation of the instant challenge, NAD will briefly address the issues raised by the challenger and defended by the advertiser.

The advertiser argued that this claim is strictly a reference to *use* time based upon a comparison of the minimum wear time for its product (10 minutes) to the average wear time advertised by competing products (30 minutes). NAD noted, however, that the directions for Rapid White state "Wear the tray for 10-20 minutes, once or twice a day," and, indeed, in the Rapid White Pro study, subjects used the product for 20 minutes twice daily – thereby bringing the wear time for the advertised product to actually longer than the 30 minutes use time of competing products.

Additionally, as previously stated, an advertiser is obligated to support all reasonable interpretations of claims made in its advertising, not just messages it intended to convey.[36] In the absence of consumer perception evidence, NAD determined that consumers could reasonably interpret the claim, "WHITENS 3 TIMES FASTER," to mean that, by using Rapid White, consumers could achieve the same shade improvement of competing products in one-third the time. An unqualified superiority claim such as this should be supported by testing that is consumer relevant, measurable and meaningful. Here, the advertiser failed to provide any evidence testing its product against any competitive products as support for this claim.

III.    "Depending On The Color Of Your Teeth, You Should Start To See Results After A Few Days." and "Many people may see demonstrable results within the first few applications."

NAD concluded that a reasonable interpretation of these claims is that a consumer could, if used as directed (for 10 to 20 minutes, once or twice daily), reasonably expect to see results by the second day (i.e., if used twice a day for two days, for a total of four applications) or after the first few days of use – a performance capability not supported by the evidence. Again, the advertiser's Rapid White Pro Study offered in support of its claims did not test the actual product

---

[35] See, Ecofibers, Inc. (Hydroseeding Mulch), Report #3905, *NAD Case Reports* (May 2002); Knight-McDowell Labs (Airborne Formula), Report # 3862, *NAD Case Reports* January 2002)

[36] See, Nutramax Laboratories, Inc. (Senior Moment), Report #3878, *NAD Case Reports* (February 2002); Thane International (BioSlim Weight Loss Program), Report #3557, *NAD Case Reports* (June 1999)

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 12**

at issue and, moreover, results were measured after two weeks of product use – there were no shade measurements taken after the first few applications or after the first few days of product use.

The advertiser defended these claims as fully supported by arguing that it is a generally accepted fact that all studies on tooth whitening demonstrate that whitening with peroxide occurs gradually and that more noticeable results occur during the initial period of use. According to the advertiser, this is an objective statement that is not in dispute and to require clinical support of this fact would result in needless additional costs. NAD noted, however, that aside from the advertiser's blanket assertion, it failed to cite to any authority as support for this position. Further, even assuming *arguendo* that tooth whitening products containing hydrogen peroxide *can* achieve noticeable results within the first few days/applications of use, it cannot be disputed that the concentration of peroxide found in any given whitening product impacts whether or not any noticeable shade change is effected. Thus, even if the advertiser were to have cited to industry authority for the *general* proposition that whitening may occur within the first few days or applications (i.e., using a particular concentration level of peroxide), it would nonetheless be incumbent on the advertiser to demonstrate that *its product* can perform in the same manner as described in such cited authority and/or as advertised. Accordingly, NAD recommended that these claim be discontinued.

III.    "Before" and "After" Photographs/Dramatization

Dramatizations, while an acceptable means of conveying a message, must nonetheless still be true, accurate, and substantiated.[37]

Neither party submitted communication data that could provide an indication of how consumers interpret the photographic dramatization on the product packaging and advertising materials at issue. Therefore, NAD used its own experienced judgment to determine the reasonable interpretations of this dramatization. NAD concluded that the challenged "before" and "after" depictions could reasonably be interpreted to mean that consumers could anticipate similar dramatic results after using Rapid White.

The advertiser argued that the photographic depictions accurately represent a 10-shade difference as supported by its study. "[W]hen determining whether an exaggerated depiction of a product unfairly, inappropriately or inaccurately conveys a message about the functional qualities of the product, it is critical to examine it in the context of the advertising in which it appears."[38]  Here, NAD observed that the text under the photographs in question states, "This is a dramatization of the results you can achieve by using our Rapid White Tooth Whitening System." However, NAD noted, the entire context of the product packaging surrounds a 7 (not 10) shade change.

---

[37] See, The Procter & Gamble Company (Crest Dual Action Whitening Toothpaste), Report #3874, *NAD Case Reports* (February 2002)( "When a product demonstration is presented as visual proof of how the product will perform, the demonstration must be presented accurately and any material conditions or limitations should be clearly disclosed.")

[38] see, The Procter & Gamble Company (Pampers Baby Fresh Wipes with Moisture Pillow Quilting), Report #3565, *NAD Case Reports* (July 1999).

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 13**

Further, for the reasons previously discussed, NAD determined that the Rapid White Pro Study was insufficient to support the advertiser's "whitens your teeth up to 7 shades in 7 days" claim. In fact, NAD noted that, of the fifty participants in the Rapid White Pro study, only two participants (or 4%) achieved a shade change of 10, and that was after *two* weeks of use. NAD determined that such an atypical result was insufficient to support the advertiser's implied product performance claim conveyed by the "before" and "after" photographs, and recommended that the use of the challenged photographic dramatization be discontinued.

**Summary of Conclusions:**

NAD appreciated the advertiser's assurance that it has voluntarily undertaken to modify its product packaging, and that it is doing the same for its website and other advertising materials for Rapid White (for reasons unrelated to the instant challenge), to reflect the discontinuance of the claims "whiten your teeth up to 7 shades in 7 days," and "WHITENS 3 TIMES FASTER!" Notwithstanding this assurance, however, given that these two claims were still active at the time of the initiation of the instant challenge NAD reviewed these claims and concluded that the evidence submitted by the advertiser was insufficient to support these quantified and unqualified performance claims. Additionally, although the advertiser stated that it intended to obtain additional evidence from University of New Jersey to support its claims, NAD stressed that an advertiser is obligated to possess support for its claims at the time it's advertising is disseminated to the public. NAD further concluded that the advertiser's claims that a consumer could expect to see demonstrable results after the first few applications or after a few days of use was, similarly, unsupported by the record. Therefore, NAD recommended that these claims be discontinued. Lastly, NAD concluded that the photographic dramatization represented atypical results and that the evidence was insufficient to support the implied product performance claim conveyed by these photographs. Therefore, NAD recommended that the challenged dramatization be discontinued.

**Advertiser's Statement:**

Lornamead Brands, Inc., a leading manufacturer and marketer of quality home and personal care products, sold in over 50 countries worldwide, completed its acquisition of Natural White, Inc. approximately one and a half months after the NAD issued its decision in this matter. Lornamead had no involvement in either the development of the advertisements challenged here, or in the NAD review process that led to the decision.

Lornamead is in the process of reviewing the entire Natural White product portfolio and the marketing efforts for those products. Lornamead appreciates the apparently thorough and careful review given to these matters by the NAD, and intends to take the NAD's recommendations into account in any future advertising for the Rapid White Tooth Whitening System.

**N.B.**

NAD noted that the prior owner and advertiser for Rapid White Tooth Whitening System had assured NAD that it had voluntarily undertaken to modify its product packaging, and that it is doing the same for its website and other advertising materials for Rapid White, to reflect the

**NATURAL WHITE, INC.**
**Rapid White® Tooth Whitening System**
**Page 14**

discontinuance of the claims "whiten your teeth up to 7 shades in 7 days," and "WHITENS 3 TIMES FASTER!"

Notwithstanding this fact, however, NAD also concluded that the advertiser failed to adequately substantiate its claim that consumers can expect to see demonstrable results after the first few applications or after a few days of use of the advertiser's product (as formulated and marketed), and recommended that this claim be discontinued. Further, having concluded that the advertiser failed to adequately substantiate its claim that Rapid White "whitens your teeth up to 7 shades in 7 days," and the fact that the photographic "before and after" dramatization (based upon the advertiser's evidence) depicted a *10-shade* change, NAD recommended that these photographic dramatizations be similarly *discontinued.* The prior owner and advertiser for Rapid White, failed to provide an Advertiser's Statement, pursuant to Section 2.8 of the *NAD/NARB Procedures*, stating whether it agrees to modify or discontinue claims as recommended in NAD's decision or that it is appealing NAD's decision as specified in Section 3.1 of the *NAD/NARB Procedures.* As such, NAD believed that it had no other choice but to refer the file to the attention of the appropriate government agency. However, in light of the Advertiser's Statement provided by Lornamead, the new owners of Natural White Inc. and its assurances that it will take NAD's recommendations into account in any future advertising for the Rapid White Tooth Whitening System, NAD was satisfied that the self-regulatory forum had, in fact, achieved its purpose, determined that referral of the case was unwarranted and closed the instant matter. (#3995 MSZ, closed 01/06/03)

# EXHIBIT

# 3C

*Case #4126 (12/16/03)*
**BAYER CORPORATION (Consumer Care Division)**
Aleve
*Advertising Agency:*        *Saatchi & Saatchi*
*Challenger:*                *McNeill, PPC*

-   **It is well-established that an advertiser is obligated to support all reasonable interpretations of claims made in its advertising, even messages it did not intend to convey.**

**Basis of Inquiry:**  Claims made by Bayer Corporation in two television commercials for its Aleve (naproxen sodium) pain reliever were challenged by McNeill, PPC, makers of Tylenol (acetaminophen) products.  The following are representative of the claims that served as the basis for the instant inquiry:

In the 30-second commercial, a woman emerges from her doctor's office and, when asked by her husband what the doctor said to her, the woman responds that "the doctor" told her that the pain that was waking her up at night is from arthritis. The husband then asks what the doctor said to do, to which the woman answers, "He said I should take Aleve." "Not Tylenol?" asks the man. The woman replies, "No. Tylenol can wear off, so the pain can come back in the middle of the night. Aleve works all night." A voice-over announcer then states, "Doctors know Aleve has the strength to stop arthritis for up to 12 hours, so pain won't interrupt your sleep."

The challenger also took issue with the sufficiency of the commercial's disclosure (that Aleve is being compared to Extra-Strength Tylenol), to limit the oral claim that the comparison being made is between Aleve and "Tylenol."

In the 15-second version of this commercial the woman states that the doctor recommended Aleve for her overnight arthritis pain that kept her awake, but makes no comparison between Aleve and Tylenol.

**The Challenger's Position:**

I.    The Challenger's Argument that the Doctor Recommended Claim is Unsubstantiated:

The challenger argued that the advertiser claims, without any substantiation, that doctors prefer Aleve® to Tylenol® for nighttime arthritis pain because "doctors know Aleve stops arthritis pain for up to 12 hours so pain won't interrupt your sleep." The challenger stated that it knew of no data demonstrating that doctors choose Aleve over Tylenol for nighttime arthritis pain, let alone for the specific reason touted in the commercial. In fact, the challenger maintained, the only known relevant data demonstrates just the opposite. Data collected by IMS National Disease and Therapeutic Index (NDTI) shows that for each of the past three years, Tylenol has received approximately *four times* as many recommendations for arthritis pain relief as Aleve.[1]
According to the challenger, the difference each year – between an average of close to 1 million recommendations per year for Tylenol versus approximately 250,000 recommendations for Aleve – was statistically significant, thereby undermining the advertiser's claim that, for nighttime arthritis pain, more doctors recommend Aleve than Tylenol.

---

[1] The challenger provided the NDTI data to NAD.

**BAYER CORPORATION (Consumer Care Division)**
Aleve
Page 2

Further, the challenger contended, the advertiser's specific claim requires equally specific substantiation. The challenger argued that NAD's decision in Johnson & Johnson McNeil Consumer Products Co.,[2] is directly on point. In that case, the challenged advertisement claimed "For their patients on aspirin heart therapy, Tylenol is the pain reliever doctors recommend most for aches and pains." The advertisement suggested that doctors made this recommendation because taking more aspirin could cause stomach irritation. NAD held that the doctor recommendation claim was not substantiated because the advertiser's doctor survey had failed to elicit the reason doctors recommended Tylenol and stated, in relevant part:

> When a rationale is attributed to a recommendation, it is itself a claim that requires support. The [advertiser's] survey did not elicit reasons for the doctors' recommendations. While all the descriptions may be accurate about Tylenol per se … they do not provide a basis to conclude that these were, in fact, the reasons why the doctors who recommended this brand chose it.

Similarly, here, the challenger argued, the advertiser must demonstrate not only that Aleve® is preferred by doctors over Tylenol for nighttime arthritis, but also that the *reason* doctors prefer Aleve for nighttime arthritis is because it will "stop arthritis pain for up to 12 hours" so pain "won't interrupt" their patients' sleep. The challenger stated that it was unaware of any such evidence.

The challenger noted that NAD has repeatedly recognized that, "… advertisements that include the claims concerning medical professionals such as "Doctor Recommended" … carry a great deal of weight with consumers. Consequently, NAD closely scrutinizes these types of claims and requires highly reliable supporting evidence as substantiation."[3] Here, the challenger argued, the advertiser has no such substantiation for its doctor recommendation claim. Accordingly, NAD should recommend that the challenged commercial be immediately discontinued.

II.    The Challenger's Position that the Super in the Commercial is Insufficient to Limit the Comparison being Made:

Although the commercial contains a small-type super stating that Aleve® is being compared to Extra-Strength Tylenol, the audio refers generally to "Tylenol." In this respect the challenger noted that "NAD has consistently held that a super is inadequate to limit an oral claim in a

---

[2] Johnson & Johnson McNeil Consumer Products Co.(Tylenol Acetaminophen), Report #3406, *NAD Case Reports* (August 1997).

