# EXHIBIT

# 6A

*Case #4176 (05/04/04)*
**GENERAL MILLS**
**FIBER ONE® Cereal**
*Advertising Agency:*          *In-House*
*Challenger:*                  *Kellogg Company*

- **Qualifiers and disclaimers in comparative claims must clearly reference the basis for comparison.**

**Basis of Inquiry:**   Product packaging and promotional claims made by General Mills for its Fiber One® Cereal were challenged by Kellogg Company, a manufacturer of competing cereals. The following challenged claims are referenced on the front panel of the Fiber One® Cereal box, in large print type, next to a picture of a bowl containing Fiber One® Cereal in milk:

"#1                                          In                                          Fiber."

"#1 In Taste."

The following claim is featured in between the above-referenced claims, in smaller print type:

"Most Fiber of Any Cereal."

Below the "#1 In Taste" claim appears another claim in yet smaller print type:

"Tastes Better Than Kellogg's All-Bran Original®."

**Challenger's Position:**

The challenger contended that the above-referenced claims on the packaging for the advertiser's product are false and misleading and should be discontinued.[1]

A.   "#1   In   Fiber"   &   "Most   Fiber   of   Any   Cereal"   Claims

---

[1] The challenger explained the placement and print size of the claims on the product's principal panel. It also noted that the fact that the challenged claims are made on package labels, as opposed to conventional advertising, is not a bar to NAD review, as suggested by the advertiser, in light of NAD's long-held view that it has jurisdiction over labeling claims (particularly those that are promotional in nature and may appear in a labeling/advertising context) and its authority and expertise in reviewing potentially misleading claims in labeling, advertising or other media, evidenced by its frequent review of challenges involving labeling claims. It noted that the present challenge relates to promotional claims about the advertiser's product and not technical compliance with federal regulations. See, International Home Foods, Inc. (Crunch 'n Munch Butter Toffee Popcorn with Peanuts), Report # 3599, *NAD Case Reports* (November 11, 1999) (in a case analyzing Federal Food and Drug Administration ("FDA") requirements regarding labeling disclosure of artificial flavors, NAD stated that it, "as the advertising industry's self-regulatory body, will, as a general rule, attempt to harmonize its decisions with the standards applied in the regulatory world."); American Pop Corn Company (Jolly Time BLAST O BUTTER Pop Corn), Report # 3524, *NAD Case Reports* (March 1, 1999); Guinness UDV Of North America, Inc. (Smirnoff Ice Malt Beverage), Report # 3879, *NAD Case Reports* (February 12, 2002); Carter-Wallace, Inc. (First Response® Early Result Pregnancy Test), Report # 3846, *NAD Case Reports* (December 1, 2001); Thorn Apple Valley, Inc. (Thorn Apple Valley Bun-Sized Skinless Smoked Sausage), Report # 3425, *NAD Case Reports* (November 1, 1997).

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 2**

The challenger maintained that Fiber One® does not have the "Most Fiber of Any Cereal," and therefore cannot be "#1 In Fiber," referencing the Nutrition Facts declarations for Fiber One® and All-Bran® Extra Fiber which indicate that a 30-gram serving of Fiber One® contains 14 grams of fiber, while a 26-gram serving of All-Bran® Extra Fiber contains 13 grams. Thus, on a gram-for-gram basis, the challenger contended that its product contains more—not less—fiber than Fiber One®.[2]

The challenger argued that "#1 In Fiber" is a nutrient content claim given that it "characterizes the level of a nutrient" in the product and, contrary to the advertiser's assertions, it is the "reference amount customarily consumed" (RACC), not the labeling serving size, that governs pursuant to 21 C.F.R. §§ 101.13(p)(1) and 101.54(e)(1)(i).[3]  It asserted that allowing nutrient content claims to be made based on declared serving size would fly in the face of FDA regulations and basic logic since virtually any claim could be made merely by manipulation of serving size.

The challenger further contended that the "#1 In Fiber" claim does not meet the FDA's express requirements for nutrient content claims.  It stated that, according to FDA regulations, only defined nutrient content claims—or synonyms of those defined claims—are permitted.  The challenger asserted that the "Most Fiber" claim is a prohibited, undefined nutrient content claim pursuant to 21 C.F.R. § 101.13(b) given that the FDA has not defined "most" in connection with a nutrient.

The challenger maintained that the "#1 In Fiber" claim is false based on clear regulations governing comparative nutrient content claims.  It noted that the advertiser's "most fiber of any cereal" claim is clearly a "comparative" nutrient content claim because it expressly compares the amount of a nutrient (fiber) in Fiber One® to the amount of that nutrient in all other cereals.[4]  Under FDA regulations, "more" claims may be made only if the subject food contains 10 percent more of the Daily Reference Value (DRV) of the RACC than the compared food.[5]  Here, the challenger averred that the "compared food" is "any cereal," the DRV for fiber is 25 grams, and

---

[2] .50 grams vs. .47 grams of fiber per gram of cereal, respectively.

[3] The challenger averred that one of the primary purposes for this approach was to ensure that claims are made on an "apples to apples" basis rather than in a way that is subject to manipulation and change based on a variety of factors, including the density of the compared products, manufacturers' labeled serving sizes, etc. The challenger maintained that the advertiser's reference, in its reply, to 21 C.F.R. § 101.9(b), which calls for nutrient quantity declarations to be based on a "serving" of the food, applies to the declarations of nutrient quantities and percent of daily values that are provided in the Nutrition Facts Box for a food and not to comparative nutrient content claims. It added that it never disputed the serving size or the quantitative declaration of fiber content provided in the Nutrition Facts Box for the advertiser's product.

[4] See 21 C.F.R. §§ 101.13(b), (j).  The challenger referred to the advertiser's reply contention that it uses "most" outside of the context of a nutrient content claim as a "simple statement of rank," arguing that it is elementary that a food containing the "most fiber of any cereal" also has more fiber than any other cereal thus rendering the claim as one to be governed by the FDA regulation for "more" claims.

[5] 21 C.F.R. §§ 101.13(p)(1), 101.54(e)(1)(i).

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 3**

the RACC for high fiber cereals, such as its product and that of the advertiser, is 30 grams.[6] Accordingly, in order for the advertiser to satisfy FDA requirements for this type of comparative nutrient content claim, the challenger noted that the RACC for Fiber One® would need to have 2.5 grams more fiber than the RACC for any other cereal. However, it noted Fiber One® not only does not contain 2.5 grams *more* fiber than any cereal but actually contains *less* fiber than All-Bran® Extra Fiber, whether measured in terms of RACC or ounce-for-ounce, given that a 30-gram RACC of Fiber One® contains 14 grams of fiber while a 30-gram RACC of Kellogg's® All-Bran® Extra Fiber contains 15 grams of fiber.

The challenger noted that NAD is no stranger to nutrient content claims, and, without exception, looks to FDA regulations to decide whether a claim may be false or misleading.[7] Here, it argued that a "most fiber of any cereal" claim for a product that does not meet the FDA's definition for "more" nutrient content claims clearly would mislead consumers and should be discontinued.

B.    "#1          In          Taste"          Claim

The challenger argued that the overall impression created by the Fiber One® principal display panel is that Fiber One® is superlative over all cereals in terms of fiber content and taste. As to the "#1 in taste" claim, the context of this claim as well as the "mousetype" qualifier underneath it (that Fiber One® "Tastes Better Than Kellogg's All-Bran Original") implies that Fiber One® beats every cereal on the basis of taste when this is clearly not the case. It maintained that it is unable to assess the validity of the advertiser's comparative taste tests based on the summaries included in the advertiser's reply. The challenger asserted that the "mousetype" qualifier, which is less than half the size of any other statement made on the principal display panel, can be seen and reviewed by only the most zealous consumer. It added that the narrow representation of the qualifier ("Tastes Better Than Kellogg's All-Bran Original") conflicts with comparative taste data on these two products, referencing a summary of a study conducted by *Consumer Reports*, which rated various high fiber cereals including Fiber One®, Kellogg's® All-Bran® Original, Kellogg's® All-Bran® Buds, and Kellogg's® All-Bran® Extra Fiber. The challenger stated that the results of the study show that Fiber One® does not beat Kellogg's® All-Bran® Original in terms of taste and is, in fact, outscored by all three All-Bran® varieties in terms of taste. Moreover, even if the advertiser had adequate substantiation for this narrow claim, the challenger asserted that the "mousetype" qualifier, in comparison with the prominence of this and other claims on the package, is inadequate to prevent the implication of a far broader claim. Thus, the "#1 In Taste" claim is misleading and should be withdrawn or substantially modified.

---

[6] See 21 C.F.R. § 101.12(b), Table 2.

[7] Citing SportPharma USA (Promax Protein Bar), Report # 3602, *NAD Case Reports* (November 1, 1999) (applying FDA's definition of various nutrient content claims in deciding whether the antioxidant nutrient content claims made for the product in question were appropriate); see also Campbell Soup Company (Campbell's Soups In A Jar), Report # 3393, *NAD Case Reports* (July 1, 1997) (holding that, when reviewing claims defined by the FDA, using a claim in a manner inconsistent with the FDA's definition would likely mislead consumers).

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 4**

**Advertiser's Position:**

The advertiser maintained that each of the contested claims on its product labeling is factual, appropriately made, and fully substantiated and, as such, requested NAD close the challenge.[8]

---

[8] As an initial matter, the advertiser, while noting that it is fully supportive of the NAD self-regulatory process, expressed concern regarding NAD's review of this challenge, which involves the Fiber One® cereal labeling, and not advertising, objections. Given its understanding that NAD's policy is not to hear challenges such as this one, where the FDA has the expertise, power and authority to adequately evaluate and address a challenger's labeling concerns, it maintained that opening NAD to the review of claims properly regulated by the FDA may result in a flood of challenges that might seriously jeopardize the efficiency and effectiveness of NAD's principal mandate of advertising monitoring and review. The advertiser added that the cases to which the challenger cites to justify NAD review of this challenge (the Guinness and Thorn Apple Valley cases) fail to do so and do not support an expansion of NAD's traditional role given that the statements made on the labels were also featured prominently in advertising and that, in Guinness, NAD did not supplant a regulatory agency but, rather, the relevant regulatory agency's scope of review could not address the claims at issue, which is not the case here.

