# Exhibit

# 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LG ELECTRONICS U.S.A., INC.,** | ) | |
| **a subsidiary of  LG Electronics, Inc.,** | ) | |
| **a Korean company,** | ) | **Civil Action No. 08 C 242** |
| | ) | |
| **Plaintiff,** | ) | **Judge St. Eve** |
| | ) | |
| **v.** | ) | **Magistrate Judge Mason** |
| | ) | |
| **WHIRLPOOL CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF ROBERT A. LEONARD, PH.D.**
**IN REBUTTAL TO DECLARATION OF DR. JUDITH LEVI**

I, Robert A. Leonard, declare and state as follows:

1. I am Professor of Linguistics and the Chair of Department and Director of the
   Forensic Linguistics Project at Hofstra University in Hempstead, which is located
   at 322 Calkins Hall, Hofstra University, 1000 Front Street, Hempstead, New York
   11549. I reside in Lattingtown, New York.

2. I received my Ph.D. from Columbia University with research specialties in
   Semantic Theory, or Theory of Meaning, and Sociolinguistics.  I received my
   B.A. from Columbia College, where I was elected to Phi Beta Kappa and
   graduated with honors, and my M.A., M.Phil., and Ph.D. from Columbia
   Graduate School, where I was a Faculty Fellow.  I was awarded a Fulbright
   Fellowship to conduct the research for my dissertation.

3. Linguists with the specialty of Semantics receive special training in analyzing data and constructing hypotheses on the meaning of linguistic forms. At Columbia I additionally did course work in Lexicography ("dictionary-making") with one of the foremost American lexicographers, Allen Walker Read, and Prof. Read advised me on semantic research projects of mine for years after.

4. I have been qualified as an Expert in Linguistics in New York Supreme Court, in Pennsylvania State Court under Frye, and as an Expert in Linguistics and Sociolinguistics in Federal District Court in Newark, under *Daubert*. I have been admitted as a Forensic Linguist to the Expert Panel of the 18B Assigned Counsel Plan of the City of New York, which is an organization that provides free legal representation to indigent criminal defendants in New York Supreme Court Criminal Division, and to both juvenile and adult respondents in the New York Family Courts.

5. Some of my recent consulting clients include the FBI, Pennsylvania State Police, NYPD Hate Crimes Task Force, New Jersey Office of the Attorney General, US Attorney's Office, Eastern District of NY, and law firms that specialize in both civil and criminal cases.

6. I have trained FBI and international agents in Forensic Linguistic techniques at the FBI Behavioral Analysis Unit-1 (Counter-terrorism and Threat Assessment) headquarters in Quantico, and I have participated with the FBI to give training in

Quantico and NY to U.S. Secret Service, NYPD, U.S. Park Police, National Park

Service, CIA, New Jersey State Park Police, New Jersey State Troopers, Dept. of

Homeland Security, Federal Reserve Police, UN, FBI-NYFO, and ATF.

7. At Hofstra University, I teach a special graduate section of Linguistics for FBI

Supervisory Special Agents.

8. Linguistics is the scientific study of language. It is a science, recognized as such

by the American Academy of Sciences. Linguists regularly apply for and are

granted research funds by the National Science Foundation.

9. In virtually any major university or college one can major in linguistics and most

major universities grant a PhD degree in linguistics. There are academic

associations, peer-reviewed professional journals, all within the field of

linguistics. Similarly, sociolinguistics is an established branch of linguistics, with

peer-reviewed professional journals.

10. Forensic Linguistics applies the science of linguistic investigation to issues of

law. Forensic Linguistics augments legal analysis by applying rigorous,

scientifically accepted principles of analysis to legal evidence like contracts,

letters, confessions, and recorded speech.

11. A member of the International Association of Forensic Linguists, I have testified and consulted for both prosecution and defense in criminal cases of murder, espionage, and other felonies, and in civil cases of plagiarism, libel, malpractice, and the meaning of contracts.

12. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A. My hourly rate for linguistic analysis and report-writing is $350 per hour.

13. I have been retained by Winston & Strawn to evaluate the use of the word *steam*, and specifically to respond to the report of Dr. Judith Levi regarding use of the word *steam*. I reviewed the report of Dr. Levi, the Complaint, the Motion for Preliminary Injunction and Memorandum in Support, and the Redacted Memorandum in Response to Motion for Preliminary Injunction. To the extent there were any highly confidential documents included with these submissions, counsel for LG informs me that those documents were removed and counsel did not show them to me.

14. I conclude that by both the technical and by the ordinary non-technical meanings of *steam* in proper context, Whirlpool's machines cannot be said to use steam.

**LANGUAGE IS ARBITRARY; LANGUAGE CHANGES**

15. Human language is essentially arbitrary. That is, words and other signals bear a certain meaning not because of a natural connection between the sounds of a word

and its meaning, but rather because there is a general agreement among speakers of a language that X means Y.

16. There is nothing inherent in the sounds of the English word *cat* that makes it mean what it does. Any other sequence of sounds would serve as well.  In Spanish, cat is *gato,* in French *chat*, in Swahili *paka*. So linguistic sounds (except for a very few imitative ones) are *arbitrarily* linked to meanings.  Also arbitrary is a language's inventory of meanings.  Examination of English dictionaries published centuries apart would show quite clearly that there is nothing immutable or preordained about word meaning.

17. When the Declaration of Independence was being written, the word *enthusiasm* meant 'divine inspiration' and 'spirit possession'. Adam Smith, Hobbes and Locke all wrote warning against enthusiasm's influence and attacking its superstitious power against Reason.

18. More recently,  most of my college-age students hold that "peruse" means "to lightly scan" yet several dictionaries recently sampled give the meaning as  "study carefully and slowly," reflecting its older usage.

