## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 242 | **DATE** | 3/19/2008 |
| **CASE TITLE** | LG Electronics USA, Inc. Vs. Whirlpool | | |

**DOCKET ENTRY TEXT**

MOTION by plaintiff LG Electronics U.S.A., Inc. for preliminary injunction and request for expedited hearing [10] is denied.

■[ For further details see text below.]

Notices mailed by Judicial staff.

---

### STATEMENT

In October 2007, Defendant Whirlpool Corporation, a manufacturer of home appliances, launched a new product: the Duet Steam Dryer. Unlike traditional dryers, the Duet Steam Dryer injects a fine mist of water into a heated dryer drum for the supposed benefit of reducing odors and relaxing wrinkles. According to Defendant's marketing efforts, the Duet Steam Dryer "works on the same principle as hanging a wrinkled shirt in a hot and steamy bathroom . . ." ®. 51-1, Rogers Decl. at ¶¶9, 14, 15.)

In December 2007 and January 2008, Plaintiff LG USA, Inc. released its own steam dryer, the Tromm Steam Dryer, that, unlike the Duet Steam Dryer, uses an independent steam generator to create steam that then is blown through a tube into the dryer drum. (R. 24-1, Pl.'s Motion at 6; *id.*, Ex. 4 ("Choi Decl.") at ¶9.) Citing the differences in the respective technology, Plaintiff initiated the current litigation, contending that Defendant's use of the term "steam" in its advertising campaign is literally false in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125. Currently before the Court is Plaintiff's motion for a preliminary injunction, which asks that the Court enjoin Defendant from "using, airing, disseminating or causing to be used, aired or disseminated, the name Duet Steam Dryer and any television, print, online, or other advertisements stating that the Duet Steam Dryer utilizes steam." (R. 24-1, Pl.'s Motion at 1.) For the reasons below, the Court denies the motion.

### LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved," *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001), and as "a very serious remedy, [it is] never to be indulged in except in a case clearly demanding it." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000) (internal quotation omitted). "A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of

**STATEMENT**

success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); *see also Ayres v. City of Chicago*, 125 F.3d 1010, 1012 (7th Cir. 1997) (the "granting of a preliminary injunction is not a decision on the merits of the plaintiff's suit. It is merely a decision that the suit has enough merit – which need not be great merit – to justify an order that will freeze the situation, in the plaintiff's favor, for such time as it may take to determine whether the suit is, or is not, meritorious."). "If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Jones Group*, 237 F.3 at 895 (citing *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)). "Finally, the court must consider the public interest (non-parties) in denying or granting the injunction." *Id.* (parentheses in original). The court then weighs all of these factors, in a process that "involves engaging in . . . [a] sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.*; *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998) ("The stronger the likelihood that the plaintiff will win, the less of a showing he need make that the denial of the preliminary injunction would hurt him more than granting it would hurt the defendant. If the defendant is very likely to lose, allowing him to continue in his probably unlawful course of conduct until the end of what may be protracted proceedings would give him a windfall." (internal citation omitted)). "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Jones Group*, 237 F.3d at 895-96 (quoting *Abbott Labs.*, 971 F.2d at 12); *see also Planned Parenthood*, 162 F.3d at 465 (referring to the weighing of preliminary injunction factors as "[t]he balance of imponderables").

**ANALYSIS**

**I.      The Lanham Act**

Section 43(a) of the Lanham Act "prohibits the use of false or misleading statements or representations of fact in commercial advertising, and establishes a private remedy for any violation thereof." *Abbott Labs.*, 971 F.2d at 13; *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); 15 U.S.C. §1125(a)(1) ("Any person who, on or in connection with any goods . . . uses in commerce any word, [or] . . . false or misleading description of fact, or false or misleading representation of fact, which – . . . (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."). Section 43(a) "applies with equal force to (1) statements which are literally false and (2) statements which, while literally true or ambiguous, convey a false impression or are misleading in context . . ." *Abbott Labs.*, 971 F.2d at 13; *Hot Wax*, 191 F.3d at 820. To sustain a claim under Section 43(a), a plaintiff generally "must show that the defendant (1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) that results in actual or probable injury to the plaintiff." *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999); *cf. Hot Wax*, 191 F.3d at 819. But "[w]here the statement in question is actually false, then the plaintiff need not show that the statement either actually deceived consumers or was likely to do so." *B. Sanfield*, 168 F.3d at 971-72 (further noting that "where the statement is literally true or ambiguous, then the plaintiff is obliged to prove that the statement is misleading in context, as demonstrated by actual consumer confusion" (internal quotation and

