# INDEX OF EXHIBITS
## TO WHIRLPOOL CORPORATION'S MOTION TO EXCLUDE SURVEY EVIDENCE, AND EXPERT REPORT AND OPINIONS, OF ROBERT REITTER

**Description**                                                                                                    **Exhibit**

Communication Test of Advertising for the Whirlpool Duet® Steam Washer and Dryer
("Reitter Report")...............................................................................................................................1

DVD of 2 Commercials .......................................................................................................................2

Excerpts of Reitter 04/15/09 Deposition  .......................................................................................... 3

Excerpts of Rebuttal Report Evaluating the Expert Report and Study of Dr. Ravi Dhar
and the Report of Dr. Nowlis ("Wind Report")...............................................................................4

Defendant's Deposition Exhibit 139....................................................................................................5

# Exhibit 1



# COMMUNICATION TEST OF ADVERTISING FOR
# THE WHIRLPOOL DUET® STEAM WASHER AND DRYER

PREPARED FOR:

WINSTON & STRAWN
35 West Wacker Drive
Chicago, IL   60601

October  2008

Guideline
625 Avenue of the Americas
New York, NY 10011
*tel*  212.329.1030  Direct Dial / rreitter@guideline.com
*fax*  212.629.0061

Boston
Chicago
Minneapolis
New York
Washington DC

www.guideline.com

## *TABLE OF CONTENTS*

|  | Page # |
|---|---|
| BACKGROUND AND PURPOSE | 1 |
| CONCLUSIONS | 2 |
| METHOD | |
| OVERVIEW | 3 |
| STUDY AUTHORSHIP AND RESPONSIBILITY | 4 |
| STUDY DESIGN | 5 |
| THE RELEVANT UNIVERSE OF INTEREST | 6 |
| SAMPLING PLAN | 7 |
| DOUBLE BLIND INTERVIEWING | 10 |
| QUESTIONNAIRE | 10 |
| INTERVIEWING PROCEDURES | 12 |
| RESPONDENT VERIFICATION | 12 |
| CHECK-IN PROCEDURES | 13 |
| INTERVIEWING PERIOD | 13 |
| DATA PROCESSING | 14 |
| DETAILED FINDINGS | 15 |

APPENDIX A:  BIOGRAPHICAL BACKGROUND OF STUDY'S AUTHOR
APPENDIX B:  QUESTIONNAIRES
APPENDIX C:  FIELD INSTRUCTIONS
APPENDIX D:  VALIDATION QUESTIONNAIRE/LETTER
APPENDIX E:  COMPUTER TABLES
APPENDIX F:  LIST OF DOCUMENTS CONSIDERED

## BACKGROUND AND PURPOSE

Whirlpool Corporation makes and advertises the Duet® Steam Dryer. LG Electronics, maker of the LG SteamDryer, has brought an action for false advertising against Whirlpool, alleging that Whirlpool's Duet® Steam Dryer[1] does not use steam to remove wrinkles and odors from clothing, but relies instead on a mist of cold water which is then heated by the regular heating action of the dryer. LG alleges that consumers are being deceived, because they do not regard this mist of cold water system to be steam.

Winston & Strawn LLP, a law firm for LG Electronics, commissioned Guideline to conduct this study of a commercial for the Whirlpool Duet® Steam Washer and Dryer, namely *New Way to Care for Clothes* (the "test" commercial). The purpose of the study is to learn to what extent if any relevant consumers take away from this test commercial the impression that the Duet® Steam Dryer uses steam; taking away that it injects a hot vapor onto clothes, and not that it injects a mist of cold water that is heated after it is sprayed into the dryer drum.

---

[1] LG's complaint makes the identical allegation with respect to the Maytag Bravos™ Steam Dryer and the Whirlpool Cabrio® Steam Dryer.

## CONCLUSIONS

A clear majority of the relevant consumers (66%) who were shown a test commercial for the Duet® Washer and Dryer rejected the notion that the dryer injects a mist of cold water that is then heated by the normal heating action of the dryer. To learn to what extent this finding could be attributed to so-called "noise"[2], a control commercial was shown to a separate sample. Unlike the test commercial, the control commercial does not mention *steam* in connection with the Duet® Dryer. Only one in four of the relevant consumers (26%)[3] who were shown the control commercial rejected the same notion.

Furthermore, 56% of those shown the test commercial for the Duet® Washer and Dryer came away with the impression that the dryer injects a hot vapor onto the clothes in the dryer drum, as against only 21%[4] doing so among those shown the control commercial.

The message about steam in the test commercial was impressive to consumers. Recall and playback of this message were at exceptionally high levels.

---

[2] Noise is defined as a result which is not caused by the commercial being tested, but is attributable to pre-existing beliefs on the part of the research participants, or to suggestiveness in the questions being asked, or simply to random guessing.
[3] Significantly less than of those shown the test commercial, at the 95% level of confidence.
[4] Significantly less than of those shown the test commercial, at the 95% level of confidence.

# *METHOD*

## OVERVIEW

In designing and conducting studies intended to measure consumer perceptions of communications, we follow the guidelines and standards generally employed in the field of survey research, as well as the criteria set forth in the Reference Guide on Survey Research published by the Federal Judicial Center (2000).

These standards and criteria require that:

1. Those responsible for the design, conduct and analysis of the survey be experts in the field of survey research.

2. The survey design properly address its objectives.

3. The relevant universe be defined appropriately.

4. A representative sample be drawn from the relevant universe.

5. The measures collected include data for control groups and/or control questions when appropriate.

6. The survey questions be framed clearly and precisely, and so as to avoid bias; and, as far as possible, so as to avoid order or context effects.

7. The interviewers be well-trained and be without knowledge of the purposes for which the data will be used.

8. The interviews be conducted in a correct and unbiased manner and in accordance with generally accepted standards of procedure in the field.

9. Once gathered, the data be accurately analyzed and reported.

These criteria are discussed in greater detail on the following pages.

## STUDY AUTHORSHIP AND RESPONSIBILITY

This study was designed, supervised and implemented by Guideline, under the supervision of Robert N. Reitter, Senior Vice President.

Biographical material on Mr. Reitter is provided in Appendix A.

The author has been accepted as an expert witness in the field of marketing research in several court jurisdictions.

_____          October 20, 2008
Robert N. Reitter

## STUDY DESIGN

Two separate groups of similarly qualified respondents were interviewed:

- Approximately 200 respondents were shown a 30-second TV commercial for the Duet® Steam Washer and Dryer, *New Way to Care for Clothes.* The principal unique benefit attributed to the dryer is that it utilizes steam to remove wrinkles and odors. This commercial makes several references to steam, both in the name of the product and in describing what it does;

- Approximately 200 respondents were shown a 30-second control TV commercial for the Duet® Steam Washer and Dryer which also states that the dryer removes wrinkles and odors, but from which explicit references to steam were removed[5].

In each case, the respondents were interviewed in person in research facilities in 12 markets selected to be representative of all U.S. Metropolitan Areas. They were shown the respective commercial twice in succession and then questioned about their impressions of it.

---

[5] In keeping with accepted survey practice, references to steam were professionally removed from the 30-second television commercial for the Duet® Steam Washer and Dryer, *Woman Greets Swans Made of Laundry,* in order to test the extent to which responses in the test group concerning steam or a hot vapor are attributable to noise.

## THE RELEVANT UNIVERSE OF INTEREST

The relevant universe for this study was defined as decision-making consumers who have bought a clothes dryer in the past 12 months or who intend doing so in the next 12 months and who at least sometimes purchase premium-priced appliances.

The survey excluded persons employed in fields which would give them special knowledge or insight about this subject, namely those employed in advertising or market research, or for a manufacturer of home appliances or a store that sells home appliances. Similarly, persons who had an immediate household member so employed were excluded from participation. Screening out people with special knowledge is a generally accepted procedure. The actual wording of the screening questions used is shown in Appendix B.

## SAMPLING PLAN

The sampling procedure employed, which utilized shopping malls as a means of identifying relevant consumers, has been widely used and relied upon by market researchers, and many business decisions of consequence are made based on results derived from studies that employ such plans. Properly designed and executed studies of this type have been accepted in numerous court decisions.

A multi-stage sampling plan was executed in interviewing facilities located in shopping malls in each of the four principal U.S. Census regions. The four stages of the sampling plan for this study were:

SAMPLING UNIT

1. Census regions
2. Metropolitan Areas within regions
3. Shopping malls within Metropolitan Areas
4. Respondents within shopping malls

1.  Census Region Selection

    In accordance with generally accepted standards, the study was conducted in each census region -- Northeast, South, Midwest and West -- thus obtaining a cross section of residents from all parts of the country.

2.  Metropolitan Area Selection

    The selection of markets for this study was carried out using a sample design originally developed by Professor Martin R. Frankel. Professor Frankel developed the computer program for Metropolitan Area selection specifically for use by Guideline.

    The population frame for the first stage of sample selection consists of the 112 Metropolitan Areas[6] in the United States which have one or more permanent mall interviewing facilities.

    Prior to sample selection, the sampling frame was stratified on the basis of census region, census division and Metropolitan Area size within region. The allocation of sampling points among the regions was in proportion to the Metropolitan Area population of these regions. Within a region, the allocation of sampling points was in proportion to the population of Metropolitan Areas which have one or more permanent mall interviewing facilities.

    This procedure yielded a sample of the following 12 Metropolitan Areas:

    | | |
    |---|---|
    | Atlanta | Miami |
    | Bridgeport-Stamford | Minneapolis |
    | Chicago | New York |
    | Cincinnati | Oklahoma City |
    | Las Vegas | Philadelphia |
    | Los Angeles | Seattle |

---

[6] In New England, Metropolitan Areas follow the definitions of NECMAS (New England County Metropolitan Areas) as defined by the U.S. Bureau of the Census.

3. <u>Shopping Mall Selection</u>

The criteria for selecting a specific shopping mall testing facility within each of the Metropolitan Areas selected included: 1) that an experienced interviewing organization existed within the mall, and 2) that this organization had a permanent office within the shopping center created specifically to conduct interviews with consumers, 3) that their workload was such that they could complete their portion of the assignment within the desired schedule. Using these criteria, the following malls were selected as interviewing sites:

| <u>Market</u> | <u>Mall</u> |
|---|---|
| Atlanta | Mall of Georgia |
| Bridgeport-Stamford | Westfield Shopping Town |
| Chicago | Louis Joliet |
| Cincinnati | Florence Mall |
| Las Vegas | Galleria Mall |
| Los Angeles | Moreno Valley Mall |
| Miami | Miami International Mall |
| Minneapolis | Ridgedale Mall |
| New York | Sunrise Mall |
| Oklahoma City | Cross Roads Mall |
| Philadelphia | Vorhees Mall |
| Seattle | Tacoma Mall |

4. <u>Respondent Selection</u>

It is often found by market researchers that people who frequent shopping malls are more apt to be female than male and tend to be younger than the population as a whole.

To safeguard against the skewing toward any particular age or gender group, a "quota screening" procedure was employed in which males and females, aged 18 years and older, were approached in three age groupings proportionate to their presence in the population. In this manner, these age groups were correctly represented for the purpose of determining eligibility according to census demographics.

Based on available data[7], these screening quotas were established:

| Ages | Male % | Female % |
|------|--------|----------|
| 18 - 34 | 15.7 | 15.3 |
| 35 - 49 | 14.8 | 15.0 |
| 50 + | 17.9 | 21.3 |

While screening was in proportion to population, actual inclusion in the sample was not necessarily, and need not be, proportional to census demographics. Once a respondent met age screening needs, inclusion in the study was based on the fact that he or she met all the stated prerequisites.

Thus, by setting quotas for screening the number of males and females by age group, a representative number of qualifiers within each age group was obtained on an "as they fall" basis, thereby providing a directly proportionate sample of relevant consumers.

---

[7] Source: Resident Population Projections for 2005, published by the U.S. Census Bureau.

## DOUBLE-BLIND INTERVIEWING

It is important to point out that the study was administered under "double-blind" conditions. That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the interviewers were similarly "blind" with respect to the study's purpose and sponsorship. Without such knowledge, there is little likelihood that some interviewer(s) might ascertain what responses would be desirable from the sponsor's perspective, and thereby be in a position either to exert an influence on the respondents in this regard, or to modify their recording of a respondent's answers so as to be "helpful".

## QUESTIONNAIRE

This study utilized a questionnaire (provided in Appendix B) which had two parts: a screener and a main questionnaire.

In the screener, the consumer's eligibility to participate in the study was ascertained. Only those who fully met screening criteria -- that is, those who belonged to the relevant universe of interest -- continued on to the main questionnaire. Others not meeting a screening criterion were terminated at this point in the interviewing process.

In the main questionnaire, respondents were questioned about matters pertinent to the objectives of the study. Qualified respondents were seated in front of the television screen and then told:

> I'm going to show you a commercial that you may or may not have seen before. If you normally wear glasses or contact lenses when you watch TV please put them on.

They were then shown the commercial corresponding to the group to which they were assigned -- the test group or the control group -- twice in succession. They were than asked the following open-ended questions:

1. What was the main idea of the commercial?
2. What else, if anything, did the commercial say, show or imply?

Next, after focusing the remaining questions on the dryer, a so-called "filter" question was asked:

> You may have mentioned this already, but the commercial showed both a washer and a dryer. I'd now like to ask you specifically about the advertised dryer.

> 3a. Did the commercial say, show or imply anything about any unique feature of the advertised dryer?

Respondents answering the filter question affirmatively were asked:

> 3b. What did the commercial say, show or imply about any unique feature of the advertised dryer?
> 3c. Anything else?

Finally, all respondents were both shown and read descriptions of two dryers, "Dryer A" and "Dryer B". For half the respondents in both the test and the control groups, these dryers were described as follows:

> **DRYER A**
> **A mist of cold water is injected into the heated dryer drum. The dryer then heats the water and tumbles the clothes until dry.**
> **DRYER B**
> **A hot vapor is injected onto clothes inside the dryer drum. The dryer then heats and tumbles the clothes until dry.**

For the other half of respondents in each group, the definitions were reversed. This was done to control for any effect on the responses that referring to a description as "Dryer A" or "Dryer B" may have produced, and at the same time to control for any effect the order of presentation of the descriptions may have had on the responses. With the two descriptions still in front of them, all respondents were asked:

> 5. Thinking of the commercial you just saw and what it said, showed or implied about the advertised dryer, do you think the commercial …

> > Could be for Dryer A only
> > Could be for Dryer B only
> > Could be for either Dryer A or Dryer B
> > Could not be for either Dryer A or Dryer B
> > or, don't you know?

The four substantive choices were read half the time as shown above, and half the time starting with the third option.

## INTERVIEWING PROCEDURES

Screenings for eligibility were conducted on the mall premises in each designated shopping mall. Once qualified, respondents were escorted into the interviewing facility that was operated by the interviewing organization. Throughout the assignment, tight control and supervision was maintained over all aspects of the interviewing. Guideline prepared customized, detailed interviewer and supervisor instructions for this assignment. Copies of all of these instructions are found in Appendix C of this report.

Before beginning work on this study each interviewer was required to:

- Read the interviewer instructions.
- Attend a personal briefing. At this briefing, interviewing procedures were outlined and discussed in detail, question by question.
- Complete one or more practice interviews.

Additionally, a representative from each interviewing facility was required to contact a Guideline representative with periodic detailed progress reports. This allowed Guideline to closely monitor and supervise the progress of the study.

## RESPONDENT VERIFICATION

In addition to on-spot verification where both respondent and interviewer signed their respective names onto a "certification" page, telephone follow-up validation calls were attempted by an independent company who specializes in this type of work to verify that the interview did in fact take place and that only qualified respondents were interviewed.

A listing of each respondent's name and phone number was sent to Outfielders of Eastchester, NY, an independent telephone interviewing service, for verification.

This independent validating service was given the responsibility of attempting to recontact respondents by phone to confirm that:

- Such a person actually existed.
- He/she met the universe requirements for this study.
- He/she was actually interviewed for this study.

A total of 440 interviews were completed of which 438 provided telephone numbers. Outfielders successfully contacted 285, which represents a level of validation (65%) far exceeding the customary industry practice, which is to validate 15-20%. This validation procedure identified just one interview that did not validate; this interview was removed from the database.

## CHECK-IN PROCEDURES

Completed interviews were reviewed to ensure that respondents' answers to screening questions indicated that they met all eligibility requirements and that the interviews themselves were conducted in accordance with the field instructions. A total of 26 interviews were removed, leaving 207 in the test group and 206 in the control group which form the basis for the study's tabulations.

## INTERVIEWING PERIOD

Interviewing was conducted from July 29, 2008 through August 29, 2008.

## DATA PROCESSING

Data was entered using 100% verification. That is, each and every respondent's answer was entered twice and then compared.

## *DETAILED FINDINGS*

The principal ideas played back in response to the "main idea" question were as follows:

### Q. 1 Main Idea of Commercial

|  | Saw Test Commercial | Saw Control Commercial |
|---|---|---|
| Base: *Total Respondents* | (207) | (206) |
|  | % | % |
| It's a washer/dryer combo | 33 | 39 |
| Made by Whirlpool | 26 | 33 |
| Ready to wear in 15 minutes | 24 | 0 |
| Removes/relaxes wrinkles | 11 | 12 |
| Steam – net total of all mentions | <u>41</u> | <u>4</u> |
| Utilizes steam | 15 | 2 |
| Steams out wrinkles | 8 | 0 |
| Steams out odors | 3 | 0 |
| Steams clothes dry | 7 | 0 |
| Steaming in the dryer | 2 | 0 |
| Vapor/hot vapor | 1 | 1 |
| Showed steam | 0 | 1 |

The principal difference between perceptions of the test and of the control commercial were in mentions of steam, dominant after viewing the test commercial but almost absent among those who saw the control commercial. (The few mentions of steam in the latter group appear to have been produced by visual elements of the control commercial that suggested steam[8].) In addition, respondents exposed to the test commercial were impressed by the commercial's statement that clothes would be ready to wear in 15 minutes.

---

[8] Alternatively, as in all tests of ad campaigns that have actually been aired, a few respondents may be reporting their recall of the test commercial from their normal viewing experience.

Similarly, in responding to the second open-ended question, "What else, if anything, did the commercial say, show or imply?", the main difference between the playback in the test and control group was in mentions of steam, and in playback that clothes would be ready to wear in 15 minutes.

### Q. 2    What Else Commercial Said, Showed, Implied

|  | Saw Test Commercial | Saw Control Commercial |
|---|---|---|
| *Base: Total Respondents* | (207) | (206) |
|  | % | % |
| It's a washer/dryer combo | 13 | 6 |
| Made by Whirlpool | 12 | 6 |
| Ready to wear in 15 minutes | 24 | 0 |
| Removes/relaxes wrinkles | 12 | 16 |
| <u>Steam – net total of all mentions</u> | <u>24</u> | <u>3</u> |
| Utilizes steam | 13 | 0 |
| Steams out wrinkles | 6 | 1 |
| Steams out odors | 4 | 1 |
| Steams clothes dry | 3 | 1 |
| Steaming in the dryer | 1 | 1 |
| Vapor/hot vapor | 0 | 0 |
| Showed steam | 0 | 1 |

When next asked whether the commercial said, showed or implied any unique feature of the advertised dryer, 72% of test group and 45% of control group respondents answered affirmatively. Although only these respondents were asked to say what this unique feature was, the results are displayed below based on total respondents in order to facilitate a meaningful comparison between the test and control groups.

Playback about steam continues to be the chief differentiator between the test and the control commercial. The mention of clothes being ready to wear in 15 minutes, which comes up as a unique feature after exposure to the test commercial is matched by an equal number of mentions of removing or relaxing wrinkles as a unique feature perceived by control group respondents.

**Q. 3b/c  What Commercial Said, Showed, Implied about a Unique Feature**

|  | Saw Test Commercial | Saw Control Commercial |
|---|---|---|
| Base: Total Respondents | (207) | (206) |
|  | % | % |
| It's a washer/dryer combo | 6 | 2 |
| Made by Whirlpool | 3 | 1 |
| Ready to wear in 15 minutes | 27 | 0 |
| Removes/relaxes wrinkles | 13 | 27 |
| Steam – net total of all mentions | 54 | 7 |
| Utilizes steam | 19 | 2 |
| Steams out wrinkles | 18 | 5 |
| Steams out odors | 7 | 3 |
| Steams clothes dry | 5 | 1 |
| Steaming in the dryer | 1 | 0 |
| Vapor/hot vapor | 1 | 0 |
| Showed steam | 0 | 0 |

Taking into account playback across all of the study's open-ended questions, mentions of steam emerge as by far the most important feature of the playback about the test commercial, and the feature that most clearly differentiates between the test and control commercials. More than two-thirds of test group respondents but only 11% of control group respondents said anything in answer to any open-ended question about steam.

In the test group, the mentions about steam are principally functional in nature; the dryer utilizes steam, steams out wrinkles and/or odors, steams clothes dry. In the control group, the few mentions of steam are scattered across not only these functional ideas but comprised also visual aspects concerning what the commercial showed.

A specific feature of a product, such as steam in the case of the test commercial, to be mentioned unaided by more than two thirds of consumers, makes for an exceptionally noteworthy feature of the product. Experience shows that an element mentioned by half or more of respondents in a study such as this represents an important and memorable element of the product or service being promoted by the advertising.

### Summary of Open-Ended Responses

|  | Saw Test Commercial | Saw Control Commercial |
|---|---|---|
| *Base: Total Respondents* | (207) % | (206) % |
| It's a washer/dryer combo | 43 | 43 |
| Made by Whirlpool | 37 | 37 |
| Ready to wear in 15 minutes | 55 | 0 |
| Removes/relaxes wrinkles | 30 | 44 |
| Steam – net total of all mentions | <u>68</u> | <u>11</u> |
|     Utilizes steam | 33 | 4 |
|     Steams out wrinkles | 25 | 5 |
|     Steams out odors | 12 | 3 |
|     Steams clothes dry | 11 | 2 |
|     Steaming in the dryer | 5 | 1 |
|     Vapor/hot vapor | 1 | 1 |
|     Showed steam | 0 | 1 |

Although more than two-thirds of test group respondents (and only 11% of control group respondents) spoke about steam, the purpose of the study included an understanding of whether in talking about steam respondents meant that the dryer injects a hot vapor onto clothes, and not that it injects a mist of cold water that is then heated by the normal action of the dryer. It was anticipated that respondents would not articulate anything about this distinction in response to general, open-ended questions.

