# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LG ELECTRONICS U.S.A., INC. ) | |
| a subsidiary of LG Electronics, Inc., ) | |
| a Korean company ) | |
| ) | **Civil Action No.: 08 C 242** |
| **Plaintiff,** ) | |
| ) | **Judge St. Eve** |
| v. ) | |
| ) | **Magistrate Judge Mason** |
| **WHIRLPOOL CORPORATION,** ) | |
| ) | **REDACTED** |
| **Defendant.** ) | |

**WHIRLPOOL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

I.     INTRODUCTION ..................................................................................................... 1

II.    STATEMENTS OF FACTS AND PREVIOUS PROCEEDINGS ................................... 2

III.   ARGUMENT ............................................................................................................ 3

   I.   AS A MATTER OF LAW, LG CANNOT PROVE THAT WHIRLPOOL'S
      ADVERTISING IS LITERALLY FALSE ....................................................... 3

      A.  Steam can be defined as water at or above 100 C, or as "a vapor arising from a
          heated substance." According to LG's expert, Whirlpool's steam dryer
          satisfies both definitions ....................................................................................... 4

      B.  Discovery has not created any material disputed fact on the question of literal
          falsity.................................................................................................................. 7

   II.  AS A MATTER OF LAW, LG CANNOT PROVE THAT WHIRLPOOL'S
       ADVERTISING IS IMPLIEDLY FALSE ........................................................ 7

      A.  As a threshold matter, implied falsity claims require proof of an implied
          message .............................................................................................................. 8

      B.  LG has failed to establish any implied message ............................................... 9

         1.  The Reitter report—LG's only consumer survey evidence—is fatally
            defective ................................................................................................. 9

         2.  LG has no evidence establishing that Whirlpool's advertising implies "hot,
            billowy white" moisture in the Whirlpool dryer.................................... 11

   III. DISMISSAL OF LG'S LANHAM ACT CLAIMS NECESSITATES
        DISMISSAL OF LG'S STATE LAW CLAIMS, AS WELL ......................................... 11

IV.  CONCLUSION ....................................................................................................... 12

## TABLE OF AUTHORITIES

Page

### Cases

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
   168 F.3d 967 (7th Cir. 1999) .................................................................................. 3

*Coors Brewing Co. v. Anheuser-Busch Cos.*,
   802 F. Supp. 965 (S.D.N.Y. 1992) ...................................................................... 4, 7

*First Health Group Corp. v. BCE Emergis Corp.*,
   269 F.3d 800 (7th Cir. 2001) ............................................................................... 2, 7

*First Health Group Corp. v. United Payors & United Providers*,
   95 F. Supp. 2d 845 (N.D. Ill. 2000), *aff'd sub nom. First health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001)......................................................... 4, 7

*Gimix, Inc. v. JS & A Group, Inc.*,
   699 F.2d 901 (7th Cir.1983) ................................................................................. 12

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
   191 F.3d 813 (7th Cir. 1999) .................................................................................. 3

*Johnson & Johnson v. Smithkline Beecham Corp.*,
   960 F.2d 294 (2d Cir. 1992) ........................................................................ 8, 10, 11

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*,
   No. 91-7009, 1993 WL 21239 (E.D. Pa. Jan. 29, 1993), *aff'd*, 19 F.3d 125 (3d Cir. 1994) ....................................................................................................................... 8

*Kraft, Inc. v. F.T.C.*,
   970 F.2d 311 (7th Cir. 1992) .................................................................................. 8

*Mead Johnson & Co. v. Abbott Labs.*,
   201 F.3d 883, *op. amended on denial of reh'g by*, 209 F.3d 1032 (7th Cir. 2000) .................. 4

*MJ & Partners Rest. Ltd. v. Zadikoff*,
   10 F. Supp. 2d 922 (N.D. Ill. 1998) ..................................................................... 12

*Republic Tobacco L.P. v. North Atlantic Trading Co.*,
   No. 06C2738, 2007 WL 1424093 (N.D. Ill. May 10, 2007) .................................. 3

*Spex, Inc. v. Joy of Spex*,
   847 F. Supp. 567 (N.D. Ill. 1994) ........................................................................ 12

**I.     INTRODUCTION**

This litigation is just one part of a larger marketing battle being waged over two similar yet distinct "steam" dryers, each designed to refresh dry clothes by relaxing wrinkles and reducing odors. Today, consumers have a choice. They can purchase the LG steam dryer, which creates hot water vapor that cools as it is directed into the dryer drum and settles on cool clothing; or, they can purchase technology used in the Whirlpool[1] steam dryer, which sprays a mist of water into a heated dryer drum, converting it to hot vapor after contact with heated air, the dryer drum surface, and clothing. **Both** dryer technologies create hot, moist air in the dryer drum; and **both** dryer technologies relax wrinkles and reduce odors in dry clothing, as shown in LG's own test documents.

