IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **Case No. 08 C 242** |
| v. | ) | |
| | ) | **Honorable Amy J. St. Eve** |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | **Magistrate Judge Mason** |
| *Defendant.* | ) | |

## WHIRLPOOL CORPORATION'S MOTION TO COMPEL AND FOR SANCTIONS

Whirlpool brings this motion to redress the conduct of LG during the deposition of a key Korea-based engineer, Mr. Sang Hun Bae, who worked on the development of LG's steam dryer. On June 22 and July 9, the Court granted Whirlpool leave to take additional limited discovery of LG and allow questioning of Mr. Bae on testing documents LG produced at the close of discovery, and after Mr. Bae had been deposed. However, during the deposition, counsel for LG repeatedly instructed Mr. Bae not to answer basic questions about his late-produced documents. Mr. Bae also appeared to be coached not to provide information about the underlying data in the late-produced documents, despite the fact that Mr. Bae's prior testimony confirmed that LG had *not* produced all relevant and responsive testing.[1]   LG's tactics prevented Whirlpool from obtaining answers from Mr. Bae on these Court-ordered topics, and are the latest in LG's campaign to obstruct Whirlpool's ability to obtain information about testing documents that its witnesses have testified existed, but which LG has not produced.

---

[1] For example, following nearly every question about underlying data, and before the deponent could speak, counsel for LG would coach the witness "not to speculate." In most cases, after this coaching, Mr. Bae rotely responded "I don't know."

Accordingly, Whirlpool requests that the Court order LG to provide substantive responses to the questions identified below where Mr. Bae was either explicitly or implicitly (by way of coaching) instructed not to answer, and to provide the deposition of Mr. Ku Young Son who appears to be the witness most knowledgeable about the missing documents. Whirlpool also asks for its costs and fees incurred in taking Mr. Bae's deposition, bringing this motion, and taking additional discovery ordered by the Court.

## I.    Background

As noted in WHR's motion for leave to conduct limited discovery (Docket Entry No. 223), LG has claimed that its steam dryer, with its external boiler design, is the *only* way to provide consumers with the benefits of steam. LG aggressively pursued this performance argument by submitting, on August 6, an additional report by its purported expert, Jerry Wind, in which Mr. Wind concludes that "[Whirlpool's] steam feature does not perform at the level expected by a majority of consumers in this study. This is in sharp contrast to the messages in the advertising that the dryer has a steam feature that delivers benefits to consumers." (*See* Report of Yoram (Jerry) Wind Evaluating 35 Videos On Consumer In Home Experience With The Whirlpool Dryer at p. 6, attached at Ex. A.)

### The Gap Issue:  Discrepancies in LG production

As LG has made performance an issue in this case, it is critical that Whirlpool have all of LG's internal testing data and results. However, LG's production of minimal testing information related to performance issues stands in stark contrast to the substantial amount of performance testing that LG actually conducted and about which many of its witnesses, including Mr. Bae, testified. As a result, Whirlpool sought leave to depose a Rule 30(b)(6) witness from LG to

address the discrepancies in LG's witnesses' testimony, and the continued deposition of Mr. Bae to address LG's belated production of his documents.

In response to Whirlpool's motion, LG stated – as it has since Whirlpool challenged its production in early March – that it has produced "all" relevant and responsive testing information.  LG did not explain the vast discrepancies in LG's witnesses' testimony and LG's production, and instead, rested its "response" on its document collection process.  (*See* Docket Entry No. 235.)  LG submitted a declaration from one of its lawyers as well as a declaration from the engineer in Korea who was charged with collecting responsive information, Mr. Ku Young Son.  (Docket Entry No. 235 at Ex. 7.)  Mr. Son stated that he was the principal person in charge of locating and collecting documents in Korea (*id.* ¶ 4); he manually checked the personal computer of "every key engineer" involved in the development of LG's steam dryers and washers; he manually checked these computers "several times" over a year-plus period (*id.* ¶ 5-6); he had "numerous conversations with several engineers at various departmental meetings" about the importance of gathering and preserving relevant documents (*id.* ¶ 10); and he "personally contacted" engineers involved in the testing regarding specific requests (*id.* ¶ 11).  In its response brief, LG argued that Mr. Bae was one of the key engineers from whom Mr. Son obtained documents.  (Docket Entry No. 235 at p.8.)

The Court granted Whirlpool's request for Mr. Bae's continued deposition to address his late-produced documents (Docket Entry No. 232 (6/22 order)), and also ordered LG to provide a representation with respect to its testing production.  (*See* Transcript of July 9, 2009 Hearing, attached as Ex. B at 14-15.)

<u>*LG's Response to The Gap Issue*</u>

On August 6, LG served its submission to address the gap issue. It provided a supplemental response to Whirlpool's testing interrogatory that stated only the following: "LG USA has repeatedly stated that it has produced and identified all documents that are responsive to this interrogatory. [Citations omitted.] LG USA has conducted several exhaustive searches for responsive documents to this request. To the extent that any documents were created responsive to this request, they have been searched, reviewed and produced to Whirlpool." (*See* Plaintiff LG Electronics U.S.A., Inc., Supplemental Responses to Whirlpool Corporation's Third Set of Interrogatories, attached as Ex. B at p. 6.) This supplemental response says nothing about *the testing documents identified by LG witnesses*, but which have not been produced. Whirlpool identified these documents in its briefing on the motion for additional discovery. (*See* Docket Entry Nos. 223 and 237.)

## II.    LG's Obstructed Mr. Bae's Continued Deposition

<u>*Instructions not to answer*</u>

Having been given no explanation about the discrepancies in LG's production versus the testimony of its witnesses, Whirlpool asked Mr. Bae about LG's document collection efforts with respect to the newly produced information. Counsel for LG, however, instructed Mr. Bae not to answer any question related to this subject:





(Tr. at 115-16) (A copy of the transcript of Mr. Bae's August 6 deposition is attached hereto as Ex. D.)

\* \* \*

On the subject of hand-written notes, LG's counsel repeatedly claimed during discovery that its engineers did not create any hand-written notes. *See, e.g.*, Docket Entry No. 223-3 at p. 23. However, *after* Mr. Bae's May 20-21 deposition, LG produced hand-written notes but refused to let Mr. Bae answer questions about where the newly-produced notes were found. (Tr. at 174.) Moreover, following Mr. Bae's testimony that ██████████████ ██████████████ (Tr. at 178), counsel for Whirlpool asked about this practice ██ ██████████████ as no such other documents had been produced. But counsel for LG again instructed Mr. Bae not to answer it, making the nonsensical argument that Whirlpool should have asked about this in the *first* deposition of Mr. Bae, before the document was ever produced ██████████████████████████:



(Tr. 179-80.)[2]

* * *

Counsel for LG also instructed Mr. Bae not to answer any questions on the issue of LG's efforts to collect his documents. (Tr. at 191-92.) As a result, LG has *never* explained - in response to Whirlpool's motion for leave to conduct additional discovery or in its supplemental interrogatory response - the vast discrepancies between Mr. Bae's (and other LG witnesses') prior testimony regarding LG's extensive performance testing and LG's limited production of such information.

---

[2] The above exchange is an example of LG's obstructive tactics. In response to additional questioning, Mr. Bae ultimately provided a response. (Tr. at 180-81.)

*Improper coaching*

LG coached Mr. Bae not to provide any additional information on potentially missing or destroyed testing information related to the documents LG belatedly produced *from Mr. Bae*. Indeed, after questions about the underlying data of the test results on these documents, LG's lawyer objected and instructed Mr. Bae "not to speculate." In each instance, after such an instruction, Mr. Bae claimed "I don't know." Mr. Bae's purported lack of knowledge about data underlying the testing results in documents *he produced* stands in stark contrast to his prior testimony where he testified to the "***tremendous amount of testing***" that occurred and the data captured from the testing:





(Tr. at 125-27) (emphasis added).

