IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., INC.<br>a subsidiary of LG Electronics, Inc.,<br>a Korean company | ) ) ) ) | |
| Plaintiff , | ) ) | Civil Action No.: 08 C 242 |
| v. | ) ) | Judge St. Eve |
| WHIRLPOOL CORPORATION, | ) ) | Magistrate Judge Mason |
| Defendant. | ) ) | **REDACTED** |

**WHIRLPOOL CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ..................................................................................................... 2

    A. LG's Literal Falsity Claim Fails Because Whirlpool Meets At Least Two
    Common Definitions Of The Word "Steam." .............................................. 2

    B. LG's Implied Falsity Claim Fails Because LG Has Not Produced Evidence Of An
    Implied False Message In Any Of Whirlpool's Advertising ......................... 6

       1. LG's direct evidence fails to establish any implied message ........................ 7

       2. LG's survey evidence does not establish an implied message ..................... 9

          a. The survey results are unreliable and inadmissible ................................. 9

          b. LG's arguments do not salvage Reitter's opinion ................................. 14

III.       CONCLUSION .......................................................................................... 18

## Cases

*AHP Subsidiary Holding Co. v. Stuart Hale Co.,*
1 F.3d 611 (7th Cir. 1993) .................................................................................... 14

*American Home Prods. Corp. v. Proctor & Gamble Co.,*
871 F. Supp. 739 (D.N.J. 1994) ................................................................ 10, 12, 16

*Baker v. Indian Prairie Comm. Unit, Sch. Dist. 204,*
No. 96 C 3927, 1999 WL 988799 (N.D. Ill. Oct. 27, 1999) ................................ 17

*Bergstrom, Inc. v. Siemens Elec., Ltd.,*
208 F.R.D. 234 (N.D. Ill. 2002) .............................................................................. 6

*Castrol Inc. v. Penzoil Co.,*
987 F.2d 939 (3d Cir. 1993) ..................................................................................... 4

*Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.,*
873 F. Supp. 893 (D.N.J. 1994) ............................................................................ 15

*Compaq Computer Corp. v. Packard Bell Elecs., Inc.,*
163 F.R.D. 329 (N.D. Cal. 1995) ............................................................................. 4

*Coors Brewing Co. v. Anheuser-Busch Cos.,*
802 F. Supp. 965 (S.D.N.Y. 1992) ............................................................. 2, 10, 11

*Cumberland Packing Corp. v. Monsanto Co.,*
32 F. Supp. 2d 561 (E.D.N.Y. 1999) ............................................................... 13, 16

*Gillette Co. v. Norelco Consumer Prods. Co.,*
69 F. Supp. 2d 246 (D. Mass. 1999) ................................................................. 7, 12

*Inianapolis Colts Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship,*
34 F.3d 410 (7th Cir. 1994) ................................................................................... 14

*Johnson & Johnson v. Smithkline Beecham Corp.,*
960 F.2d 294 (2d Cir. 1992) ............................................................................... 7, 12

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.,*
No. 91-7099, 1993 WL 21239 (E.D. Pa. Jan. 29, 1993), *aff'd*, 19 F.3d 125 (3d Cir. 1994) 7, 12, 13

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.,*
2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ........................................................ 11

*Kubert v. Aid Assocs.*,
  2009 WL 1270351 (N.D. Ill. 2009) ................................................. 13, 14

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
  243 F.3d 789 (4th Cir. 2001) ........................................................ 5

*Mattel, Inc. v. MCA Records, Inc.*,
  28 F. Supp. 2d 1120 (C.D. Cal. 1998) ........................................... 12

*Mead Johnson & Co. v. Abbott Labs.*,
  201 F.3d 883, *op. amended on denial of reh'g by*, 209 F.3d 1032 (7th Cir. 2000) .................... 2

*Navistar Int'l Transp. Corp. v. Freightliner Corp.*,
  No. 96 C 6922, 1998 WL 911776 (N.D. Ill. Dec. 28, 1998) ................. 14

*Packman v. Chicago Tribune Co.*,
  2000 WL 35359711 (N.D. Ill. Dec. 6, 2000) ................................... 5

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*,
  292 F. Supp. 2d 594 (D.N.J. 2003) ........................................... 13, 16

*Salgado v. Gen. Motors Corp.*,
  150 F.3d 735 (7th Cir. 1998) ...................................................... 16

*Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*,
  __ F. Supp. 2d __, 2009 WL 2407207 (D. Del. Aug. 5, 2009) .................. 4

*Spraying Sys. Co. v. Delavan, Inc.*,
  975 F.2d 387 (7th Cir. 1992) .................................................. 12, 14

*THX Am., Inc. v. NSK, Ltd.*,
  917 F. Supp. 563 (N.D. Ill. 1996) ............................................... 6

*Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*,
  915 F. Supp. 360 (S.D. Fla. 1996) ............................................... 4

*Universal City Studios, Inc. v. Nintendo Co.*,
  746 F.2d 112 (2d Cir. 1984) ..................................................... 12

*Whirlpool Props., Inc. v. LG Elects. U.S.A., Inc.*,
  2006 WL 62846 (W.D. Mich. Jan 10, 2006) ..................................... 14

## Other Authorities

Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference Manual on
  Scientific Evidence, Federal Judicial Center*, 253 (2d ed., 2000) ................... 9, 12, 15

**Rules**

Fed. R. Evid. 801(c) ................................................................................................ 4

Fed. R. Evid. 807 .................................................................................................... 5

# I. INTRODUCTION

LG's response includes a plethora of factual assertions and arguments that identify many factual disputes. But these factual issues are a diversion and not pertinent to the two issues that need to be decided by the Court on this motion: Is Whirlpool's use of the word steam in its advertising literally false? Has LG established that Whirlpool's advertising conveys to consumers an actionable implied message? The many disputed facts that arise from the parties' submissions do not create a *material* issue of fact on these issues. The uncontested testimony from LG's own expert, as well as other evidence, establishes that Whirlpool's steam dryer has steam according to common definitions of the word. And LG has not proffered any admissible evidence that Whirlpool's advertising conveys an implied message, a necessary element to a claim that advertising is impliedly false.[1]

