IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LG ELECTRONICS U.S.A., INC. a subsidiary of LG Electronics, Inc., a Korean company,<br><br>Plaintiff,<br><br>v.<br><br>WHIRLPOOL CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>) Civil Action No.: 08 C 242<br>)<br>) Judge St. Eve<br>)<br>) Magistrate Judge Mason<br>)<br>)<br>) |

**WHIRLPOOL CORPORATION'S SUR-REPLY BRIEF IN RESPONSE TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS LISTED ON DEFENDANT'S PRIVILEGE LOG**

**INTRODUCTION**

On August 24, 2009, the Court issued a ruling granting in part and denying in part Plaintiff LG Electronics U.S.A., Inc.'s Motion to Compel Production of Documents Listed on Defendant's Privilege Log, and directing further briefing by the parties on two issues: (1) whether communications between Whirlpool's counsel and its outside advertising and marketing agencies are protected by the "common legal interest" exception to the attorney-client privilege; and (2) whether this Court may recognize an extension of the attorney-client privilege protection for these communications on the grounds that the agencies were acting as the representatives or "de facto employees" of Whirlpool. (Docket No. 284 at 6.)

Whirlpool and its outside advertising agencies do share a common legal interest here in avoiding liability for false advertising claims, and that common interest extends the protection of the attorney-client privilege to communications of legal advice between them. Alternatively, the communications should be protected on the grounds that the agencies, which take primary responsibility for creating and disseminating Whirlpool's advertising, were acting as representatives or functional employees of Whirlpool in the communications. Either of these

grounds on its own would be sufficient to protect these communications with outside agencies from disclosure, and LG's motion to compel their production should therefore be denied.

## BACKGROUND

The communications that remain at issue after the Court's August 24 ruling are communications between Whirlpool's counsel and Whirlpool's outside advertising, marketing, public relations, printing or production agencies (collectively referred to hereafter as "advertising agencies"). There are a limited number of these agencies, and Whirlpool's relationships with them are long-term. (Supplemental Declaration of Joel Van Winkle ("Van Winkle Decl."), July 2, 2009, ¶ 5, attached hereto as Exhibit A. ) The outside advertising agencies work closely with Whirlpool's employees, and many are frequently on-site at Whirlpool. *Id.* Whirlpool has a very small internal marketing department, and primary responsibility for developing Whirlpool's consumer messaging, crafting its print, television and internet advertising, and disseminating those advertisements in the media thus falls on these outside agencies. *Id.* at ¶ 6.

Whirlpool's in-house attorneys are often consulted on questions relating to an advertisement's compliance with the law, and Whirlpool specifically requires the final form of all advertising materials to be reviewed and approved by its legal department to ensure compliance with the law. *Id.* at ¶ 7. Because front-line responsibility for Whirlpool's advertising is assumed by the outside advertising agencies, they are sometimes the ones to communicate with Whirlpool's legal department. *Id.* at ¶ 8. Other times, legal department directives might be passed along to the advertising agencies by other Whirlpool employees. *Id.* All of the agencies are required to execute written confidentiality agreements covering all information they learn through their work for Whirlpool. *Id.* at ¶ 12.

The Court reviewed *in camera* the documents withheld from production by Whirlpool based on the attorney-client privilege. In its August 24 Opinion, the Court ordered just six of these documents to be produced on the grounds that they did not reveal legal advice or the substance of a confidential communication. (Docket No. 284 at 3.) The only subjects for this supplemental briefing are the two specific questions posed by the Court that bear on whether communication of legal advice to representatives of the outside advertising agencies waived the attorney-client privilege that would otherwise attach to the communications.

## ARGUMENT

A.   **Whirlpool And Its Outside Advertising Agencies Have A Common Legal Interest, And Communications With The Agencies Involving Legal Advice Thus Retain Their Privileged Character**

LG contends that communications about legal advice between Whirlpool's counsel and Whirlpool's advertising agencies, or legal department advice conveyed by other Whirlpool employees to these agencies, lost their privileged character by virtue of having been communicated to "third parties." The scope of the attorney-client privilege in the federal courts is governed by principles of federal common law. Fed. R. Evid. 501. "Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007), *cert denied*, __ U.S.__, 128 S. Ct. 1471 (2008) (citing *Robinson v. Texas Auto Dealers Ass'n*, 214 F.R.D. 432, 443 (E.D. Tex. 2003)). The common interest exception applies "where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise." *BDO*, 492 F.3d at 815-16 (citing *United States v. Evans*, 113 F.3d 1457, 1467 (7th Cir. 1999)).

