**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LG ELECTRONICS U.S.A., Inc.,     ) | |
|     ) | |
|     Plaintiff,     ) | |
|     ) | No. 08 C 242 |
|     v.     ) | |
|     ) | Honorable Amy J. St. Eve |
| WHIRLPOOL CORPORATION,     **)** | |
|     ) | |
|     Defendant.     ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

As is often true in false advertising cases under the Lanham Act, LG and Whirlpool are fierce competitors in a lucrative product market.[1] This particular case involves home laundry appliances, and specifically, the recent release of the parties' respective clothes dryers that include "steam" features. These "steam" features generally are designed to refresh fabrics by removing odors and wrinkles—similar to dry cleaning at home, only "not-so-dry cleaning." LG experienced the first success in the "steam" category, entering the market in late 2005 with a steam washer. Whirlpool subsequently introduced its own steam washer *and* dryer, just months before LG's release of its own steam dryer. LG now alleges that Whirlpool's "steam" dryers do not actually employ steam, and thus Whirlpool's advertising of its "steam" dryer is false.

Before the Court is Defendant Whirlpool Corporation's motion for summary judgment and its motions to exclude the testimony of Robert N. Reitter and Dr. Anthony Jacobi, experts

---

[1] "Typically, plaintiffs suing under § 43(a) are business competitors claiming to be injured as a result of false advertising." *See Thorn v. Reliance Van Co., Inc.*, 736 F.2d 929, 931 (3d Cir. 1984).

proffered by Plaintiff LG Electronics, U.S.A., Inc.  In addition, LG moves to strike portions of Whirlpool's Local Rule 56.1 statement of material facts and an additional expert report issued on July 1, 2009, concurrent with its motion for summary judgment.  For the reasons discussed below, the Court denies Whirlpool's motion for summary judgment and its motion to exclude Mr. Reitter's opinions.  The Court grants in part and denies in part Whirlpool's motion to exclude the report and opinions of Dr. Jacobi.  Having considered the issues raised in LG's motion to strike Whirlpool's Rule 56.1 statement in the context of ruling on summary judgment, the Court denies this motion as moot.  The Court further denies the remainder of LG's motion relating to Whirlpool's allegedly untimely expert report.

## BACKGROUND

### I.      Relevant Parties

Plaintiff LG Electronics U.S.A., Inc. ("LG") is the American subsidiary of LG Electronics, Inc., a Korean company that manufactures home appliances sold in the United States.  (R. 280-1, LG's Rule 56.1(b) Statement ¶ 77.)  LG maintains its principal place of business in Englewood, New Jersey.  (*Id.*)  Defendant Whirlpool Corporation ("Whirlpool") is a Delaware corporation with its principal place of business in Benton Harbor, Michigan.  (*Id.* ¶ 78.)  The Court exercises jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(b) based on LG's claims under the Federal Lanham Act.

### II.     Whirlpool's Steam Dryers

Whirlpool makes three dryer models that use the technology at issue in this case.  Under the Whirlpool brand, Whirlpool markets the Duet Steam Dryer and the Cabrio Steam Dryer, and under the Maytag brand, Whirlpool markets the Bravos Steam Dryer (collectively, "Whirlpool

Steam Dryers"). (R. 280-1 at ¶ 11; R. 296-1, Whirlpool's Resp. to LG's Rule 56.1(b)(3)(C) Statement ¶ 1.)[2] Whirlpool also manufactures Sears' Kenmore brand Elite Steam Dryer, which incorporates the same technology used in the Whirlpool Dryers, but which is not at issue in this case. (R. 280-1 at ¶ 12.)

## A. How Steam Dryers Function

The Whirlpool Steam Dryers work by introducing a spray of cool or cold water into a hot, spinning dryer drum. (R. 280-1 at ¶ 13; 296-1 at ¶ 1.) This spray, or "mist," as the parties characterize it, dampens the clothing in the dryer drum. (*Id.*) The heat of the dryer, along with the moving air in the dryer drum, speeds the evaporation of moisture from the dampened clothing. (R. 296-1 at ¶ 1.) Temperatures inside the drum of Whirlpool dryers range from less than 60 degrees Celsius to over 100 degrees Celsius, and in certain locations, reach in excess of 140 degrees Celsius. (R. 280-1 at ¶ 16.) Clothing placed in a Whirlpool Steam Dryer generally has fewer wrinkles after completing a "steam" cycle than before the cycle. (R. 280-1 at ¶ 3.) LG contends, however, that conventional non-steam dryers produce the same effect. Specifically, LG argues that Whirlpool's technology is no different than "taking an article of clothing, throwing it into [a conventional] dryer for five minutes, taking it out, spraying it with water with a spray gun, and throwing it back into the [conventional] dryer." (R. 296-1 at ¶ 1.)

LG markets steam dryers under the Tromm model. LG's Tromm Steam Dryer includes a

---

[2]     For ease of reference, the Court uses the phrase "Whirlpool Steam Dryer" merely to distinguish the dryers at issue in this case from Whirlpool's previous technology. As discussed below, the meaning of "steam," as used in Whirlpool's advertising, is a disputed issue of fact. *Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000) ("[W]hether a claim is either 'false' or 'misleading' is an issue of fact rather than law."). The Court's use of the phrase "Whirlpool Steam Dryer" implies no conclusion about whether a given technology properly uses "steam" or what "steam" in fact means.

boiler unit outside the dryer drum that LG refers to as a "steam generator."  (R. 280-1 at ¶ 21; R. 296-1 at ¶ 1.)  It is undisputed that LG's dryer creates steam by boiling water and then injecting or spraying the steam into the dryer drum as a vapor.  (*Id.*)  Once LG's dryer injects steam into the dryer drum, the steam combines with cooler air in the drum and condenses into what LG calls a "hot while billowy steam."  (*Id.* at ¶ 22.)

