**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 242 |
| v. | ) | |
| | ) | Honorable Amy J. St. Eve |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is the remainder of Plaintiff LG Electronics U.S.A., Inc.'s motion to compel production of documents listed on Defendant Whirlpool Corporation's privilege log. The remaining issue is whether the attorney-client and work product privileges extend to protect corporate communications with third party advertising agencies. Whirlpool takes the position that these third party advertising agencies act as the functional equivalent of Whirlpool employees, or alternatively, share a common legal interest with Whirlpool sufficient to justify an exception to the general rule that disclosure to a third party outside the scope of the privilege waives the protection of the attorney-client privilege. *See Beneficial Franchise Co., Inc. v. Bank One, N.A.*, 205 F.R.D. 212, 215 (N.D. Ill. 2001) (citing *In re Air Crash Disaster at Sioux City, Iowa*, 133 F.R.D. 515, 518 (N.D. Ill. 1990)). LG argues that the "de facto" employees test has not been adopted by the Seventh Circuit and that Whirlpool's common interest with its outside agencies is nothing more than a routine business interest in avoiding a lawsuit.

Given the unique and fact-specific nature of this issue, the Court has twice ordered additional briefing from the parties because the parties failed to address certain relevant issues.

Most recently, the Court ordered the parties "to brief: (1) whether the common legal interest exception, as articulated in *United States v. BDO Seidman, LLP*, 492 F.3d 806 (7th Cir. 2007), extends to communications between Whirlpool and its advertising agencies; and (2) whether the Court may recognize the 'de facto employees' test articulated by other courts." (R. 284-1, 8/24/09 Minute Order.)  The attorney-client privilege is a bedrock principle of our legal system, and the Court does not take lightly the issue of whether the privilege has been waived. Nonetheless, under the facts of this case, Whirlpool has not justified that the documents are privileged or an extension of the privilege, and thus the Court grants the remainder of LG's motion.

## LEGAL STANDARD

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients . . . [because] sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client."  *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584 (1981).  "Open communication assists lawyers in rendering legal advice, not only to represent their clients in ongoing litigation, but also to prevent litigation by advising clients to conform their conduct to the law and by addressing legal concerns that may inhibit clients from engaging in otherwise lawful and socially beneficial activities."  *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007) (citing *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999)).  Because "[t]he cost of these benefits is the withholding of relevant information from the courts," *BDO*, 492 F.3d at 815, the Seventh Circuit has stressed that "the privilege is in derogation of the search for the truth and, therefore, must be strictly confined."  *In re Grand Jury*

*Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000); *see also Univ. of Pa. v. EEOC*, 493 U.S. 182, 189, 110 S. Ct. 577, 582, 107 L.Ed.2d 571 (1990) (expressing reluctance, because testimonial and evidentiary privileges impede the search for truth, to recognize a testimonial or evidentiary privilege "unless it 'promotes sufficiently important interests to outweigh the need for probative evidence...'") (quoting *Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 912, 63 L. Ed. 2d 186 (1980)). As recognized by the Supreme Court's functional approach in *Upjohn*, any application of the attorney-client privilege must be "consistent with the underlying purposes" of the privilege. *Upjohn*, 449 U.S. at 395, 101 S. Ct. 677.

### ANALYSIS

In its August 24, 2009 Minute Order, the Court reviewed the evidence submitted by Whirlpool in support of its position. Whirlpool has not submitted additional information in support of this briefing, but it did file, under seal, the declaration previously provided to the Court. For ease of reference, the Court reiterates those facts here. Specifically, Whirlpool submitted a supplemental declaration of Joel Van Winkle, an in-house Whirlpool attorney. Mr. Van Winkle's declaration describes a close relationship between Whirlpool and a number of outside agencies. Because Whirlpool employs "relatively few" marketing and advertising employees, it maintains "long-term relationships with third-party agencies, including advertising, marketing, public relations, printing, and production consultants, and relies heavily on these agencies in executing its marketing and advertising campaigns." (R. 302-1, Van Winkle Decl. ¶ 4.) Whirlpool owns the work product of these agencies, requires confidentiality of agency employees, and exercises final approval over all agency work. (*Id.* ¶¶ 5, 11, 12, 17.) In some instances, employees of these agencies work out of Whirlpool offices or receive Whirlpool

