**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., INC. | ) | |
| a subsidiary of LG Electronics, Inc., | ) | |
| a Korean company, | ) | |
| | ) | Civil Action No.: 08 C 242 |
| Plaintiff, | ) | |
| | ) | Judge St. Eve |
| v. | ) | |
| | ) | Magistrate Judge Mason |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**WHIRLPOOL CORPORATION'S MOTION TO EXCLUDE THE EXPERT REPORT,
TESTIMONY AND OPINIONS OF MOHAN RAO (PUBLIC VERSION)**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

I.  INTRODUCTION ........................................................................................................... 1

II.  LEGAL STANDARDS ................................................................................................... 2

III.  ARGUMENT .................................................................................................................. 3

    A.  Dr. Rao's Flawed Opinions Regarding LG's Alleged Lost Profits And Whirlpool's Unjust Enrichment Attributable To Alleged False Advertising ............................................................................................................ 3

    B.  Dr. Rao's Lost Profits Opinion Based On Lost Dryer Sales Is Fundamentally Flawed And Inadmissible. ................................................... 3

        1.  Dr. Rao's "methodology" for establishing lost dryer sales caused by Whirlpool's use of the word "steam" is wholly speculative. ................. 5

        2.  Dr. Rao improperly assumes that LG would have made all the sales purportedly attributable to the false advertising. ...................................... 11

        3.  Dr. Rao's use of a non-party's incremental profit margin to bolster LG's lost profits renders his opinion unreliable and inadmissible. ........... 13

    C.  Dr. Rao's Price Erosion Analysis Is Fundamentally Unsound And Therefore Inadmissible. ........................................................................................ 14

    D.  Dr. Rao's Opinions Related To Sales Of Steam Washers Are Flawed And Therefore Inadmissible. ........................................................................................ 17

    E.  Dr. Rao's Unjust Enrichment Opinions Are Inadmissible Because They Suffer Similar Methodological Flaws As His Lost Profits Opinions. .................. 18

IV.  CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

**Page**

**Cases**

Black and Decker v. Bosch Tools,
    No. 04 C 7955, 2006 WL 5156873, at *1-2  (N.D. Ill. Sept. 8, 2006) ..................................... 15

Blue Cross and Blue Shield United of Wis. v. Marshfield Clinic,
    152 F.3d 588, 593 (7th Cir. 1998) .............................................................................................. 11

Bucklew v. Hawkins, Ash, Baptie & Co.,
    329 F.3d 923, 933 (7th Cir. 2003) ........................................................................................... 9, 18

Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l. Inc.,
    246 F.3d 1336, 1355 (Fed.Cir. 2001) ..................................................................................... 14, 15

CSC Holdings, Inc. v. Redisi,
    309 F.3d 988 (7th Cir. 2002) ................................................................................................... 8, 10

Daubert v. Merrell Dow Pharm., Inc.,
    509 U.S. 579 (1993) .................................................................................................................. 2, 3

Ervin v. Johnson & Johnson, Inc.,
    492 F.3d 901, 904 (7th Cir. 2007) ................................................................................................ 9

General Elec. Co. v. Joiner,
    522 U.S. 136, 146 (1997) .............................................................................................................. 9

Kay v. First Cont'l Trading, Inc.,
    976 F. Supp. 772, 776 (N.D. Ill. 1997) ........................................................................................ 8

King-Indiana Forge, Inc. v. Millennium Forge, Inc.,
    No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685, *2 (S.D. Ind. Sept. 29, 2009).................. 15

Kumho Tire Co. v. Carmichael,
    526 U.S. 137, 147 (1999) .............................................................................................................. 2

LeClercq v. The Lockformer Co.,
    No. 00 C 7164, 2005 WL 1162979, (N.D. Ill. April 28, 2005) ................................................. 19

Lewis v. CITGO Petroleum Corp.,
    561 F.3d 698, 705 (7th Cir. 2009) ............................................................................................... 2

Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,
    387 F. Supp. 2d 794, 807-08 (N.D. Ill. 2005).......................................................................... 15

Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago,
    877 F.2d 1333, 1340 (7th Cir. 1989) ........................................................................................... 7

*Otis v. Doctor's Assoc., Inc.*,
    No. 94 C 4227, 1998 WL 673595, at \*1-2 (N.D. Ill. Sept. 14, 1998) ..................................... 11

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
    383 F.3d 1303, 1311 (Fed. Cir. 2004)........................................................................... 13

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
    969 F.2d 410, 415 (7th Cir. 1992) ......................................................................... 9, 12

*Smithkline Beecham Corp. v. Apotex Corp.*,
    247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003) ............................................................... 3

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
    427 F. Supp. 2d 1022, 1030-31 (D. Kan. 2006)......................................................... 12

*Tel-Lock, Inc. v Thomson Consumer Elecs.*,
    No. 03 C 320, 2005 WL 741930, at \*10 (N.D. Ill. March 30, 2005) ............................... 14, 15

*U.S. Gypsum Co. v. Lafarge North America Inc.*,
    670 F. Supp. 2d 748, 751 (N.D. Ill. 2009) ................................................................. 2

*Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*,
    218 F. Supp. 2d 247, 250 (D. Conn. 2002)................................................................ 12

*Web Printing Controls Co. v. Oxy-Dry Corp.*,
    906 F.2d 1202, 1205 (7th Cir. 1990) .................................................................... 5, 9

## Rules

Fed. R. Evid. 402 .......................................................................................... 2, 20

Fed. R. Evid. 403 ....................................................................................... 2, 3, 20

Fed. R. Evid. 702 ....................................................................................... 2, 3, 20

## I.    INTRODUCTION

LG has submitted a report from its damages expert, Dr. Mohan Rao, that presents opinions based on two alternative theories of recovery -- LG's lost profits and Whirlpool's alleged unjust enrichment.  His opinions are fatally flawed, rendering them unreliable and inadmissible for the following reasons:

- *__He assumes – rather than proves - causation:__*  Dr. Rao fails to apply a scientifically rigorous and well-accepted method to determine whether any causal link exists between Whirlpool's allegedly false advertising, and any Whirlpool sales made or any LG sales lost.  Absent a scintilla of evidence of actual lost sales, Dr. Rao points to a percentage difference in two internal, pre-launch Whirlpool sales *forecasts*, guesses that the increase in forecasted sales "may" be attributable to Whirlpool's decision to market its dryers as "steam" dryers, and then uses that percentage difference as a proxy for Whirlpool's *actual* steam dryer sales purportedly attributable to Whirlpool's use of the word "steam" in its advertising (the alleged false advertising).  Through his made up "proxy" methodology and assumptions, Dr. Rao arrives at the conclusion that LG is entitled to ██████████████████;

