**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 242 |
| v. | ) | |
| | ) | |
| WHIRLPOOL CORPORATION, | **)** | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Whirlpool Corporation ("Whirlpool") has moved to exclude (i) the expert testimony and opinions of Plaintiff LG Electronics U.S.A., Inc.'s ("LG") damages expert, Mohan Rao, Ph.D., and (ii) portions of the rebuttal expert report and a video expert report of LG's marketing expert, Dr. Yoram (Jerry) Wind. For the reasons discussed below, the Court (i) denies Whirlpool's motion to exclude Dr. Rao's testimony and opinions, and (ii) grants in part, denies in part, and denies in part as moot Whirlpool's motion to exclude Dr. Wind's testimony and opinions.

## BACKGROUND

LG sued Whirlpool for false advertising in violation of Section 43(a) the Lanham Act, 15 U.S.C. § 1125(a), regarding its steam dryers. LG asserts both literal and implied falsity theories under the Lanham Act. The focus of LG's claim is that Whirlpool uses the word "steam" in its advertisements and in the name of its Duet® Steam Dryer, and that such use is literally false and misleading because the Duet® Steam Dryer does not truly use steam, but instead uses a mist of

cold water sprayed into a warm dryer drum. Trial is scheduled to commence in this case on October 4, 2010.

## LEGAL STANDARD

In anticipation of trial, Whirlpool challenges the admissibility of Dr. Rao's expert opinions and testimony pursuant to Rules 402, 403 and 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and Dr. Wind's expert opinions and testimony pursuant to Rule702 and *Daubert*. Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of opinion or otherwise." Fed. R. Evid. 702. Rule 702 "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 824 (7th Cir. 2010). It requires that the district court serve as a "'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741-42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)). The purpose of the court's gate-keeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

In assessing whether an expert's testimony is reliable, *Daubert* lists a number of considerations — including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Supreme Court, however, has clearly stated that "the test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141, 119 S. Ct. 1167 (internal quotation omitted). This is especially true when the expert's opinions are non-scientific in nature and do not follow traditional scientific testing. "[T]he test for reliability for nonscientific experts is 'flexible' and . . . *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (quoting *Kumho Tire*, 536 U.S. at 141.) "Rather the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kuhmo Tire*, 536 U.S. at 142 (emphasis in original).

In addition, the 2000 Advisory Committee's Notes to Rule 702 suggest additional criteria for gauging expert reliability, including whether: (1) "maintenance standards and controls" exist; (2) the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (3) "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (4) "the expert has adequately accounted for obvious alternative explanations"; (5) "the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (6) "the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005) (citations omitted), *vacated in part on other grounds*, 448 F.3d 936

(7th Cir. 2000) (quoting Fed. R. Evid. 702 advisory committee's note (2000)).  *See also American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010).  "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence.  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

An expert may be qualified to render opinions based on experience alone.  "In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony."  Advisory Committee Notes to Rule 702.  The Seventh Circuit has repeatedly stated that "genuine expertise may be based on experience or training."  *United States v. Conn.,* 297 F.3d 548, 556 (7th Cir. 2002), quoting *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir. 1996).  "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."  *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc*., 493 F.3d 782, 787-88 (7th Cir. 2007) (citations and quotations omitted).  As such, courts "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).

## ANALYSIS

### I.     Dr. Rao

Whirlpool seeks to exclude Dr. Rao's opinions in their entirety because they are

4

unreliable.  LG claims that all of Whirlpool's arguments go to the weight of Dr. Rao's testimony, not its admissibility.  The Court held a *Daubert* hearing on June 28, 2010 and July 8, 2010. During the hearing, Dr. Rao testified for approximately a day and a half.  For the following reasons, the Court denies Whirlpool's motion to exclude the testimony and opinions of Dr. Rao.

### A.      Dr. Rao and His Opinions

Dr. Rao has a B.S. in engineering from the University of Michigan, a pre-doctoral fellowship from Harvard University, and a Ph.D. from the University of Colorado.  He currently is an adjunct professor in the Department of Industrial Engineering and Management Sciences at the McCormick School of Engineering and Applied Sciences at Northwestern University where he teaches finance.  Dr. Rao is also the Managing Director at LECG.  He is a member of the American Economic Association, the Licensing Executives Society, and the IEEE.  In addition, Dr. Rao served as the chair of the Valuation and Taxation Committee of the Licensing Executives Society, a professional organization for intellectual property valuation and transactions.  He also teaches courses in intellectual property valuation to executives at LES.

Dr. Rao is the author of a chapter on econometrics in the context of damages analysis in the Litigation Services handbook.  Dr. Rao specializes in intellectual property and antitrust economics.  He previously has testified as an expert in more than thirty cases, including approximately six false advertising cases in which he has testified as a damages expert.

Winston & Strawn, counsel for LG, retained Dr. Rao to "evaluate certain economic and financial issues in this litigation related to LG's claims against Whirlpool."  (Supplemental Expert Report of Mohan Rao, Ph.D. ("Rao Report") at 2.)  In essence, Dr. Rao is a damages expert.   Dr. Rao states in his Report that: "LG lost sales and, in turn, profits as a result of

Whirlpool's false and misleading claims regarding its steam dryers." (*Id.* at 4.) As of March 2009, Dr. Rao opines that LG has lost a total of approximately $33.3 million in profits as a result of Whirlpool's false advertising of its steam dryers, broken down as follows:

    *      Lost profits of approximately $10.8 million for lost sales of LG steam dryers and $10.4 million for lost sales of LG steam washers between December 2007 and March 2009; and

    *      Lost profits of approximately $12.1 million due to price erosion on LG steam dryers during the same period.

(*Id.* at 4.) He further opines that Whirlpool has gained approximately $25.4 million in profits as a result of its false and misleading advertising of steam dryers during this same time period. (*Id.* at 5.) According to Dr. Rao, Whirlpool's profits as a result of its conduct on its sales of steam dryers is $12.9 million and on its sales of steam washers is $12.5 million.

In total, Dr. Rao opined that, as a result of Whirlpool's false and misleading claims, LG's lost profits are approximately $33.3 million and Whirlpool's gains are approximately $25.4 million.