[3] CCA Industries, Inc. (Scar Zone Topical Scar Diminishing Cream with SPF15 and Silicone), Report #4018, *NAD Case Reports* (February 2003).

**BAYER CORPORATION (Consumer Care Division)**
**Aleve**
**Page 3**

broadcast commercial if it contradicts the audio message."[4]  Here, the challenger contended, although the voiceover refers only to "Tylenol," there are many different varieties of Tylenol, including Regular Strength Tylenol, Tylenol Arthritis Pain Extended Relief, Tylenol PM, and Tylenol 8 Hour Extended Relief.  It was the challenger's position that the super is not sufficient to communicate that advertiser's comparison refers to <u>only</u> Extra-Strength Tylenol.

The 15-Second Spot

Although acknowledging that the 15-second commercial does not compare Aleve to Tylenol, the challenger asserted that it nonetheless contains the claim that doctors recommend Aleve for nighttime arthritis pain because Aleve can provide up to 12 hours of continuous pain relief at night.  To substantiate this version of the doctor recommendation claim, the challenger argued that the advertiser must prove that a significant number of doctors recommend Aleve for the specific reasons the commercial cites, i.e., to stop arthritis pain for up to 12 hours at night so that pain will not interrupt your sleep.[5]

**The Advertiser's Position:**

The advertiser responded that given the fact that the two claims at issue represent time-honored messages related to Aleve's undisputed pharmacologic profile, the advertising question is fully substantiated                                          and                                          appropriate.

According to the advertiser, its claims that "Tylenol can wear off, so the pain can come back in the middle of the night.  Aleve works all night," are based on the long-recognized differences in duration of action between Aleve and Extra Strength Tylenol.  The labeling for the two products reflects the fact that a dose of Aleve relieves minor arthritis pain for 8 to 12 hours whereas a dose of Extra Strength Tylenol is effective from 4 to 6 hours.  This difference has been featured consistently in Aleve advertising directed to consumers and physicians since its launch in 1994 and, in fact, the challenger has conceded the validity of this difference in duration.[6]

The advertiser argued that the difference in duration of these products is particularly relevant to arthritis pain sufferers.  According to the advertiser, numerous references in the medical literature provided to NAD attest to the fact that arthritis pain can disturb sleep.  It is, therefore, the advertiser posited, a common sense proposition that an analgesic that is effective for 8-12 hours (i.e., through the night), will have a product feature of interest to arthritis sufferers who experience sleep disturbance associated with arthritis pain.

---

[4] <u>International Home Foods, Inc. (Polaner All Fruit)</u>, Report #3447, *NAD Case Reports* (March 1998); <u>see also</u> <u>Reckitt-Benckiser</u>, Report #3929, *NAD Case Reports* (July 2002) (headnote: "When supers are used in television commercials to qualify claims, they should be clear and conspicuous to ensure that they are communicated to consumers.")

[5] See, <u>Johnson & Johnson McNeil Consumer Products Co.(Tylenol Acetaminophen)</u>, Report #3406, *NAD Case Reports* (August 1997).

[6] See, e.g., <u>Bayer Corporation (Aleve)</u>, Report #3915, *NAD Case Reports* (July 2002).

**BAYER CORPORATION (Consumer Care Division)**
**Aleve**
**Page 4**

I.    The Advertiser's Position that its Doctor Recommended Claim is Substantiated:

The challenged commercials claim that "Doctors know Aleve has the strength to stop arthritis pain for up to 12 hours, so pain won't interrupt your sleep." According to the advertiser, as reflected in its submission to NAD, Aleve is extensively recommended by physicians, who are presumed to know the characteristics of the drugs they recommend. In this case, moreover, the dosing and duration of Aleve have been widely advertised and unchallenged for many years, not only in messages directed to consumers but in professional medical marketing directed to physicians. Further, physicians had extensive familiarity with naproxen sodium – Aleve's active ingredient – even before Aleve was launched. The prescription form of naproxen sodium, Anaprox[®], has the same duration as Aleve and has been marketed since 1980.

**Decision:**

I.    The Dr. Recommended Claim:

It is well-established that an advertiser is obligated to support all reasonable interpretations of claims made in its advertising, even messages it did not intend to convey.[7] In this case, neither party submitted communication data to support its respective position concerning messages that consumers could reasonably take away from the challenged advertising. Consequently, NAD used its own expertise to evaluate whether any implied messages were conveyed.[8]

In the challenged commercial, the protagonist is seen emerging from her doctor's office as her husband inquires, "So what did the doctor say?" The woman responds that "the doctor" said the pain waking her up at night is from arthritis. The man asks what the doctor said to do. The woman answers, "He said I should take Aleve." "Not Tylenol?" asks the man. The woman responds, "No. Tylenol can wear off, so the pain can come back in the middle of the night. Aleve works all night." Then the announcer says, "Doctors know Aleve has the strength to stop arthritis pain for up to 12 hours, so pain won't interrupt your sleep." The commercial cuts back to a shot of the couple in bed in the morning. The woman sits up and stretches; the man says "I see the Aleve worked." The woman responds, "All night long." The commercial closes with the tag line, "Aleve. All night strong, all night long."

Although the words, "Not Tylenol?" are spoken by the husband, and the words, "Tylenol can wear off, so the pain can come back in the middle of the night..." are spoken by the woman, NAD determined that the overall message conveyed was that the *doctor* told the woman that the pain that was waking her up at night is from arthritis and that she should take Aleve, not Tylenol, because Tylenol can wear off, so the pain can come back in the middle of the night unlike Aleve which works all night. NAD, therefore, concluded that from the overall context of the doctor's

---

[7] See, Natural White, Inc. (Rapid White Tooth Whitening System), Report # 3995, *NAD Case Reports* (January 2003).

[8] See, Hill's Pet Nutrition, Inc. (Science Diet Pet Food), Report #3932, *NAD Case Reports* (June 2002).

**BAYER CORPORATION (Consumer Care Division)**
**Aleve**
**Page 5**

advice scenario, consumers could reasonably take away the message that doctors recommend Aleve over Tylenol for arthritis pain – more specifically, arthritis pain that interrupts sleep at night.

As NAD has recognized in prior decisions, advertisements that include claims concerning medical professionals such as "Doctor Recommended" carry great deal of weight with consumers. Consequently, NAD closely scrutinizes these types of claims and requires highly reliable supporting evidence as substantiation.[9] Such "doctor recommended" claims must be supported by well-conducted physician surveys, which base conclusions on their actual experience and what they do in their daily practice. Further, in the instant case, NAD agreed with the challenger that, with respect to the 30-second commercial, the advertiser must demonstrate not only that Aleve® is preferred by doctors over Tylenol for nighttime arthritis, but also that the *reason* doctors prefer Aleve for nighttime arthritis is because it will "stop arthritis pain for up to 12 hours" so pain "won't interrupt" their patients' sleep.[10] Here, the advertiser did not provide evidence in support of either proposition.

Similarly, to substantiate the 15-second version of the doctor recommendation claim, the advertiser must prove that a significant number of doctors recommend Aleve for the specific reason claimed in the commercial, i.e., to stop arthritis pain for up to 12 hours at night so that pain will not interrupt your sleep.[11] Again, the advertiser did not provide such substantiation.

NAD takes no issue with the articles submitted by the advertiser supporting the notion that persons suffering from arthritis pain report poor sleep patterns or difficulty sleeping. Moreover, NAD agrees that *it stands to reason* that, if pain is what keeps pain sufferers awake, and that one product provides 12 hours of pain relief whereas another offers only 4 to 6 hours of relief, a person *may* sleep easier through the night. Notwithstanding the absence of any scientific evidence supporting this theory, this is quite a different message than that conveyed by the challenged commercial – that *doctors recommend* Aleve over Tylenol for arthritis pain, *and that they do so because Aleve stops arthritis pain for up to 12 hours so pain won't interrupt their patients' sleep* – a claim that is unsupported by the evidence in the record. Accordingly, NAD recommended that the commercial be modified to avoid conveying a "doctor recommended" message.

II.    The Adequacy of the Disclosure Regarding the Comparison Being Made:

NAD precedent makes clear that an advertiser *can* compare two dissimilar products even if a competitor makes a more similar product, so long as the objects of comparison are clearly

---

[9] See, CCA Industries, Inc. (Scar Zone Topical Scar Diminishing Cream with SPF15 and Silicone), Report #4018, *NAD Case Reports* (February 2003).

[10] Johnson & Johnson McNeil Consumer Products Co.(Tylenol Acetaminophen), Report #3406, *NAD Case Reports* (August 1997)( When a rationale is attributed to a recommendation, it is itself a claim that requires support.)

[11] Id.

**BAYER CORPORATION (Consumer Care Division)**
**Aleve**
**Page 6**

identified in the advertisement, and there is no implication that the comparison is to the competitor's more similar product, or that the competitor does not make a more similar product.[12] However, it is incumbent upon the advertiser to clearly indicate the exact product to which its advertised comparison refers.[13]

NAD again noted that neither party submitted consumer perception evidence to support its respective position as to any implied messages that may have been conveyed by the challenged advertisements. Consequently, NAD relied upon its own experienced judgment to assess the reasonable take-away from the challenged commercials.[14]

In the challenged commercial, the comparison being made (and the message which the advertiser seeks to convey) is between Aleve and *Extra Strength* Tylenol, as per the super. NAD observed that the super appears for a sufficient length of time, in a typeface appropriately contrasted with the background and, again, an advertiser *can* compare two dissimilar products even if a competitor makes a more similar product, as long as the objects of comparison are clearly identified. In an ideal world, the comparison made in the instant commercial would have been accomplished solely via the audio (i.e., the actors would say "Extra Strength Tylenol" instead of simply "Tylenol"), thereby vitiating any need for a qualifying super. However, on this record, NAD could not state that the super qualifying the main message was *per se*, insufficient, or that consumers are taking away a misleading message as to the comparison being made.

**Summary of Conclusions:** NAD concluded that the advertiser failed to provide a reasonable basis for its claim that doctors recommend Aleve over Tylenol for arthritis pain, and that they do so because Aleve stops arthritis pain for up to 12 hours so pain won't interrupt their patients' sleep and recommended that the commercials be modified to avoid conveying a "doctor recommended" message. Further, although noting that the best way to disclose the object of comparison would be in the audio portion of the commercial, on this record, NAD could not state that the super qualifying the main message was insufficient, or that consumers are taking away a misleading message as to the comparison being made.

**Advertiser's Statement:**

"Although we [at Bayer HealthCare] disagree with a number of the findings and conclusions reached by NAD in this case, we appreciate the attention NAD has given the matter and the forum it provides for the resolution of such disputes. We will take account of NAD's conclusions in modifying the challenged commercials and creating new advertising." (#4126 MSZ, closed 12/16/03)

---

[12] See, Northland Cranberries, Inc. (Northland Juices), Report # 3948, *NAD Case Reports* (August 2002); Schering-Plough Healthcare (Lotrimin AF Spray Liquid), Report #3722, *NAD Case Reports* (January 2001).

[13] See, Schering-Plough Healthcare (Lotrimin AF Spray Liquid), Report #3722, *NAD Case Reports* (January 2001); The Procter & Gamble Company (Aleve Analgesic Tablets), Report #3167 , *NAD Case Reports* (December 1994).

[14] See, McNeil Consumer Healthcare/McNeil-PPC, Inc. (St. Joseph Aspirin), Report #3834, *NAD Case Reports* (November 2001).

# EXHIBIT

# 3D

*Case #4248 (11/01/04)*
**MCNEIL-PPC, INC.**
**Tylenol® Arthritis Pain**
*Advertising Agency:*      *BBDO Chicago*
*Challenger:*              *Wyeth Consumer Healthcare*

- **It is well established that an advertiser is obligated to support all reasonable interpretations of claims made in advertising**

**Basis of Inquiry:** Wyeth Consumer Healthcare ("Wyeth" or the "challenger"), challenged the truthfulness and accuracy of claims made by McNeil-PPC, Inc. (the "advertiser") on advertising for Tylenol® Arthritis Pain (the "product"). Specifically, the challenger took issue with the claim that the product "is as effective as prescription ibuprofen in treating arthritis pain." This claim, and variations of this claim, appear in television commercials and on the advertiser's website.[1]

**The Challenger's Position:**

The challenger contended that the advertiser makes the misleading claim that the product "is as effective as prescription ibuprofen" in relieving arthritis pain. As support for its position, the challenger asserted that the study relied upon by the advertiser fails to provide a reasonable basis for this claim, and that other studies demonstrate that the products do not perform at parity.

With respect to the study relied on by the advertiser, the Bradley Study, the challenger disputes that this study concluded that acetaminophen was "as effective as" prescription strength ibuprofen.[2] Instead, according to the challenger, the Bradley Study concluded that:

> At the end of the treatment period, no significant differences were observed between the three treatment groups in any of the major outcome variables except rest pain, which decreased to a greater extent in both ibuprofen groups than in the acetaminophen group.

The challenger also pointed out that the Bradley Study reported that the OTC ibuprofen was "numerically" superior for walking pain and improvement according to physicians. The challenger contended that the advertiser improperly casts the statement that "no significant differences were observed" as an affirmative finding that acetaminophen is as effective as ibuprofen in treating arthritis pain. In other words, the challenger asserted that a conclusion that no significant differences were observed in a study does not prove parity between the treatments.

In addition to disputing the advertiser's interpretation of the Bradley Study's conclusions, the challenger asserted that the Bradley Study is flawed in a number of ways. First, the challenger argued that the Bradley Study failed to use the same dosage or release-type formulation as the

---

[1]   The commercial originally challenged has since been discontinued, but the advertiser has continued to make the specific claims at issue.