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 5**

.

   A.  "#1     In     Fiber"     Claim

The advertiser argued that its "#1 in Fiber" claim is truthful, accurate and in full compliance with relevant FDA regulations, and contended that the real issue to be considered by NAD is whether the Fiber One® package is misleading or deceptive. It asserted that the "#1 in Fiber" statement is based on the per-serving information from the Nutrition Facts box on the side of the package and that a serving-to-serving comparison, and not a gram-for-gram comparison as claimed by the challenger, is appropriate.[9] The advertiser maintained that, notwithstanding the challenger's position, the All-Bran® Extra Fiber label characterizes a serving as 26 grams and not 30 grams like Fiber One®. It added that Fiber One®'s 14 grams of fiber per serving is the most of any cereal, including the challenger's All-Bran Extra Fiber, which has 13 grams per serving.[10] The advertiser averred that given the challenger's acknowledgment that it does not dispute "the quantitative declaration of fiber content provided by General Mills in the Nutrition Facts box for the product, nor the serving size," both parties agree that the nutrient values contained in the Nutrition Facts box are determined on a per serving basis. It posited that since the serving size, pursuant to 21 C.F.R. § 101.9(b)(1), "is expressed in a common household measure that is appropriate to the food," it appropriately stated its "#1 in Fiber" claim on the Fiber One® label.[11]

   B.  "Most Fiber of Any Cereal" Claim

The advertiser explained that the "Most Fiber of Any Cereal" statement has been deleted from the Fiber One® cereal label due to a recent packaging redesign (which revised packaging is expected to flow into its production facilities in February 2004), thereby making the issue moot. However, it argued that this statement is truthful and could remain on the label.

---

[9] Citing 21 C.F.R. § 101.9(b) (stating that "[e]xcept as provided in section 101.9(h)(3) [an exception for gift assortments not relevant here], all nutrient and food component quantities shall be declared in relation to a serving."). The advertiser also referred to the FDA's regulations for comparing nutrient content between foods which specifically refer to "comparing the amount of the nutrient in the product per labeled serving." 21 C.F.R. § 101.13(j)(i)(iv)(k).

[10] The advertiser stated that its recent packaging redesign adds the phrase "14 grams of fiber per serving" directly under the words "#1 in Fiber." The advertiser added that it strains credulity to believe that a consumer, viewing the Nutrition Fact boxes on both products, would feel misled by the "#1 in Fiber—14 grams of fiber per serving" statement where a ½ cup serving of Fiber One® contains 14 grams of fiber and a ½ cup serving of All Bran® contains 13 grams of fiber.

[11] The advertiser noted that it did not attempt to "diminish NAD's authority" (as claimed by the challenger), having stated that it is "fully supportive of the NAD self-regulatory process," adding that while it understands that the primary purpose of such regulation is to identify and address advertising practices that deceive or mislead consumers, no such practices are involved in the present challenge, a point that it does not wish to become obscured by technical readings of inapplicable FDA regulations. The advertiser maintained that the claims on its product are truthful, substantiated and appropriately presented and thus should not be deemed misleading or deceptive advertising.

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 6**

The advertiser asserted that the challenger's objection to its claim, namely that the "most" statement on the label is a comparative nutrient content "more" claim under FDA regulations and that Fiber One® cereal does not meet the regulatory test for a "more" claim, is a linguistic sleight-of-hand that neither changes the wording of the FDA regulations nor turns the plain language meaning of the word "most" into the FDA-regulated meaning of "more."[12] It maintained that the FDA chose to define "more" and not "most," adding that "most" is not included in that list because it is not synonymous with "more" and is thus not properly considered a synonym of "more" in the context of the regulation. In addition, the advertiser noted that all of the listed synonyms require a direct comparative to give them meaning and that "most" does not. It claimed that its use of "most" is not intended as a nutrient content claim defined by FDA, but rather in the common, plain-English sense of the word. The advertiser claimed that the placement of the "Most Fiber of Any Cereal" statement, in conjunction with the "#1 in Fiber" statement, reinforces the meaning of the term "most" as a simple statement of rank.

The advertiser maintained that, in this case, the challenger was asking NAD to judge a non-regulated term against the standards of an inapplicable regulation given that FDA regulations do not prohibit the plain language, factual use of the term "most." It added that the NAD cases cited by the challenger are not on point given that challenged claims in those cases used terms specifically regulated by the FDA (Campbell's) or that are obvious synonyms (SportPharma). As such, it concluded that the use of the term "most" on its Fiber One® cereal label is permissible, even if moot.[13]

     C.    "#1 In Taste" Claim

The advertiser argued that it has conducted numerous taste tests for more than a decade comparing Fiber One® cereal and All Bran® Original. It noted that the Fiber One® label simply reflects the fact that its taste is consistently preferred by consumers. The advertiser asserted that its claim was tested most recently in 2003 in an appropriately designed mall-intercept test of 312 adults in ten geographically dispersed cities using blinded samples of the two products.[14] It asserted that the test showed a statistically significant consumer taste preference, at a 99%

---

[12] The advertiser noted that the FDA defines and regulates the use of the term "more" in 21 C.F.R. § 101.54(e), but not the term "most," and that in section 101.54, it lists many words it considers synonyms for "more" such as "fortified," "enriched," "added," "extra," and "plus."

[13] The advertiser argued that the logical conclusion from the challenger's position is that any superlative claim about a nutrient is an implied "more" claim regulated by FDA, noting that the challenger uses the claim "highest protein cereal available" in its Kashi GOLEAN® Crunch advertising, even though it would not qualify to state "more protein than any cereal available."

[14] Concerning the testing protocol, the advertiser noted that the study participants were screened for age, history of cereal eating, willingness to eat fiber cereals with milk, non-participation in marketing research surveys in the previous 3 months and potential employment bias. It added that the interviewers followed strict procedures to ensure that each participant was unaware of the product being tested and that test conditions were identical for each product.

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 7**

confidence level, for Fiber One® over the challenger's All-Bran Original. [15]  The advertiser added that now, just as in NAD Report # 3083, its test supports its "#1 in Taste—Tastes Better Than Kellogg's All-Bran Original" claim.

In response to the challenger's argument that the "#1 in Taste" claim should be read in isolation as referring to all cereals and ignore the clear qualifying language ("Tastes Better Than Kellogg's All-Bran Original," appearing on the label immediately below the statement), the advertiser averred that, according to NAD precedent, a qualifying statement that is conspicuously disclosed at the point of purchase is sufficient to limit a claim. [16]  The advertiser explained that the qualifying language "Tastes Better Than Kellogg's All-Bran Original" appears on the front of the package in white, legible font and type size on a dark contrasting background immediately adjacent to the "#1 in Taste" statement, and within a blue "flag" that contains the taste preference claim, at the point of purchase.  Thus, it argued, the "Tastes Better Than Kellogg's All-Bran Original" statement is a stand-alone claim, not "mousetype" hidden in a long paragraph in a dark corner of the box, and is wholly obvious and understandable to the consumer at the time of purchase.  Thus, the advertiser claimed that the plain language of the statement on the Fiber One® label evidences that this is simply a comparison between two of the leading fiber cereals and that to construe it otherwise would ignore the conspicuous placement and clear language of the qualifying statement.

**Decision:**

>     A.      "#1 In Fiber" Claim; "Most Fiber of Any Cereal"

As the challenger noted, when evaluating nutrient content claims, NAD typically accords great weight to FDA regulations.  The challenger argued that the advertiser's "#1 In Fiber" claim is a nutrient content claim given that it "characterizes the level of a nutrient" in the product and asserted that the "reference amount customarily consumed" (RACC), not the labeling serving size (as argued by the advertiser), governs.  Thus, gram-for-gram, in fact, Fiber One® contains less fiber than All-Bran® Extra Fiber.  Concerning the advertiser's "most fiber of any cereal" claim, the challenger maintained that it is clearly a "comparative" nutrient content claim because it expressly compares the amount of a nutrient (fiber) in Fiber One® to the amount of fiber in all other cereals and argued that this claim is a prohibited, undefined nutrient content claim given that the FDA has not defined "most" in connection with a nutrient.

---

[15]  The advertiser asserted that while the challenger states that it is "unable to assess the validity" of the testing, despite having been provided detailed documentation describing the test protocol and results (which are typical for such taste preference claims), the testing is of the same nature as testing it provided in a previous challenge to substantiate a taste preference claim (made for its Fiber One® cereal over the challenger's All-Bran Original cereal in print advertising) for which NAD found a reasonable basis.  See General Mills, Inc. (Fiber One Bran Cereal), Report # 3083, *NAD Case Reports* (January 13, 1994).  It added that the October 1999 *Consumer Reports* article provided to NAD by the challenger reports the "judgments of trained tasters," which "judgments" do not agree with the consistent results of rigorous consumer testing conducted multiple times over the last decade.

[16]  See Northland Cranberries, Inc. (Northland Juices), Report # 3694, *NAD Case Reports* (September 1, 2000).

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 8**

The advertiser responded arguing that its "#1 in Fiber" claim is based on the per-serving information from the Nutrition Facts box on the side of the package and that a serving-to-serving comparison, and not a gram-for-gram comparison, is appropriate. Thus Fiber One®'s 14 grams of fiber per serving is the most of any other cereal, including the All-Bran Extra Fiber (13 grams per serving). It posited that both it and the challenger agree that the nutrient values contained in the Nutrition Facts box are determined on a per serving basis, and that the serving size "is expressed in a common household measure that is appropriate to the food."[17] The advertiser maintained that its "Most Fiber of Any Cereal" statement is truthful (though it has been deleted from the label due to a recent packaging redesign) as its use of "most" serves as a statement of rank based on its placement with the "#1 in Fiber" claim and that it is not an FDA-defined nutrient content claim since FDA defined "more" and not "most" (the plain language, factual use of which is not prohibited by the FTC).

In considering the positions of both parties, and in its continued effort to harmonize its decisions with the standards applied in the regulatory world, NAD reviewed the Nutrition Labeling and Education Act of 1990 ("NLEA"), which established requirements for nutrition labeling and nutrient claims. NAD reviewed the "#1 In Fiber" and "Most Fiber of Any Cereal" claims in light of NLEA to determine: 1) whether they are nutrient content claims; and 2) whether the fiber content of these products should be determined based on a RACC or per serving basis.