## MEANING IS NOT ORDAINED BY GOD OR DICTIONARY; DICTIONARIES MERELY MIRROR CURRENT USAGE

19. One can only determine the meaning of words and terminology by investigating (current) usage.  Dictionaries attempt to reflect how language is actually being

used. As the famous lexicographer Alan Walker Read, my own professor in graduate school, wrote in the Encyclopedia Britannica, there is unfortunately a widespread popular "Neoplatonic outlook [that] assumes that there exists an ideal form of language from which faltering human beings have departed and that dictionaries might bring people to the perfect language."

20. On the contrary, Read continues, a dictionary has only the "function of recording accurate information on the state of the language." A dictionary does this by describing how the language is used, by recording and compiling actual usage by actual language users.

**CONTEXT IS IMPORTANT**

21. *All meanings are general enough to be interpreted in a vast number of ways, depending on what makes sense in actual context.*   The words do no more than suggest a path that our inferential powers, our imagination, actually, seizes upon in an effort to make sense out of what is said.  Here is a textbook example of what I mean:

 "The story of John" (from Sanford and Garrod (1981) discussed in Yule 1996:146-7.)

First two lines: " John was on his way to school last Friday.  He was really worried about the math lesson."

OK, now who is John?  Most people say he's a schoolboy.  How is he going to school?  Is he swimming?  Nobody says that.  Why?  It doesn't say he is not swimming.  Although indeed it doesn't specify how he's going, most people infer that he's on a bus, or walking.

Next line: "Last week he had been unable to control the class."

Now the inference is that he is a teacher.  Now we might visualize him on the way to school in a car.  If you are a teacher, perhaps you visualize him on the type of vehicle you take to school.

Next: "It was unfair of the math teacher to leave him in charge."  Now he's back to being a student.

Last: "After all, it is not a normal part of a janitor's duties."

22. So where does all that information come from?  Certainly not the words themselves.  It comes from the listener or reader.  We try to make sense of what was said, to construct a coherent message based on the word meanings, the context, and our background knowledge – our experiences of how the world works.  We have ready-made scripts or schemas for who does what in a school, and our story about John plays with this.   The story of John is not about word meaning, but about cumulative context in forming a schema.

23. Our differing interpretations might remind us of optical illusions that seem to switch interpretations in front of one's eyes. At first glance, a stairway seems to be coming out of the picture, and then, we reinterpret it as angling into the picture. Of course the printed page is not changing – your mind is making sense out of the information on the page in different ways. This is quite analogous to the way we understand language.

24. Other optical illusions of words, some quite humorous, are collected by the Columbia Journalism Review (quoted in Goshgarian 2001:141-5). They are real headlines that allow for some wildly variant interpretations depending on the real-world context the reader assumes: "Free vaccinations sought for every child by Clinton," (meaning of *by*) "Cherry Hill man enters 741-pound shark," (meaning of *enters*) "Club hears trees talk at meeting," (*talk*) "Partial jury chosen for Tyson trial," (*partial*) "Dr. Ruth talks about sex with newspaper editors," (*sex with*) "Grilled duck shows off skill," (*shows off*) and "Police nab students with pair of pliers" (*with*). Just how is it that we can discern which is the "real" interpretation? Not from the words, but from our inferential abilities and our encyclopedic knowledge of the world that tell us the appropriate context.

25. It is important to note that while these marginal and humorous examples are useful to show the processes at work, such interpretation is constant in language processing, and usually goes without notice.

8

**ORDINARY (AND OTHER MEANING) IS INTERPRETATIVE, BASED ON CONTEXT**

26. The "ordinary meaning" of a word depends heavily on context – linguistic, physical, and cultural --  because there is insufficient information in the word alone to allow for coherent interpretation.

27. For example, in a demonstration we call "Rocky on the Mat" (Yule 1996:148, from Andersen *et al.* 1977), we manipulate the linguistic context by changing the title of a passage.  Subjects first are given the text with the title "A prisoner plans his escape:" "Rocky got up from the mat, planning his escape...the charge against him had been weak...the lock that held him was strong, but he thought he could break it."

28. When we re-title this "A wrestler in a tight corner," and thus change the context, the same words evoke a quite different script.

29. In one group, two young women could not generate a scenario with Rocky as wrestler.  Try as they might, they could not visualize it.  It turned out neither one had ever seen a wrestling match, nor had ever paid the least attention to descriptions of them: their personal dialects lacked a "wrestler" script.  Language meaning is only created through interpretation in context.

**ORDINARY USE OF THE WORD *STEAM* IN PROPER CONTEXT**

30. Since there are many senses of the word *steam*, both literal and abstract, we must remember that important for the interpretation of meaning is CONTEXT. In this case, the context is the laundry care segment of the home appliance industry.

31. Whirlpool's expert, Dr. Levi, explores the many different senses of *steam*. However, Dr. Levi is wrong, I believe, when she claims (Para. 8) that the argument boils down (no pun intended) to whether there is one meaning of *steam*, "invisible steam," or several, and that if there is one meaning, LG is correct, and if there are several meanings, Whirlpool is correct. I respectfully submit that this is not the core issue. One might even suggest that the one/many issue is a "straw-man" argument.

32. The term *steam* must be considered in context. Dr. Levi's definitions are immaterial to a consumer in the context of buying an appliance in the laundry care sector.

33. Dr. Levi (Para. 8) differentiates between senses of *steam* that are "visible" and "invisible." Yet, Whirlpool at no point makes the claim that their machines create visible steam. Further, LG's argument does not depend on there being only one "invisible" meaning of steam.

34. What is material to a consumer, and thus to this case, is whether both LG's and Whirlpool's machines may be said to use steam in its ordinary, core sense. Linguistic analysis of this matter leads me to conclude that by both the technical and by the ordinary non-technical meanings of *steam* in proper context, the laundry-care segment of the home appliance industry, Whirlpool's machines can not be said to use steam.

35. The non-technical, common, "ordinary" meaning of (non-abstract) *steam* may have several senses, but one sense it does NOT have is "cold water," and it is cold water that Whirlpool's machines introduce into their dryers.

36. Not only does Dr. Levi  fail to put her definitions of visible steam in the proper context, but her definitions are irrelevant because nowhere, as noted above, does Whirlpool claim their machines produce visible steam.  At most, they create a mist of cold water.