# STATEMENT

citation omitted)).  The same analysis presumably applies to false advertising claims under Illinois law, as well.  *See, e.g., Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007) ("[t]he district court held, and we have previously assumed without deciding, that [the Lanham Act] analysis also applies to Illinois false advertising claims").

"[A] Lanham Act plaintiff bears the burden of proving literal falsity, but [ ] the proof sufficient to meet this burden will vary depending upon the statement made."  *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089-91 (7th Cir. 1994); *see also Castrol Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992).  This is the case because "the conditions under which a statement is true or false vary according to the statement at issue . . ."  *BASF*, 41 F.3d at 1091.  Where, as here, an advertisement makes a so-called independent claim (*i.e.*, that the subject product has certain attributes), a plaintiff must provide "affirmative proof of falsity to establish liability" because a lack of substantiation does not necessarily establish literal falsity.  *BASF*, 41 F.3d at 1090.

## II.    Likelihood of Success on the Merits

Plaintiff takes issue with a number of claims that Defendant uses in its advertising campaign, but argues only that they are literally false (as opposed to being literally true, but misleading).  (*See, e.g.,* R. 24-1, Pl.'s Motion at 8 (arguing that Plaintiff is entitled to a preliminary injunction because "the commercial claims at issue are literally false as a factual matter"), 9 (arguing that Defendant makes a number of "expressly false advertising claims"), 10 ("there can be no doubt that Whirlpool's claims that its Duet Steam Dryer utilizes steam or has the 'power of steam' are literally false").)  Specifically, Plaintiff challenges the following claims that Defendant makes regarding the Duet Steam Dryer:

(1)  "Naturally steam out wrinkles and odors with the touch of a button.  The new Duet Steam dryer features two cycles – Enhanced Touch-Up and Quick Refresh – that infuse clothing with steam to refresh and dewrinkle;"

(2)  "The pure power of steam – Nothing beats the power of steam to get rid of wrinkles.  The Duet Steam dryer naturally steams out wrinkles in just minutes, while removing any lingering odors;"

(3)  The Duet Steam Dryer (i) "naturally steams away tough stains," (ii) "steams out tough wrinkles and odors," and (iii) uses the "pure power of steam;"

(4)  "How does the addition of steam work to enhance cleaning performance?"  The Duet Steam Dryer:  (i) "naturally steams away tough stains," (ii) provides a setting of "20 minutes of steam and tumbling;"

(5)  "The Whirlpool Duet Steam laundry pair, a whole new way to care for your clothes from start to finish, with the pure power of steam.  Just another laundry innovation from Whirlpool."

(R. 24-1, Pl.'s Motion at 2, 9.)  Plaintiff claims that Defendant's "use of the word 'steam' in these advertising claims and in the name of its Duet Steam Dryer is literally false and misleading because the Duet Steam Dryer does not use steam, but instead uses a mist of cold water sprayed into a warm dryer drum" – two "thermodynamically different substances [that] have different characteristics. . . ."  (R. 24-1, Pl.'s Motion at 2; *see also id.* at 4 ("The Duet Steam Dryer does not, however, utilize 'steam,' which is a clear gas obtained by vaporizing water, and which occurs at standard pressure when the water is heated at or above its boiling

**STATEMENT**

point of 100 degrees Centigrade."), 5 ("Tumbling clothes that have been sprayed with cold water in a warm dryer drum does not create steam, however, but simply results in the evaporation of the water – just like any traditional, non-steam washing machine").) As Plaintiff sees it, the thermodynamic difference would be material to the decision to purchase goods because "[s]team removes wrinkles, static, and odors better than a traditional dryer." (*Id.* at 4 (further noting that "[w]ith these benefits comes increased cost, as the creation of steam requires additional components in the dryer").)