A closed-ended question was accordingly asked. This question presented descriptions of two dryers, one of which injects a hot vapor onto clothes, while the other injects a mist of cold water which is heated by the dryer's normal heating action. Respondents were asked whether the commercial they saw could only be for the dryer which injects a hot vapor onto clothes, or could only be for the dryer which injects a mist of cold water, or could be for both or could not be for either of these dryers. (The "don't know" option was also provided, and the possible answers were labeled and rotated so as to avoid label and order bias, as more fully detailed above, at p. 11.) The responses clearly show that the test commercial overwhelmingly conveyed the impression that the advertised steam dryer relies on a hot vapor which is injected onto clothes and not a mist of cold water which is then heated by the normal action of the dryer.

|  | Saw Test Commercial | Saw Control Commercial |
|---|---|---|
| Base: Total Respondents | (207) | (206) |
|  | % | % |
| Could be for hot vapor only | 55.6 | 20.9[9] |
| Could be for cold water mist only | 10.6 | 33.5 |
| Could be for either | 17.9 | 30.6 |
| Could not be for either | 10.1 | 5.3 |
| Don't know | 5.8 | 9.7 |

The responses also show that 66% of the test group respondents rejected the notion that the advertiser dryer uses mist of cold water that is heated after it is sprayed into the dryer drum: 56% (could be for hot vapor only) plus 10% (could not be for either).

---

[9] Significantly less than the corresponding figure for the test commercial, at the 95% level of confidence.

# APPENDIX A

## BIOGRAPHICAL BACKGROUND OF STUDY'S AUTHOR

*Robert N. Reitter*

## Employment

1990 -     Senior Vice-President, Guideline

- Designed and supervised more than five hundred surveys intended to withstand adversarial scrutiny, including Claims Substantiation, Trademark, Trade Dress, and Advertising Perception studies.

- Accepted on numerous occasions as an expert witness, and has had many surveys credited by Federal and State courts, by the U.S.P.T.O., Federal Trade Commission, the NAD (National Advertising Division of the Better Business Bureau) and the NARB (National Advertising Review Board).

1968 – 1990     President, Reitter, Wilkins & Associates, Inc.

- Planned and interpreted market research for companies in the food, beverage, fashion, and travel industries

1967 - 1968     Associate, Land-Reitter Associates

1966 - 1967     Assistant Director of Research, PKL Advertising

1963 - 1966     Product Research Assistant, General Foods Corporation

## Education

1962     Master of Industrial Administration, Yale University

1960     French National Scholar, University of Paris

1959     Bachelor of Arts *cum laude*, Yale College

*Testimony at Trial or by Deposition since 2004*

| 2004 | State of California v. Altaire | Superior Court of CA, Alameda |
|------|--------------------------------|------------------------------|
| 2004 | Diarama Trading Co. v. J. W. Thompson | USDC Southern District of NY |
| 2004 | Louis Vuitton v. Dooney & Bourke | USDC Southern District of NY |
| 2004 | Pilot Corp. v. Fisher-Price and Mattell | USDC District of Connecticut |
| 2004 | Starbucks Opposition to Lessbucks | U.S.P.T.O. |
| 2005 | Whirlpool Properties v. LG | USDC Western District of MI |
| 2005 | Schick v. The Gillette Company | USDC District of Connecticut |
| 2005 | Middleton v. Swisher | USDC Eastern District of PA |
| 2006 | IMIG, Inc. v. Electrolux | USDC Eastern District of NY |
| 2006 | Enterprise Rent-a-Car v. U-Haul | USDC Eastern District of MO |
| 2006 | Life is Good v. LG Electronics | USDC District of MA |
| 2006 | Monaco Coach v. Mitsubishi | U.S.P.T.O. |
| 2006 | Unique Sports v. Babolat | USDC Northern District of GA |
| 2006 | Kettle Foods v. Classic Foods | USDC Southern District of CA |
| 2007 | Louis Vuitton v. Dooney & Bourke | USDC Southern District of NY |
| 2007 | Sunscreen Cases (Rule 1550B) | Superior Court of California LA |
| 2007 | Verizon CA v. Maltuzi | USDC Central District of CA |
| 2008 | ComponentOne v. ComponentArt | USDC Western District of PA |
| 2008 | University of Kansas v. Joe College | USDC for the District of Kansas |

*Publications and Speeches since 1996*

<u>Implementation Issues in Claims Substantiation</u> Seminar at a meeting of the Advertising Research Foundation, New York, 1996

<u>What You Need to Know to Be Successful before the NAD</u> The 8th National Advanced Forum for Advertising Law, New York, 2001

<u>ASTM Standards for Claim Substantiation from a Research Practitioner's Perspective</u> Presentation to an ASTM Committee, Salt Lake City, 2004

<u>Survey Research and Dilution</u> Presentation to the Practicing Law Institute, New York, 2004

**APPENDIX B**

**QUESTIONNAIRE**

GUIDELINE
625 Avenue of the Americas
New York, NY 10011

Job #W25-0208

July 2008

# DRYER COMMERCIAL STUDY
## - SCREENER -

5 - 1

| MARKET: (6) | AGE: (7) | GENDER: (8) | COLOR: (9) |
|---|---|---|---|
| Atlanta .............................. 1 | | | |
| Chicago ............................ 2 | 18 - 34 .............1 | Male ................ 1 | Blue ................. 1 |
| Cincinnati........................... 3 | | | |
| Las Vegas ........................ 4 | 35 - 49 ............2 | Female............ 2 | Yellow.............. 2 |
| Los Angeles...................... 5 | | | |
| Miami................................. 6 | 50+ .................3 | | |
| Minneapolis ...................... 7 | | | |
| New York........................... 8 | | | |
| Oklahoma City .................. 9 | | | |
| Philadelphia ...................... 0 | | | |
| Seattle .............................. X | | | |
| Trumbull, CT.................... Y | | | |

---

**SIGHT SCREEN FOR MEN AND WOMEN 18 YEARS OF AGE OR OVER**

---

Hello, I'm _____ of Guideline, a national market research organization. We're conducting a survey in your area and I'd like to ask you a few brief questions.

A. But first, do you or does any member of your immediate household work in ... *(Read list and record "Yes" or "No" for each).*

| | Yes | No |
|---|---|---|
| Market research ................................................ | 1 | ............ 1 |
| Advertising ....................................................... | 2 | ............ 2 |
| For a manufacturer of home appliances .............. | 3 | ............ 3 |
| For a store that sells home appliances ................ | 4 | ............ 4 |

**Terminate if "Yes" to any boxed occupation listed above. Record in box below. Erase and re-use screener.**

**Terminate Q. A: Related Occupation** ----------------------- 1 2 3 4 5 6 7 8 9 (10)

*Terminates at Q. A do **not** count towards screening quota.*

B.    And which of the following includes your age?  Are you ... *(Read list.)*

A.  Under 18........    1 → | *Terminate.  Circle in box below.  Erase and re-use Screener.*

B.  18 - 34 years..    2
C.  35 - 49 years    3 → | *Check quotas.  If needed continue.  If over quota, terminate.  Circle in box below.  Erase and re-use screener.*
D.  50 years & over    4

**(DO NOT READ)**
Refused...............    X → | *Terminate.  Circle in box below.  Erase and re-use Screener.*

| *Terminate Q. B:  Under Age/Over Quota/Refused------  * 1  2  3  4  5  6  7  8  9 (11) |
| --- |
| *Terminates at Q. B do not count towards screening quota.* |

---

*(Hand respondent Card C)*

C.    When it comes to purchasing home appliances, which of the statements on this card best describes your own role within your household?

                                             (12)

You decide what brand and model of appliance to purchase ................  1

You are involved with other household members in deciding what brand and model of appliances to purchase.....................................................  2

You play no role in deciding what brand and model of appliances to purchase......................................................................................  3

| *Respondent must select a boxed response to continue.  All others, terminate, record in appropriate box below, erase and re-use screener.* |
| --- |

| *Terminate Q. C:  Not a decision maker* | | | | | | | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **_MALES_** | | | | | | | | | | | **_FEMALES_** | | | | | | | | | | |
| **18 - 34** | | | | | | | | | | | **18 - 34** | | | | | | | | | | |
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | (13, | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | (19, |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 14) | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 20) |
| **35 - 49** | | | | | | | | | | | **35 - 49** | | | | | | | | | | |
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | (15, | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | (21, |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 16) | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 22) |
| **50 or older** | | | | | | | | | | | **50 or older** | | | | | | | | | | |
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | (17, | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | (23, |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 18) | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 24) |
| *Terminates at Q. C do count toward screening quota.* | | | | | | | | | | | | | | | | | | | | | |

*(Take back Card C)*

D.  Which of the following home appliances, if any, have you yourself purchased or been involved in purchasing in the past 12 months?  *(Read list.  Record for each "yes" below under Column Q. D.)*

E.  And, which of the following home appliances, if any, are you likely to purchase or be involved in purchasing in the next 12 months?  *(Record for each "yes" below under Column Q. E.)*

| | Q. D<br>Bought In<br>Past 12 Months<br>(25) | Q. E<br>Likely to Buy<br>In Next 12 Months<br>(26) |
|---|---|---|
| A refrigerator | 1 | 1 |
| A vacuum cleaner | 2 | 2 |
| A dishwasher | 3 | 3 |
| A clothes washer | 4 | 4 |
| A clothes dryer | .5 | .5 |

*Respondent must say "yes" to "clothes dryer" in either Q. D OR Q. E OR both to continue.  All others, terminate, record in appropriate box below, erase and re-use screener.*

| Terminate Q.D/E: | Has not bought a clothes dryer in past 12 months and is not likely to buy in next 12 months |
|---|---|

| **MALES** | | **FEMALES** | |
|---|---|---|---|
| **18 - 34** | | **18 - 34** | |
| 01  02  03  04  05  06  07  08  09  10<br>11  12  13  14  15  16  17  18  19  20 | (27,<br>28) | 01  02  03  04  05  06  07  08  09  10<br>11  12  13  14  15  16  17  18  19  20 | (33,<br>34) |
| **35 - 49** | | **35 - 49** | |
| 01  02  03  04  05  06  07  08  09  10<br>11  12  13  14  15  16  17  18  19  20 | (29,<br>30) | 01  02  03  04  05  06  07  08  09  10<br>11  12  13  14  15  16  17  18  19  20 | (35,<br>36) |
| **50 or older** | | **50 or older** | |
| 01  02  03  04  05  06  07  08  09  10<br>11  12  13  14  15  16  17  18  19  20 | (31,<br>32) | 01  02  03  04  05  06  07  08  09  10<br>11  12  13  14  15  16  17  18  19  20 | (37,<br>38) |

*Terminates at Q. D/E do count toward screening quota.*

CARD 1 Cont'd

F.   When purchasing appliances such as clothes washers and dryers, do you ... *(read list)* ?

(39)

Always purchase the least expensive appliances you can find ............... 1

Sometimes purchase the least expensive and sometimes purchase
medium-priced appliances .................................................................. 2

Purchase medium-priced appliances only ................................................ 3

Sometimes purchase medium-priced and sometimes purchase
premium-priced appliances .............................................................. | 4 |

Purchase premium-priced appliances only, or ....................................... | 5 |

Purchase appliances of all price levels ................................................. | 6 |

---

*Respondent must select a boxed response to continue. All others, terminate, record in appropriate box below, erase and re-use screener.*

---

| Terminate Q. F: Never purchase premium-priced appliances | |
|---|---|
| **MALES** | **FEMALES** |
| **18 - 34** | **18 - 34** |
| 01  02  03  04  05  06  07  08  09  10 (40, <br> 11  12  13  14  15  16  17  18  19  20  41) | 01  02  03  04  05  06  07  08  09  10 (46, <br> 11  12  13  14  15  16  17  18  19  20  47) |
| **35 - 49** | **35 - 49** |
| 01  02  03  04  05  06  07  08  09  10 (42, <br> 11  12  13  14  15  16  17  18  19  20  43) | 01  02  03  04  05  06  07  08  09  10 (48, <br> 11  12  13  14  15  16  17  18  19  20  49) |
| **50 or older** | **50 or older** |
| 01  02  03  04  05  06  07  08  09  10 (44, <br> 11  12  13  14  15  16  17  18  19  20  45) | 01  02  03  04  05  06  07  08  09  10 (50, <br> 11  12  13  14  15  16  17  18  19  20  51) |
| *Terminates at Q. F do count toward screening quota.* | |

G.   Do you usually wear eyeglasses or contacts when watching TV?

Yes.......................... 1  →  *(Ask Q. H)*
No .......................... 2  →  *(Skip to Q. I)*

H.   Do you have these eyeglasses or contacts with you?

Yes.......................... 1  →  *Must be circled to continue. If not, terminate, circle in box below. Erase and re-use screener.*

No .......................... 2

---

*Terminate Q. H: No Eyeglasses* ----------------------------- | 1  2  3  4  5  6  7  8  9 | (52)
*Terminates at Q. H do **not** count towards screening quota.*

I.  *Invite qualified respondent to interviewing facility. Go to main questionnaire same color as this screener. If qualified but refused, terminate. Circle next available number in box below. Erase and re-use screener. Terminates do __not__ count towards your screening quota.*

| *Terminate Q. I:  Qualified Refusal* -------------------------- | 1  2  3  4  5  6  7  8  9 | (53) |
|---|---|---|

*Terminates at Q. I do __not__ count towards screening quota.*

GUIDELINE
625 Avenue of the Americas
New York, NY  10011

JOB #W25-0208 [B1-x1]

July, 2008

| CARD 2 |
| --- |
| 5 - 2 |
| **BLUE** |

# D R Y E R   C O M M E R C I A L   S T U D Y
## - M A I N   Q U E S T I O N N A I R E –
### B L U E

---

**Seat respondent in front of the television screen, and say:**

---

I'm going to show you a commercial that you may or may not have seen before.  If you normally wear glasses or contact lenses when you watch TV please put them on.

---

**SHOW COMMERCIAL <u>COLOR DOTTED SAME AS THIS QUESTIONNAIRE</u> ONE TIME, THEN STOP TAPE.**

---

***(After commercial has been shown for the first time, say:)***
I'm going to show you the same commercial a second time, after which I'll be asking you some questions about it.  If you don't know the answer to any question I ask, it's okay to tell me so.

---

**SHOW COMMERCIAL A SECOND TIME, THEN REWIND TAPE.**

---

1.    What was the main idea of the commercial?  ***(Record verbatim)***

_____   6-

_____   7-

_____   8-

_____   9-

_____   10-

_____   11-

_____   12-

_____   13-

14-          16-          18-

15-          17-          19-

2.  What else, if anything, did the commercial say, show or imply?  *(Record verbatim)*

_____ 20-

_____ 21-

_____ 22-

_____ 23-

\* _____ 24-

_____ 25-

_____ 26-

_____ 27-

28-          30-          32-

29-          31-          33-

You may have mentioned this already, but the commercial showed both a washer and a dryer.   I'd now like to ask you specifically about the advertised dryer.

3a.  Did the commercial say, show or imply anything about any unique feature of the advertised dryer?

(34)

Yes.......................... 1

No ........................... 2  → *(Skip to 4)*

Don't know .............. 3

35 R

3b.  What did the commercial say, show or imply about any unique feature of the advertised dryer? *(Record verbatim)*

_____ 36-

_____ 37-

_____ 38-

_____ 39-

_____ 40-

_____ 41-

_____ 42-

3c.   Anything else?  *(Record verbatim)*

_____   43-

_____   44-

_____   45-

_____   46-

_____   47-

_____   48-

_____   49-

| 50 – 56R |

**[Tear off last page of this questionnaire, hand it to the respondent and say:]**

4.   Now, I'm going to show you descriptions of two dryers.  Assume that both dryers have clothes in them.  Please read along as I read these descriptions to you.  *(Read both descriptions aloud.)*

---

**DRYER A**

**A mist of cold water is injected into the heated dryer drum.  The dryer then heats the water and tumbles the clothes until dry.**

**DRYER B**

**A hot vapor is injected onto clothes inside the dryer drum.  The dryer then heats and tumbles the clothes until dry.**

---

**[Leave description page in front of respondent and ask:]**

5.   Thinking of the commercial you just saw and what it said, showed or implied about the advertised dryer, do you think the commercial … *[Read statements, starting with X'd statement.  Read all statements before accepting a response.]*

|  | <u>Start</u> |  | (57) |
|---|---|---|---|
| [ **X** ] | Could be for Dryer A only............................................. | 1 |
| [   ] | Could be for Dryer B only............................................. | 2 |
| [   ] | Could be for either Dryer A or Dryer B .......................... | 3 |
| [   ] | Could not be for either Dryer A or Dryer B .................... | 4 |
| *(Always read last)>* | or, don't you know...................................................... | 5 |

**[Re-staple description page to back of Main Questionnaire]**

| 58 - 1 |
| 59 - 80 R |

**COMPLETE CERTIFICATION PAGE**

# CERTIFICATION PAGE

[PRINT]
RESPONDENT'S FULL NAME:_____

ADDRESS:_____

CITY: _____ STATE:_____ ZIP: _____

TELEPHONE: ( ):_____

INTERVIEWER: _____ DATE:_____

**RESPONDENT:  PLEASE READ AND SIGN**

I acknowledge that I was interviewed on this date.  During this interview I was shown a commercial twice and was asked some questions about it.

RESPONDENT'S SIGNATURE: _____

DATE: _____

_____

**INTERVIEWER:  PLEASE READ AND SIGN**

I certify that I conducted this interview in accordance with the written instructions which I received as well as my supervisor's briefing.

INTERVIEWER'S SIGNATURE: _____

DATE: _____

_____

**SUPERVISOR:  PLEASE READ AND SIGN**

I certify that I observed this interview and that it was conducted in accordance with the briefing instructions.

SUPERVISOR'S SIGNATURE: _____

DATE: _____

**DRYER A**

A mist of cold water is injected into the heated dryer drum. The dryer then heats the water and tumbles the clothes until dry.

**DRYER B**

A hot vapor is injected onto clothes inside the dryer drum. The dryer then heats and tumbles the clothes until dry.

GUIDELINE
625 Avenue of the Americas
New York, NY   10011

JOB #W25-0208 [B1-x3]

July, 2008

| CARD 2 |
| --- |
| 5 - 2 |
| **BLUE** |

# D R Y E R   C O M M E R C I A L   S T U D Y
## - M A I N   Q U E S T I O N N A I R E –
### B L U E

> **Seat respondent in front of the television screen, and say:**

I'm going to show you a commercial that you may or may not have seen before.  If you normally wear glasses or contact lenses when you watch TV please put them on.

**SHOW COMMERCIAL <u>COLOR DOTTED SAME AS THIS QUESTIONNAIRE</u> ONE TIME, THEN STOP TAPE.**

**(After commercial has been shown for the first time, say:)**
I'm going to show you the same commercial a second time, after which I'll be asking you some questions about it.  If you don't know the answer to any question I ask, it's okay to tell me so.

**SHOW COMMERCIAL A SECOND TIME, THEN REWIND TAPE.**

1.    What was the main idea of the commercial?  **(Record verbatim)**

_____   6-

_____   7-

_____   8-

_____   9-

_____   10-

_____   11-

_____   12-

_____   13-

14-                      16-                      18-
15-                      17-                      19-

2.    What else, if anything, did the commercial say, show or imply?  *(Record verbatim)*

_____    20-

_____    21-

_____    22-

_____    23-

_____    24-

_____    25-

_____    26-

_____    27-

28-            30-            32-
29-            31-            33-

You may have mentioned this already, but the commercial showed both a washer and a dryer.   I'd now like to ask you specifically about the advertised dryer.

3a.    Did the commercial say, show or imply anything about any unique feature of the advertised dryer?

(34)

Yes........................... 1
No ........................... 2   → *(Skip to 4)*
Don't know .............. 3

| 35 R |

3b.    What did the commercial say, show or imply about any unique feature of the advertised dryer? *(Record verbatim)*

_____    36-

_____    37-

_____    38-

_____    39-

_____    40-

_____    41-

_____    42-

3c.   Anything else? *(Record verbatim)*

_____    43-

_____    44-

_____    45-

_____    46-

_____    47-

_____    48-

_____    49-

| 50 – 56R |

**[Tear off last page of this questionnaire, hand it to the respondent and say:]**

4.   Now, I'm going to show you descriptions of two dryers.  Assume that both dryers have clothes in them.  Please read along as I read these descriptions to you. *(Read both descriptions aloud.)*

---

**DRYER A**

    **A mist of cold water is injected into the heated dryer drum.  The dryer then heats the water and tumbles the clothes until dry.**

**DRYER B**

    **A hot vapor is injected onto clothes inside the dryer drum.  The dryer then heats and tumbles the clothes until dry.**

---

**[Leave description page in front of respondent and ask:]**

5.   Thinking of the commercial you just saw and what it said, showed or implied about the advertised dryer, do you think the commercial … *[Read statements, starting with X'd statement.  Read all statements before accepting a response.]*

| | **Start** | | (57) |
|---|---|---|---|
| | [   ] | Could be for Dryer A only............................................... | 1 |
| | [   ] | Could be for Dryer B only............................................... | 2 |
| | [ **X** ] | Could be for either Dryer A or Dryer B ......................... | 3 |
| | [   ] | Could not be for either Dryer A or Dryer B ................... | 4 |
| *(Always read last)>* | | or, don't you know...................................................... | 5 |

**[Re-staple** description page to back of Main Questionnaire]

| 58 - 1 |
| 59 - 80 R |

---

**COMPLETE CERTIFICATION PAGE**

---

# CERTIFICATION PAGE

[PRINT]
RESPONDENT'S FULL NAME:_____

ADDRESS:_____

CITY: _____ STATE:_____ ZIP: _____

TELEPHONE: (_____):_____

INTERVIEWER: _____ DATE:_____

**RESPONDENT:  PLEASE READ AND SIGN**

I acknowledge that I was interviewed on this date.  During this interview I was shown a
commercial twice and was asked some questions about it.

RESPONDENT'S SIGNATURE: _____

DATE: _____

_____

**INTERVIEWER:  PLEASE READ AND SIGN**

I certify that I conducted this interview in accordance with the written instructions which I
received as well as my supervisor's briefing.

INTERVIEWER'S SIGNATURE: _____

DATE: _____

_____

**SUPERVISOR:  PLEASE READ AND SIGN**

I certify that I observed this interview and that it was conducted in accordance with the briefing
instructions.

SUPERVISOR'S SIGNATURE: _____

DATE: _____

**DRYER A**

  **A mist of cold water is injected into the heated dryer drum.  The dryer then heats the water and tumbles the clothes until dry.**

**DRYER B**

  **A hot vapor is injected onto clothes inside the dryer drum.  The dryer then heats and tumbles the clothes until dry.**

GUIDELINE
625 Avenue of the Americas
New York, NY  10011

JOB #W25-0208 [B2-x1]

July, 2008

| CARD 2 |
|---|
| 5 - 2 |
| **BLUE** |

# D R Y E R   C O M M E R C I A L   S T U D Y
## - M A I N   Q U E S T I O N N A I R E -
### B L U E

---

**Seat respondent in front of the television screen, and say:**

I'm going to show you a commercial that you may or may not have seen before.  If you normally wear glasses or contact lenses when you watch TV please put them on.

---

**SHOW COMMERCIAL <u>COLOR DOTTED SAME AS THIS QUESTIONNAIRE</u> ONE TIME, THEN STOP TAPE.**

---

*(After commercial has been shown for the first time, say:)*
I'm going to show you the same commercial a second time, after which I'll be asking you some questions about it.  If you don't know the answer to any question I ask, it's okay to tell me so.