Using the vehicle of litigation, LG now seeks judicial coronation of its external boiler system as the steam laundry standard, to the exclusion of any other technology. However, LG ignores that it is Whirlpool's system, not LG's, that has become the industry's prevailing approach. Bosch, Samsung, Sears/Kenmore, and Electrolux all provide consumers with steam dryer technology choices identical to Whirlpool's, and they all vigorously compete, marketing these products under the "steam" name or by describing the technology as a "steam" cycle. LG also ignores Consumer Reports—a leading, independent, non-profit organization dedicated to helping consumers "distinguish hype from fact"— which characterizes Whirlpool's "water hookup and heat" as a "steam setting." Consumer Reports describes Whirlpool's system as a steam dryer, correctly stating that it operates by spraying "a small amount of water . . . into the drum while tumbling with heat." Notably, LG described the same vapor produced by Whirlpool's technology as "steam" in patent filings *for LG dryers* and ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ a definition the Whirlpool dryer easily satisfies.

Given the above, Whirlpool's use of the word "steam" in this context is neither literally false nor likely to mislead consumers. This reality is underscored by Whirlpool's open disclosure to consumers that its "steam" cycle involves the injection of water into a heated drum. "What [LG] wants—a judicial decree that only [dryers] using a [boiler] can employ the term ["steam"]—is nothing less than an order establishing property rights in the language. . . . [LG]

---

[1]     Defendant Whirlpool and its brand, Maytag, will be referred to collectively as "Whirlpool."

1

should have turned to an advertising agency, not to a court . . . ." *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 804-05 (7th Cir. 2001). Accordingly, Whirlpool respectfully requests that the Court grant summary judgment in Whirlpool's favor on all of LG's claims.

## II. STATEMENTS OF FACTS AND PREVIOUS PROCEEDINGS[2]

Whirlpool's steam dryer technology was the first to be launched in the United States. (SOF ¶ 10.) Unlike traditional dryers, steam dryers have the ability to refresh dry clothing, relaxing wrinkles and removing odors by exposing the clothing to the combined action of heat, moisture, and tumbling. (SOF ¶¶ 5-8.) Whirlpool's steam dryer[3] injects a fine mist of water into a heated dryer drum; the water combined with the heat creates steam. (SOF ¶¶ 1-2, 13.) LG's own testing establishes that Whirlpool's steam dryer relaxes wrinkles in and removes odors from dry clothing. (SOF ¶¶ 3-4, 50-51.)

Subsequent to Whirlpool's launch, LG released its own steam dryer, which has an external boiler wherein water is heated to create steam and directed into a cool dryer drum. (SOF ¶¶ 20-22.) LG then sued, alleging that Whirlpool's use of the word "steam" to describe the Whirlpool steam dryer is literally false and therefore violates the Lanham Act. (Docket No. 101, 3/19/08 Op. at 1.) In denying LG's motion for a preliminary injunction, this Court held that LG had not demonstrated a likelihood of success on its literal falsity claim because LG's testing showed that at least a portion of the Whirlpool steam dryer "reaches temperatures that exceed 100° C" (*id.* at 4-5), and because LG had not established that the Whirlpool steam dryer did not satisfy an alternative, common definition of the word steam: "a vapor arising from a heated substance" (*id.* at 5-6, quoting Merriam-Webster's Collegiate Dictionary (10th ed. 1999)).

LG's engineering expert has since conceded that Whirlpool's steam dryer generates vapor rising from a heated substance, too. (SOF ¶¶ 27, 43; Exh. 43, Jacobi Dep. at 122:6-21



); *id.* at 147:19-148:2 (

---

[2] Additional background facts and record support appear in Whirlpool's separately filed Local Rule 56.1(a)(3) Statement of Material Facts ("SOF").