* * *



(Tr. at 133-34.)

* * *



(Tr. at 135-37.)

* * *

With respect to data generated by a camera system used by LG in connection with its

wrinkle testing:



(Tr. 149-50.)

* * *



. . .

(Tr. 166-68.)

LG's repeated improper objections and coaching have prevented Whirlpool from getting discovery about underlying data from LG's testing. LG has made an issue in the case about the interpretation of data from the testing of odor and wrinkle removal from the steam process, yet it continues to interfere with Whirlpool's ability to obtain LG's underlying testing data, and to question an important witness about the data LG has produced.

### III.     Sanctions Are Appropriate.

Counsel for LG improperly instructed the witness not to answer, coached the witness not to answer through improper code-signals or instructions "not to speculate", and otherwise improperly objected. As for instructions not to answer, Rule 30(c)(2) provides that "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(2)." Fed. R. Civ. P. 30(c)(3). Though the Court previously cautioned the parties to limit the deposition to the belatedly-produced information, counsel for LG improperly invoked the Court's ruling to preclude any testimony as to *where* the belatedly-produced documents were found (compare Whirlpool's explanation to the Court and LG as to when and how it discovered the existence of the CUFT videos it produced following the close of discovery, *see* Docket Entry No. 219) as well as follow-up information related to the documents or subject matter contained therein.

As for LG's counsel's improper objections, Rule 30(c)(2) provides that "[a]n objection must be stated concisely in a nonargumentative *and nonsuggestive* manner." LG coached the witness through its suggestive objections and this was improper. *See, e.g., Amari Co. v. Burgess,* No. 07 C 1425, 2009 WL 1269704, at *4 (N.D. Ill. Apr. 30, 2009) (ordering continued deposition, costs and fees related to same, and further ordering plaintiff's counsel not to make speaking objections, provide answers to the deponent or instruct the witness not answer unless allowed under Rule 30).

Given LG's counsel's repeated and unfounded instructions not to answer as well as his improper coaching, Whirlpool respectfully requests that LG be required to provide substantive responses to the questions identified above where Mr. Bae was either explicitly instructed or improperly coached not to answer. Moreover, in light of LG's failure to provide any explanation for the gross discrepancies in its witnesses' testimony and LG's production of testing

- 11 -

information (as set forth in detail in Whirlpool's motion for leave briefing, Docket Entry Nos. 223 and 237), Whirlpool also asks for leave to take the deposition of Ku Young Son, who LG recently identified as responsible for collecting LG's testing information. Whirlpool also asks for its costs and fees incurred in connection with Mr. Bae's deposition, in bringing this motion, and in connection with any additional discovery ordered by the Court.

Dated:  August 24, 2009

Respectfully submitted,

WHIRLPOOL CORPORATION,
Defendant.

By:/s/Brian D. Roche
        One of its Attorneys

Brian D. Roche
Jennifer Yule DePriest
Vanessa Martí Heftman
REED SMITH LLP
10 South Wacker Drive, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 207-1000

J. A. Cragwall, Jr.
John J. Bursch
Warner Norcross & Judd LLP
900 Fifth Third Center
Grand Rapids, Michigan 49503
Telephone:  (616) 752-2000

*Attorneys for Defendant, Whirlpool
Corporation*

## CERTIFICATE OF SERVICE

I, Jennifer Yule DePriest, an attorney, hereby certify that on August 24, 2009, I filed

**WHIRLPOOL CORPORATION'S MOTION TO COMPEL AND FOR SANCTIONS** with

the Clerk of the Court using the ECF system, which will send notification of such filings to the

following:

Ronald Y. Rothstein
rrothstein@winston.com
Eric L. Broxterman
ebroxterman@winston.com
Bryna Joyce Roth Dahlin
bdahlin@winston.com
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601

*/s/ Jennifer Yule DePriest*

# EXHIBIT A

Yoram (Jerry) Wind
Wind Associates, Inc.
1041 Waverly Road
Gladwyne, PA 19035
(610) 642-2120
windj@wharton.upenn.edu

**Report of Yoram (Jerry) Wind Evaluating 35 Videos on Consumer In Home Experience with the Whirlpool Dryer**

### I. Objectives

1.  <u>Objectives</u>.  I, Yoram (Jerry) Wind, was asked by counsel for LG to analyze the Whirlpool videos of consumers' in home experience with the Whirlpool steam dryer and assess 1) consumers' actual experience and satisfaction with the steam feature of dryer and 2) whether or not the experience supports the advertising claims made for Whirlpool's steam dryers.

### II. Qualifications

2.  I am the Lauder Professor and Professor of Marketing at the Wharton School of the University of Pennsylvania.  I joined the Wharton staff in 1967, upon receipt of my doctorate from Stanford University.

    (a) <u>Publications</u> – I have been a regular contributor to the marketing field,[1] including 22 books and over 250 papers, articles and monographs. My books and articles, which are frequently cited by other authors, encompass marketing strategy, marketing research, new product and market development, consumer and organizational buying behavior, and global marketing strategy.

    (b) <u>Editorships</u> – I have served as the editor-in-chief of the *Journal of Marketing*, as a guest editor of numerous marketing journals, on the

---

[1]  Marketing, according to the American Marketing Association, is the process of planning and executing the conception, pricing, promotion and distribution of ideas, goods and services to create exchanges that satisfy individual and organizational goals. (P.D. Bennet ed. Dictionary of Marketing terms, Chicago AMA 1988, p.54)

policy boards of the *Journal of Consumer Research* and *Marketing Science*, and have been on the editorial boards of the major marketing journals. I am the founder of Wharton School Publishing and served as its first Wharton editor from 2004 to 2008.

(c) <u>Teaching and Consulting</u> – I have taught MBA, Ph.D. and executive development courses on a wide range of marketing topics. I also have consulted extensively for many Fortune 500 firms, including major consumer goods firms. In my teaching, consulting, editorial and university positions I have designed, conducted and evaluated thousands of marketing and consumer research studies.

(d) <u>Expert Witness</u> – I have conducted and evaluated marketing and consumer research in a litigation context, have been qualified as a marketing and survey research expert and testified in trial in a number of federal courts.

(e) <u>Awards</u> – I have received various awards, including the four major marketing awards – The Charles Coolidge Parlin Award (1985), the AMA/Irwin Distinguished Educator Award (1993), the Paul D. Converse Award (1996), and MIT's Buck Weaver Award (2007). I also received the first Faculty Impact Award by Wharton Alumni (1993). I was elected to the Attitude Research Hall of Fame in 1984. I have also been honored with a number of research awards, included two Alpha Kappa Psi Foundation awards. In 2001, I was selected as one of the ten grand Auteurs in Marketing and in 2003 I received the Elsevier Science Distinguished Scholar Award of the Society for Marketing Advances.

(f) <u>Complete Resume and Compensation</u> – My resume is attached to this declaration as Appendix A. It includes a list of my publications (pages 4 – 24) and cases in which I have testified as an expert (pages 31 – 35). My total compensation for review and analysis of the relevant material and

2

preparation of this expert report is based on my regular consulting rate (of $1,000 an hour).