In addressing the issues of literal falsity, LG takes issue with Whirlpool's reliance on a common dictionary definition describing steam as "a vapor arising from a heated substance" calling its use in this context "tortured" and "strained to the point of absurdity." But LG ignores that courts, including this Court, regularly turn to dictionaries to identify the common meaning of words for advertising cases. This particular common definition is reasonable in the context of laundry as evidenced by LG's description of the condition of the steam in dryers that are the subject of its own patent applications. And it is not just LG and Whirlpool that describe the steam created in dryers in this fashion; the prevailing approach in the laundry industry is to use "steam" in the name of clothes dryers that use the same technology as Whirlpool's Steam Dryer, as LG admits. (D. No. 281, LG's Local Rule 56.1(B) Stmt. in Opp'n, ¶ 52 Resp.) Whirlpool's steam dryer also has vapor in its drum at temperatures higher than 100 C, thus satisfying a definition of steam that LG has embraced in this case. (D. No. 247, Jacobi Dep. at 121:18-123:13, Exh. 43 to Def.'s SOF.)

LG also contends that internal Whirlpool documents from the period during the development and launch of the steam dryer create a fact issue as to consumer confusion and whether Whirlpool's steam dryers use real steam. While Whirlpool disputes LG's characterization of these documents, this evidence does not create a fact issue on the question of whether Whirlpool's dryers actually use steam. Whirlpool has established that its advertising is not literally false because as an *objective* matter its dryers use steam under common definitions of the term. This evidence also does not resurrect LG's implied falsity claim that Whirlpool's advertising conveys the message that steam is introduced into the dryer in a particular way. Before determining whether an implied message is confusing or false, LG must first establish

---

[1] LG's state law claims should be dismissed as well because, as LG concedes, they are entirely derivative of its Lanham Act claims. (D. No. 279, LG Resp. Br. at 25 n.13).

that there *is* an implied message communicated to consumers in advertising. However, nothing in the Whirlpool documents establishes an *implied message received by consumers* about how steam is introduced into the dryer. LG's survey evidence also fails to establish an implied message because of its failure to conform to accepted survey procedures and methods. Summary judgment dismissing the entire case is appropriate.

## II. ARGUMENT

### A. LG's Literal Falsity Claim Fails Because Whirlpool Meets At Least Two Common Definitions Of The Word "Steam."

LG does not contest that when a term is capable of multiple meanings, an advertisement is not literally false for purposes of the Lanham Act if the claim meets **at least one** of those definitions. *Coors Brewing Co. v. Anheuser Busch Cos.*, 802 F. Supp. at 965, 969-70 (S.D.N.Y. 1992). (*See also* D. No. 101, 3/19/08 Op. at 5-6, citing *Coors*.) Whirlpool's steam dryer satisfies *at least two* definitions of the word "steam."

Common Definitions

Courts often "turn to dictionaries as an aid in defining the meaning of advertising claims when determining literal falsity." (D. No. 101, 3/19/08 Op. at 5 (citations omitted).) "[P]hilologists and others who contribute to dictionaries devote their lives to discovering usage and interpreting nuance." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 885, *op. amended on denial of reh'g by*, 209 F.3d 1032, 1034 (7th Cir. 2000); *id.* at 886 ("never before has survey research been used to determine the meaning of words" in a literal falsity claim).

A first common definition is the one LG initially advanced in support of its preliminary injunction: vaporized water at or above 100 C. (D. No. 101, 3/19/08 at 3-4, citing D. No. 24-1, Pl.'s Prelim. Inj. Mot. at 4.) LG's expert explained that "[v]apor is being created all over the [Whirlpool steam dryer] drum," including "regions of the drum where air is more than 100 degrees centigrade." (D. No. 247, Jacobi Dep. at 121:18-123:13, Exh. 43 to Def.'s SOF.) Because water vapor conforms to the temperature of the surrounding air (Malladi Dep. at 127, Ex. 8 to Def's Resp. to LG's SOF[2]), the water vapor in Whirlpool's steam dryer achieves temperatures of at least 100 C (*id.* at 158-59). Whirlpool's satisfaction of this first definition of "steam" alone makes summary judgment appropriate on LG's literal falsity claim.

A second definition is "Steam: 1: a vapor arising from a heated substance." (D. No. 101, 3/19/08 Op. at 5, citing Merriam-Webster's Collegiate Dictionary.) Whirlpool's use of the word "steam" also satisfies this definition. In fact, there is no real dispute on this point. LG's expert

---

[2] Whirlpool Corporation's Responses to LG's Statements of Undisputed Material Facts in Response to Defendant's Motion for Summary Judgment and appendix of supporting materials accompany this filing.

agrees that "if steam is defined as vaporizing [*sic* – should be "vapor rising"] from a heated surface without more, **that exists in the Whirlpool dryer drum**." (D. No. 247, Jacobi Dep. at 147:19-148:2 (emphasis added), Exh. 43 to Def.'s SOF.) This is consistent with LG's own definition of "steam" when describing the operation of dryers in LG Patents.[3] (D. No. 247, U.S. Patent No. 6,941,674, Ex. 18 to Def.'s SOF.) The definition is also consistent with the prevailing approach in the laundry appliance industry. (D. No. 281, LG's Local Rule 56.1(B) Stmt. in Opp'n, ¶ 52 Resp. ("LG admits that Kenmore/Sears, Electrolux, and Samsung advertise dryers either as steam dryers or as having steam functions and employ the same technology as Whirlpool.").)[4] Whirlpool's satisfaction of this second definition of "steam" makes summary judgment appropriate on LG's literal falsity claim.