The common interest exception does not constrict the attorney-client privilege, and applies to the full range of communications otherwise protected by the privilege. *BDO*, 492 F.3d at 816. Contrary to LG's suggestion in its prior briefing, "communications need not be made in anticipation of litigation to fall within the common interest doctrine." *Id.* This broad protection "encourages parties with a shared legal interest to seek legal 'assistance in order to meet legal requirements and to plan their conduct' accordingly." *Id.* (citing *In re Regents of the Univ. of California*, 101 F.3d 1386, 1390-91 (Fed. Cir. 1996)).

Here, Whirlpool and its advertising agencies have a shared legal interest in making certain that advertising for Whirlpool's products is truthful and not misleading, as both Whirlpool and its advertising agencies potentially bear liability for false or misleading claims. The advertising agencies with which Whirlpool works are charged with developing Whirlpool's consumer messaging, and with creating and disseminating Whirlpool's print, television and internet advertising. (Van Winkle Decl. at ¶ 6.) Such outside agencies can be held liable for participation in advertising that violates § 43(a) of the Lanham Act. *See, e.g., Waits v. Frito-Lay,*

*Inc.*, 978 F.2d 1093, 1111 (9th Cir. 1992) (affirming jury finding of liability against advertiser and advertising agency on Lanham Act false endorsement claim, though vacating elements of damages found to be duplicative). Outside agencies are also subject to action by the Federal Trade Commission in connection with false or deceptive advertising. *See, e.g., Doherty, Clifford, Steers & Shenfield v. FTC*, 392 F.2d 921, 928-29 (6th Cir. 1968) (upholding cease and desist order issued by Commission against ad agency that was responsible for offering general marketing consultation, formulating advertising plans and originating advertising ideas, and was thus joint creator of and active participant in advertising found to be deceptive); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 308-10 (D. Mass. 2008) (upholding FTC action against production companies that created deceptive infomercials and media firm that bought airtime).

Just like Whirlpool, then, its advertising agencies could face liability if they were found to have been active participants in creating or disseminating advertisements they knew or should have known were false or misleading. This Court found that Sears and Whirlpool have a common legal interest with respect to Whirlpool's steam dryer, stating: "Given that both companies share the risk of liability for false advertising relating to this technology, both Sears and Whirlpool have an interest in assuring that any advertising claims they make are both literally true and not misleading." (Docket No. 284. at 4.) The outside agencies with which Whirlpool works share this same interest in making sure that the advertising they create and disseminate is truthful, non-deceptive, and in compliance with the law. Outside agency employees communicate with Whirlpool's counsel in order to obtain legal advice concerning the content of the advertisements they create, and legal department directives are passed along to them (Van Winkle Decl. at ¶¶ 8-10), all to protect the legal interest the agencies share with Whirlpool in assuring the advertisements comply with the law. The communication of legal advice to the outside agencies, either directly by Whirlpool's counsel or passed through other Whirlpool representatives, is therefore protected by the common interest exception.

Whirlpool and its outside advertising agencies obviously have a business relationship in addition to their shared legal interest – Whirlpool has a contractual relationship with these agencies and pays them for their services. In its August 24, 2009 Opinion on this Motion, the Court noted that *BDO* leaves open "the question of where to draw the line between business and legal interests." (Docket No. 284 at 6.) This is indeed a question not well

addressed by the Seventh Circuit in its *BDO* decision, and it has not been satisfactorily addressed by other courts either.  In this particular case, however, the communications at issue are clearly in furtherance of the shared legal interests, and not any shared business interests.  The communications do not relate to contract negotiations or payments between Whirlpool and the outside agencies, media buying strategy, or any other business issue.  Instead, the communications at issue relate to legal questions with respect to advertising of Whirlpool's steam dryer.  In *BDO*, the IRS argued that the communications at issue were really designed to coordinate the message that the defendant accounting firm and a law firm that represented some of the same clients would deliver to those clients, and were therefore not really communications for the purpose of seeking legal advice concerning any common legal interest.  The Seventh Circuit disagreed, ruling that even if the ultimate reason was to advance the firms' interests in the representation of their clients, "it does not follow that the communication itself was not made to secure legal advice with respect to a common legal interest." 492 F.3d at 817.  Similarly here, while the parties' joint business interests were ultimately being advanced by the advertisements at issue, these communications involve the transmission of <u>legal</u> advice.  That legal advice concerned their common legal interest in ensuring the advertisements complied with the law, and the communications are therefore within the scope of the common legal interest exception.