Both LG and Whirlpool pair their steam dryers with steam washers and sell these appliances for a premium price when compared to conventional non-steam appliances.  (R. 296-1 at ¶ 3.)  The respective steam washers marketed by each of the parties use an internal boiler to create steam that is then injected into the washer drum.  Indeed, the parties do not dispute that: (1) the washers marketed by both LG and Whirlpool use "steam"; and (2) LG's dryer with the incorporated boiler uses "steam."  Instead, the parties dispute the precise scope of "steam" and whether Whirlpool's Steam Dryers also employ "steam" sufficient to justify their respective names.

**B.      Development of the Steam Laundry Market**

LG introduced its Tromm Steam Washer in late 2005.  In January 2006, *Consumer Reports* magazine issued a new evaluation of home laundry appliances that ranked LG's Tromm Steam Washer as its top choice, a position previously "dominated" by Whirlpool appliances.  (R. 296-1 at ¶ 13.)  Whirlpool employee Scott Slabbekoorn, who was involved with the development of Whirlpool's Duet Steam Washer, testified that "there was a lots of [ ] noise in the market about the [LG] steam washer," that steam "definitely had an effect," and that LG obtaining the number one ranking in *Consumer Reports* "escalated the priority" of Whirlpool's development of a steam washer.  (*Id.* at ¶ 14.)  In June 2006, Whirlpool's Global Tech Lead in Drying

Systems, Don Tomasi, sent an email to his team stating, "LG is now rated as #1 for [North American Region] washers - yuk!  Lets [sic] continue to work together to assure this does not happen on dryers.  Our work on energy, blower system, dispensing, heat system, sensing, etc - to achieve the customer attributes is very important."  (R. 281 at Ex. 24.)

Whirlpool thereafter developed a dryer designed to "[p]rovide wrinkle reduction and odor reduction within the clothes dryer."  (R. 281 at Ex. 29; R. 296-1 at ¶ 20.)  Whirlpool's internal documents describe the technology as a "refresh" cycle "designed to provide a warm up stage of some time, a water spray stage of some time, a drying stage of some time, and a cool down stage of some time."  (R. 281 at Ex. 29.)  According to a Whirlpool email, by December 2006, Whirlpool decided to accelerate the introduction of its "Myst Dryer project ('steam' in the dryer)," from Fall 2007 to Spring 2007—timing "driven by the desire to have something in the news about Whirlpool and Kenmore brands and their innovation at the same time LG will be entering into Sears."  (*Id.* at Ex. 38.)  Shortly thereafter, in January 2007, Whirlpool changed the name of its project from "Duet Myst" to "Duet Steam."  (*Id.* at Ex. 45.)  By accelerating the introduction of the Duet Steam product, Whirlpool offered an initial release in the Spring of 2007 and a full launch in the fall of 2007—beating LG's own steam dryer to the market.  (R. 280-1 at ¶¶ 10; 20.)

Whirlpool advertises its steam dryers through print media, television, internet, and point-of-sale placements.  (R. 296-1 at ¶ 51.)  The advertising claims challenged by LG include:

> (1) "Naturally steam out wrinkles and odors with the touch of a button.  The new Duet Steam dryer features two cycles—Enhanced Touch-Up and Quick Refresh—that infuse clothing with steam to refresh and dewrinkle;"

> (2) "The pure power of steam—Nothing beats the power of steam to get rid of wrinkles.  The Duet Steam dryer naturally steams out wrinkles in just minutes,

while removing any lingering odors;"

(3) The Duet Steam Dryer (I) "naturally steams away tough stains," (ii) "steams out tough wrinkles and odors," and (iii) uses the "pure power of steam;"

(4) "How does the addition of steam work to enhance cleaning performance?" The Duet Steam Dryer: (I) "naturally steams away tough stains," (ii) provides a setting of "20 minutes of steam and tumbling;"

(5) "The Whirlpool Duet Steam laundry pair, a whole new way to care for your clothes from start to finish, with the pure power of steam. Just another laundry innovation from Whirlpool."

(R. 116-1, Second Am. Compl. ¶¶ 21–25).

## III. Various Definitions of "Steam"

Whirlpool has offered the following definitions of steam from multiple dictionaries:

1. "vapor arising from a heated surface," (R. 280-1 at ¶¶ 31–32);

2. "the invisible vapor into which water is converted when heated to the boiling point: water in the state of vapor—compare DRY STEAM, WATER VAPOR, WET STEAM," (*id.* at ¶ 32);

3. "the mist formed by the condensation on cooling of water vapor: visible vapor," (*id.*);

4. "the vapor phase of water," (*id.* at ¶ 33); and

5. "Steam...can be generated by evaporation of water at subcritical pressures, by heating water above the critical pressure, and by sublimation of ice . . . . Steam is generated from water by boiling flash evaporation, and throttling from high to low pressure. The phase change occurs along the saturation line with the specific volume of steam larger than that of the boiling water. . . . At the critical and supercritical pressures, the water-steam distinction disappears." (*Id.* at ¶ 34)

In support of its position, Whirlpool contends that its Steam Dryers meet at least the first and fourth of these definitions. Whirlpool's expert Dr. Subbaiah Malladi, for example, concluded that "the vapor phase of water," and "vapor arising from a heated surface,"

respectively, occur in Whirlpool dryers "when the sprayed mist evaporates after contact with heated clothing and dryer drum surfaces, as well as later when the water subsequently vaporizes during the drying process." (R. 280-1 at ¶ 42.) Dr. Malladi tested the air temperature in the Whirlpool dryer and opined that what occurs in Whirlpool's dryer is similar to spraying a mist of water into an oven heated to one hundred degrees Celsius or higher—water evaporates, and the resulting vapor combines with the heated air. (*Id.* at 157:6–10; 159:14–17; 161:5–10; 161:21–24; 162:15–21.)