security clearances. (*Id.*) To ensure compliance with the Lanham Act, Copyright Act, and other applicable law, Whirlpool requires that its in-house counsel review and approve all marketing materials before dissemination and publication. (*Id.* ¶ 7.) As part of this review process, "[a]gency employees, just like regular Whirlpool employees, periodically seek the advice of the Whirlpool Law Department regarding the content of advertisements prior to publication." (*Id.* ¶ 8.) Based on these close relationships, Mr. Van Winkle maintains that "[i]t would be effectively impossible for Whirlpool employees to communicate critical information to their agency counterparts, if they could not discuss legal issues or the Law Department's input." (*Id.* ¶ 10.) Mr. Van Winkle admits, however, that "[a]lthough Whirlpool's agencies rely on Whirlpool's research and legal directives in creating advertisements and promotional materials, the agencies retain independent liability for the truth of the materials they author." (*Id.* ¶ 13.)

## I.     *De Facto* Employee Exception

Whirlpool first claims that outside agencies act as the functional equivalent of Whirlpool employees. Specifically, Whirlpool argues that its "outside advertising agencies work closely with Whirlpool's employees, and many are frequently on-site at Whirlpool," and that because "Whirlpool has a very small internal marketing department, and primary responsibility for developing Whirlpool's consumer messaging, crafting its print, television and internet advertising, and disseminating those advertisements in the media thus falls on these agencies." (R. 301-1, Whirlpool's Sur-Reply at 2.) As noted in the Court's August 24, 2009 Order, the Seventh Circuit has not directly addressed this *de facto* employees exception. Other courts, however, have applied the attorney-client privilege to communications disseminated to outside consultants and independent contractors who act as *de facto* employees of the party asserting the

4

privilege.

### A. Precedent from Other Circuits

Courts considering the issue of privilege as to communications with independent contractors and outside agencies have closely examined the relevant facts of each respective case in an effort to determine whether protecting the communication furthers the purpose and policy behind the attorney-client privilege. The Second Circuit, for example, has refused to extend the privilege to communications between corporate in-house counsel and an outside tax advisor even though the attorney claimed that the communications were necessary to better advise his client. *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). "The purpose of the privilege is 'to encourage clients to make full disclosure to their attorneys.' To that end, the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client." *Id.* (citing *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976)). "[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *Id.*

In *Calvin Klein Trademark Trust v. Wachner*, the Southern District of New York applied the rationale of *Ackert* to a case involving communications between the plaintiff's counsel and an outside public relations ("PR") firm. 198 F.R.D. 53, 54 (S.D.N.Y. 2000). In *Calvin Klein,* the plaintiff's counsel retained the outside PR firm to act as a consultant in connection with counsel's representation of the plaintiff. The *Calvin Klein* court focused on the fact that the outside PR agency performed no duties outside of those normally performed by any PR agency: "[t]he possibility that such activity may also have been helpful to [counsel] in formulating legal

strategy is neither here nor there if [the PR firm's] work and advice simply serves to assist counsel in assessing the probable public reaction to various strategic alternatives, as opposed to enabling counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice." *Calvin Klein*, 198 F.R.D. at 55.

Conversely, the Eighth Circuit has held that protection for communications with third parties turns on whether the third parties at issue were the "functional equivalent" of employees. *In re Bieter Co.*, 16 F.3d 929, 930 (8th Cir. 1994). In *Bieter*, a partnership formed to develop a parcel of farmland asserted privilege over certain communications with an independent contractor. The contractor maintained a long-term relationship with the partnership, worked in the partnership's office, and consulted on commercial and retail development in exchange for a monthly fee plus expenses. In addition to securing tenants for the development, acting as the partnership's sole representative in meetings with tenants and architects, and representing the partnership in front of the city council, the contractor worked extensively with the partnership's counsel on the litigation that resulted from the project. Based on these facts, the Eighth Circuit found that there was "no principled basis to distinguish [the contractor's] role from that of an employee, and his involvement in the subject of the litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentially in order to understand [the partnership's] reasons for seeking representation. . . . As we understand the record, he was in all relevant respects the functional equivalent of an employee." *Bieter*, 16 F.3d at 938. The Eighth Circuit then analyzed the privilege issue as if the contractor were any other *Bieter* employee.