- *__He ignores actual data in favor of pre-launch estimates__*:  Assuming his "proxy" methodology even has any merit, Dr. Rao inexplicably relies on a comparison of two pre-launch forecasts of Whirlpool expected sales that are *demonstrably at odds* with Whirlpool's *actual* steam dryer sales.  Dr. Rao undertook *no investigation regarding the reliability* of these early forecasts and simply adopts them, resulting in an inflated lost profits number under his "proxy" methodology;

- *__He ignores the presence of other competitors__*:  To artificially increase LG's claimed market share and his claim of damages, Dr. Rao *wholly ignores the presence of other competitors* in the steam dryer market segment.  The effect of this serious error is that he claims that LG would have made every single sale that Whirlpool made from the asserted false advertising;

- *__He adds non-parties to the mix__*:  Further inflating his damages claim, Dr. Rao inexplicably *adds the profit margin of a non-party* to LG's purported incremental profits on the purported lost steam dryer (and washer) sales, thus magically quadrupling LG's purported lost profits;

- *__He provides no scientific analysis of alleged price erosion__*:  For his claim of lost profits resulting from purported price erosion, Dr. Rao *rests his entire opinion on a discussion with a single LG employee* who said that LG would have liked to charge a certain premium for its steam dryer.  Dr. Rao performed no investigation into the accuracy or reliability of this lone employee's hope.  Instead, with some simple math, Dr. Rao turns that conversation into an "opinion" asserting ███████ in lost profits;

- *__He ignores the law of demand and price sensitivity__*:  Dr. Rao inexplicably assumed that LG would have made every one of the steam dryer sales it allegedly lost at a higher price but-for the alleged false advertising, thereby completely ignoring a golden rule of economics - the law of demand.  To explain this failure, he asserts that *LG's customers*

*are not price sensitive*, ignoring testimony and evidence to the contrary, and ultimately dooming his entire opinion (for if LG's consumers are not price sensitive, LG could have charged whatever premium it wanted);

- *He improperly includes washer sales*: Dr. Rao lays claim to ███████████ in damages (or Whirlpool's profits) related to Whirlpool's steam *washer* sales, even though LG makes no claim that Whirlpool falsely advertised its *steam washers*. In fact, the premise for this opinion – that steam dryers drive (or cause) the sale of steam washers – is contradicted by LG's own witnesses, who state █████████████████████ ████████████████!

In short, Dr. Rao's theories are entirely void of the economic rigor and well-accepted analysis required to support any damages claim and are, at best, the very definition of the sort of "simplistic extrapolation" that should be excluded as unreliable. Accordingly, Whirlpool moves, pursuant to Federal Rules of Evidence 702, 402 and 403, and under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), to exclude the opinions and expected testimony of Dr. Rao.[1]

## II.    LEGAL STANDARDS

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Under *Daubert*, a court is required to function as a "gatekeeper", screening the admissibility of expert testimony, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), and must ensure that an expert uses "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *U.S. Gypsum Co. v. Lafarge North America Inc.*, 670 F. Supp. 2d 748, 751 (N.D. Ill. 2009). Rule 702 sets forth three requirements: expert testimony must be based on sufficient facts or data, stem from reliable principles and methods, and reliably apply those methods to the facts. *See also U.S. Gypsum Co.*, 670 F. Supp. 2d at 753 ("[T]he court must determine that the proffered expert opinions are more than mere speculation or conjecture, but have at their core some reliable basis."). LG must prove that Dr. Rao's proposed testimony meets these requirements by a preponderance of the evidence. *Daubert*, 509 U.S. at 593 n.10; *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

---

[1]    Dr. Rao submitted an opening report on January 30, 2009 (Expert Report of Mohan Rao, Ph.D. ("Rao Rep."), attached as Ex. 1.) Following Whirlpool's submission of its expert's rebuttal report and production of updated financial information (reflecting 2008 year end and Q1 2009 steam dryer sales), Dr. Rao submitted a supplemental report on May 27, 2009. (Supplemental Expert Report of Mohan Rao, Ph.D. ("Rao Supp. Rep."), attached as Ex. 2.) Whirlpool seeks to exclude the opinions set forth in these reports in their entirety.

The court's gatekeeper role is of particular importance in jury trials. "The primary purpose of the *Daubert* filter is to protect juries from being bamboozled by technical evidence of dubious merit." *Smithkline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003) (Posner, J., sitting by designation). Moreover, expert testimony is subject to Rule 403 and must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. Fed. R. Evid. 403; *see also Daubert*, 509 U.S. at 595 (noting heightened need to scrutinize expert testimony under Rule 403 given the tendency of such evidence to be misleading and difficult to interpret, while simultaneously disproportionately influential in a jury's deliberations).

## III.   ARGUMENT

### A.   Dr. Rao's Flawed Opinions Regarding LG's Alleged Lost Profits And Whirlpool's Unjust Enrichment Attributable To Alleged False Advertising.

Dr. Rao concludes that LG is entitled to (a) lost profits on sales of LG's steam dryers of ███████████ (b) price erosion damages on sales of LG's steam dryers of ███████████, and (c) lost profits on sales of LG's steam washers of ██████████. In total, LG seeks ███████████ in lost profits damages. (Ex. 2, Rao Supp. Rep. at pp. 4-5.) Alternatively, Dr. Rao opines that LG is entitled to Whirlpool's purported steam dryer and steam washer profits under an unjust enrichment theory in the amount of ███████████. (*See id.*)[2] Fundamental flaws in Dr. Rao's string of assumptions underlying his opinions require this Court to exclude them in their entirety.