### B. Whirlpool's Challenges

Whirlpool raises seven separate challenges to the admissibility of Dr. Rao's opinions. Specifically, Whirlpool contends that his opinions are inadmissible on the grounds that Dr. Rao: 1) wrongly assumes causation; 2) improperly relies on pre-launch estimates of sales rather than actual sales figures; 3) ignores the presence of other competitors and excludes them from his damages analysis; 4) improperly includes profits of LG's Korean parent company in his analysis; 5) fails to consider price erosion; 6) ignores price sensitivity; and 7) improperly includes the sale

of washers in his analysis.  The Court will address each argument in turn.

1.      **Causation Between the Allegedly False Advertisements and LG's Damages**

Whirlpool first argues that Dr. Rao's testimony is inadmissible because he simply assumes causation between the allegedly false advertisements at issue and Whirlpool's sales and LG's lost sales.  It contends that Dr. Rao fails to determine whether any causal link exists between Whirlpool's false advertising and LG's lost profits.  Dr. Rao, however, has demonstrated that his methodology is reliable.

In reaching his conclusions, Dr. Rao relied on several Whirlpool documents that show that consumers' preference for steam is a key driver of sales of Whirlpool's dryers.  During the *Daubert* hearing, Dr. Rao explained the basis for this opinion by citing to a variety of internal Whirlpool surveys and reports.  The Whirlpool documents reveal that Whirlpool sales associates believed that steam was a key driver of sales for LG and that Whirlpool sought to place a steam dryer in the market prior to LG.  Dr. Rao also relied on Whirlpool documents that show that Whirlpool recognized a distinction between steam and mist, and that consumers recognized a distinction between hot steam and cold vapor.  He also considered Whirlpool surveys demonstrating that consumers prefer steam dryers to steam washers by a 2 to 1 margin, and steam washers to misting dryers by a 2 to 1 margin.  (Rao Report at ¶ 15.)  After determining that consumers prefer steam and that they can distinguish between steam and mist, Dr. Rao also opined, again based on Whirlpool documents, that Whirlpool gained market share and LG lost market share when Whirlpool began selling its steam dryer.  Accordingly, Dr. Rao opined that he established a causal link between Whirlpool's false advertising and the damages sustained by LG.

Whirlpool levels several criticisms at Dr. Rao's methodology. Whirlpool first argues that Dr. Rao is offering an opinion -- that Whirlpool believed that its decision to change its dryer name from mist to steam would result in a marked increase in sales -- based on his interpretation of Whirlpool's internal documents which are unrelated to actual sales. Whirlpool contends that the Court should strike Dr. Rao's opinions because he failed to address evidence related to Whirlpool's actual steam dryer sales and to conduct his own surveys regarding the value that consumers placed on the word "steam." Dr. Rao, however, testified that surveys after-the-fact of sales would not assist in his causation analysis because the point of sale is the relevant time period for evaluating the consumer's purchase preferences. Dr. Rao also explained that he did not need to conduct such studies because Whirlpool had already conducted studies that evaluated consumer preference for steam.

Whirlpool further criticizes Dr. Rao's reliance on Whirlpool's internal surveys, which it asserts did not directly address the incremental value that consumers attach to steam over mist. During the hearing, Whirlpool's counsel questioned Dr. Rao regarding his reliance on these internal Whirlpool surveys conducted prior to litigation. As noted above, Dr. Rao testified that he could quantify consumer preference for steam as compared to mist based on research that Whirlpool conducted and that he did not conduct his own surveys with regard to this information because Whirlpool had already conducted the relevant surveys. During this line of questioning, Whirlpool's counsel inquired as to whether Dr. Rao adhered to the guidelines established in Shari Seidman Diamond's Reference Guide on Survey Research.

Diamond's manual addresses survey methodology relating to surveys that parties present as evidence during litigation. Shari Seidman Diamond's Reference Guide on Survey Research,

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Federal Judicial Ctr 2d ed. 2000). The manual is "intended to assist judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information." (Diamond at 226.) The manual specifically states that "[a] routine use of surveys in federal courts occurs in Lanham Act cases, where the plaintiff alleges trademark infringement or claims that false advertising has confused or deceived consumers. The pivotal legal question in such cases virtually demands survey research because it centers on consumer perception (i.e., is the consumer likely to be confused about the source of a product, or does the advertisement imply an inaccurate message?)." (Diamond at 227.) With regard to Dr. Rao's opinions, however, LG is not offering the surveys conducted by or on behalf of Whirlpool and relied on by Dr. Rao as evidence of consumer perception. Instead, the surveys relied on by Dr. Rao form a limited portion of the documents he relied on in forming his opinions regarding damages. Moreover, it is well-established that "criticisms of surveys used in litigation are appropriate topics of cross-examination and contrary evidence to reduce the weight of the survey without requiring that [] it be excluded." *Simon Property Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) (citing *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir.1993); *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1172 (7th Cir. 1986); *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 357 (7th Cir. 1983)).

Whirlpool also has failed to show that Dr. Rao's use of internal Whirlpool documents rather than conducting his own surveys renders his opinions inadmissible. Whirlpool's reliance on *Jamsports & Entm't, LLC v. Paradama Prods., Inc.*, No. 02 C 2298, 2005 WL 14917 (N.D. Ill. Jan 3, 2005), is misplaced. In *Jamsports*, the district court excluded a portion of the expert's

testimony where the expert simply interpreted certain correspondence and evidence because such opinions did "not constitute the application of 'scientific, technical, or other specialized knowledge [that] will assist the trier of fact.'" *Id*. at *10 (citing Fed. R. Evid. 702.) In other words, the expert did not apply his methodology to certain factual underpinnings and reach an opinion. Instead, the expert simply interpreted the factual evidence. The court held that merely interpreting the evidence did not involve a specialized skill or knowledge.

Similarly, *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 748 (N.D. Ill. 2009), does not support Whirlpool's argument. In *U.S. Gypsum*, the court struck the testimony of an expert who reviewed certain consumer complaints and internal communications and rendered opinions about the quality of the product at issue based on this information. The court found that the expert's conclusions about the quality of the product were "essentially based on anecdotal data with little or no governing method of analysis." *Id.* Given the unreliable methodology, the district court struck the opinions.