[2]   *See* John D. Bradley, *et al., Comparison of an Antiinflammatory Dose of Ibuprofen, and Analgesic Dose of Ibuprofen, and Acetaminophen in the Treatment of Patients with Osteoarthritis in the Knee,* 325 New Eng. J. Med. 87-91 (July 11, 1991) (the "Bradley Study").

MCNEIL-PPC, INC.
Tylenol® Arthritis Pain
Page 2

advertised product. Specifically, the challenger highlighted, participants in the Bradley Study took 1,000 mg of acetaminophen taken four times a day, in tablet form, for a total of 4,000 mg, as compared to the dosage for the product which is 1,300 mg, taken three times a day, in the form of two 650 mg caplets, for a total of 3,900 mg. The challenger also noted that the Bradley Study used an immediate release formulation, rather than the advertised product which consists of an extended release formulation.

Next, the challenger noted that the acetaminophen in the Bradley Study was used for a prescription strength duration of 28 days, whereas the maximum duration of use for the product, as directed on the product label, is ten days. It is significant, according to the challenger, that no measurements were taken in the Bradley Study within the first ten days, which would represent actual OTC use. In addition, the challenger contended that because the Bradley Study limits its findings to osteoarthritis in the knee and to "short-term" use, it does not support a general finding of similar efficacy in other joints or "long-term" use.[3]

The challenger also cited a number of studies and reviews comparing the efficacy of acetaminophen and NSAIDs in support of its position that the product is not at parity with prescription strength ibuprofen. These included the Altman Study, which concluded that ibuprofen and acetaminophen "were comparably effective in patients with mild to moderate pain, but ibuprofen was statistically superior to acetaminophen in patients with severe pain," and the Towheed Review which concluded that "NSAIDs are superior to acetaminophen in the treatment of osteoarthritis for both pain and global evaluation." [4]

**The Advertiser's Position:**

In support of its parity claims, the advertiser submitted the Bradley Study. The Bradley Study compared the use of acetaminophen (4,000 mg per day) with low dose (1,200 mg per day) OTC strength ibuprofen and high dose (2,400 mg per day) prescription strength ibuprofen for symptomatic treatment of osteoarthritis in the knee. The medications were taken for 28 days, and subjects were evaluated at the end of the 28-day period. The advertiser highlighted that the Bradley Study was published in a very prestigious journal which referred to the study as "the

---

[3]   The challenger also claims that the advertising misleads consumers that the product will be effective in treating all types and levels of arthritis pain, and that this claim is unsupported by the Bradley Study.

[4]   *See* R.D. Altman, *et al., Ibuprofen, Acetaminophen and Placebo in Osteoarthritis of the Knee: A Six-Day Double-Blind Study* [abstract], Arthritis Rheum, 42 (suppl.) 9:S403 (1999) (the "Altman Study"); T.E. Towheed, *et al., Acetaminophen for Osteoarthritis (Cochrane Review),* The Cochrane Library, Issue 3 (2004) (the "Towheed Review"). The challenger also cited the following journal articles: Pincus, *et al., A Randomized, Double-Blind, Crossover Clinical Trial of Diclofenac Plus Misoprostol Versus Acetaminophen in Patients with Osteoarthritis of the Hip or Knee,* 44 ARTHRITIS & RHEUMATISM 7, 1587-1598 (July 2001); Geba, *et al., Efficacy of Rofecoxib, Celecoxib, and Acetaminophen in Osteoarthritis of the Knee,* 287 JAMA 1, 64-71 (Jan. 2, 2002); and Pincus, *et al., Patient Preference for Placebo, Acetaminophen or Celecoxib Efficacy Studies: Two Randomized Placebo-Controlled Cross-Over Clinical Trials in Patients with Osteoarthritis of the Knee or Hip,* ANN. RHEUM. DIS. (Apr. 2004).

**MCNEIL-PPC, INC.**
**Tylenol® Arthritis Pain**
**Page 3**

most rigorous test of whether use of an NSAID is better than simple analgesic drugs in the treatment of symptomatic osteoarthritis of the knee."[5]

As described by the advertiser, the Bradley Study sought to determine whether analgesic agents with no anti-inflammatory activity are any less effective than NSAIDs in the treatment of osteoarthritis. The Bradley Study involved 184 patients in a randomized, double-blind trial. The participants were divided into three groups, an acetaminophen group, an ibuprofen group taking the OTC dosage, and an ibuprofen group taking the prescription dosage. At the end of a four week period, the investigators collected 13 different efficacy assessments for each subject, including the Stanford Health Assessment Questionnaire (the "HAQ"), and other assessments that measured each person's ability to complete certain physical tasks such as walking, getting out of bed, climbing steps, rising from a chair, and getting into bed; pain questionnaires that measured pain at rest, pain on walking, and walking distance; the tenderness, swelling, range of motion of the knee and the "50-ft walk time"; and a physician's global assessment. The investigators concluded that the only outcome variable where significant differences were observed between the three treatment groups was that of "rest pain" which decreased to a greater extent in both ibuprofen groups. As explained by the advertiser, despite this one difference, the Bradley Study concluded, that overall, the prescription dose of ibuprofen did not provide greater efficacy than either the acetaminophen or the lower does of ibuprofen for pain relief or improvement of function.[6]

With respect to the concerns raised by the challenger that the Bradley Study tested individuals using a different formulation of the product, the advertiser responded that this does not mean that the Bradley Study cannot be used to support the claims at issue. The advertiser explained that in 1989, as part of its New Drug Application for the product (the sustained-release form of acetaminophen with a 3,900 mg per day dose), the advertiser conducted two studies comparing the efficacy of the product with the regular release, 4,000 mg per day dose formulation. The results of the these studies demonstrated that the two formulations provided equal efficacy. These results were accepted by the FDA, and, in 1994, the FDA approved the NDA. Thus, according to the advertiser, there is no reason to believe the Bradley Results would have been any different had the sustained-release formulation been used.

With regard to the challenger's contention that the Bradley Study is flawed because it tested "a prescription duration of acetaminophen," the advertiser avers that this is a misrepresentation of

---

[5]  The advertiser also noted that the Bradley Study is frequently cited by those prominent in the field, including Towheed, the same author of a review cited by the challenger, who gave the Bradley Study a high rating for methodological quality; the European League Against Rheumatism who has credited and cited the Bradley Study; and the American Pain Society. In addition, the advertiser provided a statement from Jonathan Kay, M.D., an Associate Clinical Professor of Medicine at Harvard Medical School, who asserts that the Bradley Study is widely regarded and relied upon by rheumatologists, and notes that the Bradley Study was appropriately powered and used standard benchmarks to assess clinical significance.

[6]  In his statement, the advertiser's expert, Jonathan Kay, M.D., stated that the difference in rest pain does not invalidate the Bradley Study, and explained that the rest pain difference may have resulted from inflammation and so would be expected to respond better to an NSAID.

MCNEIL-PPC, INC.
Tylenol® Arthritis Pain
Page 4

the OTC labeling of the product. According to the advertiser, the product is often used for a time period beyond 10 days, and the labeling for the product merely states "[s]top use and ask a doctor if . . . pain gets worse or lasts more than 10 days." The FDA's reason for this warning, the advertiser explained, is to reduce the possibility that serious conditions will go undiagnosed and untreated. Indeed, the advertiser noted, the FDA specifically stated that it "does not believe that these warnings will imply to consumers that analgesic products are unsafe or toxic if taken for more than 10 days."[7] Thus, the advertiser maintained, the usage in the Bradley Study is not a "prescription duration," but rather the OTC duration continued after consultation with a physician. This assertion was also supported by the Statement of Jonathan Kay, M.D., who asserted that in his clinical experience, after consulting with a doctor, patients typically continue taking OTC drugs for arthritis for a much longer period after an initial ten days.

With respect to the challenger's contention that the findings of the Bradley Study are limited to the knee, the advertiser argued that while physical therapy and surgical interventions may differ from joint to joint, arthritis pain treatment does not. Consequently, the product label and directions for use state that the product is for "relief of minor arthritis pain," and does not give different directions for different joints. The advertiser further noted that arthritis guidelines similarly make no distinctions between joints.

Finally, the advertiser asserted that the Altman Study cited by the challenger does not disprove the Bradley Study. In particular, the advertiser notes that the Altman Study has only been published as an abstract, which should not be given the same weight as a full article, because the abstract form does not allow for a thorough review of the study's soundness or conclusions. Moreover, while the Bradley Study received a high quality score from Towheed of 4 out of 5, the Altman Study received only 2 out of 5.

**DECISION:**

It is well established that an advertiser is obligated to support all reasonable interpretations of claims made in advertising.[8] As support for its parity claim that Tylenol® Arthritis Pain is as effective as prescription ibuprofen, the advertiser provided the Bradley Study. The Bradley Study was a randomized, double-blind study of 184 subjects with osteoarthritis, which compared acetaminophen in a dose of 4,000 mg per day, ibuprofen in a dose of 1,200 mg per day (the OTC dose), and ibuprofen in a dose of 2,400 mg per day (the prescription dose). This study concluded that the "[prescription] dose of ibuprofen was not superior to either the dose of acetaminophen or the [OTC] dose of ibuprofen for pain relief or improvement of function."

---

[7]   *See* 53 FR 46204 at 46208.

[8]   *See* Bayer Corporation (Aleve), Report #4126, *NAD Case Reports* (December 2003); Natural White, Inc. (Rapid White Tooth Whitening System), Report #3995, *NAD Case Reports* (January 2003).

MCNEIL-PPC, INC.
**Tylenol® Arthritis Pain**
Page 5

After a thorough review, NAD determined that the Bradley Study provided a reasonable basis for the claim that the product is as effective as prescription strength ibuprofen.[9]  In making this determination, NAD considered the challenger's argument that the Bradley Study was not sufficiently reliable because it did not test the advertised product and that its conclusions failed to support the advertiser's claim.  With regard to the acetaminophen tested, NAD recognizes that it is best practice to test the actual product being advertised.[10]  In this challenge, the advertiser provided information from two studies which compared the two formulations, the sustained-release 3,900 mg per day regimen of acetaminophen (the advertised product's formulation) and the regular-release 4,000 mg per day regimen of acetaminophen (the formulation used in the Bradley Study), and found them to be equivalent.  One study was a clinical trial, in which the investigators concluded that the formulation of acetaminophen used in the Bradley Study has the same efficacy as the formulation of the advertised product.   The second study was a pharmacokinetic trial, which demonstrated that there was no statistically significant difference in average acetaminophen plasma concentrations between the two formulations.  These two studies were part of the advertiser's New Product Application for Tylenol® Arthritis Pain which was submitted to the FDA.  The FDA accepted the results of these studies and approved the NDA.  Because of the FDA's expertise in issues concerning efficacy and bioequivalence, NAD deferred to the FDA's judgment in this area, and thus concluded that results involving the formulation of acetaminophen used in the Bradley Study is an appropriate basis from which to make claims about the product.

As to the Bradley Study's conclusion, NAD agreed with the advertiser that the study found the product to be as effective as prescription strength ibuprofen.  NAD understands and appreciates the challenger's position that a finding of "no significant difference" does not necessarily prove parity.[11]  However, in this particular instance, the stated goal of the study was to detect differences between treatment groups, the confidence interval was 95%, the size of the group was large enough for changes to be detected with more than 90% statistical power, and no significant differences were found between the groups, except for rest pain.  NAD determined that under these circumstances, a lack of difference is indeed significant, and is a reasonable basis to support a claim of parity.[12]  In particular, because the Bradley Study found no statistical difference between acetaminophen and ibuprofen in six of the seven variables, including the "overall pain scores" of the Stanford Health Assessment Questionnaire, and the advertised claim does not specify "rest pain," but is rather a general pain relief claim, NAD determined that the

---

[9]   Because the advertising does not make any implied claims that the product is as effective as prescription ibuprofen for "long-term" use or to treat moderate to severe arthritis pain, it was unnecessary for NAD to make a determination about substantiation on these points.

[10]   *See* Powerbar, Inc. (PowerBar Perform and Perform Plus), Report #3695, *NAD Case Reports* (September 2000).

[11]   *See* S.C. Johnson & Son, Inc. (Shout Oxy Power Multi-Purpose Stain Remover), Report #4047, *NAD Case Reports* (May 2003).

[12]   The higher the statistical power, the more certain one can be that the study will not fail to detect a difference when in fact one exists.  A statistical power of 90% is considered to be "high."  For example, the FDA requests that bioequivalence studies have a power of 80 or 90%.

**MCNEIL-PPC, INC.**
**Tylenol® Arthritis Pain**
**Page 6**

fact that there was not parity with regard to rest pain was not significant to the claim being made by the advertiser, and that the study formed a reasonable basis for the claim.[13]

Once a claim is determined to have a reasonable basis, "the challenger must show either that advertiser's evidence is fatally flawed or that it possesses more reliable evidence reaching a different result."[14] Here, the challenger asserted both that the Bradley Study is flawed and also that more reliable studies disprove the advertiser's parity claim. NAD did not find any of the flaws raised by the challenger to be fatal. Specifically, NAD did not find persuasive the challenger's argument that the Bradley Study observed the participants for a "prescription duration" of 28 days, when the product label advises that use only be continued for more than 10 days after consulting with a doctor. Given that the product may be, and often is, used for more than ten days, it does not seem significant to NAD that the study evaluated the participants after 28 days. NAD also is mindful of the advertiser's argument that to the extent arthritis pain is caused by inflammation an evaluation over a longer period of time would favor results for ibuprofen because its anti-inflammatory effect builds up over time, whereas the effect of acetaminophen is not cumulative. In contrast, beyond simply noting that the Bradley Study evaluated participants after 28-days, the challenger did not provide any theory under which effect a shorter evaluation time would have altered the study's findings.