The NLEA defines nutrient content claims as claims that "expressly or implicitly characteriz[e] the level of a nutrient of the type required to be in nutrition labeling under sec. 101.9[18] or under sec. 101.36 (that is, a nutrient content claim)...." The FDA regulations further provide that nutrient content claims "...may not be made on the label or in labeling of foods unless the claim is made in accordance with this regulation and with the applicable regulations in subpart D of this part or in part 105 or part 107 of this chapter."[19] In addition, if information about a specific nutrient that is required as part of a product's nutritional labeling (such as the amount of dietary fiber in a serving) pursuant to § 101.9 is included on another part of a product's label, then it is considered a nutrient content claim "and is subject to the requirements for nutrient content claims."[20] Moreover, a product that contains a statement comparing the amount of the nutrient in that product "to an amount of nutrient in an appropriate reference food" is deemed a "relative" nutrient content claim pursuant to 21 C.F.R. § 101.13(j).

Here, based on the NLEA standards, NAD determined that the "14 grams of fiber per serving" claim on Fiber One's revised label, standing alone, constitutes an "express" nutrient content

---

[17] 21 C.F.R. § 101.9(b)(1).

[18] Dietary fiber is included as one of the nutrients included in nutrient labeling pursuant to 21 C.F.R. § 101.9.

[19] 21 C.F.R. § 101.13(b).

[20] 21 C.F.R. § 101.13(c). The advertiser referred to its new labeling which indicates "14 grams of fiber per serving" directly under the words "#1 in Fiber." Under this rule, the "14 grams" claim, standing alone, would be considered an express "nutrient content claim" as the 14 grams is already indicated on Fiber One's nutrition label and is similar to the example given for an express content claim: "contains 100 calories." See 21 C.F.R. § 101.13(b)(1).

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 9**

claim as it directly references the quantitative amount of fiber in the product and "14 grams" is already indicated on Fiber One's "Nutrition Facts" title.[21] However, the "14 grams of fiber per serving" claim does not stand alone as it qualifies the broad "#1 in Fiber" superiority claim[22] and does so clearly (references the amount of fiber per serving), conspicuously (large font size) and in close proximity to the underlying claim (directly below the "#1" claim).[23] In addition, neither the "#1 In Fiber" nor the "Most Fiber of Any Cereal" claims qualifies as an "implied" nutrient content claim pursuant to 21 C.F.R. § 101.65 as none of the terms in that section (such as "contains the same amount of [nutrient] as a [food]" or "healthy") are referenced in the challenged claims, even though both claims suggest that a nutrient (here, fiber) is "absent or present in a certain amount (e.g., 'high in oat bran')" pursuant to 21 C.F.R. § 101.13(b)(2)(i).

Concerning "relative" nutrient content claims, the "#1 in Fiber" and "Most Fiber of Any Cereal" claims could (each claim standing alone) be considered a relative nutrient content claim. As such, each would be an undefined nutrient content claim as "#1" and "more" are not among the defined nutrient content terms or their synonyms pursuant to 21 C.F.R. § 101.13. Despite the fact that "#1 in Fiber" and "Most Fiber of Any Cereal" claims, standing alone, are undefined nutrient content claims, they do not, in fact, stand alone in the context in which they appear on the challenged advertising. The "#1 in Fiber" claim is qualified by the "Most Fiber of Any Cereal" claim and thus must be analyzed in this context. As such, the key determination is whether "Most Fiber of Any Cereal" properly qualifies the underlying claim. While the "Most Fiber of Any Cereal" claim is conspicuous and appears in close proximity to the underlying claim, given that it is a comparative claim as against all cereals, it does not, unlike the "14 grams per serving" claim, clearly reference that the basis for comparison is whether Fiber One has most fiber *per serving*. Accordingly, NAD determined that the "#1 in Fiber" claim was not adequately qualified by the "Most Fiber of Any Cereal" claim and, recognizing that the claim is no longer being made, recommended that all future claims include clear qualifications by referencing the "per serving" basis of comparison.[24]

---

[21] See 21 C.F.R. § 101.13(b)(1). None of the restrictions pertaining to express content claims would apply here, namely, Subpart D of part 101 (21 CFR §§ 101.54-101.69), part 105 (special dietary use) or part 107 (infant formula) of Chapter I.

[22] See, e.g., <u>Breath Asure Inc. (BreathAsure Breath Freshener)</u>, Report #3429, *NAD Case Reports* (December 1, 1997) (deeming the "#1 selling breath freshener" claim as one of sales superiority).

[23] See <u>Windmill Health Products (Chitosol™ (Chitosan Fat Binding Diet System))</u>, Report # 3900, *NAD Case Reports* (April 29, 2002) (holding that disclaimer that intended to qualify the underlying "America's #1 Fat Binding Diet" claim, namely "IRI, 24 weeks. Ending 10/7/01," was inconspicuous and, even if conspicuous, did not substantively contain information "to effectively clarify the meaning of the underlying claim and/or describe the data upon which the claim was based."). Qualifiers and disclaimers are essential when additional, material information is necessary to avoid an inaccurate inference. <u>Nutrition Resource, Inc. (Prozone Nutritionally Balanced Bars)</u>, Report # 3489, *NAD Case Reports* (September 1, 1998).

[24] In addition, NAD ascertained that the "most" claim is not, contrary to the challenger's contention, a "more" claim pursuant to 21 C.F.R. § 101.54. A "more" claim is defined as "[a] relative claim using the terms 'more,' 'fortified,' 'enriched,' 'added,' 'extra,' and 'plus' [and] may be used on the label or in labeling of foods to describe the level of protein, vitamins, minerals, dietary fiber...." See 21 C.F.R. § 101.54(e). The term "most" is not included in the list of synonyms for "more," nor is there any indication that the FDA intended "most" to be included as a "more" claim. Thus the "Most Fiber of Any Cereal" claim is not synonymous with a "more" claim. NAD observed that 21 C.F.R. § 101.13(j) states that "[a] food may bear a statement that compares the level of a nutrient in the food with the level of a nutrient in a reference food," which statements are known as "relative claims" and include "'light,' 'reduced,'

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 10**

The remaining issue concerned the accuracy of the advertiser's superiority claim, namely whether the RACC or serving size governs as the applicable measure for determining which cereal has the most fiber. Again, NAD referred to the NLEA, specifically its preamble, to ascertain the FDA's intent. The FDA stated that in section 101.12(g), it proposed the requirement that "the reference amount be used in determining whether a product meets the criteria for nutrient content claims, such as 'low calorie,' and for health claims," noting that serving size and reference amounts differ (citing to the example of a soft drink and the sodium amount contained therein per reference amount) and that it was proposed that nutrient content claims be based on both the reference amount and the serving size.[25] However, though the FDA ultimately concluded that the reference amount, and not serving size, would serve as the basis for evaluating nutrient content claims, the examples cited in support of its decision are foods in which the <u>entire</u> container is the serving size.[26] Indeed, the FDA stated that "it would be misleading to make a claim on a product that met the criteria for a claim on a reference amount basis but that did not qualify for the claim on the basis of the labeled serving size, *i.e. the entire container*...[t]his approach created situations in which a product in one size container would be eligible to bear a claim, while the same product in a different size container would not be eligible."[27] It referred again to its soft drink example where it stated that "products packaged in *containers* that differ from the reference amount may contain an amount of the nutrient significantly different from the amount on which the claim is based (e.g., 50 mg of sodium in a 12-fl oz container that can claim 'very low sodium' since it contains only 35 mg sodium per 8 fl oz)," noting that it "agrees with the comments that claims should reflect the true characteristics of a product, and those characteristics do not change if the product is packaged in a different size *container*."[28] Thus, the FDA's underlying reason in choosing the reference amount and not a serving size as the means by which to evaluate nutrient content claims centered on the possible manipulation of the size of a product's container, which it deemed as equivalent to the labeled serving size.

Here, the serving size in question is ½ cup, not the entire cereal box. Thus the preamble of the NLEA, while instructive, is inapplicable in this instance as it references container sizes as

---

'less' (or 'fewer'), and 'more' claims." While, at first blush, the "More Fiber of Any Cereal" claim compares the level of fiber in Fiber One to the level of fiber in a reference food (here, other cereals), "most" is not listed as a relative claim nor is it is listed as a synonym for any of the relative claims. See *A Food Labeling Guide—Appendix A: Definitions of Nutrient Content Claims*, U.S. Food and Drug Administration, Center for Food Safety and Applied Nutrition (June 1999), http://www.cfscan.fda.gov/~dms/flg-6a.html.

[25] 58 Fed. Reg. 3, at 2286 (January 6, 1993).

[26] Id. at 2287.

[27] Id. at 2314. (emphasis added)

[28] Id. at 2287. (emphasis added)

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 11**

constituting the labeled serving size. Section 101.9(b)(2)(iii) states that "[f]or nondiscrete bulk products (e.g., breakfast cereal, flour, sugar, dry mixes, concentrates, pancake mixes, macaroni and cheese kits)…the serving size shall be the amount in household measure that most closely approximates the reference amount for the product category…." The reference amount for high fiber cereals, in which category both Kellogg's All-Bran Original® and Fiber One® cereals are included, is 30 grams of product though the exact serving size is not indicated. The challenger and advertiser each chose ½ cup as the serving size for their products, and while a ½ cup of Fiber One® Cereal is 30 grams, a ½ cup of Kellogg's All-Bran Original® is 26 grams. Numerous variables undoubtedly determine and account for the varying reference amounts for a particular serving size of a cereal, such as the weight of the cereal's ingredients. The challenger *chose* to base its product's serving size on a 26 gram reference amount, just as the advertiser *chose* to base its product's serving size on a 30 gram reference amount and, accordingly, either party may compare the amount of the various nutrients (including fiber) in their labeled serving size. Moreover, consumers who wish to determine the quantitative amounts of calories, fat, fiber, or other nutritional ingredients in a product look to quantitative amount of each variable as referenced per serving, not based on the RACC amount. Accordingly, NAD determined that the "serving size" was an appropriate measure to compare the fiber content of competing cereals and, as such, the advertiser's revised qualified claim that Fiber One® Cereal with 14 grams of fiber per serving contained the "Most Fiber of Any Cereal" per serving was substantiated.