37. In addition, cold water sprayed into warm air is not steam under any of Dr Levi's definitions, which involve the opposite effect:  the introduction of warmer water into a colder environment.

38. The general rule of law is that terms are to be given their ordinary meaning. In a disputed claim, the ordinary and accustomed meaning of a term is presumed to be the correct one.  (One court, ruling on an insurance matter, found:  "As a general

11

rule, an insurance policy should be considered as any other contract, and should be given effect according to the ordinary sense of the terms used; and if the terms are clear, they will be applied according to their plain and ordinary meaning." Dairyland Ins. Co. v. Esterling, 205 Neb. 750, 752_53, 290 N.W.2d 209, 211 (1980).)

39. Lawrence Solan, a lawyer and linguist, discusses ordinary meaning in "New Textualists' New Text" (Loyola of Los Angeles Law Review vol. 38:2027 Dec 2005).  He describes a 1993 Supreme Court case, *Smith v. United States*. [508 U.S. 223 (1993)].   John Smith offered to trade his unloaded cased machine gun for drugs.

40. The issue was whether he fell under a statute that increased sentences for anyone who "uses or carries a firearm" "during and in relation to any crime of violence or drug trafficking crime."  In his dissent, Justice Scalia explained that Smith had not "used" a firearm.

41. As Justice Scalia says:
> In the search for statutory meaning, we give nontechnical words and phrases their ordinary meaning.  To use an instrumentality ordinarily means to use it for its intended purpose. When someone asks, "Do you use a cane?," he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you *walk* with a cane. Similarly, to speak of "using a firearm" is to speak of using it for its distinctive purpose, *i.e.*, as a weapon. To be sure, "one can use a firearm in a number of ways," including as an article of exchange, just as one can "use" a cane as a hall decoration—but that is not the ordinary meaning of "using" the one or the other. The Court does not appear to grasp the distinction between how a word *can be* used and how it *ordinarily is*

used. It would, indeed, be "both reasonable and  normal to say that petitioner 'used' his MAC-10 in his drug trafficking offense by trading it for cocaine." It would also be reasonable and normal to say that he "used" it to scratch his head. When one wishes to describe the action of employing the instrument of a firearm for such unusual purposes, "use" is assuredly a verb one could select. But that says nothing about whether the *ordinary* meaning of the phrase "uses a firearm" embraces such extraordinary employments. It is unquestionably *not* reasonable and normal, I think, to say simply "do not use firearms" when one means to prohibit selling or scratching with them. [*Smith*, 508 U.S. at 241].  (p 2034)

42. Justice Scalia's explanation concerning ordinary meaning applies in this case.

   The ordinary meaning of *steam* includes that which LG, but not Whirlpool, uses

   in its dryers.  While somewhere a meaning of *steam* could perhaps be found that

   includes Whirlpool's cold water spray, it is analogous to the "not reasonable and

   normal" claim that the word *use* in "use a firearm" should perforce include its use

   as a head-scratcher.  LG's steam qualifies as *steam* by the ordinary and

   accustomed meaning of the word; Whirlpool's spray of cold water does not.


43. I conclude that by both the technical, and by the ordinary non-technical, meanings

   of *steam* in proper context, Whirlpool's machines cannot be said to use steam.

Signed,

_Robert A. Leonard_
_____
Robert A. Leonard, Ph.D.

February 22, 2008

# EXHIBIT

# 7A

**Robert Andrew Leonard, Ph.D.**
**Linguist**
**Professor of Linguistics and Chair of Department**
**Director of the Forensic Linguistics Project**
tel.: (516) 477-3834
fax: (516) 629-6027
email: cllral@hofstra.edu

www.forensiclanguage.com
http://people.hofstra.edu/faculty/Robert_A_Leonard

## EXPERT WITNESS

Leonard has been qualified as an Expert in Linguistics in NY Supreme Court, in PA State Court (under Frye), and as Expert in Linguistics and Sociolinguistics in Federal District Court in Newark (under Daubert). He is the only Forensic Linguist to have been admitted to the Expert Panel of the 18B Assigned Counsel Plan of the City of New York.

## EDUCATION

Columbia University, New York, NY
    Graduate School of Arts and Sciences    Ph.D. 1982 (Linguistics)
        M. Phil. 1973 (Linguistics)
        M.A. 1973 (Linguistics)
    Columbia College    B.A. 1970 *cum laude* (Sociology)

University of Nairobi, Kenya    Research Associate 1974-75
    Institute of African Studies

## OTHER TRAINING

Linguistic Society Institutes:    Advanced Linguistic Training
    University of Hawaii, Honolulu    Summer 1977
    University of Michigan, Ann Arbor    Summer 1973
American University Alumni Association    Thai Language
    Bangkok, Thailand    Summer 1976

## ACADEMIC FELLOWSHIPS, AWARDS

Graduate:    Fulbright Fellowship for Ph.D. Research 1973-74
    Faculty Fellow of Columbia University 1970-73
    National Defense Foreign Language Fellowship 1970-73
Undergraduate:    Phi Beta Kappa 1970
    Gutmann Prize for Excellence in Humanities 1967

## FOREIGN LANGUAGES

Speak and Read:    Swahili (several varieties), French, Spanish
Reading Knowledge:    German, Italian
Structural Knowledge:    Giriama, Kamba, Rabai, Pokomo, (Kenya); Shona (Zimbabwe); Thai, Arabic

**LINGUISTIC CONSULTING**
Clients include:
> FBI
> NYPD Hate Crimes Task Force
> New Jersey Office of Attorney General
> US Attorney's Office, Eastern District of NY
> Pennsylvania State Police
> Law firms
> ABC-TV News Investigative Division
> BBD&O advertising agency
> Soviet Ministry of Agrochemical Industries via National Institute for World Trade
> Della Femina, Travisano & Partners advertising agency
> State Court System of New Jersey
> *The New Yorker* Magazine