**A. By Relying on Contradictory Declarations, Plaintiff Fails To Satisfy Its Burden**

In support of its motion, Plaintiff relies mainly on two declarations: (1) the declaration of Dr. Anthony Jacobi, a purported expert on the thermodynamic qualities of water, who opines on whether the Duet Steam Dryer uses or creates steam; and (2) the declaration of Dr. Chul Jin Choi, an LG engineer, who tested the temperature within the tub of the Duet Steam Dryer during its steam cycles. The combined effect of these declarations, however, leaves unresolved the critical issue of whether Defendant's dryer uses "steam." In other words, Plaintiff has failed to meet its burden at this stage of providing affirmative evidence that Defendant's dryer does not use steam.

Significantly, Dr. Jacobi's opinion rests on an unsupported assumption *that the testing of Plaintiff's own expert contradicts.* Dr. Jacobi opines that "[f]rom a thermodynamic perspective,[1] . . . it is my expert opinion to a reasonable degree of scientific certainty that Whirlpool's duet Steam Dryer does not create or use steam . . ." (*Id.*, Jacob Decl. at ¶24; *see also id.*, Jacobi Decl. at ¶18 ("Whether liquid water is introduced with wet clothes or sprayed into a dryer drum as sub-cooled liquid water, in the drying process it is evaporated to form hot, moist air. This hot, moist air is thermodynamically different from steam.").) His opinion, however, has no gravitas because it rests upon on the (erroneous) assumption "that the operating temperature of the Whirlpool machine's dryer drum is always below 100 degrees Centigrade" (*id.*, Jacobi Decl. at ¶22) – a critical point that permeates Plaintiff's entire motion. (*See, e.g.*, R. 24-1, Pl.'s Motion at 5 ("The Duet Steam Dryer does not possess a steam generator or any apparatus that creates steam or otherwise provides for heat transfer, *nor does the drum reach sufficient temperatures to generate steam*" (emphasis added)), 10 ("[S]team cannot be created inside the Duet Steam Dryer *because the temperatures inside are not sufficiently hot*. Rather, the cold water mist simply evaporates during the drying process into hot, moist air that remains thermodynamically different from steam." (emphasis added)).) Dr. Jacobi – who did *not* test the temperature within Defendant's dryer's drum (*id.*, Jacobi Decl. at ¶22) – relied on the demonstrably incorrect opinion of Plaintiff's other expert, Dr. Choi. (*Id.* at 5.) While opining that temperatures inside the Duet Steam Dryer never reach 100º C (*id*, Choi Decl. at ¶19), the testing summary Dr. Choi cites in support of this contention shows precisely the opposite as to a portion of the dryer and undermines Plaintiff's entire argument. Specifically, the testing summary reveals that at least a portion of the Duet's dryer drum reaches temperatures that exceed 100º C. (*Id.*, Choi Decl. at Ex. 4C (attaching a breakdown of thermocouple temperature readings reflecting peak temperatures between 123.5º C (without the water spray) to 105.5º C (during or after the water spray)); *see also* R. 55-1, Malladi Decl. at 27-36 (opining that a certain portion of the dryer drum near the air inlet recorded temperatures in excess of 100º C with a peak temperature of 130-32º C while the mist is spraying); R. 76-1, Pl.'s Reply, Suppl. Jacobi Decl. at ¶19 ("I am relatively confident [Dr. Malladi] is correct in concluding air temperatures at some location did at some times exceed 100º C"), ¶20 ("In point of fact, the data show that at some locations – all confined to a region very near the supply air inlet, and all very near each other – temperatures at some times exceeded 100º C."), ¶29 (No part of my

| STATEMENT |
| --- |

original declaration is vitiated by [Dr. Malladi's] measurements, *except that I now believe the air temperatures in a small region near the air supply do at times exceed 100° C*" (emphasis added)).) Submitting self-defeating declarations such as these means that Plaintiff has failed to come forth with affirmative evidence that Defendant's advertising claims are literally false and, in turn, it means that Plaintiff has not demonstrated a likelihood of success on the merits at this stage.[2]