---

**SHOW COMMERCIAL A SECOND TIME, THEN REWIND TAPE.**

---

1.    What was the main idea of the commercial?  *(Record verbatim)*

_____   6-

_____   7-

_____   8-

_____   9-

_____   10-

_____   11-

_____   12-

_____   13-

14-                     16-                     18-

15-                     17-                     19-

2.  What else, if anything, did the commercial say, show or imply?  *(Record verbatim)*

_____  20-

_____  21-

_____  22-

_____  23-

_____  24-

_____  25-

_____  26-

_____  27-

    28-            30-            32-

    29-            31-            33-


You may have mentioned this already, but the commercial showed both a washer and a dryer.   I'd now like to ask you specifically about the advertised dryer.

3a.  Did the commercial say, show or imply anything about any unique feature of the advertised dryer?

                              (34)
        Yes........................    1
        No .........................   2     →   *(Skip to 4)*
        Don't know .............      3

                                            | 35 R |

3b.  What did the commercial say, show or imply about any unique feature of the advertised dryer?  *(Record verbatim)*

_____  36-

_____  37-

_____  38-

_____  39-

_____  40-

_____  41-

_____  42-

3c.     Anything else?  *(Record verbatim)*

_____ 43-

_____ 44-

_____ 45-

_____ 46-

_____ 47-

_____ 48-

_____ 49-

50 – 56R

**[Tear off last page of this questionnaire, hand it to the respondent and say:]**

4.      Now, I'm going to show you descriptions of two dryers.  Assume that both dryers have clothes in them. Please read along as I read these descriptions to you.  *(Read both descriptions aloud.)*

**DRYER A**

   **A hot vapor is injected onto clothes inside the dryer drum.  The dryer then heats and tumbles the clothes until dry.**

**DRYER B**

   **A mist of cold water is injected into the heated dryer drum.  The dryer then heats the water and tumbles the clothes until dry.**

**[Leave description page in front of respondent and ask:]**

5.      Thinking of the commercial you just saw and what it said, showed or implied about the advertised dryer, do you think the commercial … *[Read statements, starting with X'd statement.  Read all statements before accepting a response.]*

<u>Start</u>                                                            (57)

[ **X** ]  Could be for Dryer A only............................................. 1

[    ]  Could be for Dryer B only............................................. 2

[    ]  Could be for either Dryer A or Dryer B ........................ 3

[    ]  Could not be for either Dryer A or Dryer B .................. 4

*(Always read last)*->  or, don't you know....................................................... 5

**[Re-staple** description page to back of Main Questionnaire]

58 - 2

59 - 80 R

**COMPLETE CERTIFICATION PAGE**

# CERTIFICATION PAGE

[PRINT]
RESPONDENT'S FULL NAME:_____

ADDRESS:_____

CITY: _____ STATE:_____ ZIP: _____

TELEPHONE:  (_____):_____

INTERVIEWER: _____ DATE:_____

**RESPONDENT:  PLEASE READ AND SIGN**

I acknowledge that I was interviewed on this date.  During this interview I was shown a commercial twice and was asked some questions about it.

RESPONDENT'S SIGNATURE: _____

DATE: _____

_____

**INTERVIEWER:  PLEASE READ AND SIGN**

I certify that I conducted this interview in accordance with the written instructions which I received as well as my supervisor's briefing.

INTERVIEWER'S SIGNATURE: _____

DATE: _____

_____

**SUPERVISOR:  PLEASE READ AND SIGN**

I certify that I observed this interview and that it was conducted in accordance with the briefing instructions.

SUPERVISOR'S SIGNATURE: _____

DATE: _____

**DRYER A**

A hot vapor is injected onto clothes inside the dryer drum. The dryer then heats and tumbles the clothes until dry.

**DRYER B**

A mist of cold water is injected into the heated dryer drum. The dryer then heats the water and tumbles the clothes until dry.

GUIDELINE                                                    JOB #W25-0208 [B2-x3]
625 Avenue of the Americas
New York, NY   10011                                         July, 2008

| CARD 2 |
|--------|
| 5 - 2 |
| **BLUE** |

# D R Y E R   C O M M E R C I A L   S T U D Y
## - M A I N   Q U E S T I O N N A I R E –
### B L U E

---

**Seat respondent in front of the television screen, and say:**

I'm going to show you a commercial that you may or may not have seen before.  If you normally wear glasses or contact lenses when you watch TV please put them on.

**SHOW COMMERCIAL <u>COLOR DOTTED SAME AS THIS QUESTIONNAIRE</u> ONE TIME, THEN STOP TAPE.**

**(After commercial has been shown for the first time, say:)**
I'm going to show you the same commercial a second time, after which I'll be asking you some questions about it.  If you don't know the answer to any question I ask, it's okay to tell me so.

**SHOW COMMERCIAL A SECOND TIME, THEN REWIND TAPE.**

1.    What was the main idea of the commercial?  **(Record verbatim)**

_____   6-

_____   7-

_____   8-

_____   9-

_____   10-

_____   11-

_____   12-

_____   13-

14-                16-                18-

15-                17-                19-

2.      What else, if anything, did the commercial say, show or imply?  **(Record verbatim)**

_____  20-

_____  21-

_____  22-

_____  23-

_____  24-

_____  25-

_____  26-

_____  27-

| 28- | 30- | 32- |
|-----|-----|-----|
| 29- | 31- | 33- |

You may have mentioned this already, but the commercial showed both a washer and a dryer.   I'd now like to ask you specifically about the advertised dryer.

3a.     Did the commercial say, show or imply anything about any unique feature of the advertised dryer?

(34)

Yes........................... 1

No .......................... 2 → **(Skip to 4)**

Don't know .............. 3

35 R

3b.     What did the commercial say, show or imply about any unique feature of the advertised dryer? **(Record verbatim)**

_____  36-

_____  37-

_____  38-

_____  39-

_____  40-

_____  41-

_____  42-

3c.     Anything else?  *(Record verbatim)*

_____     43-

_____     44-

_____     45-

_____     46-

_____     47-

_____     48-

_____     49-

| 50 – 56R |

**[Tear off last page of this questionnaire, hand it to the respondent and say:]**

4.      Now, I'm going to show you descriptions of two dryers.  Assume that both dryers have clothes in them. Please read along as I read these descriptions to you.  *(Read both descriptions aloud.)*

---

**DRYER A**

   **A hot vapor is injected onto clothes inside the dryer drum.  The dryer then heats and tumbles the clothes until dry.**

**DRYER B**

   **A mist of cold water is injected into the heated dryer drum.  The dryer then heats the water and tumbles the clothes until dry.**

---

**[Leave description page in front of respondent and ask:]**

5.      Thinking of the commercial you just saw and what it said, showed or implied about the advertised dryer, do you think the commercial … *[Read statements, starting with X'd statement.  Read all statements before accepting a response.]*

     <u>Start</u>                                                                (57)

     [    ]   Could be for Dryer A only............................................. 1

     [    ]   Could be for Dryer B only............................................. 2

     [ **X** ]   Could be for either Dryer A or Dryer B ...................... 3

     [    ]   Could not be for either Dryer A or Dryer B ................... 4

     *(Always read*
     *last)->*      or, don't you know...................................................... 5

     **[Re-staple** description page to back of Main Questionnaire]

| 58 - 2 |
| 59 - 80 R |

**COMPLETE CERTIFICATION PAGE**

# CERTIFICATION PAGE

[PRINT]
RESPONDENT'S FULL NAME:_____

ADDRESS:_____

CITY: _____ STATE:_____ ZIP: _____

TELEPHONE:  (_____):_____

INTERVIEWER: _____ DATE:_____

**RESPONDENT:  PLEASE READ AND SIGN**

I acknowledge that I was interviewed on this date.  During this interview I was shown a commercial twice and was asked some questions about it.

RESPONDENT'S SIGNATURE: _____

DATE: _____

**INTERVIEWER:  PLEASE READ AND SIGN**

I certify that I conducted this interview in accordance with the written instructions which I received as well as my supervisor's briefing.

INTERVIEWER'S SIGNATURE: _____

DATE: _____

**SUPERVISOR:  PLEASE READ AND SIGN**

I certify that I observed this interview and that it was conducted in accordance with the briefing instructions.

SUPERVISOR'S SIGNATURE: _____

DATE: _____

**DRYER A**

A hot vapor is injected onto clothes inside the dryer drum. The dryer then heats and tumbles the clothes until dry.

**DRYER B**

A mist of cold water is injected into the heated dryer drum. The dryer then heats the water and tumbles the clothes until dry.

# APPENDIX C

# FIELD INSTRUCTIONS



Guideline —

Job #W25-0208
Dryer Commercial Study
July, 2008

Dear Supervisor:

Enclosed are the following materials for the "Dryer Commercial Study":

- Screeners (Blue and Yellow)
- Main Questionnaires (Blue - 4 versions interleaved/Yellow - 4 versions interleaved)
- Hand Card C
- Video Commercials (dotted blue or dotted yellow)
- Interviewer's Instructions
- Screening Quota Control Sheet (Blue and Yellow)
- Progress Report Sheet (Blue and Yellow)
- Practice Interview (Tan)
- Validation Listing Sheet

## OVERVIEW
This is a two cell test to be conducted in a permanent enclosed mall facility.

You will be sight screening in the mall for males and females **18+** *years of age.*
Qualified respondents will then be escorted back to the interviewing facility to be shown a commercial and asked some questions about it.

## STAFF

All interviewers while screening and interviewing on this study are not to be screening or interviewing on any other study.

## BRIEFING

Field supervisors must have read and examined all materials to be completely prepared for the study. The field supervisor must be present at the briefing and be present for all days of interviewing on the study. In addition, the supervisor must observe at least 15% or 1 or 2 interviews, whichever is greater per interviewer. The supervisor is to sign the Certification Page for every interview they have observed. A field kit of all paper materials must be supplied for each participant at the briefing.

**Each interviewer is to read his/her Interviewer Instructions and sign them. Also, a personal briefing is required.** If possible, one briefing should be conducted. All interviewers must do at least one Practice Interview.

PLEASE STRESS THE FOLLOWING:
  (1) SHOWING THE COMMERCIAL TWICE AS INDICATED ON THE MAIN QUESTIONNAIRE
  (2) TEAR OFF LAST PAGE (PRODUCT DESCRIPTION PAGE) AND HAND TO THE RESPONDENT AT Q.4 AND THEN RESTAPLE PAGE TO THE BACK OF THE MAIN QUESTIONNAIRE AFTER Q.5.
  (3) DO NOT PROBE BEYOND WHAT IS SHOWN ON THE QUESTIONNAIRE.
  (4) WRITING RESPONSES FULLY AND CLEARLY ON THE MAIN QUESTIONNARIE.
  (5) PROBE FOR SPECIFICS IF RESPONDENT GIVES ONLY A VAGUE OR ONE-WORD ANSWER TO AN OPEN-ENDED QUESTION.

All practice interviews must be looked over by you-- and any questions cleared up -- before any actual interviewing is begun. (Each interviewer's signed Instructions are to be stapled to the Practice interview and returned to Guideline at the end of the study.).

## QUALITY CONTROL PROCEDURES

> **ANY WORK RECEIVED BY OUR OFFICE, WHICH HAS NOT BEEN SUBJECT TO THE FOLLOWING PROCEDURES, WILL BE SUBJECT TO A PAYMENT ADJUSTMENT.**

Strict quality control is a primary Supervisor responsibility. Guideline requires that the following quality controls be strictly followed:

* This study must be screened by itself, not along with any other projects.

* No more than one respondent per shopping group should be screened.

* Friends, relatives or acquaintances must NOT be interviewed.

* The supervisor is expected to observe 15% of the interviews or 1-2 per interviewer, whichever is greater.

* Except for the interviewer (and supervisor for the interviews being observed) no one else is to be in the interviewing room with the respondent.

* Anyone accompanying the respondent must wait for the respondent in the waiting room.

* Be sure the respondent does not see the COMMERCIALS before it is indicated to be shown.

* Interviewing should not be conducted with anyone who has a hearing, visual or English language problem.

## SECURITY INSTRUCTIONS

* All materials related to this study are the property of Guideline and our client.

* You are responsible for all materials being used on this study; all materials are to be kept out of sight of anyone not directly involved in the study.

* No one representing Guideline or our client is to be admitted to the facility or have access to the materials without you first calling Guideline to confirm. Further, no one is to be permitted access to the facility or materials without showing satisfactory identification.

## EDITING

All work should be edited soon after completion in order to spot errors and quickly bring them to an interviewer's attention.

In editing check for:

- <u>Completeness including market</u> on the front of each screener of each completed questionnaire
- <u>Following proper skip patterns exactly</u>.
- Verbatim capture of comments. (See "Open-Ended Responses" on Interviewers Instructions.)
- Legible handwriting
- Certification page filled out by interviewer and respondent.

If an interviewer appears not to be following instructions exactly, please alert him/her to that as soon as possible and take remedial action if needed.

## VALIDATION

- List only <u>ONE</u> interviewer's work on a validation sheet.

- Fill out all required respondent information, interviewer name, city and quota group.

- Be sure about indicating <u>correct</u> area code for every respondent.

- Write listings in <u>black ink ONLY</u>.

- You are not to phone validate, since we will be independently validating 100% of every interviewer's work, as well as doing a duplicate number search.

- You must, however, monitor or do in-site validation for at least 10% of each interviewer's work and note validated work on Validation Listing Form.

- <u>Handling "No Phone" or "Refused Phone"</u>
  The Supervisor must attempt to do a telephone lookup for all respondents who do not give a phone number. If a number is <u>not</u> found, indicate that you have attempted a look-up by writing "L.U.".

## PROGRESS REPORTS

Enclosed are Progress Report Sheets for your convenience. Accurate cumulative reports are to be received by us each day the study continues. We are to <u>RECEIVE</u> them by <u>10:00 AM OUR TIME</u>.

- **FAX # 212-947-6294 (Preferred). Do <u>not</u> use a cover sheet, just fill in all the required information on the Progress Report Sheet. Be sure to write <u>your city</u> and <u>contact</u> name on each sheet of the report.**


## RETURNING WORK

- Completed interviews are to be bundled together by interviewer with that interviewer's Validation Sheet on the top of the pile.
- Completed interviews are to be stapled together in the following order:
-        1) SCREENER
-        2) MAIN QUESTIONNAIRE
- Bundle together all Screeners that contain a record of termination. Mark each screener "For Tallies Only". Label this bundle "<u>Screener -- Tallies Only</u>".
- Return all PRACTICE interviews.
- Enclose Master/Final Progress Report Forms.


## SHIPMENT/CHARGES

- Use the blank waybills provided as they contain our account # and address
- All shipments are to be send Federal Express Priority Overnight to Guideline and charged to our Federal Express Account #0100-0112-9 unless otherwise specified
- Insure packages for $500.00
- Indicate Job #W25-0208 on airbill for all shipments
- Important
  Since Guideline Research does not want to incur additional shipping charges, make sure that all items specified above are included with your completed questionnaires, unless otherwise specified. If you "forget" we will have to deduct the additional shipping charges from your bill.


## BILLING

Submit all bills under separate cover to the attention of our Accounting Department.


Thank you for your help with this survey.

Sincerely,



Nelly Valentin
Field Director

Guideline Inc.                                          Job #W25-0208
625 Avenue of the Americas                              Dryer Commercial Test
New York, New York 10011                                July, 2008
                    **INTERVIEWER INSTRUCTIONS**

INTERVIEWER'S NAME: _____ DATE: _____

BRIEFING SUPERVISOR: _____

## MATERIALS

- Screeners (Blue and Yellow)
- Main Questionnaires (Blue and Yellow)
- Video Commercials (dotted blue or dotted yellow)
- Practice Interviews
- Validation Listing Sheet

## OVERVIEW

This is a two cell test to be conducted in a permanent enclosed mall facility.

You will be sight screening in the mall for males and females **18+** *years of age.*
Qualified respondents will then be escorted back to the interviewing facility to be shown a commercial and
asked some questions about it.

## QUOTA ASSIGNMENT

Your supervisor will give you a quota assignment by age. Refer to the enclosed Master Quota Control Sheet to
determine your exact quota assignment.

## DO YOU HAVE A QUOTA FOR COMPLETED MAIN QUESTIONNAIRES?

No, you do not. You have a quota for screenings; we take completes "as they fall".

However, we always have a "target" number of completes which we hope will fall in. If we fall significantly
short of this number, we may ask you to do additional screenings.

You are to do exactly the number of screenings assigned by age: NO MORE, NO LESS.

## WHAT COUNTS TOWARD YOUR SCREENING QUOTA

The questions on the Screener clearly state whether or not they count toward your screening quota.

IMPORTANT:

Because you have a screening quota by gender and age, all terminated questions that count toward your quota have termination boxes that are also broken down by gender and age. It is imperative that when terminating a respondent you circle the next available number in the appropriate gender and age group for that terminated respondent. This is the only way you will be able to accurately keep track of your screening quotas by gender and age.

## POSSIBLE COMMON MISTAKES TO AVOID IN USING THIS PROCEDURE

- Conducting too many screenings (by gender and age).
- Using a separate tally sheet to record terminates and not recording terminates directly on the screener in the boxed area.
- Mistaking terminated screenings (ineligible respondents) for completed interviews.
- Mistaking total screening assignment for total quota of interviews to be completed.

## ELIGIBILITY

An eligible respondent is a male or female who meets the following requirements:

- Respondent must pass occupational security (Q. A).
- Respondent must be 18+ years of age and needed for your screening quota (Q. B).
- Respondent must decide what brand and model of appliance to purchase for the household and/or be involved with other household members in deciding what brand and model of appliance to purchase (Q.C)
- Respondent must have purchased or been involved in purchasing a clothes dryer in the past 12 months or is likely to do so in the next 12 months (Q.D/QE)
- Respondent when purchasing appliances such as clothes washer and dryers, purchases appliances that are medium priced, premium priced or all price levels (QF)
- Respondent must have glasses/contact lenses with them if worn when watching TV (Q. G/H)
- Respondent must be willing to participate (Q. I)

## QUALITY ASSURANCE IN SCREENING

- Do not interview friends, relatives or acquaintances.
- When screening for this study you must not screen for any other study at the same time.
- Only one potential respondent in a group of people may be screened.
- Only one potential respondent is to be in the interviewing room at the time of the interview.
- Anyone accompanying the respondent must wait for the respondent in the waiting room.
- Do not proceed to interview anyone who has a hearing, visual or English language problem.

# MAIN QUESTIONNAIRE

## GENERAL GUIDELINES

- Read introductions and <u>all</u> questions exactly as written.
- Always give respondents enough time to answer.
- Mark answers clearly and write <u>clearly</u>
- When questionnaire calls for you to show the commercial under no circumstances are you to discuss the commercial. Read the questions referring to the ad verbatim as written, always referring to the commercials AND SAYING WHAT THE QUESTIONNAIRE STATES.

## OPEN ENDED RESPONSES

- Read open-ended questions slowly and ask respondent to slow down if you cannot write quickly enough. **WE NEED EXACT VERBATIM RESPONSES.** Capture comments exactly as respondent states them -- **never summarize or paraphrase.**
- Capture comments in the words of the respondent. <u>Do not say</u> "she said…" or "she felt…" rather; just write down exactly what the respondent says.
- If respondent says, "I have already answered the question", or "same", do not write this –instead, ask them to repeat their answer and write it verbatim.
- Give respondent sufficient time to think and answer a question before continuing.
- Never reword the questions. Simply repeat the question if the respondent indicates that she does not understand. **DO NOT** attempt to explain any questions.
- Please write clearly. Answers to the open end questions are important to this study and will be carefully read.
- However, if respondents gives you a vague or one-word answer, probe for specifics, for example, ask: "What do you mean by …?"
- Do not probe with additional "what else?" questions beyond what is shown on the questionnaire.

## SCREENER QUESTION BY QUESTION INSTRUCTIONS

<u>SCREENER:</u>

Be sure you are familiar with the circle screener method of termination. If you are not, ask your supervisor to explain it to you. For any answers which disqualify the respondent, you are to circle the next available number in the termination box, erase and re-use screener. Do <u>NOT</u> erase any of the circles around the numbers in the termination boxes. If all the numbers in a termination box have been circled before you contact a qualified, willing respondent, you are to return the screener to your supervisor. Write in your name, circle your city and mark clearly on the top of the screener "FOR TALLIES ONLY".

**Sight screen for appropriate gender and age groups as needed. Randomly approach males and females 18+ years of age and ask questions on screener exactly as indicated.**

**SCREENER**:

Q. A:    If "yes" to any boxed occupation terminate.  Otherwise continue.  **These terminates do <u>not</u> count toward your screening quota.**

Q. B:    If 18 years of age or older, check open age quotas.  If needed, continue.  Otherwise, terminate.  If under 18 or refused age, terminate.  **These terminates do <u>not</u> count toward your screening quota.**

Q. C:    Hand Card C.  If punch "1" or "2" continue, otherwise, terminate.  **These terminates <u>do</u> count toward your screening quota.**

Q. D:    Read the list.  Record "yes" response under column Q.D -"Bought in Past 12 Months"

Q.E:     Record "yes" response under column Q.E – "Likely to Buy in Next 12 Months".

**If "yes" to "clothes dryer" in either Q.D or Q.E or both continue.  Otherwise, terminate.  These terminates <u>do</u> count toward your screening quota.**

Q.F:     Read list.  If respondents says yes to any <u>**Boxed**</u> statement continue.  Otherwise, terminate.  **These terminates <u>do</u> count toward your screening quota.**

Q. G:    If "yes" ask Q.H.  If "no" skip to Q.I.

Q. H:    If "yes" continue.  If "no" terminate.  **These terminates do <u>not</u> count toward your screening quota.**

Q. J:    Invite the respondent to participate, continue with the main questionnaire.  If the respondent refuses, terminate.  **These terminations do <u>not</u> count toward your screening quota.**

## MAIN QUESTIONNAIRE QUESTION BY QUESTION INSTRUCTIONS

**Important**: There are two cells (blue and yellow) and within each cell there are four versions of the questionnaire (interleaved).  The difference between cells is the commercial shown (dotted blue or yellow).  It is critical that the blue questionnaire be used only with the blue dotted commercials, and the yellow questionnaire be used only with the yellow dotted commercials.  The difference between the alternating versions of the blue and the yellow questionnaire is the order of the statements on the description sheet and the X'd statement in Q.5.  Therefore, it's important that the questionnaires are used in the order provided.

The questionnaire is straightforward and must be administered exactly as written.

If respondent wears glasses or contact lenses, that is they said "yes" to Q.G in the screener, make sure that she is wearing them before continuing.

**Before you show the commercial to the respondent adjust the volume on the television set so that the commercial is clear and audible.**

Have the respondent seated in front of the television screen.

Read statement verbatim.