[3] References to Whirlpool's "steam dryer" refer collectively to the Duet® Steam Dryer, the Maytag Bravos™ Steam Dryer, and the Whirlpool Cabrio® Steam Dryer. Whirlpool also manufactures the Kenmore line of steam dryers, which contains the same steam generation technology as the Whirlpool steam dryers. (SOF ¶¶ 11, 12.)

███████████████████████████████████████████████████████████████████

███████████████████████████████████████).)

Electrolux, Bosch, Sears/Kenmore, and Samsung all manufacture and market dryers with the same technology as Whirlpool, describing those appliances as "steam dryers" or having "steam cycles." (SOF ¶¶ 52-53.) LG nevertheless asserts that marketing this type of technology as one that creates "steam" is literally and impliedly false. The question is whether LG should be allowed to proceed to the jury with a claim to permanently enjoin Whirlpool from using the word "steam" in advertising, when "steam" accurately describes Whirlpool's process, and other laundry appliance industry participants use the same word to describe an identical process.

### III. ARGUMENT

To prove a false advertising claim under Section 43(a) of the Lanham Act, LG must show that Whirlpool "(1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to" LG. (Docket No. 101, 3/19/08 Op. at 2, quoting *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999).) It is LG's burden to prove that Whirlpool's advertising is false. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *Republic Tobacco L.P. v. North Atlantic Trading Co.*, No. 06C2738, 2007 WL 1424093, at *4 (N.D. Ill. May 10, 2007). LG is unable to satisfy its burden of proving a false advertising claim. For purposes of summary judgment, Whirlpool will focus on element (1), *i.e.*, LG's allegation that Whirlpool has made an advertising statement that is either literally or impliedly false.

### I. AS A MATTER OF LAW, LG CANNOT PROVE THAT WHIRLPOOL'S ADVERTISING IS LITERALLY FALSE.

LG claims that Whirlpool engages in false advertising by describing and advertising its product as a "steam" dryer. Specifically, LG contends that Whirlpool's advertising is literally false because Whirlpool's steam dryer "does not create steam under any common and ordinary definition of the word within the context of washer and dryer systems." (Exh. 35, LG Supp. Resp. to Whirlpool's Second Set of Interrogs. at 3-5.) It follows that if this Court concludes that Whirlpool's steam dryer **does** create steam under any common and ordinary definition of the word within the washer and dryer context, Whirlpool is entitled to summary judgment.

3

### A. Steam can be defined as water vapor at or above 100 C, or as "a vapor arising from a heated substance." According to LG's expert, Whirlpool's steam dryer satisfies both definitions.

As this Court observed in denying LG's motion for preliminary injunction, there are multiple definitions of the word "steam." (*Cf.* SOF ¶¶ 23, 31-36.) One definition is technical, *i.e.*, a clear gas obtained by vaporizing water heated to a temperature at or above 100 C at standard (or atmospheric) pressure.[4] (Docket No. 101, 3/19/08 Prelim. Inj. Op. at 3-4; *see also* SOF ¶ 26.) Another common, broader (or "lay") definition is "a vapor arising from a heated substance." (*Id.* at 5, quoting Merriam-Webster's Collegiate Dictionary (10th ed. 1999); *see also* SOF ¶ 31.)[5] LG has proffered no expert testimony that consumers' understanding of the word "steam" in the washer and dryer context is any different than this common dictionary definition.[6]

Whirlpool's advertisements are not literally false as long as its claim meets at least one of those definitions (s*ee Coors Brewing Co. v. Anheuser-Busch Cos.*, 802 F. Supp. 965, 969-70 (S.D.N.Y. 1992); *see also* Docket No. 101, 3/19/08 Op. at 5-6),[7] though the Lanham Act's consumer focus suggests that sources like the dictionary are the most relevant indicia of word meanings, rather than technical definitions. *See Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 886, *op. amended on denial of reh'g by*, 209 F.3d 1032, 1034 (7th Cir. 2000) (dictionaries are a proper way to determine common word meanings in a false advertising case). In any event,

---

[4] Since the Court's ruling, LG's engineering expert has even narrowed his technical definition of the word "steam" to mean "pure water vapor," with absolutely no air in the mixture. (SOF ¶ 24.) But, as LG's expert admits, neither LG nor Whirlpool have steam in the dryer drum under this extremely narrow definition. (*Id.* ¶ 25.)