### III. Approach

3. <u>Approach and criteria for evaluation</u>. In preparing this Declaration, I reviewed the videos, the deposition of Pamela Rogers and Whirlpool steam dryer advertising as indicated in my previous expert report. In evaluating the videos, I relied on the standards employed in marketing and consumer behavior and research (a) as reflected in the professional literature and as taught by me and others at Wharton and other leading universities, (b) as practiced by me and other leading professionals in conducting and evaluating marketing and consumer research, for academic peer reviewed publications, and for management and courts as input to their decisions, and (c) as reflected in the standards and criteria suggested by the Manual for Complex Litigation (Section 11.493), and the Shari Seidman Diamond "Reference Guide on Survey Research". These are consistent with the professional marketing research literature.[2]

4. <u>The videos</u>. My understanding is that the videos were taken during video interviews with consumers as part of Whirlpool Consumer Use Fielding Testing ("CUFT") .The interviews were conducted in the interviewees homes in Phoenix and Tampa in 2007. Some of the video interviews may have been conducted with consumers who are related to Whirlpool employees as part of their Engineering Field Test (EFT). The interviews took place 6

---

[2] See for example marketing research texts such as:
- Aaker, David A., V. Kumar and George S. Day, *Marketing Research* (Eighth Edition), 2004, Wiley, New York.
- Churchill, Jr., Gilbert A. and Dawn Iacobucci, *Marketing Research: Methodological Foundations* (9th ed.), 2005, Fort Worth, TX: Harcourt.
- Green, Paul E., Donald S. Tull and G. Albaum *Research for Marketing Decisions* (5th ed.), 1990, Prentice Hall.
- Lehmann, Gupta and Joel Steckel, *Marketing Research,* 1998, Addison-Wesley
- Rosenthal, Robert and Ralph L. Rosnow, *Essentials of Behavioral Research*, 2nd ed., 1991, McGraw-Hill.
- Shadish, William R., Thomas D. Cook, and Donald T. Campbell, *Experimental and Quasi-Experimental Designs for Generalized Causal Inference*, 2002, Houghton Mifflin Company.

3

weeks after the dryers were installed in the respondents home and designed to get their reactions to the products.

Such in home use tests are common in many industries and provide valuable insight into consumer evaluation of the product based on their actual experience in using the product.

5.  <u>The analysis</u>.  I reviewed a sample of the videos and  given the objective of the analysis to assess consumers experience and satisfaction with the steam dryer I established the following criteria for segmenting the respondents into three segments:

   (a) Those satisfied with the  steam dryer who felt that it met or exceeded their expectations

   (b) Those who said that the steam dryer did not meet their expectations and/or found that the cloth were still wrinkled and /or indicated that the cloth still required ironing.

   (c) Those who had mixed reactions. While they liked some of the features had difficulty with others.

Once these criteria were established I asked an assistant to go over all the videos and classify the respondents into one of these three segments and to capture in writing the relevant comments.

### IV.  Results

6.  The results of the analysis are summarized in Figure 1 – consumer usage experience segments re the Whirlpool steam dryer [Laura this is the new title for figure 1 which I will forward to you shortly] -- and Figure 2 illustrative quotes for each of the respondents included in the 3 segments.  In all, 55 videos were collected, which included 53 separate interviews of participants.  Among those, 35 expressed an opinion regarding the steam feature on the dryer and its effectiveness at reducing or eliminating wrinkles and odors. These results are summarized in figure 1 below.

4

**Figure 1**

**Consumer Usage Experience Segments Re the Whirlpool Steam Dryer**



7.    Examination of these results show that  while 46% of the respondents had a
      positive evaluation of the steam feature on the dryer, 37% had a negative assessment of
      the steam feature and 17% had mixed a assessment involving some positive but also
      some negative evaluations.

### V.  Conclusions

8.    Since these in home interviews were conducted prior to launch, a critical question is
      whether the problems identified in the home use test were corrected prior to launch. Based
      on Pamela Rogers deposition, one lesson from the in home use test was that consumers
      should not use the dryer with a single garment. According to her, this was corrected in the
      Use and Care Guide, yet an examination of the Whirlpool web site shows that even today
      the instructions are to include 1-4 garments.  (*See* Whirlpool Duet Use and Care Guide at
      http://www.whirlpool.com/assets/pdfs/product/ZUSECARE/WED9500TW_Use%20and%20
      Care.pdf, p. 12, last accessed August 6, 2009.)

---

[3] Positive evaluation: 16 Respondents: 68, 73, 81, 86, 87, 89, 91, 93, 96, 101, 104, 105, 106, 109, 110.1, 113/114
[4] Mixed evaluation: 6 Respondents: 88, 102.1, 108, 110.2, 112
[5] Negative evaluation: 13 Respondents: 64, 67, 69, 70, 71, 80, 90, 94, 97, 99, 100, 103, 111

9.  These results demonstrate a significant dissatisfaction among consumers with the steam feature on the Whirlpool steam dyer tested.  More than 37% of those tested responded negatively to the steam feature, and when combined with those who had a mixed evaluation, 54% of the respondents were dissatisfied or partially dissatisfied.  These are very significant results and, in my opinion, this high level of dissatisfaction reveals that the steam feature does not perform at the level expected by a majority of consumers in this study. This is in sharp contrast to the messages in the advertising that the dryer has a steam feature that delivers benefits to consumers.  To the extent Whirlpool claims that the delivery of benefits associated with steam, rather than steam itself, justifies its steam advertising messages, this proposition is not true for those consumer segments similar to the consumers with the negative and mixed evaluations in this study.

Dated:  August 6, 2009

_____
Yoram (Jerry) Wind

6

**Figure 2**

**Illustrative Quotes of Consumers' Evaluation of Whirlpool's Steam Dryers:**

Segment 1 – Negative Evaluations

| Consumer ID #[6] | Statements |
|---|---|
| 64 | After refresh cycle, would still have to iron pants, t-shirt is still wrinkled |
| 67 | Reaction to end of Refresh cycle, "still has creases"; Doesn't meet expectations; When asked about steam in dryer: thought it would take wrinkles out like a dry cleaner, steam iron or a steamer for curtains. Only used once at first and wasn't impressed.  Shirts still wrinkled, regular cycle just as good |
| 69 | Asked how refresh cycle works - doesn't know.  Thought steam accounts for why it's damp.  Steam clean did not take wrinkles out. |
| 70 | Some clothes are ok, but some wrinkled.  Steam cycle does not meet expectations. |
| 71 | Likes the steam, if she takes it out early it's a little moist;<br>Clothes "even more wrinkled" than when the cycle started, still wet;<br>Couldn't see steam, would expect condensation.  Not sure if it is dispersing steam or water, given the wet spots |
| 80 | Has used steam cycles a couple of times for removing wrinkles.  Less wrinkled, but still had to iron.  Used quick refresh not enhanced touch up |
| 90 | Clothes better but still need ironing.  Baby shorts came out damp |
| 94 | Clothes came out less wrinkled, would still need to iron |
| 97 | Thought it would take more wrinkles out.  Clothes also come out with a "weird wet smoky smell".  Takes out fabric softener smell too which she doesn't like;<br>Works no different than regular dryer.  Takes scents out but not wrinkles<br>Clothes aren't coming out fresher with steam cycles;<br>Functions were not necessary.  Still needs to iron like before. |
| 99 | Clothes have been stained in dryer during refresh cycle |
| 100 | Used refresh cycle for husband's work shirt hoping not to have to iron but still had to iron |
| 103 | Refresh does a really good job on some things but not on 100% cotton shirts.  Those shirts came out really wrinkled;<br>Was surprised by refresh - thought it would take wrinkles out of 100% polyester skirt and it came out the same as when it went in |
| 111 | Would've expected for wrinkles to come out and wouldn't require ironing.  Shirt came out damp and full of wrinkles.  Would expect for it to be dry;<br>Shirt came out damp and more wrinkled than it started;<br>Shirts worse than when they went in.  More wrinkled plus it's damp |

Segment 2 – Mixed Evaluations

| Consumer ID # | Statements |
|---|---|
| 88 | Odors still present, but wrinkles removed. |
| 102.1 | Still presses dress shirts after refresh cycle;<br>Ironing time hasn't changed since getting the dryer;<br>Refresh cycle is very good for casual wear but it's not a finished iron look;<br>Expected refresh to cut down on ironing - disappointed that shirts come out wrinkled still;<br>Steam refresh is main benefit of dryer; |
| 102.2 | Some clothes definitely come out ready to wear.  Still had to iron 100% cotton work shirts; |