While LG begrudgingly admits that dictionary definitions are relevant to the issue of literal falsity, it argues that the first definition of "steam" from Merriam-Webster's Collegiate Dictionary cannot be applied here because the vapor Whirlpool's steam dryer creates is like the vapor created in every conventional dryer. (D. No. 279, LG Resp. Br. at 21-22.) However, LG itself considers the vapor in a conventional dryer to be "steam." (D. No. 247, U.S. Patent No. 6,941,674, Ex. 18 to Def.'s SOF.) In any event, Whirlpool's steam dryer and a conventional dryer are very different. Unlike a traditional dryer, a steam dryer has an independent "steam cycle" that actually **delivers steam to dry clothes** (via water that vaporizes in the heated drum) to relax wrinkles and reduce odors. (D. No. 247, Def.'s SOF ¶ 5.) A traditional dryer lacks such a cycle, and it is incapable of delivering steam in the drum to dry clothing. LG's repeated assertions that Whirlpool's use of the word "steam" is "strained" and "tortured" is further belied by the prevailing industry approach, which unequivocally is consistent with Whirlpool's use of the word. LG's hostility to the common dictionary definitions which Whirlpool's steam dryer meets does not create an issue of fact.[5]

---

[3] LG retreats from its use of the word "steam" in its own dryer patent filing, claiming it is "quite irrelevant" to this case without conducting a Markman hearing. (D. No. 279, LG Resp. Br. at 25, n.12.) But no hearing is necessary to appreciate the relevancy of LG's patent to a Lanham Act claim. The patent discusses a clothes dryer in which "high temperature-little moisture air is converted into high-temperature-much moisture air by **steam** generated while the clothes are heated." (D. No. 247, U.S. Patent No. 6,941,674, Ex. 18 to Def.'s SOF (emphasis added).) LG has provided no reason for the Court to believe that LG's use of the word "steam" in its patents means anything other than ordinary English usage.

[4] LG says that "Bosch does not have a steam dryer." (D. No. 279, LG Resp. Br. at 24.) LG ignores that Bosch's dryer has the same technology as Whirlpool's, and Bosch advertises the dryer as having "Steam Functions," including "Steam Refresh," "Steam Wrinkle Relax," and "Steam Touch Up." (D. No. 245, Whirlpool S.J. Br. at 6.)

[5] Nor do the internal Whirlpool documents that LG cites (D. No. 279, LG's Resp. Br. at 2-6) create a fact issue. ███████████████████████████████████████████████████████████████████

<u>Industry usage confirms the common definition of steam</u>

The rest of LG's response arguments regarding literal falsity can be addressed in summary fashion. For example, LG argues that industry usage is "irrelevant to consumer expectations" in false advertising cases. (D. No. 279, LG Resp. Br. at 24-25, citing *Castrol Inc. v. Penzoil Co.*, 987 F.2d 939, 957-58 (3d Cir. 1993).) But LG cites from the **dissenting opinion** in *Castrol*; the majority's analysis turned on standard industry testing to determine the subject ad's literal falsity. 987 F.2d at 944. As other courts interpreting *Castrol* have explained:

> While the determination whether an advertising claim is misleading to consumers is evaluated from the public's perspective, "[i]n order to determine whether a claim is literally false courts have looked to objective industry standards."

*Compaq Computer Corp. v. Packard Bell Elecs., Inc.*, 163 F.R.D. 329, 336 (N.D. Cal. 1995) (quoting *Castrol*) (defendant's "potential liability under the Lanham Act for allegedly falsely advertising its personal computers to consumers as 'new' may turn on the meaning of the term within the industry" . . . "information concerning whether [defendant's] competitors . . . recycle used components and pass them off, re-assembled, as 'new' is obviously relevant"); *accord Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F. Supp. 360, 365-66 (S.D. Fla. 1996) (citing *Castro*) (relying on industry use of the word "Economy" tire to determine whether defendant's use of the word was false); *see also Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, __ F. Supp. 2d __, 2009 WL 2407207, at *4 (D. Del. Aug. 5, 2009) ("The test for literal falsity is an objective one for the court's determination.") (citing *Castrol*).

LG concedes that "Kenmore/Sears, Electrolux, and Samsung advertise dryers either as steam dryers or as having steam functions and employ the same technology as Whirlpool." (D. No. 281, LG's Local Rule 56.1(B) Stmt. in Opp'n, ¶ 52 Resp.) The laundry industry's prevailing use of the word "steam" to describe the operation of similar steam dryers confirms one common definition and refutes any claim of literal falsity (as well as any claim of a "strained" or "tortured" use of the word "steam"). LG's argument that "everyone in the industry is wrong except us" does not establish literal falsity.[6]

---

[6] It is significant that consumer publications like <u>Consumer Reports</u> are easily able to describe precisely how Whirlpool "steam" is created. *See* D. No. 247, Exs. 31, 33 to Def.'s SOF (explaining Whirlpool Steam Dryer's "steam option," in which "a small amount of water is sprayed into the drum while tumbling with heat). LG argues that <u>Consumer Reports</u> and similar publications are inadmissible hearsay. (D. No. 279, LG Resp. Br. at 23-24.) But Whirlpool is not offering <u>Consumer Reports</u> articles to prove the truth of the matter asserted (*i.e.*, that Whirlpool's steam dryers have steam), Fed. R. Evid. 801(c), but

<u>No material "conflicting evidence" or "battle of the experts"</u>

Alternatively, LG says that summary judgment is inappropriate when there is conflicting evidence or a "battle of the experts." (D. No. 279, LG Resp. Br. at 15-16, 20 n.11.) Regarding factual evidence, LG points to internal Whirlpool documents, noted above, regarding the method of steam delivery in Whirlpool's steam dryer – suggesting these give evidence of Whirlpool's intent. But even if one draws all inferences in LG's favor, these documents are legally irrelevant, because Whirlpool's use of the word "steam" in advertisements satisfies at least two common definitions of the word.

LG's attempt to create a "battle of the experts" regarding whether the Whirlpool steam dryers, in fact, create steam simply fails. There is no material "battle of the experts" here (other than the battle between LG experts Choi and Jacobi at the preliminary injunction stage). With discovery complete, LG's expert now agrees that vapor is being created in regions of the Whirlpool steam dryer drum that exceed 100 C (D. No. 247, Jacobi Dep. at 121:18-123:13, Ex. 43 to Def.'s SOF), consistent with one common definition, **and** that Whirlpool's steam dryer has vapor rising from a heated substance, consistent with a second common definition (*id.* at 147:19-148:2). Because there is no **material** disputed fact or expert opinion, Whirlpool is entitled to summary judgment.[7]

<u>No one (except LG) is equating a glass of water with a steam dryer</u>

LG grossly mischaracterizes Dr. Malladi's deposition testimony by trying to equate Whirlpool's steam dryer with water evaporating from a glass. (D. No. 279, LG Resp. Br. at 16, citing Malladi Dep. at 97:18-99:3.) The obvious response is that neither Whirlpool nor Dr.