    All of the case law relied upon by LG in its Reply Brief in Support of its Motion to Compel (Docket No. 197) predates the Seventh Circuit's decision in *BDO* and is, perhaps not surprisingly, inconsistent with it.  LG relies most heavily upon *In re Application of the Federal Trade Commission*, No. M18-304, 2001 WL 396522 (S.D.N.Y. April 19, 2001), to argue that there is no common interest between a company and its advertising agency, and that communications of legal advice between them, or between the company's counsel and the advertising agency, therefore cannot be privileged.  The *FTC* court, however, examined whether an actual attorney-client relationship had been demonstrated to exist between counsel for the company and the advertising agency.  2001 WL 396522 at * 3.  The court found that no such attorney-client relationship had been shown, and rejected the attempt to instead demonstrate a common legal interest between the company and the advertising agency, stating "the common interest rule is not an independent source of the attorney-client privilege."  *Id.*  The rule of *BDO*, of course, is not based upon any finding of an attorney-client relationship between counsel for BDO and the outside law firms with which they had communicated.  Instead, the Seventh Circuit

looked to the common legal interest shared by BDO and the law firms in providing recommendations to their common clients that complied with the law. 492 F.3d 816. And, further, the *FTC* court noted that it was <u>the company</u> that would have been in a position to assert any attorney-client privilege, not the advertising agency, but the company was not a party to the proceeding. 2001 WL 396522 at *3 fn. 1. Here, as in *BDO*, the company <u>is</u> a party, and is the one asserting the privilege. *FTC* is therefore both factually inapposite, and inconsistent with the law of this Circuit.

        The other cases relied upon by LG are similarly unhelpful. *Cellco P'ship v. Nextel Commc'n, Inc.*, No. M8-85, Civ. A. 03-725, 2004 WL 1542259, *1 (S.D.N.Y. July 9, 2004) simply cites *FTC*, finds a failure to establish the existence of an attorney-client relationship between a company's counsel and its advertising agency, and orders communications between them produced. In *Blanchard v. EdgeMark Fin. Corp.*, 192 F.R.D. 233, 236-37 (N.D. Ill. 2000) the court found no common <u>legal</u> interest between a company and its investment banker with respect to a contemplated merger, but instead only a common <u>financial</u> interest. Here, as outlined above, Whirlpool and its advertising agencies share a common legal interest. And finally, in *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 152 F.R.D. 132, 136-38 (N.D. Ill. 1993), the primary basis for the court's order that documents be produced was that the defendant had failed to demonstrate that the documents were covered by any privilege, either work product or attorney-client, at all. The court then went on to state that even if some privilege covered the documents, the common interest exception did not shield communications to the defendant's reinsurers because "a necessary precondition for the common interest doctrine to apply is that the common interest arise as a result of impending or anticipated litigation." 152 F.R.D. at 140-41. Such a precondition is flatly at odds with *BDO*.

        The Seventh Circuit has set forth the parameters of the common interest doctrine, and it protects communications between parties made to further their common legal interest. *BDO*, 492 F.3d at 815-16. Whirlpool and its advertising agencies had a common legal interest in assuring that advertising met legal requirements, and the communication of legal advice from Whirlpool's counsel to the outside agencies, either directly by counsel or via other Whirlpool employees, was made in furtherance of those interests. These communications are therefore protected by the common interest doctrine.

### B. Whirlpool's Advertising Agencies Communicate With Whirlpool's Counsel As Representatives Of Whirlpool, And The Communications Are Therefore Privileged

As noted above, federal common law governs the contours of the attorney-client privilege here. The federal courts recognize the Supreme Court's Proposed Federal Rule of Evidence 503, while not adopted by Congress, "as a source of general guidance regarding federal common law principles." *BDO*, 492 F.3d at 814-15 (citing *In re Grand Jury Investigation*, 399 F.3d 527, 532 (2d Cir. 2005)). Proposed Rule 503 provides:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself <u>or his representative</u> and his lawyer or his lawyer's representative, or (2) between his lawyer and the lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

Proposed Fed. R. Evid. 503(b), 56 F.R.D. 183, 236 (1972) (emphasis added). By its very terms, then, Proposed Rule 503 covers communications between a client <u>or its representative</u> and a lawyer. While the Proposed Rule leaves the term "representative" undefined, the federal courts have held that the attorney-client privilege extends to communications between an attorney and at least some agents of a client where the communications are for the purpose of rendering legal advice. *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 391-92 (1981) (rejecting "control group" test, and finding attorney-client privilege extends to communications with those employees of client who possess information attorney needs to render sound legal advice); *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487, 491-92 (7th Cir. 1970) (rejecting "control group" test, and finding that if employee makes communication at direction of his superiors and seeks legal advice in course of performance of his job duties, communication is covered by attorney-client privilege), *aff'd by equally divided court*, 400 U.S. 348 (1971).