The precise scope of Dr. Malladi's definition, however, is unclear. When presented with a glass of water at room temperature, Dr. Malladi testified that the process of evaporation occurring within and around the glass also constitutes steam. (R. 296-1 at ¶ 64; R. 281, Ex. 20 Malladi dep at 98:1-99:3.) Similarly, Whirlpool engineer Kirk Dunsbergen testified that "one way to describe the process" occurring in Whirlpool's dryers is the evaporation of water from the clothing as the clothes are dried. (R. 280-1, Ex. 15 at 102:9–103:4.) Mr. Dunsbergen also testified that this definition of steam—"where water is evaporating from clothing" and thus creating steam, under Whirlpool's first definition—is "exactly what happens in a conventional dryer when you throw wet clothes into" it, and that, at least in theory, any dryer could be called a "steam dryer." (*Id.* at 103:6–14.) According to Mr. Dunsbergen, the only difference between Whirlpool's Steam Dryers and conventional dryers is that "one of the requirements for a steam dryer is you have to be able to introduce water or the moisture into dry clothes." (*Id.* at 103:18–20.)

Whirlpool also points to U.S. Patent No. 6,941,674, (the "'674 patent") entitled, "Method and Apparatus for Detecting Residual Drying Time of Clothes Dryer," and maintains that "LG's

use of the word 'steam' in that patent . . . corresponds to published definitions" of steam as "vapor arising from some heated surface," and also to what occurs in Whirlpool's Steam Dryers. (R. 280-1 at ¶ 39.)  Filed in 2003, the '674 patent issued in 2005 and lists LG Electronics, Inc. as the assignee.  (R. 247-26, Ex. 18.)  The '674 patent describes "steam" twice.  First, in describing conventional clothes dryer prior art, the '674 patent notes that a clothes dryer "heats the clothes by making [ ] high temperature-little moisture air flow into the drum.  Herein, the high temperature-little moisture air is converted into high temperature-much moisture air by steam generated while the clothes are heated."  (*Id.* at col. 1, ll. 22–26.)  Later, when describing the preferred embodiment of the invention—a method and apparatus for measuring the remaining moisture in clothes and calculating the time left to dry—the '674 patent describes an air channel 13 for "receiving high temperature-much moisture air such as steam generated in drying of clothes in the drum 10."  (R. 247-27 at col. 3, ll. 32–34.)[3]

As to the second definition of steam – "the invisible vapor into which water is converted when heated to the boiling point" –  Dr. Malladi admitted that there is no empirical evidence that the water droplets sprayed into Whirlpool dryers reach 100 degrees Celsius.  (R. 280-1 at ¶ 17.) Dr. Malladi measured air temperature within the dryer drum.  Based on the temperature of the air in the Whirlpool dryer drum, which contains water vapor, Dr. Malladi opined that the Whirlpool dryer drum heats some water vapor to a temperature of 100 degrees or higher.  (*Id.* at 159:2–6.)

---

[3]     Whirlpool also notes that other manufacturers advertise dryers that have "steam" functions.  (R. 280-1 at ¶¶ 52–58.)  These manufacturers, however, are not parties to this case. Similarly, Whirlpool offers articles from *Good Housekeeping*, *Consumer Reports,* and the *Wall Street Journal* for the truth of the matter asserted—specifically that Whirlpool's dryers are accurately termed "steam" dryers.  (*Id.* at ¶¶59–68.)  *See  Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (Affirming exclusion on summary judgment of newspaper and magazine articles because "[t]hese articles constitute hearsay . . . And hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial.").

Dr. Malladi stopped short of concluding that any water droplets in the dryer drum reached 100 degrees Celsius, (*id.* at 159:7–9), however, because he never determined whether, or to what extent, water in the drum reached a temperature of one hundred degrees Celsius or higher. (*Id.* at 120:21–121:2.) Although evaporation occurs in the dryer drum—clothes moistened by the spray exit the dryer completely dry—Whirlpool has offered no evidence that the water spray reaches 100 degrees, sufficient to meet the definition "the invisible vapor into which water is converted when heated to the boiling point." (*Id.*)

**LEGAL STANDARD**

Summary judgment is proper when "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, --- U.S. ---, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d

608, 612 (7th Cir. 2005) (the nonmoving party must present "evidence on which the jury could reasonably find for the nonmoving party.").

**ANALYSIS**

Whirlpool has moved for summary judgment on LG's claim of false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as to both literal and implied falsity.[4] Whirlpool has also filed separate motions to exclude LG's expert testimony in support of each theory. Because LG cannot rely on inadmissible evidence in responding to summary judgment, *Lewis*, 561 F.3d at 704–05, the resolution of Whirlpool's summary judgment motion depends in part on the resolution of its *Daubert* motions. Accordingly, the Court will consider Whirlpool's motions to exclude LG's experts concurrently with Whirlpool's motion for summary judgment. *See Lewis*, at 705 ("it was entirely proper for the district court to determine the admissibility of the plaintiffs' expert testimony at the same time that it decided the defendant's motion for summary judgment.").

## I.     False Advertising Under the Lanham Act, 15 U.S.C. § 1125(a)

"Under the federal Lanham Act, which generally proscribes the false description of goods and their origins, the plaintiff must show that the defendant (1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4)

---

[4]     Whirlpool also seeks summary judgment as to LG's remaining claims, including false advertising under Illinois law, contending that these claims rise and fall with LG's Lanham Act claim. (R. 245-1, Whirlpool's Br. at 11.) *See, e.g.*, *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007) (The Seventh Circuit has "assumed without deciding, that [the Lanham Act] analysis also applies to Illinois false advertising claims."). As the Court denies summary judgment as to LG's Lanham Act claim, the Court need not separately address the remaining claims.

touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff." *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999) (citing *Grove Fresh Distribs., Inc. v. New England Apple Prods. Co.*, 969 F.2d 552, 557 (7th Cir. 1992); *see also Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 922 (7th Cir. 2002). Federal false advertising claims generally fall into two categories: literal falsity and implied falsity. Where a statement or claim made in advertising is literally false, "the plaintiff need not show that the statement either actually deceived customers or was likely to do so." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *B. Sanfield*, at 168 F.3d at 971. Where a statement or claim is literally true or ambiguous, however, a plaintiff must prove that the statement "implicitly convey[s] a false impression, [is] misleading in context, or likely to deceive consumers." *Hot Wax*, 191 F.3d at 819; *see also B. Sanfield*, at 168 F.3d at 971 (plaintiff must show that statement is "misleading in context, as demonstrated by actual consumer confusion." (quoting *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir. 1994)). In other words, "[a] statement is misleading when, although literally true, it implies something that is false." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992).