A number of courts have adopted the Eighth Circuit's "functional equivalent" test. In *In re Copper Market Antitrust Litig.*, 200 F.R.D. 213, 215 (S.D.N.Y. 2001), on which Whirlpool

6

relies, the Southern District of New York extended the attorney-client privilege to an outside "crisis management" public relations firm hired in connection with litigation. In that case, the party claiming privilege, Sumitomo, hired the public relations firm "because it had no prior experience in dealing with issues relating to publicity arising from high profile litigation . . . Sumitomo lacked experience in dealing with the Western media [and] [o]nly two of the three executives in Sumitomo's Corporate Communications Department had English language facility." *Id.* The firm worked out of Sumitomo's Tokyo headquarters and "acted as Sumitomo's agent and its spokesperson when dealing with the Western press on issues relating to the copper trading scandal" to "help the Company make the statements it needed to make, but to do so within the necessary legal framework – all with the realization, indeed the expectation, that each such statement might subsequently be used by Sumitomo's adversaries in litigation." *Id.* at 216. In this context, the firm dealt extensively with Sumitomo's outside litigation counsel.

The *outside* firm's duties in *Copper Market*, however, were limited to dealing with the Western media: Sumitomo continued to control corporate communications with the Japanese press in-house. *Id.* Although "[a]ll documents prepared by [the PR firm] relating to legal issues arising from the CFTC investigation or the Hamanaka scandal were vetted with Sumitomo's in-house counsel and/or outside counsel," the firm "had the authority to make decisions on behalf of Sumitomo concerning its public relations strategy." *Id.* Based on these facts, the court held that the public relations firm was "the functional equivalent of an in-house public relations department with respect to Western media relations, having authority to make decisions and statements on Sumitomo's behalf, and seeking and receiving legal advice from Sumitomo's counsel with respect to the performance of its duties." *Id.* The *Copper Market* court

7

distinguished *Calvin Klein* by noting that the PR firm in *Calvin Klein* was not the "functional equivalent" of an employee of the party claiming privilege. *Id.* at 220, n.4.[1]

More recently, another case in the Southern District of New York, *Export-Import Bank v. Asia Pulp & Paper Co., Ltd.*, distilled the "functional equivalent" test down to three basic elements: (1) "whether the consultant had primary responsibility for a key corporate job," (2) "whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation," and (3) "whether the consultant is likely to possess information possessed by no one else at the company." 232 F.R.D. 103, 113 (S.D.N.Y. 2005). The *Asia Pulp* court found that an outside financial advisor who negotiated on behalf of Asia Pulp was not a *de facto* employee because "Mr. Tan's efforts are precisely those that any financial consultant would likely make under the circumstances . . . . Mr. Tan's schedule, the location of his head offices, and the success of his consulting business all contradict the picture of Mr. Tan as so fully integrated into the APP hierarchy as to be a *de facto* employee of APP." *Id.* at 113–14. The court also warned that "[c]aution is especially apt here because companies in financial crisis will often find it necessary to obtain the services of outside financial experts. If the functional equivalent doctrine were extended to every situation where a financial consultant worked exhaustively to guide a company through a restructuring deal, the exception would swallow the basic rule." *Id.*

---

[1]     In addition, both the Court of Federal Claims and the District of Colorado have adopted the "functional equivalent" test. *Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002) (requiring party asserting privilege to make a "detailed factual showing" that third party is the "functional equivalent" of an employee); *Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 492 (Fed. Cl. 2000) (plaintiff failed to meet his burden of proving by a detailed factual showing that third party was the "functional equivalent" of an employee).