### B.   Dr. Rao's Lost Profits Opinion Based On Lost Dryer Sales Is Fundamentally Flawed And Inadmissible.

Dr. Rao claims that LG lost over ███████████ in profits from steam dryer sales it purportedly otherwise would have made if Whirlpool had not advertised its new dryer as a steam dryer, but called it something else instead. (Ex. 3, Rao Dep. at 85:16-86:13.) This is not an expert opinion, but rather is an untested theory based on assumptions, without any scientific analysis or support. Dr. Rao makes no attempt to identify any *actual* lost sales attributable to the word "steam", *i.e.*, whether *any* consumer *actually* purchased a steam dryer because it was called a "steam" dryer as opposed to something else. He did not review any data from, or conduct any

---

[2]   Dr. Rao testified in his deposition that in his opinion it would not be appropriate to award both lost profits and unjust enrichment in this case as these damages would be duplicative and overlapping. (Deposition of Dr. Mohan Rao ("Rao Dep.") at 131:12-132:6, attached as Ex. 3.)

research related to, actual consumer purchases of Whirlpool's dryers. Instead, Dr. Rao relies solely on two internal Whirlpool forecasts of steam and non-steam dryer sales that were prepared well before Whirlpool's national launch of the relevant dryers, and his guess as to why there was a difference between the two forecasts. Without any support and contrary to the evidence in this case, Dr. Rao simply speculates that the increase in projected steam dryer sales reflected on the later forecast must be attributable to Whirlpool's decision to use the word "steam." Bypassing any scientific analysis, Dr. Rao identifies the percentage increase between the two *forecasts* of Whirlpool sales; he then applies this percentage as a simplistic proxy for the portion of Whirlpool's *actual* steam dryer sales that Whirlpool purportedly made as a result of its use of the word "steam" in its advertising. Dr. Rao concedes in his report that he does not know the reason for the increase in the forecasts; thus, even assuming his "proxy" method for determining actual lost sales is remotely reliable – which it is not – it is without any foundation whatsoever.

More fundamentally, what matters in determining any damages to LG attributable to the alleged false advertising is not what was forecasted to happen, but what, in fact actually did happen. In this regard, Dr. Rao is conspicuously silent. He does not address the fundamental issue here: what effect, if any, did Whirlpool's alleged false advertising have on *actual* sales? He conveniently ignores that Whirlpool's *actual* sales data was significantly lower than the forecasted sales data on which he relies and instead adopts the difference between these forecasts (which include sales that Whirlpool undisputedly never made) to determine a measure of purported *actual* sales that Whirlpool made as a result of its false advertising. Simply put, Dr. Rao's convoluted thinking and methodology lead him to conclude that he can determine the *actual* impact of Whirlpool's alleged false advertising on its *actual* sales by relying not upon Whirlpool's actual sales, but Whirlpool's earlier *forecasts*. This is not a scientifically sound, well-accepted approach.

Dr. Rao compounds his lost profits opinion by ignoring the presence of numerous other competitors he acknowledged are in the steam dryer market. Dr. Rao relies on the unsound assumption that these competitors in the *same* market would have made *none* of the sales Whirlpool made due to its alleged unlawful advertising. This stands as a gaping, inexplicable hole in Dr. Rao's analysis.

Finally, Dr. Rao improperly includes the incremental profit margin of a *non-party* to this lawsuit (LG U.S.A.'s parent corporation, LG Electronics – Korea, which is a separate legal

entity).  He did this – not based on any principle of economics, his purported area of expertise – but because LG's lawyers told him to do it.

Dr. Rao's assumptions and methodology are so completely unreliable that his lost profits opinion should be excluded in its entirety.

**1.     Dr. Rao's "methodology" for establishing lost dryer sales caused by Whirlpool's use of the word "steam" is wholly speculative.**

To support LG's actual damages claim, Dr. Rao must determine that Whirlpool's alleged false advertising – Whirlpool's use of the word "steam" to describe its clothes refreshing technology, as opposed to some other word – actually caused consumers to purchase Whirlpool's dryers instead of LG's.  *See Web Printing Controls Co. v. Oxy-Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir. 1990) (to recover lost profits damages, plaintiff "must demonstrate that it has been damaged by actual consumer reliance on the misleading statements").

Dr. Rao failed, however, to cite, develop or look for any evidence of either Whirlpool's *actual* steam dryer sales or LG's *actual* lost steam dryer sales attributable to Whirlpool's use of the word "steam".  At his deposition, Dr. Rao stated that his lost profits conclusion was based on determining the incremental value that consumers placed on the word "steam" as opposed to some other word.  (Ex. 3, Rao Dep. at 85:16-86:13.)  But Dr. Rao admitted that he did not survey or interview *any* consumers who purchased a Whirlpool steam dryer about their reasons for purchasing the Whirlpool steam dryer instead of the LG steam dryer, or any other competing dryer.  (*See id.* at 78:10-15; 89:21-90:1, 110:10-15.)   And though he claimed that he was trying to determine the extent to which Whirlpool's use of "steam" in its advertising displaced LG sales at the point of sale, (*see id.* at 92:12-93:10; 94:14-95:19, 97:16-23), he also admitted that he did not conduct a point of sale or any other kind of post-purchase survey to determine whether the word "steam" was a material factor in consumers' decisions to purchase the Whirlpool steam dryer over the LG steam dryer.  (*See id.* at 102:5-18, 191:15-23.)  Thus, Dr. Rao did not determine or quantify an "incremental value" to the word steam.  He never found it in the sole source of information cited for his opinion – Whirlpool's pre-launch documents.  (*See id.* at 90:2-91:2.)  Nor did he develop any evidence to support it.[3]

---

[3]   Dr. Rao claims it was appropriate to rely on Whirlpool documents prepared *prior to launch* because these documents report that consumers place some value on a steam feature in and steam benefits from laundry appliances.  (*Id.* at 102:5-18; 107:16-21; 122:4-13.)  But Dr. Rao fails to use any critical analysis

Continued on following page

#### a. Dr. Rao's reliance on a string of unfounded assumptions is patently unsound "methodology".

Given the notable absence of real-world consumer evidence, Dr. Rao points to two Whirlpool sales forecasts, generated over eight months before Whirlpool nationally launched its steam laundry pair in October 2007, as purportedly evidencing Whirlpool's actual sales attributable to its use of the word "steam." (Ex. 2, Rao Supp. Rep at ¶¶ 46-48.) The first forecast, dated December 2006, projected sales in 2008 of ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. (WHR057548-R at 50-51, attached as Ex. 4.) A later forecast, in early 2007 (and notably labeled "Preliminary"), projected sales in 2008 of ████████████ ████████████████████. (WHR003376-R-Two at 89-91, attached as Ex. 5.)[4] ████████ ████████████████████████████████████████████████████████ ████████████. Admittedly without any evidence explaining the increase in Whirlpool's forecasted sales, Dr. Rao simply speculates that the increase is solely due to a purported intervening name change of Whirlpool's steam dryers from "mist" to "steam":

> The forecast documents <u>do not detail the underlying assumptions, nor do they indicate why the volume assumptions have changed</u>. However, one change which does appear to have occurred in this time frame is Whirlpool's decision to change the name of its misting dryer to "steam." As such, this change in forecast <u>may</u> provide an estimate of Whirlpool's expectation of the increase in sales volume as a result of the shift from "Myst" to "Steam."

(Ex. 2, Rao Supp. Rep. at ¶ 47 (emphasis added); Ex.3, Rao Dep. at 160:3-23 (confirming purported name change as sole basis for assumption regarding reason for increase in forecasted sales).)