In contrast, Dr. Rao used Whirlpool's documents as the factual underpinning for his damages opinions. As described above, Dr. Rao testified at length regarding the Whirlpool documents he reviewed, the factual content of those documents, and the means by which he drew conclusions from those documents. Significantly, Dr. Rao relies on documents from Whirlpool's, not from LG's files. *See In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 658-59 (N.D. Ill. 2006). Moreover, LG intends to establish the factual assertions relied on by Dr. Rao in conducting his analysis through other witnesses at trial. As the Seventh Circuit has emphasized, "the court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the

correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ." *Smith,* 215 F.3d at 718. *See also United States v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009) (same); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009) (denying request to strike expert's opinions where expert assumed facts based on his review of evidence even though opponent submitted evidence contradicting his assumptions).

If the factual underpinnings of Dr. Rao's expert testimony regarding causation are weak that is a matter not for exclusion, but as the Supreme Court stressed in *Daubert* for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." *Daubert,* 509 U.S. at 596. *See also Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 586-87 (7th Cir. 2000) ("the factual underpinnings of expert testimony may be subject to counter-attack."); *United States v. Lauder,* 409 F.3d 1254, 1264 (10th Cir. 2005) ("*Daubert* generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion."); *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929-30 (8th Cir. 2001) ( stating that the "factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination"). This portion of LG's motion is therefore denied.

### 2.    Pre-Launch Estimates

Whirlpool next challenges Dr. Rao's damages opinion because it maintains that Dr. Rao used Whirlpool's forecasts for steam dryer sales rather than its actual sales figures. As Dr. Rao explained, however, he did use Whirlpool's actual sales figures. Whirlpool's criticisms go to the weight and not the admissibility of Dr. Rao's opinion in this regard.

As part of his causation analysis, Dr. Rao used Whirlpool's forecasts of sales projections prior to the launch of its dryer. One forecast from December 12, 2006 forecasted sales for the Duet Myst dryer and the second one from January of 2007 forecasted sales for the Duet Steam dryer. Whirlpool changed the name of its steam dryer in early January 2007 from the Myst to the Steam dryer. With the name change, Whirlpool's internal forecasts for the anticipated sales of the dryer increased by 21 percent. As Dr. Rao testified, Whirlpool did not provide evidence of any other changes in the dryer between December 12, 2006 and January 2007, other than the change in name. Because part of the increase in sales was expected to come from Whirlpool consumers who owned the traditional dryer and would now purchase the new Whirlpool steam dryer, Dr. Rao did not include this percentage increase in his damages calculation. Instead, he used approximately 18 percent, which represents the anticipated increase in sales of Whirlpool's steam dryers from the marketplace – not from Whirlpool customers who would have switched from a traditional Whirlpool dryer to a steam Whirlpool dryer. Dr. Rao applied the 18 percent figure to Whirlpool's actual sales of steam dryers. Dr. Rao explained that he employed the forecasts to arrive at the 18 percent figure because Whirlpool did not have actual historic sales figures for the steam dryer which had just launched. He then applied this figure to Whirlpool's actual sales to reflect the sales that LG lost to Whirlpool because of Whirlpool's alleged false advertising.

Whirlpool's reliance on *Otis v. Doctor's Assocs, Inc*., No. 94 C 4227, 1998 WL 673595, *1-2 (N.D. Ill. Sept. 14, 1998), for the proposition that untested reliance on projected sales data is not a well-accepted scientific method for using forecasted data is not persuasive. *Otis* involved an expert's lost profits calculation premised on a franchise agreement that required the

plaintiff to set up a specified number of franchises over the term of the contract and which specified minimum weekly sales that the franchisee was expected to produce. The court held that this methodology was not reliable because "[the plaintiff] has made no showing that the formula and projected values [the expert] relied on is accurate or has been tested for accuracy. [The expert] himself admitted that he had not performed any independent analysis of the reliability or factual accuracy of the figures used in the DA Agreement." *Id.* at *4. Conversely, Dr. Rao has explained at length the reasons for his reliance on Whirlpool's internal forecasts and his methodology in applying figures derived from those forecasts to actual sales. LG has also asserted that it will seek to prove the factual assumptions relied on by Dr. Rao at trial. Moreover, unlike *Otis*, Dr. Rao explained that the process he followed has been subjected to peer review. Dr. Rao cites a number of reference manuals in his expert report (Rao Report at ¶ 43, n. 67.) and the reference manual on scientific evidence from the Federal Judicial Center also describes the approach used by Dr. Rao. (Pls.' Hr'g Ex. 20 at p. 281.)

Whirlpool's citation to *Pizza Hut v. Papa John's Int'l*, 227 F.3d 489, 503 (5th Cir. 2000), and *Zazu Designs v. L'Oreal S.A.*, 979 F.2d 499, 506 (7th Cir. 1992), are similarly unpersuasive. The court in *Pizza Hut* did not address an expert's use of forecast figures as applied to actual sales as a method of determining lost profits. Moreover, while the Court recognizes that "[u]sing a percentage of some number unrelated to the plaintiff's injury is an unacceptable way to estimate damages," *Zazu*, 979 F.2d at 506, Dr. Rao has explained his use of forecasts and actual sales figures to conduct the lost profits analysis. In short, LG has established that Dr. Rao applied a reliable methodology in this regard, and Whirlpool's criticisms go to the weight, and not the admissibility, of Dr. Rao's opinions and testimony.

### 3. Competitors

Whirlpool also argues that Dr. Rao's analysis ignores the presence of other competitors in the steam dryer market. Specifically, it asserts that he "improperly assumes that LG would have made *each and every one* of Whirlpool's sales allegedly 'caused' by Whirlpool's use of the word 'steam' in its advertising, notwithstanding the presence of numerous other competitors in the steam dryer market." (R. 388, Pls.' Mem in Supp. at 11.)

Dr. Rao made clear, however, that he did not ignore other competitors. As he explained, Whirlpool launched its steam dryer in October 2007, and LG followed in December of 2007. Kenmore, GE, Samsung, and Bosh subsequently entered the market with a steam dryer. In reaching his opinions, Dr. Rao assumed that none of these other competitors actually produces a steam dryer as LG does. In other words, Dr. Rao assumed that the competitors are also falsely advertising their steam dryers. This, of course, is a factual assumption that LG will have to establish at trial. As explained above, the jury has the job of evaluating the soundness of an experts' factual underpinnings.