Finally, NAD did not find any of the additional studies provided by the challenger to be more reliable, and, in fact, one of the studies did not contradict, but supported, the advertiser's claim. The Altman Study, an abstract published in *Arthritis and Rheumatism*, is not as reliable as the Bradley Study, a thorough, full-length study, published in the *New England Journal of Medicine*, inarguably one of the most prestigious publications in the country. Indeed, even the challenger's own support, the Towheed Review, gave the Bradley Study a higher quality score than the Altman Study. Moreover, the Towheed Review actually supports the advertiser's claim; the Towheed Review specifically found that "[i]n participants with mild OA pain, the [acetaminophen and ibuprofen] appear to be more similar in efficacy." It was only in circumstances where the arthritis pain was severe that the Towheed Review did not find parity between the two drugs, a condition for which the product is not indicated for use.

**Summary of Conclusions**

NAD determined that the advertiser provided a reasonable basis for its general parity claim that Tylenol® Arthritis Pain is as effective as prescription strength ibuprofen.

**Advertiser's Statement**

---

[13] Likewise, NAD determined the Bradley Study to form a reasonable basis for the claim even though the study concerned osteoarthritis of the knee. NAD agrees with the advertiser that treatment for minor arthritis pain in the knee would not differ from treatment for minor arthritis pain in other joints; the challenger has not demonstrated otherwise.

[14] *See* Discus Dental Impressions, Inc. (Zoom! Take-Home Whitening System), Report #4077, *NAD Case Reports* (August 2003).

**MCNEIL-PPC, INC.**
**Tylenol® Arthritis Pain**
**Page 7**

McNeil-PPC, Inc. appreciates NAD's thorough and thoughtful review of this matter. McNeil is pleased that NAD has recognized that the claim "Tylenol Arthritis Pain is as effective as prescription ibuprofen" is a substantiated parity claim. (#4248 MSZ / CG, closed 11/01/04)

# EXHIBIT

# 3E

*Case #4779    (01/11/08)*
**DFS Services LLC**
**Discover Card Cash Rewards Program**
*Advertising Agency:      Undisclosed*
*Challenger:              Chase Bank USA, NA*

- Whether a claim is puffery depends on the total context of the advertising; where an objective representation is made regarding the performance or other tangible attributes of a product that is sufficiently specific and material enough to create expectations in consumers, then substantiation for the claim is required.

- An advertiser is responsible for all reasonable interpretations of its claims, not simply the messages it intended to convey.

**Basis of Inquiry:** Chase Bank USA, NA ("Chase" or "challenger") challenged several claims in direct mail, newspaper and internet advertising for the Discover Card's cash rewards program, made by DFS Services LLC ("Discover" or "advertiser"). The Discover Card is in direct competition with the challenger's Chase Freedom credit card. The following representative claims were typical of those which formed the basis of this inquiry:

- "America's #1 Cash Rewards Program!"
- "#1 Cash Rewards Program in America."
- "The best cash rewards card available today."
- "More ways to earn more cash than anyone else."
- "Many credit cards offer rewards, but none can match Discover Card and *Cashback Bonus*®."
- "Fewer restrictions."
- "Most redemption choices of any cash rewards program."
- "#1 Online Customer Experience."
- "#1 Customer Loyalty."[1]

**Challenger's Position:**

The challenger argued that the claims in question were unsubstantiated superiority claims conveying overall superiority, economic value and flexibility. These claims, argued the challenger, communicated messages that the Discover card cash rewards program was "the best" and "#1"; had fewer restrictions than other programs; and offered the "most ways" to earn cash and the "most cash" back for a typical consumer, all as compared to other leading credit card cash reward programs. The challenger pointed out that it is the advertiser's burden to support all reasonable interpretations of its advertising, and that the various "best" and "No. 1 Cash Rewards Program" claims made in this advertising campaign (referred to by the parties as "America's #1 Cash Rewards Program! Campaign") were misleading to consumers. In fact, argued the challenger, its own (Chase Freedom) and other comparable programs "put more cash dollars in the hands of the typical consumer than does Discover's cash rewards program."

---

[1] The advertiser represented in writing that its "Don't Stack Up" chart (a chart comparing the Discover card to "others" and touting that "Other reward programs just don't stack up to Discover Card Cashback Bonus. See why:"), as well as the claim "Easiest Online self service options that give you control," had been permanently discontinued. Thus, NAD did not consider them in this challenge.

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 2

As a preliminary matter, the challenger argued that the advertisements at issue made broad, absolute claims that were inappropriate because the advertiser failed to maintain a consistent framework for the comparisons drawn by the advertising. Specifically, the challenger argued that the challenged claims were misleading to consumers because the advertiser compared its product (the Discover card cash rewards program, a general purpose, consumer, proprietary credit card) to other credit/charge card products, which do not have comparable features. The challenger argued that the advertiser's comparisons between Discover and "other" card programs were misleading to consumers because the advertiser combined different types of card programs[2] without disclosing this information to the consumer. The challenger contended that when placed in context, Discover cannot support its broad superiority claims against the "other" cards it refers to in its advertising.

Instead, the challenger maintained that the relevant universe of "other" cards should include all general purpose, consumer, proprietary credit cards with cash back programs, because the Discover Cashback Rewards card is a general purpose, proprietary credit card. Accordingly, the challenger used the four leading consumer credit cards offering cash rewards programs for comparisons in its arguments here, contending that they consist of: the Chase Freedom credit card, the Citi Dividend Platinum Select, the Capitol One No-Hassle Cash Rewards and the Blue Cash card from American Express (the "Leading Card Issuers' Cash Rewards Programs").

I. The Challenger's Position that Discover is not "America's #1 Cash Rewards Program"

  A.  Discover's Use of Market Share to Support its No. 1 Claim

As support for its "America's #1 Cash Rewards Program" claim,[3] the advertiser explained that the Discover card is No. 1 because it is the market share leader in the cash rewards category. The challenger, however, asserted that the advertiser has failed to substantiate this claim regardless of whether it was meant to communicate market share or some other measure. First, the challenger explained that market share is measured in the credit card industry in a number of ways, including: outstanding card balance, total purchase volume and number of cards in the market. Second, the challenger emphasized that the more significant measures (such as purchase volume or outstanding balance) do not render the Discover card No. 1 in the market. Finally, the challenger stated that regardless of how market share is measured it is not relevant to the consumer when choosing between different cash back card offerings.

  B.  The Consumer's Interpretation of the No. 1 Claim

The challenger contended that consumers are unlikely to interpret the No. 1 claim as a market share claim. Instead, the challenger argued, a No. 1 claim in the context of a campaign which touts cash rewards programs and cash back features is more likely to give the impression that the

---

[2] Discover is a proprietary credit card. Nevertheless, argued the challenger, the advertiser compared Discover's cash program features to those of charge cards rather than credit cards, to co-branded rather than proprietary cards, and to points rewards programs redeemable for merchandise rather than cash back.
[3] The challenger identified this claim as both "America's #1 Cash Rewards Program!" and "#1 Cash Rewards Program in America."

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 3

program is No. 1 in value to the consumer and that it provides more cash back than other programs. In addition, the challenger argued, the consumer may believe that the Discover card is number one in merchant card acceptance, providing the largest number of shopping opportunities during which the consumer can earn cash back. The challenger stressed that regardless of what the advertiser intended to convey, the advertiser is obligated to support all reasonable interpretations of claims made in its advertising. Therefore, the challenger concluded, the advertiser must either make cards in hand the focus of its claims in future advertising or discontinue the No. 1 claim.

C. Discover's "Combination of Benefits" Theory is not Adequate Substantiation for its No. 1 Claim or its "Best" Claim

Finally, the challenger rejected the advertiser's argument that the combination of advantages[4] offered by the Discover cash back program is what makes the Discover card the "best program" and supports the advertiser's claim that "none can match Discover Card and Cashback Bonus."[5] It was the challenger's position that a consumer viewing the advertisements at issue would have no way of knowing that Discover is relying on the Combined Advantages to support its claims or that a higher level of cash back is not one of the Discover program's competitive advantages. According to the challenger, the challenged advertising talks about base earn, accelerated earn, "unlimited" rewards and rewards which "never expire." The Discover Combination Chart, however, lists features such as the "$20 dollar threshold for redemption,"[6] the ability to redeem 24/7 online or by phone (a virtually universal rewards program feature), the variety of redemption methods (check, direct deposit, account credit), various instant point of sales offers (a feature hard to quantify, but offered by other programs), and gift card redemption (currently only mentioned in the discontinued "Don't Stack Up" chart advertising). Furthermore, the challenger argued that many of these program attributes are rarely – if ever – mentioned in the advertisements at issue and therefore, are irrelevant.

II. The Challenger's Position that the Advertiser's Claims do not Constitute Puffery

With regard to the advertiser's puffery defense, the challenger argued that the advertiser's claim, which touts the Discover program as "the best cash rewards card available today," is a quantifiable and objectively measurable claim, and therefore does not constitute puffery. The challenger emphasized at the outset of its argument that all advertising must be viewed in context and not by reviewing isolated phrases. According to the challenger, the advertising at issue

---

[4] The challenger noted that the advertiser had created and submitted a "Combined Advantages Chart" detailing the important advantages Discover refers to whenever it makes these claims.

[5] The challenger identified these claims as "The best cash rewards card available today" and "Many credit cards offer rewards, but none can match Discover Card and Cashback Bonus."

[6] The challenger emphasized that there no mention of this "feature" in the advertising and that the ability to redeem in $20 increments, while expressly true, does not disclose that a Discover customer would have to spend substantially more to earn that $20 reward than would a Chase Freedom customer, for example, because of Discover's tiered earn (only .25 percent cash back on the first $1,500 in eligible Discover spending vs. a full 1 percent from Chase on every dollar without exception). The challenger explained that most of the Leading Card Issuers' Cash Rewards Programs offers a base earn for all purchases of 1%, while with Discover's tiered base earn the consumer does not begin to earn 1% until he or she has spent $3,000 in a given year.

**DFS Services LLC**
**Discover Card Cash Rewards Program**
**Page: 4**

consistently references the Discover card's cash back offerings as the basis for the claims: "America's #1 Cash Rewards Program" and related "best" cash rewards card claims. The challenger contended that the word "best" in these advertisements is used in conjunction with the cash components of the "No. 1" program,[7] and therefore is a quantifiable and objectively measurable claim which must be supported. The challenger maintained that since the program does not actually provide consumers with more cash, the advertising must be modified.

III. Cash Specific Claims: The "Most" or "More Cash Back" and "More Ways to Earn Cash Back" Claims

A. The Consumer Could Reasonably Interpret the "More Ways" Claim in More than One Way

In addition, the challenger asserted that the advertiser's cash-specific claims, such as "more cash back" and "more ways to earn more cash," must also be substantiated. The challenger pointed out that more "ways" can reasonably be interpreted as meaning (i) more opportunities to use the card to earn cash and/or (ii) more types of available cash bonuses, and that the advertiser must be able to support both.

B. The Challenger's Position that Discover does not Provide "More" or the "Most" Cash Back

The challenger argued that the Discover card does not, in actuality, provide "more" or the "most" cash back.[8] As support for its argument, the challenger submitted a chart comparing what the typical consumer would accrue as well as the amount he or she would actually receive with Discover card versus with the Leading Card Issuers' Cash Rewards Programs.[9] The chart determined the "typical consumer" in two ways: (i) as an average of all general purpose rewards credit cards (the average annual spend is $8,172) and (ii) the average Discover card holder (whose annual spend averages $6,012).[10] Based upon the challenger's chart, the Leading Card

---

[7] Cash components include "up to one percent cash back" on all purchases, a "full 5% Cashback Bonus on Get More Purchases" and "5% cash back bonus through participating online retailers."

[8] The challenger referred to a number of these claims, including "More Ways to Earn More Cash" and "More Ways to Earn More Cash than Anyone Else."

[9] These consisted of Chase Freedom credit card, Citi Dividend Platinum Select, Capitol One No-Hassle Cash Rewards and Blue Cash from American Express.

[10] As the challenger explained:

> The average American Express customer spends $9,864 annually; and the average Visa/MasterCard cardholder (which includes Chase Freedom, Citi Dividend Platinum Select and Capital One's No-Hassle Cash Rewards) logs $8,166 annually on their cards. All spending data has been sourced from the Visa Payment Panel, which tracks the self-reported spending of approximately 4,800 U.S. consumers, 18 or older, with at least one plastic payment card, with household incomes of ten thousand dollars or more. The data reflects spending from first quarter 2006 through fourth quarter 2006 and includes average monthly spend as well as a breakout by percentage of spend in various spending categories (to account for accelerated earn "buckets"). The analysis takes into account a tiered rewards structure where applicable (Discover and Amex), as well as whether any monthly or annual spending caps were reached (none were for any product). With respect to Discover's Get More bonus program, because the program is opt in and

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 5

Issuer's Cash Rewards Programs provide more cash than does the Discover program, whether viewed as accrued earning or cash in hand.