      B.    "#1 In Taste" Claim

In support of its argument that the "#1 In Taste" claim is misleading and should be withdrawn or substantially modified, the challenger argued that Fiber One®'s principal display panel creates an overall impression of being superlative in terms of fiber content and taste over all cereals and that the context of the "#1 in taste" claim as well as the "mousetype" qualifier underneath it (Fiber One® "Tastes Better Than Kellogg's All-Bran Original"), which is less than half the size of any other statement made on the principal display panel, implies that Fiber One® beats every cereal on a taste basis when this is clearly not the case, noting that it is unable to assess the validity of the advertiser's comparative taste tests based on the summaries provided. It added that the "Tastes Better Than Kellogg's All-Bran Original" qualifier is a narrow representation and that, even if supported, is inadequate to prevent the implication of a far broader claim in comparison with the prominence of this and other claims on the package. The challenger further maintained that the qualifier conflicts with the results of a *Consumer Reports* study which rated various high fiber cereals and showed that all three All-Bran® varieties, including Kellogg's® All-Bran® Original, outscored Fiber One® in terms of taste.

The advertiser maintained that the plain language of the statement on the Fiber One® label illustrates that the comparison is between two of the leading fiber cereals and that it reflects consistent consumer taste preference for Fiber One®, adding that to construe it otherwise would ignore the conspicuous placement and clear language of the statement. It noted that it has conducted numerous taste tests for more than a decade comparing Fiber One® and All Bran® Original cereals and that its claim is supported by the results of its 2003 mall-intercept test (312 adults in ten geographically dispersed cities using blinded samples of the two products) which indicated a statistically significant (99% confidence level) consumer taste preference for Fiber

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 12**

One® over All Bran® Original. The advertiser averred that its qualifying statement ("Tastes Better Than Kellogg's All-Bran Original") is a stand-alone claim, not "mousetype," as it appears at the point of purchase in white, legible font and type size on a dark contrasting background immediately adjacent to the "#1 in Taste" statement and within the blue "flag" that contains the taste preference claim.

Regarding the adequacy of the taste test, NAD has held that comparative taste claims are best substantiated where the products in question are compared to each other, the participants convey their opinion about them, the testing is double-blind and involves a geographically dispersed sample that reflects the target market.[29] In this case, NAD determined that the advertiser's taste test and its results established a reasonable basis for a superior taste claim in comparison to Kellogg's All-Bran based on the advertiser's use of a mall-intercept test which included 312 participants from 10 major and geographically dispersed U.S. cities (gender and age quotas determined based on industry data (NET Data)), adequate protocols and methodology in place to assess the results (e.g. blind, products with similar shelf life, products presented and tested in the same way, cleansing of the palate prior to tasting another cereal) and statistically significant results (99% confidence level) in favor of Fiber One® (64% for Fiber One® vs. 30% for Kellogg's® All-Bran®). Moreover, NAD determined that the challenger's evidence, namely a 1999 Consumer Reports test, failed to rebut the advertiser's reasonable basis for its claim given that it is dated (conducted in 1999) that may not reflect the products currently on the market and the lack of information regarding the specific testing protocols (i.e., whether the testing was blind, how the test was administered, and the statistical significance of the data).[30]

Further, NAD recognizes that packaging claims have an equal or greater capacity to influence consumers than general advertising claims because they directly communicate with consumers at the point of purchase and thus can immediately influence their purchasing decisions.[31] NAD has consistently noted that advertisers who rely on disclaimers to qualify or narrow a claim must make sure that such disclosures are "clear and conspicuous" and do not contradict the main message of the advertising.[32] In the absence of any reliable consumer perception data to

---

[29] Bio-Foods, Inc. (Balance™ Nutrition Bars), Report # 3440, *NAD Case Reports* (February 1, 1998); NAD has also held mall-intercept tests to be a valid means of consumer testing, particularly where there is an acceptable sample size to produce reliable results (200-300 individuals deemed acceptable by NAD and most authorities). See Northland Cranberries, Inc. (Cranberry Juice), Report # 3948, *NAD Case Reports* (August 7, 2002) (double-blind consumer perception study of 300 participants in 12 geographic areas throughout the U.S.).

[30] See Bio-Foods, Inc. (Balance™ Nutrition Bars), *supra* note 29 (holding that well-controlled, updated testing is required to support "best tasting" claim; see also The Manhattan Bagel Company Inc. (Manhattan Bagels), Report # 3448, *NAD Case Reports* (March 1, 1998) (noting that *Consumer Reports* article that provided inadequate information about the test protocol it used or the scoring reported, despite the use of trained testers, did not allow for a determination of whether the testing provided a reasonable basis for a manufacturer's claim).

[31] Aurora Foods, Inc. (Van De Kamp's Breaded Fish Stick Value Pack), Report # 3658, *NAD Case Reports* (June 1, 2000).

[32] Thane International (BioSlim Weight Loss Program), Report # 3557, *NAD Case Reports* (June 1999).

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 13**

demonstrate what messages are being communicated by the claims, NAD has historically relied on its own expert judgment to assess the reasonable messages conveyed by an advertisement.[33]

Here, as concerns whether the disclosure ("Tastes Better Than Kellogg's All-Bran Original") is "clear and conspicuous," NAD determined that the disclosure was adequate both in terms of size and placement as it is directly below the underlying claim ("IN TASTE") and in sufficiently large print both in the challenged product packaging advertising provided by the challenger and in the revised packaging (where it is even more visible as it is featured in white letters against a blue background). However, NAD was troubled because the disclosure contradicted the claim. In Thorn Apple Valley, Inc. (Thorn Apple Valley Bun-Sized Skinless Smoked Sausage), NAD determined that consumers could reasonably believe that "America's # 1 Selling Smoked Sausage"* (Source: A.C. *Nielsen Scantrack*) and "America's # 1 Seller" (no reference to A.C. Nielsen data) claims applied to the entire smoked sausage category (i.e., that Thorn Apple was the #1 seller of "fully cooked" sausage, "ready to eat" sausage and/or "natural hardwood smoked" sausage). In light of the inaccuracy of the claim (Hillshire is the largest smoked sausage seller in America) and the resultant potential confusion, NAD recommended that the claim be modified to more accurately reflect that Thorn Apple is the #1 seller in the "Bun-sized Skinless Smoked Sausage" category.

Applying the same reasoning in this case, NAD determined that a consumer could reasonably understand "#1 In Taste" claim to mean that Fiber One® tastes better than all other cereals in the market especially since the claim appears in a significantly larger font size in relation to the other claims and specifically the qualifying disclaimer. The disclaimer, by seeking to limit the broad "#1" comparative claim to all cereals to one cereal (Kellogg's® All-Bran®), contradicts the main message of the unqualified "#1 In Taste" claim regardless of its placement and prominence. Accordingly, NAD recommended that the advertiser discontinue its "#1 In Taste" claim and limit any future comparative superior taste claims to the actual cereal(s) tested.

**Summary of Conclusions:**

NAD determined that the "14 grams of fiber per serving" claim on Fiber One's revised label is sufficiently clear and conspicuous in size and in placement to qualify the advertiser's "#1 in Fiber" superiority claim. NAD also concluded that the "Most Fiber of Any Cereal" claim was overly broad because it did not clearly reference the basis for comparison, i.e. most fiber *per serving*, and recommended that all future comparative fiber claims include clear qualifications that reference the "per serving" basis of comparison. NAD also determined that "serving size" was one appropriate measure to compare the fiber content of competing cereals and that the advertiser provided a reasonable basis for its qualified claim that "per serving" Fiber One® contained the "Most Fiber of Any Cereal." Lastly, NAD recommended that the "#1 In Taste" claim be discontinued and that future comparative superior taste claims be limited to the cereal(s) tested.

---

[33] The Andrew Jergens Company (Bioré Self-Heating Mask & Warming Deep Pore Cream Cleanser), Report # 4115, *NAD Case Reports* (December 2003).

**GENERAL MILLS**
**FIBER ONE® Cereal**
**Page 14**

**Advertiser's Statement:**

General Mills is pleased that NAD has found that the current "#1 in Fiber" claim on the Fiber One® cereal package is appropriate, and that the taste comparative claim on the package is properly substantiated.    Although we do not concur with NAD's conclusion that the communication of the taste comparative claim is overly broad, General Mills will initiate design changes to reflect NAD's recommendation.

General Mills appreciates the opportunity to participate in the NAD self-regulatory process. (#4176 AMU, closed 05/04/04)

# EXHIBIT

# 6B

*Case #4210 (07/26/04)*
**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
*Advertising Agency:*          *Justice Direct Partners, Inc.*
*Challenger:*                  *National Advertising Division*

> - **As a general rule, advertisers making claims promoting the safety and efficacy of health products should be prepared to support them with competent and reliable scientific evidence.**

**Basis of Inquiry:** As part of NAD's routine monitoring program, NAD requested substantiation for product performance claims made in product packaging, print, radio, television, Internet advertising and promotional materials by Alzare, Inc. for its Male Enhancement Supplement. The following are representative of the claims that served as the basis for NAD's inquiry:

"specially formulated to supercharge your sexual health with added size, increased strength, added performance, stamina and energy. ... deeper penetration"

"Recommended and tested by Dr. Daniel S. Stein ... Dr. Stein was able to scientifically conclude that 'Alzare ... has the ability to deliver an increase in size, stamina, staying power, desire, vitality and all-around more pleasure and better performance."

"for any man, regardless of age…"

"Tested and approved Alzare is all natural and 100% safe to use…"; "It's 100% natural, so it's 100% safe."

 "CLINICALLY CONFIRMED to work for you."

"Tested and approved Alzare …"

"Alzare's formula has been rigorously tested and clinical studies have shown increases in growth and pleasure and has a 95% success rate…." ; " a 100% effective solution to the problem that 60 million men have."

"Most individuals will notice an increase up to 25% in length and girth, increased energy, stamina, sensitivity and sexual performance"; "Virtually everyone who orders [Alzare] will experience an increase in size [98%]"

"results within the first week to ten days."

 "Over 100,000 men just like you have tried Alzare with great success."

"guaranteed to increase penis size by an average of up to 25%."

NAD also requested substantiation for claims made in consumer testimonials including, but not limited to, claims of increased size, stamina, strength and duration of erections, as well as claims of superior results with Alzare as compared to Viagra and other male enhancement products.