**MEDIA**        Recent interviews on issues of linguistics and forensic linguistics include
*New York Times*
WABC-TV news
WCBS and WINS Newsradios
Court TV's *Forensic Files* and *Hollywood Heat*
*USA Today*
*New York Daily News*
*Newsday*
*Washington Times*
*Associated Press*
Interviews have additionally appeared in *Dallas Morning News, Mainichi Daily News* (Japan), *New York Law Journal, Washington Post,* and on *WNBC, MSNBC,* and *CNN.*
Featured prominently in "A Tight Leash," an episode of *Forensic Files*, about the Hummert murder case tried in 2006


**ACADEMIC EXPERIENCE**

1990-present        **Hofstra University, Hempstead, New York**
> **Professor of Linguistics and Director of Linguistics Program** (1996-present)
> **Chair, Department of Comparative Literature and Languages** (2005-present).
> Department includes Comparative Literature, Linguistics, Asian Studies, the English Language Program, and twelve foreign languages
> **Director, Forensic Linguistics Project** (2004-present)
> **Chair, Africana Studies** (2002-2003)
> **Associate Professor of Linguistics** (1990-1996)

1988-1994        **Fulbright Teacher Exchange Program, United States Information Agency**
> **Chair, Regional Interview Committee (LI and Southern NY State)**

> - Organized and oversaw interviews by college and university faculty members expert in international matters of high school teachers applying for Fulbrights

1985-1990        **Friends World College** (A small, Quaker-founded, nonsectarian liberal arts college that specialized in undergraduate field work and experiential education at eight international centers.)
> **Vice-President for Administration, Headquarters, Huntington, NY**
> - Supervised Center Directors of Friends World College campuses and centers worldwide: New York, Costa Rica, Israel, Kenya, England, India, Japan, and Hong Kong.
> - Organized and evaluated centers' activities with emphasis on financial and operational
> - as well as academic aspects.

- Prepared and supervised annual budgets for all regional centers integrating activities of the college's world network into a unified business plan.
- Administered external academic programs in cooperation with other colleges and universities, and with non-academic agencies such as UNEP and CARE.
- Taught linguistics seminars and supervised linguistics independent research; conducted cross-cultural training.

1981-85     **Director, Friends World College East African Centre, Machakos, Kenya**
- Designed, supervised and taught comprehensive academic program integrating intensive language training with the humanities, the social sciences, cross-cultural training and field work methodology to give American undergraduates a thorough preparation for independent field study and internships in East Africa.
- Supervised faculty teaching and advising.
- Planned, supervised and evaluated students' field research methodology and report writing, in cooperation with outside field specialists.
- Taught linguistics seminars; served as field specialist for linguistics, linguistics-related, and cross-cultural research.
- Taught African literature (in English); Swahili literature and lyric poetry (in Swahili).
- Planned and prepared yearly budget.  Administered physical plant, including residential campus and on-campus experimental projects.
- Increased center enrollment, academic effectiveness, and profitability.

1979-81     **Columbia University, New York, NY**
            **Preceptor of Linguistics**
                - Taught introductory and intermediate Swahili.

1977-79     **Lehman College, City University of New York**
            **Lecturer**
                - Taught linguistics and sociolinguistics to students in the Bicultural-Bilingual Program.

**EDITORSHIPS**

Co-Editor,  *The Asian Pacific American Heritage: A Companion to Literature and Arts*.  1999.
                        New York: Routledge.
[Selected by the American Library Association's journal, *Choice*, as "one of the Outstanding Academic Books of the Year"]

Co-Editor,  *The Italian American Heritage:  A Companion to Literature and Arts.* 1998.
                        New York: Routledge.

For the series, Section Editor for Linguistics and Food/Semiotics of Food

**PUBLICATIONS -- LINGUISTICS and SEMIOTICS**

2006.  "Meaning in nonlinguistic systems."  In *Advances in Functional Linguistics:  Columbia  School Beyond its Origins*,  Gorup, Davis and Stern, eds.  Amsterdam :John Benjamins.  [This article seeks to extend the boundaries of linguistic semantic theory to *non*-linguistic non-random systematized arbitrary expressions of meaning, specifically behaviors dealing with food, architectural space, private space, and construction of social and gender identity, using data primarily from ancient city-states in East Africa and from the U.S. and Asia as well.]

3

2006.  "Semantic Analysis of Swahili Applicative Verbal Extension *li"* co-author Wendy Saliba. In *Advances in Functional Linguistics:  Columbia  School Beyond its Origins*,  Gorup, Davis and Stern, eds. Amsterdam: John Benjamins.  [A new analysis of a thorny problem in theoretical semantics (how context-sensitive can grammatical meaning be?) using data from a widely examined issue in  Swahili semantics (the applicative extension *li*).]

2006   Review of  "Language in the American Courtroom," in Sociolinguistics, Discourse Analysis, and Language Policy section of *Language and Linguistics Compass*, Blackwell electronic journal.

2006  "Forensic linguistics: applying the scientific principles of language analysis to issues of the law." *International Journal of the Humanities*, Volume 3, Issue 7, pp.65-70. Melbourne: Common Ground Publishing Pty. Ltd.

2005  "Police interrogation needs videotape." *Newsday*, April 28, 2005. [Op-Ed article on the necessity of electronically recording interrogations and confessions: how it protects the rights of suspects, protects the police from accusations of wrongdoing, and saves money for taxpayers as well.]

2005  "Forensic linguistics" In  Glenn Yeffeth, ed.,  *An Eclectic Look at NYPD Blue.*  Dallas: BenBella Books. [The cooperative principle, schemas, pragmatics, inference, dialect and idiolect, the sociolinguistics of language as identity, code-switching, and linguistic accommodation as tools for analyzing courtroom procedure, police interrogation, and how memories can be shaped by questioning.]

2003b   "Linguistics and the Law." *Washington, D.C. Legal Times.* June 16, 2003.  [Explains the background, theory and application of Forensic Linguistics in a special Litigation edition of this law journal.]