## B.    The Definition of Steam

But, equally important, Plaintiff's argument assumes that the appropriate definition to use when determining literal falsity is the strict thermodynamic definition that Plaintiff sets forth. Other, broader definitions of steam exist:

> "Steam: 1: a vapor arising from a heated substance; 2a: the invisible vapor into which water is converted when heated to the boiling point b: the mist formed by the condensation on cooling of water vapor; 3a: water vapor kept under pressure so as to supply energy for heating, cooking, or mechanical work . . ."

Merriam-Webster's Collegiate Dictionary (10th Ed. 1999) (defining "mist" to mean, among other things, "4a: a cloud of small particles or objects suggestive of a mist b: a suspension of a finely divided liquid in a gas; c: a fine spray"; defining "vapor" to mean, among other things, a "substance in its gaseous state"). And courts may turn to dictionaries as an aid in defining the meaning of advertising claims when determining literal falsity. *See, e.g., Scotts Co. v. United Indust. Corp.*, 315 F.3d 264, 274-75 (4th Cir. 2002) (looking to dictionary definition in determining literal falsity); *Syntex (U.S.A.), Inc. v. Interpharm, Inc.*, Civ. A. No. 1:92-CV-03HTW, 1993 WL 643372, *3 (N.D. Ga. Mar. 19, 1993) (same); *Coors Brewing Co. v. Anheuser-Busch Cos.*, 802 F. Supp. 965, 969-70 (S.D.N.Y. 1992) (same); *see also Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 886, *op. amended on denial of rehear'g by*, 209 F.3d 1032, 1034 (7th Cir. 2000) (false advertising case rejecting the use of consumer surveys to determine meaning of words: "So far as we can tell, however, never before has survey research been used to determine the meaning of words, or to set the standard to which objectively verifiable claims must be held. Dictionaries themselves are a form of survey; lexicographers determine how words have been used in both scholarly and popular texts. But philologists and others who contribute to dictionaries devote their lives to discovering usage and interpreting nuance. It would be a bad idea to replace the work of these professionals with the first impressions of people on the street.").

Although the parties dispute the point, it appears that when a term is capable of multiple meanings, an advertisement is not literally false as long as the claim meets at least one of those definitions. *See, e.g., Coors Brewing*, 802 F. Supp. at 969-70 ("Because the term "concentrate" is equally open to either party's definition, defendants' advertising claim that Coors Light is made from a concentrate is ambiguous at most. Therefore, the commercial's reference to concentrate is not literally false."). Plaintiff's cited authority to the contrary does not construe Section 43(a) of the Lanham Act – the statute at issue here – but rather the Federal Trade Commission Act, *see Nat'l Comm'n On Egg Nutrition v. Fed. Trade Comm'n*, 570 F.2d 157, 161 (7th Cir. 1977), and as such does not necessarily inform the analysis here, *see, e.g., Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228 (3d Cir. 1990) ("The key distinctions between the FTC and a Lanham Act plaintiff turns [*sic*] on the burdens of proof and the deference accorded these respective litigants.

---

**STATEMENT**

The FTC, as a plaintiff, can rely on its own determination of deceptiveness. In contrast, a Lanham Act plaintiff must prove deceptiveness in court. . . . [I]n cases brought by the FTC under Section 5, advertising capable of being interpreted in a misleading way should be construed against the advertiser. A Lanham Act plaintiff, on the other hand, is not entitled to the luxury of deference to its judgment." (internal quotation, citation, and certain punctuation omitted)); *see also Fed. Trade Comm'n v. Colgate-Palmolive Co.*, 380 U.S. 374, 385, 85 S. Ct. 1035, 1042-43, 13 L. Ed. 2d 904 (1965). Regardless, the Court need not definitively resolve the issue of how to define "steam." It suffices for present purposes to note that under either the narrow, thermodynamic definition or the broader lay definition, Plaintiff has failed to provide affirmative evidence that Defendant's claims are literally false. (*See* R. 24-1, Pl.'s Motion at 5 (conceding that the mist the Duet Steam Dryer shoots into the dryer drum creates "hot, moist air").)