<u>**The Commercial appears twice.**</u>

<u>**Show the commercial COLOR DOTTED SAME AS THE QUESTIONNAIRE BEING ADMINISTERED one time, then stop the tape.**</u>

After the commercial has been shown for the first time, read the statement verbatim.

<u>**Then show the commercial a second time, and then rewind the tape.**</u>

Q.1:    Read verbatim.  Record response verbatim.

Q.2:    Read verbatim.  Record response verbatim.

Q.3a:   Read verbatim.  If "yes" ask Q.3b and Q3c.  If "no/don't know" skip to Q.4.

Q.3b/3c:      Ask only if "yes" to Q.3a.  Record response verbatim.

Q.4:    Tear off the last page of the questionnaire (product description of Dryer A and Dryer B) and hand the sheet to the respondent.  Read both descriptions aloud to the respondent, along with the words "Dryer A" and "Dryer B".

Q.5:    Leave the description page in front of the respondent.  Read each statement, starting with X'd statement. Read all statements before accepting a response.  Record one response.  Now take back the description page and **restaple** to the back of the Main Questionnaire.  Then thank the respondent and continue to the Certification Page.

**SECURITY:**
- You are responsible for all materials being used on this study.  Stimuli must be locked up when not working on this study.
- All materials are to be kept <u>out of sight</u> of anyone not directly involved in the study
- All materials related to this study are the property of Guideline and our client.
- No one representing Guideline or our client is to be admitted to the facility or have access to the materials without your first calling Guideline to confirm.  Further, no one is to be permitted access to the facility or materials without showing satisfactory identification.

<u>**UPON COMPLETION OF INTERVIEW:**</u>

1. Fill out all respondent information on the front page of the screener.

2. Fill out all respondent information on certification page. You and the respondent must read, sign and date certification page.

3. Thank respondent.

4. Staple the screener to the main questionnaire and give it to your supervisor.

5. Only if a supervisor observed interview, he/she must also sign the certification page.

# APPENDIX D

## VALIDATION
## QUESTIONNAIRE / LETTER

GUIDELINE INC                                      Job #W25-0208
625 Avenue of the Americas                         Dryer Commercial Study
New York, NY  10011                                August, 2008

## *V A L I D A T I O N   Q U E S T I O N N A I R E*

- ASK TO SPEAK TO THE PERSON WHOSE NAME IS LISTED ON VALIDATION SHEET
- CORRECT ANSWERS ARE CIRCLED
- PROBE WHERE INDICATED

Hello (Mr./Miss/Mrs./Ms.) _____, I'm from Guideline in New York.  Recently a study was done in your area and we're calling to thank you for your participation and to confirm a few points.

1.  Recently, did you take part in a survey at the mall where you were shown a commercial about a dryer product and asked some questions about it?

YES ..................... ☐ 1

NO ...................... 2  →  *(Before terminating, be sure no one else in household was interviewed)*

2.  Which of the following includes your age?

Under 18 years.................... 1
18 - 34 ................................. 2
35 - 49 ................................. 3  *(Check against validation listing)*
50+ ...................................... 4

3.  When it comes to purchasing home appliances, which of the following statements best describes your own role within your household?

You decide what brand and model of appliance to purchase................................................................ 1

You are involved with other household members in deciding what brand and model of appliances to purchase................................................................ 2  → **(Must mentioned one boxed item to qualify.)**

You play no role in deciding what brand and model of appliances to purchase.......................................... 3

4      Which of the following home appliances, if any, have you purchased or been involved in purchasing in the past 12 months or are likely to purchase or be involved in the purchasing in the next 12 months?

      A refrigerator .......   1

      A vacuum cleaner   2

      A dishwasher.......   3

      A clothes washer .   4

      A clothes dryer ....   | 5 |    **(Must be mentioned to qualify)**

5      When purchasing appliances such as clothes washer and dryers, do you… (Read list)

| | |
|---|---|
| Always purchase the least expensive appliances you can find............................................................ | 1 |
| Sometimes purchase the least expensive and sometimes purchase medium-priced appliances....... | 2 |
| Purchase medium-priced appliances only ................ | 3 |
| Sometimes purchase medium-priced and sometimes purchase premium-priced appliances only, or | 4 |
| Purchase premium-priced appliances only, or........... | 5 |
| Purchase appliances of all price levels...................... | 6 |

→ **(Must mentioned a boxed response to qualify)**

Thank respondent.

# Outfielders, Inc.

Frances Murray Tavolilla
100 North Road
Eastchester NY, 10709
(914) 961-8042

September 2, 2008

Ms. Nelly Valentin
Guideline
625 Avenue of The Americas
New York, NY 10011

Dear Nelly,

The validation results of your Dryer Commercial Study #W25-0208 are as follows:

Out of the listed 440 respondent names, 438 had telephone numbers. Of these, 285 were successfully contacted (65%). Of those not reached, a minimum of three attempts were made on different days of the week and at different times of the day.

Of those contacted, there was one discrepancy found in interviewing procedures. All results of this phase of the study were reported to Guideline.

If you have any questions regarding this study, please call me.

Sincerely,

*Frances M. Tavolilla*

Frances Murray Tavolilla

**APPENDIX E**

**COMPUTER TABLES**

DRYER COMMERCIAL STUDY #W25-0208

Page 1

GUIDELINE

| Table | Title | Base |
|-------|-------|------|
| 1 | Q.1 MAIN IDEA | |
| 2 | Q.2 WHAT ELSE COMMERCIAL SAID, SHOWED, IMPLIED | |
| 3 | Q.3A DID COMMERCIAL SAY, SHOW, IMPLY A UNIQUE FEATURE | |
| 4 | Q.3B/C WHAT COMMERCIAL SAID, SHOWED, IMPLIED ABOUT A UNIQUE FEATURE | |
| 5 | Q.1,2,3B/C RESPONSES TO ALL OPEN-ENDED QUESTIONS | |
| 6 | Q.5 RESPONSE TO DESCRIPTIONS | |
| 7 | MARKET | |
| 8 | AGE | |
| 9 | GENDER | |
| 10 | Q.C ROLE IN PURCHASING DECISION | |
| 11 | Q.D/E CLOTHES DRYER PURCHASING | |
| 12 | Q.F PRICE OF APPLIANCES RESPONDENT PURCHASES | |

DRYER COMMERCIAL STUDY #W25-0208

Table 1

Q.1 MAIN IDEA

|  | SAW TEST COMM'L | | SAW CONTROL COMM'L | |
|---|---|---|---|---|
| TOTAL RESPONDENTS | 207 | | 206 | |
| CONVENIENCE (NET) | 78 | 37.7 | 20 | 9.7 |
| FAST/QUICK/SAVES TIME | 13 | 6.3 | 5 | 2.4 |
| READY TO WEAR IN 15 MINUTES | 49 | 23.7 | - | - |
| EASIER/LESS WORK | 7 | 3.4 | 10 | 4.9 |
| NO/LESS IRONING NEEDED | 3 | 1.4 | - | - |
| READY TO WEAR | 3 | 1.4 | - | - |
| READY TO WEAR IN A SHORT TIME | 5 | 2.4 | 1 | 0.5 |
| CONVENIENT | 3 | 1.4 | 1 | 0.5 |
| OTHER CONVENIENCE COMMENTS | 3 | 1.4 | 3 | 1.5 |
| NEED/USAGE (NET) | 87 | 42.0 | 113 | 54.9 |
| REMOVES STAINS | - | - | 17 | 8.3 |
| REMOVES/RELAXES WRINKLES | 23 | 11.1 | 24 | 11.7 |
| FRESHENS/REFRESHES CLOTHES | 11 | 5.3 | 8 | 3.9 |
| CLEANS CLOTHES/GETS CLOTHES CLEANER | 17 | 8.2 | 23 | 11.2 |
| POWER TO GET MORE DONE | 5 | 2.4 | 20 | 9.7 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 1

Q.1 MAIN IDEA

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| IT'S A DRYER/DRIES CLOTHES | 44 / 21.3 | 13 / 6.3 |
| ELIMINATES ODORS | 7 / 3.4 | 13 / 6.3 |
| MAKES CLOTHES SMELL FRESH | - / - | 3 / 1.5 |
| LEAVES CLOTHES LIGHT/FLUFFY | - / - | 4 / 1.9 |
| SOFTNESS/MAKES CLOTHES SOFT/ MORE SOFT | - / - | 5 / 2.4 |
| YOU CAN GET MORE DONE | 3 / 1.4 | 14 / 6.8 |
| CARING FOR YOUR CLOTHES/WHAT IT DOES FOR YOUR CLOTHES | 4 / 1.9 | 2 / 1.0 |
| CLOTHES ARE CRISPER/FRESHER | - / - | 1 / 0.5 |
| OTHER NEED/USAGE COMMENTS | 1 / 0.5 | 11 / 5.3 |
| PRODUCT (NET) | 123 / 59.4 | 137 / 66.5 |
| NEW PRODUCT/INTRODUCES PRODUCT | 31 / 15.0 | 31 / 15.0 |
| WHIRLPOOL PRODUCT/MADE BY WHIRLPOOL | 53 / 25.6 | 67 / 32.5 |
| NEW METHOD OF WASHING/DRYING CLOTHES | 13 / 6.3 | 5 / 2.4 |
| WASHER/DRYER COMBO/DUET | 69 / 33.3 | 81 / 39.3 |
| SHOWS/DESCRIBES PRODUCT | 17 / 8.2 | 11 / 5.3 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Q.1 MAIN IDEA

Table 1

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| GOOD/BETTER QUALITY | 12 5.8 | 11 5.3 |
| LIKE/TRUST WHIRLPOOL | - - | - - |
| GLASS FRONT/DOOR | 1 0.5 | 1 0.5 |
| FRONT LOADING/NOT TOP LOADING | - - | - - |
| GOOD/BETTER/BEST BRAND | 2 1.0 | 3 1.5 |
| BIGGER/LARGER | - - | 4 1.9 |
| SIDE-BY-SIDE | - - | 1 0.5 |
| MODERN/ADVANCED/INNOVATIVE/ LATEST TECHNOLOGY | 3 1.4 | 6 2.9 |
| ENERGY EFFICIENT | - - | 1 0.5 |
| ECO-FRIENDLY | - - | 3 1.5 |
| POWER/POWERFUL | 1 0.5 | 4 1.9 |
| SAVE MONEY/COST-EFFECTIVE | 2 1.0 | - - |
| MATCHING/MACHINES MATCH | - - | - - |
| DOUBLE THE LOAD/LARGER LOAD | - - | 1 0.5 |
| DURABLE/LASTS LONGER | - - | - - |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 1

Q.1 MAIN IDEA

| | SAW TEST COMM'L | | SAW CONTROL COMM'L | |
|---|---|---|---|---|
| TOTAL RESPONDENTS | 207 | | 206 | |
| OTHER PRODUCT COMMENTS | 4 | 1.9 | 8 | 3.9 |
| STEAM (NET) | 84 | 40.6 | 8 | 3.9 |
| CLEANS WITH STEAM | 19 | 9.2 | 1 | 0.5 |
| STEAMS CLOTHES DRY | 14 | 6.8 | - | - |
| UTILIZES STEAM/STEAM FUNCTION | 30 | 14.5 | 4 | 1.9 |
| STEAMS OUT WRINKLES | 17 | 8.2 | - | - |
| STEAMS OUT ODORS | 7 | 3.4 | - | - |
| QUICK STEAM CYCLE/STEAM REFRESH CYCLE | 7 | 3.4 | - | - |
| (USES STEAM) INSTEAD OF WATER AND HEAT | 1 | 0.5 | - | - |
| STEAMING IN THE DRYER | 5 | 2.4 | - | - |
| SMART STEAM | - | - | - | - |
| NATURAL STEAM POWER | 1 | 0.5 | - | - |
| STEAM POWER | - | - | 1 | 0.5 |
| STEAM-FRESH CLOTHING | 1 | 0.5 | - | - |
| REMOVES STAINS WITH STEAM | - | - | - | - |

GUIDELINE

Table 1

DRYER COMMERCIAL STUDY #W25-0208

Q.1 MAIN IDEA

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| VAPOR/HOT VAPOR | - | 2 |
| | - | 1.0 |
| IT SHOWED STEAM | - | - |
| | - | - |
| NEW STEAM BURST | - | - |
| | - | - |
| STEAMS CLOTHES | - | - |
| | - | - |
| MISCELLANEOUS | | |
| THEY WANT YOU TO BUY/TRY PRODUCT | 33 | 40 |
| | 15.9 | 19.4 |
| SWANS/DUCKS/BIRDS (ANY) | - | 6 |
| | - | 2.9 |
| SHOWED WATERFALL/LAKE/POND | - | 1 |
| | - | 0.5 |
| OTHER MISCELLANEOUS COMMENTS | - | - |
| | - | - |
| NOTHING | - | - |
| | - | - |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 2

Q.2 WHAT ELSE COMMERCIAL SAID, SHOWED, IMPLIED

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| CONVENIENCE (NET) | 69 | 22 |
| | 33.3 | 10.7 |
| FAST/QUICK/SAVES TIME | 9 | 6 |
| | 4.3 | 2.9 |
| READY TO WEAR IN 15 MINUTES | 49 | - |
| | 23.7 | - |
| EASIER/LESS WORK | 7 | 13 |
| | 3.4 | 6.3 |
| NO/LESS IRONING NEEDED | 6 | 5 |
| | 2.9 | 2.4 |
| READY TO WEAR | 3 | - |
| | 1.4 | - |
| READY TO WEAR IN A SHORT TIME | 1 | - |
| | 0.5 | - |
| CONVENIENT | - | 1 |
| | - | 0.5 |
| OTHER CONVENIENCE COMMENTS | 2 | 2 |
| | 1.0 | 1.0 |
| NEED/USAGE (NET) | 69 | 102 |
| | 33.3 | 49.5 |
| REMOVES STAINS | 2 | 27 |
| | 1.0 | 13.1 |
| REMOVES/RELAXES WRINKLES | 24 | 33 |
| | 11.6 | 16.0 |
| FRESHENS/REFRESHES CLOTHES | 6 | 15 |
| | 2.9 | 7.3 |
| CLEANS CLOTHES/GETS CLOTHES CLEANER | 15 | 16 |
| | 7.2 | 7.8 |
| POWER TO GET MORE DONE | 8 | 11 |
| | 3.9 | 5.3 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 2

Q.2 WHAT ELSE COMMERCIAL SAID, SHOWED, IMPLIED

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| IT'S A DRYER/DRIES CLOTHES | 18<br>8.7 | 7<br>3.4 |
| ELIMINATES ODORS | 5<br>2.4 | 17<br>8.3 |
| MAKES CLOTHES SMELL FRESH | 1<br>0.5 | 4<br>1.9 |
| LEAVES CLOTHES LIGHT/FLUFFY | 1<br>0.5 | 5<br>2.4 |
| SOFTNESS/MAKES CLOTHES SOFT/ MORE SOFT | -<br>- | 5<br>2.4 |
| YOU CAN GET MORE DONE | -<br>- | 5<br>2.4 |
| CARING FOR YOUR CLOTHES/WHAT IT DOES FOR YOUR CLOTHES | 3<br>1.4 | 4<br>1.9 |
| CLOTHES ARE CRISPER/FRESHER | 1<br>0.5 | 1<br>0.5 |
| OTHER NEED/USAGE COMMENTS | 3<br>1.4 | 7<br>3.4 |
| PRODUCT (NET) | 84<br>40.6 | 66<br>32.0 |
| NEW PRODUCT/INTRODUCES PRODUCT | 15<br>7.2 | 10<br>4.9 |
| WHIRLPOOL PRODUCT/MADE BY WHIRLPOOL | 24<br>11.6 | 13<br>6.3 |
| NEW METHOD OF WASHING/DRYING CLOTHES | 6<br>2.9 | -<br>- |
| WASHER/DRYER COMBO/DUET | 26<br>12.6 | 12<br>5.8 |
| SHOWS/DESCRIBES PRODUCT | 8<br>3.9 | 4<br>1.9 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 2

Q.2 WHAT ELSE COMMERCIAL SAID, SHOWED, IMPLIED

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| | ====== | ====== |
| TOTAL RESPONDENTS | 207 | 206 |
| GOOD/BETTER QUALITY | 4<br>1.9 | 15<br>7.3 |
| LIKE/TRUST WHIRLPOOL | 2<br>1.0 | 6<br>2.9 |
| GLASS FRONT/DOOR | 4<br>1.9 | 1<br>0.5 |
| FRONT LOADING/NOT TOP LOADING | 2<br>1.0 | -<br>- |
| GOOD/BETTER/BEST BRAND | 6<br>2.9 | -<br>- |
| BIGGER/LARGER | 1<br>0.5 | -<br>- |
| SIDE-BY-SIDE | 3<br>1.4 | -<br>- |
| MODERN/ADVANCED/INNOVATIVE/ LATEST TECHNOLOGY | 4<br>1.9 | 5<br>2.4 |
| ENERGY EFFICIENT | 1<br>0.5 | -<br>- |
| ECO-FRIENDLY | -<br>- | 2<br>1.0 |
| POWER/POWERFUL | -<br>- | -<br>- |
| SAVE MONEY/COST-EFFECTIVE | 2<br>1.0 | 3<br>1.5 |
| MATCHING/MACHINES MATCH | 2<br>1.0 | 1<br>0.5 |
| DOUBLE THE LOAD/LARGER LOAD | -<br>- | 4<br>1.9 |
| DURABLE/LASTS LONGER | -<br>- | -<br>- |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 2

Q.2 WHAT ELSE COMMERCIAL SAID, SHOWED, IMPLIED

| | SAW COMM'L | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|---|
| TOTAL RESPONDENTS | 207 | 207 | 206 |
| OTHER PRODUCT COMMENTS | 11 / 5.3 | 11 / 5.3 | 11 / 5.3 |
| STEAM (NET) | 50 / 24.2 | | 6 / 2.9 |
| CLEANS WITH STEAM | 6 / 2.9 | | - / - |
| STEAMS CLOTHES DRY | 6 / 2.9 | | 2 / 1.0 |
| UTILIZES STEAM/STEAM FUNCTION | 26 / 12.6 | | - / - |
| STEAMS OUT WRINKLES | 12 / 5.8 | | 2 / 1.0 |
| STEAMS OUT ODORS | 8 / 3.9 | | 2 / 1.0 |
| QUICK STEAM CYCLE/STEAM REFRESH CYCLE | 5 / 2.4 | | - / - |
| (USES STEAM) INSTEAD OF WATER AND HEAT | - / - | | - / - |
| STEAMING IN THE DRYER | 3 / 1.4 | | 1 / 0.5 |
| SMART STEAM | 1 / 0.5 | | - / - |
| NATURAL STEAM POWER | - / - | | - / - |
| STEAM POWER | - / - | | - / - |
| STEAM-FRESH CLOTHING | - / - | | - / - |
| REMOVES STAINS WITH STEAM | 1 / 0.5 | | - / - |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 2

Q.2 WHAT ELSE COMMERCIAL SAID, SHOWED, IMPLIED

| | SAW TEST COMM'L | | SAW CONTROL COMM'L | |
|---|---|---|---|---|
| TOTAL RESPONDENTS | 207 | | 206 | |
| VAPOR/HOT VAPOR | - | - | - | - |
| IT SHOWED STEAM | - | - | 1 | 0.5 |
| NEW STEAM BURST | - | - | - | - |
| STEAMS CLOTHES | - | - | - | - |
| MISCELLANEOUS | | | | |
| THEY WANT YOU TO BUY/TRY PRODUCT | 6 | 2.9 | 2 | 1.0 |
| SWANS/DUCKS/BIRDS (ANY) | - | - | 17 | 8.3 |
| SHOWED WATERFALL/LAKE/POND | - | - | 7 | 3.4 |
| OTHER MISCELLANEOUS COMMENTS | 1 | 0.5 | 3 | 1.5 |
| NOTHING | 31 | 15.0 | 34 | 16.5 |
| DON'T KNOW/NO ANSWER | - | - | 5 | 2.4 |

GUIDELINE

Table 3

DRYER COMMERCIAL STUDY #W25-0208

Q.3A DID COMMERCIAL SAY, SHOW, IMPLY A UNIQUE FEATURE

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| YES | 149 | 93 |
| | 72.0 | 45.1 |
| NO | 32 | 86 |
| | 15.5 | 41.7 |
| DON'T KNOW | 26 | 27 |
| | 12.6 | 13.1 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 4

Q.3B/C WHAT COMMERCIAL SAID, SHOWED, IMPLIED ABOUT A UNIQUE FEATURE

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| CONVENIENCE (NET) | 78<br>37.7 | 12<br>5.8 |
| FAST/QUICK/SAVES TIME | 16<br>7.7 | 8<br>3.9 |
| READY TO WEAR IN 15 MINUTES | 56<br>27.1 | -<br>- |
| EASIER/LESS WORK | 1<br>0.5 | 2<br>1.0 |
| NO./LESS IRONING NEEDED | 5<br>2.4 | 1<br>0.5 |
| READY TO WEAR | 1<br>0.5 | -<br>- |
| READY TO WEAR IN A SHORT TIME | 1<br>0.5 | -<br>- |
| CONVENIENT | -<br>- | 1<br>0.5 |
| OTHER CONVENIENCE COMMENTS | 2<br>1.0 | -<br>- |
| NEED/USAGE (NET) | 64<br>30.9 | 72<br>35.0 |
| REMOVES STAINS | 3<br>1.4 | 11<br>5.3 |
| REMOVES/RELAXES WRINKLES | 27<br>13.0 | 56<br>27.2 |
| FRESHENS/REFRESHES CLOTHES | 7<br>3.4 | 4<br>1.9 |
| CLEANS CLOTHES/GETS CLOTHES CLEANER | 5<br>2.4 | 4<br>1.9 |
| POWER TO GET MORE DONE | 3<br>1.4 | 6<br>2.9 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 4

Q.3B/C WHAT COMMERCIAL SAID, SHOWED, IMPLIED ABOUT A UNIQUE FEATURE

| | SAW TEST COMM'L | | SAW CONTROL COMM'L | |
|---|---|---|---|---|
| TOTAL RESPONDENTS | 207 | | 206 | |
| IT'S A DRYER/DRIES CLOTHES | 23 | 11.1 | 6 | 2.9 |
| ELIMINATES ODORS | 16 | 7.7 | 26 | 12.6 |
| MAKES CLOTHES SMELL FRESH | - | - | 1 | 0.5 |
| LEAVES CLOTHES LIGHT/FLUFFY | - | - | 1 | 0.5 |
| SOFTNESS/MAKES CLOTHES SOFT/ MORE SOFT | - | - | - | - |
| YOU CAN GET MORE DONE | - | - | 1 | 0.5 |
| CARING FOR YOUR CLOTHES/WHAT IT DOES FOR YOUR CLOTHES | 2 | 1.0 | - | - |
| CLOTHES ARE CRISPER/FRESHER | - | - | - | - |
| OTHER NEED/USAGE COMMENTS | 4 | 1.9 | 1 | 0.5 |
| PRODUCT (NET) | 39 | 18.8 | 31 | 15.0 |
| NEW PRODUCT/INTRODUCES PRODUCT | 5 | 2.4 | 1 | 0.5 |
| WHIRLPOOL PRODUCT/MADE BY WHIRLPOOL | 6 | 2.9 | 2 | 1.0 |
| NEW METHOD OF WASHING/DRYING CLOTHES | 4 | 1.9 | 1 | 0.5 |
| WASHER/DRYER COMBO/DUET | 12 | 5.8 | 5 | 2.4 |
| SHOWS/DESCRIBES PRODUCT | 4 | 1.9 | 2 | 1.0 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 4