[5] There are other definitions, which the Whirlpool steam dryers also satisfy. (SOF ¶¶ 31-49)

[6] LG's engineering expert, Dr. Jacobi, asserted in his expert report that consumers have a different understanding of the word. (Exh. 2, Jacobi Rep. ¶ 5.) But in his deposition, Dr. Jacobi admitted ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Exh. 43, Jacobi Dep. at 37:9-38:9, 40:2-41:5; *see also* SOF ¶ 28.) This topic is the subject of a separate *Daubert* motion to strike those portions of Dr. Jacobi's expert report in which he purports to say what consumers understand when they hear the word "steam."

[7] *Accord, e.g., First Health Group Corp. v. United Payors & United Providers*, *Inc.*, 95 F. Supp. 2d 845, 851 (N.D. Ill. 2000) (where a word does not have a fixed definition, courts should be especially reluctant to enjoin an alleged misuse of that word), *aff'd sub nom. First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) (refusing to enjoin defendant's use of the phrase "preferred provider organization," or PPO, where that word did not have a fixed definition).

4

Whirlpool's steam dryer satisfies both the technical **and** lay definitions of the word "steam," as well as LG's own definition of the word until it filed this litigation.

*First*, as this Court noted in denying LG's preliminary injunction motion, LG's testing has established "that at least a portion of [Whirlpool's] dryer drum reaches temperatures that exceed 100° C." (Docket No. 101, 3/19/08 Op. at 4-5 (numerous record citations omitted); *accord* SOF ¶ 27.) And, the Whirlpool dryer does create steam at this temperature because "[s]ome water vapor is heated to 100 C or higher within the Whirlpool Dryer" and "[o]ne cannot differentiate, from a thermodynamic state, whether the water vapor came from boiled water subsequently mixed with air and heated"—as in the LG dryer—"or from evaporated water mixed with air and heated"—as in the Whirlpool dryers. (SOF ¶¶ 17-18, 27; Exh. 45, Malladi Dep. at 109:7-11, 119:4-120:5; *accord* SOF ¶ 9 (both LG's and Whirlpool's steam dryers expose dry clothes to hot, moist air within the dryer drum).) Accordingly, the Whirlpool dryer meets LG's technical definition of "steam."

*Second*, LG's engineering expert, Dr. Jacobi, conceded in his deposition that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (SOF ¶¶ 27, 43; Exh. 43, Jacobi Dep. at 122:6-21 (acknowledging that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); *id.* at 147:19-148:2 (agreeing that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); *see also* SOF ¶¶ 42, 44-48 (describing how Whirlpool steam dryers contain "vapor arising from a heated substance").) Accordingly, the Whirlpool dryer meets the dictionary definition of "steam" as well.

*Third*, internal LG documents show that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (SOF ¶¶ 6, 41.) Whirlpool's steam dryer combines water, heat, and movement (SOF ¶ 8) which ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The Whirlpool dryer thus meets the definition of "steam" ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. In fact, both the LG and Whirlpool steam dryers expose dry clothes to this hot, moist air environment within the dryer drum. (SOF ¶ 9.) It is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (SOF ¶¶ 6, 7.)

*Fourth*, in its patent filings outside the crucible of litigation, LG describes as "steam" the process by which water vapor is extracted from heated clothes in a dryer:

5

> The clothes dryer heats the clothes by making the high temperature-little moisture air flow into the drum. Herein, the high temperature-little moisture air is converted into high temperature-much moisture air by **steam** generated while the clothes are heated.

(SOF ¶ 37 (emphasis added); *see also* ¶¶ 38-41.) Accordingly, the Whirlpool dryer even meets LG's definition of "steam" as LG uses that word in patent filings for the exact same product.