[6] The "Consumer ID #" refers to the ending bates # of the videos evaluated, with the exceptions of 102.1, which refers to the consumer at WHRV000102, clip 1, 102.2, which refers to the consumer at WHRV000102, clip 2, 110.1, which refers to the consumer at WHRV000110.1, clip 1, and 110.2, which refers to the consumer at WHRV000110, clip 2.  The videos at WHRV000113 and WHRV000114 are of the same consumer, and therefore are grouped together.

| Consumer ID # | Statements |
|---|---|
| 108 | Steam refresh does a really good job. Does better with synthetic fabrics as opposed to 100% cotton. Cotton stays wrinkled; Tested a 100% cotton shirt that had been stuffed in a drawer for a long time and it came out okay to wear; Refresh performs better as far as odors are concerned. When they first come out they are hot and don't smell great but once clothes cool down you can tell it cuts odors about 50% |
| 110.2 | Impressed with steaming features; Has used steam cycles for things hanging in closet or sports uniforms that need washing; 100% cotton shirt still needs ironing; Depends on fabric whether clothes are ready to wear out of dryer. 100% cotton is not ready to wear but blends are; Did not meet expectations. She thought when she first got dryer she would never have to iron again. Wouldn't think $200 extra would be worth it for steam refresh; Steam touch up is best benefit of dryer. |
| 112 | Cycle works pretty well. Disappointed in 100% cotton shirts coming out wrinkled. Odor removal works fine |

## Segment 3 – Positive Evaluations

| Consumer ID # | Statements |
|---|---|
| 68 | Really likes quick refresh steam cycles, don't have to wet clothes first to get wrinkles out; Loves steam cycles, best feature that old dryer didn't have |
| 73 | Clothes look better than when they went in. |
| 81 | Happy with how clothes came out |
| 86 | Has used refresh on pillows, dry cleaning goods - gets wrinkles out and refreshes clothes; Liked clothes when they came out, cuts down on dry cleaning; |
| 87 | Clothes came out de-wrinkled, feature meets expectations |
| 89 | Meets Expectations, would wear clothes |
| 91 | Clothes came out ready to wear |
| 93 | Generally happy with clothes |
| 96 | Steam cycle helps remove wrinkles; less ironing; Refresh is good for hand wash only clothes; Steam cycle is very gentle. |
| 101 | Happy with the refresh cycle except for the blue mark on pants |
| 104 | Really likes steam refresh for sweaters and bedding, etc; Refresh does as good as dry cleaning for her nice clothes. Came out nice, fresh; Likes steam refresh a lot - gentler on clothes, removes odors; Comforter went into refresh cycle and came out great; Refresh has met expectations |
| 105 | Refresh is effortless. Saves time opposed to ironing; Refresh cycle works well on all blends as far as he can tell; There is a steam generator that water goes into and generates steam and mists water in; Steam refresh is main benefit of dryer - huge benefit because he doesn't iron; |
| 106 | Refresh cycle works excellent. Takes out wrinkles and makes it presentable to wear again Refresh cycle saves time on ironing, wear and tear on clothes and removes smells and wrinkles Steam refresh takes out smells and wrinkles Clothes come out of refresh cycle smelling fresher; Steam refresh matched up to what she thought it would do |
| 109 | Refresh cycle performs excellently; Didn't have to touch anything up on Dockers after cycle. Crease was still there; Refresh worked great with blouses. Didn't have to touch up; Satisfied with end results of refresh cycle |
| 110.1 | Steam refresh cycle would be main benefit of dryer |
| 113, 114 | Had no idea what to expect when asked to test. When dryer was brought in she noticed the refresh |

8

| Consumer ID # | Statements |
|---|---|
| | button and "started jumping up and down and clapping." Familiar with concept through what she thought was an LG commercial on TV;<br>Uses touch up cycle for when she leaves an item in the washer too long. It gets rid of that musty smell.<br>Uses touch up, and then will run dryer cycle;<br>Touch up cycle gets the smell out of musty sheets;<br>Using the refresh cycle is worth the amount of time it saves. It would be worth it even if it took half an hour;<br>The refresh cycle is nice because if she decides to change work clothes at the last minute can run items through refresh to get rid of wrinkles quickly. Was thrilled to death when she found out what the hose was for when they brought it in. Put something in that's wrinkled, get ready, and by the time you are done, it will be ready, "no ironing, no nothing";<br>Would describe the touch up cycle to friends as a way to get out odors;<br>Nothing has ever come out wet from the touch up or refresh cycles;<br>After sample refresh cycle complete, comments that shirt still wrinkled, and consumer would run shirt through the cycle again. The pants came out wrinkle free. Satisifed with the pants. No ironing.;<br>Consumer has Whirlpool Fabric freshener, but has had no need to use it, because of the refresh cycle of her sample dryer. She will buy a steam dryer when they come out because the dryer does not require distilled water, like the fabric freshener |

# EXHIBIT B

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
    LG ELECTRONICS USA, INC., a    ) Docket No. 08 C 242
 4  subsidiary of LG Electronics,  )
    Inc., a Korean company,        )
 5                                  )
                        Plaintiff,)
 6                                  )
                vs.                 )
 7                                  )
    WHIRLPOOL CORPORATION,          ) Chicago, Illinois
 8                                  ) July 9, 2009
                   Defendant.) 9:11 o'clock a.m.
 9

10              TRANSCRIPT OF PROCEEDINGS - MOTION
              BEFORE THE HONORABLE AMY J. ST. EVE
11

12  APPEARANCES:

13
    For the Plaintiff:         WINSTON & STRAWN, LLP
14                             BY:  MR. RONALD Y. ROTHSTEIN
                                    MS. BRYNA DAHLIN
15                             35 West Wacker Drive
                               Chicago, Illinois  60601
16

17  For the Defendant:         REED, SMITH, LLP
                               BY:  MR. BRIAN D. ROCHE
18                             10 South Wacker Drive, 40th Floor
                               Chicago, Illinois  60606
19

20  Court Reporter:            MR. JOSEPH RICKHOFF
                               Official Court Reporter
21                             219 S. Dearborn St., Suite 1232
                               Chicago, Illinois  60604
22                             (312) 435-5562