---

rather as direct evidence as to what consumers and the industry perceive the word "steam" to be in the context of laundry. Such evidence is entirely appropriate and refutes LG's contention that Whirlpool is using a "tortured" definition. *See, e.g., Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (newspaper articles admissible to support a trademark claim under the Lanham Act when offered as direct evidence of beliefs and reactions); *Packman v. Chicago Tribune Co.*, 2000 WL 35359711, at *4 (N.D. Ill. Dec. 6, 2000), aff'd., 267 F.3d 628 (7th Cir. 2001) (newspaper articles not hearsay in trademark action when used to illustrate how the phrase "the joy of six" was used in the media); *see also* Fed. R. Evid. 807.

[7] LG also claims conflict with "Whirlpool's own expert linguist" (D. No. 279, LG Resp. Br. at 16), Dr. Levi, whom LG cites for the proposition that there are only two "senses" of steam: (1) visible steam, and (2) invisible steam formed when water is heated to or beyond the boiling point. *Id.* at 22-23. That is not what Dr. Levi said. She was asked to rebut LG's preliminary injunction position that the word "steam" had but one meaning; she "was not asked to specify the meanings of the various senses of steam" (Levi Dep. at 44:13-14, Ex. 7 to Def.'s Resp. to LG's SOF), and she rejected LG's characterization of her opinion that steam had only two senses (*e.g., id.* at 58:8; 56:24-57:5, 64:9-10, 92:7-9, 146:16-19). Dr. Levi also did not research any "intermediate" meanings of the word "steam" (*id.* at 109:15-110:4, 151:13-19 & 151:24; *contra* LG Resp. Br. at 22-23); she "was not focused on the possibility, for example, of invisible steam at a temperature lower than 212 degrees" (*id.* at 109:11-109:14).

Malladi ever state that Whirlpool's steam dryer is like water evaporating from a glass. As demonstrated above, Whirlpool's steam dryer meets at least two definitions of steam, including vapor rising from a heated substance. Dr. Malladi expressly rejected this notion of a glass of water in his next two pages of testimony (which LG does not cite), because water evaporating from a glass is nothing like the context of Whirlpool's product, which involves fine droplets being evaporated in the 100 C or warmer environment of the steam dryer. (Malladi Dep. at 99:19-100:10, Ex. 8 to Def.'s Resp. to LG's SOF.) LG also alleges that Dr. Malladi denied Whirlpool's ability to satisfy LG's technical definition of "steam." (D. No. 279, LG Resp. Br. at 20.) Dr. Malladi made no such disclaimer. He testified that the Whirlpool steam dryer creates steam by spraying a mist into a heated environment, the dryer drum. (Malladi Dep. at 50:18-53:16, 54:13-22, Ex. 8 to Def.'s Resp. to LG's SOF.) Water evaporates, transforming into water vapor. (*Id.* at 54:13-22.) Because water vapor conforms to the temperature of the surrounding air (*see id.* at 127:8-10, 127:24-25), the water vapor achieves temperatures of 100 C or above near the inlet grill where those temperatures exist. (*Id.* at 158:8-159:17.)

>        LG's new literal falsity claim on "steam imagery" is irrelevant and not timely

In responding to specific interrogatories asking LG to identify the bases for its false advertising claims, LG never once pointed to Whirlpool's "imagery." (D. No. 247, LG Supp. Resp. to Whirlpool's Second Set of Interrogs. at 2, Ex. 35 to Def.'s SOF.) Now that discovery is closed, it is far too late for LG to be concocting entirely new claims for Whirlpool to defend. *See, e.g., Bergstrom, Inc. v. Siemens Elec., Ltd.*, 208 F.R.D. 234, 235 (N.D. Ill. 2002) ("It is not the expense of formulating a counter-argument to the new theory . . . but the waste of having proceeded without it to this point."); *THK America, Inc. v. NSK, Ltd.*, 917 F. Supp. 563 (N.D. Ill. 1996) (excluding defense not included in interrogatory answers as "eleventh hour . . . gamesmanship").

In sum, LG's literal falsity claim amounts to a semantic game. LG and Whirlpool use different but equally valid alternatives to relax wrinkles and reduce odors, and both methods merit use of the "steam" moniker.

>    **B.    LG's Implied Falsity Claim Fails Because LG Has Not Produced Evidence Of An Implied False Message In Any Of Whirlpool's Advertising.**

The threshold requirement for establishing an implied claim under the Lanham Act is that the challenged advertising must *first* be shown to convey an implied message. LG skips this first step, and instead focuses on purported evidence of *confusion* regarding Whirlpool's use of steam. LG's decision to bypass this threshold requirement is fatal to its implied falsity claim as it has

failed to establish—through either direct evidence or its survey evidence—a single actionable *implied message* that Whirlpool's advertising communicates to consumers.

### 1. LG's direct evidence fails to establish any implied message.

LG chose not to address well-settled law that for any implied falsity claim to succeed, LG must *first* establish as a threshold matter that there exists *any implied message at all* in Whirlpool's use of the word "steam" in its advertising. LG tries to navigate around this requirement, and introduces instead purported evidence of *consumer confusion* in an effort to create a fact question. There are two problems with LG's approach: (1) it improperly ignores LG's *threshold* burden to prove the existence of an implied message conveyed by the advertising; and (2) the asserted "evidence" of confusion is unrelated to the existence of any implied message.