Several of the federal courts have moved beyond the employees of the client, and ruled that an independent contractor can be a "representative" of the client in certain circumstances for the purposes of applying the attorney-client privilege. One of the first courts to do so was the Eighth Circuit, in *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994). Relying heavily on the Supreme Court's decision in *Upjohn* and a law review article analyzing that decision, John E. Sexton, *A Post-*Upjohn *Consideration of the Corporate Attorney-Client Privilege*,

57 N.Y.U. L. REV. 443, 498 (1982), *Bieter* decided that it is not necessarily appropriate to distinguish between employees of a company who have the information attorneys need to render proper advice, and non-employee independent contractors in a position to have that same information. 16 F.3d at 937. Instead, the guiding principle is "that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client....'The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.'" *Id.* (citing *Upjohn*, 449 U.S. at 389). To the *Bieter* court, just as *Upjohn* had recognized that mid- and low-level employees might sometimes have the information critical to rendering legal advice, circumstances might also dictate that the critical personnel would be non-employees. 16 F.3d at 938. Ultimately, "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *Id.* at 937-38. The court therefore decided that an independent consultant retained initially to provide advice and guidance in a commercial and retail development, and then asked to assist in litigation resulting from the development's failure, had the sort of involvement in and information with respect to the project that "[made] him precisely the sort of person with whom a lawyer would wish to confer confidentially," and was thus "the functional equivalent of an employee" of the client for purposes of applying the attorney-client privilege. *Id.* at 938.

*In re Copper Market Antitrust Litig.*, 200 F.R.D. 213, 217 (S.D.N.Y. 2001), relied on the reasoning of *Bieter* and the principles of *Upjohn* to protect communications between the defendant's attorneys and its public relations firm, ruling that "confidential communications made for the purpose of obtaining legal advice between a client's representatives and the client's attorney, between representatives of a client, or between attorneys for a client should be protected from disclosure under the attorney-client privilege." The D.C. Circuit followed suit in *FTC v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002), holding that the attorney-client privilege extended to communications with independent contractors retained to assist a drug manufacturer where the consultants worked with the manufacturer's attorneys just as its full-time employees did, and "became integral members of the team." (Citation omitted).

All of these authorities were explored at some length in *Stafford Trading, Inc. v. Lovely*, No. 05-C-4868, 2007 WL 611252 (N.D. Ill. Feb. 22, 2007). *Stafford* found the rule of these decisions to be superior to some rulings from courts in the Second Circuit, which have declined to extend the attorney-client privilege to non-employees where the third party was merely providing information to an attorney, and not serving to clarify communications between the attorney and the client, *U.S. v. Ackert*, 169 F.3d 136, 138 (2d Cir. 1999), or where the consultant was not found to be a *de facto*, full-time employee of the client, *Export-Import Bank of the United States*, 232 F.R.D. 103, 114 (S.D.N.Y. 2005) (financial advisor not *de facto* employee covered by attorney-client privilege where advisor did not work in client's offices and devoted at most only 85% of his time to client's project). *Stafford* found this view "too restrictive," noting that the *Export-Import* decision seemed overly concerned with the rule that there is no accountant-client privilege. 2007 WL 611252 at *6. That rule, *Stafford* stated, was based upon the idea that an auditor accountant serves a public role and assumes a public responsibility that requires a certain measure of independence from the client, and trumps any expectation of confidentiality on the part of the client. *Id.* But where a financial advisor is not serving in that public role, *Stafford* found, and is instead clearly acting on behalf of the client, the client's attorneys may well need to have confidential communications with the financial advisor in order to render proper legal advice. *Id.*

The most correct and balanced approach, in the view of the *Stafford* court, is that the attorney-client privilege should extend to instances where the independent contractor assists a lawyer in giving legal advice, or where the independent contractor's participation is necessary to enable the attorney to render legal advice. 2007 WL 611252 at *6 (citing *Urban Box Office Network, Inc. v. Interfase Managers, LP*, No. 01 Civ. 8854, 2006 WL 1004472, *4 (S.D.N.Y. Apr. 17, 2006)). According to *Stafford*, then, the attorney-client privilege protects confidential communications between a client's independent contractor and the client's attorney "for the purpose of obtaining or providing legal advice." 2007 WL 611252 at *7.