Regardless of the theory advanced by the plaintiff, "whether a claim is either 'false' or 'misleading' is an issue of fact rather than law." *Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000); *Abbott Labs.*, 971 F.2d at 13–15; *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943–45 (3d Cir. 1993); *Johnson & Johnson * Merck Consumer Pharma. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992); *see also Walker v. Nat'l Recovery, Inc.*, 200 F.3d 500, 503 (7th Cir. 1999) (discussing confusion in the context of the FDCA, citing Lanham Act precedent and holding that "[w]hether a given message is confusing is . . . a

question of fact, not of law or logic."). Similarly, "[w]hether consumers are likely to be confused . . . is ultimately a question of fact" that "may be resolved on summary judgment only 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" *AutoZone*, 543 F.3d at 929 (quoting *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 642 (7th Cir. 2001); *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996)). "It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." *Johnson & Johnson * Merck*, 960 F.2d at 297–98. Rather, the question is "what does the person to whom the advertisement is addressed find to be the message? That is, what does the public perceive the message to be?" *Id.* (internal citations omitted).

## II.     Literal Falsity

Whirlpool contends that summary judgment is proper as to LG's literal falsity theory because Whirlpool's Steam Dryers meet: (1) the meaning of steam employed by *Consumer Reports*, other magazines, and other competitors; (2) the meaning of steam as defined in various dictionaries; and (3) the meaning of steam as used in LG's '674 patent. As an initial matter, Whirlpool's first argument is without merit. LG and Whirlpool are the only parties to this case, and Whirlpool has identified no binding precedent holding that the behavior of competitors is relevant to whether its own advertising claims are literally false. Similarly, evidence from *Consumer Reports* articles and the like is inadmissible on summary judgment to prove the truth of the matters asserted therein. *See  Lewis*, 561 F.3d at 704–05; *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (Affirming exclusion on summary judgment of newspaper and magazine articles because "[t]hese articles constitute hearsay . . . And hearsay is

inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial.").

Second, given the existence of competing definitions, the Court cannot find as a matter of law that Whirlpool meets the definition of "steam." *See, e.g.*, *Turtle Wax*, 27 F. Supp. 2d at 1048 (refusing summary judgment based on conflicting testimony as to the correct definition of "wax"). Literal falsity is a question of fact. *Abbott Labs*, 971 F.2d at 13.

Further, Whirlpool has not responded to LG's argument that the doctrine of literal falsity by necessary implication applies to this case. LG maintains that "Whirlpool's advertising of its dryers as steam dryers necessarily implies the unambiguous message that its dryers create and use steam whereas conventional dryers do not." (R. 278-1, LG's Resp. at 21.)[5] "A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir. 2000); *see Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d 578, 586–87 (3d Cir. 2002). In *Time Warner*, for example, the Second Circuit affirmed a finding of necessarily implied falsity based on a commercial featuring William Shatner, star of the television show *Star Trek*. In the commercial, Shatner appeared as his character from the show, Captain Kirk, responding to the query of whether to raise the shields of the Starship Enterprise, by stating, "Again with the

---

[5]        Rather than address this argument, Whirlpool contends in its Reply that LG raises a new claim not previously identified in its interrogatory responses. (R. 297-1, Whirlpool Reply at 6.) LG raised literal falsity in its initial Complaint, however, and the language of the interrogatory and response to which Whirlpool points does not preclude this sub-theory of literal falsity.

shields.  I wish he'd just relax and enjoy the amazing picture clarity of the DIRECTV HD we just hooked up.  With what Starfleet just ponied up for this big screen TV, settling for cable would be illogical."  *Time Warner*, 497 F.3d at 150.  Considering the context of the commercial as a whole, including the tag line, "[f]or picture quality that beats cable, you've got to get DIRECTV," the court found that the advertisement unambiguously made the literally false claim that DIRECTV's high definition picture quality was superior to the high definition quality available from cable.  *Time Warner*, 497 F.3d at 158.

In the instant case, material issues of fact remain as to whether Whirlpool's claims necessarily imply an unambiguously false message.  Whirlpool's expert and its engineers testified that Whirlpool's steam dryers met the definition of steam as "vapor arising from a heated surface."  Testimony from these same witnesses, however, suggests that the process of "vapor arising from a heated surface" that occurs in Whirlpool's Steam Dryers may not substantially differ from the process of evaporation that occurs in conventional dryers that merely dry wet clothes.  Considering the context of Whirlpool's advertising—namely, claims such as, "[t]he Whirlpool Duet Steam laundry pair, a whole *new* way to care for your clothes from start to finish, with the *pure* power of steam.  Just another laundry ***innovation*** from Whirlpool," (emphasis added)—a finder of fact could conclude that Whirlpool's use of the word "steam" necessarily implies the unambiguous message that Whirlpool's dryers refresh clothing by a process not previously available in Whirlpool's non-steam dryers.

Nor has Whirlpool presented evidence sufficient to conclude that the '674 patent is an admission by LG's parent company—much less LG—regarding steam dryers.  Whirlpool has offered no evidence, for example, that the inventors are or were LG employees.  Moreover, the

'674 patent describes the workings of conventional dryers—nowhere does the patent mention the "injection" or "spray" of water, steam, and/or mist into the dryer drum. The moisture referenced in the '674 patent comes solely from wet clothes. When viewed in a light most favorable to LG, the '674 patent's discussion of processes occurring in conventional dryers arguably supports LG's necessary falsity by implication argument.