Courts in this district have expressed doubts regarding the functional equivalent test. In *Stafford Trading, Inc. v. Lovely*, No. 05 C 4868, 2007 WL 611252, at *7 (N.D. Ill. Feb. 22, 2007), Magistrate Judge Keys adopted a "balanced approach" that recognized protection for a third party investment advisor's communications with counsel to the extent that the communications were made "for the purpose of obtaining or providing legal advice." *Id.* at *7. Similarly, in *Heriot v. Byrne*, --- F.R.D. ---, No. 08 C 2272, 2009 WL 742769, at *19 (N.D. Ill. Mar. 20, 2009), Magistrate Judge Ashman held that "that the attorney-client privilege applies to an accountant who performs services (i) that are not required by federal law or do not otherwise make him an individual acting on the public's behalf; (ii) on behalf of a party; (iii) for the purposes of rendering legal advice; and (iv) that make the accountant . . . necessary, or at least highly useful, for the effective consultation between the client and the lawyer." *Id.* at *20 (quotation omitted). Most recently—just one day after the Court's August 24 Minute Order, in fact—Magistrate Judge Keys again reviewed the precedent of *Bieter* and refused to find privileged communications between a defendant's president and an employee of an outside marketing agency because the defendant failed to show that the letter was disclosed for the "rendition of legal advice" or the "protection of a legal interest." *Flagstar Bank, FSB v. Freestar Bank, N.A.*, No. 09 C 1941, 2009 U.S. Dist. Lexis 76842, at *17 (N.D. Ill. Aug. 25, 2009).[2]

---

[2] *Flagstar* is factually distinguishable because it involved communication limited to a specific project as opposed to an on-going relationship, but Judge Keys apparently ruled in part based on the routine business nature of the communication—a fact also relevant to the common legal interest exception, discussed below.

### B.     Application to Whirlpool's Relationship

None of the cases discussed above provide an appropriate analog to the situation before the Court.  Although Whirlpool claims that the agencies are the "functional equivalent" of Whirlpool employees," (R. 302-1 ¶ 5), Whirlpool's scenario is not limited to communications with a third-party PR firm hired to independently communicate on the company's behalf, as in *Copper Market*, 200 F.R.D. at 215.  The outside agencies maintain long-term relationships based on Whirlpool's ordinary business dealings and thus do not implicate the same concerns as PR firms retained for the purpose of responding to litigation.  Nor do Whirlpool's claims of privilege relate to an agent or an outside accountant or investment advisor whose work was necessary to assist counsel in rendering legal advice.  *See Ackert*, 169 F.3d at 139; *Bieter*, 16 F.3d at 930; *Heriot*, 2009 WL 742769, at *19; *Stafford Trading*, 2007 WL 611252, at *7; *Asia Pulp*, 232 F.R.D. at 113.  Whirlpool does not contend that its in-house counsel cannot understand proposed advertisements and marketing plans without agency assistance—its counsel communicates directly with the agencies as a matter of expediency.

Paul Rice discusses a similar scenario in his treatise *Attorney Client Privilege in the United States.*  PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 4:19 (Thomson West 2d ed. Supp. 2009).  Mr. Rice served as the Special Master in the Consolidated Vioxx Cases multi-district litigation, *see In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789 (E.D. La. 2007), for the purpose of advising the district court as to Defendant Merck & Co.'s claims of privilege over communications with its outside public relations and advertising agencies.  As discussed in the Rice treatise, in *Vioxx,* Merck retained outside agencies on an on-going basis and vetted every advertisement and communication through its in-house legal

10

department to ensure compliance with strict FDA advertising regulations. Merck argued that "without Merck having the ability to share legal advice with its consultants, the consultants would not be able to effectively conform their conduct to the requirements of the law, thereby creating legal risks for Merck." Rice, *supra,* § 4.19. The Special Master rejected this argument because Merck supervised its outside agencies directly:

> the arrangement that Merck had with its consultants adequately accommodated that goal through Merck maintaining absolute control of any public dissemination of materials on Merck's behalf. Everything the consultants wanted to do under the contract had to be (1) proposed to the company, (2) screened and vetted within the company (including the Legal Department), and (3) approved in writing by Merck.