Because Dr. Rao places such prominent reliance on the increase in projected sales in the later forecast, basic scientific methodology requires some effort to determine the reasons for the

_____

Continued from previous page

or expertise to tie this qualitative research to the quantitative difference in the forecast numbers that, as discussed *infra*, he speculates reflect sales actually attributable to Whirlpool's decision to market its dryers using the "steam" name.

[4] The Whirlpool dryers referred to on the second forecast are not specifically referred to as "steam" dryers, though the WED9600 model numbers are Whirlpool's steam dryer models. Dr. Rao also erroneously describes this forecast as from April 2007; the forecast is actually dated January 23, 2007. (WHR003376-R-Two at 89; *see also* Deposition of Charles Hall at 89:19-90:5, attached as Ex. 6.)

increase, at a minimum, to ensure the opinion rests on clear, ascertainable, and if necessary, testable assumptions. *See Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) (listing many ways that an economist could have applied his expertise and concluding, "[the expert] did none of these things. Instead he examined materials produced in discovery and drew inferences from the record . . . ."). Dr. Rao's only purported investigation was his review of LG's counsel's combative cross-examination of a Whirlpool witness and the witness's repeated testimony that the difference in forecasted sales was ***not*** due to a product name change. Dr. Rao decided to reject the witness's explanation, and did not investigate further, presumably because he did not want to develop additional evidence that would contradict the guess that formed the basis for his opinion.[5]

Despite not knowing the reason for the difference in forecasted sales, Dr. Rao concludes that the difference in ***forecasted*** total unit sales (*i.e.*, steam and non-steam) is *entirely because of* Whirlpool's decision to use the word "steam" in its advertising. He then applies the percentage increase between these forecasts to Whirlpool's ***actual*** steam dryer sales to determine his "proxy" amount of Whirlpool's purported actual sales attributable to the word "steam", and summarily concludes that LG would have made each and every one of the sales represented by this percentage of actual sales had Whirlpool not advertised its dryer as a steam dryer:

> Conversely, this ▮▮▮▮▮▮ increase in expected sales volume is equivalent to an approximately ▮▮▮▮▮▮ decrease in Whirlpool [expected] sales but for its false advertising claims. These sales represent [actual] lost sales to LG during the time period in which LG sold a steam dryer in the U.S.

(Ex 2, Rao Supp. Rep. at ¶ 48 (bracketed text added).) Dr. Rao calculates LG's lost revenue by multiplying this percentage of Whirlpool's actual sales by LG's average selling price. Dr. Rao then applies LG's purported incremental profit margin to these "lost" sales revenues to conclude that LG lost ▮▮▮▮▮▮▮ in profits as a result of Whirlpool's use of the word "steam" in its

---

[5] Contrary to Dr. Rao's guess, the evidence shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

advertising.

Courts repeatedly have excluded damages opinions that, like Dr. Rao's, are predicated on unfounded assumptions. In *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988 (7th Cir. 2002), for example, the plaintiff's expert attempted to calculate damages resulting from the defendant's sale of an illegal cable unscrambling device. In order to calculate those damages, the expert needed an estimate of how many pay-per-view events were watched by people using the unscrambling devices. The expert's estimate, however, was "based on nothing more than guesswork and [the expert]'s own viewing habits", rather than any actual evidence about how often people using the unscrambling device purchased pay-per-view events. *Id.* at 995. As a result, the Seventh Circuit reversed the district court's damages award, holding that:

> While we have no problem with the basic premise that uncertainties as to damages should be resolved against the wrongdoer, this does not give an injured party carte blanche to provide wild guesses at its damages. A reasonable estimate as to pay-per-view usage must be grounded in some record evidence, not numbers pulled from thin air. Indeed, the very calculations [the expert] made were rejected as "rank speculation" in a similar case in another court. On remand, Cablevision must tie its estimates to real-world figures of customer usage if it wishes any such damages award to be upheld.

*Id.* (internal citations omitted); *see also Kay v. First Cont'l Trading, Inc.*, 976 F. Supp. 772, 776 (N.D. Ill. 1997) ("What [plaintiff's damages expert] has done is to present his own speculative numbers without having tempered them in any way to account for their 'iffy' nature. Those deficiencies involve a fundamental flaw that causes the overall [expert] opinion to be the Rule 702 equivalent of what in early computer vocabulary bore the label 'GIGO' ('garbage in, garbage out')."). Here, Dr. Rao's "rank speculation" as to the reasons for the difference in the two forecasts — a change in the name of steam dryers from "mist" to "steam" — along with his complete lack of "real-world figures", *e.g.*, actual evidence that customers purchased the dryers *because of* the word "steam", warrant exclusion of his lost profits opinion.

Dr. Rao's entire lost profits on lost sales calculation rests on his unsupported assumptions that the difference between the two early, internal forecasts reflects Whirlpool's *expected* sales attributable to the "steam" name and that this percentage is a colorable proxy for Whirlpool's *actual* sales purportedly attributable to the word "steam". But "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*,

522 U.S. 136, 146 (1997); *see also Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992) ("people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence" and experts must use reliable methodologies rather than "simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of expert knowledge"); *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 933 (7th Cir. 2003) (admonishing "the bench and bar of this circuit that proof of damages requires—proof").

Moreover, it is well-settled that "[i]n determining reliability, *Daubert* also sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Here, neither Dr. Rao nor LG offers any evidence that Dr. Rao's method of calculating lost profits has been subject to peer review or testing. Similarly, they offer no evidence that Dr. Rao's methodology—comparing two untested forecasts that were wrong and assuming that the difference in the ***forecasted*** sales amounts translates into the percentage of ***actual*** sales Whirlpool made due to the alleged false advertising—is generally accepted in the scientific community.

In sum, Dr. Rao fails to provide any evidence of the impact of the allegedly false advertising on Whirlpool's sales – he relies on no evidence of consumers' actual purchase decisions and the effect, if any, of Whirlpool's advertising on those decisions. Dr. Rao's speculation as to any internal value that *Whirlpool* placed on the word "steam" long before it launched its dryers is no substitute for actual evidence of *consumers'* value of the term and the impact that term had on consumers' actual purchasing decisions. In other words, Dr. Rao completely fails to identify actual damages to LG "by actual consumer reliance on the [alleged] misleading statements." *See Web Printing Controls Co.*, 906 F.2d at 1205. Therefore, his lost profits opinion should be excluded.