*Blue Cross & Blue Shield United of Wis. v. Marshfield,* 152 F.3d 588, 593 (7th Cir. 1998), does not provide otherwise. Instead, it stands for the proposition that "statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." *Id.* Whirlpool has not shown that Dr. Rao failed to correct for a "salient factor." Indeed, Dr. Rao did not assume that any of the sales made by Whirlpool would have gone to a competitor rather than LG because those competitors also did not make steam dryers. He explained that if competitors in the United States used the steam dryer technology and advertised

it consistently with LG's definition of steam he would "eliminate their market share" from his lost profits calculation. He further explained that in 2010 LG started manufacturing the steam dryers for Kenmore so he will update his calculations to reflect that Kenmore is using a steam dryer that is not being falsely advertised. Whirlpool may still present evidence at trial that its competitors did use the same technology and that those competitors should be factored out of the analysis, if appropriate. Whirlpool, however, has not shown that the Court should exclude Dr. Rao's opinion and testimony on this basis.

### 4. LG's Korean Parent

Whirlpool next asserts that Dr. Rao has improperly included the profits of its Korean parent -- LG Korea -- when calculating damages in this case. In support, LG relies on *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303 (Fed. Cir. 2004). *Poly-America*, however, is not instructive. In that patent infringement case, the manufacturer and owner of a patent sought to collect the lost profits of its sister corporation. The Federal Circuit held that a patentee "needs to have been selling some item, the profits of which have been lost due to infringing sales, in order to claim damages consisting of lost profits" and that there was no evidence that the manufacturer had sold any item on which it claimed damages. *Id.* at 1310-12. The court found that the manufacturer, the owner of the relevant patent, was not entitled to recover its sister corporation's lost profits. *Id.* at 1310-12. Conversely, Dr. Rao testified that he calculated the incremental profit margin for steam dryers sold in the Unites States by LG USA, the defendant in this case. He explained that although LG earns the profit on those dryers in the United States, for tax purposes LG books a portion of that profit in Korea. Dr. Rao explained that because the profit booked in Korea is still profit on LG products sold in the United States, he

included that profit in his analysis. Dr. Rao also testified that there is no double-booking of profit by LG and that his method of profit calculation is a standard and accepted practice in his field.

Moreover, while both parties assert that the Fifth Circuit's decision in *American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321 (5th Cir. 2008), supports their position on the issue, that case is also not directly on point. In *America Rice*, the Fifth Circuit considered the appropriate means for determining lost profits where the defendant was a cooperative whose structure permitted its profits to flow through to member farmers. The plaintiff argued that the district court erred in assessing lost profits under the Lanham Act. The court first noted that § 1117(a) of the Lanham Act "provides that a plaintiff can recover as lost profits the sales of the infringer unless the infringer can prove legitimate costs to reduce that sum." *Id.* at 388. The court held that while the defendant cooperative produced evidence of its taxable income through its tax return and testimony from its CEO to show that it made no profit, it did not produce any evidence of its costs as contemplated by § 1117(a). *Id.* at 338-39. The defendant argued that because of its flow-though model, the cooperative disbursed its profits to its member farmers, was not taxed on any sales, and accordingly made no profit for purposes of the Lanham Act. *Id.* The Fifth Circuit, however, held that how the defendant passes its profits onto its members was "irrelevant in the context of a Lanham Act profits award" and that the defendant had "cite[d] no authority for the proposition that tax treatment is relevant to the Lanham Act remedies." *Id.* at 339. The court concluded that "profits earned by [defendant] are [defendant]'s profits for purposes of the Lanham Act, regardless of how such profits are passed on or how they are taxed." *Id.* at 340. In sum, *American Rice* addresses the calculation of lost profits in the context

of a cooperative that passes profits on to its members.

In short, Whirlpool has presented no authority to demonstrate that the method employed by Dr. Rao to calculate lost profits under the Lanham Act is impermissible. The challenges raised by Whirlpool are the proper subject of cross-examination.

### 5.    Price Erosion

Whirlpool contends that Dr. Rao's price erosion analysis is inadmissible because Dr. Rao solely relied on a conversation with a single LG employee for the basis of his price erosion opinion. This criticism goes to the weight, and not the admissibility, of Dr. Rao's opinions for several reasons.

First, Dr. Rao did not rely solely on one conversation with one LG employee in conducting his price erosion analysis. Dr. Rao's report reflects that he also considered the washer and dryer market as a whole and LG's pricing history with respect to its steam and non-steam washers and dryers. (Rao Report at ¶¶ 50-57.) Indeed, Dr. Rao testified that he conducted a market reconstruction analysis in order to reach the price erosion figure. He explained that he premised his calculation on three initial facts: (1) consumers prefer steam in a dryer to steam in a washer, (2) consumers are willing to pay a price premium for a steam dryer, and (3) LG was getting a price premium on its steam washers already in the market. Thus, Dr. Rao opined, LG should at least get the same price premium for a steam dryer as for a steam washer. Because Whirlpool's steam dryer was already in the market, however, LG did not charge the premium for its steam dryer as it had with its steam washer. Using the weighted sales for each distributor from LG's price sheets, Dr. Rao then calculated the price erosion figure.

Dr. Rao further explained that he also spoke with T.J. Lee, L.G.'s Product Manager. (Rao Report at ¶ 55, n. 82.)  He spoke with Lee to determine whether LG had intended to charge a higher premium for the steam dryer if Whirlpool had not been in the marketplace.  Lee informed Dr. Rao that LG would have performed the same pricing analysis for the steam dryers as it did for the steam washers if Whirlpool had not been in the marketplace.  Employee knowledge of a corporation's intent regarding price damages can be a relevant factor in a price erosion analysis.  *See, e.g., Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 166 F. Supp. 2d 1008, 1032-1033 (D. Del. 2001), *overturned in part on other grounds* (award of damages for price erosion can be based on employee's testimony regarding price concessions for purposes of price erosion analysis where testimony was based on his personal knowledge and experience). While the Court recognizes that *Honeywell* is distinguishable in some respects, like the expert in *Honeywell*, Dr. Rao explained that he did not solely rely on the information provided by Lee, but that he also conducted a market reconstruction analysis to reach his conclusions.  Whirlpool's motion is therefore denied with respect to this criticism.