### C.  The Advertiser's Hypotheticals Have No Real World Significance

The challenger stated that both parties agree that the starting point for any program review must be to calculate the total annual spend and then translate that annual spend into cash back. The challenger explained that from this point on the advertiser's calculations diverge from those of the challenger. According to the challenger, the advertiser chose to ignore spending typicality and instead used a scenario that maximized accelerated earn and online merchant spending. The challenger contended that the advertiser started with high accelerated earn numbers in its hypotheticals because the Discover card has a tiered program where the card holder is not eligible for the full 1% cash back base earn from all purchases until he or she has spent $3,000 on Discover-eligible purchases.[11]  Furthermore, the challenger stated that the advertiser's hypotheticals were far fetched, failed to portray the typical consumer and were mathematically impossible to apply to the Chase or other issuer program parameters (in order to compare earnings for Discover customers versus Chase or other customers).

## IV.  The Remaining No. 1 Claims: Customer Loyalty and Online Customer Experience

### A.  The Brand Keys Analysis does not Support the No. 1 Customer Loyalty Claim

In its response, the advertiser explained that its "No. 1 Customer Loyalty" claim is supported by a Brand Keys Customer Loyalty Engagement Index. The challenger, however, argued that while Discover's use of the claim appears to be limited, the actual Brand Keys analysis must also be taken into consideration. The challenger asserted that there are several discrepancies regarding the analysis and its ability to support the No. 1 Customer Loyalty claim[12] – one being that the ranking represents credit cards generally (not cash back rewards programs). This, according to the challenger, is misleading because the advertiser's use of the claim implies that customer loyalty is driven by the Discover cash back rewards benefits. The challenger argued that in the future, the limits on the Brand Keys analysis should be noted in connection with this claim.

### B.  The Advertiser Uses the No. 1 Online Customer Experience Claim in a Misleading Manner

The challenger also disputed the advertiser's use of the "No. 1 Online Customer Experience" claim because this claim relies on a No. 1 Keynote ranking which only applies to prospective

---

the offers are seasonal, third party hard data was not available. Accordingly, Challenger has assumed that 2% of annual spending would fall into the bonus category. This is likely a generous allotment; if incorrect, Challenger presumes Discover will provide the missing data.

[11] The challenger noted that in the Discover program, certain spending (at warehouse clubs) is never eligible for more than .25 percent cash back regardless of total spend.

[12] The challenger argued that there is no indication of how the Brand Keys analysis measured customer loyalty and that the purpose of the survey was to conclude that the brand holder is more likely to increase earnings due to customer loyalty – rendering the analysis irrelevant to the consumer.

DFS Services LLC
Discover Card Cash Rewards Program
Page: 6

customers. According to the challenger, the advertisements at issue do not distinguish between online customer experience for prospective customers versus actual customers. The challenger maintained that consumers will expect that No. 1 "means No. 1 in the way that counts – after the consumer has signed up." Therefore, the challenger concluded, the advertiser must provide proper attribution for any use of the claim, qualify any use of the ranking as applicable to prospective customers only and make clear that the ranking is not based on any review of customer service for actual customers in the Discover cash rewards program.

**Advertiser's Position:**

The advertiser argued that it had ample substantiation and more than a reasonable basis for the claims at issue. The advertiser emphasized that, based on NAD precedent, where the advertiser has shown a reasonable basis for its claims the burden shifts to the challenger to show that the evidence was flawed or false. In the advertiser's opinion, the challenger failed to meet its burden.

I. The #1 Claims

    A. The "America's #1 Cash Rewards Program" and "#1 Cash Rewards Program!" Claims Are True and Properly Substantiated

According to the advertiser, the challenger misrepresented its puffery argument by making it appear as though the advertiser argued puffery in defense of each of the challenged claims. Instead, the advertiser maintained that it only argued puffery with regard to its "best" claim, "The Best Cash Rewards Card Available Today." The advertiser asserted that it never argued that the "America's #1 Cash Rewards Program" claim was puffery.

With respect to the challenger's assertion that the challenged claims implied that Discover offered more cash back, the advertiser argued that there was nothing in the context of the advertisements which suggested that the claims were based on, or related to, offering "more cash." Furthermore, the advertiser noted that the challenger did not offer any consumer perception data to show that consumers interpreted the #1 claims as meaning #1 in value to the consumer or that it provided more cash rewards.

Finally, the advertiser argued that its "#1 Cash Rewards Program" claims were supported by the fact that Discover is the market share leader in the cash rewards category. The advertiser referred to the 2006 TNS Consumer Card Strategies Research Program ("TNS Study") as its primary source of substantiation for these claims. According to the advertiser, the TNS Study evaluated eight cash rewards programs and found Discover to be #1 in market share (*i.e.,* number of Discover card holders).[13] As further support for its "#1 Cash Rewards Program" claims, the

---

[13] The TNS Study analyzed the number of households and percent share for the top "Cash Back" issuers and found that, of the households in the United States that possess a cash rewards card, 52% have a Discover Card. Of the 33,698,531 total "cash back" households, 17,751,201 households own a Discover cash rewards card (52.7%). In contrast, the Study found that only 4,493,991 households own a Chase/Bank One "cash back" card (13.3%); 4,309,920 households own an American Express "cash back card" (12.8%); only 5,235,337 households own a

**DFS Services LLC**
**Discover Card Cash Rewards Program**
Page: 7

advertiser referred to a July 16, 2007 article by CardOffers.com,[14] a 2007 J.D. Power and Associates Credit Card Satisfaction Study,[15] and the fact that the Discover card is the only cash rewards program to offer all of its "Combined Advantages."

The advertiser noted that the challenger had argued that the credit card industry standard for measuring market share takes several figures into consideration, and that (regardless of how it is measured) market share is not relevant to the consumer when choosing between different cash back offerings. In response, the advertiser asserted that the "credit card industry standard" used by the challenger to measure market share does not exist and has no basis in fact. Furthermore, the advertiser argued that a cash rewards program is not #1 simply because it provides more cash – but that there are many features (such as ease of use, fees, redemption options and flexibility) that should be considered. Therefore, the advertiser argued, market share is the appropriate basis for substantiating the #1 claims because it assesses leadership with respect to the entire rewards program in comparison to all other rewards programs.

B. The "#1 Customer Loyalty" Claim is True and Properly Substantiated

The advertiser asserted that the #1 Customer Loyalty claim did not convey the message that Discover was #1 solely with regard to cash rewards programs. Rather, the claim was used as the heading of an advertisement which referred to the Discover card generally. According to the advertiser, the advertisement at issue listed four reasons why the card is #1 and only one of those reasons referred to the cash rewards program.[16] Therefore, the advertiser contended, the advertisement at issue did not in any way suggest – nor would a reasonable consumer take away a message – that the #1 Customer Loyalty claim was a specific reference to the Discover cash rewards program.

In support of its "#1 Customer Loyalty" claim, the advertiser produced the Brand Keys Customer Loyalty Engagement Index ("Brand Keys Study"), which the advertiser emphasized, has ranked Discover #1 in customer loyalty every year since 1998, including 2007.[17] In response to the challenger's criticisms[18] of the Brand Keys Study, the advertiser stated that the challenger failed

---

Citigroup "cash back" card (15.5%) (includes Citigroup-issued cards for Universal and Associates); and only 1,142,536 households own a Capital One "cash back" card (3.4%).

[14] The advertiser explained that CardOffers.com is a credit card directory web site that provides visitors with reviews and ratings of currently available credit card offers. The article tracked user data to find the top rated rewards credit cards available and rated the Discover® More[SM] Card the top-rated cash rewards card and "the best choice for users." *See* Top Rated Rewards Credit Cards by CardOffers.com, http://www.prweb.com/releases/2007/07/prweb539421.htm.

[15] The J.D. Power Study profiled the ten largest credit card issuers in the United States measuring customer satisfaction and found that Discover performed highest among all rewards programs.

[16] The challenged advertisement listed certain reasons why the "card" is #1, including (i) The #1 Cash Rewards Program in America; (ii) #1 Online Customer Experience; (iii) #1 Customer Loyalty; and (iv) A Leader in Fraud Detection Services.

[17] Discover ranked first in Customer Loyalty ahead of Capital One, Visa, American Express, Chase (f/k/a First USA), and MasterCard. *See* Brandweek Customer Loyalty Awards, http://www.brandkeys.com/awards/cli06.cfm.

[18] The challenger argued that the limitations of the study should be clarified for future use and that there was no explanation for how customer loyalty was measured.

**DFS Services LLC**
**Discover Card Cash Rewards Program**
**Page: 8**

to identify one legitimate limitation of the study and that the study measured the leading drivers of loyalty – attributes, benefits and values related to the credit card category.

### C. The "#1 Online Customer Experience" Claim is True and Properly Substantiated

In support of this claim, the advertiser noted that Discovercard.com was ranked the #1 web site for prospective customers by Keynote Competitive Research.[19]   The advertiser contended that the claim at issue only appeared in advertisements targeted specifically to prospective customers, such as direct mailings with solicitation materials. Therefore, the advertiser stated, there was no need to modify the claim. In addition, the advertiser stressed that Discover.com has won other awards such as the 2006 WebAward from the Web Marketing Association.[20] Finally, the advertiser argued that although Chase may have received an accolade from Credit Card Monitor, such an award failed to show that Discover's well-supported "#1 Online Customer Experience" claim was false.  This, according to the advertiser, is because Credit Card Monitor is a non-comparative and non-competitive measurement and does not rank web sites in terms of "best" or "second best."

### II.   "The Best Cash Rewards Card Available Today" Claim

#### A. The "Best" Claim is Non-Actionable Puffery

The advertiser averred that the "best" claim is non-actionable puffery because it conveys a subjective opinion about the cash rewards program generally.  The advertiser contended that the challenger lumped each of the challenged claims together as if they appeared in a single advertisement instead of reviewing the claims in the context of the advertisement in which they appeared.

According to the advertiser, the "best" claim appeared by itself as a tagline on a piece of direct mail and was not used in connection with any specific product attribute claim. Therefore, the advertiser averred, when viewed in context the phrase "best cash rewards card" is non-actionable puffery because it was not capable of quantifiable measures. The advertiser explained that the advertisement did not connect the claim to any specific product feature but rather conveyed a subjective opinion about the Discover cash rewards program. Furthermore, the advertiser noted

---

[19]       *See*       Keynote       Rankings       for       Credit       Card       Web       Sites, http://www.keynote.com/docs/kcr/cem/Keynote_CreditCard.pdf.   The Keynote Rankings examines the technical performance of leading credit card web sites, including site responsiveness and reliability. The study uses Keynote's Transaction Perspective® product, the leading subscription-based service for measuring and monitoring web site performance. Transaction Perspective examines performance from multiple geographic locations and mimics the actions of consumers, collecting more than 6,500 data points for each site to detail their online technical performance.
[20] The 2006 WebAward was awarded to Discover Financial Services and Discover.com for outstanding achievement in web site development.

DFS Services LLC
Discover Card Cash Rewards Program
Page: 9

that it would be difficult to quantify a "best" claim with respect to cash rewards programs because consumers may believe their card is the best for different reasons.[21]

B. The "Best" Claim was Adequately Substantiated

In addition, the advertiser argued that while the "best" claim is non-actionable puffery, it nevertheless provided NAD with a reasonable basis for the claim. The advertiser noted that Discover is America's #1 Cash Rewards Program and was ranked #1 in Customer Loyalty. Therefore, the advertiser averred, as "America's #1 Cash Rewards Program," it is also undoubtedly the "best." As further support for the "best" claim, the advertiser emphasized the fact that Discover scored the highest in Rewards in the J.D. Power Study and that the card's "Combined Advantages" offer customers the most flexible and desirable cash rewards program.

III.    The "Many Credit Cards Offer Rewards, But None Can Match Discover Card and Cashback Bonus" Claim

This claim, according to the advertiser, referred to the unique advantages and benefits offered by Discover's cash rewards program. It was not, argued the advertiser, a superiority claim made against the leading cash rewards card issuers. The advertiser contended that the claim does not compare its rewards program against "all" rewards programs, but only against "many." The message of the challenged claim, when viewed within the context of the targeted direct mail piece in which it appeared, was that Discover's cash rewards program offers a combination of certain benefits and advantages that consumers cannot receive with other card programs. According to the advertiser other credit cards do not offer the 'Combined Advantages," nor do they have the same flexibility and ease of use (e.g., easy redemption 24 hours a day, seven days a week online and by phone, any time a Cardmember reaches an increment of $20).

IV.    The "More Ways To Earn More Cash" Claim

A. Discover Does Not Make a "Most Cash" or "More Cash" Claim

The advertiser argued that the words "more cash," when read in context, is a reference to the number of opportunities Discover offers Cardmembers to earn cash through its rewards programs. The advertiser maintained that a reasonable interpretation of the "more cash" claim was that it focused on "ways" to earn cash – not that it made a stand-alone promise offering "more cash." Furthermore, the advertiser noted that the challenger did not submit any consumer research to support its interpretation of the "more cash" claim.

B. The "More Ways To Earn More Cash" Claim is a Statement about the Opportunities Available to Discover Cardmembers

---

[21] The advertiser stated that consumers believe their card is the best for many different reasons, such as: available cash rewards, number and type of ways to earn cash, customer service or redemption options.

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 10

The advertiser maintained that the claim "More Ways to Earn More Cash" was a truthful statement about Discover's broad cash rewards program, which offers its Cardmembers a number of opportunities to earn cash rewards in addition to the "standard" Cashback Bonus reward of up to 1% on each purchase. The advertiser noted that Discover's major competitors do not offer the same number of the accelerated rewards opportunities as Discover's Cashback Bonus Program. Therefore, the advertiser contended, since none of Discover's leading competitors can offer these additional ways to earn cash rewards, the "More Ways to Earn More Cash" claim is true.