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 2**

**The Advertiser's Position:**

The advertiser maintained that Alzare improves both sex drive and sexual performance for normal men of all ages, and may reasonably be expected to have even more dramatic effects on men with a weak sex drive or low sexual stamina. The advertiser explained that such symptoms occur in an estimated 15 million American men, and may be related to a natural hormone decline which begins at 20 years of age (and continues downward as one ages). These symptoms may also be associated with stress, fatigue, sleeplessness, sexual inactivity, or pressure from work or home. The advertiser stated that Alzare's Male Pro-hormone Blend produces optimal replenishment of this male hormone and has been shown to strengthen sex drive, enhance sex performance, boost sexual ability, increase sexual stamina, and improve sexual self-confidence – which translates to more frequent sexual contact, more gratifying and rewarding sexual contact, and a better quality of life in general. The advertiser also noted that, with Alzare, no doctor visits are necessary to get a prescription. In fact the advertiser stated that Alzare worked better than Viagra to improve desire and sexual enthusiasm, because Viagra only improves erection strength but has *no effect* on desire, lust, passion, stamina, or overall virility.

According to the advertiser, unlike any of its competitors, Alzare includes a full adult dose of pharmaceutical grade, testosterone-boosting DHEA – a prohormone produced by the body and used as a basic building block to assist production of many important hormones in the body. Indeed, the advertiser stated, it is the most important human prohormone. Further, Alzare is the only male enhancement supplement to combine the enhancing effects of DHEA, Yohimbe, Tongkat Ali, and Tribulus Terrestris, in a full adult male meaningful dose, which increases sexual performance, stamina, desire and energy as documented by the advertiser's study and make it the leader in libido and penis enhancement supplements.

In particular, the advertiser noted that the ingredient Yohimbe, along with the other ingredients in Alzare, works synergistically to promote an increase in blood flow *into* the penis and a decrease in blood flow *out* of the penis, thereby enlarging the two erectile tissue chambers in the penis to hold more blood during an erection. In fact, the advertiser stated (and as the advertisements tout), Yohimbe is FDA approved for physicians to prescribe for this very purpose.

I.     The Advertiser's Clinical Study:

In support of its efficacy, quantified performance and other claims, as well as in support of its consumer endorsements, the advertiser provided NAD with its clinical study,[1] conducted in a professional medical setting, documenting authentic, experienced results on sexual performance, sexual desire, and sexual intimacy from a clinical perspective.

  *a) Protocol & Methodology:*

---

[1] Submitted on a confidential basis.

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 3**

The advertiser explained that its study focused on participants' perception of desire, energy, passion, power, pleasure, performance, and the quantitative and qualitative improvement in sexual intimacy. Further, the psycho-physiologic effect of taking a daily sexual enhancement supplement was also considered in evaluating the study's results.[2]

The clinical study's test population consisted of twenty men ranging in age from 32 to 59 years. The 8-week study included an initial interview and evaluation, followed by weekly scheduled telephone follow-up interviews and final, in-person exit interview. Over the course of the study, participants were instructed to take one tablet of Alzare each morning, at the same time, to achieve a consistent and controlled blood level.

A series of thirteen questions were asked of the subjects before the onset of the study, weekly, and after having taken Alzare for the full eight weeks. The question criteria were evaluated by medical reviewers for objectivity and validity. The thirteen questions were divided under three sub-headings: 1) Sexual Desire/Sexual Energy/Passion, 2) Sexual Power; Pleasure; Performance, and 3) Overall Sex Life Improvement. Additionally, penile measurements (by trained medical professionals) were taken at the onset and final interview of the study; interim measurements at week one, week two, month one and month two were self administered by the participants.

   *b) Test Results:*

According to the advertiser, the results for each of the thirteen questions asked demonstrated consistent and statistically significant improvement in sexual health in all subjective categories. The advertiser added that the "improvement" responses for each question and in each group of questions were consistently and significantly positive far beyond what may reasonably be attributed to placebo or psycho-physiologic effect. Sexual performance/function improvement was significant both qualitatively and quantitatively.[3]

With respect to its claims of enhancing penile size, the study reported that 50% of the subjects experienced increase in length and 30% experienced an increase in girth, of the erect penis. Further 45 % of participants experienced an increase in length improvement and 35% experienced an increase in girth, to the flaccid penis. Results improved each week after beginning Alzare and continued throughout the 8 week period.[4] Thus, the advertiser stated, its study demonstrates that Alzare boosts sexual desire, sexual energy and sexual passion. In fact, due to the encouraging results of this study, a double blind placebo-controlled clinical trial is currently in progress.

---

[2] The advertiser explained that the thought process underlying the taking of a supplement or medication to enhance any aspect of health or wellness may be expected to create a positive effect in a certain percentage of people taking it. According to the advertiser, this placebo effect should account for approximately 15% of improvement noted.

[3] Specific percentages of participants who experienced improvement in the various categories/sub-categories (as detailed by their answers to 13 questions) were submitted to NAD on a confidential basis.

[4] The advertiser stated that, improvement should continue as long as Alzare is taken daily but that a gradual return to a less than optimum state of sexual health could be expected after stopping Alzare.

Justice Direct Partners, Inc.
**Alzare All Natural Herbal Male Enhancement**
**Page 4**

II.     Quantified Success Rate Claim:

In support of its claim that over 100,000 men have achieved the promised results using Alzare, the advertiser stated that it has received over 100,000+ orders from satisfied customers with one of the lowest return rates compared to other competitive products in the market, and that consumer testimonials also support this claim.

III.    Dr. Recommended & Safety Claims:

With respect to the recommendation of Dr. Daniel Stein and his scientific conclusion as to the performance results (and safety) of Alzare, the advertiser set forth Dr. Stein's curriculum vitae. Over the last 25 years, Dr. Stein has devoted a significant part of his career to the clinical evaluation and treatment of sexual dysfunction and the enhancement of health by optimizing the vital connection between the mind, body, and spirit of loving sexual intimacy.  Dr. Stein formulated Alzare with safety and efficacy as his primary objective, based on years of clinical experience with literally hundreds of patients. The advertiser further pointed to its clinical study, its positive results, and the absence of any subjects experiencing side effects from Alzare.

**DECISION:**

As a preliminary matter, NAD appreciated that the advertiser provided a plethora of studies and articles detailing encouraging and promising advances in the area of hormone (prohormone) and testosterone levels and enhancement, prosexual nutrients, erectile dysfunction and sexual performance.  NAD found the studies and articles related to certain ingredients in Alzare to be informative as to the intended sexual enhancing propensities of these ingredients as found in Alzare. Indeed, NAD recognized that the available scientific literature offered by the advertiser was both plentiful and promising.  NAD also appreciated the fact that the advertiser undertook the task of designing and conducting its own clinical study on the performance attributes of Alzare. Further, NAD acknowledged Dr. Daniel Stein's extensive background in the evaluation and treatment of sexual dysfunction including, but not limited to, his published books and peer-reviewed articles on sexual health.

Preliminarily,  NAD noted that nothing in this decision precludes the advertiser from making truthful claims regarding the state of science of sexual and/or erectile dysfunction research (i.e., the function of DHEA, pro-hormonal sexual nutrition, the wearing effect of hormone imbalance due to aging, stress, etc.), the state of science concerning certain ingredients (i.e., DHEA, Yohimbe, etc.), the fact that Alzare contains these ingredients, and the encouraging results of certain studies. NAD takes no issue with the advertiser discussing and/or educating the public as to the state of this science.  In this respect, NAD determined that the evidence in the record is sufficient to support *compositional claims* for Alzare relating to DHEA, Yohimbe, tribulus, etc. as long as the advertising is properly qualified so that it (1) makes clear that these claims are

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 5**

compositional claims only and (2) does not imply that use of Alzare maintains or enhances sexual potency, stamina, increased penile size, etc.[5]

Turning to the evidence provided by the advertiser in support of its claims, it is well established that NAD's evaluation of the substantiation offered by an advertiser is guided by the specific advertising claims at issue. Indeed, the message conveyed by advertising claims determines the necessary level of proof.[6] Here, the advertiser claims, *inter alia*, that Alzare is clinically proven and confirmed to increase energy, stamina, sensitivity, sexual performance, increase penile size (up to 25% in length and girth) and increase the hardness and effectiveness of erections, for "any man regardless of age". The advertiser further claims that Alzare has a success rate anywhere between 95-100%. As in all cases, principal among NAD's concerns is to ensure that the scope of the claims made in the challenged advertising are consistent with the scope and specificity of the information upon which the advertiser relied.

I.    "Clinically Proven" & General Performance Claims:

With respect to the advertiser's claims that the performance results promised in its advertisements have been "clinically proven" or "clinically "confirmed" in rigorous tests or studies, such claims are establishment claims. An establishment claim is held to a very high standard of proof because it is, in essence, a promise that there is scientific evidence that proves or "establishes" the truth of an advertiser's claims.[7] Indeed, a "clinically proven" claim very literally speaks to the actual testing of the product in terms of its claimed efficacy.[8] Where, as here, an advertiser makes one or more establishment claims, the results of the test(s) that form the basis for these claims must be clearly reliable. In such cases, NAD has traditionally required that an advertiser must offer reliable and well-controlled clinical testing on that product that can be readily verified to substantiate an establishment claim for a product.[9] The FTC requires at least *two* adequate and well-controlled clinical studies to substantiate an establishment claim, a higher standard than that required for other claims.[10]

---

[5] See, e.g. Nutramax Laboratories, Inc. (Senior Moment Memory Enhancing Dietary Supplement), Report # 3899, *NAD Case Reports* (August 2002); Mead Johnson & Company (Advanced Formula Enfamil®), Report #3381, *NAD Case Reports* (April 1997)

[6] See, WIPSS Products, Inc. (Brain Pad Head Gear), Report # 4139, *NAD Case Reports* (February 2004).

[7] See, A.D. Pharma (Notox - The All Natural Way to Reduce the Ill Effects of Alcohol), Report # 4163, *NAD Case Reports* (April 2004); Avon Products, Inc. (Skin-So-Soft Bug Guard Plus IR 3535 Insect Repellent), Report #3922, *NAD Case Reports* (August 2002).