2003a   "Black English equals any other language." *Newsday,* January 22, 2003.
[ Op-Ed article on the sociolinguistic role of language and ethnic identification drawing on 25 years of research on dialect and secret language.]

1999a   "Dialect, standard, and slang:  Sociolinguistics and ethnic American literature"
In George Leonard et. al., eds.,  *The Asian Pacific American Heritage: A Companion to Literature and Arts.* New York: Routledge. [Winner of American Library Association's *Outstanding Academic Book* award.]

1999b   "Food and ethnic identity: Theory" (co-author Wendy Saliba)
In George Leonard et. al., eds.,  *The Asian Pacific American Heritage: A Companion to Literature and Arts.* New York: Routledge. [Winner of American Library Association's *Outstanding Academic Book* award.]

1999c   "Southeast Asian Food: the Durian and beyond"  (co-author Wendy Saliba)
In George Leonard et. al., eds.,  *The Asian Pacific American Heritage: A Companion to Literature and Arts.* New York: Routledge. [Winner of American Library Association's *Outstanding Academic Book* award.]

1995        "Notes on *uki*, East African Honey Wine"  [A semiotic study of an African traditional beverage which I was taught to brew and use ceremonially when I sat on the elders' council of the Akamba]. In Harland Walker, ed., *Oxford Symposium 1994*.  London: Prospect Books.

1995        "Deixis in Swahili: attention meanings and pragmatic function." In Ellen Contini-Morava and Barbara Goldberg, eds., *Meaning as Explanation: Advances in Sign-Based Linguistics*.  Berlin: Mouton De Gruyter. [This article, using data from the grammatically complex East African language Swahili, analyzes the use of deitics such as demonstratives by speakers and writers in structuring the information flow of language.]

4

1994    "Money and language." In John DiGaetani, ed., *Money: Lure, Lore and Literature*. Rutherford: Fairleigh Dickinson Univ. Press. [Explores the common theoretical underpinnings of linguistic and true monetary systems: arbitrariness.]

1992    "Food, drink, and Swahili public space." In Harlan Walker, ed., *Oxford Symposium 1991*. Co-authored with Wendy Saliba. London: Prospect Books. [Presents the problem and theoretical underpinnings of the analysis of *non*-linguistic non-random systematized arbitrary expressions of meaning, specifically behaviors dealing with food, architectural space, private space, and construction of social and gender identity, using data primarily from ancient city-states in East Africa and from the U.S. and Asia as well.]

1988    *Swahili Phrasebook*. Victoria, Australia and Berkeley, California: Lonely Planet Publications.

1987    Response to Wilt, "Discourse distances and the Swahili demonstratives." *Studies in African Linguistics* 18:97-105.

1985    "Swahili demonstratives: Evaluating the validity of competing semantic hypotheses." *Studies in African Linguistics* 16:281-293. [Explores the requirements of theoretical adequacy in the construction of explanatory hypotheses.]

1982    The Semantic System of Deixis in Standard Swahili. Columbia University Ph.D. Dissertation. Ann Arbor: University Microfilms Intl. [Analyzes the underpinnings of deitic demonstratives by speakers and writers in structuring the information flow of language using data from the grammatically complex East African language Swahili.]

1980    "Swahili e, ka, and nge as signals of meanings." *Studies in African Linguistics* 11:209-226.

## INVITED AND REFEREED PRESENTATIONS -- LINGUISTICS AND SEMIOTICS

2007    "Linguistic variation and schema analysis in forensic linguistic cases: looking beneath the surface at language evidence." Featured speaker at the 17th Annual Threat Assessment Management Conference, Association of Threat Assessment Professionals Worldwide, Anaheim, CA, August 14-16, 2007.

2007    "Sociolinguistics as forensic science." Presented at Forensic Linguistics Workshop for Law Enforcement Practitioners, Behavioral Analysis Unit-1 (Counter-terrorism and Threat Assessment) , National Center for the Analysis of Violent Crime, Critical Incident Response Group, Federal Bureau of Investigation, Quantico, VA, July 23-27, 2007.

2007    "Utilizing Shuy's approaches to speech act, schema, cooperative principle and context in an espionage case." Presented at Special Plenary Panel Honoring Roger Shuy, International Association of Forensic Linguists/Language and Law Eighth Biennial Conference, July 12-15, 2007.

2007    "Linguistic evidence of promises, threats, and power in an FBI interrogation of a suspected spy." Presented at the Ninth International Columbia School Conference on the Interaction of Linguistic Form and Meaning with Human Behavior, The City College of New York, February 18-19, 2007.

2006    "Forensic linguistic applications to investigative and threat assessment techniques." Presented at The Association of Threat Assessment Professionals, Northeast Chapter Meeting, New York, New York, November 6, 2006.

2006    "Unlocking forensic language evidence in investigations and prosecutions." Plenary address at Ohio Attorney General's Conference on Law Enforcement, Columbus, Ohio, October 27, 2006.

2006    "The world of forensic linguistics." Presented at Nassau Academy of Law Continuing Legal Education, Mineola, NY, October 16, 2006

2006    "Forensic linguistic and Socio-linguistic applications to law enforcement and threat assessment." Presented to representatives of U.S. Park Police, National Park Service, Secret Service, NYPD, New Jersey State Park Police, New Jersey State Troopers, FBI-NYFO, ATF,  Security from Empire State building, Rockefeller Center, United Nations, NY Stock Exchange, Ellis Island, August 3, 2006.

2006    "Sociolinguistic applications to a law enforcement model." Presented at Forensic Linguistics Workshop for Law Enforcement Practitioners, Behavioral Analysis Unit-1 (Counter-terrorism and Threat Assessment) , National Center for the Analysis of Violent Crime, Critical  Incident Response Group, Federal Bureau of Investigation, Quantico, VA, May 8-12, 2006.

2006    "Overview of forensic linguistics in civil and criminal litigation: author identification, statutes, contracts, copyrights, trademarks, and crimes of language such as perjury, solicitation, bribery and conspiracy."  Presented at Seminar on Current FBI and Academic Techniques in Forensic Linguistics, Hofstra University, April 19, 2006 .