Because Plaintiff – on the face of its own affidavits – has failed to establish that the Duet Steam Dryer does not create "steam" under either the thermodynamic or lay definition of the word, the Court need not conduct an evidentiary hearing. *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002) (an evidentiary hearing on a motion for preliminary injunction motion is necessary only when genuine issue of material fact issues exist); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) ("as in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive"); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1313 (11th Cir. 1998). In addition, the Court's disposition of Plaintiff's Lanham Act claim disposes of its other substantive claims, as well. As Plaintiff concedes, to the extent its state law claims differ at all from the Lanham Act claim, they are more onerous or have additional essential elements. (R. 24-1, Pl.'s Motion at 15-17.)

**III.    The Remaining Factors**

Although a finding that a plaintiff has not established a likelihood of success "obviate[s] the need for the district court to continue further with its analysis[,] [i]n the preliminary injunction context, where time is often of the essence, [the Seventh Circuit] has emphasized that it is advisable for district courts to examine, if only briefly, all four preliminary injunction considerations." *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 730 (7th Cir. 1998) ("Such a practice expedites [appellate] review of the grant or denial of a preliminary injunction and protects the interests of the parties."). Accordingly, the Court will address briefly each of the remaining factors.

**A.    Irreparable Harm and Inadequate Remedy at Law**

"The only harm that is relevant to the decision to grant a preliminary injunction is irreparable harm, since if it is reparable by an award of damages at the end of trial there is no need for preliminary relief." *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003); *see also FoodComm Int'l. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) ("Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." (citing *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984))). Normally, "[t]o demonstrate irreparable injury, [a plaintiff] must show that [it] will suffer harm that cannot be prevented or fully rectified by the final judgment after trial." *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001). Yet there is a "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of

| STATEMENT |
| --- |

business loss." *Abbott Labs.*, 971 F.2d at 16; *Promatek Indus.*, 300 F.3d at 813 (same). "This presumption, it appears, is based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Abbott Labs.*, 971 F.2d at 16; *see also*, Milton Handler, Unfair Competition, 21 Iowa L. Rev. 175, 193 (1936) ("The competition of a liar is always dangerous even though the exact injury may not be susceptible of precise proof."), *cited in Abbott Labs.*, 971 F.2d at 16.

There may be a conflict in the case law as to whether this presumption applies in all false advertising cases. Under Seventh Circuit precedent, the presumption, at a minimum, applies to comparative advertising, *see Abbott Labs.*, 971 F.2d at 16, but there is no direct authority from the Seventh Circuit regarding other types of false advertising claims; other circuits may be split on the issue. *See, e.g., Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 696 (2d Cir. 1994) (presumption of irreparable harm does not apply "the defendant's advertisements make no direct reference to any competitor's products"); *cf. United Indus., Corp. v. Clorox Co.*, 140 F.3d 1175, 1183-84 (8th Cir. 1998) (suggesting, without definitively reaching the issue, that a presumption of irreparable harm applies in all false advertising cases); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002) (noting that "there seems to be some disagreement among the courts as to when [a] presumption [of irreparable harm] should be applied" in Lanham Act false advertising cases). The Court, however, need not definitely address this issue because the presumption, assuming one exists, arises only when a plaintiff has established literal falsity. *See, e.g., United Indus.*, 140 F.3d at 1184 ("irreparable harm cannot be presumed where, as here, plaintiff has not established any prospect of success upon the merits"); *see also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007) (explaining the basis for the presumption or irreparable harm: "[w]hen an advertisement is shown to be literally or facially false, consumer deception is presumed, and the court may grant relief without reference to the advertisement's [actual] impact on the buying public. This is because plaintiffs alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe." (internal quotation omitted)). For the reasons above, Plaintiff has not made that showing, and, because it offers no other substantial argument on that point in its motion (*see* R. 24-1, Pl.'s Motion at 13-14), Plaintiff has failed to demonstrate irreparable harm.