Q.3B/C WHAT COMMERCIAL SAID, SHOWED, IMPLIED ABOUT A UNIQUE FEATURE

| | SAW TEST COMM'L COMM'L | | SAW CONTROL COMM'L | |
|---|---|---|---|---|
| TOTAL RESPONDENTS | 207 | | 206 | |
| GOOD/BETTER QUALITY | 2 | 1.0 | 3 | 1.5 |
| LIKE/TRUST WHIRLPOOL | - | - | 1 | 0.5 |
| GLASS FRONT/DOOR | 6 | 2.9 | 6 | 2.9 |
| FRONT LOADING/NOT TOP LOADING | 3 | 1.4 | 1 | 0.5 |
| GOOD/BETTER/BEST BRAND | - | - | - | - |
| BIGGER/LARGER | 1 | 0.5 | 2 | 1.0 |
| SIDE-BY-SIDE | - | - | - | - |
| MODERN/ADVANCED/INNOVATIVE/ LATEST TECHNOLOGY | 1 | 0.5 | 2 | 1.0 |
| ENERGY EFFICIENT | 1 | 0.5 | 1 | 0.5 |
| ECO-FRIENDLY | - | - | - | - |
| POWER/POWERFUL | 1 | 0.5 | - | - |
| SAVE MONEY/COST-EFFECTIVE | 1 | 0.5 | - | - |
| MATCHING/MACHINES MATCH | 1 | 0.5 | - | - |
| DOUBLE THE LOAD/LARGER LOAD | 2 | 1.0 | 4 | 1.9 |
| DURABLE/LASTS LONGER | 1 | 0.5 | 1 | 0.5 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 4

Q.3B/C WHAT COMMERCIAL SAID, SHOWED, IMPLIED ABOUT A UNIQUE FEATURE

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| OTHER PRODUCT COMMENTS | 9 | 11 |
| | 4.3 | 5.3 |
| STEAM (NET) | 112 | 15 |
| | 54.1 | 7.3 |
| CLEANS WITH STEAM | 15 | 1 |
| | 7.2 | 0.5 |
| STEAMS CLOTHES DRY | 11 | 1 |
| | 5.3 | 0.5 |
| UTILIZES STEAM/STEAM FUNCTION | 40 | 4 |
| | 19.3 | 1.9 |
| STEAMS OUT WRINKLES | 38 | 10 |
| | 18.4 | 4.9 |
| STEAMS OUT ODORS | 15 | 6 |
| | 7.2 | 2.9 |
| QUICK STEAM CYCLE/STEAM REFRESH CYCLE | 13 | - |
| | 6.3 | - |
| (USES STEAM) INSTEAD OF WATER AND HEAT | - | - |
| | - | - |
| STEAMING IN THE DRYER | 3 | - |
| | 1.4 | - |
| SMART STEAM | - | - |
| | - | - |
| NATURAL STEAM POWER | 1 | - |
| | 0.5 | - |
| STEAM POWER | 1 | - |
| | 0.5 | - |
| STEAM-FRESH CLOTHING | - | - |
| | - | - |
| REMOVES STAINS WITH STEAM | 1 | - |
| | 0.5 | - |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 4

Q.3B/C WHAT COMMERCIAL SAID, SHOWED, IMPLIED ABOUT A UNIQUE FEATURE

| | SAW TEST COMM'L COMM'L | | SAW CONTROL COMM'L | |
|---|---|---|---|---|
| TOTAL RESPONDENTS | 207 | | 206 | |
| VAPOR/HOT VAPOR | 2 | 1.0 | - | - |
| IT SHOWED STEAM | - | - | - | - |
| NEW STEAM BURST | 1 | 0.5 | - | - |
| STEAMS CLOTHES | 1 | 0.5 | - | - |
| MISCELLANEOUS | | | | |
| 'THEY WANT YOU TO BUY/TRY PRODUCT | 3 | 1.4 | 1 | 0.5 |
| SWANS/DUCKS/BIRDS (ANY) | - | - | 1 | 0.5 |
| SHOWED WATERFALL/LAKE/POND | - | - | - | - |
| OTHER MISCELLANEOUS COMMENTS | - | - | - | - |
| NOTHING | - | - | - | - |
| DON'T KNOW/NO ANSWER | - | - | 1 | 0.5 |
| NOT ASKED-DID NOT SAY YES TO Q.3A | 58 | 28.0 | 113 | 54.9 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Q.1,2,3B/C RESPONSES TO ALL OPEN-ENDED QUESTIONS

Table 5

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| CONVENIENCE (NET) | 147<br>71.0 | 48<br>23.3 |
| FAST/QUICK/SAVES TIME | 31<br>15.0 | 18<br>8.7 |
| READY TO WEAR IN 15 MINUTES | 114<br>55.1 | -<br>- |
| EASIER/LESS WORK | 15<br>7.2 | 22<br>10.7 |
| NO/LESS IRONING NEEDED | 12<br>5.8 | 6<br>2.9 |
| READY TO WEAR | 5<br>2.4 | -<br>- |
| READY TO WEAR IN A SHORT TIME | 7<br>3.4 | 1<br>0.5 |
| CONVENIENT | 3<br>1.4 | 3<br>1.5 |
| OTHER CONVENIENCE COMMENTS | 7<br>3.4 | 5<br>2.4 |
| NEED/USAGE (NET) | 154<br>74.4 | 171<br>83.0 |
| REMOVES STAINS | 5<br>2.4 | 53<br>25.7 |
| REMOVES/RELAXES WRINKLES | 61<br>29.5 | 90<br>43.7 |
| FRESHENS/REFRESHES CLOTHES | 20<br>9.7 | 20<br>9.7 |
| CLEANS CLOTHES/GETS CLOTHES CLEANER | 33<br>15.9 | 37<br>18.0 |
| POWER TO GET MORE DONE | 14<br>6.8 | 33<br>16.0 |

GUIDELINE

Table 5

DRYER COMMERCIAL STUDY #W25-0208

Q.1,2,3B/C RESPONSES TO ALL OPEN-ENDED QUESTIONS

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| IT'S A DRYER/DRIES CLOTHES | 67 / 32.4 | 23 / 11.2 |
| ELIMINATES ODORS | 26 / 12.6 | 48 / 23.3 |
| MAKES CLOTHES SMELL FRESH | 1 / 0.5 | 7 / 3.4 |
| LEAVES CLOTHES LIGHT/FLUFFY | 1 / 0.5 | 9 / 4.4 |
| SOFTNESS/MAKES CLOTHES SOFT/ MORE SOFT | - / - | 9 / 4.4 |
| YOU CAN GET MORE DONE | 3 / 1.4 | 20 / 9.7 |
| CARING FOR YOUR CLOTHES/WHAT IT DOES FOR YOUR CLOTHES | 9 / 4.3 | 6 / 2.9 |
| CLOTHES ARE CRISPER/FRESHER | 1 / 0.5 | 2 / 1.0 |
| OTHER NEED/USAGE COMMENTS | 7 / 3.4 | 19 / 9.2 |
| PRODUCT (NET) | 155 / 74.9 | 158 / 76.7 |
| NEW PRODUCT/INTRODUCES PRODUCT | 42 / 20.3 | 40 / 19.4 |
| WHIRLPOOL PRODUCT/MADE BY WHIRLPOOL | 77 / 37.2 | 76 / 36.9 |
| NEW METHOD OF WASHING/DRYING CLOTHES | 21 / 10.1 | 6 / 2.9 |
| WASHER/DRYER COMBO/DUET | 88 / 42.5 | 89 / 43.2 |
| SHOWS/DESCRIBES PRODUCT | 24 / 11.6 | 16 / 7.8 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 5

Q.1,2,3B/C RESPONSES TO ALL OPEN-ENDED QUESTIONS

| | SAW TEST COMM'L COMM'L | SAW CONTROL COMM'L COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| GOOD/BETTER QUALITY | 17<br>8.2 | 27<br>13.1 |
| LIKE/TRUST WHIRLPOOL | 2<br>1.0 | 6<br>2.9 |
| GLASS FRONT/DOOR | 8<br>3.9 | 7<br>3.4 |
| FRONT LOADING/NOT TOP LOADING | 5<br>2.4 | 1<br>0.5 |
| GOOD/BETTER/BEST BRAND | 7<br>3.4 | 3<br>1.5 |
| BIGGER/LARGER | 2<br>1.0 | 6<br>2.9 |
| SIDE-BY-SIDE | 3<br>1.4 | 1<br>0.5 |
| MODERN/ADVANCED/INNOVATIVE/ LATEST TECHNOLOGY | 8<br>3.9 | 13<br>6.3 |
| ENERGY EFFICIENT | 1<br>0.5 | 2<br>1.0 |
| ECO-FRIENDLY | -<br>- | 4<br>1.9 |
| POWER/POWERFUL | 2<br>1.0 | 4<br>1.9 |
| SAVE MONEY/COST-EFFECTIVE | 5<br>2.4 | 3<br>1.5 |
| MATCHING/MACHINES MATCH | 3<br>1.4 | 1<br>0.5 |
| DOUBLE THE LOAD/LARGER LOAD | 2<br>1.0 | 8<br>3.9 |
| DURABLE/LASTS LONGER | 1<br>0.5 | 1<br>0.5 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 5

Q.1,2,3B/C RESPONSES TO ALL OPEN-ENDED QUESTIONS

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| OTHER PRODUCT COMMENTS | 19 / 9.2 | 28 / 13.6 |
| STEAM (NET) | 141 / 68.1 | 22 / 10.7 |
| CLEANS WITH STEAM | 32 / 15.5 | 2 / 1.0 |
| STEAMS CLOTHES DRY | 22 / 10.6 | 3 / 1.5 |
| UTILIZES STEAM/STEAM FUNCTION | 68 / 32.9 | 8 / 3.9 |
| STEAMS OUT WRINKLES | 52 / 25.1 | 10 / 4.9 |
| STEAMS OUT ODORS | 24 / 11.6 | 6 / 2.9 |
| QUICK STEAM CYCLE/STEAM REFRESH CYCLE | 21 / 10.1 | - / - |
| (USES STEAM) INSTEAD OF WATER AND HEAT | 1 / 0.5 | - / - |
| STEAMING IN THE DRYER | 10 / 4.8 | 1 / 0.5 |
| SMART STEAM | 1 / 0.5 | - / - |
| NATURAL STEAM POWER | 2 / 1.0 | - / - |
| STEAM POWER | 1 / 0.5 | 1 / 0.5 |
| STEAM-FRESH CLOTHING | 1 / 0.5 | - / - |
| REMOVES STAINS WITH STEAM | 1 / 0.5 | - / - |

GUIDELINE

Table 5

DRYER COMMERCIAL STUDY #W25-0208

Q.1.2,3B/C RESPONSES TO ALL OPEN-ENDED QUESTIONS

|  | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| VAPOR/HOT VAPOR | 2 1.0 | 2 1.0 |
| IT SHOWED STEAM | – – | 1 0.5 |
| NEW STEAM BURST | 1 0.5 | – – |
| STEAMS CLOTHES | 1 0.5 | – – |
| MISCELLANEOUS |  |  |
| THEY WANT YOU TO BUY/TRY PRODUCT | 41 19.8 | 41 19.9 |
| SWANS/DUCKS/BIRDS (ANY) | – – | 23 11.2 |
| SHOWED WATERFALL/LAKE/POND | – – | 8 3.9 |
| OTHER MISCELLANEOUS COMMENTS | 1 0.5 | 3 1.5 |
| NOTHING | 31 15.0 | 34 16.5 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 6

Q.5 RESPONSE TO DESCRIPTIONS

|  | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| COULD BE COLD WATER ONLY | 22<br>10.6 | 69<br>33.5 |
| COULD BE HOT VAPOR ONLY | 115<br>55.6 | 43<br>20.9 |
| COULD BE EITHER COLD WATER OR HOT VAPOR | 37<br>17.9 | 63<br>30.6 |
| COULD NOT BE EITHER COLD WATER OR HOT VAPOR | 21<br>10.1 | 11<br>5.3 |
| DON'T KNOW | 12<br>5.8 | 20<br>9.7 |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 7

MARKET

GUIDELINE

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| ATLANTA | 18 / 8.7 | 18 / 8.7 |
| CHICAGO | 12 / 5.8 | 14 / 6.8 |
| CINCINNATI | 17 / 8.2 | 14 / 6.8 |
| LAS VEGAS | 16 / 7.7 | 20 / 9.7 |
| LOS ANGELES | 25 / 12.1 | 19 / 9.2 |
| MIAMI | 18 / 8.7 | 23 / 11.2 |
| MINNEAPOLIS | 17 / 8.2 | 15 / 7.3 |
| NEW YORK | 18 / 8.7 | 23 / 11.2 |
| OKLAHOMA CITY | 18 / 8.7 | 15 / 7.3 |
| PHILADELPHIA | 16 / 7.7 | 15 / 7.3 |
| SEATTLE | 23 / 11.1 | 14 / 6.8 |
| TRUMBULL, CT | 9 / 4.3 | 16 / 7.8 |

Table 8

DRYER COMMERCIAL STUDY #W25-0208

AGE

|  | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| 18-34 | 86 | 90 |
|  | 41.5 | 43.7 |
| 35-49 | 70 | 66 |
|  | 33.8 | 32.0 |
| 50+ | 51 | 50 |
|  | 24.6 | 24.3 |

GUIDELINE

Table 9

DRYER COMMERCIAL STUDY #W25-0208

GUIDELINE

GENDER

|  | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
|  | ====== | ====== |
| TOTAL RESPONDENTS | 207 | 206 |
| MALE | 89 | 95 |
|  | 43.0 | 46.1 |
| FEMALE | 118 | 111 |
|  | 57.0 | 53.9 |

DRYER COMMERCIAL STUDY #W25-0208

Table 10

Q.C ROLE IN PURCHASING DECISION

|  | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
|  | ====== | ====== |
| TOTAL RESPONDENTS | 207 | 206 |
| RESPONDENT DECIDES WHAT BRAND AND MODEL OF APPLIANCES TO PURCHASE | 104 50.2 | 111 53.9 |
| RESPONDENT INVLOVED WITH OTHER HOUSEHOLD MEMBERS IN DECIDING WHAT BRAND AND MODEL OF APPLIANCES TO PURCHASE | 103 49.8 | 95 46.1 |
| RESPONDENT PLAYS NO ROLE IN DECIDING WHAT BRAND AND MODEL OF APPLIANCES TO PURCHASE | - - | - - |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 11

Q.1D/E CLOTHES DRYER PURCHASING

| | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| | ====== | ====== |
| TOTAL RESPONDENTS | 207 | 206 |
| PURCHASED IN PAST 12 MONTHS, NOT LIKELY TO PURCHASE IN NEXT 12 MONTHS | 85 41.1 | 88 42.7 |
| LIKELY TO PURCHASE IN NEXT 12 MONTHS, NOT PURCHASED IN PAST 12 MONTHS | 121 58.5 | 112 54.4 |
| PURCHASED IN PAST 12 MONTHS AND LIKELY TO PURCHASE IN NEXT 12 MONTHS | 1 0.5 | 6 2.9 |
| NOT PURCHASED IN PAST 12 MONTHS AND NOT LIKELY TO PURCHASE IN NEXT 12 MONTHS | - - | - - |

GUIDELINE

DRYER COMMERCIAL STUDY #W25-0208

Table 12

Q.F PRICE OF APPLIANCES RESPONDENT PURCHASES

|  | SAW TEST COMM'L | SAW CONTROL COMM'L |
|---|---|---|
| TOTAL RESPONDENTS | 207 | 206 |
| ALWAYS PURCHASE THE LEAST EXPENSIVE APPLIANCES YOU CAN FIND | - - | - - |
| SOMETIMES PURCHASE THE LEAST EXPENSIVE AND SOMETIMES PURCHASE MEDIUM-PRICED APPLIANCES | - - | - - |
| PURCHASE MEDIUM-PRICED APPLIANCES ONLY | - - | - - |
| SOMETIMES PURCHASE THE MEDIUM-PRICED AND SOMETIMES PURCHASE PREMIUM-PRICED APPLIANCES | 91<br>44.0 | 98<br>47.6 |
| PURCHASE PREMIUM-PRICED APPLIANCES ONLY | 30<br>14.5 | 25<br>12.1 |
| PURCHASE APPLIANCES OF ALL PRICE LEVELS | 86<br>41.5 | 83<br>40.3 |

GUIDELINE

# APPENDIX F

## LIST OF DOCUMENTS CONSIDERED

## LIST OF DOCUMENTS CONSIDERED

1.    Complaint filed 1/10/2008
2.    WHR003235
3.    WHR015287
4.    WHR017522
5.    VHS tape of test commercial
6.    VHS tape of control commercial

## SUPPLEMENT TO APPENDIX F

### List of Additional Documents Considered

1. Expert Report of Dr. Stephen Nowlis, January 5, 2009 and all exhibits and documents considered by Dr. Nowlis
2. Expert Report of Dr. Ravi Dhar, January 5, 2009 and all exhibits and documents considered by Dr. Dhar
3. Expert Report of Dr. Jerry Wind, February 27, 2009 and all exhibits
4. Pamela Rogers Deposition Transcript, February 11, 2009 and all exhibits
5. All documents listed in Appendices B, C, D, and E of Dr. Jerry Wind's February 27, 2009 expert report.

# Exhibit 2



# Exhibit 3

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

1   HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

2                UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION

4

5   LG ELECTRONICS U.S.A., INC.,

6   a subsidiary of LG Electronics, Inc.

7   a Korean Company,

8                Plaintiff,

9        vs.                    Case No. 08 C 242
                                Judge St. Eve
10                              Magistrate Judge Mason

11

12  WHIRLPOOL CORPORATION,

13               Defendant.

14  ─────────────────────────────────

15

16  The Videotaped Deposition of ROBERT REITTER,

17  Taken at Reed Smith, LLP,

18  599 Lexington Avenue, New York, New York,

19  Commencing at 9:36 a.m.,

20  Wednesday, April 15, 2009,

21  Before ELLEN HAMER, a Certified Shorthand Reporter

22  and Notary Public

23

24

25  Job No.: 198988

Page 14

1 the state.
2            And then I testified in trial in the
3 case of Pizza Hut v. Papa John's. Those are the
4 ones that can come to mind right now.
5     Q.    Looking at the list of your testimony
6 at trial or deposition on Exhibit 133, which of
7 these cases involved a claim by a party of false
8 advertising?
9     A.    Schick v. The Gillette Company,
10 Sunscreen cases. I think that's it.
11     Q.    Now, for cases that are not listed on
12 your CV, so those would be ones before 2004, have
13 you given testimony by trial or deposition in a case
14 involving a false advertising claim?
15     A.    Well, the case of Pizza Hut v. Papa
16 John's was such a case, and that's the only one that
17 comes to mind right now.
18     Q.    Great. Now, for the Suncreen cases,
19 did you conduct a survey?
20     A.    No.
21     Q.    What were you retained to give an
22 opinion on?
23     A.    A survey that was conducted by someone
24 else.
25     Q.    Now, that was in 2007.

Page 15

1            You gave a deposition in that case?
2     A.    Yes.
3     Q.    And the -- who was the expert who
4 conducted the survey that you gave an opinion about?
5     A.    I regret to say I recall his survey
6 somewhat, but not his name.
7     Q.    All right. What was his survey?
8     A.    His survey had to do with people's
9 comprehension of an advertising message for
10 Sunscreen.
11     Q.    What was your opinion about the survey?
12     A.    It was a survey in a format that was
13 not suited to its purpose. It's what established
14 that in advertising perception cases, open-ended
15 questions carry much more weight than closed-ended
16 questions, and the survey that I criticized had
17 virtually no open-ended questions.
18     Q.    What was your opinion about the
19 expert's use of closed-ended questions?
20     A.    He had a battery of attributes having
21 to do with Sunscreen and asked people to rank or to
22 rate the importance of each of those attributes, and
23 I didn't think the question was organized or worded
24 in a way that would get a very thoughtful answer.
25     Q.    What was the forum? This was a

Page 16

1 Superior Court of California -- let me withdraw the
2 question.
3            What was the statute that was being
4 used by the plaintiff in that case, was it a false
5 advertising statute?
6     A.    I'm not sure.
7     Q.    Who did you represent in that case, who
8 was your client?
9     A.    It was the manufacturer of the -- you
10 know, I shouldn't really say this because I'm -- my
11 recollection is hazy.
12     Q.    Do you remember who any of the parties
13 were in that case?
14     A.    Well, I know who my client was,
15 certainly.
16     Q.    Who is that?
17     A.    Finnegan Henderson.
18     Q.    You don't recall the names of any of
19 the manufacturers or companies that were selling
20 Sunscreen?
21     A.    It may come to mind later, but at the
22 moment, my memory is not giving me that name.
23     Q.    In the Pizza Hut v. Papa John case, you
24 testified that was a false advertising case?
25     A.    Yes.

Page 17

1     Q.    Now, did you conduct a survey in that
2 case?
3     A.    Yes.
4     Q.    What was your assignment in that case?
5     A.    To do a consumer perception study of
6 some advertising on television by Pizza Hut.
7     Q.    And you testified at trial in that
8 case?
9     A.    I did.
10     Q.    And was your opinion accepted into
11 evidence in your report?
12     A.    Yes.
13     Q.    Who was the expert on the other side?
14     A.    Thomas Dupont.
15     Q.    When was the case?
16     A.    Well, it was well before 2004. My
17 guess would be 1999 or thereabout.
18     Q.    All right. In Schick v. The Gillette
19 Company, did you conduct a survey?
20     A.    Yes.
21     Q.    On behalf of which client were you
22 retained?
23     A.    Schick.
24     Q.    And what was the objective of your
25 survey in that case?