In sum, Whirlpool's steam dryer satisfies not only the technical and lay definitions of the word "steam" as defined in this Court's March 19, 2008 Opinion, but also mirrors LG's own use of the word "steam" when LG is not seeking to enjoin a competitor from competing with LG's products. Whirlpool's advertising claims regarding the steam dryer are therefore not literally false. This conclusion is further supported by Consumer Reports. (SOF ¶ 60-66.) In its 2009 review of "steam dryers," Consumer Reports describes the Whirlpool Cabrio® dryer as having a "steam option" in which "a small amount of water is sprayed into the drum while tumbling with heat" (SOF ¶ 63) demonstrating that Consumer Reports does not consider Whirlpool's use of the term "steam" to be either false or misleading. Further, this is precisely the same description the publication uses to describe LG's steam dryer (*id.* at ¶ 66), and while LG may assert that this is factually incorrect, it suggests that Consumer Reports does not consider LG's use of the word "steam" materially different from Whirlpool's use of the word. Similarly, Consumer Reports' 2008 review of "steam dryers" included Whirlpool's dryer, describing it as using "a fine mist and the heat of the dryer to refresh clothes." (SOF ¶ 62.)

Given these facts, and the additional reality that Whirlpool's technology is easier to use than LG's (Whirlpool's steam dryer has a water feed, whereas LG's requires the consumer to refill a water tray every few uses, SOF ¶ 15), it is no surprise that Whirlpool's technology is fast becoming the industry's prevailing approach. Compare the advertising of the following companies, each of which is also marketing a dryer that injects water into a heated dryer drum to create steam:

- *Electrolux* – Features "**Perfect Steam**"; the "latest technology removes wrinkles and freshens clothes."
- *Bosch* – "**Steam** Functions relax wrinkles and refresh clothing"; dryer has "**Steam** Refresh," "**Steam** Wrinkle Relax," and "**Steam** Touch Up" cycles.
- *Sears/Kenmore* – "Elite HE5 **Steam** . . . Dryer" has a "**SteamCare**" function. "Get **steam**, hassle-free." "**Steam Care Refresh** cycle relaxes wrinkles and removes odors."

6

- *Samsung* – "SAMSUNG dryers use the **power of steam** to reduce ironing, eliminate wrinkles and remove odors" with "**Steam WrinkleCare**" and "**Steam Refresh**" cycles.

(SOF ¶¶ 52-55.) Likewise, the popular Dryel fabric care system (manufactured by Procter & Gamble, a reputable company well familiar with the rules of false advertising) describes a system in which heat from the dryer activates a moist Dryel Cloth to create "steam" for removing odors and "Turns your dryer into a **STEAM CLEAN MACHINE**." (SOF ¶¶ 56-58.) Because Whirlpool's steam dryer creates steam under any common and ordinary definition of the word within the washer and dryer context, this Court should grant summary judgment to Whirlpool on LG's claims of literal falsity.

      **B.    Discovery has not created any material disputed fact on the question of literal falsity.**

Whirlpool anticipates that LG will argue that there is a disputed question of material fact regarding literal falsity created by internal Whirlpool documents debating whether the dryer's moisture delivery system should use "steam" or "water"[8] and by the so-called "Insperience" documents that were the subject of LG's spoliation motion. But disagreements—whether internal or external—about the meaning of the word "steam" are legally irrelevant; such debate underscores the fact that "steam" can be defined in multiple ways, depending on an individual's perspective and background. As stated in the *Coors* case, where a term like "steam" has multiple definitions, an advertising claim consistent with even one of those definitions "is **not** literally false." *Coors*, 802 F. Supp. at 969 (emphasis added). Debate about the meaning of the word "steam" is thus of no legal relevance to LG's claims based on literal falsity.

Ultimately, what this case comes down to is LG's attempt to artificially restrict consumer choice to a single steam technology: its own. But that sales strategy is one that must be pursued in the commercial marketplace, not the legal system. *First Health Group*, 269 F.3d at 804-05.

**II.    AS A MATTER OF LAW, LG CANNOT PROVE THAT WHIRLPOOL'S ADVERTISING IS IMPLIEDLY FALSE.**

Following the Court's denial of LG's motion for preliminary injunction, LG amended its complaint to add a new theory: that Whirlpool's use of the word "steam" in its advertising was

---

[8]    Note, however, that none of the Whirlpool engineers deposed by LG testified that the Whirlpool steam dryers lacked "steam" within the dryer drum. (SOF ¶ 19.) In fact, some testified that Whirlpool's steam dryers contain steam under a variety of definitions, including the thermodynamic definition put forth by LG. *Id.*