23          * * * * * * * * * * * * * * * * * *
                      PROCEEDINGS RECORDED BY
24                   MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED BY COMPUTER
25
```

2

 1          THE CLERK:  08 C 242, LG Electronics vs. Whirlpool
 2   Corporation.
 3          MR. ROTHSTEIN:  Good morning, your Honor, Ron
 4   Rothstein for LG.
 5          MS. DAHLIN:  Bryna Dahlin also for LG.
 6          MR. ROCHE:  Good morning, your Honor, Brian Roche for
 7   Whirlpool Corporation.
 8          THE COURT:  Good morning.
 9          I have several things before me.
10          I guess my first question that, I think, will dictate
11   at least some of the issues, Mr. Roche, when you moved to
12   dismiss your counterclaims, was it all of the pending
13   counterclaims.
14          MR. ROCHE:  Yes.
15          THE COURT:  That is what I thought.
16          Now, LG has filed a motion for fees and costs as a
17   prevailing party as to that.  Do you want to respond?
18          MR. ROCHE:  Yes, your Honor.
19          Could we have two weeks?
20          THE COURT:  You may.
21          MR. ROCHE:  Or actually, could we have the end of
22   that week, whatever that would be, to the Friday that is two
23   weeks from this Friday?  So, when is that?
24          THE CLERK:  July 24th?
25          MR. ROCHE:  Yes.

1          THE COURT:  July 24th.

2          I do not think I need a reply on that one.  So, I am

3   not going to set a reply date.  If I feel like I do, I will

4   issue a minute order or let you know when you are here on the

5   29th, if that date stands.

6          The motion to compel documents on the privilege log,

7   you will get an answer on that soon -- or a ruling on that.

8          I have two other -- or three other -- motions.  I

9   have two motions to exclude expert reports that were filed by

10  Whirlpool, and I have Whirlpool's motion for leave to conduct

11  limited discovery.

12         Let us talk about the expert motions first.  I know,

13  I think, you contacted Katie and said you did not want to go

14  forward with those at this point.  Is that --

15         MR. ROTHSTEIN:  We've also filed an objection, your

16  Honor.

17         THE COURT:  Okay.  I did see that.

18         MR. ROTHSTEIN:  Yeah.

19         THE COURT:  I did see that.

20         Explain to me a little more clearly what your

21  objection is to going forward on those.

22         MR. ROTHSTEIN:  Well, first of all, we pointed out

23  that this was in violation of your Honor's standing order.

24  Your standing order says that motions in limine must be filed

25  with the pretrial order.  We relied on that, your Honor.  We

4

1  would have --

2         THE COURT:  But the expert motions -- motions to

3  strike experts are not necessarily motions in limine.

4         MR. ROTHSTEIN:  It's a --

5         THE COURT:  I do not know if you styled them as a

6  motion in limine, but --

7         MR. ROTHSTEIN:  They're Daubert motions.

8         THE COURT:  Yeah.  Those -- I did not --

9         MR. ROTHSTEIN:  Daubert motions, to me, are -- we

10  cited a case even where you call a Daubert motion an in limine

11  motion.  That's always been my --

12         THE COURT:  I see them separately.  They certainly

13  can be, but I usually -- I have not given you Daubert dates

14  yet.

15         MR. ROTHSTEIN:  Right.

16         THE COURT:  I have not said one way or the other.

17         I usually do those before.  And I think they have

18  already been -- well, I usually do those before the Final

19  Pretrial Order and motions in limine so in case we have to

20  have a hearing --

21         MR. ROTHSTEIN:  Well --

22         THE COURT:  -- I can do that before the hearing.  So,

23  I am not persuaded by that argument.

24         MR. ROTHSTEIN:  Okay.

25         Well, I think the thrust of the argument, though,

1   your Honor, is that it's untimely in the sense that we would

2   have filed Daubert motions, as well.  And we would have filed

3   Daubert motions and, then, moved for summary judgment on the

4   basis of those Daubert motions, just like Whirlpool did; but,

5   we were expecting that they would be scheduled as part of, you

6   know, the regular schedule; that you'd probably conduct a

7   hearing on the Daubert motions; that we'd likely be able to

8   present our expert in connection with the Daubert motion.

9           And it just seems to us that when you predicate a

10  summary judgment motion on expert issues like this, that it

11  just really doesn't make sense.  I mean, summary judgment

12  should be based on there being no disputed issues of material

13  fact.  We're entitled, as a non-movant, to have all the facts

14  interpreted in our favor.  And as far as we're concerned,

15  predicating a motion on all of these expert issues just

16  doesn't seem to me to be the appropriate course here.

17          THE COURT:  There is a fairly recent Seventh Circuit

18  opinion, I think, from about two months ago -- and Judge

19  Bucklo was the underlying judge; I cannot remember the name of

20  the opinion -- where it said it is perfectly appropriate to

21  address expert issues in the context of summary judgment

22  motions; and, if a Daubert hearing is needed through the

23  course of it, that is perfectly appropriate.

24          So, the law is -- the Seventh Circuit law works

25  against your argument there.

6

1           I am going to set a briefing schedule on those.

2           If I hear you correctly, Mr. Rothstein, you are

3    saying you may have Daubert motions, as well, which is a

4    separate issue; and, I certainly will afford you the

5    opportunity to file Dauberts, if you wish to do so.

6           MR. ROTHSTEIN:  Well, your Honor, we'd like the

7    opportunity to address all of the Daubert issues together

8    because, I mean, you know, we should have the opportunity to

9    bring up their expert issues, as well --

10          THE COURT:  Absolutely.

11          MR. ROTHSTEIN:  -- in defending our summary judgment

12   motion --

13          THE COURT:  Well, I will --

14          MR. ROTHSTEIN:  -- if that's deemed appropriate.

15          THE COURT:  I will give you time on the Daubert.  If

16   you are saying you should have filed a summary judgment with

17   expert issues, the law is out there.  Do not suggest that you

18   have been wronged somehow --

19          MR. ROTHSTEIN:  No, I'm not.

20          THE COURT:  -- because you did not --

21          MR. ROTHSTEIN:  No, I'm not.  I'm saying --

22          THE COURT:  -- know that that was appropriate --

23          MR. ROTHSTEIN:  No, no.

24          THE COURT:  -- to do.

25          MR. ROTHSTEIN:  In opposing -- I'm saying in opposing

1  -- the summary judgment motion, we may want to bring up

2  Daubert issues, as well.

3          THE COURT:  Your own or respond to theirs?

4          MR. ROTHSTEIN:  Well, we'd want to respond to theirs,

5  but we'd like to address the inadmissibility of their expert

6  issues, as well.

7          THE COURT:  And that -- if you certainly need to do

8  that in responding to the summary judgment motion, nothing

9  precludes you from doing that.

10         MR. ROTHSTEIN:  Right.

11         THE COURT:  And I have given you a briefing schedule

12  already on that.

13         MR. ROTHSTEIN:  Right.

14         THE COURT:  I am going to give you a briefing

15  schedule on their motion to strike the experts.

16         Three weeks, is that sufficient to respond?

17         MR. ROTHSTEIN:  Your Honor, again, we -- here's the

18  issue that we're confronting.  We've got 80 responses to their

19  statement of facts.  We've got our own statement of facts to

20  prepare.  We've got --

21         THE COURT:  I am just asking you how much time you

22  need.  How much time would you like?

23         MR. ROTHSTEIN:  We were originally envisioning 45

24  days on the summary judgment motion to have an opportunity to

25  respond.

8

1          THE COURT: I have already set a briefing schedule on
2   the summary judgment motion, which gave you about 30 days from
3   the time it was filed.
4          MR. ROTHSTEIN: Right.
5          THE COURT: I am asking now on the motions to strike
6   how much time you think --
7          MR. ROTHSTEIN: I think we need about 30 days after
8   the due date for the summary judgment motion.
9          THE COURT: Okay.
10         Respond to the expert motions to strike by August
11  24th, and then reply -- two weeks later would be Labor Day, so
12  I am not going to schedule it then. Reply by September 10th.
13         And if I need a Daubert hearing on the motions, I
14  will let you know after I have seen the briefing schedule. I
15  cannot really determine that.