*First*, LG leapfrogs over the threshold issue to focus on purported evidence of *confusion* in an effort to create a fact question as to implied *falsity*. (*See* D. No. 279, LG Resp. Br. at 9-10.) As explained in Whirlpool's motion, the law is clear: before getting to confusion, LG must *first* prove that the advertising at issue conveys a particular message. *See Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) ("*before* a court can determine the truth or falsity of an advertisement's message, it must first determine what message was actually conveyed to the viewing audience") (emphasis added); *Gillette Co. v. Norelco Consumer Prods. Co.*, 69 F. Supp. 2d 246, 258 (D. Mass. 1999) ("A claim of implied falsity requires that the court make a two-part determination. *First*, the court must determine what the ambiguous statements made in the commercials mean to consumers.... If [plaintiff] succeeds in establishing what the ... commercials meant to consumers, the court must consider the *second* inquiry – whether that meaning is deceptive or misleading.") (emphasis added); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm. Co.*, Civ. A No. 91-7099, 1993 WL 21239, at *9 (E.D. Pa. Jan. 29, 1993) ("Whether or not a claim is misleading depends upon the message that is conveyed to consumers. The court must determine the content of such a message and *then* decide if that message deceived or misled."), *aff'd*, 19 F.3d 125, 129 (3d Cir. 1994) (internal citation omitted, emphasis added). As noted in Whirlpool's Memorandum, "[a]bsent such a threshold showing, an implied falsehood claim must fail." *Johnson & Johnson*, 960 F.2d at 298. LG's singular focus in its response brief on purported evidence of *confusion* puts the cart before

the horse, and LG's attempt to bypass the threshold (and separate) requirement of establishing an implied message in the first place must be viewed as an implicit admission that it cannot do so.[8]

*Second*, LG's sole purported "direct" evidence of *confusion* (and purported intent, which LG states gives rise to a presumption of deception) is Whirlpool internal communications and the so-called Insperience evidence. (D. No. 269, LG Resp. Br. at 9-11.) Whirlpool disputes LG's characterizations of these documents. But even taking LG's characterizations as true for purposes of this motion, this evidence does not establish any implied message, much less the implied message about *injection of hot vapor* that LG asserts (through its expert) is conveyed to consumers by Whirlpool's advertising:



LG claims that the above evidence establishes "[d]irect evidence of actual consumer confusion" (D. No. 279, LG Resp. Br. at 9) as to whether Whirlpool's steam dryers use steam. But LG's challenge to Whirlpool's claims that its steam dryers use steam is LG's literal falsity claim, and as set forth above, it is undisputed that Whirlpool's steam dryers use steam. Just as LG's evidence is irrelevant to literal falsity, it is irrelevant here, as it does not establish any *implied* message conveyed *to consumers* by Whirlpool's express use of the word "steam" in its advertising – a prerequisite to its implied claim.

---

[8] LG's cases (D. No. 279, LG Resp. Br. at 9-10) are inapposite, in that they stand for the unremarkable proposition that direct evidence can be evidence of the element of *consumer confusion* in Lanham Act cases. None of the cases allow for a Lanham Act claimant to skip the threshold requirement of showing the existence of an implied message.

## 2. LG's survey evidence does not establish an implied message.

Lacking any direct evidence of an *implied* message in Whirlpool's advertising, LG relies solely on the fatally impaired survey of its expert, Mr. Reitter, in an attempt to establish an implied message about what is injected in Whirlpool's dryer. (D. No. 279, LG Resp. Br. at 11-15.) LG claims that the survey shows "55% of consumers who watched the survey test advertisement believed it was for a dryer that *injects a hot vapor* onto clothes inside the dryer drum." (*Id.* at 11 (emphasis added).) LG wants to establish that consumers take away this implied message from Whirlpool's advertising so that it can then argue that the message is false or misleading because Whirlpool's steam dryers do *not inject* a hot vapor into the drum (like LG), but instead create a hot vapor in the drum in a different way. (*Compare* D. No. 281, LG SOF ¶ 2 (LG's steam function) *with* LG SOF ¶ 1 (Whirlpool's steam function).) LG's implied falsity claim fails because this alleged "implied message" that a hot vapor *is injected* did not come from Whirlpool's advertising at all, but rather from the unreliable results of Reitter's flawed survey. (*See generally* D. No. 243, Whirlpool Corporation's Motion to Exclude Survey Evidence, and Expert Report and Opinions, of Robert Reitter, ("Motion to Exclude").) In its Response, LG has not excused the survey's flaws or resuscitated Reitter's unreliable opinion.

### a. The survey results are unreliable and inadmissible.

<u>Reitter ignores survey responses to open-ended questions</u>

Reitter began his survey by having participants view a "test" commercial with references to steam and a different "control" commercial with steam references omitted and filled with images of water, streams and waterfalls. He then asked participants the following three **open-ended** questions:

1) "What was the main idea of the commercial?"

2) "What else, if anything, did the commercial say, show or imply?"

3) "Did the commercial say, show or imply anything about any unique feature of the advertised dryer?", and, of respondents who answered yes, "[w]hat did the commercial say, show or imply about any unique feature of the advertised dryer?"

(D. No. 247, Reitter Report at 10-11, Ex. 36 to Def.'s SOF.) Reitter himself concedes, and many courts and experts agree, that such open-ended questions in false advertising cases "carry much more weight than closed ended questions." (D. No. 243, Reitter Dep. at 15:12-17, Ex. 3 to Motion to Exclude; *see* Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference Manual on Scientific Evidence, Federal Judicial Center*, 253 (2d ed., 2000)

("Diamond article") ("many courts prefer open-ended questions on the grounds that they tend to be less leading").)

In response to the Reitter Survey's open-ended questions, **not a single participant identified any actual or implied message about <u>injecting</u> hot vapor onto clothes or about how, where, or when the hot vapor is created**. (D. No. 243, Reitter Dep. at 73:5-76:5, 97:15-98:3, Ex. 3 to Motion to Exclude.) And only a statistically insignificant 1% of respondents even mentioned "hot vapor" or "vapor" in their responses at all. (D. No. 247, Reitter Report at 18, Ex. 36 to Def.'s SOF.) Even Reitter conceded that "people don't have an impression of how this steam is created since **the commercials didn't get into that at all**." (D. No. 243, Reitter Dep. at 169:11-13 (emphasis added), Ex. 3 to Motion to Exclude.)