Applying this rule to the documents before it, *Stafford* upheld the attorney-client privilege with respect to a number of communications among the plaintiff (Stafford), its attorneys (Kirkland) and its independent investment banker (Goldman Sachs). A draft agreement forwarded by the investment banker to the plaintiff and its attorney, for example, was found to have been given to the attorney for the purpose of obtaining legal advice with respect to

many of its terms, and therefore privileged. 2007 WL 611252 at *8. Three communications from plaintiff's attorneys to the plaintiff and the investment banker were found to contain legal advice, and to have been shared with the investment banker as the plaintiff's agent, and therefore privileged. *Id.* at *9. An email from the investment banker to the plaintiff and its attorneys summarizing various issues with respect to the transaction was ruled privileged on the grounds that it was sent primarily for the purpose of seeking legal advice, such as requesting legal advice regarding regulatory issues. *Id.* And an email from the investment banker to the plaintiff's attorneys forwarding terms sheets for blacklining was deemed privileged because it sought legal advice to facilitate the transaction. *Id.* With respect to each document, the court examined whether the communication was for the purpose of obtaining or providing legal advice, and whether the independent contractor was acting as the plaintiff's agent. Communications that met both requirements were held to be privileged.

The rule settled upon by *Stafford* is the one that this Court should follow as well. Its reasoning is sound, and well-grounded in the Supreme Court's decision in the *Upjohn* case, and *Upjohn*'s logical extension in *Bieter*. It is a rule that honors *Upjohn*'s elucidation of the purpose of the attorney-client privilege "to encourage full and frank communication between attorneys and their clients…[because] sound legal advice or advocacy serves public ends and…such advice or advocacy depends upon the lawyer's being fully informed by the client." 449 U.S. at 389.

The logic of a rule protecting communications between an independent contractor and a client's attorney if the communications are for the purpose of obtaining or rendering legal advice is well demonstrated by the circumstances here. If an employee of one of Whirlpool's outside advertising agencies is communicating with Whirlpool's counsel for the purpose of insuring that Whirlpool's advertising complies with the law, and if that outside agency employee is the individual who is directly engaged in creating the Whirlpool advertisement with respect to which the advice is being sought, there is simply no principled basis upon which to differentiate between that outside agency employee and an employee of Whirlpool's own small internal marketing department engaged in the same conduct. The outside agency employee is acting as Whirlpool's representative, and is the person who both possesses the information the attorney needs to formulate his or her advice, and to whom the resulting legal directive needs to be

conveyed. Communications between Whirlpool's counsel and its outside advertising and marketing agencies should therefore be protected by the attorney-client privilege.

## CONCLUSION

This Court requested supplemental briefing on two questions: whether the common legal interest exception applies to communications involving Whirlpool's outside advertising agencies, and whether this Court may recognize some version of a *"de facto employees"* test that would cover these advertising agencies. The answer to both questions is "yes," and either by itself would be sufficient to support a finding that communications with the advertising agencies reflecting legal advice are protected by the attorney-client privilege. LG's motion to compel production should therefore be denied with respect to the remaining documents at issue.

Dated: August 31, 2009

          Respectfully submitted,
          WHIRLPOOL CORPORATION,
          Defendant.


          By: */s/Brian D. Roche*
              One of its Attorneys

          Brian D. Roche
          Jennifer Yule DePriest
          Vanessa Martí Heftman
          REED SMITH LLP
          10 South Wacker Drive, Suite 4000
          Chicago, Illinois 60606
          312.207.1000

          J.A. Cragwall, Jr.
          John J. Bursch
          WARNER NORCROSS & JUDD LLP
          900 Fifth Third Center
          111 Lyon Street, N.W.
          Grand Rapids, Michigan 49503-2487
          616.752.2000

          Attorneys for Defendant, Whirlpool Corporation

## CERTIFICATE OF SERVICE

I, Jennifer Yule DePriest, an attorney, hereby certify that on August 31, 2009, I filed **WHIRLPOOL CORPORATION'S SUR-REPLY BRIEF IN RESPONSE TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS LISTED ON DEFENDANT'S PRIVILEGE LOG** with the Clerk of the Court using the ECF system, which will send notification of such filings to the following individuals:

> Ronald Y. Rothstein
> rrothstein@winston.com
> Eric L. Broxterman
> ebroxterman@winston.com
> Bryna Joyce Roth Dahlin
> bdahlin@winston.com
> Winston & Strawn LLP
> 35 West Wacker Drive
> Chicago, IL  60601

*/s/ Jennifer Yule DePriest*

# EXHIBIT A FILED UNDER SEAL