Given the lack of a clear definition of "steam" and the remaining issues of material fact raised by the context of Whirlpool's advertisements, the Court cannot conclude as a matter of law that Whirlpool's "steam" claims are not literally false. Because these issues preclude summary judgment, the Court need not address Whirlpool's remaining arguments that overlap with its motion to exclude the testimony of Dr. Jacobi. Instead, the Court will address these arguments below, in ruling on Whirlpool's motion to exclude the testimony of Dr. Jacobi.

## III. Implied Falsity

To establish implied falsity, a plaintiff must first establish that a statistically significant portion of the target audience received the implied message allegedly communicated by the challenged advertisement—without such proof, the plaintiff cannot establish injury arising from the advertiser's allegedly false message. *Johnson & Johnson * Merck*, 960 F.2d at 298. Accordingly, before a court can consider the truth or falsity of an advertisement's message, "it must first determine what message was actually conveyed to the viewing audience." *Id.* Given the logistical difficulties of obtaining such evidence from a population as large and diverse as the consuming public, plaintiffs asserting implied falsity theories often turn to statistical sampling in the form of consumer surveys. Indeed, some courts have held that "the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey." *Id.* (citing

*Coca-Cola Co. v. Tropicana Prods. Inc.*, 690 F.2d 312, 317 (2d Cir. 1982); *see also Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 318 (7th Cir. 1992) (noting the Federal Trade Commission policy that "[t]he most convincing extrinsic evidence is a survey of what consumers thought upon reading the advertisement in question." (internal quotation omitted)).

Cognizant of the significance of survey evidence, Whirlpool argues that summary judgment is proper as to LG's implied falsity theory because LG's survey is inadmissible. According to Whirlpool, because LG's consumer survey evidence is inadmissible, LG cannot establish the existence of an implied message. The Court thus must first address Whirlpool's motion to exclude the testimony of LG's survey expert, Robert Reitter.

## A. Admissibility of Expert Testimony

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) provide the legal framework for the admissibility of expert testimony. *See U.S. v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 permits the admission of expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 thus requires that the district court act as a "'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741–742 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *Daubert*, 509 U.S. at 589; *Jenkins v. Bartlett*, 487 F.3d 482, 488–89 (7th Cir. 2007).

To determine reliability, "the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive a particular conclusion." *Pansier*, 576 F.3d at 737 (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)); *see Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). *Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology—including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert* at 593–94, 113 S. Ct. 2786. "[T]he test of reliability is flexible," however, "and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141, 119 S. Ct. 1167 (internal quotation omitted). "Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142, 119 S. Ct. 1167 (emphasis in original); *see also Pansier*, 576 F.3d at 737 (the Seventh Circuit "gives the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable.") (citing *Jenkins*, 487 F.3d at 489); *Lewis*, 561 F.3d at 704–705 ("the law grants the district court great discretion regarding the manner in which it conducts that [*Daubert*] evaluation.").

### B.    Expert Qualifications

As Senior Vice President of the consultancy Guideline, Robert N. Reitter has designed and supervised over five hundred consumer surveys in the areas of trademark, trade dress, advertising perception, and advertising claim substantiation. (R. 243-2, Reitter Report at 25.) Prior to joining Guideline, Mr. Reitter served for 22 years as President of Reitter, Wilkins, & Associates, where he provided market research consulting services to the food, beverage,

fashion, and travel industries.  (*Id.*)  Mr. Reitter also holds a masters degree in industrial

administration from Yale University.  (*Id.*)  Whirlpool does not take issue with Mr. Reitter's

qualifications.

### C.    Survey Methodology

To meet Rule 702 and *Daubert*'s standard of reliability, a survey offered to establish the

likelihood of consumer confusion must "have been fairly prepared and its results directed to the

relevant issues."  *Weight Watchers, Inc.*, 744 F. Supp. at 1272 (citations omitted); *see also Coors

Brewing Co. v. Anheuser-Busch Co., Inc.*, 802 F. Supp. 965, 972 (S.D.N.Y. 1992) ("The

evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself."

(quoting *Johnson and Johnson \* Merck*, 960 F.2d at 300)).[6]  "The criteria for the trustworthiness

of survey evidence are that:  (1) the "universe" was properly defined; (2) a representative sample

of that universe was selected; (3) the questions to be asked of interviewees were framed in a

clear, precise and non-leading manner; (4) sound interview procedures were followed by

competent interviewers who had no knowledge of the litigation or the purpose for which the

survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed

in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was

---

[6]    In the context of the Lanham Act, the Seventh Circuit has addressed specific concerns without providing comprehensive guidance regarding the standard of reliability for consumer surveys.  In *Muha v. Encore Receivable Mgmt., Inc*., 558 F.3d 623, 625–626 (7th Cir. 2009), however, the Seventh Circuit evaluated consumer survey evidence under the Fair Debt Collection Practices Act ("FDCPA") by reference to Lanham Act precedent from other circuits, including the Second Circuit and Southern District of New York.  *Muha*, 558 F.3d at 625–26 (holding that "[a] consumer survey, to be sufficiently objective to be usable as evidence in a suit under the Fair Debt Collection Practices Act, depends among other things on 'whether the questions are leading or suggestive.'" (collecting cases)).  Consequently, where Seventh Circuit precedent has not addressed a given issue relating to survey reliability, the Court looks to Lanham Act precedent from other circuits, focusing on precedent that the Seventh Circuit previously has cited with approval.

assured." *Weight Watchers, Inc*., 744 F. Supp. at 1272 (collecting cases); *see also* Shari Seidman Diamond, *Reference Guide on Survey Research*, Reference Manual on Scientific Evidence 231 (Federal Judicial Ctr 2d ed. 2000).[7]  Although these criteria generally address the weight a fact finder should give the survey, a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant—and thus inadmissible.  *See, e.g.*, *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007) ("survey evidence in debt-collection as in trademark cases must comply with the principles of professional survey research; if it does not, it is not even admissible."); *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc*., 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983) ("many courts have ignored such evidence when it does not meet the criteria." (collecting cases)); (R. 310-2 at 131, Diamond at 241 ("A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant.").)