*Id.* According to the Special Master, "[b]ecause of the pervasive supervision of the consultant's work by Merck, the consultants are not independently making decisions that need to be informed in the same way," and thus there was no justifiable need to extend the privilege to Merck's outside agencies:

> The fact that the consultants could not directly receive confidential advice being rendered to the corporation would have no untoward consequences. This is particularly true since the consultants are not deprived of the benefit of that advice. Legal concerns expressed to Merck need to be adopted by Merck and then transmitted to the consultants as corporate concerns and policies independent of the explicit advice previously received. Merck is the client, not the consultants. Based on the advice received, Merck is making corporate decisions about advertising and public relations matters that clearly effect the consultants and their work, but only after Merck has adopted that advice.

*Id.*

The Special Master's reasoning above comports with available precedent and is logically persuasive. Whirlpool's agencies may prepare its marketing materials, but Whirlpool, like Merck, exercises the final say in all of its advertisements, closely monitors all agency work, and retains all rights in the agencies' work product. Whirlpool claims that "[i]t would be effectively

11

impossible for Whirlpool employees to communicate critical information to their agency counterparts, if they could not discuss legal issues or the Law Department's input," (Van Winkle Decl. ¶ 10), but this misconstrues the scope of the attorney-client privilege. To the extent that agencies need to be informed, Whirlpool's non-legal employees may screen counsel's legal advice and communicate Whirlpool's business concerns to the agencies without revealing Whirlpool's confidential communications to its counsel. Rice, *supra,* at § 4.19. Whirlpool does not allow its agencies the freedom to design advertisements without Whirlpool's internal marketing approval. Accordingly, even assuming *arguendo* that the Seventh Circuit would adopt the *de facto* employee test applied by other circuits—which is not at all clear— the factors delineated in *Asia Pulp*, 232 F.R.D. at 113, establish that Whirlpool's agencies do not qualify for the *de facto* exception.

## II.    Common Legal Interest Exception

Unlike the *de facto* employee test, the Seventh Circuit has clearly accepted and applied the common legal interest exception to cases "where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise." *BDO,* 492 F.3d at 815. The fact that Whirlpool's communications with its outside agencies were not in the context of litigation is of no moment because communications "need not be made in anticipation of litigation to fall within the common interest doctrine." *Id.* Rather, the common interest exception applies to a range of communications to encourage "parties with a shared legal interest to seek legal 'assistance in order to meet legal requirements and to plan their conduct' accordingly." *Id.* (citing *In re Regents of the Univ. of Cal.,* 101 F.3d 1386, 1390-91 (Fed. Cir. 1996)). "Reason and experience

12

demonstrate that joint venturers, no less than individuals, benefit from planning their activities based on sound legal advice predicated upon open communication." *Id.*

In its sur-reply responding to the Court's August 24, 2009 Order, Whirlpool maintains that it has a "shared legal interest in making certain that advertising for Whirlpool's products is truthful and not misleading, as both Whirlpool and its advertising agencies potentially bear liability for false and misleading claims." (R. 301-1 at 3.) Specifically, Whirlpool cites three cases that subjected advertising agencies to liability based on advertisements prepared for clients. In *Doherty, Clifford, Steers & Shenfield, Inc. v. FTC*, 392 F.2d 921, 927 (6th Cir. 1968), the Sixth Circuit affirmed an FTC cease and desist order against an advertising agency (and broadly against the advertiser) because, based on the record in that case, "the advertising agency participated actively in the deception." *Id.* (citing *Carter Prods., Inc. v. FTC*, 323 F.2d 523, 534 (5th Cir. 1963)). In particular, both the FTC and the Sixth Circuit found it relevant that "the agency knew that the products were recommended only for the relief of minor sore throat pain, mouth and throat irritations." *Doherty*, 392 F.2d at 927. Similarly, in *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992), the Ninth Circuit affirmed a jury verdict finding false endorsement from a Doritos commercial using a sound-alike voice of singer Tom Waits. Although the basis of the advertising agency's joint liability is not entirely clear, the Ninth Circuit noted that the agency chose the final singer based on his ability to sound like Tom Waits, despite legal concerns. *Id.* at 1098. The Ninth Circuit thus painted a picture of agency control over the final commercial. Similarly, in *FTC. v. Direct Marketing Concepts, Inc.*, 569 F. Supp. 2d 285, 308 (D. Mass. 2008), the outside agency played "a central role in the creation and distribution of the Coral Calcium infomercial" and at one point "assumed total responsibility for

13

the infomercials," including financing. *Id.* at 308-09. Each of these cases, however, involved decisions made after an intensive factual inquiry such as a trial, based on information not currently before the Court.