> **b.      Dr. Rao did not reconcile the evidence of lower actual sales, thus artificially increasing his "proxy" for actual sales.**

Dr. Rao's "proxy" methodology is unsound for the additional reason that he inexplicably adopts Whirlpool's forecasted sales as reliable even though these forecasts were at odds with Whirlpool's actual, "real-world" sales data. Dr. Rao appears to concede at his deposition that

real-world data generally is better than projected data in calculating damages (Ex. 3, Rao Dep. at 137:20-38:2), but here, he failed to consider Whirlpool's actual sales data in determining the percentage of Whirlpool's "actual" sales purportedly attributable to the word "steam". Indeed, while the 2007 forecast projected dryer sales of ▮▮▮▮▮▮ in 2008 (Ex. 5 at WHR03390-R-Two), Whirlpool *actually* sold *less* than the forecasted amount – approximately ▮▮▮▮▮▮ – during that year. (Declaration of Raymond S. Sims, "Sims Decl." at ¶ 6, attached as Ex. 7.) Thus, even if Dr. Rao's "proxy" premise were correct, by using the 2008 forecast instead of Whirlpool's actual sales data as the upper limit in determining his proxy of steam dryer sales attributable to the word "steam", he nearly doubles his proxy percentage – from about ▮▮ (using actual sales data) to the ▮▮▮ "proxy" he uses in his calculation of Whirlpool's sales attributable to the word "steam." (Ex. 7, Sims Decl. at ¶ 7.) Dr. Rao offers no cogent explanation as to why he did not use Whirlpool's *actual* 2008 sales data in lieu of the 2007 *forecasted* sales. It goes without saying that if Whirlpool did not achieve its forecasted sales, LG could not have lost those sales to Whirlpool.

Moreover, Dr. Rao continues to apply this over-stated percentage of sales purportedly attributable to Whirlpool's use of the word "steam" – calculated from internal projections for *2008* – to his calculations for *2009* sales. (*See* Ex. 2, Rao Supp. Rep. at Tab 8 (applying percentage to 2009 data).) Dr. Rao fails to investigate or explain why this assumed percentage of dryer sales attributable to the use of the word "steam" would remain the same in subsequent years after the dryers entered the market and faced increased competition from other steam dryer manufacturers.

Dr. Rao's reliance on 2008 forecasts that are demonstrably at odds with Whirlpool's 2008 real-world sales also undermines his lost profits damages opinions. As he acknowledges, the forecasts "*do not detail the underlying assumptions*." (*Id.* at ¶ 47) (emphasis added). But as discussed above, rather than investigate the assumptions underlying the data or conduct any independent testing to verify whether they could support his "proxy" theory, Dr. Rao instead merely assumed that they were an appropriate source of data for his calculations and opinion about actual losses suffered by his client, LG. (Ex. 3, Rao Dep. at 160:3-163:7.) Instead of assuming that these forecasts were appropriate to use, Dr. Rao should have dismissed them as inaccurate. *Cf. CSC Holdings*, 309 F.3d at 995 (cautioning that plaintiff "must tie its estimates to real-world figures of customer usage if it wishes any such damages award to be upheld").

This type of untested reliance on projected sales data does not reflect any well-accepted, scientific method for using forecasted data and has been soundly rejected by other courts. In *Otis v. Doctor's Assoc., Inc.*, a fast food company hired the plaintiff to act as its agent, selling franchise locations in Chicago. No. 94 C 4227, 1998 WL 673595, at *1-2 (N.D. Ill. Sept. 14, 1998). After the fast food company failed, plaintiff sued, claiming that the company had misrepresented the established nature of the franchise. Like Dr. Rao, the plaintiff's damages expert relied on defendant's sales estimates and projections, set forth in the agent agreement, to calculate plaintiff's lost profits. *Id.* The court rejected the expert's opinion because, like Dr. Rao, the expert did not perform "any independent analysis of the reliability or factual accuracy of the figures used in [the agent agreement]." *Id.* at *4. "Nor did [the expert] perform any comparative analysis . . . against actual results. . . ." *Id.* at *1. Accordingly, the court found that the plaintiff "failed to show that [the expert]'s lost profit calculations are based on 'scientific knowledge' as Rule 702 requires. Most importantly, [the plaintiff] has made no showing that the formula and projected values [the expert] relied on is accurate or has been tested for accuracy. . . ." *Id.* at *4. Given Dr. Rao's concession that he has no information about the underlying assumptions behind the projections, his failure to confirm their reasonableness, and the fact that Whirlpool's sales forecasts were wrong, there is no evidence that his lost profits methodology "is anything more than an exercise in arithmetic based on inherently unreliable values." *Id.*

### 2. Dr. Rao improperly assumes that LG would have made all the sales purportedly attributable to the false advertising.

Compounding his flawed quantification of Whirlpool's sales purportedly attributable to its use of the word "steam", Dr. Rao improperly assumes that LG would have made *each and every one* of Whirlpool's sales allegedly "caused" by Whirlpool's use of the word "steam" in its advertising, notwithstanding the presence of numerous other competitors in the steam dryer market. (Ex. 2, Rao Supp. Rep. at Tab 8.) The Seventh Circuit has held that expert damages reports "that fail to correct for salient factors, not attributable to the defendant's misconduct that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment" and "are worthless." *Blue Cross and Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (affirming denial of damages in antitrust case due to failure of plaintiff's damages experts' statistical studies to attribute difference between defendant health clinic's prices and the prices of other clinics to anything other than improper market

division agreement; experts did not consider relevant factors like market share or quality of service).

Here, though Dr. Rao acknowledges ████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████, (Ex. 2, Rao Supp. Rep. at ¶ 19; Ex. 3, Rao Dep. at 142), he fails to account for sales that would have been made by any of these competitors. (Ex. 7, Sims Decl. at ¶¶ 8-9.) Dr. Rao justifies his intentional disregard of these competitors on the ground that LG's lawyers told him that these companies, too, engage in false advertising. (Ex. 2, Rao Supp. Rep. at ¶ 19; Ex. 3, Rao Dep. at 150:16-151:6.) But Dr. Rao – and LG – is wrong on that point. As LG knows, at least one of the many competitors in the steam dryer segment uses the same or similar steam technology as LG. (Docket Entry No. 280, LR 56.1(B) Statement of Material Facts in Opp'n to Whirlpool's Mot. for Summ. J. at ¶ 52 ████████████████████████████████████
████████████████████████.) And as Dr. Rao concedes, he did not bother to do his own investigation in that regard. (Ex. 3, Rao Dep. at 142:2-144:1) (noting his reliance on counsel). Moreover, as noted above, Dr. Rao makes no effort to update his estimate that ████ of Whirlpool's actual sales are attributable to its use of the word "steam" (based on a comparison of *2008* sales forecasts), notwithstanding the entry of other competitors into the steam dryer market after the original forecasts were created (indeed, Dr. Rao has applied this same percentage to 2009 sales as well). (*See* Ex. 2, Rao Supp. Rep. at Tab 8.)