### 6.     Demand and Price Sensitivity

Whirlpool also asserts that Dr. Rao failed to consider the effect that price premium on steam dryers has on consumer demand for LG's dryers.  *See, e.g., Tel-Lock, Inc. v. Thomson Consumer Elecs.*, No. 03 C 320, 2005 WL 741930, at *10 (N.D. Ill. Mar. 30, 2005) (noting that the "theory of price erosion 'must account for . . . the effect of the hypothetically increased price on the likely number of sales at that price in that market'") (internal citation omitted).  Dr. Rao, however, stated that he analyzed price elasticity during his price erosion analysis and that he concluded that the "relatively trivial change in price" would not affect consumer demand.  (R.

388-2, Wind Dep, Ex. 2 at 222-23.) He explained that he did not take into account price elasticity in a quantitative way in conducting the price erosion analysis because, in this case, steam is a primary feature for consumers, and they are not as price sensitive as they are feature sensitive. Therefore, according to Dr. Rao, there is no price elasticity when there is no competitor in the market, *i.e.*, when LG is the only participant in the market selling steam dryers. But when another company enters the market, in this case Whirlpool, price elasticity becomes a relevant factor. If Whirlpool believes that Dr. Rao's analysis in this regard is in error or that it contradicts the testimony of other LG employees, Whirlpool can raise the issue on cross-examination. *Daubert*, 509 U.S. at 596.

### 7. Inclusion of Washer Sales in Damages Calculation

Finally, Whirlpool challenges Dr. Rao's inclusion of washer sales in his damages calculations. Because Whirlpool's arguments go to the weight of Dr. Rao's testimony, this challenge also fails.

In reaching his damages opinion, Dr. Rao opined that Whirlpool's false and misleading advertising also resulted in LG's lost sales of washers. (Rao Report at ¶¶ 40-42.) As he explained, he based this opinion on the factual assumption that consumers typically purchase washers and dryers in pairs. Specifically, a significant number of consumers purchased matching washers and dryers. In fact, the underlying data from an independent market research company called NPD revealed that consumers purchased washers and dryers in pairs 88 percent of the time. This percentage – known as an attachment rate – was lower than LG and Whirlpool's own data. LG's data showed a 95 percent attachment rate, and Whirlpool's data showed a 98 percent attachment rate. Dr. Rao used the lower percent in making his calculations.

In addition, Dr. Rao relied the Declaration of Pamela Rogers, Whirlpool's Director of Product

Management for Front Loading Laundry. She asserted that:

> In the laundry market, the sales of washer and dryers are inextricably linked. This is because consumers typically buy washers and dryers in matching sets. For example, since September 2007, Whirlpools' sales figures indicated that 99.8% of purchasers of the Duet Steam Dryer in the color aspen, also purchased the matching Duet Steam Washer, and that number (known as the "attachment rate") is even higher for purchasers of the product in the color white. Thus, if there is no steam dryer available to match the Whirlpool Steam Washer for a period of time, sales of the Duet Steam Washer will also suffer.

(Pls.' Hr'g Ex. 10 at ¶ 44.) Based on this data, Dr. Rao concluded that if LG lost the sale of a

steam dryer to Whirlpool, it would also lose the sale of a washer 88 percent of the time.

Whirlpool contends that this opinion is inadmissible because Dr. Rao did not test these

assumptions himself. Once again, however, this is an issue for cross-examination. *See Smith*,

215 F.3d at 718. *See also Pansier*, 576 F.3d at 738 (same); *In re Ready-Mixed Concrete

Antitrust Litig.*, 261 F.R.D. at 165. LG can establish the underlying factual assumptions at trial.

*See Smith* 215 F.3d at 718. Moreover, Whirlpool's reliance on *Bucklew v. Hawkins, Ash, Baptie

& Co., LLP*, 329 F.3d 923 (7th Cir. 2003), is misplaced. In *Bucklew*, the Seventh Circuit

recognized that a plaintiff can recover profits that an infringer made from a non-infringing

product related to the infringing product. *Id.* at 933. The Seventh Circuit found:

> But [plaintiff's] evidence that [defendant] shifted profits from the infringing forms to a separate, noninfringing financial software package ("HMS for Windows") was too speculative to sustain an award of damages. His theory is that the prospect of one-stop shopping attracted customers who might otherwise have gone to a competitor, and so increased [defendant]'s revenue and presumably its profits. One of [defendant's] employees testified that the infringing forms would indeed help with the sale of HMS for Windows, but no evidence was presented that would have enabled the market value of this "help" to be gauged. The testimony by an expert witness for the plaintiff that 10 percent of the profits on [defendant]'s sales of HMS for Windows were due to the buyers' being able to buy the infringing forms from HAB had no factual basis whatsoever, and we repeat previous reminders to the bench

and bar of this circuit that proof of damages requires--proof.

*Id.*.  Conversely, Dr. Rao based his statistical analysis on Whirlpool and LG's sales figures as well as the testimony and declaration of Whirlpool employees.  Moreover, in *Bucklew*, there was no evidence of an attachment rate between the sales of the product and the noninfringing software product.  While consumers may purchase washers and dryers separately in some instances, Dr. Rao has relied on evidence of an attachment rate between washer and dryer sales.  Whirlpool's motion is accordingly denied in this regard.

## II.     Dr. Wind

Whirlpool has also moved to exclude expert testimony and opinions regarding portions of the rebuttal expert report and a video expert report of Dr. Wind pursuant to Rule 702 and *Daubert*, 509 U.S. at 593-94.  The Court held a *Daubert* hearing on August 10, 2001.  For the reasons discussed below, Defendant's motion to exclude Dr. Wind's testimony is granted in part, denied in part, and denied in part as moot.