C.   Discover has Shown a Reasonable Basis for the "More Cash" Claim

Further, the advertiser contended that it had provided NAD with a reasonable basis for the "More Cash" claim.   The advertiser criticized the challenger's example of consumer spending, contending that it made incorrect assumptions.[22]   The advertiser maintained that its examples were more reliable because they reflected the actual and additional opportunities each Discover Cardmember has to earn more cash.[23]   These additional opportunities could significantly affect a consumer's potential earnings, and yet were not factored into the challenger's chart.   According to the advertiser, the challenger's example is irrelevant because using the same or slightly different numbers would yield countless alternative outcomes simply by emphasizing a product's best features.

With regard to the challenger's argument that the advertiser's examples did not reflect typicality, the advertiser stated that typicality is irrelevant. The statement "more ways to earn more cash" did not represent that consumers on average earned more cash with Discover's cash rewards program than with leading competitors. Rather, the advertiser argued, the claim promised only "more *ways* to earn more cash" – *i.e.*, possibilities to earn more cash.

V.   The "Fewer Restrictions" Claim is True and Properly Substantiated

The advertiser maintained that the Discover cash rewards program does, in fact, offer a more flexible earning and redemption structure with fewer restrictions than other cash rewards programs.   The advertiser explained that, unlike Discover's major competitors, Discover Cardmembers: (i) can earn unlimited rewards; (ii) may redeem their *Cashback Bonus* without having to wait until their anniversary date; (iii) may redeem their *Cashback Bonus* in $20 increments; (iv) may redeem at any time of the day, 24 hours a day, 7 days a week, either online or by phone; and (v) may redeem immediately for instant e-certificates.[24]   In addition, the advertiser argued, the challenger conceded that the fewer restrictions claim was true when it

---

[22] The advertiser explained that the challenger's example assumed that two different rewards cards would generate the same type of spending by their respective cardholders when cardholders are encouraged to spend in ways that best maximize the features of their individual cash rewards program.

[23] The advertiser stated that Chase's example fails to account for the accelerated cash rewards which Discover Cardmembers can earn with its cash rewards program and the fact that Discover Cardmembers can earn unlimited cash rewards.

[24] Although the challenger stated that these are not important features to customers, the advertiser argued that the challenger had not explained why or what a better measurement for "fewer restrictions" would be.

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 11

admitted that it offers the same features as Discover with the exception of the $20 increment redemptions.

VI.    The "Most Redemption Choices of any Cash Rewards Program" Claim is True and Adequately Supported

The advertiser argued that it expressly limited the "Most Redemption Choices" claim to cash reward programs. Therefore the challenger's response, which included non-cash rewards such as travel, airline mileage programs and merchandise, was irrelevant. Discover's redemption choices include: account credit, direct deposit into a checking or savings account, check, gift card, instant e-certificate, and charitable donation. The advertiser argued that the challenger admitted that it offers only *some* of the options offered by Discover: "cash," gift cards, and charitable contributions. Therefore, the advertiser asserted, it has provided a reasonable basis for this claim.

**Decision:**

As a preliminary matter, NAD notes that "cash back" rewards cards are very popular with consumers. Discover was the first, and now many have followed. All of these programs offer valuable consumer benefits. Given the vast array of cash rewards programs available, the question of which rewards card it the best is very complicated and often turns on the needs and buying habits of the cardholder.

This challenge concerned an advertising campaign encompassing specific claims, and also the manner in which they appeared within the overall context of the campaign. NAD noted certain axiomatic precepts that it uses in deciding every challenge, and that were particularly applicable here. First, an advertiser is responsible for all reasonable interpretations of its claims, not simply the messages it intended to convey.[25] In the absence of reliable consumer perception evidence, NAD uses its expertise to determine the express and implied messages reasonably conveyed in an advertisement.[26] In analyzing the messages conveyed by a particular advertisement, NAD typically reviews the totality or overall net impression created by an advertisement as a whole, not merely words or phrases standing alone.[27]

I.    **"America's #1 Cash Rewards Program" and "#1 Cash Rewards Program!"**

The advertiser maintained that its "#1 Cash Rewards Program" claims were supported based on market share, as measured by cards in hand. It contended that Discover is the market share leader in the cash rewards category, according to an independent study by TNS. The TNS study analyzed the number of households and percent share for the top cash back issuers and found that, of the households in the U.S. that possess a cash rewards card, 52% have a Discover card.[28]

---

[25] *See* Johnson & Johnson Consumer Companies, Inc. (Aveeno Advanced Relief Cold Sore Treatment), Report #4719, *NAD/CARU Case Reports* (September 2007).
[26] Id.
[27] Id.
[28] The advertiser contended that its "#1 Cash Rewards Program" claims were further supported by a CardOffers.com press release rating the Discover® More[SM] Card the top-rated cash rewards card and "the best choice for users."

DFS Services LLC
Discover Card Cash Rewards Program
Page: 12

The challenger, on the other hand, argued that in the credit card industry market share is frequently measured in other ways, such as outstanding credit card balances (referred to as "outstandings") and total purchase volume.

NAD recognizes that market share is an appropriate basis for substantiating a "#1" claim in many instances, and both the challenger and the advertiser here agreed that market share is relevant. As both the advertiser and the challenger acknowledged, there is no single standard in the credit card industry for measuring market share. While market share is frequently measured in sales, the product at issue here – a cash back rewards card – is different in that there are no "sales" of credit cards (whether cash rewards cards or otherwise). Cards are issued, and thus card issuance might be analogized to sales and is certainly one potential indicator of leadership in the category. But, as the challenger argued, methods other than cards in the market are commonly used in the industry to measure market share, notably "outstandings" and total purchase volume. NAD thus analyzed this claim in the context in which it appeared to determine if it conveyed only the advertiser's intended message, i.e., #1 in the number of card holders, or a broader message.

NAD believes that consumers viewing a "#1" claim regarding a "cash back" rewards program might well consider that claim in relation to the value they expect to receive with such a credit card – the actual cash received back for purchases made with that card. In the absence of reliable consumer perception evidence, NAD steps into consumers' shoes to determine the reasonable takeaway of an advertising claim.[29] Here, given the overall context of the advertising, NAD determined that consumers would likely take away a message that Discover is "#1" in *specific*

---

The advertiser described CardOffers.com as "a credit card directory web site that provides visitors with reviews and ratings of currently available credit card offers, which tracked user data to find the top rated rewards credit cards available." Chase took issue with this evidence, arguing that it "gives no information about rating criterion and PR Web is merely an industry supported and paid online distributor of press releases that does not produce news reports and does not write originally researched articles," that CardOffers.com rates cards based on its own rating system and by random visitor reviews, and that it was neither statistically representative nor a valid sample of consumers or cardholders. NAD agreed that it was a press release and not a convincing form of evidence, and that it failed to establish a reasonable basis for the advertiser's "#1 Cash Rewards Program" claims.

Additionally, the advertiser contended that these claims were further substantiated by a 2007 J.D. Power Study which "profiled the ten largest credit card issuers in the United States measuring customer satisfaction and each issuer's position in the market relative to the overall industry as well as to the other issuers, and found that Discover performed highest among all rewards programs with a satisfaction score significantly above industry average." While NAD appreciated that this study reflected positively on consumers' satisfaction with Discover in terms of rewards, it was not persuaded that this provided a reasonable basis for the advertiser's "#1 Cash Rewards Program" claims. First, the advertiser did not show that consumers viewing these claims would most likely consider them to communicate "#1" in customer satisfaction, and as noted elsewhere in this decision, NAD determined that the consumer takeaway here would likely relate to value in terms of "cash back." Additionally, NAD observed that the J.D. Power Study also noted that while "89 percent of Visa customers and 87 percent of MasterCard customers indicate that their card is accepted everywhere they want to use it . . . only 17 percent of American Express and 19 percent of Discover customers say the same." Ability to use the card would likely be an important factor to the typical consumer interested in cash back on purchases made. *See* http://www.jdpower.com/press-releases/pressrelease.aspx?id=2007232.

[29] *See, e.g.,* Mead Johnson Nutritionals (Enfamil® ProSobee® LIPIL®), Report #4475, *NAD/CARU Case Reports* (April 2006).

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 13

*"cash back"* value (whether in terms of "more" or "the most" cash back or in terms of shopping opportunities), particularly because of the juxtaposition of these claims to specific "cashback bonus" and other features in the advertising. The advertiser did not provide a reasonable basis for that interpretation, as is explained more fully below in the "Cash Specific Claims" section.

NAD agreed that card issuance is one indicator of a brand leader. However, it may not be the best or most consumer-relevant measure. For instance, Discover was the first "cash back" credit card, a fact that could explain its dominance in card issuance. Since its inception, many other issuers have entered the market and issued their own "cash back" cards. Consumers who first obtained a Discover card (when it was the only one of its kind) may since have obtained other "cash back" cards, from any one of the other card issuers. Moreover, a typical consumer might have several credit cards ("cash back" or general purpose), but primarily use just one or two. NAD considered that the true measure of market dominance might be the "use" of a card, which would be better determined by total purchase volume or "outstandings" than by card issuance. Ultimately, NAD determined that the advertiser had not shown that its measure – cards in hand or card issuance – was the most consumer-relevant method to measure market share, and thus concluded that the advertiser had not provided a reasonable basis for its unqualified "#1 Cash Rewards Program" claims on the basis of market share.

Finally, the advertiser advanced a "combination of benefits" theory as substantiation for its "#1 Cash Rewards Program" claims. It argued that "Discover is undoubtedly America's #1 Cash Rewards Program because it is the only cash rewards program that offers all of the Combined Advantages" provided by its cash rewards program. NAD found this argument to be somewhat circular. Additionally, this reading of the claim renders it an overall superiority claim, rather than a pure brand leader claim. To prevail on this theory, then, the advertiser would have to show that its program's particular combination of advantages made it superior to all other competitors. As explained more fully below, the evidence in the record did not provide a reasonable basis for a "#1 Cash Rewards Program" claim on this theory either.

Consequently, NAD recommended that the advertiser either discontinue its "#1 Cash Rewards Program" claims, or modify them to disclose the specific basis for the claim, *i.e.,* that the Discover card is "#1" in terms of number of cards in the market.[30]

## II. "The Best Cash Rewards Card Available Today"

The advertiser argued that its "best" claim, "The Best Cash Rewards Card Available Today," was puffery when viewed within the context of the challenged advertising. It contended that the claim was used as a stand-alone tagline, not used in connection with any product attribute or feature, and not used in any comparative context. The advertiser further argued that the claim conveyed a subjective opinion about Discover's cash rewards program. The challenger argued that the "best" claim was not puffery, because the advertiser consistently referenced its cash back offerings as the basis for the claim.

---

[30] As NAD has frequently noted, where a claim contains or implies a comparison, the advertiser must clearly and conspicuously disclose the basis to consumers. *See, e.g.,* 3M Company (Nexcare Comfort Ultra Fabric Bandages), Report #4596, *NAD/CARU Case Reports* (November 2006).

DFS Services LLC
Discover Card Cash Rewards Program
Page: 14

The concept of puffery generally allows an advertiser to state, without any substantiation, that, for example, its product is "the best."[31]  However, as NAD has repeatedly articulated, the line between puffery and a claim requiring substantiation is dependent on the total context of the advertising.[32]  For example, "where an objective representation is made (*i.e.*, termed in fact rather than opinion) regarding the performance or other tangible attributes of a product that is sufficiently specific and material enough to create expectations in consumers, then substantiation for the claim is required."[33]

Here, the claim "The Best Cash Rewards Card Available Today" consistently appeared in advertising juxtaposed with and connected to claims of specific product features or attributes. It is well established that all advertising must be viewed in context and not by viewing isolated phrases.  Despite the advertiser's assertions to the contrary, the "best" claim appeared in close proximity to "cash back" components of the product, such as "5% *Cashback Bonus* on Get More purchases," "1% *Cashback Bonus*," "no limits" and "rewards never expire."  NAD determined that in the context of advertising that includes objective representations regarding tangible attributes of the product, the "best" claim is a quantifiable and objectively measurable claim which must be supported, not puffery.[34]

The advertiser argued in the alternative that even if its "best" claim were not puffery, it could nevertheless show a reasonable basis for the claim.  The advertiser's support for this argument

---

[31]  *See, e.g.*, Nestlé USA, Inc. (Good Start Supreme Infant Formula), Report #4214, *NAD/CARU Case Reports* (August 2004) ("the best" standing alone, in a non-comparative context, is puffery; a non-specific statement of opinion that a product is the "best" generally does not require substantiation); ConAgra Foods, Inc. (Hunt's Ketchup), Report #4104, *NAD/CARU Case Reports* (June 2004) (NAD found that the "best tomatoes" was not connected to any specific "particular objectively measurable product performance characteristics" such as taste, color or ripeness. NAD further observed that "[o]bvious hyperbole, exaggerated displays of a manufacturer's pride in its product and other non-provable claims, the truth and accuracy of which cannot be determined, have been found to constitute puffery. Generally speaking, these are claims for which reasonable consumers will not expect substantiation.").

[32]  *See, e.g.*, The Gorilla Glue Company (Gorilla Glue), Report #4486, *NAD/CARU Case Reports* (May 2006).