[8] See, e.g., Dream Products, Inc. (Breast Enhancer Tablets), Report #3972, *NAD Case Reports* (November 2002)

[9] See, A.D. Pharma (Notox - The All Natural Way to Reduce the Ill Effects of Alcohol), Report # 4163, *NAD Case Reports* (April 2004); Virbac, AH, Inc. (Preventic Tick Control Product), Report #3603, *NAD Case Reports* (November 1999).

[10] Id. (Where NAD also noted that, similarly, the networks require advertisers representing that their products are "clinically proven" to provide at least two studies that permit sound conclusions regarding statistical and clinical significance of products or their ingredients; In contrast, NAD noted, if a claim is *not* an establishment claim, the

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 6**

In support of its "clinically proven" and other efficacy claims, the advertiser submitted to NAD, among other things, its 2004 Alzare Clinical Study. NAD commended the advertiser for its intent to document authentic, experienced product use results on sexual performance, sexual desire and sexual intimacy from a clinical perspective. At the same time, however, NAD had several concerns regarding the design of the Study including the number of subjects, the duration of the trial, the lack of a control group, the absence of objective verification of the results purportedly achieved and, notably, the reliability and accuracy of the participants' unverified measurements to support increased penile size claims.[11] More importantly, NAD noted that this study, offered in support of sweeping (and often quantified) performance claims, was only preliminary in nature, as conceded by the authors of the study. While this study produced encouraging results concerning the Alzare's potential performance capabilities, and prompted the undertaking of a double-blind placebo study which is currently underway, that study has not yet been completed and no findings have yet been reported. In this respect, NAD has routinely questioned the appropriateness of extrapolating information from preliminary findings to support unqualified and quantified performance claims, such as the ones made here[12]

In addition to the preliminary nature of the Alzare Clinical Study, NAD observed that the sample size tested (20 men) was extraordinarily small, particularly given the nature of the broad, unqualified (yet often specifically quantified) establishment claims it purports to substantiate. Even where the use of such a small number of subjects may be customary in a particular industry, an advertiser cannot necessarily extrapolate from those results to support a sweeping unqualified establishment claim.[13] This is particularly problematic where, as here, there is no evidence that the test group utilized is representative of men in general. With the exception of the age bracket of the participants (32-59 years old), there is no information as to the criteria used for participant selection (i.e., the physiological make up of the subjects, e.g., height, weight, medical history, etc.). While NAD acknowledged that the advertiser's product is not targeted *specifically* to men with erectile dysfunction or a particular age group (and, therefore, the chosen age group of otherwise healthy participants, could potentially be deemed proper), it cannot be

---

advertiser had to have a reasonable basis for the claim, a standard which did not necessarily require two clinical studies.)

[11] See, Lifekey Healthcare, Inc. (Enzyte Male Enhancement Program), Report #4074, *NAD Case Reports* (July 2003).

[12] See, Natrol, Inc. (Carb Intercept with Phase 2), Report #4158, *NAD Case Reports* (March 2004); Inverness Medical Innovations, Inc. (Posture-D), Report #4105, *NAD Case Reports* (October 2003)(NAD cited expert's cautioning against extrapolating from preliminary findings and urging full trial testing); Discus Dental (Zoom! Chairside Tooth Whitening System), Report # 4009, *NAD Case Reports* (January 2003)(Where NAD made note of the small sample size of a "pilot" study submitted as support, highlighting that this was not a full-scale study.); The Sharper Image (Ionic Breeze Air Purifier), Report #4006, *NAD Case Reports* (November 2002)(NAD questioned the reliability of certain extrapolations made from preliminary report results.)

[13] See, Basic Research, LLC (Bust Booster Breast Enhancement Product), Report #4008, *NAD Case Reports* (February 2003); Avon Products, Inc. (Skin-So-Soft Bug Guard Plus IR 3535 Insect Repellent), Report #3922, *NAD Case Reports* (August 2002).

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 7**

ignored that individuals suffering from various types of erectile dysfunction are clearly part of the marketplace, are consumers who might specifically search out products such as Alzare and, in part, are individuals to whom such advertising is directed. Notably, one of the testimonials in the challenged advertising compared the performance results of Alzare to that of Viagra, indicating that, at the very least, there is an overlap in target audiences between healthy individuals and individuals suffering from some kind of erectile dysfunction. Given the absence in the record of any information as to the physiological make up of these individuals, their medical history, or any information as to the selection criteria for this test population, there was no evidence from which NAD could discern that the study population was consumer relevant.

NAD was also concerned that the study (that the advertiser argues shows "statistically significant improvement" in the various areas of Sexual Power, Desire, Overall Sex Life), was designed in such a manner as to rely primarily on the observation of the study participants and their subjective responses to questions rather than the expertise of professionals in the relevant area. Although the advertiser stated that a placebo effect should account for approximately 15% of the improvements noted in the study, it pointed to nothing in the record to support this assertion (save for its statement that the taking of a supplement to enhance any aspect of health or wellness can be expected to have this percentage of a placebo effect.) Notably, this study was not blinded and there was no control group employed in the study.

Moreover, although subjects were instructed as to how to self-administer the taking of penile measurements over the course of the study, the fact that they were self-administered calls into question the accuracy of the measurements reported. The study appears to note little, if any monitoring of the participants over the course of the 8-week study to ensure the measurements were properly and accurately reported.[14] It cannot be disputed that the target audience for the Alzare product is a vulnerable one. In view of this vulnerability, it is reasonable to conclude that perhaps some (if not many) of the positive results of the study may have been attributable to embarrassment (a reluctance to report little or no increase in size) and/or wishful thinking.[15]

To the extent that the advertiser relies upon other studies on the ingredients in Alzare in support of its clinically proven claims, as previously noted, a "clinically proven" claim very literally speaks to the *actual testing of the product* in terms of its claimed efficacy.[16] These other articles cited by the advertiser, although informative, cannot serve as substantiation for the advertiser's claims that it possesses scientific evidence (tests, data, etc.) proving that Alzare (or at a minimum, tests of products with identical ingredients at the same levels and with the same dosing instructions as contained in Alzare), delivers the specifically quantified performance results (indeed, in some cases specifically quantified results) promised in the advertisements.

---

[14] See, Lifekey Healthcare, Inc. (Enzyte Male Enhancement Program), Report #4074, *NAD Case Reports* (July 2003).

[15] Id.

[16] See, e.g., Dream Products, Inc. (Breast Enhancer Tablets), Report #3972, *NAD Case Reports* (November 2002).

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 8**

For all of these reasons, NAD determined that this evidence was insufficient to provide a reasonable basis for the advertiser's "clinically proven" claims of product performance and/or efficacy.

Even absent the "clinically proven" or "clinically tested" claims, NAD questioned the sufficiency of the advertiser's evidence as substantiation for the advertiser's general efficacy claims, particularly its specifically quantified performance claims. The advertiser expressly claims that Alzare is, among other things, "specially formulated to supercharge your sexual health with added size, increased strength, added performance, stamina and energy. ... deeper penetration," "boost sexual potency while increasing the hardness and effectiveness of the penis..." and "deliver an increase in size, stamina, staying power, desire, vitality and all-around more pleasure and better performance."

In evaluating the adequacy of the advertiser's support, NAD has looked to the Federal Trade Commission's guidelines for dietary supplement advertising ("Dietary Supplements: An Advertising Guide for Industry" ["FTC Guide"]) which requires "competent and reliable scientific evidence" as substantiation for claims regarding the efficacy of dietary supplements.[17] FTC defines competent and reliable scientific evidence as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated by persons qualified to do so, using procedures generally accepted in the profession to yield accurate results." Thus, a guiding principle for determining the amount and type of evidence that will be sufficient is what experts in the relevant area of study would generally consider to be adequate.[18]

The advertiser's primary source of substantiation for its performance claims for its specifically formulated product was its 2004 Alzare Clinical Study.   The advertiser contended that its clinical study, and the resultant data, supports a link between its product and increased penis size and success in increasing stamina, sexual potency, performance, etc.  NAD did not agree.  As previously discussed, the advertiser's study, though well-intentioned, contained significant flaws, not the least of which was the lack of objectivity, the small number of subjects, and the absence of a control group.  As such, NAD determined that this study did not constitute the requisite reliable, well-controlled human clinical studies necessary to provide a reasonable basis for the advertiser's broad general claims of product efficacy.[19]

---

[17] See, e.g., Dietary Supplements: An Advertising Guide for Industry, Business Publications (Federal Trade Commission 1998); http://www.ftc.gov/bcp/conline/pubs/buspubs/dietsupp.htm.

[18] Id.

[19] Nutramax Laboratories, Inc. (Senior Moment Memory Enhancing Dietary Supplement), Report # 3899, *NAD Case Reports* (August 2002); (Chattem, Inc. (Garlique® Standardized Herbal Supplement), Report #3497, *NAD Case Reports* [November 1998])

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 9**

With respect to the advertiser's specifically quantified performance claims,[20] it is well settled that "the nature and extent of claims made by an advertiser should mirror the precision and specificity of the data used to substantiate the claims."[21] Such specific, quantifiable performance claims require very reliable scientific support and an affirmative demonstration by the advertiser that the advertised product actively provides/performs the claimed benefit(s).[22] As previously discussed, the advertiser's study was insufficient to support its broad general claims of product efficacy and, consequently, its specifically quantified 95% to 100% success rate. Moreover, with respect to the penile measurements taken, even assuming *arguendo* that these measurements are accurate, at best, 50% reported *some* increase in size according to the study submitted by the advertiser. These results are insufficient to support the advertiser's unqualified claim of 25% increase in penile length in the general population, as well as the advertiser's claim that its product has a 95% success rate in achieving such results. The advertiser's study, informative though it may be, did not rise to the level of such scientific support necessary to support such specifically quantified performance claims. Indeed, again, the study itself acknowledges its own limitation to the extent that it noted that it was preliminary in nature.