2005    "Simple Words:  the art and science of forensic linguistics."  Presented at North Shore Medical Center-LIJ Internal Medicine Group Annual Meeting, November 9, 2005.

2005    "Forensic linguistics: applying the scientific principles of language analysis to issues of the law." Presented at  The Third International Conference on New Directions in the Humanities, University of Cambridge, UK, August 5, 2005.

2005    International Linguistic Association lecture: "The law is language, the law is data: forensic linguistics, *NYPD Blue* and  the importance of schemas."   Presented at  New York University, February 12, 2005.

2004    "Keynote address: language and culture on the streets of New York."  Presented at Education, Language, Culture, Development, City College, New York City, June 17-19, 2004.

2004    "Keynote address: Youth movements, music, world language and culture."  Presented at the Fifteenth Annual Academic Conference of Smithtown High School and the  SUNY Stony Brook Center for Excellence and Innovation in Education, "Youth movements as a force in History,"  Smithtown High School, New York,  May 27, 2004

2004    "Semantic analysis of tape recorded conversations: meaning as explanation of a discourse strategy exploiting the "mitigation of claim" of 'non-standard' *like*."  Co-author.  Presented at the Eighth International Columbia School Conference on the Interaction of Linguistic Form and Meaning with Human Behavior.  City College, New York City, February 14-15, 2004.

2003    *"Virginia  v. Black* and the Supreme Court: scientifically establishing the meaning of a symbol [cross-burning]." Presented at the Law and Society Association of the United States and Canada annual meeting, Pittsburgh, PA, June 2003.

2002    "Food and drink and the transformation of meaning." Presented at the 28th Annual conference of the Southern Comparative Literature Association, Tuscaloosa, Alabama, October 10-12, 2002.

2002    "The language scientist as expert on legal 'Ordinary' Meaning."  Presented at the Law and Society Association of the United States and Canada annual meeting, Vancouver, Canada, May 2002.

1994      "Notes on *Uki*, East African honey wine."  (A semiotic study of an African traditional beverage which I was  taught  to brew and use ceremonially when I sat on the elders' council of the Akamba). Presented (in absentia) at Oxford Food Symposium, St. Antony's College, Oxford University, Sept 1994.

1993      "Non-linguistic systematic meaning."  Presented at Third International Conference of the Columbia School of Linguistics, Rutgers University, October, 1993. Co-author: Wendy Saliba.

1992      "Language change, language equality, and cross-cultural constructions of reality."  Presented at 15th Annual Conference of the Organization for the Study of Communication, Language and Gender, Hofstra University, Hempstead, NY, October 1992.

1991      "The language of money."  Presented at Money: Lure, Lore and Liquidity Conference, Hofstra University, Hempstead, NY, November 1991.

1991      "Grammatical meanings and thematic organization."  Presented at Second International Conference of the Columbia School of Linguistics, University of Virginia, Charlottesville, October 1991.

1991      "Food, drink, and Swahili public space."  Presented at Oxford Food Symposium, St. Antony's College, Oxford University, Sept 1991.  Co-authored with Wendy Saliba.

1989      "Mid-deixis in Swahili and its exploitation in structuring text."  Presented at First International Conference of the Columbia School of Linguistics, Columbia University, New York, August 1989.

1986      "The Swahili system of deixis and its utilization in the structuring of discourse."  Presented at Seventeenth Annual Conference on African Linguistics, University of Indiana, Bloomington, April 1986.

1979      "The semantic constants of Standard Swahili e, ka, and nge."  Presented at Tenth Annual Conference on African Linguistics, University of Illinois, Champaign-Urbana, April 1979.

1977      "Entering the speech community--with special emphasis on Mombasa (Kenya) street criminals." Presented at Professor William Labov's Sociolinguistics Seminar, University of Pennsylvania, October, 1977.

## PRESENTATIONS -- COMMUNICATION ACROSS CULTURES

1991      "Cross-cultural aspects of international business negotiations."  Series of seminars given to
          Soviet executive management groups, Hempstead, NY and New York, NY.
1990      "Doing business in Africa: cross-cultural considerations."  Presented at 100 Black Men of
          Nassau/Suffolk Import-Export Seminar, Hempstead, NY, May 1990.
1990      "American cultural behavior."  Presented to delegation from the Ministry of Education of the
          Republic of Turkey, Central Islip, May 1990.
1989      "National culture and corporate culture."  Presented to the delegation from the State Agro-
          chemical Association (formerly the Ministry of Agrochemical Industries) of the Soviet Union,
          Lloyd Harbor, NY, December 1989.
1985      "The Western businessman in the Islamic world: Intercultural considerations."  Presented at the
          Conference of the Mediterranean Basin, Long Island University, Greenvale, NY, November 1985.

## PRESENTATIONS -- INTERNATIONAL EDUCATION

1993      "Intercultural linguistics: the value of fieldwork."  Presented at the Interdisciplinary Symposium
          on Teaching, Hofstra University, March, 1993.
1989      "Medical and safety issues in international educational programs."  Presented at the Regional
          meeting of the Association of International Educators (formerly NAFSA), Albany, NY, November
          1989.
1989      "How to establish an education center overseas."  Presented at the City University of New York
          Conference on Developing a Study Abroad Program on Your Campus, New York, NY, May 1989.

| 1988 | "Role of academics abroad: Internationalizing the curriculum and the university."  Presented at National Association for Foreign Student Affairs Regions IX and X Conference--Section on U.S. students abroad, Philadelphia, PA, November 1988.  Voted "best session of the conference."  Repeated at National Meeting, Minneapolis, MN, June 1989. |
|---|---|
| 1988 | "Education for a new world order."  Presented at Scientists-Educators-Government Officials' Roundtable, Bangalore, India, September 1988. |
| 1985 | "Choosing the most effective study-abroad models."  (Developing experiential assignments to match academic and career path objectives.)  Presented at Key Educational Systems Symposium of the National Association for Foreign Student Affairs, Princeton, NJ, November 1985. |
| 1985 | "Crisis handling in the developing world."  (Ensuring expatriate student and staff safety during political strife or medical emergency.)  Presented at 38th Annual Conference of the Council on International Educational Exchange, New York, NY, November 1985. |
| 1982 | "Current opportunities for undergraduate field work in Kenya." (e.g., market studies, scientific research, agronomy, socio-economics, language.)  Presented at Africa-Asia-the Americas: Conference on Teaching and Research, State University of New York, October 1982.  Co-authored with Lawrence Weiss. |