## B.  Harm to the Non-Movant and Effect on the Public

The final factor a court "must consider is the balance of harms." *Promatek Indus.*, 300 F.3d at 813. A proper balancing requires a court to consider "the irreparable harm [defendant] will suffer if the injunction is enforced weighed against the irreparable harm [plaintiff] will suffer if it is not," and also "the effect the injunction will have on the public." *Id.*  Regarding these factors, Plaintiff contends that, because of Defendant's false claims, it is suffering "irreparable damage to its business reputation, goodwill, and potential sales," and that the "the public interest is being harmed . . . because consumers are making purchasing decisions based upon the erroneous belief that Defendant's claims are true and accurate."  (R. 24-1, Pl.'s Motion at 14-15.)  As noted above, these arguments are unsustainable on the current record, and, thus, Plaintiff has failed to satisfy its burden as to these elements, as well.

## CONCLUSION

| **STATEMENT** |
|---|
| Because Plaintiff has failed to meet its burden at this stage, the Court denies Plaintiff LG USA's motion for preliminary injunction. |

1.     Throughout his declaration, Dr. Jacobi defines of "steam" in the thermodynamic sense, which, he asserts, is "dry steam," "a clear gas obtained by vaporizing water." (*Id.*, Jacobi Decl. at ¶15.)  As Dr. Jacobi explains, in order to vaporize water and obtain dry steam, water (at standard pressure) must be heated at or above 100 degrees Centigrade.  (*Id.*, Jacobi Decl. at ¶15 (further opining that "[d]ry steam has much higher energy content (enthalpy) than air, and than sub-cooled water, at the same temperature").)  By contrast, "[a] spray or mist of sub-cooled liquid water is a dispersion of droplets at a temperature below that corresponding to liquid-vapor saturation.  It is an opaque or semi-transparent collection of liquid water and air." (*Id.*, Jacobi Decl. at ¶16 ("At standard pressure, sub-cooled liquid water has a much lower energy content than that of dry steam at the same temperature."); *see also* R. 76-1, Pl.'s Reply, Ex. 5 ("Suppl. Jacobi Decl.") at ¶4(c) (defining saturation temperature as "the temperature at which a phase change can occur (*e.g.,* evaporation or condensation)").)  Put differently, steam and sub-cooled water "are separate and distinct forms of water.  Steam must reach boiling point, while sub-cooled water is always below the boiling point."  (R. 24-1, Pl.'s Motion, Jacobi Decl. at ¶17.)

2.     Recognizing this shortcoming, Plaintiff shifts gears in its reply, arguing that Defendant has no proof that the injected mist reaches the portion of the dryer that exceeds 100º C.  (R. 76-1, Pl.'s Reply at 15 (asserting that Dr. Malladi's "data fail to provide any evidence that the cold water sprayed into the Whirlpool drum ever reaches the hot air grill, how much water reaches the grill, or tha[t] any drop of cold water ever reaches 100º C" (citing *id.*, Suppl. Jacobi Decl. at ¶¶23, 25); *id.*, Suppl. Jacobi Decl. at ¶25 ("I am skeptical that any significant entrainment of liquid droplets occurs in the region very near the air supply grill.").)  Although Defendant debates this point (R. 94-1, Def.'s Surreply, Ex. A (Suppl. Malladi Decl.) at ¶¶33, 35), the merits of this issue are irrelevant at this stage.  Foremost, Plaintiff waived the argument by failing to raise it in its opening brief.  *See United States v. Adamson*, 441 F.3d 513, 521 n.2 (7th Cir. 2006).  It fails in any event.  To demonstrate a likelihood of success, Plaintiff must come forth with "affirmative evidence" of falsity; pointing to shortcomings in Defendant's declaration is unavailing.  *See BASF*, 41 F.3d at 1089-91 (a plaintiff must provide "*affirmative proof* of falsity to establish liability" because a lack of substantiation does not necessarily establish literal falsity . . . proof that the advertiser had no support for its statement [regarding a product] would not necessarily prove falsity" (emphasis added)).