Page 54

```
 1     Q.    Who created those commercials?
 2     A.    They were created at my instigation and
 3  direction by a firm that Winston & Strawn hired, a
 4  production house.
 5     Q.    Tell me how it is that you went about
 6  creating these two commercials.
 7     A.    You mean how I gave the instructions
 8  for how they should be created or --
 9     Q.    What did you start with?  These -- let
10  me -- let me ask it more generally.
11         Are either of these two commercials,
12  commercials that existed without any modification?
13     A.    The test commercial was not modified.
14  The control commercial existed, but was extensively
15  modified.
16     Q.    Now, how did you start -- how did you
17  determine what commercials you were going to start
18  with for the process that ended up with the
19  modification?
20     A.    We must be speaking about the control
21  commercial, I assume?
22     Q.    Yes.
23     A.    Well, the first consideration was given
24  to modifying the test commercial, but that proved
25  not practical to do, so then, as I recall, there
```

Page 55

```
 1  wasn't such a choice of other commercials that we
 2  could have used for the same dryer that would have
 3  been -- or the same washer/dryer combination.
 4         It would have been possible to use a
 5  commercial for something else, but desirable to
 6  stick to a commercial for the -- that included at
 7  least the Duet Steam Dryer.  So there was another
 8  one that was identified, which was the waterfall
 9  commercial, I think it's called, and that one was
10  modified to take out steam references.
11     Q.    You said there was another one that was
12  modified.  Who did the -- there's another one that
13  was identified.  Who identified this other
14  commercial for you?
15     A.    The law firm did that.
16     Q.    Did you do any of your own searching
17  and reviewing of commercials for selecting the ones
18  used in this case?
19     A.    Reviewing, but not searching for other
20  commercials.
21     Q.    So were you given multiple commercials
22  from Winston & Strawn from which to select
23  commercials for this case?
24     A.    No.  I think that I was told that the
25  other commercial that's available is the waterfall
```

Page 56

```
 1  commercial.
 2     Q.    So what were you given by Winston &
 3  Strawn to review?
 4     A.    The waterfall commercial and, of
 5  course, the test commercial.
 6     Q.    So the test commercial was given to you
 7  intact and you made no modifications to it.  Is that
 8  right?
 9     A.    Yes.
10     Q.    Now, the waterfall commercial, what
11  you're calling the waterfall commercial, was that
12  given to you as the original intact commercial that
13  Whirlpool created?
14     A.    The first time I saw it, that's how it
15  was, yes.
16     Q.    Now, did you create multiple versions
17  of that waterfall commercial as potential candidates
18  to use in your research?
19     A.    I don't recall doing that.  What I
20  recall is that we went over it and eliminated
21  references to steam, but, you know, and then I
22  reviewed it after the references to steam had been
23  eliminated.
24         It looked all right to me.  It flowed
25  all right.  And I don't recall seeing multiple
```

Page 57

```
 1  versions of that, although the process for creating
 2  that control commercial took quite a while.
 3     Q.    What do you mean?
 4     A.    I don't know.  It's just -- you know,
 5  it didn't appear instantly.  It took a week or two
 6  to create.
 7     Q.    When you say "it took a week or two,"
 8  is this the time that it was at the outside firm
 9  that was doing the editing?
10     A.    Yes.
11     Q.    Did you have iterations of this
12  commercial going back and forth between you and this
13  outside firm with multiple changes being made and
14  you reviewing them and then it coming back with
15  multiple, additional changes, that type of process?
16     A.    No.
17         MR. ROTHSTEIN:  Object to form.
18     A.    I don't recall that being the case.
19     Q.    Did you have exchanges with Winston &
20  Strawn of different versions of the control
21  commercial until you settled on one that was
22  acceptable to you for your research?
23     A.    No, I don't think there were different
24  versions of the control commercial that I can
25  remember.
```

15 (Pages 54 to 57)

Page 58

1    Q.    Who is dealing with the company that
2  was doing the editing, you or the law firm?
3    A.    The law firm.
4    Q.    Was this a company that the law firm
5  retained or that you retained?
6    A.    The law firm retained them.
7    Q.    Is this a company that you've used in
8  the past?
9    A.    No.
10   Q.    So did you have any dealings with the
11 company that was editing the control commercial?
12   A.    I didn't.
13   Q.    The instructions to the firm that was
14 doing the editing, the instructions to the firm as
15 to what should go in and what should not go in,
16 those were instructions that were given by Winston &
17 Strawn and not you?
18       MR. ROTHSTEIN:  Object to form.
19   A.    I gave Winston & Strawn what I thought
20 were clear enough directions, and they may have
21 gotten into more detail with the production house.
22   Q.    Did you then only see one version of
23 the control commercial that had any editing and
24 that's the version that you used for this study?
25   A.    I believe that's the case, although I

Page 59

1  also recollect this stretch of time, and I'm really
2  trying to think hard, did I see any other versions
3  during that interval, but I don't recall doing so.
4    Q.    Did you get your copies of the
5  commercials that you reviewed by e-mail as
6  attachments to files or did you get them some other
7  way?
8    A.    By e-mail.
9    Q.    Did you get them by any other means?
10   A.    I think just e-mail. Well, at least I
11 think so. I mean, they ended up on my computer.
12   Q.    Are they still on your computer?
13   A.    Yes.
14       (Whereupon, there is a brief
15 off-the-record discussion.)
16       MR. ROCHE:  We'll mark this as
17 Exhibit 134. Exhibit 134 is GL 83, 84, 85 and 63.
18       (Exhibit 134, E-mails, GL 83-85, GL 63,
19 is marked for identification.)
20   Q.    Mr. Reitter, I've given you
21 Exhibit 134.
22       You recognize these as e-mails from --
23 that you received from Mr. Rothstein?
24   A.    Yes.
25   Q.    And you can take a minute and look at

Page 60

1  them, but you'll note that these are e-mails that
2  have attachments to them or showing that they have
3  attachments. Right?
4    A.    Yes. Well, three of them have
5  attachments.
6    Q.    I think they all have attachments.
7         Which one do you think doesn't have an
8  attachment?
9    A.    The one that is dated May 8th at
10 5:13 p.m.
11   Q.    Why don't you think this has an
12 attachment?
13   A.    Well, the other ones have a symbol and
14 that one has a reference.
15       Sometimes in my computer -- well,
16 actually, as I look at this more carefully, there
17 are two kinds of e-mails here, the first two that
18 you stapled together, the first one, May 8th at
19 5:14, and the second one, May 8th at 5:14,
20 respectively called Commercial 3 and Commercial 2,
21 have that familiar symbol that you just click on,
22 and then it opens up and you can view it.
23       And they are respectively the test on
24 the control commercial, "A New Way to Care for
25 Clothes" being the test commercial and CD, and

Page 61

1  "Swans Fly" being the control commercial. So those
2  two things were sent about the same time on May 8th.
3         The third page is also May 8th, but
4  just a minute before the first two that we
5  discussed, and it may have been that this one did
6  not actually have the attachment to it. It looks
7  sort of like that. I don't know.
8         Often in my computer, when the message
9  about the attachment appears in this form, not as a
10 symbol, but as a thing under the usual kind of
11 disclaimers, what it means is that this is being
12 forwarded, but I'm not getting the attachment.
13   Q.    All right. Now, you'll see that these
14 three e-mails from Mr. Rothstein have three
15 different subjects in the subject line, right,
16 Commercial One, Commercial 2 and Commercial 3?
17   A.    Yes.
18   Q.    Did you receive from Mr. Rothstein in
19 early May two different commercials having to do
20 with swans, do you know?
21   A.    I don't know that. I mean, obviously,
22 I did receive what ended up being the test and what
23 ended up being the control commercial. This other
24 e-mail sent the same day, I don't know what it could
25 be. It's -- it's titled the same way or similarly.

16 (Pages 58 to 61)

Page 62

1  It's titled, "Woman Meets Swan Made of Laundry
2  Fabric."
3      Q.    That's a different title than the --
4      A.    It's a different title.
5      Q.    Well, let me ask you this, Mr. Reitter:
6  You have these e-mails still on your e-mail system,
7  don't you?
8      A.    In all likelihood. I certainly didn't
9  eliminate them.
10     Q.    So why don't -- we'll just ask, as part
11 of our request, that you go back and provide us the
12 electronic files that were the attachments to these
13 e-mails. That will clear up whether you've got
14 three commercials or two commercials.
15     A.    Okay.
16     MR. ROCHE: Unless you can clear it up.
17     MR. ROTHSTEIN: I can clear it up.
18     MR. ROCHE: Yeah.
19     MR. ROTHSTEIN: He got three
20 commercials, but two of them were the same. Two
21 swan references were the same commercial.
22         I think that -- I personally don't
23 remember why they were titled differently, may have
24 been they came from two different sources where we
25 obtained --

Page 63

1          MR. ROCHE: I'm sorry. I don't want
2  to --
3          MR. ROTHSTEIN: He can get us the
4  electronic copies, but my recollection is that two
5  of the commercials were identical, but we could do
6  that.
7      Q.    Okay. We'll just -- is that your
8  recollection or do you have no recollection other
9  than what you've told me? I don't want to redo
10 everything we've just done.
11         Do you have any different recollection
12 or -- well, let me ask you -- I just asked about
13 five questions. Let me ask you one.
14         Do you recall getting only one version
15 of a swan commercial or do you have no recollection
16 at all?
17     A.    Well, I got certainly a version before
18 it was edited and a version after it was edited, I
19 know that, but I think what you're asking is did I
20 get two versions that were unedited, let's say, and
21 I don't recall having gotten two versions that were
22 unedited.
23     Q.    Is the edited version that you got the
24 one that references an attachment to the fourth page
25 of Exhibit 134?

Page 64

1      A.    Yes, that is -- I infer that it is,
2  because if you notice, the first -- all of the three
3  e-mails that you showed me initially were dated
4  May 8th, and then this is dated June 23rd, which is
5  a considerable time later. That's the time I was
6  referring to as having passed while the editing was
7  in progress.
8      Q.    What work were you doing on this
9  project between May 8th and June 23rd?
10     A.    Nothing. I was waiting and it seemed
11 like a long time.
12     Q.    Were you having back and forth with the
13 Winston law firm about the project at the time or
14 were you just basically sitting in wait?
15     A.    Sitting and waiting. I mean, maybe
16 there were phone calls, but not substantive work.
17     Q.    Now, apart from whether -- withdraw
18 that.
19         Did you -- who did you discuss with at
20 Winston what edits you wanted to have done to the
21 commercial?
22     A.    Ron Rothstein.
23     Q.    Anybody else?
24     A.    No.
25     Q.    Now, did you and he revise, during this

Page 65

1  period, changes that you wanted or did you make a
2  suggestion and he would come back and make another
3  suggestion, and then you would go back and forth on
4  this, or did you just say this is where we're going
5  to do it and that's it and there was no back and
6  forth?
7      A.    Somewhere between those two extremes.
8  I mean, the concept was simple enough. It was to
9  eliminate references to steam, but as I recall,
10 there were some issues about what should happen in
11 place of some audio where the word "steam" was being
12 spoken, but it's pretty hazy, I must say.
13     Q.    What's hazy?
14     A.    What's hazy is exactly what issues came
15 up in implementing this rather simple idea.
16     Q.    Did you give anything in writing to
17 Mr. Rothstein about what you wanted taken out of
18 this commercial?
19     A.    No.
20     Q.    Whose decision was it to use
21 commercials as opposed to some other media?
22     A.    Ultimately, I think it was mine.
23     Q.    Why did you decide to use commercials
24 as the media for your study?
25     A.    The commercial that was the test

17 (Pages 62 to 65)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 66

1    commercial in this case seemed to me a particularly
2    good piece of advertising to test the allegations in
3    the complaint.
4        Q.    Why?
5        A.    Because that commercial showcased the
6    steam feature clearly and prominently.
7        Q.    What did it showcase?
8        A.    The name of the dryer and the
9    advantages of having a steam dryer.
10       Q.    Did you consider using print ads?
11       A.    I did see some print ads.  I think they
12   were attached to the complaint, if I'm not mistaken,
13   but certainly the television commercial that was the
14   test commercial seemed a very impactful and
15   well-constructed communication about the steam
16   dryer.
17       Q.    Have you ever done consumer research in
18   an advertising case where you've used print ads?
19       A.    I have.  I'm trying to think of whether
20   I've done them in reported cases.  Certainly I've
21   done them in NAD context, yes.
22       Q.    Have you been criticized by other
23   experts for using print ads as opposed to some other
24   media?
25       A.    No.

Page 67

1        Q.    In your field, is there any rule or
2    standard which says when conducting a survey like
3    you've conducted, when you should use a commercial
4    ad or a print ad?
5        A.    I'm not aware of any such rules, no.
6        Q.    What about standards that would apply?
7        A.    No.  You know, obviously, there are
8    many campaigns that appear only in print and many
9    campaigns that appear only in television, and then
10   there's some that appear in both ways, but I don't
11   know that there are any standards or rules to guide
12   an expert as to which to choose when both are
13   available.
14       Q.    Was Whirlpool's campaign for the Duet
15   Steam Dryer one that appeared in multiple media?
16       A.    I believe there was print, as well as
17   television.
18       Q.    Now, did the two commercials that you
19   ended up using for your study, did they come from
20   the same advertising campaign that Whirlpool was
21   conducting?
22       A.    I don't know, but I would -- I'm
23   presuming they did, but I'm not sure of that.
24       Q.    Why are you presuming that?
25       A.    Well, because they both are for the

Page 68

1    same products, but maybe within Whirlpool, they're
2    considered a different campaign.  You know, that's a
3    matter of definition.
4            (Exhibit 135, Code Master, GL 2-7, is
5    marked for identification.)
6        Q.    Exhibit 135 is GL 2 through GL 7.
7            Mr. Reitter, what is Exhibit 135?
8        A.    It's called a code master that we used
9    for this particular study.
10       Q.    Who prepared it?
11       A.    I think this was prepared by an outside
12   coding company that we use.
13       Q.    What company?
14       A.    I think they're called Flatiron Data.
15       Q.    How did this get prepared?  I don't
16   mean -- was it printed on a computer?  I mean,
17   substantively, how was this thing substantively
18   prepared?
19       A.    The first batch of questionnaires comes
20   back from the field and is sent to the coding house,
21   and they do something called sampling the open-ended
22   answers.
23            Usually one of their senior people
24   takes it question by question and writes out either
25   by hand or on a word processing program the answers

Page 69

1    that are coming up, and then looks at them after
2    they looked at a hundred questionnaires, let's say,
3    and decides how to group them.
4            For example, the first so-called code
5    point on this list is fast, quick, saves time, and
6    there are slashes between those three ideas.  So the
7    decision is made that we don't need to distinguish
8    between fast and quick and saves time, that for the
9    purposes of this study, those are synonymous.
10           And in the end, that becomes subsumed
11   under a general heading called convenience, and the
12   job of building these code masters is a job of
13   deciding where distinctions need to be very minutely
14   detailed and where they can be aggregated together,
15   and that often depends on the purpose of the study.
16           And, you know, we give directions to
17   the coding house of what topics are of particular
18   concern and where more delineation is needed and
19   where less delineation is needed.
20           And that -- the result of that process
21   is to come out with a list of codes like this, which
22   we then look at closely and either approve or ask to
23   be revised.
24       Q.    Did you give directions to the coding
25   house in this case as to what should be the code

18 (Pages 66 to 69)

Page 70

1 points included on the code masters?
2     A.    I usually do, and I'm pretty sure that
3 I did in this case, yes.
4     Q.    What were the directions you gave the
5 coding house?
6     A.    I'm sure that I would have told them
7 that mentions of steam need to be aggregated in one
8 heading, and they did that, as I can see, and to be
9 very detailed about mentions related to steam when
10 they did that as well.
11     Q.    Why did you want there to be detail as
12 to mentions about steam?
13     A.    Well, the reason that the study was
14 being conducted was to understand what consumers
15 took away from the test commercial, particularly as
16 regards steam or related benefits, and so it was
17 just a good principle to not lump too many similar
18 ideas together.
19         That way the researcher can examine the
20 detail and then decide to lump them together if
21 that's useful or to look at them in detail, but once
22 you lump them together, you can no longer look at
23 the detail, so it's -- the safest thing is to start
24 with the detail.
25     Q.    So this code master was prepared after

Page 71

1 your -- the team in the field had obtained how many
2 responses from participants?
3     A.    I don't know the exact number in this
4 case, but typically, we wait until we have a hundred
5 interviews done before building a code master.
6     Q.    How many interviews were done in this
7 case?
8     A.    About 200 in the test group and 200 in
9 the control group.
10     Q.    Let me give you just a sample of the
11 screener sheets.
12         MR. ROCHE:  Mark -- this is 136.
13         (Exhibit 136, Screener Questionnaire,
14 GL 371-379, is marked for identification.)
15     Q.    GL 371 through GL 379.  And I think
16 you'll see that there is a screener sheet here and
17 then a sheet that shows the responses of the
18 participant to the specific questions.  Am I right
19 about that?
20     A.    Well, it's not a screener sheet, it's a
21 screener questionnaire.  It runs for the first five
22 pages, and then the rest of it is the main
23 questionnaire.
24     Q.    Explain for me how the coding on the
25 master sheet, master code sheet, ties into the

Page 72

1 responses given to the main questionnaire in
2 Exhibit 136.
3     A.    Well, we have to turn to GL 376, and
4 there you'll see a person who said and was
5 transcribed in the following way, "Presenting a new
6 way to clean your clothes with steam instead of
7 water and heat."
8         And we see three numbers to the right
9 of this set of ideas, and those are the three codes
10 that were used.  The first one is next to a column
11 called eight and it's a three, the code is three.
12         So if we look on the code master next
13 to eight and then go down to three, we see that same
14 idea, "New method of washing or drying clothes," and
15 this person said, "A new way to clean your clothes,"
16 so that's a pretty good fit with the code that's
17 labeled 8-3.
18         And the next idea that was coded here
19 is on 9-5.  9-5 is, "Matching machines, machines
20 match."  I'm surprised that I see that here.  Oh, I
21 must be reading it wrong.
22         Yeah, 9-5 is not what I said it was.
23 9-5 is, "Utilizes steam/steam function," and that's
24 what this respondent said, "New way to clean your
25 clothes with steam."

Page 73

1         Finally, there was a 9-9, which is,
2 "Uses steam instead of water and heat," and then
3 that's what this person also says, "instead of water
4 and heat."
5     Q.    Now, which of the codes on Exhibit 135
6 represent a category that you've given for somebody
7 that says -- that makes a comment about injection or
8 spraying of mist or steam as a message from the
9 commercial?  Identify which of these codes would fit
10 that.
11     A.    The only one that comes a little bit
12 close to what you're asking is ten -- well, it's on
13 GL 3, and it's the -- it has a four next to it and
14 it says, "Vapor that sprays directly onto your
15 clothes."
16     Q.    So if you wanted to know whether any of
17 the respondents to the test commercial made a
18 comment that the commercial was about injecting hot
19 vapor or injecting steam or injecting anything, you
20 would look for the code 10-4 on the responses to the
21 questionnaire.  Is that right?
22     A.    Well, you could do that, but it
23 wouldn't be a guaranteed way of finding such a
24 respondent.
25     Q.    The guaranteed way would be to look at

19 (Pages 70 to 73)

Reitter - direct

Page 74

1  the actual verbatim responses written down by the
2  questioner during the process?
3       A.   Yes.
4       Q.   Had you, as part of your research and
5  part of your study, looked at the verbatim responses
6  in this -- that were provided by your questioners?
7       A.   Some.
8       Q.   Did you look at all of them, sir?
9       A.   No.
10      Q.   Why not?
11      A.   There are some studies that I do that I
12  look at all of the verbatims myself.  It depends on
13  the objective of the study.  In this study, I did
14  not deem the -- that that exercise would have been
15  helpful.
16      Q.   Did you, as part of this study, look at
17  the verbatim responses from the participants to
18  determine whether any of the participants identified
19  as a message or as a response to the question that
20  the test commercial is about injecting hot vapor
21  onto clothes?
22      A.   That inquiry was not one that occurred
23  to me in the process of analyzing the results of
24  this study.
25      Q.   Did you look at the verbatim responses

Page 75

1  from the participants to determine whether any of
2  the participants said they -- in a response that
3  they took away the impression that the test
4  commercial was about injecting a mist of cold water?
5       A.   No, I didn't.
6       Q.   Do you know whether any participant, in
7  response to your open-ended questions, provided a
8  statement that the commercial was about injecting
9  hot vapor onto clothes?
10      MR. ROTHSTEIN:  Object to form.
11      A.   All of the questions that you've been
12  asking me in the last few minutes include the word
13  "inject," and as I recall, the commercial, the test
14  commercial, does not contain the word "inject"
15  either in its visual or audio content.
16      So it would never have occurred to me
17  to look for that word in the responses.  I wouldn't
18  expect people to play back so specific a word when
19  it wasn't in the commercial.
20      Q.   My question, sir, is, did you look at
21  the verbatim responses to the questions to see
22  whether any participant said, in viewing the test
23  commercial, that it was about injecting steam onto
24  clothes or conveyed a message of injecting steam
25  onto clothes or that they had the impression it was

Page 76

1  about injecting steam onto clothes, did you look to
2  see whether any of those were on the verbatim
3  responses?
4       A.   Taking your question literally, the
5  answer is no.
6       Q.   So you didn't review all the responses,
7  we know that.  Right?
8       A.   I didn't.
9       Q.   Who did review the responses?
10      A.   The process works like this.  Someone
11  at Flatiron Data creates a coding master and sends
12  it to us, and my project director, whose name is
13  Stan Abramowitz, reviews it and gives it to me, and
14  I look at it.  And then we might make modifications,
15  we usually do, and then it goes back and we say,
16  please use these.
17      At Flatiron Data, coders then go to
18  work to do what we saw as an example in this
19  Exhibit 136, where they coded the comment that I
20  read earlier with those three code points.
21      And there's a supervisor at Flatiron
22  Data who checks their work and does a sampling of
23  their coding to see whether it is accurate.  It's so
24  easy to see whether it's accurate.
25      For example, in the case that you

Page 77

1  happened to present me with, the person said,
2  "Presenting a new way to clean your clothes with
3  steam instead of water and heat," and in reviewing
4  what the coder did with that, we find that the coder
5  decided to code it as, "New method of washing or
6  drying clothes, also utilizes steam or a steam
7  function, and also uses steam instead of water."
8      And those three codes fit this sentence
9  very well, and there's nothing in the sentence that
10  I can see that they didn't code, so it's a good job,
11  and that's what the supervisor does.
12      Now, where a coder has trouble using
13  the coding master because somebody says something
14  that doesn't quite match a code; for example, if
15  they had used the word "inject," which is a very
16  specific word, but there is no code that includes
17  the word "inject," they would tend to list it as all
18  other.
19      And when something is coded as all
20  other on these studies that we do for litigation, we
21  look at those individual responses and make
22  decisions about them, either by expanding the code
23  list or by deciding that that remark, whatever it
24  was, could be captured by one of the code points
25  that's available, and that's the quality control

20 (Pages 74 to 77)

Page 78

1  that's done on the coding process.
2      Q.    For your study, you asked four
3  open-ended questions and then a fifth one that you
4  call closed-ended.  I think that was your term.  Am
5  I right about that?
6      A.    Yes.
7            MR. ROTHSTEIN:  Are you moving to a new
8  topic?
9            MR. ROCHE:  You want to take a break?
10           MR. ROTHSTEIN:  It's about noon.  We've
11  been going about an hour and twenty-five minutes.
12           THE VIDEOGRAPHER:  This marks the end
13  of Tape No. 2 in the videotaped deposition of
14  Robert Reitter.  We're going off the record.  The
15  time is 11:57.
16           (A luncheon recess takes place.)
17           THE VIDEOGRAPHER:  This marks the
18  beginning of Tape No. 3 in the videotaped deposition
19  of Robert Reitter.  We are on the record.  The time
20  is 1:07.
21  BY MR. ROCHE:
22      Q.    Mr. Reitter, was the purpose of your
23  research to determine whether consumers think that
24  the Whirlpool dryer in the ad uses steam?
25      A.    Yes.