7

*impliedly* false. LG's implied falsity theory rests on the flawed premise that Whirlpool's steam dryer advertisements are literally true or ambiguous, but convey a false impression or are misleading in context. LG has failed, however, to put forth credible or admissible evidence of an implied message conveyed to consumers by Whirlpool's advertising. LG's consumer survey expert asserts Whirlpool's advertising implies that its steam dryer works in a particular manner. But LG's *own* consumer survey data shows that the **opposite** is true: consumers do not receive *any* message about how the steam dryer works from Whirlpool's advertising. Moreover, LG's survey expert candidly admitted that "people don't have an impression of how this steam is created since the commercials don't get into that at all." (SOF ¶ 72.) Whirlpool has filed the accompanying Motion to Exclude LG's survey expert's survey and opinions for failing to comply with Federal Rule of Evidence 702. As LG has not satisfied the threshold requirement that there be credible evidence of an implied message, Whirlpool respectfully requests that the Court grant summary judgment on LG's implied falsity claim as well.

        **A.**    **As a threshold matter, implied falsity claims require proof of an implied message.**

It is well-settled that "[w]here, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers." *Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992); *Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 319 (7th Cir. 1992) ("[c]ourts hearing deceptive advertising claims . . . generally require extrinsic proof that an advertisement conveys an implied claim").

The pivotal question in implied falsity cases is "what does the person to whom the advertisement is addressed find to be the message?" *Johnson & Johnson*, 960 F.2d at 297-98. Consequently, "the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey." *Id.*; *see also Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, No. 91-7009, 1993 WL 21239, at *9 (E.D. Pa. Jan. 29, 1993), *aff'd*, 19 F.3d 125, 135-36 (3d Cir. 1994) (success of an implied falsity claim and the content of any message conveyed to consumers usually turns on consumer survey evidence). It is only **after** "the meaning to the target audience has been determined" that "the finder of fact must . . . judge whether the evidence establishes that they were likely to be misled." *Johnson & Johnson*, 960 F.2d at 298. When a plaintiff fails to establish by extrinsic evidence the existence

8

of an implied message conveyed to consumers by defendant's advertising, summary judgment is appropriate. *Cf. id.* ("Absent such a threshold showing, an implied falsehood claim must fail."). As set forth below, LG has failed to establish with any admissible evidence that consumers actually perceived either of the two implied messages that LG has asserted.

### B. LG has failed to establish any implied message.

#### 1. The Reitter report—LG's only consumer survey evidence—is fatally defective.

In its amended complaints, LG asserted simply that, in addition to being explicitly false, Whirlpool's steam dryer advertisements "imply a false message that the . . . Steam Dryer creates or infuses clothing with steam when it does not." (Docket No. 116, Second Amended Complaint at ¶¶ 27, 33, 38.) As these allegations are nearly identical to LG's allegations that Whirlpool's advertising is *explicitly* false (*see id.* at ¶¶ 26, 32), Whirlpool sought through discovery to discern the precise implied message(s) LG claims consumers perceive from Whirlpool's advertising, and the basis for LG's claim that the implied message was false. LG claimed Whirlpool's advertising created a false impression because the "mist system" in the Duet, Bravos, and Cabrio dryers "is not understood by consumers to be steam; [which] will also be the subject of Rule 26(a)(2) disclosures." (SOF ¶ 69.)

LG provided Whirlpool with the Rule 26(a)(2) report of its consumer survey expert, Robert Reitter, who identified the following purportedly implied message from Whirlpool's advertising: "the advertised steam dryer relies on a hot vapor which is injected into clothes." (SOF ¶ 73; *see also* SOF ¶ 70.) But Reitter was only able to reach that conclusion using methodology that has been rejected by numerous courts in other impliedly false advertising cases. Reitter's use of such flawed methodology renders his report fatally defective and unreliable. As explained in detail in the accompanying Motion to Exclude Reitter's survey and opinions, key defects of Reitter's survey are:

- It is well-established that responses to open-ended questions are the most probative evidence of any messages communicated by advertising. (Mot. to Exclude at 6-8.) But, in fashioning his opinion, *Reitter ignored the results of open-ended questions which showed that* ***Whirlpool's advertising does not convey any message*** *about how the steam dryer works or about what is injected into the dryer drum.* (*Id.* at 6-7.) In fact, Reitter "anticipated that respondents would not articulate anything about this distinction in response to general, open-ended questions" (SOF ¶ 71), because even he concedes that "people don't have an impression of how this steam is created since the commercials don't get into that at all" (SOF ¶ 72).