16         If you feel that you need to raise Daubert issues or
17  challenge experts in connection with the summary judgment
18  motion, then nothing precludes you from doing that, either via
19  separate motion or in response to the summary judgment
20  referring to a separate motion.
21         MR. ROTHSTEIN: I understand.
22         I think the bigger point that I was making is that we
23  envision that the Daubert issues would be dealt with on a
24  consolidated basis and that's how we wanted to proceed on
25  that. And we do have Daubert issues. We thought it would

9

1  make more sense to deal with them all together.  And I think
2  that's what my point was.

3         THE COURT:  I cannot necessarily agree with that
4  broad statement.  I do not know enough about whether here --
5  and likely they will all get taken up somewhat together.  So,
6  I have given you your briefing schedule.  If you want me to
7  give you a deadline for filing your own Daubert motions, I can
8  certainly do that.

9         MR. ROTHSTEIN:  Well, I mean, you know, as far as
10 we're concerned, we'd like to think about that and contact the
11 Court.  I just -- you know, I was expecting there to be a
12 Daubert schedule and we were going to proceed on that basis.
13 I assume there still will be a Daubert schedule regardless.

14        THE COURT:  Which is what I am asking you.

15        Here is what I am going to do.  I am going to strike
16 your July 29th status and set the status over for August 6th.
17 That way, you will have responded to the summary judgment
18 motion at that point, and we can talk about other Daubert
19 issues.  If you file any motions in connection with the
20 summary judgment on Daubert issues, you can notice them for
21 the 6th and I will take them up then.  Otherwise, I will take
22 up a Daubert schedule, if you wish to file one, at that point.

23        MR. ROCHE:  The schedule that you've set for our
24 motions still stands?

25        THE COURT:  Absolutely.

1          MR. ROCHE:  The expert motions?

2          THE COURT:  Absolutely.

3          Okay.  The last motion I have is Whirlpool's motion

4   for leave to conduct limited discovery.

5          I am not sure -- part of what you are basing this on

6   is testimony from witnesses saying they do not know if things

7   still exist.  LG is under an obligation to supplement

8   responses.  I assume they have gone back and checked.

9          MR. ROTHSTEIN:  Numerous times.

10         THE COURT:  Have you put in writing that you have

11  produced everything that you are aware of that is responsive?

12         MR. ROTHSTEIN:  You mean in the form of a response to

13  a document request?

14         THE COURT:  Or a letter or --

15         MR. ROTHSTEIN:  I think so.

16         MR. ROCHE:  Your Honor, here's --

17         MR. ROTHSTEIN:  We have numerous times.

18         MR. ROCHE:  Here's the practical problem we face.  At

19  trial, it's very difficult to prove the absence of something

20  based on document responses and responses to interrogatories

21  that have pages and pages of objections and qualifying

22  language and refusals to answer questions directly.

23         We then engaged them in a back-and-forth after these

24  documents came, asking them for an explanation.  They refused

25  to give it to us.  They did not give us -- they didn't answer

1  any of our questions about whether the documents exist or

2  whether they were destroyed.  They refused to answer them.

3  So, then we said we need witnesses.  And we got a witness --

4           THE COURT:   Which particular documents are you

5  talking about?

6           MR. ROCHE:   We --

7           THE COURT:   There are various things --

8           MR. ROCHE:   Yes.

9           THE COURT:   -- that are the subject of the motion.

10          MR. ROCHE:   What we have, we have an open question

11 about whether they have done additional testing of the

12 Whirlpool dryer performance on wrinkle relaxation and odor

13 removal, where there was testing done and they haven't

14 produced documents.

15          Now, their position is they've produced all the

16 documents.  That's what the lawyers say.  The witnesses'

17 testimony is either ambiguous or directly contradictory of

18 that.

19          THE COURT:   And is this -- I am sorry, go ahead.

20          MR. ROCHE:   So, what we have is a contradiction.  So,

21 if we tried to establish at trial that they conducted testing

22 of documents and never produced them, we do not have complete

23 proof.  We would be subject to rebuttal.  I don't know

24 where -- some witness could come in -- or any witness that

25 they have could come in -- and say, "We never did the

1  testing."

2      Well, we have ambiguity because the lawyers haven't

3  confirmed that they have either produced the documents or that

4  the documents existed at one time and no longer exist.  We

5  have a witness that says they existed, and we don't have them.

6      THE COURT:  Why do you not -- I am going to direct LG

7  to supplement its testing interrogatory response to identify

8  all testing documents and the subject matter of the testing.

9      MR. ROTHSTEIN:  Your Honor --

10     THE COURT:  And if you have already produced

11 everything, put that in writing.

12     MR. ROTHSTEIN:  We did, and we put that into our

13 interrogatory response, as well.

14     I don't understand what Mr. Roche just said.

15     THE COURT:  If that is in the interrogatory response,

16 that they have produced everything, what else --

17     MR. ROCHE:  Your Honor, if I had the interrogatory

18 response in front of me -- we could give you a supplemental

19 submission.  You read it and you could see.  Do we have the

20 ability to prove anything out of that?  We can't because of

21 the way they have answered.  They won't answer directly.

22     MR. ROTHSTEIN:  No, your Honor.  We put 80 tests, I

23 believe, into our interrogatory responses.

24     THE COURT:  Are those all testing documents?  Did you

25 identify all --

1          MR. ROTHSTEIN:   We identified all the documents and
2    all the testings by Bates number.
3          MR. ROCHE:   But what they haven't identified is
4    the -- where are the documents?
5          MR. ROTHSTEIN:   They're in the production.
6          THE COURT:   They identified by Bates number.
7          MR. ROCHE:   No, no.   Where are the documents that a
8    witness testified exists that they haven't produced?   They
9    have to either tell us those documents no longer exist or that
10   they haven't produced them.   But we have a huge gap.   Your
11   Honor --
12         MR. ROTHSTEIN:   Your Honor --
13         MR. ROCHE:   -- this is -- for this case.
14         THE COURT:   Is this Mr. Bae?   Who --
15         MR. ROCHE:   Yes, Mr. Bae is the one who identified
16   this, but also their 30(b)(6) witness, Mr. Choi, who is also
17   the witness who is in here as a declarant under affidavits.
18   He was their 30(b)(6) witness on testing, and he described
19   multiple kinds of testing that were done and, then, they
20   didn't produce documents to support all of his testing.   So,
21   we have a gap there.
22         THE COURT:   Are there additional documents?
23         MR. ROTHSTEIN:   There's no gap.   Your Honor, we laid
24   out exactly the procedure we went through, in terms of
25   electronic discovery and going through everybody's files; and,

14

1  we sent that protocol over to Whirlpool.  They commented on it
2  twice.  They blessed it twice.  We did everything they asked
3  us to do.

4       And to the extent that they're asking a witness at a
5  deposition, "Do we have every test that you did?" the witness
6  isn't going to know when we did extensive electronic discovery
7  and we pulled all of these files from electronic databases.
8  How would he have all the knowledge of what Whirlpool's in
9  possession of?  He is not one of the attorneys.

10      But we have done an extensive review and protocol and
11  collection of the data, and we've involved Whirlpool in the
12  process.  We've explained to them exactly what we've done.
13  There was no objection at the time.  This was coming on a year
14  ago.  And we have gone back time after time after time, tried
15  to find more documents that they're requesting and we've come
16  up empty at this point.

17           THE COURT:  Okay.

18           MR. ROTHSTEIN:  And we've identified everything
19  they've asked us to identify in the interrogatory responses.

20           THE COURT:  Here is what I want you to do.  I would
21  like you to supplement just confirming -- and maybe you have
22  done this already, but there seems to be some gap -- that the
23  documents that the 30(b)(6) witness mentioned or Mr. Bae
24  mentioned -- I do not have all that transcript testimony, I do