But Reitter improperly disregarded these probative results from the open ended questions when he concluded—contrary to them—that the participants <u>did</u> take away an implied message about how hot vapor is introduced in the dryer. (*See* D. No. 247, Reitter Report at 2, Ex. 36 to Def.'s SOF.) *See also Coors Brewing Co. v. Anheuser-Busch Cos.,* 802 F. Supp. 965, 970-72 (S.D.N.Y. 1992) (plaintiff's reliance on responses to closed-ended questions to show certain implied message unreliable where responses to open-ended responses suggested no message on topic was conveyed); *American Home Prods. Corp. v. Proctor & Gamble Co.,* 871 F. Supp. 739, 761 (D.N.J. 1994) (survey unreliable where few participants identified any comparison between Aleve and Advil in response to open-ended questions, only doing so after a question prompted that comparison).[10]

<u>Reitter's exclusive reliance on the closed-ended leading "Question 5" is improper</u>

Instead of accepting the results from the open-ended questions establishing that the participants *did not* take away a message about what is *injected* into the dryer drum, Reitter relies on a closed-ended question to all survey participants that prompts them to identify a message he knew they were unlikely to identify on their own. (D. No. 247, Reitter Report at 19 ("[i]t was anticipated that respondents would not articulate anything about this distinction in response to general, open-ended questions," Ex. 36 to Def.'s SOF).) Reitter bases his entire opinion

---

[10] LG also claims, without any explanation or support, that "the 'hot, billowy white' message *was* a part of the Reitter Survey ... which established that consumers believe a hot vapor is being injected onto clothes in Whirlpool's dryer." (D. No. 279, LG Resp. Br. at 19 n.19.) But Reitter never once opined that consumers took away the "hot, billowy white" message, or that a message that "hot vapor is being injected onto clothes" really means "hot, billowy white" steam is used in Whirlpool's steam dryers.

- 10 -

**exclusively** on responses to the following closed-ended question ("Question 5") that expressly provides specific implied messages to participants.

> Dryer A: A mist of cold water is injected into the heated dryer drum. The dryer then heats the water and tumbles the clothes until dry.
>
> Dryer B: A hot vapor is injected onto clothes inside the dryer drum. The dryer then heats and tumbles the clothes until dry.
>
> 5) Thinking of the commercial you just saw . . . do you think the commercial . . .
>
> Could be for Dryer A only
>
> Could be for Dryer B only
>
> Could be for either Dryer A or Dryer B
>
> Could not be for either Dryer A or Dryer B or, don't you know?

(D. No. 247, Reitter Report at 11, Ex. 36 to Def.'s SOF.)

Not surprisingly, Reitter's use of Question 5 caused a significant jump in the percentage (*__from 1% to 55%__*) of respondents that identified an implied message relating to "hot vapor" as compared to responses from the open-ended questions. A smaller jump in percentage was referenced by the *Coors* court in its rejection of a survey, finding that such dramatic change in the results "**further suggests the leading nature of Question 5.**" 802 F. Supp. at 970-74 ("In response to the open-ended questions . . . a statistically insignificant percentage of respondents remarked on differences between the processes by which the two beers are made. **This jump in the percentage of respondents whose answers indicate a mistaken belief that Natural Light is not also made by a process of high gravity brewing from between 3% and 9% to 36.18% further suggests the leading nature of Question 5....** For the above reasons, I do not credit Question 5 with probative value. By contrast, I find that the survey's open-ended questions . . . were generally reliable.") (emphasis added).

Courts are in agreement that such leading, closed-end questions are "far more likely to generate 'demand effects' by suggesting the existence" of a message that respondents would not have identified on their own. *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *8 (S.D.N.Y. Aug. 6, 2007); *Coors Brewing Co. v. Anheuser-Busch Cos.*, 802 F. Supp. 965, 970-72 (S.D.N.Y. 1992) (closed-ended survey responses were insufficient to show an implied message about the processes defendant used to make beer because responses to open-ended questions indicated no message about beer process was conveyed); Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference Manual on Scientific Evidence,*

*Federal Judicial Center*, 253 (2d ed., 2000) ("Diamond article") ("courts prefer open-ended questions on the grounds that they tend to be less leading"); *American Home Prods.*, 871 F. Supp. at 761 (D.N.J. 1994) (survey unreliable where few participants identified any comparison between Aleve and Advil in response to open-ended questions, only doing so after a question prompted that comparison); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 1991 WL 206312, at * 7, 8 (survey failed to support existence of any alleged implied message about aluminum being dangerous because open-ended question responses did not reveal such message, which was identified only after leading questions), *aff'd*, 960 F.2d 294 (2d Cir. 1992) (S.D.N.Y. 1991) ; *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) (affirming summary judgment; closed questions failed to establish meaning "in an unbiased manner"); *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118-20 (2d Cir. 1984) (one of LG's cited cases; granting summary judgment in trademark infringement case because responses to leading questions in a consumer survey failed to raise a question of fact as to consumer confusion); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1133 (C.D. Cal. 1998) ("The mere presentation of a survey purporting to show confusion, however, does not itself create a triable issue of fact." . . . "leading or biased" questions "should be given little if any weight . . . ."), *aff'd*, 296 F.3d 894 (9th Cir. 2002). (*See also* D. No. 243, Mot. to Exclude at 6-8.)

<u>No filter question before "Question 5"</u>

Leading Question 5's inherent unreliability is exacerbated by the fact that Reitter did not first ask a filter question – a critical and standard survey method that would have screened out participants who received no message at all about how Whirlpool's steam is created. *See Gillette Co. v. Norelco Consumer Prods. Co.*, 69 F. Supp. 2d 246, 260 (D. Mass. 1999) (survey was not probative because it did not use open-ended questions to determine whether participants thought advertisement compared defendant's electric razor to other blade razors before asking whether commercial made comparisons); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm. Co.*, Civ. A No. 91-7099, 1993 WL 21239, at *11 (E.D. Pa. Jan. 29, 1993), ("Questions that inappropriately suggest and frame the issue for interviewees are **'fatally defective and untrustworthy.' A survey should be properly 'filtered' to screen out those who got no message from the commercial.**" (internal citations omitted, emphasis added)), *aff'd*, 19 F.3d 125 (3d Cir. 1994); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc*

*Rorer Pharm., Inc.*, 19 F.3d 125, 133-134 (3d Cir. 1994) (failure to use filter question rendered opinion unreliable; "[a] survey is **not credible** if it relies on leading questions which are 'inherently suggestive and invite guessing by those who did not get any clear message at all'") (citations omitted, emphasis added)). Reitter's failure to first utilize a filter question to identify respondents who received a particular message renders his wholesale reliance on the results of closed-ended Question 5 improper. (*See also* D. No. 243, Mot. to Exclude at 8-11.)