### D.    The Reitter Study

#### 1.    Methodology

Mr. Reitter's study examines a commercial for Whirlpool's Duet® Steam Washer and Dryer, entitled, *New Way to Care for Clothes* (the "test commercial").  His survey report provides a detailed description of the survey's methodology.  Specifically, the report describes: (1) the purpose of the survey; (2) the target population and the actual population sampled (the "universe"); (3) the design of the survey, including how interviewers selected and interviewed respondents and how Reitter verified responses; (4) the sample implementation and results; and

---

[7]    *Available at*: http://www.fjc.gov/public/pdf.nsf/lookup/8.sur_res.pdf/$File/8.sur_res.pdf (last visited Sept. 3, 2009); provided by the parties at R. 310-2 at 119–166.

(5) the exact wording of the interviews and interviewer directions, providing a copy of the relevant questionnaires and visual exhibits. The study report thus meets the minimum requirements of reliability.

> The purpose of Mr. Reitter's study was to:
>
> learn to what extent if any relevant consumers take away from this test commercial the impression that the Duet® Steam Dryer uses steam; taking away that it injects a hot vapor onto clothes, and not that it injects a mist of cold water that is heated after it is sprayed into the dryer drum.

(R. 243-2 at 5.) The study thus addresses a question relevant to LG's implied falsity claim, namely, did the consumers take away from Whirlpool's commercial the message that Whirlpool's steam dryer uses or injects a hot vapor onto clothes? To answer this question, Mr. Reitter defined the universe of the study—the relevant consumers—as "decision-making consumers who have bought a clothes dryer in the past 12 months or who intend doing so in the next 12 months and who at least sometimes purchase premium-priced appliances." (R. 243-2 at 10.) The study's universe, encompassing prospective and actual purchasers of Whirlpool's products, addresses an appropriate target population.

To obtain a representative sample, Mr. Reitter conducted a double-blind, "mall-intercept" survey in 12 separate metropolitan markets representing each census region. (*Id.* at 9–11; 14.) The interviewers applied a pre-planned quota screening procedure designed to obtain a sample population roughly equivalent to male and female age groups based on the United States census. (*Id.* at 12–13.) Each sample group—the test group and the control group—targeted 200 respondents, for a total sample population of 400 respondents. (*Id.* at 9.) In practice, interviewers completed a total of 440 interviews. (*Id.* at 17.) Each sample group met the same screening criteria and answered the same questionnaire. (*Id.* at 14.)

20

The study questionnaire asked both open-ended and closed-ended questions. The questionnaire, for example, asked three open-ended questions at the beginning of the survey:

1. "What was the main idea of the commercial?"
2. "What else, if anything, did the commercial say, show or imply?"
3. "Did the commercial say, show, or imply anything about any unique feature of the advertised dryer?"

(R. 243-2 at 14–15.) Reitter characterized the third open-ended question as a "filter" question, and to respondents answering in the affirmative, asked two follow-up, or "probe" questions: (3b.) "what did the commercial say, show, or imply about any unique feature of the advertised dryer?"; and (3c.) "Anything else?" (*Id.*) The interviewer then provided the respondents with a card that contained descriptions of two dryers, "Dryer A" and "Dryer B," as follows:

DRYER A
A mist of cold water is injected into the heated dryer drum. The dryer then heats the water and tumbles the clothes until dry.

DRYER B
A hot vapor is injected onto clothes inside the dryer drum. The dryer then heats and tumbles the clothes until dry.

(*Id.*)[8] With these descriptions in hand, Respondents then answered the following closed-ended question:

5. Thinking of the commercial you just saw and what it said, showed, or implied about the advertised dryer, do you think the commercial . . .

Could be for Dryer A only
Could be for Dryer B only
Could be for either Dryer A or Dryer B
Could not be for either Dryer A or Dryer B
or, don't you know?

---

[8]    To mitigate ordering effects or bias, Mr. Reitter reversed the order of the descriptions, swapping A for B, on half of the cards provided to each group. (*Id.*) Similarly, for the closed-ended question, No. 5, Reitter instructed half of the interviewers to begin reading the responses with the third option, always ending with the "don't know" option. (*Id.*)

(*Id.*)

Once the study was complete, Reitter engaged an independent telephone interviewing service to verify the responses of the survey and detect any potential fraud by the interviewers who performed the initial study. Specifically, the interviewing service contacted respondents by phone (438 out of 440 provided phone numbers) to verify that the respondent who purportedly participated in the initial study: (1) in fact existed; (2) met the universe requirements; and (3) recalled completing the interview. (*Id.* at 17.) The service successfully contacted 285 respondents, for a total validation level of 65%—far in excess of the 15-25% that Reitter contends is customary industry practice. (*Id.*)

### 2.    Whirlpool's Objections

Focusing on the questionnaire and visual exhibits, Whirlpool criticizes the Reitter study as leading and unreliable on three grounds. First, Whirlpool contends that the survey ignores the results of open-ended questions—questions that required respondents to answer in their own words. (R. 243-1, Whirlpool's *Daubert* Br. at 6.) Second, Whirlpool argues that Mr. Reitter improperly bases his opinion solely on the result of the closed-ended question at the end of the survey, despite the lack of a filter question to screen out respondents who received no message from the commercial. (*Id.* at 8.) Third, Whirlpool contends that the "control" commercial employed by Mr. Reitter was too different from the "test" commercial to eliminate "noise" from the survey results. (*Id.* at 11.)