Whirlpool's position that fear of lawsuit, alone, justifies a common legal interest has no cognizable boundaries and runs the risk of allowing the common interest exception to swallow the rule. Fear of lawsuit is a concern shared by most—if not all—corporations, and it is not clear that this fear justifies the common interest exception articulated by the Seventh Circuit. *BDO*, for example, involved the circulation of a memorandum from in-house counsel at an accounting firm to outside counsel, requesting legal advice about pending IRS regulations. The memorandum subsequently circulated to a second outside law firm that, although not involved in the matter that prompted the original communication, jointly represented other clients with the accounting firm. The Seventh Circuit held that it was not relevant that the accounting firm was not engaged in litigation with the second outside firm at the time because the accounting firm and second law firm shared "a common legal interest to which the parties formed a common strategy," namely, their joint representation of various clients. 492 F.3d at 816.

A common strategy appears to be a touchstone of this exception. In *Jenny Craig,* FTC Docket No. 9260, 1994 WL 16774903 (F.T.C. May 16, 1994), for example, the FTC reviewed a similar claim of privilege by Jenny Craig International ("JCI") over communications with an outside advertising agency ("JWT") and found a common legal interest between the parties. In that case, however, the terms of the agency agreement required the agency to perform legal review of proposed advertisements:

> JCI's marketing personnel and JCI's outside counsel worked cooperatively with
> JWT's creative team and JWT's in-house counsel on legal issues concerning

14

> JCI's advertising program. Thus, JCI sought legal litigation-related advice from both JWT in-house counsel and . . . outside counsel retained by JCI to defend this action. JWT's in-house counsel met with JCI officials and JCI's outside counsel at the outset of the investigation to discuss legal strategy. JCI's outside counsel regularly consulted with JWT's in-house counsel regarding JCI's advertising program. JCI's outside counsel gave legal advice to JWT personnel and JWT's in-house counsel advised JCI. . . JWT kept the confidential materials exchanged between JWT and JCI in secure and segregated files. These materials were not disclosed to anyone outside of JWT and JCI.

*Jenny Craig,* 1994 WL 16774903 at *1.

Similar facts are not available here. Examining the communications withheld by Whirlpool, the communications suggest Whirlpool's firm control over the relationship rather than joint strategy. The documents withheld by Whirlpool paint a picture of Whirlpool's one-sided control of the advertising strategy pursued by its outside agencies. Whirlpool did not provide the Court with copies of agreements with its agencies to allow the Court to evaluate whether its agencies direct their own actions and the extent to which the agencies risk liability based on Whirlpool's advertisements. Nor did Whirlpool provide any testimony from the agencies themselves as to how the agencies handle Whirlpool information. The Van Winkle declaration, however, makes clear that Whirlpool legal exercises review and approval over all final advertisements created by the agencies. The declaration is silent as to whether the agencies' internal legal departments participate in developing strategy—or indeed whether the agencies maintain independent counsel at all. Whirlpool has had three opportunities to provide the Court with such information and has failed to do so.

Extending the exception to Whirlpool's relationship, based on the information currently before the Court, would permit two companies to argue a common legal interest simply because they routinely deal with one another and neither desires to be sued. *See*, *e.g.*, *FTC v. Rexall*, No.