Dr. Rao's failure to consider the presence of any other competitor who sells steam dryers dooms his opinion. *Cf. Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030-31 (D. Kan. 2006) (citing *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992), and excluding plaintiff's damages expert's lost profits opinion where, among other things, record was "devoid of evidence that a reasonable economist would assume that … increased competition did not impact plaintiff's sales during the relevant period"); *Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F. Supp. 2d 247, 250 (D. Conn. 2002) (finding plaintiff failed to establish lost profits attributable to defendant's copyright infringement where plaintiff offered no evidence addressing the impact of other competitors on plaintiff's sales).[6]

---

[6] Another "salient factor" that Dr. Rao ignores is the fact that Whirlpool and LG do not sell steam dryers through the same retailers. ████████████████████████████████████████████

Continued on following page

### 3. Dr. Rao's use of a non-party's incremental profit margin to bolster LG's lost profits renders his opinion unreliable and inadmissible.

After applying his "proxy" percentage to Whirlpool's actual dryer sales and claiming all of these sales as LG lost sales, Dr. Rao applies LG's average sales price for its steam dryers to these lost sales to determine LG's purported lost revenues. He then applies LG's purported incremental profit margin to these lost revenues to determine LG's purported lost profits attributable to the false advertising. But Dr. Rao greatly overstates LG's purported incremental profit margin. Rather than just apply LG's incremental profit margin (which he calculated as ████ (Ex. 2, Rao Supp. Rep. at Tab 7)) to the alleged lost sales, Dr. Rao inexplicably adds the incremental profit margin of a non-party, its parent company, LG Electronics – Korea, which is a separate legal entity. LG's inclusion of its parent company's purported incremental profit margin results in a four-fold increase in LG's purported profit margin: from ████ to approximately ████. (Ex. 2, Rao Supp. Rep. at ¶ 48 & Tab 7.) Dr. Rao offers no explanation as to why the proper measure of damages to LG U.S.A.—the plaintiff in this case—should include the profit margin of a non-party to this litigation. He testified in his deposition that he included the profit margin of LG Electronics -- Korea because he was told by LG's counsel to do so. (Ex. 3, Rao Dep. at 214:16-215:18.) In other words, Dr. Rao's opinion is not based on any sort of accepted analytic framework explaining why LG Electronics – Korea's incremental profit is an appropriate amount to include in the determination of LG U.S.A.'s purported lost profits damages; it is based only on LG's attorneys' say so.

Courts have rejected similar attempts by plaintiffs to recover the lost profits from a related corporate entity. *Cf. Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) (rejecting plaintiff patent holder's claim to lost sales of a sister corporation (the licensee) in a patent infringement case, noting that the two companies "are not simply divisions

---

Continued from previous page



Dr. Rao's failure to consider channels of distribution in his analysis overstates his lost profits calculation and further demonstrates the lack of reliability of his opinion.

of a single corporation, but are separate corporate entities" and that because the "corporate identities and functions . . . suit its own goals and purposes . . . it must take the benefits with the burdens"). While LG Electronics – Korea may manufacture the appliances in question, it is a separate corporate entity that chose not to participate in this litigation. LG cannot avoid the consequences of this decision. Dr. Rao's attempts to include lost profits damages based on LG Electronics – Korea's incremental margins should be rejected.

**C.     Dr. Rao's Price Erosion Analysis Is Fundamentally Unsound And Therefore Inadmissible.**

Dr. Rao's price erosion opinion is based on nothing more than a conversation with a single LG employee who allegedly told Dr. Rao that LG hoped to charge a certain premium on its steam dryers over its non-steam dryers. Based on this conversation, Dr. Rao opines that LG is entitled to over ▮▮▮▮▮▮▮▮ in lost profits. But Dr. Rao's failure to consider the effect of LG's purported desired premium on market demand, or to analyze any market factors that could have influenced LG's prices, and his startling contentions that LG's steam dryer customers are, in fact, *not* price sensitive, doom his price erosion opinion as a matter of law.

In order to establish price erosion, a plaintiff must show that "but for" the wrongful conduct, "it would have been able to charge and receive a higher price." *Tel-Lock, Inc. v Thomson Consumer Elecs.,* No. 03 C 320, 2005 WL 741930, at *10 (N.D. Ill. March 30, 2005) (granting summary judgment dismissing price erosion damages claim). "To show 'but for' causation and entitlement to lost profits the [plaintiff] must reconstruct the market to show, hypothetically, 'likely outcomes with [the wrongful conduct] factored out of the economic picture.'" *Tel-Lock,* 2005 WL 741930, at *10 (citing *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l. Inc.,* 246 F.3d 1336, 1355 (Fed.Cir. 2001)). "Although hypothetical, this market reconstruction requires 'sound economic proof of the nature of the market.'" *Id.* In "addition, the [plaintiff's] theory of price erosion 'must account for the nature, or definition, of the market, similarities between any benchmark market and the market in which price erosion is alleged, and the effect of the hypothetically increased price on the likely number of sales at that price in the market.'" *Id.*

In contrast with the detailed analysis and "sound economic proof" required by the law, Dr. Rao's entire price erosion analysis is based on a conversation he had with a single LG employee who told him that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 2, Rao Supp. Rep. at ¶ 55.) With this untested factual assertion as

- 14 -

his predicate, Dr. Rao calculated the premium by using the difference between LG's steam and non-steam washer prices, and determining how much less of this premium LG charged for its steam dryers – ███. (*Id.* at ¶ 56.) Dr. Rao then multiplied the ███ figure by LG's actual sales of all of its steam dryers. Dr. Rao's failure to perform any market analysis or consider anything beyond the aspirations of a single LG employee in performing these calculations renders his price erosion opinion inadmissible for the following reasons.

*First*, Dr. Rao's sole reliance on a conversation with an LG employee as the basis for his price erosion opinion falls far outside the bounds of any acceptable scientific methodology. Dr. Rao did not consider the information provided by the LG employee – ███████████ ███████████████████████ – as part of an independent review of facts supporting his price erosion opinion. Instead, he essentially offered the opinion of that LG employee as his own. *See King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685, *2 (S.D. Ind. Sept. 29, 2009) ("[w]hen an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded", and further, that "when an expert relies upon information given to him by a party or counsel, he must independently verify that information before utilizing it in his calculations") (citations omitted); *Black and Decker v. Bosch Tools*, No. 04 C 7955, 2006 WL 5156873, at *1-2 (N.D. Ill. Sept. 8, 2006) (St. Eve, J.) (Rule 703 "does not 'allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'"); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 807-08 (N.D. Ill. 2005) (excluding damages expert's opinions where calculation of loss was based on assumptions about productivity gleaned from "unquestioning reliance" on defendant's employees). Here, Dr. Rao's unquestioning reliance on LG's employee dooms his price erosion opinion.