### A.     Dr. Wind and His Opinions

Dr. Wind is a consumer survey expert who received his doctorate from Stanford University.  He is the Lauder Professor and Professor of Marketing at the Wharton School of the University of Pennsylvania.  Dr. Wind has written 22 books and more than 250 papers in the field of marketing.  His writings address marketing strategy, marketing research, new product and market development, consumer and organizational buying behavior and global marketing strategy.  Dr. Wind has served as the editor-in-chief of the *Journal of Marketing*.  He is also the founder of Wharton School Publishing and served as its first Wharton Editor from 2004 to 2008.

In addition, he has taught MBA, Ph.D. and executive development courses on a wide range of marketing topics. He consults for fortune 500 firms, including major consumer goods firms. He has also been qualified as a marketing and survey research expert and has testified at trial in a number of federal courts. Furthermore, Dr. Wind has won numerous marketing awards.

LG offers Dr. Wind as a rebuttal expert to evaluate the opinions of Dr. Ravi Dhar and Dr. Nowlis. He also offers a separate opinion evaluating Whirlpool's videos regarding the home experience of consumers with the Whirlpool steam dryer.

As an initial matter, in his report, Dr. Wind compared Dr. Dhar's opinions with the Second Amended Complaint in this case and concluded:

> Dr. Dhar's basic premise and associated study objective (which focus on how steam is made), are inconsistent with [LG's] actual complaint (that the Duet Steam Dryer, despite its name and associated advertising with steam as a message, does not have steam. Furthermore, since steam is an inherent characteristic of a steam dryer, knowing that the dryer utilized steam, or not, to relax wrinkles, remove odors and refresh clothing and household fabrics, is an important (material) determinant of consumers' decision to buy a steam dryer). Thus, Dr. Dhar's study does not address the question of materiality."

(Rebuttal Report Evaluating the Expert Report and Study of Dr. Ravi Dhar and the Report of Dr. Nowlis ("Wind Report") at ¶ 7.) During the *Daubert* hearing, LG withdrew this opinion and the other opinions set forth in paragraph 7 of Dr. Wind's rebuttal report. Accordingly, the Court denies as moot this aspect of Whirlpool's motion.

## B.     Whirlpool's Challenges

Whirlpool does not seek to strike all of Dr. Wind's opinions. Instead, it challenges the following opinions: 1) his opinions regarding the materiality of steam; 2) his opinions regarding the applicable legal standard; 3) any technical opinions regarding steam; 4) his opinions regarding consumer confusion; and 5) his opinions regarding Whirlpool's videotapes.

## 1.     Dr. Wind's Materiality Opinion Goes Beyond a Rebuttal of Dr. Dhar's Opinion

Whirlpool first challenges Dr. Wind's rebuttal opinion as to the materiality of steam as beyond the scope of a rebuttal opinion and as an improper legal conclusion.[1]  Dr. Wind opines that the "materiality of steam seems obvious" and that "there is no question that a product feature/benefit, like steam in this case, which is important to consumers and prominent in both the name and advertising will, in my opinion, significantly impact purchase intent."  (Wind Report at ¶ 8, p. 6)   He noted that his "understanding of materiality in this context is whether the use of steam in the dryer name and advertising for the Duet Steam Dryer affects consumers' decision to purchase the dryer."  (*Id.* at ¶ 11, p. 20.)   Dr. Wind criticizes Dr. Dhar's opinions because, according to Dr. Wind, he failed to assess consumers' perceptions of the Whirlpool dryer as a steam dryer and whether steam is an important determinant of their purchase decision. (*Id.* at ¶¶ 7-8.)

The Court previously addressed Dr. Dhar's opinions when it denied LG's motion to strike the expert testimony of Dr. Dhar.  (Order, R. 417-1.)  As made clear in his opinions and during Dr. Dhar's *Daubert* hearing, Dr. Dhar made the factual assumption that the Whirlpool dryer creates steam, and he designed and conducted a consumer perception survey to assess whether the implied claim that the Whirlpool Duet® Steam Dryer injects hot vapor onto clothes had any impact on consumers' decisions to purchase the Whirlpool Duet® Steam Dryer.  Dr. Dhar opined that "even if one assumes that a majority of the consumers were taking away a claim that the Whirlpool Dryer injects hot vapor onto clothes as R. Reitter concludes, my survey

---

[1]  Whirlpool also contends that his materiality opinions are not based on a scientific method and are impermissible under Rule 403.  The Court need not address either of these arguments given that it strikes these opinions.

shows no statistical difference in the intent to purchase as well as in product quality in comparison to a control ad that explicitly added the language stating that a mist of water is injected and is heated after it is sprayed into the dryer drum."  In other words, his opinion focuses on the materiality of how steam is created, not whether steam is created.

Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose a "complete statement of all opinions the [expert] witness will express and the basis and reasons for them" at the time specified for expert disclosure by the court.  Fed. R. Civ. P. 26(a) (2)(B)(i).  Rebuttal reports should be limited to "contradict[ing] or rebut[ting] evidence on the same subject matter identified by another party" in its expert disclosures.  Fed. R. Civ. P. 26(a)(2)(C)(i).  *See, e.g., Butler v. Sears Roebuck & Co.*, No. O6 C 7023, 2010 WL 2697601, at *2 (N.D. Ill. July 7, 2010) (striking expert's supplemental report for failure to comply with strictures of Rule 26).  The Court set a deadline of January 30, 2009 for the parties to issue their expert reports on issues on which they had the burden of proof.   The parties had until February 27, 2009 to issue rebuttal expert reports.