[33]  Amden Corp. (Smile White Tooth Whitening System), Report #4048, *NAD/CARU Case Reports* (May 2003); *see also* The Gorilla Glue Company (Gorilla Glue), Report #4486, *NAD/CARU Case Reports* (May 2006) ("The Toughest Glue on Planet Earth" is a measurable claim, not puffery, requiring substantiation and "advertiser must substantiate all reasonable interpretations of its claims, not just the message it intended to convey"); Electrolux Home Care Products, Ltd. (Eureka® Atlantis™ Extractor), Report #4561, *NAD/CARU Case Reports* (September 2006); The Procter & Gamble Company (Vicks® NyQuil® and NyQuil Cough), Report #4499, *NAD/CARU Case Reports* (May 2006); Nestle U.S.A. (Nescafe Frothe Cappuccino), Report #4263, *NAD/CARU Case Reports* (November 2004) (concluding that the claim "the best compact specialty coffee solution" is a broad superiority claim and, when presented with fliers touting various attributes of the system and related services, can be objectively measured against those of other competitors); ConAgra Foods, Inc. (Hunt's Ketchup), Report #4104, *NAD/CARU Case Reports* (June 2004) ("Whether a specific claim falls within puffery's protective reach is largely dependent on what is communicated, *i.e.*, what, if any, consumer expectations are created. . . .  [W]here an objective representation is made (*i.e.*, termed in fact rather than opinion) regarding the performance or other tangible attributes of a product, that is sufficiently specific and material enough to create expectations in consumers, then substantiation for the claim is required.").

[34]  *See* Saint-Gobain Abrasives, Inc. (Sandpaper, Sanding Sponge Blocks & Pads), Report #4113, *NAD/CARU Case Reports* (October 2003) ("best" claims in context of advertising were not puffery, but rather were objective claims requiring substantiation, because advertiser linked them to specific product performance traits).

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 15

was (i) that it has established that it is America's #1 cash rewards program; (ii) that Brand Keys ranks it #1 in customer loyalty; (iii) that it scored the highest in "rewards" in the J.D. Power Study; and (iv) that it offers "combined advantages" that no other card offers. However, as explained above, the advertiser has not provided a reasonable basis for its "#1" claims other than in the context of the number of cards in the market. Further, while NAD notes that the advertiser may also make a qualified claim regarding its J.D. Power ranking (clearly and conspicuously disclosing the basis for such claim, such as citing the source and context of the ranking), neither it nor the Brand Keys "#1 Customer Loyalty" ranking provides a reasonable basis for an overall superiority or "best" claim.[35]

Finally, regarding its "combined advantages" theory, the advertiser has not shown that its cash rewards program is superior to all other cash rewards cards in the way that is likely to be most important to consumers – *i.e.*, yielding, unequivocally, the most cash back on purchases made with the Discover card, or at least providing, again unequivocally, the most opportunities for the typical consumer, or a majority of consumers, to earn that cash back. NAD precedent is instructive on this point. In <u>Cimo, Inc. d/b/a Hotwire (Hotwire Airline, Hotel and Car Rental Discount Pricing</u>, the advertiser argued that its "better deals" claims were puffery.[36] The challenger argued that a reasonable consumer would interpret these claims to mean better (lower) prices. The advertiser further contended that even if the "better deals" claims were not puffery, a combination of benefits including price substantiated these claims. NAD rejected the advertiser's puffery argument, and evaluated the claim in the overall context of the advertising. NAD opined that, despite the advertiser's "combination of benefits" theory, the critical factor for consumers was low prices:

> While NAD agreed with the advertiser that price might not be the only consideration for a consumer in determining what constitutes a "better deal," in the highly competitive travel services it is undisputed that that consumers consider price to be an important factor in evaluating which is the "better" or "best" travel deal. . . . In any event, NAD cannot ignore the fact that, as a practical matter, both [parties] are selling low prices rather than service. In fact, NAD noted, what drives consumers to make the trade-offs necessary to obtain the savings opaque fares offer (*e.g.*, not knowing the name of the hotel, air carrier or flight times before purchase), is the low price. . . . NAD believes that because price is such a critical component of the "deal" where the marketing of opaque travel services is concerned, that consumers can also reasonably take-away the implied message that that Hotwire provides "better deals" than Priceline because it offers lower prices on travel related services.

---

[35] This is particularly so because of the broad and sweeping nature of this claim. As the advertiser itself noted, "[i]n fact, it would be difficult to quantify a 'best' claim with respect to cash rewards programs because consumers may believe their card is the best for several different reasons, such as available cash rewards, number and type of ways to earn cash, customer service, redemption options, and so forth." Thus, the evidence to support such a claim (when, as here, it falls outside the realm of puffery) must be particularly robust.

[36] <u>Cimo, Inc. d/b/a Hotwire (Hotwire Airline, Hotel and Car Rental Discount Pricing</u>, Report #3946, *NAD/CARU Case Reports* (August 2002).

DFS Services LLC
Discover Card Cash Rewards Program
Page: 16

As noted above, NAD routinely steps into consumers' shoes to determine reasonable interpretations of an advertising claim, and it is a basic principle of advertising law that an advertiser has the obligation to support any reasonable interpretation of its claims. Here, NAD determined that, in the overall context of the advertising, a reasonable consumer could interpret the advertiser's "best" claim to mean that the advertiser's product is the best cash rewards card available in terms of *specific "cash back"* value. While the advertiser is free to tout the "combined advantages" and specific attributes that Discover provides consumers (*e.g.*, "5% *Cashback Bonus* on Get More purchases," "1% *Cashback Bonus*," "no limits" and "rewards never expire"), these attributes are not sufficient to support the message conveyed by its "Best Cash Rewards Card Available Today" claim as used in this advertising. Because the value of actual "cash back" is such a critical component of the value a cash rewards credit card provides, NAD found that consumers can reasonably take away the message that the advertiser's product provides the most cash back. Therefore, to substantiate its "best" claim as it appears in the challenged advertising, the advertiser would need to demonstrate that it offers the most cash back (or, at least, the most opportunities to do so for the typical consumer or the majority of consumers). As explained below in the "Cash Specific Claims" section of this decision, although the advertiser produced evidence indicating that it does provide many cash back opportunities and that there are scenarios under which a consumer might earn more cash back with its product than with a competitor's card, it did not produce sufficient data to substantiate the overall superiority message conveyed by this claim. In essence, the advertiser has not demonstrated that the value of its specific product attributes add up to the "best" value (in "cash back" terms) for a typical consumer, of for the majority of consumers.

Therefore, although the advertiser is free to tout the specific benefits and attributes of its cash rewards program, NAD recommended that the advertiser discontinue its "best" claim and avoid conveying a message of overall superiority in future advertising.

## III. Cash Specific Claims: "More Ways to Earn More Cash" and "More Ways to Earn More Cash Than Anyone Else"

The advertiser contended that it had not made a "more cash" claim, that its advertising did not claim to provide cardholders with the most cash, and that a reasonable consumer would not take that message away. Rather, the advertiser argued, it used the language of these claims simply "in reference to the number of opportunities Discover offers its Cardmembers to earn cash through its rewards program. . . ." In the alternative, the advertiser argued that even if it were to make a "more cash" claim, the challenger failed to show that it would be false. The challenger argued that more "ways" can reasonably be interpreted as meaning (i) more opportunities to use the card to earn cash and/or (ii) more types of available cash bonuses, and that the advertiser must be able to support both interpretations. The challenger also contended that the Discover card does not literally provide "more" or the "most" cash back.

NAD again noted that it is the advertiser's obligation to provide support for all reasonable interpretations of its claims, not simply the messages it intended to convey. Here, NAD determined (given the context of the claims and the importance of actual cash back to the cardholder in this specific "cash back" rewards card market) that a reasonable consumer

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 17

takeaway was that the Discover card both provides more ways to earn cash back, and provides more actual cash back, than any competing cash rewards card.

Regarding the "ways" to earn cash, upon considering all of the evidence in the record, NAD determined that all of the leading issuers' programs enable consumers to earn cash by: (i) base earn; (ii) accelerated earn opportunities; (iii) online shopping opportunities; and (iv) certain promotional or "special" offers. In addition, the advertiser provided NAD with examples of other "ways" consumers could earn cash back using a Discover card such as enhanced redemption options, mall-issued gift cards and "unlimited earn." However, as the challenger noted, its card (and at least some other leading issuers' cards) also has unlimited earn; enhanced *redemption* is not a *way* to *earn*; and mall-issued gift cards are not cash.[37] Moreover, the restrictions inherent in Discover's tiered base earn (*i.e.*, the cardholder does not begin to earn the full base 1% until spending $3,000 on eligible purchases, which exclude warehouse club store purchases) and accelerated earn (*e.g.*, seasonal opportunities, at times with limited specific merchants, to which the cardholder must opt in each time, as well as quarterly caps on accelerated earn) were not insignificant. NAD also considered card acceptance to be an important factor to consumers when considering "more ways" to earn. The challenger provided evidence that Visa/MasterCard branded cards are accepted in significantly more locations than Discover. The advertiser argued that this gap is closing, but did not provide evidence of comparable acceptance rates. NAD agreed with the challenger that greater acceptance is a factor to be considered in determining whether a card provides the consumer with greater opportunities to spend, and therefore earn, cash back.[38] Thus, NAD determined that the evidence in the record was not sufficient to support claims that Discover's program provides consumers with more "ways" to earn cash back than competing products.

Regarding "more" cash, both parties provided NAD with charts and examples – scenarios illustrating their respective positions, each showing cases in which their arguments prevailed. NAD carefully reviewed the entire record, and noted that cash rewards card programs are filled with complexities, with various opportunities for benefits shifting and changing. Consequently, substantiating overall superiority claims in this particular product category is exceptionally difficult. Moreover, the value of any particular card to the consumer depends in large part on that consumer's spending habits. Discover's program, for example, contains seasonal or quarterly opportunities for accelerated earn, which at times incorporate popular categories of purchases and other times are limited to specific merchants, and which must be affirmatively opted-into each time by the cardholder. Discover also has a tiered base earn program, with the cardholder only reaching the full 1% base earn after spending $3,000 on eligible purchases. Further, there are caps on accelerated earn options. Discover is not alone in these complexities

---

[37] NAD's position is that cash is simply cash, and not other forms of exchangeable value. While some dictionaries include checks (*see, e.g.,* Merriam-Webster online at: http://www.merriam-webster.com/dictionary/cash: "1. ready money; 2. money or its equivalent (as a check) paid for goods or services at the time of purchase or delivery"), others do not (*see, e.g.,* Cambridge Dictionaries online at: http://dictionary.cambridge.org/results.asp?searchword=cash&x=0&y=0: "money in the form of notes and coins, rather than cheques or credit cards"). Nevertheless, a mall-issued gift card is not negotiable to the degree that cash is, and any form of value having such restrictions cannot be defined as cash.

[38] The challenger stated that "[a]t year-end 2006, some 6.6 million merchant locations in the United States accept Visa or MasterCard-branded cards compared to 4.8 million for Discover," citing Carddata (CardWeb.com).

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 18

and vagaries. NAD concluded, based on the evidentiary record, that all of the leading card issuers (the only issuers for which evidence was provided) have programs with different options, shifting opportunities, certain caps and/or tiers in earning potential, and various ways to maximize rewards potential *if a cardholder spends in the ways encouraged by the particular program*. However, despite inclusion in the record by both the challenger and the advertiser of various scenarios, NAD was not persuaded that the evidence was sufficient to support the advertiser's (or, for that matter, any rewards card program's) claim that it provides either the most "cash back," or more "ways" to actually get the most cash back, to the typical consumer or the majority of consumers, as compared to competing programs.

For these reasons, NAD recommended that the advertiser discontinue its "more cash" claims and avoid conveying an overall superiority message of providing the most cash back to consumers among competing cards in the market, in future advertising.

## IV. Remaining Claims

> **"Many credit cards offer rewards, but none can match Discover Card and Cashback Bonus®."**

NAD determined that consumers could reasonably interpret this claim to mean that Discover's cash rewards program provides the most ways to earn and/or the most cash back. For the same reasons articulated above, the advertiser's evidence was not sufficient to support this claim.

Therefore, NAD recommended that the advertiser discontinue the claim "Many credit cards offer rewards, but none can match Discover Card and Cashback Bonus."

> **"Fewer restrictions"**

The advertiser argued that this claim is accurate because the Discover cash rewards program offers an easier, more flexible earning and redemption structure with fewer restrictions than the leading card issuers in the categories most important to consumers.[39] The advertiser contended that, unlike Discover's major competitors, Discover Cardmembers: (i) can earn unlimited rewards; (ii) may redeem their *Cashback Bonus* without having to wait until their anniversary date; (iii) may redeem their *Cashback Bonus* in \$20 increments; (iv) may redeem at any time of the day 24 hours a day, 7 days a week, either online or by phone; and (v) may redeem immediately for instant e-certificates. The challenger argued that, in fact, the advertiser does not offer fewer restrictions, and that the group of features enumerated in support of this claim are misleading. For example, the challenger stated that the Chase Freedom program provides every one of these benefits except for the \$20 increment redemption option; and moreover, that Discover does have earning caps, which are "more tedious" than those of Chase. It also pointed out that all of the leading competitors provide monthly vs. annual redemption except for AmEx

---

[39] Initially, the challenge referred to "few*est* restrictions," and the advertiser correctly noted this claim was, in fact, "few*er* restrictions." NAD, accordingly, addressed the actual claim.

DFS Services LLC
**Discover Card Cash Rewards Program**
Page: 19

Blue Cash, and that the ability to redeem 24/7 online or by phone is a virtually universal card reward program feature.