With respect to the advertiser's submission of other studies and articles concerning the various ingredients contained in Alzare, these submissions demonstrate that many of the ingredients in Alzare including, but not limited to, DHEA, Yohimbe, Tribulus Terrestris and Tongkat Ali, have been the subject of numerous studies (especially abroad). The results of these studies have been encouraging and promising particularly in the area of hormone (prohormone) enhancement, genital blood flow testosterone levels and enhancement, vasodilation, prosexual nutrients, and erectile dysfunction and sexual performance. The issue for NAD, however, was the relevance and applicability of these studies to the *general* public (i.e., all men, regardless of age) and to the advertiser's specific performance claims for its product, which are targeted to a very broad consumer audience. NAD has previously noted that a common problem in the substantiation of advertising claims is that an advertiser has valid studies but the studies do not support the specific claims in the advertisement.[23] Claims that do not match the science, no matter how sound that science is, are likely to be unsubstantiated.[24]

---

[20] i.e., that virtually anyone taking Alzare will experience the results promised, including a "guaranteed" increase in penis size by an average of up to 25%. (in length and girth)"; that Alzare has a 95% to 100% success rate with respect to the promised performance results.

[21] See, WIPSS Products, Inc. (Brain Pad Head Gear), Report # 4139, *NAD Case Reports* (February 2004); Nutramax Laboratories, Inc. (Senior Moment Memory Enhancing Dietary Supplement), Report # 3899, *NAD Case Reports* (August 2002).

[22] See, WIPSS Products, Inc. (Brain Pad Head Gear), Report # 4139, *NAD Case Reports* (February 2004); Mission Pharmacal Company (Citracal Calcium Supplements), Report # 4045, *NAD Case Reports* (May 2003).

[23] Nutramax Laboratories, Inc. (Senior Moment Advanced Memory Enhancing Dietary Supplement), Report #3899, *NAD Case Reports* (April 29, 2002).

[24] Id.

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 10**

While the advertiser's product may contain the same ingredients as used in the cited studies, NAD was concerned about whether it is possible to accurately extrapolate from the research conducted to the claimed benefit promised (as a result of taking the advertiser's specific product formulation) to the general population in the challenged advertising.[25] NAD concluded that it was inappropriate to do so. Although NAD recognized that the available scientific literature offered by the advertiser is promising and plentiful, NAD questioned the relevance of the substantiating studies to support the specific claims directed to men in general.[26]

After carefully reviewing the submitted articles and studies, NAD believed that the body of evidence upon which the advertiser relied might, when considered collectively or in its entirety, provide a reasonable basis for a limited, properly qualified claim about *the composition of the product* and its intended function/potential benefits (i.e., to help improve sexual performance, stamina, penile size, etc.), however, NAD concluded that the evidence in the record was not sufficient to support the advertiser's specific claims about its own product formulation when used by the general population.[27]  In other words, while the advertiser provided scientific background for the ingredients and discussed the general mechanism by which certain of the ingredients are believed to function, the evidence did not support the specific performance benefits promised by the daily supplementation with the Alzare formulation.[28] Further, to the extent that the advertiser bases its claims of product performance on its sales figures and minimal number of product returns (as well as testimonials from satisfied consumers), as NAD has noted in prior cases, anecdotal evidence (e.g., consumer reports of satisfaction with the product), as a general rule, are insufficient to support performance claims.[29]

Given the foregoing, NAD recommended that the advertiser's *general* claims of product efficacy/performance, as well as its specifically quantified performance claims be discontinued.

---

[25] A.D. Pharma (Notox - The All Natural Way to Reduce the Ill Effects of Alcohol), Report # 4163, *NAD Case Reports* (April 2004); Nutramax Laboratories, Inc. (Senior Moment Advanced Memory Enhancing Dietary Supplement), Report # 3899, *NAD Case Reports* (April 29, 2002).

[26] See, Nutramax Laboratories, Inc. (Senior Moment Memory Enhancing Dietary Supplement), Report # 3899, *NAD Case Reports* (August 2002); Chattem, Inc. (Garlique® Standardized Herbal Supplement), Report #3497, *NAD Case Reports* (November 1998)

[27] NAD noted that structure/function claims, although permitted in dietary supplement labeling without prior authorization by the Food and Drug Administration ("FDA"), like all health claims in advertising, require adequate substantiation before the claims are disseminated.

[28] NAD appreciated that the advertiser did qualify some of its performance claims in certain instances with the disclaimer that, "results may vary," however, in the absence of any sufficiently reliable scientific research as to the *typical* effect that the advertised product (or its ingredients) would have on users, disclosures to the effect that "individual results may vary" are insufficient to prevent a claim from being misleading and does not vitiate the advertiser's responsibility to provide evidence as to typicality.

[29] See, Lifekey Healthcare, Inc. (Enzyte Male Enhancement Program), Report #4074, *NAD Case Reports* (July 2003); See also, Concept Laboratories, Inc., Report #3631, *NAD Case Reports* March 2000).

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 11**

With respect to the advertiser's claim that FDA has approved Yohimbine to increase blood flow to the male genitalia, NAD notes that an advertiser must be careful not to mischaracterize the extent to which a product has been reviewed or approved by the FDA.[30]  It is well-established that an advertiser is obligated to support all reasonable interpretations of claims made in its advertising, even messages it did not intend to convey.[31]  In the absence of consumer perception evidence to the contrary, NAD determined that consumers could reasonably take away the (albeit unintentional) message that the advertiser's product or the ingredients (i.e. Yohimbine) *as contained in the advertiser's product formulation* has been FDA-approved when that is not the case.  Moreover while Yohimbe hydrochloride may well be FDA-approved for the treatment of erectile dysfunction, and may be prescribed by *physicians* as a first-line medication for people with this problem, this is not the same as claiming that Yohimbe, as contained in the advertiser's product (and in combination with the other ingredients therein) is FDA approved for this purpose.  As such, NAD recommended that this claim, in the context in which it appears, be discontinued as well as the advertiser's claim, "Tested and approved Alzare..."

With respect to the advertiser's claim that any promised performance results (quantified and otherwise) of Alzare are "guaranteed," although it may have been the advertiser's intent that the referenced "guarantee" is meant to speak to its refund policy, NAD observed that, while *generally* the advertisements use the word "guarantee" in reference to this policy – such is not the case in all instances.  To this end, and to avoid the potential for consumer confusion, NAD recommended that in all future advertising, the advertiser qualify all of its "guaranteed" claims to make it clear that the guarantee extends only to the consumer's right to obtain a refund if not satisfied with the product

To the extent that the advertiser's commercial spokesperson states that once an individual has achieved his desired results, he can cease taking Alzare and still maintain the results already achieved (i.e., without dissipation), NAD observed that there was no evidence in the record as to continued sexual performance levels/penile size enhancement beyond the study's eight-week period.  Moreover, the advertiser acknowledged in its submission to NAD that "improvement should continue as long as Alzare is taken daily" but that "a gradual return to a less than optimum state of sexual health could be expected after stopping Alzare."  As such, NAD recommended that this claim be discontinued.

II     Quantified Success Rate Claim:

The advertiser offered as support for its claim that over 100,000 men have achieved success (i.e., the advertised results) with Alzare, the fact that it has received over 100,000+ orders from satisfied customers with one of the lowest return rates compared to other competitive products within the same market space and that consumer testimonials also support this claim.  As NAD

---

[30] Dietary Supplements: An Advertising Guide for Industry, Business Publications (Federal Trade Commission 1998); http://www.ftc.gov/bcp/conline/pubs/buspubs/dietsupp.htm.

[31] See, WIPSS Products, Inc. (Brain Pad Head Gear), Report # 4139, *NAD Case Reports* (February 2004); Thane International (BioSlim Weight Loss Program), Report #3557, *NAD Case Reports* (June 1999).

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 12**

has noted in prior cases, anecdotal evidence (e.g., consumer reports of satisfaction with the product), as a general rule, are insufficient to support performance claims.[32]    Therefore, while the advertiser is free to tout is sales figures, as well as the fact that it has received few product returns, NAD recommended that the advertiser discontinue its claim that over 100,000 men have achieved success with Alzare and avoid the implication that its sales figures and low rate of return can be equated with product-user successes.

III.    Safety Claims:

The advertiser bases its safety claims on (1) the fact that none of the participants in its study registered any side effects during the 8-week test, (2) Dr. Stein's findings regarding this study and (3)  the fact that 98% of product users write in with tales of success (with a low return rate) and the fact that the product is 100% natural, therefore it is 100% safe (according to the commercial's spokesperson).  Just as NAD determined that the advertiser's preliminary study was insufficient to support its broad claims of product performance, it is likewise, insufficient to support its unqualified claims of product safety.  An advertiser should not exaggerate the extent of a study's findings nor suggest greater scientific certainty than actually exists.  No specific safety study was performed on the advertiser's product.

While NAD noted that manufacturers of dietary supplements need not prove the safety and efficacy of their products to FDA before offering them for sale to the public, it is well-established that any advertising claims made regarding the safety, efficacy and performance capabilities of dietary supplements must be truthful, accurate and supported by adequate substantiation.[33]    In this regard, NAD noted that the FTC's guidelines for dietary supplement advertising ("Dietary Supplements: An Advertising Guide for Industry" ["the Guides"][34] are particularly instructive. According to the FTC Guides, competent and reliable scientific evidence is required as substantiation regarding the safety and efficacy of dietary supplements. The FTC defines competent and reliable scientific evidence as "test, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated by persons qualified to do so, using procedures generally accepted in the profession to yield accurate results."[35] As NAD has noted in prior cases involving safety and efficacy claims for health products, an advertiser should produce studies that test the actual product; or, at a minimum, produce tests of products with identical ingredients at the same levels

---

[32] See, Lifekey Healthcare, Inc. (Enzyte Male Enhancement Program), Report #4074, *NAD Case Reports* (July 2003); See also, Concept Laboratories, Inc., Report #3631, *NAD Case Reports* March 2000).

[33] See, Lifekey Healthcare, Inc. (Enzyte Male Enhancement Program), Report #4074, *NAD Case Reports* (July 2003); Knight-McDowell Labs (Airborne Formula), NAD Case Reports #3862 (January 2002).

[34] Dietary Supplements: An Advertising Guide for Industry, Business Publications (Federal Trade Commission); http://www.ftc.gov/bcp/conline/pubs/buspubs/dietsupp.htm.

[35] Id.

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 13**

and with the same dosing instructions as contained in the actual product.[36]  Here, there was no evidence of any specific safety testing provided by the advertiser and its reliance upon the absence of side effects on the 20 subjects of its study (about whom little is known) is insufficient to support the advertiser's broad unqualified claim of product safety.  Further, contrary to the advertiser's explicit claim, NAD determined that simply because a product may be 100% natural (or contains natural ingredients), it does not necessarily follow that it is 100% safe for consumption.