## PROFESSIONAL ORGANIZATIONS

Member:        International Association of Forensic Linguists
                    Columbia School Linguistics Society
                    Linguistic Society of America

## BUSINESS-RELATED EXPERIENCE

1986-1990        **Chair, Internship Program**
National Institute for World Trade, Huntington, NY

1986-1990        **Member, Education Committee**
World Trade Club, Long Island Association

1969-70          **Leader, Lead Singer, and business manager, Sha-Na-Na**
While undergraduate at Columbia.  (Sha-Na-Na developed its own syndicated TV show and performed in the movie *Grease*.)  Supervision of group members and employees, conducting rehearsals, scheduling, etc., dealing with agents managers, lawyer, record company, promoters, press, etc., and performing as lead singer.  Performances include the Tonight Show and the Woodstock Festival, plus many others.

## COURSES DEVELOPED AT HOFSTRA UNIVERSITY

Introduction to Linguistics
General overview of linguistics, the "scientific study of language."  Human language vs. animal systems of communication.  Language as a code system.  Development of writing.  Language and the brain.  Sign language.  "Good" English controversy and educational policy.  Bilingual education.  Language history and change.  Phonetics and phonology.  Semantics, pragmatics, discourse analysis.  Language, society and culture.  Sapir-Whorf "hypothesis."  First and second language acquisition.  Propaganda and euphemisms.  Non-verbal communication.

Sociolinguistics
The relation of language and society.  Language as an indicator of societal identity, group, and status.  Case studies of language situations in countries around the world.  Diglossia.  Language attitudes, change and maintenance.  Nonverbal communication.
        Students form small teams and replicate a seminal sociolinguistic field experiment demonstrating the interconnectedness of language and social class.

Experiments in Sociolinguistics

8

A field-based approach to sociolinguistics.  Students conduct a series of investigations of sociolinguistic behavior through student-designed independent fieldwork.  A bibliographic-based research paper is also required.  Current field projects are:

1. Social Groupings in the Student Community.
2. Gender Variation in Verbal Response to Nonverbal Communication.
3. Structure of Vernacular Narratives.
4. Social Class and Language Variation.

Senior Honors Seminar:  Culture, Language and Voice  (Co-developed and taught with Dr. Lisa Merrill) Cultural perspectives and some of the problems of cross-cultural communication and negative valuation, studied through symbolization and performance linguistically, behaviorally, and through narrative. Linguistic and other communicative behavior of groups and genders is both different and differentially valued.  Subordinates in a hierarchy, such as women and ethnic minorities, are set apart by their language use.  Cultures discussed are from different parts of the world, such as the Swahili, the Japanese and the Colombians;  cultures that exist within a single country, such as the United States' Cajuns, Hutterites, and the racial cultures of Black and White.  Throughout, we examine gender differences and similarities and the social construction of gender identities.  Perceptual filters;  Point of view and narrative voice; Multiple points of view; Case study; Gender, voice and values; Language and social value; Messages of inclusion and exclusion:  deep-structure interpretation of the food code; Negotiation simulation; Applications.

Kenya in Contemporary Africa
Focus on four important forces of change directly affecting modern Kenyans.  Urbanization is the headlong flight of rural populations into the cities.  Monetarization is the integration into the cash economy and the larger world economy and the continuation of Kenya's centuries-long underdevelopment vis-à-vis foreign trade partners.  Detribalization and Europeanization are the loss of traditional "village" value systems and languages and the influence of urban societies, Western education and religion, and the secular values of the global consumer economy.  Degradation of the environment includes  overpopulation, erosion, deforestation, desertification, and competition for land between humans and wildlife.

Elementary and Intermediate Swahili: Swahili 1, 2, 3, 4
Fundamentals of conversation, grammar, reading and writing in the most widely spoken language of East Africa.  Elements of culture of the Swahili and other East African ethnic groups.

Cross-Cultural Linguistics
Language as joiner and divider.  Linguistic aspects of cross-cultural communication themes: perception, value systems, ethnocentricity and cultural relativity, paralinguistic behavior, time/space, foodways, social interaction.
        Linguistic reinforcement of class, ethnic, religious and national divisions.  Sapir-Whorf hypothesis.  Barriers to effective translation.

Power of Words
Societal divisions and power differentials caused and maintained by language.  Propaganda, advertising, and political manipulation of news.  Social, geographical and ethnic dialect divisions:  dialects vs. the standard language, and ethnic and racial linguistic prejudice.  Language, sex, and gender roles.  Linguistic acculturation of the sexes. Doctor and lawyer talk.

Language and Culture
Examination of language, the most powerful and complex communicative instrument available to humans. Language as a sign-system unique to the species, as a reflection of cultural values, and as an artistic instrument in both day-to-day speech and, especially, in literature.  Analysis of sections of literary works in Swahili, a Bantu language of East Africa, and English.

Language and Society in Africa, Asia and Latin America (Multicultural Core Course)Examination of the relation between language and society with emphasis on Africa, Asia and Latin America.  Conflict between nationalist languages and former colonial world languages.  Language as a cognitive system.  Language as

an indicator of societal identity, group, and status.  Diglossia.  Language planning in government, industry and education.  Language attitudes, change and maintenance.  Case studies of language situations in countries around the world.