Page 79

1      Q.    Steam is -- meaning what?
2      A.    Whatever they took to -- they took to
3  mean steam.
4      Q.    Were you trying to determine from your
5  research what consumers understood to be the meaning
6  of steam as used in the ad?
7      A.    No.  Well, I wouldn't put it that
8  generally, but it was part of my purpose to
9  understand what impression they took away about the
10  steam that the dryer uses, if they had the
11  impression that it uses steam.
12      Q.    Were you trying to determine what
13  consumers understood steam to mean as being used in
14  Whirlpool's ad?
15           MR. ROTHSTEIN:  Object to form.
16      A.    No, I wouldn't put it quite like that.
17  I didn't ask them what they meant by "steam" or
18  anything like that.  I wanted to know more
19  specifically something about the impression that
20  they formed of the steam in the Whirlpool dryer, if
21  they had an impression that it contained or used
22  steam.
23      Q.    Well, the test commercial ad said steam
24  in the ad.  Right?
25      A.    Yes.

Page 80

1      Q.    It said the machine is a steam dryer.
2  Right?
3      A.    Yes.
4      Q.    So did you need to test to find out
5  whether jurors heard the word "steam," is that what
6  you were testing for?
7      A.    No.  At issue in this case, and the
8  purpose of the survey, ultimately, was to determine
9  whether the impression that people got from the
10  commercial was accurate, so I needed to find out two
11  things.
12           First of all, I needed to find out did
13  they take away that the steam -- that the dryer uses
14  steam, and then I needed to find out whether the
15  impression that they had of the steam that the dryer
16  uses is consistent with how the Whirlpool dryer
17  actually uses steam or the Whirlpool dryer works.
18      Q.    Did you do any investigation or
19  research to determine how the Whirlpool dryer
20  actually works?
21      A.    I did.
22      Q.    What did you rely on for making that
23  judgment?
24      A.    I noted a number of statements that I
25  was sent that Whirlpool itself publishes about how

Page 81

1  the dryer works, and I read some deposition
2  testimony by people who work for Whirlpool.
3      Q.    Well, let's look at the documents you
4  identified in your report that you relied on, sir.
5  Why don't you find where that is.
6      A.    It's the last page of this report, I
7  believe.
8      Q.    Now, when you issued your report, you
9  issued with it this page of documents you
10  considered.  Right?
11      A.    Actually, the law firm and I discussed
12  this list after I published this report to them, and
13  they sent this off, so I did not actually compile
14  this.  They compiled it for me.
15      Q.    Well, did they get it right?
16      A.    You know, I told them all the things
17  that I looked at; in fact, I had gotten all of them
18  originally from the law firm, and now I see that
19  they refer to them in this manner that I have no way
20  of, you know, double-checking myself.  I don't know
21  what WHR 003235 actually means.
22      Q.    Well, they don't list here any
23  deposition testimony, sir.  Do you notice?
24      A.    I didn't know that.  I mean, I trusted
25  them to get it right in terms of what they had sent

Reitter - direct                    HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 82

1    me, and I didn't know -- one of the reasons that I
2    said what I did when you showed me this report
3    originally is you asked me if this was my report,
4    and I said yes, and you asked is it complete, and I
5    said, yeah, in a cursory inspection it is, but when
6    I saw this page here, I really can't attest to the
7    completeness of this page.
8        Q.    I'll tell you that the documents listed
9    in Page 2, 3 and 4 are one-page documents that are
10   not deposition transcripts.
11       A.    Really?
12       Q.    Those are one-page documents.
13       A.    Well, I looked at deposition
14   transcripts, and also, I looked at a lengthy report
15   by Dr. Jerry Wind, which includes many references
16   from Whirlpool exhibits.
17       Q.    This report was issued in October at
18   some time.  I don't have the exact date, but it's
19   probably -- you signed it and it's probably got a
20   date on it?
21       A.    Yeah, it's signed -- it's issued in
22   October.
23       Q.    Now, I doubt you looked at anything
24   that Professor Wind did in October, unless Mr. Wind
25   had given you something back when you were working

Page 83

1    on your report?
2        A.    No.  I didn't look at his report until
3    after this was issued.
4        Q.    I'm -- we have a report from you that
5    you issued in which you gave opinions, and in this
6    report, which is issued in October, you list
7    documents you considered on -- you considered and
8    relied on for purposes of this report.  I'm not
9    asking about anything you looked at since you issued
10   your report.
11          Do you understand?
12       A.    Yes.
13       Q.    So for issuing your report, is this a
14   complete list?
15       A.    When I looked at the complaint, I saw
16   the commercials.  You know, it's not part complete,
17   because I saw the control commercial before and
18   after it was edited, so it's not complete in that
19   regard.
20          And I was given some materials.  I'm
21   remembering that they show how the dryer works.
22   They talk about a Y connector.
23       Q.    That's the use and care guide, the
24   Whirlpool use and care guide?
25       A.    Could well be.

Page 84

1        Q.    It has a picture of a piping, a V pipe?
2        A.    Yes.
3        Q.    Okay.  What else did you look at?
4        A.    Well, you're asking me specifically
5    what else did I look at before issuing this report,
6    and that's all I remember looking at then.
7        Q.    Is that the last one I marked, 136 or
8    135?
9        A.    This is 136.
10       Q.    136.  Okay.  This is 137.  137 is WHR
11   003235.
12          (Exhibit 137, Document, WHR 003235, is
13   marked for identification.)
14       Q.    Mr. Reitter, this is one of the
15   documents listed on your list of documents
16   considered?
17       A.    Yes.
18       Q.    You recognize this?
19       A.    Well, possibly, but I saw something
20   that had more detail in it than this page shows.  It
21   shows an actual Y connector visually.
22       Q.    And what else -- that's a separate
23   document from this?
24       A.    Yes.
25       Q.    So do you -- did you -- do you recall

Page 85

1    seeing any other documents that described how
2    Whirlpool's dryer works?
3        A.    Well, I only saw things in the way of
4    deposition transcripts after this report, but -- so
5    that's the answer to your question.
6        Q.    Okay.  Now, you said that the purpose
7    of your report -- one of the purposes was to
8    determine whether the impression of the participants
9    of steam is how the Whirlpool dryer actually uses
10   steam.  Do I have that right?  Have I stated that
11   correctly?
12       A.    Well, the problem with that wording,
13   and I sort of tried to take it back after I had said
14   it, is that I'd really rather say is it consistent
15   with the way that the Whirlpool dryer works rather
16   than saying consistent with the way that the
17   Whirlpool dryer uses steam, because to say
18   consistent with the way that the Whirlpool dryer
19   uses steam implies that I think it does use steam,
20   and I don't think it uses steam, or at least I'm not
21   told that it uses steam.
22       Q.    Have you done a -- your own
23   investigation to determine whether the Whirlpool
24   dryer uses steam or not?
25       A.    I'm not an engineer in that sense.  I

22 (Pages 82 to 85)

VERITEXT CORPORATE SERVICES (800) 567-8658

Reitter - direct

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 94

1  A.  Whether it's consistent with their
2  impression of the steam in the test commercial, if
3  indeed they took away that it had steam, that it
4  used steam, whether it's consistent with their
5  impression of steam, that it be actually a mist of
6  cold water injected into the heated dryer drum,
7  which is then heated by the dryer.
8  Q.  The question represented by Question 5
9  was given to all of the respondents, wasn't it?
10  A.  Yes, it was.
11  Q.  So it wasn't given to just the
12  respondents that had identified some message of
13  steam from the open-ended questions that were asked
14  previously.  Right?
15  A.  Correct, but I did examine how those
16  people had answered the question who did play back
17  something about steam.
18  Q.  Now, show me in the report where that
19  is.
20  A.  It's not in the report because it's
21  supplementary.
22  Q.  Well, I'm talking about your report,
23  the report that you delivered in this case and
24  signed.
25  Where in this report does it show that

Page 95

1  you analyzed specifically how the participants that,
2  in your word, play back steam, responded to Question
3  5?
4  A.  It's not in here.
5  Q.  It's not in the report?
6  A.  No.
7  Q.  Since you've issued the report, have
8  you looked at that question?
9  A.  Yes.
10  Q.  Why?
11  A.  It came up in my discussions with
12  counsel as perhaps being a useful thing.  I didn't
13  think it was particularly necessary, because
14  68 percent of the respondents in the test group
15  played back steam, in their own words.
16  So I didn't think that there would be
17  much opportunity for a difference between what those
18  people said and what the minority who didn't happen
19  to play back steam said.
20  Q.  You said that the purpose of this
21  report was to first determine whether steam was an
22  impression that the respondents took away from the
23  exam -- from the test commercial and then determine
24  whether, for those respondents that took away the
25  message of steam, what they understood that to mean

Page 96

1  based on your Question No. 5.  Right?  Have I got
2  that correct?
3  MR. ROTHSTEIN:  Object,
4  mischaracterizes the testimony.
5  Q.  You can answer.
6  A.  There's one part that I'd like to
7  amplify on, and that is, if I had wanted to do
8  exactly that, I would have started off with my
9  open-ended questions, but many people will have
10  mental ideas that they will not report until they're
11  probed more explicitly.
12  So I could have followed up the
13  open-ended questions, and I considered them -- doing
14  so with a question like did the commercial say,
15  sure, imply anything about steam.
16  And I'm very comfortable that if I had
17  done that, all or most of the people who didn't
18  happen to bring up steam in their own words would
19  have said yes, because -- for a number of reasons,
20  which I can go into later if you're interested.
21  But the main thing is that I didn't add
22  that question, and I think I had very good reasons
23  for not adding that question; namely, if I had added
24  that question, it would have had an influence
25  possibly on the subsequent closed-ended question.

Page 97

1  I would have been adding one more
2  mention of steam to the ones that were in the test
3  commercial, and just before asking them which of
4  these dryers that I described in these statements is
5  consistent with the impression that they got from
6  the commercial, so if I reinforced to them that the
7  dryer has steam, it would be considered leading, and
8  I wanted to avoid that.
9  Q.  So if you had asked them is the
10  commercial about steam, in your view, that would
11  have been an improper question for this study?
12  A.  It's -- it's a more artful study that
13  gets at that in an open-ended inquiry and doesn't
14  heavy handedly hit it in a closed-handed way.
15  Q.  Now, in your open-ended question that
16  you asked, did any respondent say that an impression
17  they took from the test commercial was that the
18  dryer injects hot vapor or steam or something like
19  that under the clothes?
20  A.  I don't think any respondent used the
21  word "injects," no.
22  Q.  Did anyone use a synonym of the word
23  "injects," infuse, spray?
24  A.  I don't know the answer to your
25  question, but certainly not many.

25 (Pages 94 to 97)

Page 98

1    Q.    How do you know that it was not many?
2    A.    If it was many, then one of the code
3    points would have included the word "spray."
4    Q.    Now, was a purpose of your study to
5    determine whether consumers believed that
6    Whirlpool's Steam Dryers use hot vapor?
7    A.    Whether they got that impression from
8    the advertising, yes.
9    Q.    How does your study get at the question
10   of whether respondents who saw the test commercial
11   had the impression that Whirlpool uses hot vapor?
12   A.    Well, that was at the Question 5. We
13   described two dryers. One of them used hot vapor.
14        In this particular questionnaire that
15   you showed me, that's labeled as Dryer B, but it's
16   not always labeled as Dryer B. We alternated what
17   we refer to it as, but I'll just call it Dryer B,
18   because that's the way this respondent was posed the
19   question.
20        So for this respondent, the question
21   is, is Dryer B consistent with the commercial that
22   you just saw or not. It's -- you know, we presented
23   two dryers, Dryer A and B, and the person could say
24   both those dryers are consistent or one is, but the
25   other isn't and the other is, but one isn't or

Page 99

1    they're both consistent or I don't know.
2    Q.    Why did you use the word "vapor" as
3    opposed to some other word to describe the -- the --
4    well, let me ask -- let me back up.
5         In your view, sir, is this study, as
6    structured -- does steam mean the same thing as hot
7    vapor?
8    A.    Well, let me answer your first
9    question.
10        I'm not a scientist myself, but I
11   wanted to avoid using the word "steam" in the
12   description of Dryer B, because I thought if I did
13   that, instead of getting a thoughtful and considered
14   answer, I might get people to say, oh, it's a steam
15   dryer, they mention steam and this statement talks
16   about steam, so I'll pick that statement.
17        So I was essentially leaning over
18   backwards to test the matter in a deeper manner than
19   just a verbal association.
20   Q.    So for this study, the way you
21   structured it, in your view, hot vapor is steam?
22   A.    Testing the premise of steam as used in
23   that commercial, is it consistent with the idea of a
24   hot vapor. It may not be exactly the same as steam,
25   but are the two things consistent with one another.

Page 100

1    Q.    Well, in -- in -- you chose the word
2    "hot vapor," the phrase "hot vapor." Right?
3    A.    I did.
4    Q.    In choosing it, did you understand hot
5    vapor to be steam?
6    A.    Maybe not exactly, but close enough to
7    test the proposition that what people took away is
8    not consistent with a mist of water, mist of cold
9    water, but is consistent with a hot vapor.
10   Q.    Now, in your understanding, as somebody
11   that designed the study, is hot, moist air the same
12   thing as hot vapor?
13        MR. ROTHSTEIN: Object.
14   A.    I don't know the answer to that
15   question.
16   Q.    Did you consider using the phrase "hot,
17   moist air"?
18   A.    No.
19   Q.    Was the phrase "hot vapor" one given to
20   you by the lawyers?
21   A.    Well, certainly we talked about it a
22   lot, but I wouldn't characterize them as having
23   given it to me.
24   Q.    Where did the phrase originate, "hot
25   vapor," from you or the lawyers?

Page 101

1         MR. ROTHSTEIN: Object, asked and
2    answered.
3    A.    I suppose from me, but I don't recall.
4    You know, we spent a long time talking about this
5    questionnaire, and I don't remember the moment at
6    which the phrase "hot vapor" came into the
7    discussion.
8    Q.    So in the discussions you had with
9    counsel about the wording you were going to use for
10   Dryer B, you don't remember whether it was the
11   lawyers who said use hot vapor or you first said use
12   hot vapor?
13        MR. ROTHSTEIN: Object,
14   mischaracterizes the testimony.
15   A.    No, I don't remember that.
16   Q.    Did you seek to determine whether
17   there's hot vapor in the Whirlpool Steam Dryer when
18   it's running the steam cycle?
19   A.    Well, what I sought to determine was
20   not that, but what I was satisfied is that the
21   Whirlpool Steam Dryer does not start its steam cycle
22   with a hot vapor.
23   Q.    Does the Whirlpool Steam Dryer have hot
24   vapor during its cycle?
25        MR. ROTHSTEIN: I'm going to object.

26 (Pages 98 to 101)

Reitter - direct

Page 106

1    Q.    Let me rephrase the question, because I
2  see why you paused.
3         How would you go about conducting a
4  consumer survey to determine whether the method of
5  steam creation in the Whirlpool Steam Dryer is
6  material to a consumer's purchasing decision?
7         MR. ROTHSTEIN:  Again, I'm going to
8  object.  That is such a loaded, vague, wide-ranging
9  question.  I don't know how he can answer it.
10    A.    It's -- it's not an easy inquiry,
11  because the way the question is phrased covers a
12  multitude of possibilities; for example, somebody
13  might include in it whether the machine uses copper
14  or lead piping or some other such
15  engineering-related issue.
16         But a more specific concern here is
17  whether people would care if they learned that the
18  Whirlpool dryer does not inject a hot vapor, but
19  rather starts by injecting a mist of cold water, and
20  whether they care about that particular difference.
21         And so if I wanted to test with the
22  materiality of that distinction, I can imagine some
23  direct question being asked about that.  It's not
24  perfect, but -- and I don't know what that question
25  would be.

Page 107

1         This is an awkward venue for designing
2  a study, but all I'm saying to you is that if I were
3  tasked with the question of finding out whether it's
4  a material issue about this particular distinction,
5  then I think some good questions could be asked
6  about that, while they're certainly not perfect.
7    Q.    Is your study perfect?
8    A.    No study is perfect.
9    Q.    So we know that if someone wanted to do
10  the materiality study that you just talked about in
11  your answer like the study you just did, they
12  wouldn't be able to do a perfect one either.  Right?
13    A.    They might not be able to, probably
14  not.
15    Q.    So have you seen any perfect studies in
16  your years of working in the field?
17    A.    Something that can't be criticized, no,
18  I haven't.
19    Q.    And so there's nothing that you're
20  aware of in the science or the methodology of
21  consumer surveys that would be a bar to conducting a
22  study to determine whether it's material to
23  consumers that, for example, steam is made by
24  boiling outside of the dryer versus by heating moist
25  air inside of the dryer, there's nothing that would

Page 108

1  bar doing that type of a study to make that
2  determination, is there?
3         MR. ROTHSTEIN:  I'm going to object to
4  the unbounded hypothetical that you're asking him.
5    A.    I -- when I said that there are
6  problems with the question and that no survey is
7  perfect and so on, I do think this materiality
8  inquiry in this particular case would be subject to
9  more -- that this materiality inquiry would be
10  difficult to implement, not impossible, but
11  difficult, impossible to do perfectly, and perhaps
12  even impossible to do very, very well, but it would
13  be possible to attempt it anyway.
14    Q.    Was one of the purposes of your survey
15  to determine whether consumers believe that steam is
16  the same thing as hot vapor?
17    A.    Well, one of the purposes of the study
18  was to determine if the impression they formed of
19  steam, if they did form an impression of steam, was
20  consistent with the idea of hot vapor.  To that
21  extent, the answer is yes.
22    Q.    Were you attempting to determine
23  whether consumers believe that steam is defined as
24  hot vapor?
25    A.    Just the idea of being consistent with.

Page 109

1  It's not a scientific inquiry.
2    Q.    Let's turn to Page 2 of your report.
3    A.    Yes.
4    Q.    Now, you conclude, and I quote:  A
5  clear majority of the relevant consumers, 66
6  percent, who are shown a test commercial for the
7  Duet Washer and Dryer, rejected the notion that the
8  dryer injects a mist of cold water that is then
9  heated by the normal heating action of the dryer.
10         That's your conclusion.  Right?
11    A.    It is.
12    Q.    Now, this conclusion is based on what
13  data from your survey?
14    A.    On the results of Question 5.
15    Q.    Then you conclude in the next
16  paragraph, and I quote:  Furthermore, 56 percent of
17  those shown the test commercial for the Duet Washer
18  and Dryer came away with the impression that the
19  dryer injects a hot vapor into clothes in the dryer
20  drum as against only 21 percent doing so among those
21  shown in the control commercial.
22         That conclusion is based on what data
23  from your survey?
24    A.    Question 5.
25    Q.    Okay.  And you also conclude, "The

28 (Pages 106 to 109)

Reitter - direct                                    HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 130

1    Q.    So the intent was not to address
2  whether, during the performance of either cycle,
3  there's the existence -- either cycle, being Dryer A
4  or Dryer B, there's the existence of hot vapor?
5         MR. ROTHSTEIN: Object, asked and
6  answered.
7    A.    The focus here is on the entire steam
8  cycle, and it's not a scientific description, but
9  it's -- I believe it to be accurate.
10        And when people were asked whether this
11 general statement about a mist of cold water later
12 being heated is consistent with the impression they
13 got from the test commercial, they got a very clear
14 answer that it was not.
15        MR. ROCHE: We're going to have to
16 change the tape, so it will just take a second.
17        THE VIDEOGRAPHER: This marks the end
18 of Tape No. 3 in the videotaped deposition of
19 Robert Reitter. We are going off the record. The
20 time is 2:47.
21        (A brief recess is taken.)
22        THE VIDEOGRAPHER: This marks the
23 beginning of Tape No. 4 in the videotaped deposition
24 of Robert Reitter. We are on the record. The time
25 is 2:56.

Page 131

1  BY MR. ROCHE:
2    Q.    Mr. Reitter, you said that the focus of
3  the statements for Dryer A and Dryer B was on the
4  entire steam cycle. Is that correct?
5    A.    Yes.
6    Q.    And so the -- the strength of your
7  survey, the scientific strength of your survey,
8  would depend then on whether you got it right in
9  Dryer A, the way you described the Whirlpool steam
10 cycle. Is that right?
11   A.    It should get it right, yes.
12   Q.    But if you don't have it right, if
13 you're not accurately describing the Whirlpool steam
14 cycle, that undercuts the validity of your survey,
15 doesn't it?
16   A.    It would, but of course there are
17 degrees of detail that might or might not be
18 required.
19   Q.    All right. Let's look at the -- okay.
20 Let's look at your -- let's discuss the control
21 commercial.
22        Is the language that is being used in
23 the control commercial ad language that's been used
24 in any Whirlpool advertisement?
25        MR. ROTHSTEIN: Object to form.