9

- As more probative responses to open-ended questions failed to establish a message about how Whirlpool's steam dryers create or use steam, *Reitter relied solely on responses to a multiple choice—or closed-ended—leading question that he crafted to establish the purported implied message*. (Mot. to Exclude at 8-9.) But closed-ended questions are a much-less-effective means of testing the messages conveyed by an advertisement because they prompt participants to identify messages they may not have otherwise thought about or considered. (*Id.* at 8.)

- Proper survey technique requires that participants first identify a particular type of message received through use of a "filter" question. (Mot. to Exclude at 8-11.) Failure to first utilize an open-ended filter question to identify respondents who received a particular message typically renders a survey's results not probative of whether a message was communicated by the advertisement. (*Id.*) *Reitter's survey did not use a filter question to identify whether participants received a message about how the dryer works before suggesting that message in a closed-ended question.* (*Id.* at 10-11.)

- Reitter failed to use a proper "control." (Mot. to Exclude at 11-13.) The purpose of a "control" commercial in the context of a false-advertising survey is to isolate the particular element of an advertisement that communicates a certain message (here, that the "steam" references in Whirlpool's advertising purportedly convey a message about how Whirlpool's dryer works). (*Id.* at 12-13.) But Reitter used a control commercial that differed greatly from the test commercial, and his failure to account for, or acknowledge, how these differences impacted the survey responses makes it impossible to determine whether the purported implied message was communicated by the "steam" references in Whirlpool's advertising or something else. (*Id.* at 13-15.)

In sum, Reitter's purported implied message is unsupported by acceptable survey methodology. To the contrary, the only probative results from Reitter's survey—the responses to the open-ended questions—actually show that consumers do **not** take away from Whirlpool's advertising any message about how Whirlpool's steam dryer works. As LG has identified no other evidence to support its contention that consumers take away from Whirlpool's advertising a message that Whirlpool's steam dryers inject a hot vapor onto clothes,[9] its claim based on the "hot vapor" implied message fails as a matter of law. *See Johnson & Johnson*, 960 F.2d at 298 (stating "[w]here the plaintiff cannot demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, the plaintiff cannot establish that it suffered any injury as a result of the advertisement's message. Without injury, there can be no claim . . . .").

---

[9] In an interrogatory response, LG stated that it "has voluminous evidence" other than Mr. Reitter's report that Whirlpool's advertising implied false and misleading messages to consumers, but LG failed to identify any of this supposed evidence. (*See* SOF ¶ 75.)

10

### 2. LG has no evidence establishing that Whirlpool's advertising implies "hot, billowy white" moisture in the Whirlpool dryer.

LG has claimed only one other impliedly false message: that consumers purportedly believe that "steam" in Whirlpool's advertising conveys the message of water vapor condensing to form hot, billowy white moisture (the "hot, billowy white" message). (SOF ¶ 74.)[10] But LG has not submitted any survey to establish that consumers, in fact, take away from Whirlpool's advertising this specific implied message. LG has submitted only the expert testimony of its engineer, Dr. Jacobi, who opines that when consumers think of "steam," they probably think of the "mist formed by the condensation on cooling of water vapor" (Exh. 2, Jacobi Rep. ¶ 5), *i.e.*, "hot, billowy white" moisture. There are two problems with this evidence.

*First*, as explained in the accompanying Motion to Exclude Report and Opinions of Anthony Jacobi on Lay Definitions of Steam, Dr. Jacobi is not qualified to render such an opinion, and it should be disregarded. *Second*, Dr. Jacobi's expert testimony reflects only his abstract musings about the meaning of the word "steam." It does not purport to analyze any implied message inherent in Whirlpool's advertising.[11] Lacking any sort of expert consumer survey regarding the alleged "hot, billowy white moisture" message (or any other evidence that consumers actually take away this message from Whirlpool's advertising), LG's implied falsity claim fails as a matter of law. *See Johnson & Johnson*, 960 F.2d at 298.