25  not know how they were mentioned; but, to the extent they

15

1  exist -- you have produced them.  Just confirm that via

2  interrogatory, letter, some way that that is confirmed.

3          MR. ROTHSTEIN:  I think we've done this about five

4  times, but we'll do it, again.

5          THE COURT:  Do it a sixth --

6          MR. ROTHSTEIN:  Okay.

7          THE COURT:  -- if you have, just to make clear that

8  there is no gaps.

9          MR. ROCHE:  We just want it clear, your Honor,

10  without a lot of qualifying language and objections.

11          MR. ROTHSTEIN:  And, your Honor, if we didn't produce

12  documents as he's alleging, we can't rely on them at trial.

13          THE COURT:  Absolutely.

14          MR. ROTHSTEIN:  So --

15          THE COURT:  Well, I think he does not want any

16  surprises or if they are --

17          MR. ROTHSTEIN:  How --

18          THE COURT:  -- helpful to him.

19          MR. ROTHSTEIN:  But these are --

20          MR. ROCHE:  Your Honor --

21          MR. ROTHSTEIN:  -- fictional documents, so, you know

22  --

23          THE COURT:  Just put it in --

24          MR. ROTHSTEIN:  I understand.

25          THE COURT:  -- the letter -- I do not care what

1   format, letter, interrogatory -- something that you sign --

2           MR. ROTHSTEIN:  Fair enough.

3           THE COURT:  -- that that has been turned over.

4           MR. ROCHE:  Your Honor, on this motion there's one

5   open issue.  I don't think it's in dispute.  The last time we

6   were here, you granted the portion of this motion that would

7   allow us to have additional deposition testimony from Mr. Bae.

8   And you said that --

9           THE COURT:  Yes.

10          MR. ROCHE:  -- had to be -- yeah -- that had to be

11  concluded by this week.

12          It was set to go yesterday and they cancelled at the

13  last minute because he had a personal issue.  So, now our time

14  has ended to take his deposition.  Could we have an extension

15  of that?  It's not been rescheduled until the end of July or

16  the last week in July.  It's not something that should affect

17  the summary judgment motions.

18          MR. ROTHSTEIN:  His father passed away.  So, we just

19  asked that it be put off --

20          THE COURT:  Sure.

21          MR. ROTHSTEIN:  -- until he can have his deposition.

22  We have no problem with that.

23          THE COURT:  Try to do it by July 31st.

24          MR. ROCHE:  We can -- that shouldn't be a problem.

25          THE COURT:  And, you know, if he is not ready at that

17

1    point and you need to move it out, that is fine with me --

2             MR. ROTHSTEIN:  We understand.

3             THE COURT:  -- if you can mutually agree.

4             MR. ROCHE:  Your Honor, there's one other matter.  On

5    Monday, they filed a fee petition pursuant to your earlier

6    order.

7             THE COURT:  That is the one I set the briefing

8    schedule on, I thought.

9             MR. ROTHSTEIN:  No --

10            MR. ROCHE:  No, they filed two fee petitions.

11            THE COURT:  Oh, thank you.  Thank you.  They did.

12            MR. ROTHSTEIN:  One was pursuant to court order.

13            THE COURT:  They did.

14            I need a response to that, please.

15            MR. ROCHE:  Yes.  Can we just have it be the same

16   date as the other one?

17            THE COURT:  Yes.

18            MR. ROCHE:  The --

19            THE COURT:  So, both Record No. 254 and 258, your

20   response is due July 24th.  That is the petition for award of

21   attorneys' fees and costs and the motion for fees and costs as

22   prevailing party.

23            Now, does that cover everything on the motion for

24   leave to conduct limited discovery?  There were some issues

25   about statistical analysis and --

18

1          MR. ROCHE:  Well, we've got Mr. Bae's deposition --

2          THE COURT:  Okay.

3          MR. ROCHE:  -- that we're hoping that will deal with.

4          THE COURT:  So, the motion is granted, in limited

5   part, and, it sounds like, denied as moot with respect to the

6   other issues.

7          What about settlement, as long as you are here?

8          MR. ROCHE:  Well, when -- we had made a proposal that

9   when the summary judgment motions were filed -- and they now

10  are -- that would be a time to have a mediation.  And that was

11  turned down.  We reported that last time we were here.  And

12  that's -- as far as I understand, that's the status.

13         MR. ROTHSTEIN:  Your Honor, nothing was turned down.

14  I think we just had some discussions back and forth about the

15  scope of the mediation.  And we hit an impasse.  And I think

16  it was Mr. Roche that withdrew his offer of mediation.

17         MR. ROCHE:  Your Honor, that is absolutely not true.

18         THE COURT:  Okay.  Well, now rather than talking

19  about what was said and what was not said --

20         MR. ROCHE:  Okay.

21         THE COURT:  -- would you like me to refer this to

22  Magistrate Judge Mason?

23         I think, just based on what I have seen, that it

24  might be helpful to you to go sit before an objective person

25  and get an evaluation.

1       I do not care one way or the other.  If you want to
2   go to trial, that is fine with me.  It is going to be
3   expensive, you see already.  You get into Dauberts, that is
4   going to really set the clock ticking and the rates going up
5   with your time, the expert fee time.  It is very expensive
6   going forward.

7       I know this is hotly-contested and there are strong
8   feelings on both sides and you do not necessarily agree on
9   many things at all.  It might be productive for -- to go to
10  Judge Mason and get an objective assessment and see if some of
11  those feelings can be put aside and you can objectively look
12  at this.  If you do not want to, that is --

13      MR. ROTHSTEIN:  I'll talk to my client, your Honor.
14  I have actually successfully mediated in front of Magistrate
15  Mason.  But I --

16      THE COURT:  He is great.

17      MR. ROTHSTEIN:  -- understand his demeanor and I
18  under- -- you know, I've been through the process with him.  I
19  don't know if it would be that productive given where the
20  parties are right now, but we can talk about it.

21      THE COURT:  This is a jury trial, too, right?

22      MR. ROTHSTEIN:  Uh-huh.

23      THE COURT:  The other possibility is to come before
24  me.  I usually refer these because I have so many trials, that
25  it is hard to fit them in.  I will throw that out there.  And

1    I am going to ask you to call Katie by July 24th and let her

2    know if you would like me to refer it to Magistrate Judge

3    Mason or schedule one myself.  And if you do not and you want

4    to go forward with trial, that is fine, too.  But we are going

5    forward.

6              I will see you on August 6th.  Remember, I am

7    striking July 29th, so you do not have to come back on the

8    29th.

9              MR. ROCHE:  That's the normal 8:30 wake-up call?

10             THE COURT:  Yes.  I am putting you at the end of

11   my -- I can even make it 8:45 or 9:00, if you like.  I put you

12   at the end because you usually need the time, and I do not

13   want to short you on the time or make everybody else --

14             MR. ROCHE:  We appreciate that.

15             THE COURT:  -- sit through a half hour.

16             Let me just check.

17             (Brief pause.)

18             THE COURT:  I will put you at 9:00 o'clock on the

19   6th.  Does that work all right or would you --

20             MR. ROCHE:  Yes, your Honor, that's fine.

21             THE COURT:  Because if I put you at the end of the

22   8:30, that is about when you usually get in anyway.  So, I

23   will put you at 9:00 on the 6th.

24             MR. ROCHE:  Thank you, your Honor.

25             THE COURT:  Anything else?

21

1          (No response.)

2          MS. DAHLIN:   Thanks.

3                    *    *    *    *    *

4

5    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
6

7

     /s/ Joseph Rickhoff                    July 28, 2009
8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LG ELECTRONICS U.S.A., INC., <br> a subsidiary of  LG Electronics, Inc., <br> a Korean company, <br><br> Plaintiff, <br><br> v. <br><br> WHIRLPOOL CORPORATION, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 08 C 242

Judge St. Eve

Magistrate Judge Mason

## PLAINTIFF LG ELECTRONICS U.S.A., INC.'S SUPPLEMENTAL RESPONSES TO WHIRLPOOL CORPORATION'S THIRD SET OF INTERROGATORIES

Plaintiff LG Electronics U.S.A., Inc. ("LG USA"), by its undersigned counsel, Winston & Strawn LLP, hereby supplements its responses to Defendant Whirlpool Corporation's ("Whirlpool") Third Set of Interrogatories.