Substantial differences between the "test" and "control" commercials

Finally, it is impossible to know if the responses to Question 5 were attributable to the steam references present in the "test" commercial or the material differences between the "test" and "control" commercial. It is axiomatic, and Reitter concedes, that a proper control must be as similar as possible to the test with the exception of the tested stimulus – here, steam references. (Diamond article at 258; D. No. 243, Reitter Dep. at 167:9-168:18, Ex. 3 to Motion to Exclude); *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 603-04 (D.N.J. 2003) (in false advertising case, finding that "difference between the control and test commercial is fatal to the evidentiary value of the Dupont Survey"); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 583-84 (E.D.N.Y. 1999) (granting defendant summary judgment on false advertising claim where survey testing for message communicated by "NutraSweet" name on sweetener packet used two different packets, and results showed that image on one significantly influenced responses). But simply by viewing the 30-second commercials Mr. Reitter used (which have been provided to the Court), one can see that they are from different advertising campaigns, and starkly different visually and in content. One is filled with steam imagery, and the other with water imagery. (*See also* D. No. 243, Mot. to Exclude at 11-15.)

In short, the Reitter Survey is riddled with fundamental flaws that severely compromise its reliability and mandate its exclusion. Accordingly, LG lacks admissible evidence of the existence of any implied message and summary judgment is appropriate.[11]

---

[11] LG asserts that Whirlpool has "cited no case law and submitted no expert declarations" establishing the Reitter Survey's inadmissibility. (D. No. 279, LG Resp. Br. at 11.) But LG is wrong. Whirlpool filed, referenced and incorporated into its summary judgment papers a separate Motion to Exclude Reitter's opinion, setting forth in detail the factual and legal basis for its inadmissibility. Moreover, Whirlpool was not required, as LG suggests, to submit its own expert's report to establish the report's inadmissibility. *See, e.g., Kubert v. Aid Assocs.*, No. 05C 5865, 2009 WL 1270351, at *4 (N.D. Ill. May 7, 2009) (citing

## b.    LG's arguments do not salvage Reitter's opinion.

Against this backdrop, LG tries to revive Reitter's opinion by positing five arguments. *First*, LG asserts that the Reitter Survey "appropriately relies on open-ended and closed-ended questions." (D. No. 279, LG Resp. Br. at 12.)  But Reitter himself admits that he **did not rely on the responses to open-ended questions in forming his inconsistent opinion** that the commercial conveyed a message about how Whirlpool's dryer works.  (Reitter Aff. ¶ 8, Ex. B to D. No. 279; *see also* Reitter Dep. at 109:4-24, attached at Ex. 3 to Motion to Exclude, D. No. 243.)  Had he relied on the responses to the open-ended questions, he would have had to confirm his expectation before he began the survey – that the Whirlpool advertisement did not convey **any** message about how steam was made or the dryer worked.[12]

*Second*, ignoring Whirlpool's authorities, LG asserts that Reitter's closed-ended questions were proper despite the absence of a filter question because they presented "carefully worded" questions offering "a choice between well-identified options."  (D. No. 279, LG Resp. Br. at 13; Reitter Aff. ¶ 14, Ex. B to D. No. 279.)  But Reitter concocted his own two "options" about specific and detailed dryer operations that are not identified or addressed in Whirlpool's commercial.  Moreover, neither of these options offer consumers the choice of "hot vapor" without "injecting."  They are simply suggestions of implied messages offered up to the participants.  LG's own authority confirms that Reitter, to produce probative and admissible results, should have used filter questions before posing leading Question 5 to **all** respondents,

---

treatise and legal authorities).  And contrary to LG's position that the flaws in the Reitter Survey "simply go to the weight of Mr. Reitter's opinions, not their admissibility," it is well-settled that where, as here, a survey expert's opinion is based on flawed methodology and is unreliable, it is inadmissible and summary judgment is appropriate. *See, e.g., Spraying Systems*, 975 F.2d at 394-95 (flawed survey fails to create a genuine issue of fact); *Kubert*, 2009 WL 1270351, at \*4 (summary judgment granted where survey evidence was unreliable).  LG's other cited authorities are inapposite. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (moving party's ground for excluding the survey was premised on the wrong legal standard); *Navistar Int'l Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 911776, at \*9, n.15 (N.D. Ill. Dec. 28, 1998) (court neither identified nor analyzed any alleged survey flaws; no motion to exclude filed); *Indianapolis Colts Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 414-16 (7th Cir. 1994) (on preliminary injunction, survey contained only minor flaws; court properly discredited different survey containing major flaws); *Whirlpool Props., Inc. v. LG Elects. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at \*4, 6, 10-11 (W.D. Mich. Jan. 10, 2006) (alleged survey flaws unsupported by "reference to written authority in the area of survey research").

[12] LG also asserts, through the affidavit of its materiality expert, Jerry Wind, that the open-ended questions did not elicit responses about dryer operation because they sought information only about the "main idea" of the commercial. (Ex. C to D. No. 279; Wind Aff. ¶ 9). But Wind ignores survey questions 2 and 3, which are not so limited and broadly explore any and all messages conveyed by commercials.

including those receiving no message. *See Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 908-11 (D.N.J. 1994) (allegedly leading and closed-ended questions about specific message proper only because survey first posed "not one, but three filter" questions to effectively "screen out respondents who received no message"). Reitter's opinion is inadmissible because his leading dryer descriptions improperly suggested messages that many respondents likely received from Reitter, not from the commercials.[13]

*Third*, LG implicitly concedes the value of a proper filter when using closed-ended questions, but argues that Reitter was somehow excused because he could not think of a good filter question. (D. No. 279, LG Resp. Br. at 14.) Specifically, LG dismisses the question, "did the commercial say, show or imply anything about how the dryer works?" on the basis that "it would have been unclear from those responses whether the consumers were referring to steam or some other function . . . ." (*Id.*) To remedy that concern, however, standard survey methodology offers the follow-up question -- a technique Reitter concedes he used in Question 3 -- which could have pinpointed whether any participants actually received any message about steam generation before proceeding to the closed-ended question.[14] (*See* Diamond Article at 253; D. No. 247, Reitter Report at 10-11, Ex. 36 to Def.'s SOF). Alternatively, Reitter could have asked directly whether the commercial communicated anything about steam. Respondents who said *yes* could then be asked a series of narrower questions to discern whether the commercial communicated anything about how the steam was created or introduced in the dryer, and if so, what the commercial communicated. Reitter's failure to use a proper filter compounds the flaw of using a suggestive, closed-ended question and mandates the survey's exclusion.[15]

---

[13] Reitter's assertion that his descriptions are not leading because he rotated the responses misses the point. Whirlpool is not criticizing the order of questions in Question 5, but rather the fact that Question 5 suggests messages about how and where steam is created that the advertisements did not actually suggest.