To begin with, Whirlpool contends that open-ended questions are the "most probative evidence of any messages communicated by advertising," and thus Reitter erred in failing to base his opinion on responses to these questions. (*Id.* at 6.) The precedent cited by Whirlpool, however, does not support uncritical acceptance of answers to open-ended questions. In *Johnson*

& *Johnson-Merck Consumer Pharma. Co. v. Rhone-Poulenc Rorer Pharma., Inc*., for example, the Third Circuit held that "[t]he probative value of a consumer survey is a highly fact-specific determination." 19 F.3d 125, 134 (3d Cir. 1994) (quoting *Weight Watchers Int'l*., 744 F. Supp. at 1272). The issue is whether a given question is leading—"the wording of a question, open-ended or closed-ended, can be leading, and the degree of suggestiveness of each question must be considered in evaluating the objectivity of a survey." (R. 310-2 at 142, Diamond at 252); *see also Johnson & Johnson-Merck Consumer Pharma. Co. v. Rhone-Poulenc Rorer Pharma., Inc*., 19 F.3d 125, 134 (3d Cir. 1994) ("A survey is not credible if it relies on leading questions which are "inherently suggestive and invite guessing by those who did not get any clear message at all.") (citations omitted)).

Open-ended and closed-ended questions serve different purposes and generally elicit different responses. According to Diamond, "[m]ost responses are less likely to be volunteered in answering an open-ended question than to be endorsed in answering a close-ended question." (R. 310-2 at 142, Diamond at 252.) Properly-drafted closed-ended, multiple choice questions are not inherently leading simply because they provide respondents with an explicit set of responses from which to choose—"closed-ended questions may remind respondents of options that they would not otherwise consider or which simply do not come to mind as easily." *Id.* As explained in Diamond,

> Although [many] courts prefer open-ended questions on the grounds that they tend to be less leading, the value of any open- or closed-ended question depends on the information it is intended to elicit. Open-ended questions are more appropriate when the survey is attempting to gauge what comes first to a respondent's mind, but closed-ended questions are suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives.

(*Id*. at 143, Diamond at 253.) Thus, a non-leading closed-ended question is not improper merely

because it explicitly provides respondents with a set of responses from which to choose—particularly where as here, the question allows respondents the option of choosing "don't know/not sure," in case they do not agree with any of the provided choices.  (*Id.* at 141, Diamond at 251 (discussing the use of "no opinion" and "don't know" responses as quasi-filters)); *see, e.g.*, *Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 910 (D.N.J. 1994) (rejecting similar argument based on precedent cited by Whirlpool, holding that "because marketers regularly employ closed-ended consumer survey questions when making multi-million dollar consumer marketing decisions, this Court finds it reasonable in the context of the present case to rely on unbiased, closed-ended questions when adjudicating a false advertising claim."); *Consumers Union of U.S., Inc. v. New Regina Corp.*, 664 F. Supp. 753, 769 (S.D.N.Y. 1987) ("Closed-ended questions are not inherently leading . . . Courts have relied on closed-ended questions to determine consumer confusion on many occasions." (citations omitted)).

Given that the universe surveyed—consumers of home laundry appliances—does not necessarily make appliance purchasing decisions impetuously, the closed-ended question may provide relevant information beyond what first pops into the minds of respondents.  The jury thus will be free to weigh the utility, if any, of the closed-ended question along with the open-ended question and the survey as a whole.  Given the facts in this case, the mere existence of the closed-ended question does not render the survey inadmissible.  Similarly, given that the purpose of a filter question is to reduce guessing, (*id.*), the Court rejects Whirlpool's criticism of the lack of filter questions—the Reitter Study's use of "don't know" in the close-ended question sufficiently mitigates this concern to permit admission of the survey.

Whirlpool also takes issue with the control advertisement employed by Mr. Reitter. In particular, Whirlpool contents that, rather than editing the test commercial, the Reitter Study improperly used as a control another commercial for Whirlpool's Duet Steam Washer and Dryer. The purpose of a control is to eliminate "noise"—to reduce the impact of respondents' preexisting impressions on their answers and focus the survey on the proposition the study is designed to test. (R. 310-2 at 146, Diamond at 256). To be relevant, a proper control should be similar to the test group and:

> share[ ] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed. A survey with an imperfect control group generally provides better information than no control group at all, but the choice of the specific control group requires some care and should influence the weight that the survey receives.

(*Id.* at 148, Diamond at 258.) Although the Reitter Study's control commercial used different imagery, the commercial aired contemporaneously with the test commercial and otherwise covered the same Whirlpool product that the test commercial addressed. Indeed, Whirlpool's own expert, Dr. Ravi Dhar, testified that "[t]he question is not—it's not about using a different [television commercial]. I mean, what you want to do is minimize the difference between the test and control. That's the key essence." (R. 310-2, Dhar Tr. at 182 (approving for use of control different advertisement for the same product.)) The differences between the test and the control may affect the weight that a jury attributes to the study, but they are insufficient to find the Reitter Study inadmissible.

In sum, Whirlpool's criticism addresses the weight of the Reitter Study, rather than its admissibility. Evaluating technical deficiencies and awarding weight to this evidence is the province of the trier of fact. *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618

(7th Cir. 1993) ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare."); *see also Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 320 (E.D. Pa. 2007) ("Courts in the Third Circuit have generally held that a survey's 'technical unreliability goes to the weight accorded a survey, not its admissibility.'" (quoting *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 121 (3d Cir.2004))); *Johnson & Johnson * Merck*, 960 F.2d at 300–01 ("The probative value of any given survey is a fact specific question that is uniquely contextual."); 6 McCarthy on Trademarks and Unfair Competition § 32:178 (4th ed. Supp. Sept. 2009) ("The proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand."). The Court thus denies Whirlpool's motion to exclude Mr. Reitter's testimony. As Whirlpool's motion for summary judgement relied on its criticisms of the Reitter study, the Court also denies Whirlpool's motion for summary judgment as to LG's implied falsity claim.

## IV.    Whirlpool's Motion to Exclude the Report and Opinions of Dr. Anthony Jacobi

Whirlpool also has moved to exclude a portion of the testimony of LG's thermodynamics expert, Dr. Anthony Jacobi. Specifically, Whirlpool argues that Dr. Jacobi's opinions exceed the boundaries of his scientific expertise. "[Q]ualifications alone do not suffice. . . . [an] opinion must be grounded in the scientific process and may not be merely a subjective belief or unsupported conjecture." *Lewis*, 561 F.3d at 705 (citing *Daubert*, 509 U.S. at 589-90, 113 S. Ct. 2786; *Goodwin v. MTD Prods., Inc*., 232 F.3d 600, 608–09 (7th Cir. 2000); *Clark v. Takata Corp*., 192 F.3d 750, 759, n.5 (7th Cir. 1999)).