15

M18-304, 2001 WL 396522, at *5 (S.D.N.Y. April 19, 2001) (common legal interest not found

where company's counsel provided legal advice to advertising agency regarding draft

advertisements and both company and advertising agency were "concerned about the

consequences of failing to comply with the applicable law and regulations" because these issues

were not sufficient "to transform their mutual commercial interest in [an] advertising campaign

into a coordinated legal strategy.")  This approach runs the risk of allowing the exception to

swallow the rule and conflicts with the Seventh Circuit's direction that "the privilege is in

derogation of the search for the truth and, therefore, must be strictly confined."  *In re Grand Jury

Proceedings*, 220 F.3d at 571.  Accordingly, the Court orders Whirlpool to produce the

following documents by October 27, 2009:

- Tabs 7, 10, 11, 12, 14, 17, 20, 21, 22, 25, 29, 48, 49, 51, 60, 61, 117, 118, 119, 122, 127, 173, 219, 251, 259, 291 (and by virtue of duplication, 292), 318, 327, 328, 329, 346, 368, 371, 378, 379, 380, 383, 384, 385, 390, 391, 392, 393, 395, 396, 400, 402, 405, 409, 413, 414, 430, 432, 433, 434, 436, 437, 438, 441, 442, 445, 446, 447, 449, 451, 453, 454, 455, 457, 458, 459, 460, 465, 466, 470, 473, 569, 583, 584, 592, 593, 594, 598, 600, and 601.[3]

In addition, Whirlpool should produce Tab 381 with only the last two emails between

Whirlpool employees and legal personnel redacted.  This redaction should not, however, include

---

[3]     Of these documents, Whirlpool listed six as subject to both the attorney-client privilege and work product protection.  From the face of these documents, however, it is clear that Whirlpool asserted work product protection based solely on the date of the communication (shortly after litigation commenced).  None of these documents refers to the on-going litigation and none of them represents a document prepared in anticipation of litigation.  Rather, these documents represent legal review in the ordinary course of Whirlpool's business.  This is insufficient to support work product protection.  *Transcap Assoc., Inc. v. Euler Hermes Am. Credit Indem. Co.*, No. 08 C 723, 2009 WL 1543857, at *3 (N.D. Ill. June 3, 2009) (work product protection "does not extend to documents prepared for business purposes."); *Heriot,* 2009 WL 742769, at *16–17; *see also Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996) ("The mere fact that litigation does eventually ensue does not, by itself, cloak materials . . . with the work product privilege; the privilege is not that broad." (quoting *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983))).

the email on WHR101746 from Whirlpool legal to an outside agency. Whirlpool should also produce Tab 421 with the three last emails between Whirlpool employees and legal personnel redacted, leaving the email beginning on WHR101895 that copies outside agency personnel. Similarly, as to Tab 555, Whirlpool may redact the first four emails in the chain, on WHR102682-685 between Whirlpool employees and Whirlpool legal personnel, but it must produce the remainder of the chain, beginning at WHR102686, which copies outside agencies. As to Tab 573, Whirlpool may only redact the last email in the chain, on WHR102742.

The following documents to which LG objected represent email chains or similar communications in which the third party was outside counsel or in which outside agencies participated earlier in the chain, but when Whirlpool employees forwarded the communication to Whirlpool legal, the third parties were not included. These documents bolster the Court's opinion that the only interest served in Whirlpool's counsel communicating directly with outside agencies is expediency. Nonetheless, these documents were properly withheld and thus *remain privileged:*

- Tabs 104, 252, 296, 317, 319, 320, 321, 322, 330, 386, 407, 408, 410, 422, 426, 427, 476, 479, 578, and 596.

The Court reprints the Tab numbers of these documents to aid Whirlpool in ensuring that it does not produce any properly withheld documents.

In addition, Tab 254 is a traditional email chain between Whirlpool personnel. Whirlpool's log lists no third parties and thus LG had no basis for objecting to this entry based on third party waiver.

**CONCLUSION**

The remainder of LG's motion to compel is granted. Whirlpool shall produce incorrectly withheld documents, consistent with the Court's Order, by October 27, 2009. Given the complexities of the legal issues involved, the Court will not consider a request for further sanctions against Whirlpool based on its decision to withhold the documents relating to this Order.

DATED:   October 13, 2009                               ENTERED

                                                        _____
                                                        AMY J. ST. EVE
                                                        United States District Court Judge

18