*Second*, Dr. Rao failed to analyze the effect of this price premium on consumer demand for LG's dryers. As Dr. Rao acknowledges, the Law of Demand states that, all else being equal, as the price of a good increases, consumer demand for that good will decrease. (*See* Ex. 3, Rao Dep. at 221:11-18; Ex. 7, Sims Decl. ¶ 11.) Yet Dr. Rao fails to account for "'the effect of the hypothetically increased price on the likely number of sales at that price in the market.'" *Tel-Lock*, 2005 WL 741930, at *10 (citation omitted); *see also Crystal Semiconductor Corp., 246 F.3d at 1359-60 (affirming judgment as a matter of law denying price erosion damages because

expert failed to consider effect of increased price on demand). Dr. Rao must account for the price elasticity of demand, a metric representing the amount of sales a manufacturer could expect to *lose* for a given price increase. Dr. Rao, however, fails to even mention the price elasticity of demand, let alone analyze it. In so doing, Dr. Rao ignores evidence from LG's own marketing executive who testified that ████████████████████████████████████ ████████████████████████████ (02/06/09 Deposition of Tim Kavanaugh ("02/06/09 Kavanaugh Dep.") at 182:5-13, attached as Ex. 8; *see also* 05/14/09 Deposition of Tim Kavanaugh ("5/14/09 Kavanaugh Dep.") at 136:22-137:12, attached as Ex. 9 ██████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████; *see also* Ex. 7, Sims Decl. ¶ 12.) Moreover, although Dr. Rao concedes elsewhere in his report that "the housing crisis and the economic downturn are likely to have a significant adverse effect on the laundry market" (Ex. 2, Rao Supp. Rep. at n.11), he fails to analyze – or even consider – the effect of the economic crisis on the price consumers might have been willing to pay for LG steam dryers.

At his deposition, Dr. Rao attempted to excuse this failure, positing that consumers of high-end laundry appliances are more concerned with features as opposed to price, and as a result, the higher price would not have impacted LG's sales. (Ex. 3, Rao Dep. at 222:6-224:6; 227:5-228:22.) Dr. Rao's testimony is not only at odds with LG's own marketing executive's testimony (referenced above), but his admissions in this regard contradict his entire price erosion theory. Simply put, if consumers for high-end steam dryers, like LG's, are not price-sensitive, then LG could have charged its full premium regardless of whether Whirlpool was falsely advertising or not. That LG apparently did not feel it could raise its prices with Whirlpool in the market (the gist of any price erosion theory) indicates that LG's customers are price sensitive. But Dr. Rao fails to account for this price sensitivity in his damages analysis. Dr. Rao cannot have it both ways.

*Third*, Dr. Rao never reconstructs the market as appropriate under the law. He fails to determine whether a price difference actually existed between comparable models of the LG and Whirlpool steam dryers, or whether any price difference that may have existed was due to the alleged false advertising rather than other unrelated features or functions of the dryers. Whirlpool, in fact, priced some of its steam dryers higher than LG's, and as such, LG could have

raised its prices.  (Ex. 7, Sims Decl. at ¶ 14.)  Dr. Rao also did not examine whether LG could have raised its prices, even in the absence of Whirlpool's alleged false advertising, in a highly competitive market.  For example, he fails to consider whether the existence of other competitors ███████████████████ which offered comparable steam dryers at price points significantly below LG's would have independently prevented LG from significantly raising its prices.  (Ex. 2, Rao Supp. Ex. at ¶¶ 50-57; Ex. 7, Sims Decl at ¶ 13.)  Moreover, he ignores the fact that even absent the alleged false advertising, Whirlpool still would have been in the market selling its dryers, which have substantially similar features and functionality as LG's.  Dr. Rao offers no support for his assumption that consumers are willing to pay this premium – or any premium at all – because LG's dryer is named "steam" rather than something else.

For these reasons, Dr. Rao's price erosion claim is simply too speculative and unreliable to be presented to the jury.

### D. Dr. Rao's Opinions Related To Sales Of Steam Washers Are Flawed And Therefore Inadmissible.

Though LG has not alleged that Whirlpool's steam *washer* advertising is false, Dr. Rao nevertheless claims that LG is entitled to over ████████ in lost profits from lost steam washer sales.  He does this by using the same flawed calculation of lost dryer sales purportedly attributable to Whirlpool's use of the word "steam" in its advertising.  He then calculates an "attachment rate" (or correlation between washer and dryer sales) of ████ and applies this ████ figure to the purported lost steam dryer sales to arrive at the number of steam washers he believes LG would have sold but for Whirlpool's use of the word "steam" in its steam *dryer* advertising.  Dr. Rao's opinion is unreliable and inadmissible for the following reasons.

*First*, it is premised on his flawed calculation of Whirlpool's steam dryer sales that are purportedly attributable to Whirlpool's use of the word "steam" in its advertising.  *See supra* Section III.B.1.

*Second*, Dr. Rao's idea to claim lost profits on steam *washers* is premised on his assumption that "steam dryer sales also drive [or cause] sales of washers", (Ex. 2, Rao Supp. Rep. at ¶ 58 & Tab 12), an assumption that Dr. Rao did not attempt to test himself, (*see* Ex. 3, Rao Dep. at 183:5-184:1), and indeed, is contrary to the testimony of LG's own senior marketing executives who testified that ████████████████████████████████ ████. (Ex. 8, 02/06/09 Kavanaugh Dep. at 169:25-171:7; Deposition Transcript of John Weinstock at 41:10-16, attached as Ex. 10.)  In addition, ████████████████████ (Ex.

8, 02/06/09 Kavanaugh Dep. at 171:12-25), undermining Dr. Rao's assumption that dryers drive washer sales. If steam dryer sales drove steam washer sales, one would expect there to be more dryer sales than washer sales. Absent any actual evidence that steam dryer sales purportedly caused by Whirlpool's false advertising caused steam washer sales (and not the other way around), Dr. Rao cannot establish that "but for" Whirlpool's purported false steam *dryer* advertising, LG would have made additional steam *washer* sales.