Whirlpool correctly notes that Dr. Wind's opinion does not contradict or rebut Dr. Dhar's opinion.  Instead, he opines on the materiality of whether steam is created[2] – an issue on which

---

[2]  During the *Daubert* hearing, the parties raised the issue of whether expert testimony was necessary to establish the materiality element in Lanham Act cases.  Courts do not require that a party proffer expert testimony to establish that the subject of the false or misleading advertising was material to the consumer's decision to purchase the goods.  *See, e.g., Osmose, Inc. v. Viance, LLC*, 2010 U.S. App. LEXIS 15896, 48-49 (11th Cir. July 30, 2010) (holding that in order to establish materiality the plaintiff must demonstrate that "the defendant's deception is likely to influence the purchasing decision" and upholding district court's finding that the materiality of the defendant's statements were "self-evident" because "the advertisements attacked an inherent quality of [the product], namely its ability to prevent decay and preserve the structural integrity of wood"); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (holding that the evidence "amply supports the district court's conclusion that [the defendant's] statements are material to consumers' purchasing decisions" based on letters from doctors who had purchased the machine at issue and expressed their dissatisfaction with their inability to rely on the claims regarding the machine at issue in the litigation); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311-312 (1st Cir. 2002) (holding that it was reasonable to conclude that "defendants' misrepresentation of the blazers' cashmere content was material because it relates to a characteristic that defines the product at issue, as well

LG carries the burden of proof. Dr. Dhar made clear that he assumed, for purposes of his opinion, that the Whirlpool dryer created steam. The focus of his materiality inquiry was on the impact on consumers' purchasing decisions of how the dryer created steam. As such, Dr. Wind's materiality opinion on steam itself being material exceeded the scope of Dr. Dhar's report and thus is not a proper rebuttal opinion under Rule 26(a)(2). Dr. Dhar narrowly tailored his opinions to the materiality of how steam is created, not to whether steam itself is material. Dr. Wind does not address the materiality of how steam is created in the dryer.

LG's attempt to save Dr. Wind's opinion by arguing that Dr. Wind is merely telling the jury what the appropriate materiality inquiry is does not save the day. As discussed below, the Court will instruct the jury as to materiality in this case, not Dr. Wind.

### 2. The Court Will Instruct the Jury on the Legal Standard for Materiality

In paragraph 11 of his report addressing Dr. Dhar's research design, Dr. Wind states:

Consider for example the approach presented in this jurisdiction, that for a false advertising claim, the false statement be 'on a subject material to the decision to purchase the goods.' *See Sanfield v. Finlay Jewelry Corp.*, 168 F.3d 967 (7th Cir. 1999) (accepting the district court determination that price claims were material in that they affected purchaser's decision); *see also Skil Corp. V. Rockwell Int. Corp.*, 375 F.Supp. 777 (N.D. Ill. 1974). The materiality standard in this jurisdiction is the broadest I have seen. In a case very similar to this one, *Cashmere and Camelhair Mfr. v. Saks Fifth Ave.*, 284 F.3d 302 (1st Cir. 2002), the court said" "*One method of establishing materiality includes showing that the false or misleading statement releates to an 'inherent qualify or characteristic' of the product.*" Clearly, steam is an inherent quality or characteristic of the Duet Steam Dryer. This approach was

---

as the market in which it is sold" and that it was "reasonable to infer from defendants' aggressive marketing strategy highlighting the 'cashmere' nature of the blazers that defendants themselves believed cashmere to be an inherent and important characteristic of the blazers"). *Cf. Kraft, Inc. v. FTC*, 970 F.2d 311, 324 (7th Cir. 1992) (upholding Federal Trade Commission's finding, in the context of a deceptive commercial practices Federal Trade Commission Act claim requiring a party to show that the relevant advertising claims are material to prospective consumers, that (i) expert testimony showed that a 30% exaggeration of calcium content was a nutritionally significant claim that would affect consumer purchasing decisions, and (ii) internal company documents demonstrating that the defendant designed the ads to deliver an imitation superiority message showed that the message was material).

also adopted by Whirlpool in its report *"Steam in the Laundry, an Overview of Existing Research for Messaging Discussion"* of March 2007 in which they state:

> *'The prioritization of features demonstrates how they would impact purchase decision.'*

(Wind Report at ¶ 11.) Whirlpool challenges this aspect of Dr. Wind's report as an impermissible legal conclusion. Indeed, courts – not experts – instruct juries on applicable legal standards. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) ("we previously have stated that allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance") (citing *Bammerlin v. Navistar Int'l Transp. Co.*, 30 F.3d 898, 900 (7th Cir.1994); *Harbor Ins. Co. v. Cont'l Bank Corp.,* 922 F.2d 357, 366 (7th Cir.1991)).

During the *Daubert* hearing, counsel for LG confirmed that Dr. Wind has "absolutely no intention" of offering this legal opinion. Accordingly, this aspect of Whirlpool's motion is denied as moot.

### 3. Dr. Wind is Not Qualified to Give a Technical Opinion that the Whirlpool Dryer Does Not Create Steam

Whirlpool next challenges Dr. Wind's opinions that it is a "fact" that the Whirlpool dryer does not use steam and that this "fact" is known by consumers. Dr. Wind opined in his rebuttal report:

> A proper control would have eliminated the word steam entirely and would have used a term that *accurately describes the feature* . . . . Dr. Dhar's selection of both test and control stimuli that focuses on steam is surprising given the number of internal Whirlpool documents that clearly state that *the dryer is not a steam dryer....* *This fact* was also known to consumers . . . . Before developing his research design and selecting the stimuli, Dr. Dhar should have been aware of *these facts*.

(Wind Report at ¶ 10, p. 17.) Whirlpool challenges this opinion primarily on the ground that Dr.

Wind is unqualified to testify regarding whether the dryer uses steam because he is not a technical expert. Indeed, Dr. Wind concedes that he is not qualified to render a technical opinion on whether there is steam in the dryer. In response, LG contends that Dr. Wind is not providing a technical opinion as to whether steam is created in the Whirlpool Dryer, but is simply relying on numerous admissions from Whirlpool that its dryers do not create steam.

Experts can make factual assumptions when rendering opinions. As the Seventh Circuit has emphasized, "the court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ." *Smith,* 215 F.3d at 718. *See also Pansier*, 576 F.3d at 738; *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. at 165. Here, Dr. Wind can make the factual assumption that the Whirlpool Dryer does not create steam, and LG can attempt to establish that fact at trial. Dr. Wind's opinions, however, go beyond making factual assumptions. As Whirlpool notes, Dr. Wind's report refers to the "fact" that the dryer is not a steam dryer. Dr. Wind may not give this technical opinion.

### 4. Dr. Wind's Opinion Regarding Consumer Confusion Is Admissible

Whirlpool contends that the Court should exclude Dr. Wind's opinion on the issue of consumer confusion. Dr. Wind opines on the issue of consumer confusion based on the Whirlpool Insperience Studio study and other Whirlpool documents. His opinion is in rebuttal to Dr. Nowlis' opinion that the responses to the less-leading open-ended question shows no evidence of confusion about the way in which a Whirlpool dryer creates steam.