As with every claim, NAD analyzed "fewer restrictions" within the overall context of the advertising and not as an isolated phrase. The phrase appears at the top of the page of a direct mailing piece, in the same size font as the claim "America's #1 Cash Rewards Program." The text of the advertisement describes product features such as "5% Cashback Bonus" and "No limit to how much you can earn," which are followed by other "#1" claims ("#1 Cash Rewards Program in America"; "#1 Online Customer Experience"; "#1 Customer Loyalty"). Given this context, NAD determined that a reasonable consumer could take away the message that this claim was comparative, and that Discover has fewer restrictions than all competing cash rewards programs.

In providing substantiation for this claim, the advertiser appeared to pick and choose among restrictions, listing five non-restrictive benefits that it provides and then asserting that all leading issuers do not provide these particular five. However, as NAD noted above, the various cash rewards programs are highly complex, not only in terms of earnings opportunities, but also in the form of restrictions. In fact, restrictions abound with all of these programs, making it difficult to quantify and compare restrictions among competitors. This illusive quality makes it very difficult for rewards card advertisers to provide competent substantiation to support comparative claims. Here, for example, in order to show that the Discover card has "fewer restrictions" in a sense that consumers could reasonably read the claim (*i.e.*, fewer than any other cash rewards program), the advertiser would have to produce clear evidence definitively showing that it has the fewest of all leading cash rewards cards programs, which it has not done. NAD noted that even the advertiser observed (in relation to it's "best" claim) that "consumers may believe their card is the best for several different reasons, such as available cash rewards, number and type of ways to earn cash, customer service, redemption options, and so forth." NAD concluded that this reasoning similarly applies to restrictions – what is onerous to one consumer might not matter as much to another. Thus, the advertiser's bare contention that it has fewer restrictions in the categories that matter most to consumers, and its list of five non-restrictive benefits, is not sufficient to support the claim.

Accordingly, although the advertiser is free to promote all of the non or less restrictive aspects of its program, NAD recommended that the advertiser discontinue the claim "Fewer Restrictions" and avoid conveying a message of overall superiority regarding the number of restrictions in future advertising.

## "Most Redemption Choices of Any Cash Rewards Program"

The advertiser argued that it does, in fact, have the most redemption choices of any cash rewards program, because it provides: account credit, direct deposit into a checking or savings account, check, gift card, instant e-certificate, and charitable donation. Chase, it argued, only offers cash back in the form of checks. The advertiser further argued that certain non-cash redemption options offered by Chase (such as points, airline miles and merchandise) are irrelevant in

**DFS Services LLC**
**Discover Card Cash Rewards Program**
Page: 20

comparison, because the advertiser "expressly limits the Most Redemption Choices Claim to cash rewards."

The challenger argued that the availability of its non-cash options defeats this claim. The challenger presented evidence that in addition to cash rewards (of which it offers a $50 check for each $50 in rewards or, as a bonus earning option, a $250 check for $200 in rewards), Chase provides for transfer of rewards to points which can then be redeemed for: travel, airline mileage, merchandise, gift cards or charitable contributions.[40]

NAD reviewed this claim in context to analyze the message conveyed to consumers. Whereas the "more cash" claims communicated possibilities about earning *cash* specifically, in its uniquely negotiable form, NAD determined that this claim conveyed a message regarding all types of redemption choices, without limit.[41] As NAD noted regarding the earnings end of cash rewards programs (*see* "Cash Specific Claims" section, *above*), redemption choices among the competing programs are hard to pin down and quantify as well; and, as with other claims herein, this merely highlights the requirement for clear and robust proof. NAD noted further that certain of the advertiser's options were not, in fact, cash options (*i.e.*, gift cards, e-certificates, and charitable donations). Regardless, NAD determined that all cash and non-cash redemption options must be considered in analyzing this claim.

The advertiser has claimed that it provides the most redemption choices of any cash rewards program. Viewing the evidence offered, NAD concluded that the advertiser has not shown that it offers more redemption choices than the challenger. What the challenger has shown (point redemption for travel, airline mileage, merchandise, gift cards or charitable contributions) are redemption choices, and simply counting the options, the advertiser does not prevail. Moreover, to provide a reasonable basis for this claim, the advertiser would have to produce definitive and comprehensive evidence demonstrating that it has more redemption choices than all of the other leading cash rewards cards programs. The advertiser did not quantify and provide data against all leading issuers of cash rewards programs, and thus did not demonstrate that it has the most redemption choices. Therefore, the advertiser has not provided a reasonable basis for this claim.

Consequently, although the advertiser may make qualified claims regarding specific ways in which it provides more choices, and as against whom, NAD recommended that the advertiser discontinue the claim "Most Redemption Choices of Any Cash Rewards Program."

### "#1 Customer Loyalty"

The advertiser argued that it has a reasonable basis for this claim, because since 1998, its product has ranked #1 in customer loyalty in this Brand Keys Customer Loyalty Engagement Index. The

---

[40] The challenger further noted that the advertiser's option of redemption in the form of a check is no longer available as of October 1, 2007.

[41] NAD acknowledged that this claim appeared in the context of advertising for a cash rewards program. Nevertheless, NAD believes that it is common knowledge among consumers that cash rewards programs generally offer a variety of redemption options in forms other than cash back (such as points, travel, merchandise, gift cards, e-certificates and charitable contributions).

**DFS Services LLC**
**Discover Card Cash Rewards Program**
**Page: 21**

advertiser further argued that where it made this claim in the advertising, it did so generally and without qualification, and that it did not present the claim as solely regarding its cash rewards program.[42]

The challenger argued that the Brand Keys ranking is for credit cards generally and not specific to cash back rewards programs, and that in the future, the limits of the Brand Keys study should be noted with this claim, because the advertiser's use of the "#1 Customer Loyalty" claim implied that customer loyalty is driven by the Discover cash back rewards benefits.

NAD analyzed this claim, as always, within the overall context of the advertising, and noted that Discover's advertising campaign, overall, concerned "cash back" and the benefits of its cash rewards program. However, while the Brand Keys ranking is for credit cards generally, NAD considered that (i) the claim appears simply as "#1 Customer Loyalty" – without a qualifier specific to the cash rewards program (whereas, notably, the #1 cash rewards program claims are specific in that sense) and (ii) the Discover brand is inextricably linked to its cash rewards program – it is the genesis of the card category – and therefore it would most likely not be misleading for a consumer to connect one "driver" of loyalty with the cash rewards program, the very core of the product. Moreover, NAD was persuaded that the study's methodology was sound, that the research was conducted to identify the most important drivers of customer loyalty, and that this is nearly a decade-long ranking held by Discover.[43]

NAD, therefore, concluded that the advertiser provided a reasonable basis for its "#1 Customer Loyalty" claim.

### "#1 Online Customer Experience"

As support for this claim, the advertiser cited to its #1 Keynote ranking: in 2007, Discovercard.com was ranked the #1 web site by Keynote Competitive Research for prospective customers.[44] The advertiser argued that because it is directed to prospective customers only (through direct mail solicitation), the claim is substantiated and does not require modification.

The challenger emphasized that this study ranked Discovercard.com #1 for *prospective*, and not actual, customers; and that Capital One and not Discover won the best overall customer experience honor for actual customers. Moreover, the challenger argued that "consumers (even prospects) will expect that No. 1 means No. 1 in the way that counts – after the consumer has

---

[42] The advertiser noted that the advertisement in which the claim appears lists several reasons why the Discover "card" is "#1": "(i) The #1 Cash Rewards Program in America; (ii) #1 Online Customer Experience; (iii) #1 Customer Loyalty; and (iv) A Leader in Fraud Detection Services." Thus, it argued, the claim did not suggest that the "#1 Customer Loyalty" claim was a specific reference to Discover's cash rewards program, and that because it did not appear in the context of the "more cash" claims, there was no implication that customer loyalty is driven solely by Discover's cash rewards program.

[43] According to Brand Keys, the "Discover Card continues to surpass all competitors in the credit card category in terms of the loyalty of its customers. Discover keeps winning the customer loyalty award because it exhibits no significant weakness versus its competitors."

[44] The advertiser noted further that Discovercard.com won the 2006 Web Marketing Association Award for outstanding achievement in web site development.

**DFS Services LLC**
**Discover Card Cash Rewards Program**
Page: 22

signed up," and thus that the claim requires modification clearly disclosing the ranking as applicable to prospective customers only.[45]

As mentioned previously, an advertiser is responsible for all interpretations of its claims, even those that are unintended. The main issue here was the fact that the Keynote ranking applied only to prospective customers, and not to actual customers. NAD, therefore, had to analyze the reasonable consumer takeaway for this claim. NAD agreed with the challenger that viewing the claim "#1 Online Customer Experience," consumers could reasonably interpret it to regard actual customer experience, and would reasonably be most interested in their experience once they actually became Discover cardholders. NAD noted that, of course, the advertiser is free to tout its Keynote ranking, but should avoid misleading consumers as to its real world significance.

Therefore, NAD recommended that in future advertising, the advertiser modify its claim "#1 Online Customer Experience" to clearly disclose that the ranking is for prospective customers only, and not current customers.

**Conclusion:**

NAD determined that the advertiser provided a reasonable basis for its "#1 Customer Loyalty" claim. However, NAD recommended modifications to the other challenged claims, in future advertising, as follows:

1) NAD recommended that the advertiser either discontinue its "#1 Cash Rewards Program" claims, or modify them to disclose the specific basis for the claim, *i.e.,* that the Discover card is "#1" in terms of number of cards in the market;
2) Although the advertiser is free to tout the specific benefits and attributes of its cash rewards program, NAD recommended that the advertiser discontinue its "best" claim and avoid conveying a message of overall superiority in future advertising;
3) NAD recommended that the advertiser discontinue its "more cash" claims and avoid conveying an overall superiority message of providing the most cash back to consumers among competing cards in the market;
4) NAD recommended that the advertiser discontinue the claim "Many credit cards offer rewards, but none can match Discover Card and Cashback Bonus";
5) Although the advertiser is free to promote all of the non or less restrictive aspects of its program, NAD recommended that the advertiser discontinue the claim "Fewer Restrictions" and avoid conveying a message of overall superiority regarding the number of restrictions in future advertising;
6) Although the advertiser may make qualified claims regarding specific ways in which it provides more choices, and as against whom, NAD recommended that the advertiser discontinue the "Most Redemption Choices of Any Cash Rewards Program" claim; and

---

[45] Further, the challenger noted that its product's online service options have been praised by Credit Card Monitor, while Discover's web site has not been similarly recognized.

**DFS Services LLC**
**Discover Card Cash Rewards Program**
**Page: 23**

7) NAD recommended that in future advertising, the advertiser modify its claim "#1 Online Customer Experience" to clearly disclose that the ranking is for prospective customers only, and not current customers.

**Advertiser's Statement:**

Discover Card appreciates NAD's careful consideration of this matter and is pleased that NAD determined that we provided sufficient substantiation to support the claims that Discover Card is the #1 cash rewards card based on card issuance; Discover Card is the #1 cash rewards card based on customer loyalty; and our website is #1 in overall customer satisfaction and experience among prospective credit card customers.

We acknowledge NAD's position that substantiating an overall superiority claim for a cash rewards program in the credit card category may be difficult, since "the value of any particular card to the consumer depends in large part on that consumer's spending habits." However, we respectfully disagree with NAD's conclusions and strongly believe that the challenged claims were adequately substantiated. We respect the process of industry self-regulation and are committed to providing truthful and accurate advertising. Therefore, we will consider the comments and recommendations made by NAD and modify our advertising accordingly. (#4779 **SMZ, closed 01/11/2008)**

© 2008. Council of Better Business Bureaus, Inc.

# EXHIBIT

# 3F

**Search Results:** You searched for Full Text contains "support all reasonable interpretations" and found 165 Documents

*Fuzzy:OFF Stemming:OFF Phonic:OFF Natural Language:OFF*

| Case# » | Date | Advertiser-Product | Challenger | Category |
|---|---|---|---|---|
| 4779 Case Report | 01/11/2008 | **DFS Services LLC** /Discover Card Cash Rewards Program | Chase Bank USA, NA | Financial Services |
| 4772 Case Report | 12/28/2007 | **Johnson & Johnson Vision Care, Inc.** /Acuvue Advance for Astigmatism | Bausch & Lomb Incorporated | Cosmetics / Beauty Products / Toiletries |
| 4730 Case Report | 09/21/2007 | **Match.com, L.P.** /www.match.com | eHarmony.com, Inc. | Websites/Web Services |
| 4718 Case Report | 08/29/2007 | **Bausch & Lomb Incorporated** /ReNu MultiPlus | ALCON LABORATORIES, INC. | Cosmetics / Beauty Products / Toiletries |
| 4700 Case Report | 07/13/2007 | **The Hershey Company** /Hershey's Special Dark Chocolate | National Advertising Division | Food/Beverage |
| 4692 Case Report | 07/12/2007 | **Rexall Sundown, Inc.** /Osteo Bi-Flex Dietary Supplement | National Advertising Division | Drugs / Health / Health Aids |
| 4687 Case Report | 07/05/2007 | **Nestle Purina Petcare Company** /Purina Puppy & Dog Chow / Pro Plan Dog Food Products | The Procter & Gamble Company | Pet Products |
| 4673 Case Report | 05/17/2007 | **Bayer Consumer Healthcare** /Aleve | WYETH CONSUMER HEALTHCARE | Drugs / Health / Health Aids |
| 4667 Case Report | 05/08/2007 | **LEGO SYSTEMS, INC.** /Lego Racers: Crash Collection | Children's Advertising Review Unit | Toys |
| 4666 Case Report | 05/04/2007 | **Intelligent Beauty** /iQ RestorEyes | National Advertising Division | Cosmetics / Beauty Products / Toiletries |

Previous Page  **1** 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17  Next Page