Additionally, although NAD recognized that certain studies provided by the advertiser concerning the ingredient Yohimbine demonstrated modest, "relatively safe" benefits in the treatment of erectile dysfunction, the advertiser's evidence also noted that side effects can include agitation, tremors, obsessive sweating, insomnia, incoordination, anxiety, hypertension, tachycardia, nausea and vomiting.[37]  Moreover, the FTC has stated that, based on existing evidence, over-the-counter products containing certain ingredients including, but not limited to, Yohimbine, for use as an aphrodisiac,[38] "cannot be generally recognized as safe and effective."[39] Indeed, the Federal Regulations note that, there is a lack of adequate data to establish general recognition of the safety and effectiveness of these ingredients for OTC use as an aphrodisiac.[40]

Accordingly, NAD recommended that the advertiser's safety claims be discontinued.

V.    Consumer & Doctor Testimonials/Endorsements:

The advertisements at issue contain testimonials claiming, *inter alia*, that, due to taking Alzare, "I am also bigger, stronger and a lot longer," that "Viagra or any other medication could not help me" (but that Alzare did); that "I have noticed that my diameter has grown and my stamina has

---

[36] See, e.g., Powerbar, Inc. (PowerBar Perform and Perform Plus), Report # 3685, *NAD Case Reports* (September 2000).

[37] Further, the advertiser's evidence points out that certain people should exercise caution when using Yohimbe including, but not limited to, diabetics, very elderly people, people with irregular heartbeats or heart disease, children/adolescents, people with kidney problems or history of gastric or duodenum ulcers, as well as individuals taking anti-depressants or other mood-altering drugs.  Finally, the evidence sets forth that Yohimbe should be administered with caution to patients with high blood pressure, especially individuals undergoing concurrent treatment with Tricyclic anti-depressants or other drugs that interfere with neuronal uptake or metabolism of norepinepehrine.  Notably, the evidence states that "[t]hese cautions and contradictions apply to the Yohimbe in Alzare and should be taken seriously."

[38] Aphrodisiac, is defined as, "any product that bears labeling claims that it will arouse or increase sexual desire, or that it will improve sexual performance, is an aphrodisiac drug product" 21 CFR 310.528(a).

[39] 21 CFR 310.528(a)

[40] 21 CFR 310.528(a)  The Federal Regulations note that claims that are false and misleading and unsupported by scientific data for such products include claims such as: helps restore sexual vigor, potency, and performance," "improves performance staying power, and sexual potency…"

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 14**

also increased."[41]  One testimonial, from a 60 year-old diabetic, claimed that Viagra nor any other medication could help him but that, after checking with his doctor, after 15 days of taking Alzare, he had "gotten bigger, longer and extra hard, " and that "[b]efore Alzare, [he] tried to make love about once every six weeks - maybe. Now after taking Alzare, [he is] always ready to go at any time."

In support of these testimonials, the advertiser provided NAD with actual handwritten letters upon which some of the subject testimonials are based and asserted that they reflect the honest experiences and/or opinions of customers. NAD did not question the veracity of the customers offering testimonials as to their personal experiences using Alzare, however, it is well-settled that it is not enough that a testimonial represent the honest opinion of the endorser.[42]  Advertisers must also have appropriate scientific evidence to back up the underlying claims made in those testimonials. Indeed, it is a basic principle of advertising law that in the absence of competent and reliable scientific evidence, product performance claims cannot be substantiated by anecdotal evidence such as consumer testimonials.[43] NAD has long held, consistent with the FTC, that anecdotal evidence, based solely on the experiences of individual consumers is insufficient to support product efficacy claims. [44]  As previously discussed, the evidence provided by the advertiser in support of the product performance claims was insufficient to provide a reasonable basis for the advertiser's product performance and efficacy claims. As such, the advertiser cannot claim product performance or efficacy results in testimonials that it cannot support via independent scientific evidence. Moreover, that the record is devoid of any evidence to support a comparative efficacy claim between the advertiser's Alzare and Viagra.

Accordingly, NAD recommended that the advertiser discontinue those testimonials wherein consumers assert that they have experienced product performance/efficacy benefits of Alzare including, but not limited to, added size, increased strength, added performance, stamina/staying

---

[41] The advertiser also pointed to several personal quotes from study participants attesting to, *inter alia*, increased firmness, greater ease of arousal, increased number, strength and intensity of orgasms, increase of sexual thoughts, dreams and fantasies, quantified increase in semen volume, increased energy and sensitivity as well as claims of weight loss after taking Alzare.

[42] See, <u>Naturopathic Laboratories, Inc. (Joint-Ritis Arthritis Pain Reliever)</u>, Report #3836, *NAD Case Reports* (November 2001); <u>Forever Young Again Products (Fat Absorb Weight-Loss Supplement)</u>, Report #3471, *NAD Case Reports* (July 1998).

[43] See, <u>Naturopathic Laboratories, Inc. (Joint-Ritis Arthritis Pain Reliever)</u>, Report #3836, supra; <u>Forever Young Again Products (Fat Absorb Weight-Loss Supplement)</u>, Report #3471, supra).

[44] see e.g., <u>Naturopathic Laboratories, Inc. (Joint-Ritis Arthritis Pain Reliever)</u>, Report #3836, *NAD Case Reports* (November 1, 200); <u>Forever Young Again Products (Fat Absorb Weight-Loss Supplement)</u>, Report #3471, *NAD Case Reports* (July 1998); Federal Trade Commission, http:www.ftc.gov/bcp/online/pubs/buspubs/dietsupp.htm citing Guides Concerning Use of Endorsements and Testimonials in Advertising, Business Publications (Federal Trade Commission).

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 15**

power, desire, fantasies/sexual thoughts, sensitivity, and energy, or that Alzare is superior to Viagra[45]

Similarly, while NAD acknowledges Dr. Stein's expertise in the scientific assessment and treatment of sexual function, his opinion (premised upon the 2004 Clinical Study which NAD determined to be insufficient to support the establishment and general efficacy claims), is insufficient to support efficacy claims made by him in the various advertisements and promotional materials. However, as previously noted, nothing here precludes Dr. Stein from making truthful claims regarding the evidence in the record is sufficient to support claims as to the state of science of sexual and/or erectile dysfunction research (i.e., the function of DHEA, pro-hormonal sexual nutrition, the wearing effect of hormone imbalance due to aging, stress, etc.), the state of science concerning certain ingredients (i.e., DHEA, Yohimbe, etc.), the fact that Alzare contains these ingredients, and the encouraging results of certain studies. NAD takes no issue with the advertiser discussing and/or educating the public as to the state of this science. Further, Dr. Stein is free to make *compositional claims* for Alzare relating to DHEA, Yohimbe, tribulus, etc. as long as any such claim is properly qualified so that it (1) makes clear that these claims are compositional claims only and (2) does not imply that use of Alzare maintains or enhances sexual potency, stamina, increased penile size, etc.

**Summary of Conclusions:**

NAD determined that the evidence in the record is sufficient to support *compositional claims* for Alzare relating to DHEA, Yohimbe, tribulus, etc. as long as the advertising is properly qualified so that it (1) makes clear that these claims are compositional claims only and (2) does not imply that use of Alzare maintains or enhances sexual potency, stamina, increased penile size, etc.

With respect to the remaining claims, NAD recommended that the advertiser discontinue its "clinically proven/confirmed" and its general product performance/efficacy claims (quantified or otherwise) as well as its safety claims. NAD also recommended that the advertiser discontinue its claim regarding the FDA's approval of Yohimbine as it appears in the subject advertisements, as well as the advertiser's claim that Alzare is "Tested and approved ..." NAD further recommended that the advertiser discontinue any comparative performance/efficacy claims between Alzare and Viagra. With respect to the advertiser's "success rate" claims, NAD recommended that, while the advertiser is free to tout is sales figures and its low product return rate, it discontinue its claim that over 100,000 men have achieved success with Alzare and avoid the implication that its sales figures and low rate of return can be equated with product-user successes. With respect to the advertiser's "guaranteed" claims, NAD recommended that in all future advertising, the advertiser qualify all of its "guaranteed" claims to make it clear that the guarantee extends only to the consumer's right to obtain a refund if not satisfied with the product and not product performance. Lastly, NAD recommended that the advertiser modify the

---

[45] To the extent that the advertiser provided testimonials from study participants that do not yet appear to be featured in the challenged advertisements as yet, NAD offered the observation that there was no evidence to support any claims regarding the intensity of product users' orgasms, increase in semen volume as a result of taking Alzare, or that Alzare had *any* impact on weight loss.

**Justice Direct Partners, Inc.**
**Alzare All Natural Herbal Male Enhancement**
**Page 16**

endorsement (efficacy claims) by Dr. Stein and discontinue its consumer testimonials in which product users claim to have achieved certain performance/efficacy benefits of Alzare including, but not limited to, added size, increased strength, added performance, stamina, desire, fantasies/sexual thoughts, sensitivity, or energy.

**Advertiser's Statement:**

Justice Direct Partners, Inc. ("JPD") is pleased with NAD's conclusion that there is a reasonable basis for claiming that promising evidence suggests some of the ingredients in Alzare™ are beneficial for sexual health. In addition, we are gratified with NAD's acknowledgement of Dr. Daniel Stein as an expert qualified to scientifically assess and treat sexual function. We also agree with NAD's decision that JDP may make truthful compositional claims regarding the ingredients in Alzare™ and that it may continue to make "guaranteed" claims which clearly extend only to the consumer's right to obtain a refund if not satisfied with the product.

JPD respectfully disagrees with NAD, however, regarding its conclusions that other claims used to promote Alzare™ were not fully substantiated. We submitted substantial scientific evidence, including a clinical study conducted by a physician whom NAD acknowledges to be a qualified expert to support several of the claims. We respectfully disagree that this "plethora" of evidence was insufficient to serve as a reasonable basis for these claims.

Nevertheless, despite our disagreement with some of NAD's conclusions, JDP will either discontinue or modify any advertising which does not comply with NAD's recommendations. Because JDP supports the NAD's activities and the self-regulatory process, it will abide by the decision. (#4210 MSZ, closed 07/26/04)