University Honors Program Senior Honors Seminar: Meaning, Language, and Communication Across Cultures
Semiotic (meaning) systems such as language, clothing, architecture and food and how they create a culture's "reality."  Semiotic systems as self contained systems ("tout se tient.") Centrality of arbitrariness and systematicity. Processes and problems of intercultural communication.  Ethnocentricity and evolutionary forces on ethnocentrism. Language as joiner and divider.  Communicative vs. mere grammatical competency. Linguistic aspects of inter-cultural communication themes: perception, value systems, ethnocentricity vs. cultural relativity, paralinguistic behavior, time/space, foodways, social interaction.

Students complete a field trip to an unfamiliar "ethnic" neighborhood; a book report on a inter-cultural aspect of one's own major or planned career;  a class presentation on the book;  various interviewing assignments and analyses;  and a 15-page structured term paper.

Linguistic Field Methods
Natural data collection using Labovian field interview techniques.  Semantic analysis of recorded speech and written texts, and the differences in coherent context.  Conversational and narrative structure.

Language and Law
This course applies linguistic theory to the analysis of language data in legal settings.  Much legal evidence and data are linguistic in nature, yet the use of scientific techniques to help explicate them is a relatively recent phenomenon.  Just as medical evidence is profitably commented on by medical experts, language evidence, it is becoming increasingly seen, is advantageously examined by linguistic experts. Ordinary versus Plain meaning, the language of contracts, confession events, disputed authorships, the nature of questions, code-switching, examination and cross examination, cross-cultural aspects of jurisprudence.

Forensic Linguistics Internships
Interns work with HCLAS professors and/or Law clinic students and faculty on language-related legal cases such as authorship, false confessions, or consensual searches.

Forensic Linguistics
A case-based approach to solving legal problems through linguistic analysis.  Forensic Linguistics augments legal analysis by applying rigorous, scientifically accepted principles of analysis to legal evidence such as contracts, confessions, and recorded speech. In the U.S. legal system, language is key. Through language we promulgate laws, issue subpoenas and warrants, question suspects, give testimony, write contracts, confess, claim and deny. Attorneys use language to write briefs, make opening and closing arguments, question and cross-examine witnesses; judges issue orders, write decisions, and charge juries. As biology and physics play crucial roles in the interpretation of forensic medical and ballistic data, the science of linguistics enables a deeper understanding of forensic language phenomena.

Forensic Linguistics for Law Enforcement
Graduate-level course designed specifically for FBI Supervisory Special Agents of  Behavioral Analysis Units, Critical Incident Response Group, National Center for the Analysis of Violent Crime.

**Robert Andrew Leonard, Ph.D.**
**Linguist**

**RECENT CASES (where involvement was disclosed and in the public record):**

2008.  Commonwealth of Pennsylvania v. Brandon Williams
   No. CP-51-CR 1300479-2006
- First Degree Murder
- Consulted by defense.
- Linguistic issue:  whether confession statement was actually authored by  defendant.
- Acquitted.

2007.    United States v. Matthew William McCoy.  Criminal No. 4:07-CR-077
- Attempted Extortion by Public Official.
- Consulted by defense.
- Linguistic issue:  whether covert recordings show defendant made illegal threats.
- Acquitted.

2007.  United States v. Stephen Christopher Plunkett.
- Conspiracy to Extort Money.
- Consulted by defense.
- Linguistic issue:  whether emails show defendant made illegal threats.
- Reduced charges.

2007.  State of New Jersey v. Melanie McGuire.
- First Degree Murder.
- Consulted by prosecution.
- Linguistic issue: whether defendant wrote letters (letters contained hard evidence) to prosecutors under assumed identities.
- Convicted of First Degree Murder, acquitted of Obstruction of Justice.

2007.    United States v. Gary M. Kornman. No. 3:05-CR-0298-P.
- Insider trading.
- Consulted by defense.
- Linguistic issue:  whether defendant lied to agents of the SEC.
- Reduced charges.

2007.    United States v. Sohail Chaudhry. Criminal No. 06-771.
- Internet sting.
- Consulted by defense.
- Linguistic issue:  age of Instant Messaging interlocutor.  Judge issued order accepting forensic linguistic testimony under Daubert.
- Convicted.

2006-2007.    Hlinka v. USA. USDC-EDNY CV-04-3121.
- Malpractice.
- Consulted by defense (Department of Justice).
- Linguistic issue:  meaning of abbreviations in a medical report.
- Settled.

2006-2007.    Eleanor Russell, Darrell A. Russell, v. Los Angeles County Metropolitan Transportation Authority, Sheryl M. Anderson, City Of Los Angeles, S. Yoon, Officer I.D. 34959, et al.
- Wrongful death.

- Consulted by plaintiff.
- Linguistic issue:  whether police accident reports were authored by interviewees or police themselves.
- Ongoing.

2006.  United States v. Carlos Alvarez, Elsa Alvarez Case. No. 05-20943-CR-Moore.
- Espionage.
- Consulted by defense.
- Linguistic issue:  whether FBI agents threatened and made promises to defendant.
- Reduced charges.

2006.    Jeevan Padiyar v. Yeshiva University, Albert Einstein College of Medicine of Yeshiva University and Sue Golding Graduate Division of Medical Sciences Albert Einstein College of Medicine of Yeshiva University. Supreme Court of the State of  New York Index No. 110578/05.
- Wrongful termination.
- Consulted by plaintiff.
- Linguistic issue:  authorship of documents.
- Case ongoing.

2005-2006.       Commonwealth of Pennsylvania v. Brian D. Hummert. No. 6140 CA 2004.
- Murder.
- Consulted by prosecution.
- Linguistic issue:  testified as to evidence of authorship of documents incriminating suspect.  Judge issued order accepting forensic linguistic testimony under Frye.
- Convicted of 1st Degree Murder.
[Forensic Files "A Tight Leash" features this case and my testimony.]

2005-2006       People of the State of New York v. Nelson Pardo. Index No. 13/2004.
- Internet sting.
- Consulted by defense.
- Linguistic issue:  authorship of confession; age of  Instant Messaging interlocutor. Appointed Forensic Linguist Expert pursuant to County Law, Section 722-C.
- Reduced charges.