Page 132

1    Q.    Do you understand my question?
2    A.    It's an odd question, because the way
3  the control commercial was created was to take
4  language in an actual Whirlpool advertisement and
5  subtract some words from it.
6    Q.    So the control commercial is not a
7  representation of an actual Whirlpool commercial?
8    A.    No. It's modified.
9    Q.    Does the control commercial provide any
10 explanation of the operative function inside the
11 dryer?
12   A.    No.
13   Q.    Does the test commercial give any
14 statement or description of the operative function
15 inside the dryer?
16   A.    No.
17   Q.    The test commercial, though, says steam
18 is used. Right?
19   A.    Yes.
20   Q.    The control commercial does not say
21 that steam is used. Right?
22   A.    Correct.
23   Q.    Why did you remove the mention of steam
24 from the control commercial?
25   A.    To answer that question, I have to

Page 133

1  start by saying why did we have to have a control
2  commercial in the first place, what was the purpose
3  of the control.
4         And researchers use a control for a
5  couple of reasons. One is to be able to understand
6  the extent to which people's answers about the test
7  commercial might have come from preexisting beliefs
8  before they were shown the test commercials.
9         The other is that, especially in the
10 study that relies a lot on a closed-ended question,
11 to examine the degree to which the question itself
12 led people to answer, but not because of what they
13 saw in the test commercial.
14        So to sum it up, the control commercial
15 is there to measure noise, so what we need to do is
16 take out of the test commercial those things that
17 are at issue in the litigation.
18        The one way to have done a control
19 commercial would have been to delete all references
20 to steam and all visuals that depict steam, although
21 -- actually, I'm not sure about that last point.
22 I'd have to think about it some more.
23        But it's the way that the word "steam"
24 is used in the test commercial that we're trying to
25 test. So we could make a control commercial that

34 (Pages 130 to 133)

Reitter - direct

Page 134

1  was the test commercial, but everything about steam
2  was subtracted.
3          The problem was and the reason we
4  couldn't do that or didn't feel we could is that it
5  -- too much is subtracted and nothing is left.  It
6  becomes too incoherent a commercial without it.  So
7  we started with a different commercial for the same
8  product, which had fewer references to steam, and we
9  removed those.
10      Q.    Did you try to use the test commercial
11  as the control commercial?  Did you experiment with
12  taking steam references out of the test commercial
13  so that you could use the test commercial as the
14  test commercial and then the test commercial minus
15  steam references as the control commercial?
16      A.    I didn't actually try to do that.  We
17  talked about doing that, but I think we made the
18  judgment that it had too many audio and video
19  elements in it that included the word "steam."
20      Q.    You removed references to the word
21  "steam" from the control commercial, didn't you?
22      A.    Yes.
23      Q.    Did the control commercial have any
24  video references to steam?
25      A.    Not corresponding to the video showing

Page 135

1  a burst of steam being applied to the shirt in the
2  test commercial, there was nothing like that.  But
3  the water scenes in the control commercial had
4  something rising up from the water, which -- where
5  could be seen as steam or vapor.  It's not clear
6  what they are.
7      Q.    Do you think the common understanding
8  of the water image in the control commercial is an
9  image that evokes steam, the idea of steam?
10      MR. ROTHSTEIN:  Object to form, object
11  to foundation.
12      A.    I don't know.  I mean, one way way to
13  find out is to see how many people mention steam
14  after seeing the control commercial.
15      Q.    Well, that won't tell you that, that's
16  not an accurate way to test that, is it, sir?
17      MR. ROTHSTEIN:  Object, vague.
18      Q.    Go ahead.
19      MR. ROTHSTEIN:  I didn't understand the
20  question.
21      Q.    Well, how many references -- how many
22  steam mentions came from the open-ended questions in
23  the control commercial?
24      A.    Well, let's look it up.  I think the
25  easiest way is to turn to Page 18, as I recall.  And

Page 136

1  it's there.  It's 11 percent.
2      Q.    Is that statistically significant for
3  your purposes in this study?
4      A.    I'm not sure I understand the question.
5          Is it significantly different from
6  zero, do you mean?
7      Q.    Is -- what is the significance to which
8  you attach 11 percent representing steam mentions in
9  the control commercial?
10      A.    That's a partial answer to the question
11  that you asked, which is how many people would take
12  what was shown in that control commercial as being
13  steam.
14      Q.    What's the rest of the answer?
15      A.    That if we wanted to find out about
16  that, we would have to ask closed-ended questions,
17  but that would get in the way of our asking our
18  Question 5.
19      Q.    Why did you decide to use the imagery
20  of a waterfall and mist for a control commercial,
21  yet for your test commercial, you had absolutely no
22  reference to the same type of imagery that existed
23  in the control commercial?
24      A.    I didn't have a lot of commercials to
25  choose from.  I needed a commercial since the test

Page 137

1  commercial had too many references to steam to make
2  a practical control commercial.
3          The next best thing that I could find
4  was another commercial for the steam line, the steam
5  washer and dryer, and the only other one that I knew
6  of was this waterfall commercial.
7      Q.    Did you do any searching yourself for
8  candidates?
9      A.    I didn't.
10      Q.    You relied on the lawyers?
11      A.    Yes.
12      Q.    Turn to Page 15, please.
13      A.    Yes.
14      Q.    In the paragraph under the chart, you
15  discuss the mentions of steam in the test commercial
16  versus the control commercial.  Right?
17      A.    Yes.
18      Q.    And you say, "The few mentions of steam
19  in the latter group" -- that's the control group --
20  "appear to have been produced by visual elements of
21  the control commercial that suggest steam.
22          What are the visual elements that -- in
23  the control commercial that suggest steam?
24      A.    Well, there are two points.  One, as I
25  say, appear to have been produced, so that's an

35 (Pages 134 to 137)

Reitter - direct                                                    HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 142

1        Well, actually, because this page only
2  talks about percentages, it's more useful to go to
3  the computer table, which is easy to find because
4  it's the one that was originally missing.
5        And there we can look at numbers of
6  respondents.  So if we look in the test group, the
7  hot vapor only, 115 is the same in the e-mail as it
8  is in the computer table.
9        Cold water only is the same as 22,
10  either is 40 in the e-mail, but is 37 in the final
11  table, and neither is 20 in the e-mail, but 21 in
12  the final table, don't know is 12 and 12 in both.
13  So very small and immaterial differences, but those
14  are they.
15      Q.    Now, in the control group, how do you
16  explain the differences which are -- which are --
17      A.    Well, in the control group, hot only is
18  36, but the final number was 43.  Cold only is 64,
19  it became 69.  Either is 78 in the e-mail, but only
20  63 in the final analysis.
21        Eleven is the answer for -- for either
22  -- I'm sorry, neither versus 10 and 20 and 21 of the
23  don't know answers.  There's some larger
24  discrepancies in some of the answers in the control
25  group.

Page 143

1      Q.    What would account for the large
2  discrepancies?
3      A.    Well, let me look again at the page
4  that shows the dates of the fieldwork and maybe that
5  will give us a clue.  That is Page 13, August 29th,
6  and this e-mail -- yes, that's the answer.
7        This e-mail is dated August 15th, and
8  the fieldwork wasn't completely finished until
9  August 29th, so there was two weeks left of
10  fieldwork.
11        So probably what's going on here is
12  that the 418 respondents the e-mail is based on
13  includes perhaps 15 or so questionnaires that were
14  later subtracted in that process that I called
15  editing earlier.
16        But there were other questionnaires
17  still being collected in the field, so that the
18  total number was both cut down by these editing and
19  added to supplemented by further interviewing.
20        (Exhibit 139, Table, is marked for
21  identification.)
22      Q.    What is Exhibit 139?
23      A.    This is the table that I mentioned
24  earlier that is the answers to Question 5 among
25  those exposed to the test commercial, but only those

Page 144

1  -- limited to those respondents who played back
2  anything about steam in answers to an open-ended
3  question.
4      Q.    When was this prepared?
5      A.    Some time ago, but after the completion
6  of this document.
7      Q.    Well, how long ago?
8      A.    Somewhere -- a month or two, something
9  like that.
10      Q.    Why did you prepare it?
11      A.    We were discussing the results.  I was
12  discussing them with Ron Rothstein, and I don't
13  remember the exact context in which the idea came up
14  that -- well, you know, when we were originally
15  devising the protocol, there was a lot of discussion
16  about whether there was a filter question we could
17  ask prior to the Question 5.
18        And there was no filter question that
19  was a non-biasing filter question, so even back
20  then, it was contemplated that instead of a filter
21  question, we could use the concept of looking for
22  people who, on their own, mentioned steam and
23  thereby showed that this was a subject that they had
24  perceived in the commercial.
25        And it's just that somehow in the

Page 145

1  writing of this report, it didn't occur to me to
2  include that analysis, and subsequent discussion
3  made me aware that it could be done and I did it.
4      Q.    What's the significance of this for
5  your opinion?
6      A.    It's just confirmation of the fact that
7  the answers to Question 5 did not require a filter
8  question.
9      Q.    How does it confirm that?
10      A.    If the filter question would different
11  commercials say sure, won't find anything about
12  steam, then all those people, 141 of them who
13  mentioned steam on their own, wouldn't have been
14  asked that filter question because they answered it
15  already by having mentioned something about steam.
16        (Exhibit 140, Supplement to Appendix F,
17  is marked for identification.)
18      Q.    Exhibit 140 is entitled, "Supplement to
19  Appendix F."
20        What is this, sir?
21      A.    These are documents that I reviewed,
22  but subsequent to the date that I prepared this
23  report that we're looking at.
24      Q.    Why did you review these?
25      A.    I go over them one by one.  I reviewed

37 (Pages 142 to 145)

Page 166

1  think that's very awkward.
2        A mist of water -- cold water line is a
3  mist that's created from water drawn from the cold
4  water line. It would have -- it's very awkward.
5        Q.    You wanted to draw the contrast between
6  hot vapor being injected by one machine and cold
7  water being injected by the other machine. Is that
8  correct?
9        A.    I did want to do that, but it wasn't
10  the only thing I wanted to do.
11        Q.    Well, what else did you want to do?
12  What other contrasts did you --
13        A.    I also --
14        Q.    What other contrasts did you want to
15  draw?
16        A.    The rest of the sentences are also
17  important, although they're less contrasting. The
18  Dryer A here heats the water and Dryer B heats the
19  clothes, so there's a little bit of a difference,
20  but not as sharp as the difference in the first part
21  of the description.
22        Q.    That's because you wanted the
23  respondents to focus on the sharp distinction
24  between the first part of the description in making
25  their selection?

Page 167

1        MR. ROTHSTEIN: Objection.
2        A.    Not really, no, no. I wanted to give
3  them a concise idea of what happens in the Whirlpool
4  dryer, and actually, what happens in the LG dryer,
5  and see whether each is consistent with the
6  impression of steam that the commercial created.
7        Q.    Seeing if there's any we haven't
8  covered already.
9        Mr. Nowlis has comments in here about
10  your use of the control commercial and the way it
11  compares to the test commercial.
12        Do you have a response to that? That's
13  on Page 15.
14        A.    Yes, yes. He says that the
15  differences, other than steam, between the test and
16  the control commercial are problematic, and I don't
17  see that that's particularly the case.
18        As a matter of fact, earlier when you
19  had me compare the responses to the main ideas
20  question between the test and the control
21  commercial, it was striking that the two most
22  prominent mentions are -- come up to equal or of
23  equal levels, that it's a washer/dryer combination
24  that's made by Whirlpool.
25        And some of the things he says are

Page 168

1  mentioned in the test commercial, but not in the
2  control commercial. Yes, they come out in the
3  results, but they're not important in the analysis.
4        But in any event, you know, the
5  discussion that he points to in Shari Diamond's
6  manual -- section for the Manual of Complex
7  Litigation says that the control stimulus should be
8  as similar as possible to the test stimulus.
9        And I do agree with that, but as I
10  testified earlier, it really wasn't possible to
11  modify the test commercial in this case, because the
12  mentions of steam and the demonstrations of steam
13  are too prominent, so the next best thing is to use
14  a different control, a different commercial for the
15  control purpose, but still for the same product, and
16  we did that.
17        And I'm sure that Shari Diamond would
18  approve wholeheartedly of that procedure here.
19        Q.    Now, let's turn to the last page of
20  Mr. Nowlis's report, and there's a statement there
21  that you said was an odd statement or something to
22  that effect.
23        Why don't you get there and point that
24  out to me?
25        A.    Well, it's in the last paragraph,

Page 169

1  especially the last half of the last sentence.
2  "This does not tell us anything about their
3  impressions of the way this steam was created or if
4  they perceived the steam they heard about to be
5  steam."
6        I do find that last phrase to be most
7  amazing and unusual and hard to interpret, but in
8  any event, my job was not to find out anything about
9  the way that the steam is created. It's the way --
10  I'm not speaking clearly now.
11        Of course, people don't have an
12  impression of how this steam is created since the
13  commercials don't get into that at all.
14        It's just a matter of whether a cold
15  mist being injected into the dryer is consistent
16  with the impression they have about steam, to the
17  extent that they had an impression about steam, and
18  that's what we were investigating.
19        MR. ROCHE: Thank you, Mr. Reitter.
20  Those are all my questions.
21        Do you have any questions. Ron?
22        MR. ROTHSTEIN: I don't believe so, but
23  let me go talk to Bob, and I'll come back and let
24  you know.
25        THE VIDEOGRAPHER: We're going off the

43 (Pages 166 to 169)

# Exhibit 4

Yoram (Jerry) Wind
Wind Associates, Inc.
1041 Waverly Road
Gladwyne, PA 19035
(610) 642-2120
windj@wharton.upenn.edu

### Rebuttal Report Evaluating the Expert Report and Study of Dr. Ravi Dhar and the Report of Dr. Nowlis

## I. Objectives

1.  <u>Objectives</u>. I, Yoram (Jerry) Wind was asked by counsel to LG to (a) evaluate Dr. Dhar's study and January 5, 2009 Expert Report, (b) evaluate Dr. Nowlis' Expert Report in critique of the Reitter study and (c) evaluate the materials provided by Whirlpool in support of their counterclaim.

## II. Qualifications

2.  I am the Lauder Professor and Professor of Marketing at the Wharton School of the University of Pennsylvania. I joined the Wharton staff in 1967, upon receipt of my doctorate from Stanford University.

    (a) <u>Publications</u> – I have been a regular contributor to the marketing field,[*] including 22 books and over 250 papers, articles and monographs. My books and articles, which are frequently cited by other authors, encompass marketing strategy, marketing research, new product and market development, consumer and organizational buying behavior, and global marketing strategy.

    (b) <u>Editorships</u> – I have served as the editor-in-chief of the *Journal of Marketing*, as a guest editor of numerous marketing journals, on the policy boards of the *Journal of Consumer Research* and *Marketing Science*, and have been on the editorial boards

---

[*] Marketing, according to the American Marketing Association, is the process of planning and executing the conception, pricing, promotion and distribution of ideas, goods and services to create exchanges that satisfy individual and organizational goals. (P.D. Bennet ed. Dictionary of Marketing terms, Chicago AMA 1988, p.54)

who used initial screening in proportion to the population age/gender distribution but included in the study only those respondents from this pool of respondents who met the other screening criteria.

16.  <u>Summary.</u> The cumulative effect of all the shortcomings of Dr. Dhar's study (Paragraphs 6-14) prevents one from relying on the results of his study and accepting any of his conclusions.

### V. The Reitter Study and Dr. Nowlis's Critique

17.  <u>The description of the dryer in the Reitter study is consistent with Whirlpool internal documents.</u>

Dr. Nowlis states "The description of the dryer that Mr. Reitter used to represent a Whirlpool steam dryer is not an accurate representation of that dryer"(Nowlis report paragraph 6). The description used by Mr Reitter (for Dryer A) is: "A mist of cold water is injected into the heated dryer drum. The dryer heats the water and tumbles the cloths until dry". Dr Nowlis' criticism is for the use of the word "cold" and he states in paragraph 17 of his report:"…my understanding is that the Whirlpool steam dryer does not actually need "cold" water, but instead water of any temperature that comes out of a cold water line". Contrary to this belief, the Internal Whirlpool documents do clearly and explicitly state the "cold" water requirements. [See e.g., WHR017602, WHR007319-R, WHR016353-R, WHR040362].

Consider for example:

A 1/08/07 e mail from Rosario Ciancimino, Senior category manager, Whirlpool Brand Laundry, who states

> "..when showing the "reasons to believe" (i.e., how steam is generated), let's be mindful that the Duet sprays nebulized (cold) water while the FF (Fabric Freshener) has an actual steamer which dispenses hot vapor" [WHR 033779]

23

See also the discussion in my evaluation of Dr. Dhar study in paragraphs 8 (a) and 9.

Furthermore in his discussion in paragraph 17 Dr. Nowlis states "…a typical consumer would most likely think cold water is refrigerated water or icy water …"This is purely speculative statement without any evidence.  The best evidence is the way the feature was discussed internally, and both the science and marketing employees said the system uses cold water.  This is confirmed by Pamela Rogers in her deposition testimony:

> Q.  Okay.  Now, Erika Vallecorsa says, the Duet Steam does in fact create real steam in the dryer during the steam fresh cycles.  The Whirlpool Duet uses a very fine mist of <u>cold</u> water in the heated dryer drum.  The combination creates steam, which penetrate – which penetrates deep into the fibers of clothes to reduce -- to release wrinkles and remove odors.  Do you see that?
>
> A.  Yep.
>
> Q.  Okay.  Now, is she correct?  Is that how it works?
>
> A.  She is correct, absolutely.
>
> [Pamela Rogers deposition p.197 ln. 13-23]

18.  <u>The control used in the Reitter study is a proper control</u>

Dr. Nowlis states "..the Reitter survey used an improper control  commercial (Nowlis paragraph 6).  He further explains in paragraph 36 of his report : "In sum, a test commercial and a control commercial should differ only in terms of the supposedly deceptive material".  While this is desirable if feasible, Dr. Nowlis ignores a frequently used control which is equally appropriate – a similar (but not identical stimuli) without the offending message.  This is often done when the creative execution of the  test commercial is an integral part of the key message (in this case the steam) and therefore just removing the words or phrases in question is not enough to create a meaningful control. In such cases it is customary to select a commercial (ideally from the same campaign), assure that it does not have the offending message (in this case any steam reference) and use it as a control.

This is what Mr Reitter did. His control commercial was from the same campaign as the test commercial. Both the test and the control focused on the key benefit: "naturally steam out wrinkles and odors" in the test and "Relax wrinkles and removes odors" in the control commercial. Both the test and the control stressed the Whirlpool Duet washer/dryer product set and both ended with the tag line of "Whirlpool-the power to get more done". Thus Mr. Reitter control commercial is consistent with the principle articulated by Shari Diamond (as quoted by Dr Nowlis paragraph 28) and is perfectly acceptable.

In a separate section of his report (Nowlis paragraph 16) Dr. Nowlis brings the responses of the control group as evidence of guessing. Yet the fact that respondents in the control group responded to all 5 response categories (and not only to the Don't know category) is evidence that the control works. Respondents could have seen other commercials and promotional material about steam dryers of Whirlpool and its competitors (including the test commercial) before the test and the control group did capture these prior beliefs and correctly controlled for them.

19. <u>The closed end questions in the Reitter study are not leading, inaccurate or ambiguous</u>

Dr. Nowlis states "...the design of the survey suffered from other fatal flaws, such as ambiguous response categories, reliance on leading closed –ended questions, and failure to attempt to reduce guessing" (Nowlis paragraph 6). He further develops his criticism by focusing on three topics:

    (a)    "closed ended questions promote guessing" ..and "the Reitter survey forces respondents to answer a very specific question.." (Nowlis paragraph 10). In addition the report has a heading: "'don't know' response not provided, which promotes guessing." (above paragraph 13 of the Nowlis report).

    ---- This criticism is without any foundation since the Reitter survey closed ended question clearly stated the option of "or don't you know" (see Reitter main

questionnaire Q 5). In addition at the introductory instructions (above Q 1) the questionnaire clearly stated "if you don't know the answer to any question I ask, its Okay to tell me so" and in the filter question 3a "Did the commercial say, show or imply anything about any unique feature of the advertised dryer," the option of "don't know" was given as well.

In fact, in the response to Q 3a 12.6% of the test respondents and 13.1% of the control respondents selected the "don't know" option. And in response to the key closed end question (Q 5) 5.8% of the test respondents and 9.7% of the control respondents selected the Don't Know option.

(b)　Not rotating the don't know option. Dr. Nowlis' criticism that Mr. Reitter "never rotated the order in which the "'don't know': response was listed" (Nowlis report paragraph 15) is wrong!. The don't know option is always presented after the main response categories and is not mixed in the middle of them.　Dr. Dhar, for example, in his rating questions (Q 2b and 3a) included the "don't know" options correctly after the scale.

(c)　Dr. Nowlis' criticism of the use of the term "could be" as ambiguous (paragraph 23) is totally speculative and not supported by evidence.　In fact, it is obvious that it was phrased in this way to avoid bias – which favors Whirlpool.

20.　The open ended responses in the Reitter study are not showing lack of confusion

Dr. Nowlis states "…the response to the less leading open ended questions show no evidence of confusion about the way in which the whirlpool dryer creates steam" (Nowlis report paragraph 6).

This is not surprising at all since the open ended question of "What was the main idea of the commercial" (Q1) and its follow up probe "what else, if anything, did the commercial

say show or imply? (Q2) elicit the respondent's main ideas. And, the main idea of the test and control commercials according to the Reitter study are:

| | Test | Control |
|---|---|---|
| Steam | 68% | 11% |
| Ready to wear in 15 minutes | 55% | 0% |
| It's a washer dryer combination | 43 % | 43% |
| Made by whirlpool | 37% | 37% |
| Removes/relaxes wrinkles | 30% | 44% |

Not surprisingly consumers do not perceive the way the dryer creates steam as the major message of the commercial.

This is precisely the reason why a follow up closed end question is needed and in fact was asked. Indeed, this is a common approach when implied messages are the basis for the study.

The study clearly shows that the test commercial sends the message that the dryer is a steam dryer with its associated benefits of "ready to wear in fifteen minutes". Since the difference between the test and control group on this attribute are highly significant (68% vs 11%) the open ended questions clearly show the presence of confusion regarding the fact that the dryer is perceived as a steam dryer in contrast to the internal Whirlpool documents that state that it is not a steam dryer. (See paragraph 10 of this report in the context of my evaluation of Dr. Dhar report).

21. <u>The perception of the steam message does suggest the importance and materiality of steam</u>

Dr Nowlis states: "Dr Reitter's 'findings' that the 'playback' of the message about steam was 'impressive' says nothing about its importance or materiality" (Nowlis report paragraph 6)

Dr Nowlis is wrong! As discussed in paragraphs 7 and 10 of this report the perception of the dryer as being steam dryer with its benefits is by itself an indication of the importance of steam and its materiality.

### VI. The "directional study" supporting Whirlpool's counterclaim

22. The "directional consumer perception study" referred to in Joel Van Winkle letter to Richard Wingate [WHR 050655-R] offers only two other documents relating to this study and in support of Whirlpool's counterclaims [See Answers to LG's Seventh Set of Interrogatories #1 and #2]:

> (a)  LG "Dirty City" commercial- suggested consumer perception survey questions" [WHR050647/8R ] and

> (b)  two tables with typed responses of 12 respondents [WHR050649/50R].

The counter claim provided no information on the survey design that is required to evaluate any survey. Specifically it did not provide any information on:

a. Objective of the study

b. Research design

c. Universe

d. Sampling procedure and size

e. Final questionnaire

f. Data collection approach (was it telephone, mail, internet, personal?)

g. Field instructions and data collection procedures

h. The actual completed questionnaires

i. Data analysis

j. Verification

Without having this information no one can rely on the results of the 12 respondents.

# Exhibit 5

DEF'S. DEP EX.
139

Table 1

DRYER COMMERCIAL STUDY #N25-0208

Q.5 RESPONSE TO DESCRIPTIONS
BASE: STEAM (NET)

GUIDELINE

| | SAW TEST COMM'L | |
|---|---|---|
| TOTAL RESPONDENTS | 141 | |
| COULD BE COLD WATER ONLY | 11 | 7.8 |
| COULD BE HOT VAPOR ONLY | 87 | 61.7 |
| COULD BE EITHER COLD WATER OR HOT VAPOR | 23 | 16.3 |
| COULD NOT BE EITHER COLD WATER OR HOT VAPOR | 14 | 9.9 |
| DON'T KNOW | 6 | 4.3 |