### III. DISMISSAL OF LG'S LANHAM ACT CLAIMS NECESSITATES DISMISSAL OF LG'S STATE LAW CLAIMS, AS WELL.

In denying LG's motion for preliminary injunction, this Court concluded that LG was unlikely to prevail on the merits of its Lanham Act claims because LG "failed to provide affirmative evidence that Defendant's claims are literally false." (Docket No. 101, 3/19/08 Op.

---

[10] In response to an interrogatory asking for LG's definition of the term "steam", LG responded that one of the definitions it is asserting is "when water vapor condenses to form hot billowy white moisture **that is commonly recognized by consumers to be steam**." (Exh. 35, LG's Supp. Resp. to Whirlpool's Second Set of Interrogs., No. 4) (emphasis added). Given LG's reference to consumer recognition, Whirlpool sought to clarify through a request for admission whether LG claimed that this definition was an implied message. LG stated that it is, (SOF ¶ 74), but has not identified any evidence to establish that this message is conveyed to consumers by Whirlpool's advertising. In fact, LG did not perform a consumer survey to determine if consumers believe that "steam" in Whirlpool's advertising conveys this supposed "hot, billowy white" message. (SOF ¶ 76.)

[11] Notably, Whirlpool openly discloses to consumers that its dryer's "steam" cycle involves the injection of "water" into a heated drum. (SOF ¶¶ 14.) That would be a curious strategy if Whirlpool's goal was to trick consumers into thinking Whirlpool's steam dryer has a boiler when it does not.

11

at 6.)  The Court held this factor dispositive of LG's other substantive claims as well, because, as "LG concedes, to the extent its state law claims differ at all from the Lanham Act claim, they are more onerous or have additional essential elements."  (*Id.*, citing Docket No. 24-1, Pl.'s Motion for S.J. at 15-17; *see also MJ & Partners Rest. Ltd. v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998) (concluding that claims "based on the [Illinois] common law of unfair competition," … "on the Illinois Consumer Fraud and Deceptive Business Practices Act," and on "the [Illinois] Deceptive Trade Practices Act . . . must rise or fall based on the Lanham Act") (citations omitted); *Spex, Inc. v. Joy of Spex*, *Inc.* 847 F. Supp. 567, 579 (N.D. Ill. 1994) ("Claims for unfair competition and deceptive business practices brought under Illinois [consumer fraud] statutes are to be resolved according to the principles set forth under the Lanham Act." (citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir.1983)).)  Accordingly, if the Court grants Whirlpool summary judgment on LG's Lanham Act claims, then Whirlpool is entitled to summary judgment on LG's remaining claims, as well.

## IV.     CONCLUSION

LG has admitted that Whirlpool's steam dryers create steam within the dryer drum.  Yet, without any basis for doing so, LG is attempting to carve out an exception from the common and ordinarily understood definition of steam that would conveniently eliminate much of LG's competition in the steam dryer marketplace.  There is no basis in the facts or law for this convenient exception.  As such, Whirlpool respectfully requests that the Court grant its motion and dismiss LG's claims in their entirety.

13

Dated: July 1, 2009				WHIRLPOOL CORPORATION, Defendant

						By:  /s/ Brian D. Roche
							One of its Attorneys

							Brian D. Roche
							Jennifer Y. DePriest
							Vanessa Martí Heftman
							REED SMITH LLP
							10 South Wacker Drive, Suite 4000
							Chicago, Illinois  60606
							Telephone:  (312) 207-1000

							J.A. Cragwall, Jr.
							John Bursch
							Warner Norcross & Judd LLP
							900 Fifth Third Center
							111 Lyon Street NW
							Grand Rapids, Michigan 49503-2487
							Telephone:  (616) 752-2000

## CERTIFICATE OF SERVICE

I, Vanessa Martí Heftman, an attorney, hereby certify that on July 1, 2009, I filed **WHIRLPOOL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the ECF system, which will send notification of such filings to the following:

>Ronald Y. Rothstein
>rrothstein@winston.com
>Bryna Joyce Roth Dahlin
>bdahlin@winston.com
>Shannon Leigh Stevens
>sstevens@winston.com
>Eric L. Broxterman
>ebroxterman@winston.com
>Mary M. Hutchings
>mreed@winston.com
>Winston & Strawn LLP
>35 West Wacker Drive
>Chicago, IL 60601

*/s/ Vanessa Martí Heftman*