## GENERAL OBJECTIONS AND RESPONSES

The following General Objections and Responses apply to all the numbered interrogatories, and the General Objections and Responses shall be deemed continuing as to each interrogatory and are not waived, or in any way limited, by the specific objections and answers.

1.    LG USA objects to the interrogatories, including the "Instructions and Definitions" therein, to the extent that Whirlpool seeks to require LG USA to provide information beyond that required by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of Illinois, and/or any applicable rules of this Court.

2.    LG USA objects to Whirlpool's interrogatories as vague, overly broad and unduly burdensome to the extent they seek to elicit information that is not reasonably calculated to lead to the discovery of admissible evidence.

3.    LG USA objects to Whirlpool's interrogatories to the extent they seek to elicit information protected by the attorney-client privilege, attorney work product doctrine, or any other available privilege or immunity.

4.    By providing answers to Whirlpool's interrogatories, LG USA does not admit the relevance of such information to the subject matter of this litigation. Further, by providing answers to Whirlpool's interrogatories, LG USA is not waiving any applicable privileges nor shall the inadvertent disclosure of any privileged information operate as a waiver of any applicable privilege or immunity.

5.    LG USA objects to Whirlpool's interrogatories to the extent they seek information that is not within LG USA's possession, custody or control.

6.    LG USA expressly reserves the right to supplement these responses and objections with further additional information and documents as such information and documents become available to it in the course of the litigation.

## SPECIFIC OBJECTIONS AND RESPONSES

**1.    Identify all testing performed on any LG steam washer and dryer, any Whirlpool steam washer and dryer, and any other competitor's steam washer and dryer. For each instance of testing, identify when the testing occurred, who performed the test, where the test was performed, the machine on which testing was performed (by brand, model and product number), the protocols used for such testing, the results of such testing (including any comparisons of test results), the lead person from LG responsible for such testing, and all documents (by bates-number) that relate to each instance of testing.**

**RESPONSE:**

LG USA objects to Interrogatory No. 1 on the grounds that it is vague, compound and overly broad.  LG USA further objects that this interrogatory seeks information related to products not at issue in this litigation.  LG USA further objects on the grounds that the term "protocols" is vague and ambiguous.  Subject to these specific objections and its General Objections, and without waiving them, LG USA states as follows:

| Documents/Protocols Relating to Test | Name of Test | Persons/Entiries Performing Test | Location of Test | Date of Test |
|---|---|---|---|---|
| LG069358 | Steam course test of Electrolux Iron Aid (Dryer) | Choi, Chul Jin | DAC Lab. | Mar. 2007 |
| LG072571 | Input Power & Max Temperature | Bae, Sang Hun Choi, Chul Jin | DAC Lab. | Oct. 2007 |
| LG069351 | Reduce static (Comparison), Easy iron (LG), Power (Comparison) | Bae, Sang Hun Kim, Min Ji (Easy Iron) Choi, Chul Jin | DAC Lab. | Oct. 2007 July 2007 (Easy Iron) |
| LG071444 | Sanyo steam washer study | LG WM Division MD Group member | LG WM Division | Aug. 2004 |
| LG071468 | Performance comparisons | Yoon Joo Hawn Bae, Sang Hun Choi, Chul Jin | LG WM Division | Aug. 2007 (Photos) Nov. 2007 (Data) |
| LG072029 | Photos of Kenmore HE5 | Yoon Joo Hawn Bae, Sang Hun Choi, Chul Jin | LG WM Division | Aug. 2007 |
| LG070083 | Operation Algorithm Analysis | Ji Yoo Chol | DA Lab.(seoul) | Dec. 2007 |

| | | | | |
|---|---|---|---|---|
| LG045121; LG070035; LG070042; LG070049; LG070056; LG070065; LG070075 | Wrinkle Release | Choi, Chul Jin Bae, Sang Hun Kim, Dong An (LGE) INTERTEK | LGE Quality Assurance Department, Washing Machine Div. | Oct. 2007 |
| LG045094 | Odor | Ulsan Univ. (Prof. Yang, Sung Bong) INTERTEK | Ulsan Univ. | Oct. 2007 |
| LG045111 | Static Charge | Choi, Chul Jin Bae, Sang Hun Kim, Dong An (LGE) INTERTEK | LGE Quality Assurance Department, Washing Machine Div. | Sept. 2007 |
| LG045093 | Easy Iron | Choi, Chul Jin (LGE) Bae, Sang Hun (LGE) | LGE DAC Lab In Changwon | First Half of 2007 |
| LG005647, LG007256 | LG Steam Dryer Field Test | Matthew Nygren, Underwriters Laboratories, Dong-An Kim (LGE); | Chicago | September, 2007 |
| LG045118 | Uniformity Test of Steam Spraying and Drying | Choi, Chul Jin (LGE) Bae, Sang Hun (LGE) | LGE DAC Lab In Changwon | June-July 2007 |
| LG006542 | SteamWasher Wrinkle and Odor test | | LG and Ulsan Dept. of Chemistry Lab | |
| LG010061 | Performance test of LG SteamWasher | Kim Dong-An, INTERTEK | Seoul, Korea | November, 2005 |
| LG010078; LG10090 | Performance test of LG | Kim Dong-An, INTERTEK | Seoul, Korea | December, 2005 |

| | Steam Washer | | | |
|---|---|---|---|---|
| LG048067 LG048074; LG048077; LG048081; LG048083; LG048085; LG048086; LG048090; LG048095 | Design and testing of Injection System of LG Steam Generator | LG | LG WM division | 2005 |
| LG048100; LG048118; LG048130; LG048138; LG048153; LG048230; LG048619; LG048620; LG048630; LG048632; LG048638; | Landmark / Alpha Generator Design and testing | LG | LG WM Division | 2005 |
| LG049183 | LG Electronics discovery Steam Dryer Presentation and testing results | LG | LG WM Division | May 21, 2007 |
| LG051771 | ITS Test Results – Washer Comparison | ITS-Korea | ITS-Korea | |
| LG056146 | Wrinkle Removal and Danish wear (Gentelness) test | Intertek Testing Services, Korea; Kyu Sang, Yi (FITI Testing); John J. Park (INTERTEK Korea) | Korea | December, 2005 |
| LG056204; LG056206 | Comparative testing of LG and Whirlpool spray time, static reducing ability and | LGE Internal | Korea | |

| | energy use | | | |
|---|---|---|---|---|
| LG057780; LG072954 | Performance test of LG Steam Washer | Kim Doong-An (Intertek) | Korea | November, 2005 |
| LG057797 | Performance test of LG Steam Washer | Kim Doong-An (Intertek) | Korea | December, 2005 |
| LG058257 | ITS & Energy Star data | ITS – Korea | Korea | November, 2005 |
| LG070035 | Performance Test of LG SteamWasher | Ulsan University, Intertek, coordinated by J.H. Yoon | Ulsan, Korea | November, 2007 |

In addition to the above listed documents and in accordance with rule 33(d), the following documents are responsive to Interrogatory No. 1: LG069351; LG069374; LG069516; LG069653; LG069902; LG070089; LG070194; LG070256; LG070365; LG070462; LG070560; LG070652; LG070750; LG071008; LG071393; LG071410; LG071427; LG071468; LG071474; LG071546; LG071647; LG071741; LG071885; LG072034; LG072181; LG072427; LG072571; and LG072971.[1] LG USA has repeatedly stated that it has produced and identified all documents that are responsive to this interrogatory. *See* 3/6/09 letter to Ms. DePriest; 3/11/09 letter to Ms. DePriest; 3/16/09 letter to Ms. DePriest; and 3/20/09 letter to Ms. DePriest. LG USA has conducted several exhaustive searches for responsive documents to this request. To the extent any documents were created responsive to this request, they have been searched, reviewed and produced to Whirlpool.

---

[1] Each bates number refers to the first page of each document.

Dated:  August 6, 2009                    Respectfully submitted,

                                          **LG ELECTRONICS U.S.A., INC.**


                                          By:  ___Eric Broxterman____
                                                    One of its attorneys

                                          Ronald Y. Rothstein – rrothstein@winston.com
                                          Eric L. Broxterman – ebroxterman@winston.com
                                          WINSTON & STRAWN LLP
                                          35 West Wacker Drive
                                          Chicago, Illinois  60601
                                          (312) 558-5600 – telephone
                                          (312) 558-5700 – facsimile

                                          *Counsel for LG Electronics U.S.A., Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing **Plaintiff LG Electronics U.S.A., Inc.'s Supplemental Objections and Responses to Whirlpool Corporations' Third Set of Interrogatories** has been served on the following counsel of record via electronic mail this 6th day of August, 2009.

> Brian D. Roche – broche@reedsmith.com
> Jennifer DePriest – jdepriest@reedsmith.com
> Vanessa C. Martí – vmarti@reedsmith.com


> ___ Eric Broxterman ___
> One of LG USA's Attorneys

# EXHIBIT D
# FILED
# UNDER SEAL