[14] LG asserts that Reitter's failure to use a filter question is justified because Reitter instead used a control commercial "to establish whether or not a certain message was communicated." (D. No. 279, LG Resp. Br. at 13.) But use of a control commercial does not negate the importance of utilizing a filter question before suggestive closed-ended questions, especially where, as here, the control commercial was improper, as set forth above.

[15] Reitter's assertion in his affidavit that asking filter questions about steam would, ironically, somehow bias the responses to the closed-ended question is unsupported. (Ex. B to D. No. 279, ¶ 16.) Reitter ignores that any respondent **not** receiving a message about how steam is created would be properly filtered out before ever responding to the closed-ended question. Reitter's contention that the phrasing of a steam-related filter question may "subtly favor[]" the dryer description *which came closer to meaning steam* also confirms the bias inherent in his "injecting hot vapor" description. Finally, Reitter's purported resistance to a steam-related filter question because it might suggest "that the commercial did

*Fourth*, LG asserts that because "steam references are pervasive in the imagery, visuals, text and spoken words" in the test commercial, it would have been "implausible" to edit them out to create a different control commercial. This simply provides Reitter's explanation for why he did not modify the test commercial to be used as the control, but it does not justify using a control commercial with starkly different imagery. A cursory review of the commercials reveals that participants' responses may have had less to do with the tested stimulus – references to steam – than with the other pronounced and material differences between the two advertisements. For example, the control is dominated by images of water, mist, a stream and waterfall, which are absent from the test commercial. What's more, these differences **directly correlate** to the language chosen for the descriptions of the dryers. It is no wonder, therefore, that participants chose the description containing references to "cold water" and "mist" but not "injecting hot vapor" after watching the control commercial, since it actually depicted "cold water" and "mist" imagery. *See Pharmacia Corp.*, 292 F. Supp. 2d at 605 n.5 (improper control commercial rendered survey unreliable; rejecting assertion that expert had to use the specific control commercial because experts can and do create mock comparative commercials and alter existing ones); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574-75, 583-84 (E.D.N.Y. 1999) (granting summary judgment where survey was unreliable because of differences between tested commercials); *American Home Prods.*, 871 F. Supp. at 749 (control necessary to filter out preconceptions). (*See also* D. No. 243, Mot. to Exclude at 11-15.)

*Finally*, LG impermissibly offers up a new opinion from Reitter that Whirlpool's advertising conveys a false and misleading message that "it is the steam [in Whirlpool's dryers] that causes the odor and wrinkle reduction benefits." (D. No. 279, LG Resp. Br. at 12; *see also* D. No. 279, Ex. B, Reitter Aff. ¶ 11, 25.) LG's attempt to offer up this new expert opinion should be rejected because it is untimely, submitted over nine months after survey reports were due and over six months after other affirmative reports were due. Courts routinely exclude expert declarations that offer new opinions, prompted by an opposing party's summary judgment motion, after discovery has closed. *See Salgado v. General Motors Corp.*, 150 F.3d 735, 741, 743 (7th Cir. 1998); *Baker v. Indian Prairie Comm. Unit Sch. Dist. 204*, No. 96 C 3927, 1999

---

say, show or imply that the dryer does make steam" is particularly disingenuous given his apparent willingness to pose a leading question, without any filter, to suggest not only "that the dryer does make steam", but also that steam is made and introduced in a *detailed and specific* way. Reitter thus implicitly concedes the unreliability of his survey results.

WL 988799, at *1-3 (N.D. Ill. Oct. 27, 1999). In addition, if this purported opinion is an attempt to come up with a new *implied* message from Whirlpool's ads it should be rejected because it merely repeats that which Whirlpool's advertisements *explicitly* state – that Whirlpool's steam dryer "naturally steams out wrinkles and odors." (*See* D. No. 281, LG's SOF ¶ 52.) Thus any challenge to Whirlpool's express performance claims would be a claim of literal falsity and LG has not asserted in this case that Whirlpool's dryers to do not remove wrinkles and odors, presumably because LG's own testing of Whirlpool's dryers establishes otherwise.[16]

In sum, LG's response fails to address the fundamental flaw in its implied falsity claim that Whirlpool identified in its summary judgment motion: a lack of any proof whatsoever that Whirlpool's advertising conveyed an implied message to consumers. Accordingly, Whirlpool is entitled to summary judgment on LG's implied falsity claim.

### III. CONCLUSION

For the foregoing reasons and those stated in Whirlpool's Memorandum of Law in Support of Its Motion for Summary Judgment, Whirlpool respectfully requests that this Court grant Whirlpool summary judgment on all of LG's claims.

Dated:  August 28, 2009

Respectfully submitted,
WHIRLPOOL CORPORATION,
Defendant.


By:_/s/Brian D. Roche_____
One of its Attorneys

Brian D. Roche
Jennifer Y. DePriest
Vanessa Martí Heftman
REED SMITH LLP
10 South Wacker Drive, Suite 4000
Chicago, Illinois 60606
312.207.1000

J.A. Cragwall, Jr.
John J. Bursch
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, N.W.
Grand Rapids, Michigan 49503-2487
616.752.2000

Attorneys for Defendant, Whirlpool Corporation

## CERTIFICATE OF SERVICE

I, Jennifer Yule DePriest, an attorney, hereby certify that on August 28, 2009, I filed **WHIRLPOOL CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the ECF system, which will send notification of such filings to the following individuals.  In addition, the foregoing document was served on the following individuals by email:

> Ronald Y. Rothstein
> rrothstein@winston.com
> Eric L. Broxterman
> ebroxterman@winston.com
> Bryna Joyce Roth Dahlin
> bdahlin@winston.com
> Winston & Strawn LLP
> 35 West Wacker Drive
> Chicago, IL  60601

*/s/ Jennifer Yule DePriest*