## A.    Qualifications

Dr. Anthony Jacobi is the co-director at the Air Conditioning & Refrigeration Center and Richard W. Kritzer Distinguished Professor at the Department of Mechanical Science and Engineering at the University of Illinois and Urbana-Champaign.  (R. 241-1, 2008 Jacobi Report at 14.)  Dr. Jacobi holds a Bachelor of Science in Mechanical Engineering from Purdue University, a Master's of Science in Engineering from the University of Central Florida, and a Ph.D. in Mechanical Engineering from Purdue University.  (*Id.* at 15.)  As a member of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE"), he has co-authored works on thermodynamics.  (*Id.*)  Dr. Jacobi is also the Associate Editor of both the *Journal of Heat Transfer* and *International Journal of Energy Research.*  (*Id.* at 16.)  Whirlpool does not contest Dr. Jacobi's qualifications and expertise in thermodynamics.

## B.    Methodology

LG asked Dr. Jacobi to "evaluate the Whirlpool Duet® Steam Dryer and whether it creates steam in any sense of the word."  (R. 241-1, 2009 Jacobi Report at 21.)  Dr. Jacobi's 2009 report—the report to which Whirlpool currently objects—reviews background terminology relating to thermodynamics, (*id.* at 23–24), as well as Whirlpool's own definitions of steam, which Dr. Jacobi refers to as "lay steam."  (*Id.* at 24.)  Dr. Jacobi also relies on his own examination of Whirlpool's Steam Dryers and documents produced by Whirlpool that discuss how the Steam Dryers work.

## C.    Whirlpool's Objections

Whirlpool objects to Dr. Jacobi's opinions as exceeding the bounds of his expertise in thermodynamics.  Specifically, Whirlpool claims that Dr. Jacobi opines on the definition of "lay

steam" even though he has no expertise in consumer perception. Whirlpool also claims that Dr. Jacobi did not rely on any scientific methodology to "come up with his definition of 'lay steam.'" (R. 241-1, Whirlpool Mot. at 7.)

As an initial matter, Dr. Jacobi, in large part, relies on the definitions of steam provided by Whirlpool and applies these definitions to his scientific analysis of Whirlpool's appliance to conclude that: (1) Whirlpool's Steam Dryers do not create thermodynamic steam (a conclusion not disputed by Whirlpool); and (2) Whirlpool's Steam Dryers do not create lay steam under the definitions offered by Whirlpool. (*Id.* at 25–27.) Although Dr. Jacobi necessarily interprets some of Whirlpool's offered definitions, this does not mean that he purports to be a language expert or that he opines on the meaning of a given term. To the contrary, Dr. Jacobi compares the definitions to the thermodynamic processes occurring in Whirlpool's dryers—well within the expertise of an experienced engineer. To the extent that Whirlpool contends that Dr. Jacobi misinterprets Whirlpool's proffered definitions of steam, this criticism goes to the weight of Dr. Jacobi's testimony and Whirlpool is free to cross-examine Dr. Jacobi regarding his application of the definition of "steam" to Whirlpool's Steam Dryers. *Civix v. Expedia*, No. 03 C 3792, 2005 WL 5961023, at *2 (N.D. Ill. Oct. 25, 2005) ("[t]he difference between weight and admissibility, moreover, is in many instances a close question." (quoting *Libas, Ltd. v. United States*, 193 F.3d 1361, 1366 (Fed. Cir. 1999)).

Dr. Jacobi, however, did go beyond his scientific expertise and offer various opinions regarding the lay definition of steam. Specifically, he opined as follows:

> "To a consumer, the most compelling lay definition of steam is probably the third one offered above, 'the mist former by the condensation on cooling of vapor.'"

> "I believe the most relevant definition of lay steam – one markedly different from

28

thermodynamic steam – is as follows: visible steam formed as a mist by the cooling and condensation of water vapor."

LG's characterization of these opinions as "common sense observations" does not save them. Dr. Jacobi is not qualified to render these two opinions. (R. 311-1, Response at 7.) Dr. Jacobi conceded that he is not an expert in marketing, consumer surveys or consumer perceptions. He has no training or expertise in linguistics. Furthermore, he did not conduct any surveys or consumer research to reach these opinions. LG has not established that Dr. Jacobi's qualifications in thermodynamics provide the necessary expertise to render these opinions. Accordingly, the Court strikes them.

## V.  LG's Motion to Strike the July 1, 2009 Expert Report of Dr. Subbaiah Malladi

LG has moved to strike the July 1, 2009 expert report of Dr. Malladi as untimely because the report contains new opinions differing from his March 2, 2009 report. Specifically, LG takes issue with paragraphs 35 and 36 of Malladi's July 1, 2009 report that offer a definition of "steam" from the *Encyclopedia of Chemical Technology* that "includes evaporation, does not require 'boiling,' and meets the conditions inside Whirlpool's steam dryers." (R. 276-1 at ¶ 8.) As noted in Whirlpool's Response to LG's Motion, however, Dr. Malladi's declaration in support of Whirlpool's opposition to LG's motion for a preliminary injunction referenced this definition from the *Encyclopedia of Chemical Technology*. (R. 55-1 at ¶ 8(b).) Consequently, this opinion is not new. The Court denies LG's motion.

**CONCLUSION**

For the foregoing reasons, the Court denies Whirlpool's motion for summary judgment and its motion to exclude the expert testimony of Robert Reitter. The Court grants in part and denies in part Whirlpool's motion to exclude the opinions of Dr. Anthony Jacobi. The Court also denies LG's motion to strike Whirlpool's Rule 56.1 statement and the July 1, 2009 expert report of Dr. Subbaiah Malladi.


DATED:   September 28, 2009                    ENTERED

_____
AMY J. STUEVE
United States District Court Judge