Dr. Rao's opinion is similar to the opinion rejected in *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923 (7th Cir. 2003). In *Bucklew*, a copyright infringement case involving a computerized form used for completing federal grant applications, the plaintiff advanced a similar "one stop shopping" damages theory, claiming that the infringing form attracted customers who ultimately purchased another, non-infringing product (a financial software package) sold by the defendant and therefore the plaintiff was entitled to a portion of the defendant's profits from the software package. *Id.* at 933. The plaintiff supported this theory by pointing to the testimony of one of defendant's employees, who testified that the infringing forms would "help" with the sale of non-accused product, and its expert's opinion that 10% of the sales of the non-infringing software package were caused by the sale of the infringing form purchased at the same time. *Id.* The Seventh Circuit held that this evidence was too speculative to sustain an award for these damages, noting that "no evidence was presented that would have enabled the market value of this 'help' to be gauged" and that "[t]he testimony by an expert witness for the plaintiff that 10 percent of the profits on [defendant's non-infringing software] were due to the buyers' being able to buy the infringing forms from [defendant] had no factual basis whatsoever." *Id.* As in *Bucklew*, Dr. Rao's opinion that LG is entitled to damages or profits related to steam washer sales is without any factual basis.

*Third*, Dr. Rao applies to his steam washer lost profits opinion the same erroneous incremental profit margin that includes the alleged incremental profit of LG's parent company. (*See* Ex. 2, Rao Supp. Rep. at ¶ 48 & Tab 7; *see also supra* Section III.B.3.)

In short, Dr. Rao's lost profits opinion related to steam washers is not reliable and should be excluded.

### E. Dr. Rao's Unjust Enrichment Opinions Are Inadmissible Because They Suffer Similar Methodological Flaws As His Lost Profits Opinions.

As an alternative to LG's lost profits, Dr. Rao offers opinions attempting to calculate the steam dryer and steam washer profits Whirlpool received based on its use of the word "steam" in

its advertising. Specifically, Dr. Rao opines that LG is entitled, under a theory of unjust enrichment, to (a) Whirlpool's profits from the sale of its steam dryers in the amount of ███ ███, and (b) Whirlpool's profits from the sale of steam washers in the amount of ███ ███. (*See* Ex. 2, Rao Supp. Rep. at p. 5 & Tabs 14 & 15.) Like his lost profits opinions discussed above, Dr. Rao's unjust enrichment opinions are unreliable and should be excluded from evidence for at least the following reasons:

*First,* they are premised on his flawed calculation of Whirlpool's steam dryer sales that are purportedly attributable to Whirlpool's use of the word "steam" in its advertising. *See supra* Section III.B.1.

*Second*, his steam washer unjust enrichment opinion is based on his flawed assumption that steam dryer sales drive steam washer sales. *See supra* Section III.D.

*Third*, Dr. Rao chooses to ignore facts that undermine or reduce his estimate of Whirlpool's profits from sales of its steam washers. Dr. Rao's calculation of Whirlpool's steam washer profits assumes that ███ of the time Whirlpool sold a steam dryer, it also sold a matching steam washer. (*See* Ex. 2, Rao Supp. Rep. at ¶ 63.) But Dr. Rao's opinion fails to account for that fact that two of the three Whirlpool steam dryers at issue in this lawsuit – specifically, the Cabrio® and Maytag® Bravos® dryers – did not have a matching steam washer. (*See* Ex. 1, Rao. Rep. at 16 n.64) (acknowledging no Cabrio® steam washer). Indeed, these dryers accounted for ███████ of Whirlpool's steam dryer sales (through September 2008). (Ex. 7, Sims Decl. at ¶ 15.) Without a matching steam washer for these dryers, Dr. Rao grossly overstates the Whirlpool's steam washer profits to which he lays claim. Dr. Rao once again selectively disregards facts that reduce or undermine his opinions. *Cf. LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979, *4 (N.D. Ill. April 28, 2005) (excluding opinion where expert ignored relevant data because it "amounts to cherry-pick[ing] the facts he considered to render his opinion, and such selective use of facts fail[s] to satisfy the scientific method and *Daubert*" and "undermines the reliability of [the expert's] entire opinion") (internal quotation and citation omitted).

For the above reasons, Dr. Rao's unjust enrichment opinions related to Whirlpool's

profits from steam dryers and steam washers should be excluded.[7]

## IV.   <u>CONCLUSION</u>

The substantial methodological flaws and speculative assumptions upon which Dr. Rao bases his opinions mandate exclusion of Dr. Rao's report and opinions from presentment at trial pursuant to Rules 702, 402 and 403.

Dated: April 6, 2010

<div style="margin-left:40%;">

Respectfully submitted,

WHIRLPOOL CORPORATION,
Defendant.

By:    <u>/s/ Brian D. Roche</u>
       One of its Attorneys

Brian D. Roche
Jennifer Y. DePriest
Vanessa Martí Heftman
REED SMITH LLP
10 South Wacker Drive, Suite 4000
Chicago, Illinois 60606
312.207.1000

J.A. Cragwall, Jr.
John J. Bursch
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, N.W.
Grand Rapids, Michigan 49503-2487
616.752.2000

Attorneys for Defendant, Whirlpool Corporation

</div>

---

[7] Dr. Rao has submitted a separate, three-page "supplemental" report, in which he calculates Whirlpool's advertising spending related to its steam dryers, based on media schedules and planned expenditures produced during discovery. (*See* July 6, 2009 Expert Report of Mohan Rao, Ph.D., attached as Ex. 11.) Dr. Rao provides no explanation or opinion related to this calculation, other than to say he was "asked by counsel for LG" to do it. (*See id.* ¶ 2.) Presumably he made this calculation in response to a criticism by Whirlpool's damages expert that Dr. Rao glaringly failed to deduct Whirlpool's advertising costs (that resulted in the alleged false advertising in the first place) from his calculation of Whirlpool's profits attributable to the purported false advertising. Should Dr. Rao's lost profits and unjust enrichment opinions be excluded, this "opinion" and related testimony should be excluded as well.

## CERTIFICATE OF SERVICE

I, Jennifer Yule DePriest, an attorney, hereby certify that on April 6, 2010, I filed **WHIRLPOOL CORPORATION'S MOTION TO EXCLUDE THE EXPERT REPORT, TESTIMONY AND OPINIONS OF MOHAN RAO, PH.D.** with the Clerk of the Court using the ECF system, which will send notification of such filings to the following individuals. In addition, the foregoing document was served on the following individuals by email:

> Ronald Y. Rothstein
> rrothstein@winston.com
> Eric L. Broxterman
> ebroxterman@winston.com
> Bryna Joyce Roth Dahlin
> bdahlin@winston.com
> Winston & Strawn LLP
> 35 West Wacker Drive
> Chicago, IL  60601

*/s/ Jennifer Yule DePriest*_____