Whirlpool again argues that this opinion is not proper rebuttal under Rule 26(a)(2)(C)(ii) because Dr. Dhar did not draw any conclusions about whether consumers perceive that "real steam [is or is not] in the dryer." As LG notes, however, it did not offer this opinion to rebut Dr. Dhar, but rather to rebut Dr. Nowlis's opinion regarding consumer confusion.

Whirlpool also challenges Dr. Wind's characterization of the Insperience documents as improperly substituting his opinion for that of the jury's. To the contrary, Dr. Wind has reviewed Whirlpool documents, including the surveys conducted by Insperience, to rebut Dr. Nowlis' criticism of the Reitter Survey's conclusions. In reaching his opinions, Dr. Wind applies his extensive expertise in the area of consumer research and marketing research. *See Smith Ford Motor Co.*, 215 F.3d at 718 ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience . . . ") While Dr. Wind did not conduct an independent market study or consumer survey to reach his opinion, he instead applied his experience in this area to render his opinions. Given his level of experience in this particular area, this opinion offered by Dr. Wind meets the mandates of *Daubert* and Rule 702.

### 5. Video Report

At the close of discovery in this case, Whirlpool produced 34 Consumer Use Feedback Testing ("CUFT") videos pertaining to consumers' perception of steam. These videos contained interviews with consumers and Whirlpool employees regarding the consumers' experiences with the Whirlpool steam dryer. The consumers commented on the performance and operation of the dryer and provided detailed feedback regarding the steam cycle on the dryers. Whirlpool produced additional videos after the close of discovery. The Court granted LG's request to take discovery regarding these late-produced videos, including leave to have its expert, Dr. Wind,

review and opine on them.

Dr. Wind reviewed a "sample" of these videos and did a "content analysis." According to Dr. Wind, content analysis "is a common approach in analyzing any document you have, whether it's videos or whether they are responses." Dr. Wind selected a sample of the videos and reviewed that sample, with the assistance of a research assistant. They divided the videos into three categories, those with 1) a positive reaction to the steam feature; 2) a negative assessment of some aspect(s) of the steam feature; and 3) a mixed reaction of positive and negative comments toward the steam feature. They then reviewed the videos and coded each one according to this coding system. Dr. Wind's research assistant transcribed the negative responses made on the videos. Dr. Wind reviewed all of the videos with negative and mixed assessments of the steam feature. Based on this review, he opined that "while 46% of the respondents had a positive evaluation of the steam feature on the dryer, 37% had a negative assessment of the steam feature and 17% had mixed a [sic] assessment involving some positive but also some negative evaluations." (Wind's Aug. 6, 2009 Report at ¶ 7.)

Dr. Wind opined, based on these videos, that there is "a significant dissatisfaction among consumers with the steam feature on the Whirlpool steam dryer tested." He concluded that "[t]o the extent Whirlpool claims that the delivery of benefits associated with steam, rather than steam itself, justifies its steam advertising messages, this proposition is not true for those consumer segments similar to the consumers with the negative and mixed evaluations in this study." (*Id.* at ¶ 9.)

Whirlpool challenges the admissibility of Dr. Wind's opinions on the videos. It argues that LG is attempting to introduce "highly questionable expert testimony" to demonstrate that

Whirlpool's dryers do not provide their advertised benefits – wrinkle relaxation and odor removal. Whirlpool argues that Dr. Wind is a marketing expert, not a technical expert, thus he is not qualified to opine on the issue. Dr. Wind expressly stated that he "relied on the standards employed in marketing and consumer behavior and research . . . consistent with the professional marketing research literature." (*Id.* at ¶ 3.) He also explained that his extensive experience in this area qualifies him to opine in this area. Specifically, he applied his years of work with consumer data, research, content analysis, and thousands of consumer studies to reach his opinions. Such experience is sufficient to qualify him to render these opinions. *See Smith Ford Motor Co.*, 215 F.3d at 718 ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience . . . "); *Lehman Bros. Holdings, Inc. v. Laureate Realty Services, Inc.*, 2007 WL 4197580, at * 3 (S.D. Ind. 2007) (expert's opinions proper where "derived from an analysis of the steps performed . . . in the underwriting process based upon his experience in the commercial lending industry"). *See also Gipson v. Wells Fargo Bank, N.A.,* 460 F.Supp.2d 9, 10-11 (D.C. Cir. 2006) (holding that expert testimony as to lending industry practices and standards based upon personal experience was admissible).

In addition, during the hearing Whirlpool identified at least two videos that Dr. Wind had mischaracterized. Whirlpool contends that, as a result of these mischaracterizations, Dr. Wind's opinion regarding the videos is not the product of reliable principles and methods. These mistakes, however, go to the weight of his testimony, not its admissibility. *AHP Subsidiary Holding*, 1 F.3d at 618 ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare . . . . [A]ny shortcomings in the survey results go to the proper weight of the survey and

should be evaluated by the trier of fact.) (internal citation omitted). Whirlpool is free to rigorously cross examine Dr. Wind on this issue and let the jury determine its weight. Whirlpool also argues that, based on the instances of improper coding of participant feedback, Dr. Wind failed to adhere to the guidelines in Shari Seidman Diamond's Reference Guide on Survey Research. As discussed above, it is well-established that criticisms of surveys used in litigation are appropriate topics of cross-examination. *See Simon Property Group L.P.*, 104 F.Supp.2d at1039 (S.D. Ind. 2000) (citing *AHP Subsidiary Holding*, 1 F.3d at 618; *McGraw-Edison Co.*, 787 F.2d at 1172; *Henri's Food Products Co.*, 717 F.2d at 357)).

## CONCLUSION

For these reasons, the Court (i) denies Whirlpool's motion to strike the expert testimony and opinions of Dr. Rao, and (ii) grants in part, denies in part, and denies in part as moot Whirlpool's motion to exclude Dr. Wind's opinions.

DATED: August 24, 2010                                   ENTERED:

_____
AMY J. ST. EVE
United States District Court Judge

31