IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., INC. | ) | |
| a subsidiary of LG Electronics, Inc., | ) | |
| a Korean company, | ) | |
| | ) | Civil Action No.: 08 C 242 |
| Plaintiff, | ) | |
| | ) | Judge St. Eve |
| v. | ) | |
| | ) | Magistrate Judge Mason |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM IN SUPPORT OF LG ELECTRONICS U.S.A. INC.'S
MOTION FOR INJUNCTIVE RELIEF AND ATTORNEY'S FEES</u>**

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................................2

I.    The Whirlpool Dryer is Actually a Cold Water Spray Dryer. ......................................3

II.    What Whirlpool Calls "Steam" Is Simply Evaporation.................................................5

III.    Whirlpool Changed The Name of Its Dryer From Mist to Steam to Capitalize on Consumers' Perceptions of Steam. ...........................................................................7

IV.    Consumers Are Misled by Whirlpool's Advertising. ...................................................9

V.    Whirlpool Knew Its Advertising Was Deceptive. ......................................................10

ARGUMENT ...............................................................................................................11

I.    THE COURT MUST BEGIN WITH THE JURY'S FINDING THAT WHIRLPOOL'S ADVERTISING OF ITS DRYERS AS STEAM DRYERS IS DECEPTIVE. ..........................................................................................12

II.    AN INJUNCTION SHOULD ISSUE UNDER THE IUDTPA PROHIBITING WHIRLPOOL'S DECEPTIVE ADVERTISING........................................................14

    A.    An Injunction is Warranted Under the IUDTPA. ...........................................14

    B.    LG Satisfies the Standard for Obtaining an Injunction under the Federal Principles of Equity....................................................................22

        1.    Irreparable Injury and Lack of Remedy at Law ...................................23

        2.    Balancing of the Hardships ................................................................27

        3.    Public Interest ....................................................................................28

III.    THE INJUNCTION MUST BE BROAD ENOUGH TO REMEDY THE WRONGDOING AND SHOULD BE NATIONWIDE IN SCOPE. ..........................28

    A.    An Injunction Should Issue Prohibiting Whirlpool from Using the Term "Steam" in Connection with its Dryers. ................................................28

    B.    At a Minimum, Whirlpool Must Prominently Disclose that its Dryer uses a Cold Water Spray, which then Evaporates in the Same Manner as in a Conventional Dryer. ...........................................................................30

    C.    The Injunction Should be Nationwide in Scope. ............................................32

IV.     LG SHOULD BE AWARDED ITS ATTORNEY'S FEES AND COSTS FOR
WHIRLPOOL'S WILLFUL VIOLATION OF THE IUDTPA. ...................................35

CONCLUSION...........................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Mead Johnson & Co.,*
  971 F.2d 6 (7th Cir. 1992) ......................................................................................24, 29, 32

*Accurate Leather & Novelty Co. v. LTD Commodities Inc.,*
  No. 90 C 6304, 1990 WL 205865 (N.D. Ill. Dec. 7, 1990) ....................................................28

*American Taxi Dispatch, Inc. v. American Metro Taxi & Limo Co.,*
  582 F. Supp. 2d 999 (N.D. Ill. 2008) ...........................................................................16, 26, 28

*Avitia v. Metro. Club of Chicago, Inc.,*
  49 F.3d 1219 (7th Cir. 1995) ...............................................................................................12

*BASF Corp. v. Old World Trading Co.,*
  41 F.3d 1081 (7th Cir. 1994) ...............................................................................................36

*Bingham v. Inter-Track Partners,*
  234 Ill. App. 3d 615, 600 N.E. 2d 70 (Ill. App. Ct. 1992)................................................16, 35

*Black & Decker, Inc. v. Robert Bosch Tool Corp.,*
  No. 04 C 7955, 2006 U.S. Dist. LEXIS 86990 (N.D. Ill. Nov. 29, 2006).........................19, 24

*Black & Decker Inc. v. Robert Bosch Tool Corp.,*
  No. 04 C 7955, 2007 WL 108412 (N.D. Ill. Jan. 12, 2007) ...................................................13

*BlueStar Mgmt. v. The Annex Club, LLC,*
  No. 09 C 4540, 2010 WL 2802213 (N.D. Ill. July 12, 2010) .................................................16

*Bonner v. Westbound Records, Inc.,*
  49 Ill. App. 3d 543, 364 N.E.2d 570 (Ill. App. Ct. 1977).................................................23, 24

*Burton v. Amontrout,*
  975 F.2d 543 (8th Cir. 1992) ...............................................................................................13

*Carson v. Here's Johnny Portable Toilets, Inc.,*
  810 F.2d 104 (6th Cir. 1987) ...............................................................................................33

*Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA,*
  384 Ill. App. 3d 849, 893 N.E.2d 981 (Ill. App. Ct. 2008)...................................14, 15, 16, 22

*CRC Press, LLC v. Wolfram Research, Inc.,*
  149 F. Supp. 2d 500 (C.D. Ill. 2000) ...................................................................................27

*Deere & Co. v. MTD Prods., Inc.*,
   No. 94 CIV 2322, 1995 WL 81299 (S.D.N.Y. Feb. 28, 1995) ..............................34

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
   420 F. Supp. 2d 866 (N.D. Ill. 2006) ..................................................................25

*Dual Mfg. & Eng'g, Inc. v. Burris Indus., Inc.*,
   619 F.2d 660 (7th Cir. 1980) ..............................................................................13

*E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.*,
   No. 06-C-0715, 2010 WL 3431822 (E.D. Wis. Aug. 31, 2010) ..........................12

*eBay v. MercExchange, LLC*,
   547 U.S. 388 (2006)................................................................................22, 23, 28

*Energy Four, Inc. v. Dornier Medical Systems, Inc.*,
   765 F. Supp. 724 (N.D. Ga. 1991) ......................................................................32

*Ford Motor Co. v. Lloyd Design Corp.*,
   184 F. Supp. 2d 665 (E.D. Mich. 2002)................................................................31

*Freeman v. Chicago Park Dist.*,
   189 F.3d 613 (7th Cir. 1999) ..............................................................................13

*FTC v.Cyberspace.com LLC*,
   453 F.3d 1996 (9th Cir. 2006) ............................................................................30

*Genderm Corp. v. Biozone Lab.*,
   No. 92 C 2533, 1992 WL 220638 (N.D. Ill. Sept. 3, 1992)..........................23, 24

*Gordon v. Degelmann*,
   29 F.3d 295 (7th Cir. 1994) ................................................................................13

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
   270 F.3d 298 (6th Cir. 2001) ........................................................................33, 34

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*,
   832 F.2d 1311 (2d Cir. 1987)..............................................................................30

*Horn Abbot Ltd. v. Sarsaparilla Ltd.*,
   601 F. Supp. 360 (N.D. Ill. 1984) ......................................................................30

*Hot Wax, Inc. v. S/S Car Care*,
   No. 97 C 6879, 1999 WL 966094 (N.D. Ill. Oct. 14, 1999)................................28

*Hyatt Corp. v. Hyatt Legal Servs.*,
   736 F.2d 1153 (7th Cir. 1984) ............................................................................33

*Illinois Bell Tel. Co. v. MCI Telecoms. Corp.*,
No. 96 C 2378, 1996 WL 717466 (N.D. Ill. Dec. 9, 1996) ....................................................25

*Instrumentalist Co. v. Marine Corps League*,
509 F. Supp. 323 (N.D. Ill. 1981) ..........................................................................................33

*Int'l Kennel Club, Inc. v. Mighty Star, Inc.*,
846 F.2d 1079 (7th Cir. 1988) ...............................................................................................29

*Jepson, Inc. v. Makita Corp.*,
34 F.3d 1321 (7th Cir. 1994) .................................................................................................19

*Keebler Co. v. Nabisco Brands, Inc.*,
No. 92 C 2848, 1992 U.S. Dist. LEXIS 6826 (N.D. Ill. May 18, 1992)...........................20, 25

*Knoll Pharm. v. Auto. Ins. Co. of Hartford*,
152 F. Supp. 2d 1026 (N.D. Ill. 2001) ...................................................................................34

*Kos Pharms., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004)...................................................................................................24

*Lawson Prod., Inc. v. Avnet, Inc.*,
782 F.2d 1429 (7th Cir. 1986) ...............................................................................................11

*Lawyers Title Ins. Corp. v. Dearborn Title Corp.*,
904 F. Supp. 818 (N.D. Ill. 1995) ..........................................................................................16

*Lebow v. Am. Trans Air, Inc.*,
86 F.3d 661 (7th Cir. 1996) ...................................................................................................12

*Lincoln Diagnostics, Inc. v. Panatrex, Inc.*,
No. 07-CV-2077, 2009 WL 3010840 (C.D. Ill. Sept. 16, 2009) .............................................24

*Linotype Co. v. Varityper, Inc.*,
No. 89 Civ. 4747, 1989 WL 94338 (S.D.N.Y. Aug. 4, 1989) .................................................32

*Luckie v. Ameritech Corp.*,
389 F.3d 708 (7th Cir. 2004) .................................................................................................14

*M & R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*,
321 F. Supp. 2d 949 (N.D. Ill. 2004) ......................................................................................16

*Mars, Inc. v. Standard Brands, Inc.*,
386 F. Supp. 1201 (S.D.N.Y. 1974)........................................................................................33

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001)..............................................................................................13

*Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*,
128 F.3d 1111 (7th Cir. 1997) ...........................................................21

*Midland Funding LLC v. Brent*,
No. 3:08 CV 1434, 2009 WL 3086560 (N.D. Ohio Sept. 23, 2009) .......................................22

*Mintel Int'l Group, Ltd. v. Neergheen*,
No. 08-CV-3939, 2008 U.S. Dist. LEXIS 54119 (N.D. Ill. July 16, 2008)..........................27

*Morningware, Inc. v. Hearthware Home Products, Inc.*,
673 F. Supp. 2d 630 (N.D. Ill. 2009) ...........................................................16

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
22 F.3d 546 (4th Cir. 1994) ...........................................................25

*Multiut Corp. v. Yehuda Draiman*,
359 Ill. App. 3d 527, 834 N.E. 2d 43 (Ill. App. Ct. 2005) .......................................15

*Nat'l Football League Prop., Inc. v. Dallas Cap & Emblem Mfg., Inc.*,
26 Ill. App. 3d 820, 327 N.E. 2d 247 (Ill. App. Ct. 1975) .......................................33

*Newark Morning Ledger Co. v. U.S.*,
507 U.S. 546 (1993)...........................................................20, 25, 26

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
290 F.3d 578, 598 (3d Cir. 2002)...........................................................29

*ON/TV v. Julien*,
763 F.2d 839 (7th Cir. 1985) ...........................................................27

*People ex rel. Hartigan v. Maclean Hunter Pub. Corp.*,
119 Ill. App. 3d 1049, 457 N.E. 2d 480 (Ill. App. Ct. 1983)...................................16

*People v. Fiorini*,
143 Ill. 2d 318, 574 N.E.2d 612 (Ill. 1991) ...........................................................22

*PepsiCo, Inc. v. Redmond*,
54 F.3d 1262 (7th Cir. 1995) ...........................................................33

*Phillips v. Cox*,
261 Ill. App. 3d 78, 632 N.E.2d 668 (Ill. App. Ct. 1994)......................................16

*Pilates, Inc. v. Current Concepts, Inc.*,
120 F. Supp. 2d 286 (S.D.N.Y. 2000)...........................................................20, 21, 26

*Polaroid Corp. v. Polaraid, Inc.*,
319 F.2d 830 (7th Cir. 1963) ...........................................................33

*Promatek Indus., LTD v. Equitrac Corp.,*
300 F.3d 808 (7th Cir. 2002) ........................................................24, 25

*R.R. Dynamics, Inc. v. A. Stucki Co.,*
727 F.2d 1506 (Fed. Cir. 1984)......................................................13

*Russian Media Group, LLC v. Cable America, Inc.,*
598 F.3d 302 (7th Cir. 2010) .......................................................32, 33

*Solon v. Midwest Med. Records Ass'n, Inc.,*
No. 04 CH 7119, 2004 WL 5660589 (Cook Cty. Chancery Div. Oct. 25, 2004)..............14, 16

*Soltex Polymer Corp. v. Fortex Indus., Inc.,*
832 F.2d 1325 (2d Cir. 1987).........................................................11

*Storck USA, L.P. v. Levy,*
No. 90 C 5382, 1991 WL 60562 (N.D. Ill. Apr. 15, 1991)....................................16

*Teaching Co. Ltd. P'shp. v. Unapix Entm't, Inc.,*
87 F. Supp. 2d 567 (E.D. Va. 2000) ..................................................24

*Tel-Lock, Inc. v. Thomson Consumer Elecs.,*
No. 03 C 320, 2005 WL 741930 (N.D. Ill. Mar. 30, 2005) ....................................18

*Telebrands Corp. v. Media Group, Inc.,*
No. 97 Civ. 6768 (RPP), 1997 WL 790576 (Dec. 24, 1997 S.D.N.Y.)............................24, 27

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.,*
No. 04 C 5312, 2008 U.S. Dist. LEXIS 86953 (N.D. Ill. May 22, 2008)........................19, 24

*United Healthcare Ins. Co. v. AdvancePCS,*
No. Civ 01-2320, 2002 WL 432068 (D. Minn. March 18, 2002)................................33, 34, 35

*United States v. An Article of Drug,*
661 F.2d 743 (9th Cir. 1981) .........................................................13

*Upjohn Co. v. Riahom Corp.,*
641 F. Supp. 1209 (D. Del. 1986)......................................................30

*West v. State,*
212 S.W.3d 513 (Tex. App. 2006).......................................................23

**STATUTES**

815 ILCS § 510/2(b) ...................................................................1, 14

815 ILCS § 510/3.................................................................1, 14, 15, 35

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65 ................................................................................................22

Ill. Pattern Jury Instructions 14.01 ...............................................................36

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2010) ..............
........................................................................................................24, 33, 34

This motion presents a simple question: Can Whirlpool continue to deceive consumers? The jury concluded that Whirlpool violated the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), finding that "Whirlpool created a likelihood of confusion or misunderstanding regarding the nature, quality, or characteristics of Whirlpool's steam dryers." (Dkt. 629, Jury Instructions at 37.) The evidence supporting this jury finding showed conclusively that Whirlpool's "steam" function actually employs cold water spray, that the dryer does not employ any "steam" that is different from the evaporation that occurs in conventional dryers, and, therefore, that advertising the dryer as a "steam" dryer creates a likelihood of confusion and misunderstanding among consumers. These facts—and the jury's verdict itself—leave no doubt that an injunction is required to bring Whirlpool's deceptive advertising practices to an end.

The IUDTPA, by its express terms, allows for injunctive relief—and only injunctive relief—once a showing of likelihood of confusion or misunderstanding has been made. 815 ILCS § 510/3. "Proof of monetary damage, loss of profits or intent to deceive is not required." *Id*. A plaintiff need not prove "actual confusion or misunderstanding" in order to obtain relief under the IUDTPA. 815 ILCS § 510/2(b). Moreover, a plaintiff is not required to prove irreparable harm. *Id*. Instead, a plaintiff need only meet the lower-threshold standing requirement that it is likely to be damaged by a defendant's deceptive trade practice. 815 ILCS § 510/3.

Here, LG proved that Whirlpool violated the IUDTPA and that LG is entitled to injunctive relief. Consumers believe that Whirlpool's "steam" refers to hot steam being injected into the dryer. That is not what occurs in the Whirlpool dryer, which works just like a conventional dryer, except that the clothing inside is moistened with a spray of cold water. The water from the damp clothing then evaporates, just as it would in any dryer. Whirlpool

originally named its dryer "Myst." Whirlpool's product development documents, as well as the current owner's manual, accurately describe the feature as a "water spray." But Whirlpool's marketing department knew that the word "steam" had strong positive associations in consumers' minds, so it changed the dryer's name. The name "Duet Steam" capitalizes on consumer perceptions that steam is "powerful, penetrating and potent"—perceptions that have nothing to do with the evaporative process that occurs in the Whirlpool dryer and conventional dryers alike.

As Whirlpool's main competitor in the steam dryer market, LG is likely to be harmed by Whirlpool's deceptive advertising. The remedy for Whirlpool's deceptive trade practice is the issuance of a nationwide injunction prohibiting Whirlpool from using the word "steam" in association with its dryer. At a minimum, however, the injunction should require that Whirlpool modify its advertising so that each time it uses the word "steam," there is a clear and conspicuous description of the feature as a "cold water spray" that results in an evaporative process that is no different than what happens in any conventional dryer. To be at all effective, any such disclaimer must be prominently integrated anywhere the word "steam" is used, especially on the dryer panel itself.

Finally, a finding of willfulness is warranted in this case, based on Whirlpool's knowledge that that its dryer does not employ "steam" as that term is commonly understood by consumers in the laundry context. Accordingly, LG is entitled to its attorney's fees for Whirlpool's willful violation of the IUDTPA.

## FACTUAL BACKGROUND

Whirlpool added a cold water spray system to its dryers that produces mere evaporation, but sold them as "steam" dryers. Because consumers understand "steam" dryers as dryers that inject a hot vapor into the dryer drum, Whirlpool's use of the word steam is deceptive.

Whirlpool willfully caused this deception to capitalize on consumers' perceptions of the word "steam."

## I. THE WHIRLPOOL DRYER IS ACTUALLY A COLD WATER SPRAY DRYER.

From the outset, Whirlpool intended to bring to market a cold water spray dryer, not a steam dryer. Not a single engineer involved in the creation of the Whirlpool dryer described the process occurring in the Whirlpool dryer as "steam" until **after** this litigation commenced. Whirlpool's Invention Disclosure Sheet called it a "water spray system." (Trial Tr. at 518:16-521:18; PX419.)[1] Whirlpool actually considered using steam, but it rejected the idea in favor of the spray system, because the dryer could be brought to market faster. (PX77 at WHR027905-R; Trial Tr. at 556:17-557:18; 741:13-742:18.) Whirlpool thus chose something cheaper, easier and quicker than the steam option it evaluated and rejected.

Donald Tomasi, Whirlpool's global head of dryer technology from 1998-2009, described the feature to Whirlpool's North American Region Brand Council—the group of senior executives responsible for green-lighting projects—as one that would "achieve re-wetting of fabric via spray." (PX29 at WHR040362-R; Trial Tr. at 512:19-513:6; 533:2-18; 538:15-16.) *See also* PX419 ("What is the problem to be solved? Provide wrinkle reduction and odor reduction within the clothes dryer. . . . The problem is solved by **application of water** to the clothing load during a refresh cycle.") (emphasis added); PX29 at WHR040362-R ("Technical Solution. Achieve re-wetting of fabric via spray.").) And in a slide titled "Why Not Steam?," Mr. Tomasi even communicated to the Brand Council the engineers' recommendation that steam **not** be used. (PX29 at WHR040367-R; Trial Tr. at 539:18-540:12.) After obtaining approval from the Brand Council for the water spray feature, Mr. Tomasi communicated the news to his

---

[1] Transcript citations attached as Exhibit A. Trial exhibits (with index) attached as Group Exhibit B.

engineering team, stating "NO STEAM-SPRAY ONLY."  (PX30; Trial Tr. at 543:8-10; 544:2-545:1.)

Kirk Dunsbergen, who was responsible for the design and development of the dryer, described it as containing a "simple, one-cycle, time-terminated water spray feature,"—never mentioning the term "steam."  (PX142 at WHR003143-R; Trial Tr. at 282:16-23.)  Steven Ficke, Whirlpool's technology lead on the platform side, called the feature "myst" technology and asked his co-workers to be prepared to discuss why they chose "water vs. steam."  (PX66; Trial Tr. at 720:9-22.)   Mr. Tomasi admitted at trial that there was nothing created at the time the dryer was being developed that said steam is injected or created inside the dryer drum.  (Trial Tr. at 699:24-700:7, 14-21; 701:4-11; 702:3-5; 703:5-9; 711:7-13.)

As numerous Whirlpool witnesses admitted, the water that is sprayed into its dryer and later evaporated is cold.  Mr. Dunsburgen testified:

> Q.  How do—how does Whirlpool tell consumers steam is created in the operator's manual and in the print advertising?
>
> ***
>
> A.  Whirlpool tells the consumers that we spray a fine mist of cold water into the hot air inside of the drum of the Whirlpool steam dryer.

(*Id.* at 333:5-12.)  Mr. Ficke testified:

> Q.  And what was Whirlpool's response to this question, why cold water?
>
> A.  We had data to believe that hot water built up more calcium. So, it would be a more reliable system if you used cold water.

(*Id.* at 824:15-19.)  Pamela Rogers testified:

> Q.  And in the Whirlpool dryer, it's a mist of cold water that's sprayed onto clothes; is that right?

A.  Right.

(*Id.* at 875:12-15.)   Indeed, the Whirlpool Installation Manual instructs that the "dryer must be connected to the cold water faucet" using a Y-connector.  (PX849 at 14; s*ee also* PX91 ("Why Cold Water? It takes longer to heat up the water to evaporate it . . . ."); *cf.* PX29 at WHR040362-R ("Water source is cold water source used for washer."); PX114 at WHR033779-R (Whirlpool email:  " . . .  let's be mindful that the Duet sprays nebulized (cold) water while the FF has an actual Steamer which dispenses hot vapor.").)[2]

## II.    WHAT WHIRLPOOL CALLS "STEAM" IS SIMPLY EVAPORATION.

In contrast to Whirlpool's contemporaneous internal documents, it is undisputed that what Whirlpool now identifies as "steam" is the evaporation of cold water that is sprayed into the dryer drum.  Whirlpool's expert, Dr. Subbaiah Malladi, admitted that as a scientific matter, there is no steam in the Whirlpool dryer.  (*Id.* at 2196:22-2197:8; 2199:21-23.)  But nevertheless, Dr. Malladi adopted a broad, nonscientific definition of steam—basically the evaporation of water into air—that includes water evaporating off clothes hung on a clothesline and water evaporating from a glass. (*Id.* at 2213:4-24; 1957:19-1958:7.)[3]  For example, Dr. Malladi testified:

> Q.  Sir, I asked you about clothes hanging on a clothes line outside
> on a warm, sunny day and the clothing inside the Whirlpool dryer.
> Can you just walk with me through that analogy, please?
>
> A.  Yes, sir.
>
> Q.  Okay.  Water is evaporated off both, right?
>
> A.  Yes.

---

[2] "FF" stands for Whirlpool's Fabric Freshener, a portable device that employs actual steam to reduce wrinkles and odors in clothes.  (Trial Tr. 1454:10-17.)

[3] While Dr. Malladi testified at length to the temperature measurements of the air inside the Whirlpool drum, and particularly the temperature of the air in a small region near the inlet grille, he never tied those temperature measurements to any definition of steam.  (*Id.* at 2246:12-2247:12.)

Q.  And, according to you, both are steam, right?

A.  The vapor phase is steam.

Q.  And both are steam, correct?

A.  Yes, sir.

(*Id.* at 2213:14-24.)

But for a cold water spray device, the Whirlpool dryer operates just like a conventional dryer.  David Palmer, LG's quality manager for laundry, examined the Whirlpool dryer as part of his duties and testified that

> in the Whirlpool dryer, the water mist is sprayed into the drum.  It touches the clothes.  They get wet, and then they dry. . . .   The only difference between that mist cycle and a regular dry cycle is the way the clothes get wet.  In a regular dry cycle, you get the clothes wet in the washer, you put them in the dryer and it dries the clothes.   In the misting dryer, you put dry clothes in, the mist sprays in, gets the clothes wet, and then they dry like a regular dry cycle.

(Trial Tr. at 83:22-84:9.)  Dr. Anthony Jacobi, the Richard W. Kritzer distinguished professor and associate head of graduate programs at the University of Illinois School of Engineering, confirmed that Whirlpool's "steam" cycle begins with a normal drying cycle, then a mist of cold water is sprayed into the dryer drum, and the dryer continues operating just like a normal drying cycle.  (*Id.* at 458:25-459:10; 474:9-11.)

It is undisputed that the "steam" Whirlpool claims to create in its dryer exists in every conventional dryer on the market.  Whirlpool's Mr. Dunsbergen admitted as much, making clear that under Whirlpool's definition of steam, any Whirlpool dryer could be called a "steam dryer":

> Q.   So whether there's any nozzle or not, any Whirlpool dryer could be called a steam dryer under the definition of steam that Whirlpool is using in this case, correct?

> A.  That is correct.

(*Id.* at 305:24-306:2.)  Indeed, according to Mr. Dunsburgen, ***any dryer at all*** can be called a

steam dryer:

> Q.  Isn't it true that under Whirlpool's definition of steam here, any conventional dryer made by any manufacturer could be called a steam dryer?
>
> A.  It could be called a steam dryer, yes.

(*Id.* at 306:10-13.)  Mr. Tomasi testified likewise:

> Q.  You consider the water that hits the clothes and then evaporates off the clothes to be steam, right?
>
> A.  Yes, I do.
>
> ***
>
> Q.  But sir, this evaporation of water off the clothes happens in every dryer, right?
>
> A.  This is true.

(*Id.* at 569:7-9; 22-24.)  Dr. Malladi also admitted that the Whirlpool dryer evaporates water just

like any other dryer, and that what he identifies as "steam" in the Whirlpool dryer is the same as

that which exists in a conventional dryer with wet clothing in it.  (*Id.* at 2208:9-25.)

## III.  WHIRLPOOL CHANGED THE NAME OF ITS DRYER FROM MIST TO STEAM TO CAPITALIZE ON CONSUMERS' PERCEPTIONS OF STEAM.

At the outset, Whirlpool appropriately named its dryer the Duet Myst.  (Trial Tr. at

1433:19-25.)  Yet, as Mr. Tomasi testified, the name of the dryer was changed to Duet Steam.

(*See id.* at 711:20-712:2.)  Mr. Tomasi was not consulted regarding the name change.  (*Id.*)

Angela Seger, Whirlpool's senior marketing manager, testified:

> Q.  My question is simply: You did choose Myst and you even started on Myst logos—Duet Myst logos—and then, you changed the name, correct?
>
> A.  Yes, we did.

(*Id.* at 1433:19-23.)  The name change occurred around the same time that Whirlpool learned that LG would be launching its steam dryer, which injects hot steam into its drum.  (PX88; *See* Trial Tr. at 742:9-11.)

As Ms. Seger testified, the reason for the name change was to ***capitalize on consumers' perceptions*** of the word "steam":

> Q.   But my question is: It was to capitalize on consumers' perceptions of the word "steam," correct?
>
> A.  Yes
>
> Q.  Because you knew that the word "steam" was very important in consumer's minds, right?
>
> A.  Yes.
>
> Q.  And, in fact, you had all kinds of research that showed that the word "steam" and the perceptions of what steam meant in consumers' minds was a key driver of sales, right?
>
> A.  Yes.

(Trial Tr. at 1434:13-22.)  In fact, Whirlpool commissioned a "proof point" marketing study to explore how consumers perceive steam and what consumers think is most important about steam. (PX198 at WHR007709-R.)   The study found that consumers perceive steam as "powerful, penetrating and potent."   (*Id.*)   Consumers were right—steam ***is*** powerful, penetrating and potent.  It releases energy and penetrates to areas difficult to reach with a water spray.  (PX13 at WHR093261; PX77 at WHR027905-R;  Trial Tr. at 454:14-455:14.)   But none of these phenomena occur when the cold water spray is evaporated in the Whirlpool dryer.  (Trial Tr. at 458:25-460:15; 461:4-21.)  Not surprisingly, Whirlpool had no consumer studies done describing mist or the evaporation of water as "powerful, penetrating and potent."  (*See id.* at 1434:13-22; PX198 at WHR007709-R.)

## IV. CONSUMERS ARE MISLED BY WHIRLPOOL'S ADVERTISING.

Whirlpool, of course, knows very well what true steam is. In a document assessing the benefits of using steam (as LG does) versus a water spray (as Whirlpool does) entitled "CONSUMER BENEFITS STEAM/MIST COULD POTENTIALLY DELIVER IN DRYER ENVIRONMENTS," Whirlpool's engineers define steam as "all water vapor, no air, @ 100 C," just as LG's expert Dr. Jacobi testified. (PX13 at WHR093261; Trial Tr. at 452:1-16.) Further, the "advantages" of steam are "uniform condensation" and "energy transfer," just as Dr. Jacobi testified. (PX13 at WHR093261; Trial Tr. at 454:14-455:14.) Whirlpool's engineers further observed that steam can be used to "uniformly condense water particles on clothes," just as Dr. Jacobi testified. (*Id.*) It is undisputed that Whirlpool chose mist, and rejected steam, for its dryer.

Just like Whirlpool itself, consumers associate "steam" in a dryer environment with pure boiled steam. The consumer confusion resulting from Whirlpool's "steam" claim was demonstrated by LG and Whirlpool witnesses alike. Robert Reitter, LG's survey expert, conducted a consumer survey to "to determine what messages consumers … take away from an advertisement" for Whirlpool's dryers. (Trial Tr. at 1621:19-24.) Mr. Reitter concluded from his survey that consumers take away the idea that steam is used to remove wrinkles and odors in Whirlpool's dryer, and consumers are deceived that Whirlpool's dryers use "hot steam . . . rather than a mist of cold water that is heated. . . ." (*Id.* at 1622:10-22.) Mr. Reitter found that two-thirds of consumers took away from Whirlpool's advertising the message that "a hot vapor is injected onto clothes inside the dryer drum," rather than "a mist of cold water is injected into the dryer drum. The dryer then heats and tumbles the clothes until dry." (*Id.* at 1637:6-11; 1622:23-1623:5.) Mr. Reitter testified that his survey showed deception that was "very significant, both statistically and in terms of consumer takeaway." (Trial Tr. at 1644:1-4.) Mr. Reitter's survey

and testimony reveal that (1) consumers believe hot steam is injected into the Whirlpool drum; and (2) this is necessarily different than the evaporative process occurring in all dryers. This evidence constitutes direct proof of consumer confusion.

Whirlpool presented nothing to the contrary. Indeed, Mr. Reitter's findings were confirmed by surveys conducted at Whirlpool's Insperience Studio, including the 2008 Ferguson Advanced Product Feedback Master List, which listed as the number one comment: "consumers have a lot of questions about steam. The No. 1 question, is it actually steam?" (PX5; Trial Tr. at 1848:3-6; 19-23; 1849:7-14.)

Whirlpool's water spray feature costs $30 to install, and yet it charges approximately the same for its dryer as LG, which uses a steam generator to inject hot steam onto clothes. (Trial Tr. at 395:20-22; 1309:6-8; 1320:3-10.) By using the name "steam," Whirlpool was able to deceive consumers into paying far in excess of what it could charge for a truthfully advertised product. (*Id*. At 1309:6-8.)

## V.     WHIRLPOOL KNEW ITS ADVERTISING WAS DECEPTIVE.

The evidence at trial demonstrated not only that Whirlpool chose the spray function over the steam function for its dryer, and that consumers expected hot steam instead of cold water spray in a "steam" dryer, but that Whirlpool itself believed there was no steam in its dryer. Lynn Voss, Whirlpool's Consumer Scientist responsible for testing and substantiating the advertising claims for the Whirlpool dryer, wrote, "We never, ever say we create steam (or at least we shouldn't be)." (PX288; Dkt. 634 at 35-37.)

Pamela Rogers, who at the time was the Product Development Director for Front Loading Laundry, emailed several people, including Erika Vallecorsa, category manager responsible for marketing materials, stating that "I really don't know that we should be pointing out that LG has 'true' steam in their dryer versus ours. I think that opens us up for questions from our trade."

(PX219; Trial Tr. at 1014:17-23; *see also* PX176.)  Laurie Lesauskis, who was responsible for reviewing advertising claims, wrote: "Suggest deleting the term 'benefit of steam' wherever it occurs as this could be construed by the consumer as that the dryer actually produces steam." (PX175; Trial Tr. at 1193:3-7.)  Fran Chickering, legal counsel for Whirlpool, warned that the phrase "[p]ower of steam" had "not been supported."  (PX236.)  Finally, category manager Matt Doll explained the position of Whirlpool's legal department with respect to "steam" as follows:

> "VERY IMPORTANT:  Direction from legal was that anytime we talk about this dryer and the technology behind the 'steam' dryer, we must never suggest we are using steam in the process (because we don't).  So we cannot say, 'Steams away wrinkles.'"

(PX137; Trial Tr. at 1226:7-1227:4.)[4]

## ARGUMENT

Courts have broad discretion in determining the scope of the injunctive relief awarded to a prevailing party.  *See Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433-36 (7th Cir. 1986) (district courts have flexibility to mold appropriate relief); *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987) ("a district court has a 'wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct.'") (citation omitted).

Here, with the jury's verdict as its starting point, the Court can and should enter a nationwide injunction barring Whirlpool from using the word "steam" to describe its dryers with a water spray feature, because these dryers do not produce or use "steam" in any way different from a conventional dryer.  Even if Whirlpool were to be permitted to use the word "steam" in limited contexts, Whirlpool must make clear each time it uses the term "steam" in connection

---

[4] Ms. Lesauskis explained that Whirlpool's legal department meets with the engineers as part of its assessment of the claims made with respect to Whirlpool's products.  (Trial Tr. at 1179:7-1180:16.)

with its water spray dryers—especially on the panel of the dryer itself—that this "steam" refers to a cold-water spray function which results in an evaporative process no different than the one used in any conventional dryer. No lesser injunction would be effective to fully remedy Whirlpool's unlawful conduct.

The discussion below begins (as it must) with the jury's findings. We then explain why an injunction is warranted, both under the state-law standard that governs here and under the federal standard on which Whirlpool will likely attempt to rely. Next, we discuss the scope of the injunction, including this Court's power to enter an injunction that would have nationwide effect. And finally, we discuss the issue of willfulness, showing that this Court can and should enter an award of attorney's fees against Whirlpool.

## I. THE COURT MUST BEGIN WITH THE JURY'S FINDING THAT WHIRLPOOL'S ADVERTISING OF ITS DRYERS AS STEAM DRYERS IS DECEPTIVE.

In determining an injunction, the court begins with the jury's verdict and any factual findings necessarily implied by the jury's verdict. *See Avitia v. Metro. Club of Chicago, Inc.,* 49 F.3d 1219, 1231 (7th Cir. 1995) ("[A] judge who makes equitable determinations in a case in which the plaintiff's legal claims have been tried to a jury is bound by any factual findings made or inescapably implied by the jury's verdict."); *Lebow v. Am. Trans Air, Inc.,* 86 F.3d 661, 672-73 (7th Cir. 1996) ("[T]he jury's factual findings are binding on the judge."); *E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.,* No. 06-C-0715, 2010 WL 3431822 at *15 (E.D. Wis. Aug. 31, 2010) ("In deciding whether to award equitable relief, I am bound by the jury's factual findings on plaintiff's legal claims but may make additional findings of fact as needed.")[5] A general verdict

---

[5] *See also United States v. An Article of Drug*, 661 F.2d 743, 747 (9th Cir. 1981) (where it was impossible to tell from jury verdict specific basis for verdict, court could issue broad injunction covering all possible bases "based upon the judge's view of the facts established by the evidence"); *Burton v. Amontrout*, 975 F.2d 543, 544-45 (8th Cir. 1992) (affirming entry of injunction notwithstanding that jury returned a

like the one rendered in this case "will of course give rise to the presumption that material fact issues have been resolved in favor of the prevailing party." *Dual Mfg. & Eng'g, Inc. v. Burris Indus., Inc.*, 619 F.2d 660, 667 (7th Cir. 1980). *See also R.R. Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1516 (Fed. Cir. 1984) ("[W]hen a jury returns a general verdict, the law presumes the existence of fact findings implied from the jury's having reached that verdict."); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1359 (Fed. Cir. 2001) (same).

A court must also interpret separate verdicts consistently, to the extent possible. *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 615 (7th Cir. 1999) ("[J]ury verdicts must be interpreted so as to avoid inconsistency whenever possible."); *Black & Decker Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2007 WL 108412 at *10 (N.D. Ill. Jan. 12, 2007) (St. Eve, J.) ("When possible, however, courts must reconcile inconsistent verdicts.").[6] In so doing, the court cannot attach any priority to one verdict over the other. *See Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994) ("[T]here is no priority among inconsistent verdicts.").

In concluding that Whirlpool violated the IUDTPA, the jury necessarily found that Whirlpool's use of the term "steam" in the advertising of its dryers "created a likelihood of confusion or misunderstanding regarding the nature, quality, or characteristics of Whirlpool's steam dryers." (Dkt. 629, Jury Instr. at 37.) This conclusion is entirely consistent with the verdicts against LG on the Lanham Act and Consumer Fraud Act claims, as those claims involved different elements. In accordance with its duty to reconcile the jury's verdicts wherever possible, this Court must conclude that LG failed to establish a ***different*** element under the Lanham Act and the Consumer Fraud Act claims—an element that is ***not*** shared with the

---

verdict in favor of defendants on damages, and noting that when the jury returns a general verdict, the court may "supply its own factual findings" and enter an injunction based on its own assessment of the evidence).

[6] Compendium of unreported cases attached as Exhibit F.

IUDTPA claim. (*See* Jury Inst. at 24, 33.) *See, e.g., Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (indicating that failure of proof on any one element is fatal to a claim). Accordingly, those verdicts do not stand in the way of the conclusion that "Whirlpool created a likelihood of confusion or misunderstanding regarding the nature, quality, or characteristics of Whirlpool's steam dryers." (Dkt. 629, Jury Instructions at 37.) The jury's finding of likelihood of confusion should be the foundation of this Court's analysis with regard to injunctive relief.

## II. AN INJUNCTION SHOULD ISSUE UNDER THE IUDTPA PROHIBITING WHIRLPOOL'S DECEPTIVE ADVERTISING.

The IUDTPA provides that "[a] person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required." 815 ILCS § 510/3. In addition, a plaintiff need not prove "actual confusion or misunderstanding" in order to obtain relief under the IUDTPA. 815 ILCS § 510/2(b). As discussed below, the jury's verdict by itself is sufficient under Illinois law to warrant entry of an injunction. But even if this Court were to apply the equitable analysis that applies to injunctions under *federal* law, an injunction would still be warranted.

### A. An Injunction is Warranted Under the IUDTPA.

Where, as here, a defendant is found to have created a likelihood of confusion under the IUDTPA, there is necessarily a likelihood that a plaintiff will be damaged by defendant's actions. *See Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 866, 893 N.E.2d 981, 996 (Ill. App. Ct. 2008). *See also Solon v. Midwest Med. Records Ass'n, Inc.*, No. 04 CH 7119, 2004 WL 5660589 (Cook Cty. Chancery Div. Oct. 25, 2004) ("Where a statute expressly authorizes injunctive relief, such as in the Deceptive Trade Practices Act, 815

ILCS 510/3, a plaintiff need only show defendant's violation of the Act and that plaintiff has standing to pursue the cause.").

In *Chicago's Pizza*, the defendant wrongly represented that it was affiliated with plaintiff's restaurant. The plaintiff asserted a claim under the IUDTPA, along with Lanham Act and other claims, and presented an accountant to testify that plaintiff had lost profits as a result of defendant's deceptive advertising. The trial court rejected the lost profits analysis and accordingly found for defendant on all counts. 384 Ill. App. 3d at 859, 893 N.E. 2d at 991. The appellate court reversed as to the IUDTPA claim, holding that, while plaintiff failed to prove defendant's conduct caused a loss in revenue, the IUDTPA does not require proof of monetary damages or lost profits. *Id*. at 866, 893 N.E. 2d at 996. Because there was evidence of likelihood of confusion, a permanent injunction was warranted. *Id*. at 868, 893 N.E. 2d at 998.

Here, LG proved that "Whirlpool created a likelihood of confusion" regarding its steam dryer. (Dkt 629, Jury Instr. at 37.)[7] Because of this likelihood of confusion, a permanent injunction is warranted here as well. *See Chicago's Pizza,* 384 Ill. App. 3d at 868, 893 N.E. 2d at 998; *see also Multiut Corp. v. Yehuda Draiman,* 359 Ill. App. 3d 527, 537, 834 N.E. 2d 43, 51 (Ill. App. Ct. 2005) (injunction warranted where defendant created likelihood of confusion or misunderstanding); *Bingham v. Inter-Track Partners*, 234 Ill. App. 3d 615, 621, 600 N.E. 2d 70, 74 (Ill. App. Ct. 1992) ("[I]njunctive relief is warranted when a party's trade practice creates a

---

[7] That the jury found LG did not establish it was entitled to lost profits, price erosion, and Whirlpool's profits is no bar to an injunction under the IUDTPA. First, the jury instructions were constructed such that the jury did not have to consider damages once it found (1) a violation of the IUDTPA, and (2) no violations of the Lanham Act or the Illinois Consumer Fraud and Deceptive Business Practices Act. (Dkt 629, Jury Instr. at 37.) "[T]he Court will determine what damages, if any, to award LG under the Illinois Uniform Deceptive Trade Practices Act." *Id*. Second, as illustrated by *Chicago's Pizza*, injunctive relief is appropriate under the IUDTPA even where a plaintiff cannot establish money damages. *See* 384 Ill. App. 3d at 866, 893 N.E. 2d at 996; 815 ILCS 510/3 ("Proof of monetary damage, loss of profits or intent to deceive is not required.").

likelihood of confusion or misunderstanding."); *People ex rel. Hartigan v. Maclean Hunter Pub. Corp.,* 119 Ill. App. 3d 1049, 1060, 457 N.E. 2d 480, 488 (Ill. App. Ct. 1983) (under the IUDTPA, "courts are free to enjoin any conduct which creates a likelihood of confusion or of misunderstanding.") (citation omitted).

Moreover, LG has standing to bring its IUDTPA claim because the confusion caused by Whirlpool's deception is likely to harm LG in the future. Likelihood of future harm is requirement for standing under the IUDTPA. *See Solon,* 2004 WL 5660589 (under the IUDTPA, a plaintiff need only show defendant's violation and that plaintiff has standing to pursue the cause); *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 904 F. Supp. 818, 822 (N.D. Ill. 1995) (The IUDTPA "limit[s] standing to 'a person likely to be damaged by a deceptive trade practice.'") (quoting 815 ILCS § 510/3); *Storck USA, L.P. v. Levy*, No. 90 C 5382, 1991 WL 60562, at *3 (N.D. Ill. Apr. 15, 1991) ("[I]t was the likelihood of injury to the plaintiff . . . that provided standing."). Competitors are routinely found to have standing under the IUDTPA.[8] In fact, LG is unaware of any instances under the IUDTPA where a competitor alleging likely future damage was found to lack standing.

---

[8] *See, e.g.*, *BlueStar Mgmt. v. The Annex Club, LLC*, No. 09 C 4540, 2010 WL 2802213, at *8 (N.D. Ill. July 12, 2010) (competing baseball stadium rooftop clubs; plaintiff stated cause of action under IUDTPA); *Morningware, Inc. v. Hearthware Home Products, Inc.,* 673 F. Supp. 2d 630, 639 (N.D. Ill. 2009) (St. Eve., J.) (competing counter-top electric stove manufacturers; plaintiff stated cause of action under IUDTPA); *American Taxi Dispatch, Inc. v. American Metro Taxi & Limo Co.*, 582 F. Supp. 2d 999, 1004 (N.D. Ill. 2008) (St. Eve., J.) (competing taxi dispatch service providers; court entered default on plaintiff's IUDTPA claim); *M & R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*, 321 F. Supp. 2d 949, 952 (N.D. Ill. 2004) (competing sellers of printing equipment; plaintiff stated cause of action under IUDTPA); *Chicago's Pizza*, 384 Ill. App. 3d at 868, 893 N.E.2d at 998 (Ill. App. 2008) (competing pizza chains; defendant violated IUDTPA); *Phillips v. Cox*, 261 Ill. App. 3d 78, 83, 632 N.E.2d 668, 672 (Ill. App. Ct. 1994) (competing sign makers; plaintiff stated cause of action under the IUDTPA).

Here, if left unabated, Whirlpool's deceptive use of the term "steam" in its advertising is more than likely to damage LG's sales in the future.[9]  *See* Declaration of Mohan Rao ("Rao Decl.") at ¶ 13, attached as Exhibit C; Declaration of John Herring ("Herring Decl.") at 4, attached as Exhibit D.  Whirlpool's own marketing studies demonstrate that LG is likely to lose sales to Whirlpool as a result of its deceptive advertising.  In particular, these studies show that consumers value "steam" in a product and that Whirlpool expected that its "steam" representations to consumers would drive sales and market share at the expense of LG.  Herring Decl. ¶ 10, Rao Decl. ¶ 9.  Whirlpool knew that the attributes of steam—attributes that Whirlpool's evaporated water does not possess—are powerful in the minds of consumers.  (Trial Tr. at 1434:13-22; 458:25-460:15; 461:4-21; PX198 at WHR007709-R; PX13 at WHR093261; PX77 at WHR027905-R.)  As Ms. Seger testified, the very purpose of the dryers' name change from "mist" to "steam" was to capitalize on consumers' perceptions of the word "steam."  (Trial Tr. at 1434:13-22.)  Steam is a key purchase driver for consumers.  (Trial Tr. at 1287:19-1288:14; PX18, PX60, PX96.)  According to Whirlpool, "consumers have shown a preference for steam, especially in the dryer."  (Trial Tr. at 1006:9-11; PX60.)  And Whirlpool's research found that to consumers, steam in the dryer is more important than steam in the washer.  (PX18 at WHR009571-R; Trial Tr. at 855:1-23.)  Whirlpool, therefore, expected that its steam dryer would propel it to the leadership position in the premium frontload laundry segment.  (PX255 at WHR062303.)  In fact, "purchase intent for refreshing dryer is double the refreshing washer."  (*Id.*)  Whirlpool knew its sale of a "steam" dryer would be "so compelling that . . . there will be

---

[9] That the jury answered Question 6 (regarding whether LG is entitled to compensation) on the verdict form does not mean that LG is not likely to be damaged.  (Dkt. 631.)  Because Whirlpool prevailed on the Lanham Act and Consumer Fraud Act counts, it "did not consider" the question of damages.  (Dkt. 629 at 35.)

single unit sales and increased attachment rates." (PX60 at WHR000565-R; Trial Tr. at 1006:12-1007:14.)

As numerous fact witnesses at trial testified, Whirlpool and LG are direct competitors in the steam dryer market, and they compete fiercely. (PX296; PX275; PX86; Trial Tr. at 885:13-25; 918:20- 919:20; 1000:16-1001:19.) Dr. Mohan Rao, LG's damage expert, testified likewise. (Trial Tr. at 1283:11-14.) Dr. Rao explained that Whirlpool's own documents establish that it expected its "ability to offer a washer-and-dryer combination that offers both benefits, in this case, they are talking about steam, will help in the fight for share against LG." (Trial Tr. at 1300:2-9; PX174 at 477.) Whirlpool's documents further demonstrate that "in a fair world, no false advertising, consumers seem to prefer LG over Whirlpool. That's what they are trying to fight." (Trial Tr. at 1305:11-15; PX255 at WHR062299-R.) Dr. Rao explained that Whirlpool's deceptive use of "steam" in its advertising creates the illusion that its "steam" technology is substitutable with LG's steam technology. (*Id.* at 1285:11-14, 1317:2-4, 1295:11-24.) He testified that "when you have direct competitors, like LG and Whirlpool, if one of them makes a sale to a customer, the other does not." (*Id.* at 1285:11-13.) Dr. Rao accordingly found that LG continues to lose sales to LG due to Whirlpool's use of steam in its advertising. (*Id.* at 1314:2-19, 1320:12-18, 1327:9-1328:18.)

In addition, as a result of Whirlpool's false and misleading claims, LG's ability to price steam dryers at a premium is constrained. Herring Decl. ¶¶ 14-15, (Trial Tr. at 1327:9-1328:12.) *See generally Tel-Lock, Inc. v. Thomson Consumer Elecs.*, No. 03 C 320, 2005 WL 741930 at *10 (N.D. Ill. Mar. 30, 2005) ("The price erosion theory of damages is 'the difference between actual costs of goods and potential price—the price they could have realized had there been no competition from the infringers.'") (citation omitted). Tim Kavanaugh, LG's merchandising

director, testified that the prices LG's competitors charge have a "very direct effect on steam dryer positioning and sales, because there is a direct comparison of the product, especially with the steam feature that LG has." (Dkt 627 at 18-19.) Dr. Rao examined the premium that LG obtains on its steam washer and the premium that LG obtains on its steam dryer, and he found that LG garners a lower premium on its steam dryer than it does on its steam washer, even though consumers prefer steam in the dryer. (Trial Tr. at 1327:9-1328:10.) He calculated that the price at which LG is currently selling its dryers has been eroded by $57 because of Whirlpool's false advertising. (*Id.* at 1328:11-12.) He also demonstrated that Whirlpool and LG are the leaders in the steam dryer category, and that LG did not suffer price erosion when other competitors, such as Samsung, entered the market. (*Id.* at 1390:21-1391-5.)

Additionally, LG's market share will continue to be eroded as a result of Whirlpool's deceptive advertising. *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321 (7th Cir. 1994) (identifying loss of market share as a "competitive injury"); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2008 U.S. Dist. LEXIS 86953 at *7 (N.D. Ill. May 22, 2008) (holding that "erosion of [market share] would cause incalculable extraneous injury to [plaintiff's] business."); *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2006 U.S. Dist. LEXIS 86990 at *13 (N.D. Ill. Nov. 29, 2006) (St. Eve, J.) (holding that loss of market share weighs in favor of granting permanent injunction). *See also* Rao Decl. ¶¶ 9-13; Herring Decl. ¶ 4. Whirlpool's rise in market share was 5 percentage points, all due the launch of its steam washer and dryer. *See* Rao Decl. ¶ 10. This large increase in market share evidences the great value that consumers place on steam. (*Id.*) Given the consumer preference for steam, the direct competition between Whirlpool and LG, and the fact that LG's dryer injects hot steam into the drum—exactly what consumers believe a "steam" dryer does—a portion of the market share that Whirlpool gained as

a result of its deceptive trade practice came at the expense of LG. *See Keebler Co. v. Nabisco Brands, Inc.*, No. 92 C 2848, 1992 U.S. Dist. LEXIS 6826 at *30 (N.D. Ill. May 18, 1992) (issuing an injunction in a trademark infringement case based in part on "loss of market share . . . due to consumer confusion"); Rao Decl. ¶ 13.

LG is also likely to suffer a loss of goodwill, brand value, and competitive position as a result of Whirlpool's deceptive advertising. Goodwill is broadly defined as "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers. . . ." *Newark Morning Ledger Co. v. U.S.,* 507 U.S. 546, 555 (1993) (citation omitted). It is "'the value attributable to a going concern apart from its physical assets—the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company.'" *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 310 (S.D.N.Y. 2000) (citation omitted). *See also* Herring Decl. ¶¶ 16-19.

LG, a relatively recent entrant into the washer and dryer market in the U.S., pioneered the steam laundry market when it introduced its steam washer, which catapulted it to the number-one position in the front-load laundry category. (Trial Tr. at 62:13-17.) According to Ms. Rogers, it was very important for Whirlpool to beat LG to market with its steam dryer:

> Q. And if you didn't beat LG to market, you'd be perceived as a "me too" to LG, right?
>
> A. Potentially. That's what happens.
>
> Q. Right. And then you lose the impact of being first to market, right?
>
> A. That's what second to market is, yes.

***

    A.  We made front-load washers the big deal in the U.S. They came in with steam, to their credit, and now we needed to get that back.

    Q.  But here you didn't want to be perceived as a "me too" in the dryer, right?

    A.  Nobody wants to be perceived as a "me, too."

(Trial Tr. 893:12-894:16.) Whirlpool was well aware of the impact being first to market with a steam dryer would have. Ms. Vallecorsa stated that Whirlpool needed "to unravel [LG] before they get a foot hold on steam." (PX296; Trial Tr. at 1000:16-1001:19.) Mr. Dunsbergen testified that Whirlpool was afraid LG would get its dryer to market first. (Trial Tr. at 273:3-15; 278:19-22.) And Ms. Voss received an award for her "exceptional efforts and willingness to take calculated risks," which allowed Whirlpool to be "first to market for the steam dryer and [] disrupted the LG launch on the Sears floors in California." (PX460; Dkt 634 at 18-19.)

    LG and Whirlpool are the main competitors in the steam dryer market. (Trial Tr. at 1283:11-14.) Whirlpool's dryer uses a cold water spray that is then evaporated, just as water in any dryer would be evaporated. (*Id.* at 304:12-305:19.) By contrast, LG's dryer injects a hot steam into the drum, which is exactly what consumers expect from a steam dryer. (*Id.* at 1622:10-1623:5.) Whirlpool's marketing of its cold water spray dryer as a steam dryer necessarily harms LG's goodwill and brand reputation, because it harms "the intangible worth of buyer momentum emanating from the reputation and integrity earned" by LG's steam innovation. *Pilates,* 120 F. Supp. 2d at 310. *See also Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1117 (7th Cir. 1997) (recognizing that the Supreme Court's definition of "goodwill" extends to the ability to "maintain a fairly stable customer base," and

finding error where district court failed to consider "injuries to goodwill, as well as economic injuries from lost sales opportunities" that can take place from consumer confusion).

Additionally, LG's success in the U.S. market, compared to the much larger and long established Whirlpool, is attributable to its reputation for innovative technology. Herring Decl. ¶¶ 16-18. This perception is largely based on the goodwill that LG established when it launched its steam washer in 2006. *Id.* ¶¶ 16, 18. But LG's goodwill is negatively affected by Whirlpool's advertisement of its "steam" dryer, which, by using the term "steam," creates the perception that its "steam" technology" has the same characteristics as LG's "steam" technology. *Id.* ¶ 13.

**B.    LG Satisfies the Standard for Obtaining an Injunction under the Federal Principles of Equity.**

Because LG established that it has a right to an injunction under a state law, the Court need not apply the four-part federal test the Supreme Court recited in *eBay v. MercExchange, LLC,* 547 U.S. 388, 391 (2006), and as set forth in Fed. R. Civ. P. 65. A federal court is "not required to consider the Rule 65 factors in determining whether a permanent injunction . . . should issue under [state] law." *Midland Funding LLC v. Brent*, No. 3:08 CV 1434, 2009 WL 3086560 at *2 (N.D. Ohio Sept. 23, 2009) (holding that "since the remedy of injunctive relief is statutory, it may be granted upon a showing the [Ohio Consumer Sales Protection Act] has been violated, without regard to equitable principles that must ordinarily be demonstrated when a plaintiff seeks an injunction, such as irreparable injury or the absence of an adequate remedy at law.") *See also People v. Fiorini*, 143 Ill. 2d 318, 346, 574 N.E.2d 612, 623 (Ill. 1991) ("[W]here a statute expressly authorizes injunctive relief to enforce the provisions of the statute, the general rules of equity requiring a showing of a lack of an adequate remedy at law and irreparable injury need not be shown."); *Chicago's Pizza*, 384 Ill. App. 3d 849, 866-68, 893

N.E.2d at 996-98 (awarding injunction under IUDTPA without considering traditional injunctive relief factors); *West v. State*, 212 S.W.3d 513, 519 (Tex. App. 2006) ("[W]hen an applicant relies upon a statutory source for injunctive relief, such as the DTPA, the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law.").

Even if the Court were to consider the federal injunction factors set forth in *eBay*, however, LG would still be entitled to an injunction. In *eBay*, the court enumerated the four principles that must be satisfied for an injunction to issue under traditional federal notions of equity. 547 U.S. at 391. A plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

### 1. Irreparable Injury and Lack of Remedy at Law

Because the jury found Whirlpool created a likelihood of confusion regarding its steam dryer, irreparable harm and lack of remedy at law necessarily follow from that finding. *See Genderm Corp. v. Biozone Lab.*, No. 92 C 2533, 1992 WL 220638, at *18 (N.D. Ill. Sept. 3, 1992) ("[A] court may presume that irreparable injury will result where there is a likelihood of proving consumer confusion."); *Bonner v. Westbound Records, Inc.*, 49 Ill. App. 3d 543, 551, 364 N.E.2d 570, 576 (Ill. App. Ct. 1977) ("Having already found a likelihood of success on the merits in proof of a deceptive trade practice, it necessarily follows that irreparable harm has been

demonstrated.")[10] *See also Teaching Co. Ltd. P'shp. v. Unapix Entm't, Inc.,* 87 F. Supp. 2d 567, 587 (E.D. Va. 2000) ("If a defendant has been found to be committing acts which constitute unfair competition, there is little doubt that money damages are inadequate to compensate for continuing harm") (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30-1 at 30-6 (4th Ed. 1995); *Telebrands Corp. v. Media Group, Inc.*, No. 97 Civ. 6768 (RPP), 1997 WL 790576 at * 3 (Dec. 24, 1997 S.D.N.Y.) ("[A] finding of irreparable harm is warranted in a context where the parties are direct competitors and some evidence is adduced to suggest that consumers are misled by defendant's advertising.") (citing *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 316-17 (2d. Cir. 1982).[11]

The confusion created by Whirlpool also results in a loss of market share to LG, which is an irreparable harm that cannot be compensated by money damages. (*See supra* at 20-21.) Loss of market share can "render monetary relief inadequate." *Abbott Labs.*, 971 F.2d at 18. "Loss of market share is a key consideration in determining whether a plaintiff has suffered irreparable harm." *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2006 U.S. Dist. LEXIS 86990 at *12 (N.D. Ill. Nov. 29, 2006) (St. Eve, J.), vacated in part on other grounds, 260 Fed. Appx. 284 (Fed. Cir. 2008). *See also Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C

---

[10] Although *Genderm* and *Bonner* dealt with requests for preliminary injunctions, 1992 WL 220638, at *1; 364 N.E.2d at 570, their analyses of the irreparable injury requirement are equally applicable to this case.

[11] In fact, in Lanham Act cases, there is a presumption of irreparable harm, which is "based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 16 (7th Cir. 1992) (noting the "well established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss"); *Promatek Indus., LTD v. Equitrac Corp.,* 300 F.3d 808, 813 (7th Cir. 2002); *Lincoln Diagnostics, Inc. v. Panatrex, Inc.,* No. 07-CV-2077, 2009 WL 3010840, at *9 (C.D. Ill. Sept. 16, 2009); *Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 730 (3d Cir. 2004) (in Lanham Act case, reversing decision to deny injunction where consumer confusion had occurred, reasoning that "the most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy").

5312, 2008 U.S. Dist. LEXIS 86953 (N.D. Ill. May 22, 2008) (explaining that the potential for lost market share "weigh[s] in favor of granting" a motion for a permanent injunction); *Illinois Bell Tel. Co. v. MCI Telecoms. Corp.*, No. 96 C 2378, 1996 WL 717466 at *9 (N.D. Ill. Dec. 9, 1996) ("Loss of market share is also irreparable injury, because market share is difficult to recover."); *Keebler Co. v. Nabisco Brands, Inc.*, No. 92 C 2848, 1992 U.S. Dist. LEXIS 6826 at *30-31 (N.D. Ill. May 18, 1992) ("[T]he possibility of loss of market share and damage to reputation, all due to consumer confusion, is sufficient to establish irreparable harm to the plaintiff.").

LG will also suffer from a loss of goodwill and brand value, which results in irreparable harm that cannot be compensated by money damages. (*See supra* at 21-22.) *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (explaining that loss of good will and brand value are intangible harms that are extremely hard to measure, thus no adequate remedy at law exists); *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (granting preliminary injunction, noting that the standard for a permanent injunction is essentially the same and that loss of goodwill and competitive position are not easily calculable or redressed by monetary damages); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 552 (4th Cir. 1994) (finding that "the threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm"). By deceptively marketing its own steam dryer, Whirlpool drives interest away from LG—its main competitor in the steam dryer market—depriving it from the "constant or habitual customers" it could obtain absent Whirlpool's deceptive marketing. Herring Decl. ¶ 13, Rao Decl. ¶¶ 9-10. Every sale that LG loses to Whirlpool represents a potential "habitual customer" lost to Whirlpool. *See Newark Morning Ledger,* 507 U.S. at 555.

Whirlpool's deceptive use of steam in its advertising thus depreciates LG's brand and reputation in the steam laundry category and causes LG to lose goodwill in the marketplace. Herring Decl. ¶¶ 16-19. This constitutes an irreparable injury for which there is no remedy available at law. *See Amer. Taxi,* 582 F. Supp. 2d at 1005.

In *American Taxi*, the plaintiff alleged infringement of its trademark in violation of the Lanham Act as well as the IUDTPA. *Id.* The defendant provided poor customer service, which consumers attributed to the plaintiff, thus resulting in damage to the plaintiff's reputation. *Id.* at 1006. The Court entered default judgment against the defendant, and consequently adopted all the facts alleged in the complaint as true. *Id.* at 1004. This Court noted that "it is not necessary for plaintiff to prove actual damage or injury to obtain injunctive relief" and held that the harm to plaintiff's reputation weighed in favor of granting an injunction. *Id.* at 1005-07. The same reasoning applies here. LG injects hot steam into its steam dryer. Whirlpool injects a cold water spray into its dryer, which evaporates just as it would in a conventional dryer. Consumers believe, however, that Whirlpool's dryer utilizes a hot steam, and not a cold water spray that is then evaporated. (Trial Tr. at 1622:23-1623:5; 1637:6-11.) LG created the steam laundry market. Herring Decl. ¶ 6. But the benefit LG can gain from its "constant or habitual customers" and "buyer momentum" is necessarily affected when its main competitor markets the conventional evaporation of water as the same innovative steam that LG pioneered. *See generally Newark Morning Ledger,* 507 U.S. at 555; *Pilates,* 120 F. Supp. 2d at 310; Herring Decl. ¶ 13.

Additionally, "if consumers are misled by defendant's advertising into believing something about the product that makes it more desirable than it would otherwise be, and if plaintiff and defendant are direct competitors, then it is likely that plaintiff will lose business

because consumers will unfairly choose defendant's product over plaintiff's." *Telebrands*, 1997 WL 790576, at *3 (finding irreparable harm). This is exactly the irreparable harm experienced by LG when consumers choose Whirlpool's dryer. (*See supr*a at 20-23.) *See ON/TV v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985) (affirming injunction where plaintiff "would suffer irreparable harm from … lost sales if the injunction were denied"); *Mintel Int'l Group, Ltd. v. Neergheen*, No. 08-CV-3939, 2008 U.S. Dist. LEXIS 54119 at *15 (N.D. Ill. July 16, 2008) ("[i]rreparable harm includes the impossibility of ascertaining with any accuracy the extent of the loss"); *CRC Press, LLC v. Wolfram Research, Inc.*, 149 F. Supp. 2d 500, 510 (C.D. Ill. 2000) (finding irreparable harm when plaintiff "could suffer lost sales").

## 2. <u>Balancing of the Hardships</u>

The next factor of the equity analysis, balancing of the hardships, also favors LG. Calling its steam dryer as such is very important to LG. But if Whirlpool's own arguments are taken at face value, ***Whirlpool itself is currently indifferent with regard to whether it calls its dryers steam dryers or something else***. Whirlpool's damage expert, Dr. Raymond Sims, concluded after reviewing the Whirlpool consumer surveys that whether the dryer was named "steam" or "mist" would not be a "big deal." (Trial Tr. at 2326:2-5.) He testified that there was "no indication" that Whirlpool would not have sold the ***same number*** of dryers if it called its dryer a mist dryer. (*Id.* at 2389:5-9.) Dr. Sims stated:

> My position is that none of the information -- none of the evidence that I reviewed, none of the documents that I reviewed indicate that there's any value to Whirlpool's use of the name or the word "steam" in its advertising or in connection with the name of its dryer.

(*Id.* at 2390:14-18.)

Moreover, LG is only asking this Court to enjoin Whirlpool from engaging in practices that the jury already found unlawful. LG is not asking this Court to bar Whirlpool from

advertising its dryers or from selling its dryers; it is asking that Whirlpool's deceptive advertising be stopped. Just like in *American Taxi*, where this Court found an appropriately tailored injunction would not force the defendant there out of business, 582 F. Supp. 2d at 1007, an appropriately tailored injunction here would not force Whirlpool out of business, or force its dryers off the market, or prevent Whirlpool from touting the performance of its dryers in a fair and honest manner. As such, the balance of the hardships weighs in favor of LG.

### 3. Public Interest

Lastly, the public interest would not be disserved by a permanent injunction in this case. Quite to the contrary, the public interest would be well served were Whirlpool required to correct the confusion and misunderstanding it has caused. It is unquestionably within the public interest to eliminate false advertising and unfair competition. *Hot Wax, Inc. v. S/S Car Care*, No. 97 C 6879, 1999 WL 966094 at *8 (N.D. Ill. Oct. 14, 1999) ("The public has a strong interest in eradicating false advertising in the marketplace, particularly when the consumer does not receive what the consumer believes he or she is paying for when making a purchase. False advertising, by its very nature, harms the consuming public."); *Accurate Leather & Novelty Co. v. LTD Commodities Inc.*, No. 90 C 6304, 1990 WL 205865 at *4 (N.D. Ill. Dec. 7, 1990). The jury already found that Whirlpool's advertising is deceptive under the IUDTPA. Thus, the public interest would be served by the elimination of Whirlpool's deceptive trade practices and an injunction should issue in this case. *See eBay*, 547 U.S. at 391.

## III. THE INJUNCTION MUST BE BROAD ENOUGH TO REMEDY THE WRONGDOING AND SHOULD BE NATIONWIDE IN SCOPE.

### A. An Injunction Should Issue Prohibiting Whirlpool from Using the Term "Steam" in Connection with its Dryers.

The feature that Whirlpool is advertising with the word "steam" is a fabric-wetting function via a cold water spray. It is undisputed that what Whirlpool identifies as "steam" in its

dryer is the evaporation of water that occurs in every dryer. (Trial Tr. at 569:7-13; 569:22-24; 305:20-306:13.) Consumers, however, believe that the "steam" designation means a hot vapor that is injected into the Whirlpool dryer drum. (*Id.* at 1622:10-1623:5.) Consumers do not believe that what occurs in the Whirlpool dryer is the same evaporative process that occurs in any standard dryer. (*Id.* at 1622:10-22.)

Accordingly, this Court should end Whirlpool's deceptive trade practice by permanently enjoining Whirlpool from using the word "steam" in any way that refers to the Duet® Steam Dryer, Cabrio® Steam Dryer, and Maytag® Bravos™ Steam Dryer. *See also* Declaration of Jerry Wind ¶ 6 ("Wind Decl."), attached as Exhibit E. An order prohibiting the use of the term "steam" in connection with these dryers would not prohibit their sale, but rather would in effect require Whirlpool to do what it set out to do in the first place, sell Myst Dryers with a Refresh Cycle, which is a water spray function that produces conventional evaporation. *See* Wind Decl. ¶ 7.

Anything less—such as requiring Whirlpool to use some type of more detailed description of its process—would be insufficient to correct Whirlpool's false and deceptive advertising. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.* Co., 290 F.3d 578, 598 (3d Cir. 2002) (holding that a disclaimer cannot "rectify a product name that necessarily conveys a false message to the consumer"); *Abbot Labs.,* 971 F.2d at 17-18 (finding that the district court abused its discretion in holding that an injunction requiring a name change would significantly harm defendant, and remanding with instructions to consider all possible forms of injunctive relief); *Int'l Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir. 1988) ("[P]laintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers.").

**B. At a Minimum, Whirlpool Must Prominently Disclose that its Dryer uses a Cold Water Spray, which then Evaporates in the Same Manner as in a Conventional Dryer.**

LG strongly believes an injunction prohibiting Whirlpool from using the term "steam" in connection with its dryer is necessary, and thus LG objects to anything less than such an injunction.

However, if Whirlpool were to be permitted certain limited use of the term "steam," it should at least be required to include a prominent modification each time it uses "steam" in connection with its dryers—especially on the panel of the dryer itself—that would correct the confusion and misunderstanding that Whirlpool caused in the marketplace. Wind Decl. ¶¶ 8, 11. Any disclaimer must be clear and prominent, in the same size and color, immediately adjacent to the occurrence of "steam," so that it is effective at correcting Whirlpool's deceptive advertising. *Id.* ¶ 11; *see also, e.g., Upjohn Co. v. Riahom Corp.*, 641 F. Supp. 1209, 1226 (D. Del. 1986) (requiring that all packaging, brochures, and other literature regarding defendant's product include clearly "noticeable" language explaining that the product did not promote hair growth, retard hair loss, or treat baldness); *Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F. Supp. 360, 366 (N.D. Ill. 1984) (rejecting use of "fine print" disclaimer even though it was located on the cover of the book).[12]

To correct Whirlpool's deception and prevent confusion in the future, this Court should require a prominent modification immediately adjacent to each mention of the word "steam," in the same size and color, stating that it is describing a "cold water spray." For example:

---

[12] *See also Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1315 (2d Cir. 1987) (vacating district court injunction that permitted use of a disclaimer, including "because the disclaiming information [in the middle of a brochure] does not appear in sufficiently close proximity to the infringing statements [on the back panel of the brochure]"); *FTC v.Cyberspace.com LLC*, 453 F.3d 1996, 1200 (9th Cir. 2006) (rejecting as inadequate "fine print notices…placed on the reverse side of [defendants' deceptive materials]").

- Steam (Cold Water Spray)

- Duet Steam (Cold Water Spray) Dryer

- Steam (Cold Water Spray) Cycle

This modification is consistent with Whirlpool's own materials, which refer to cold water spray. (*See supra* at 6.) In fact, Whirlpool's Use and Care Guide states that "a small amount of **water** is **sprayed** into the dryer drum after several minutes of tumbling with heat. The **Steam** Status Light will come on while the **water** is **sprayed** into the drum." (PX848 at 8.)[13]

It is critical that this modification be on the Whirlpool dryer itself, where Whirlpool prominently advertises "steam" in the name of the dryers, in the washer-dryer pair brand logo, and in the dryer cycle labels of the selection dial. (DX1300 (Whirlpool Duet Steam Dryer demonstrative exhibit).) Such prominent modification on the dryer itself is the most important channel of communication with consumers. *See also* Wind Decl. ¶¶ 9, 11-12. As Ms. Rogers testified, point of purchase advertisements may or may not be available, because retailers "all have different policies." (Trial Tr. at 864:18-22.)

Whirlpool should also be required to disclose in all advertising that refers to its "steam" dryers (print, commercial, point of purchase, each web page referring to steam dryers) and in its owners' manuals that the "steam" function refers to a "cold water spray that wets the clothes, which are then dried in the evaporative process that occurs in all standard dryers." Wind Decl. ¶ 9.

---

[13] This explanation, however, would be insufficient by itself to dispel any confusion, both because the manual is reviewed after purchase, if at all, and because the description still implies that this water spray is related to "steam" that is different from simple evaporation. *See Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665, 673-74 (E.D. Mich. 2002) (rejecting adequacy of disclaimers placed on packaging and backing of floor mats: "First and foremost, many of Defendant's customers do not even see its disclaimers when they are purchasing their mats…. Moreover, even if the disclaimers are effective with respect to the purchasers of the mats, they are insufficient because they do not reach consumers beyond the point of sale.").

These changes should take place immediately for all newly produced units, and within a reasonable amount of time for all units in the distribution channel. Whirlpool must apply stickers with the corrective modifications to all dryers that are already at retailers, including all floor display units. Anything short of these changes—such as explaining that a "water mist combines with heated air to create steam"—would amount to what Whirlpool is already doing in the marketplace. Whirlpool presented this "notice" evidence at trial, and the jury still found that its advertising was deceptive. (*Id.* at 2496:16-2498:4.)

Finally, Whirlpool should be required to issue advertising correcting the confusion it created in the marketplace. "A district court has broad powers in equity to direct parties who have engaged in unfair competition to take affirmative steps to eliminate possible consumer confusion." *Energy Four, Inc. v. Dornier Medical Systems, Inc.*, 765 F. Supp. 724, 735 (N.D. Ga. 1991) (citing *Alpo Pet Foods, Inc. v. Ralston Purina Co.*, 720 F. Supp. 194 (D.D.C. 1989) (both parties required to issue corrective releases), rev'd on other grounds, 913 F.2d 958 (D.C. Cir. 1990)); *see also Abbott Labs.*, 971 F.2d at 17-19 (finding that the district court "abused its discretion" by failing to consider the possibility of corrective advertising in crafting injunctive relief); *Linotype Co. v. Varityper, Inc.,* No. 89 Civ. 4747, 1989 WL 94338, at *3 (S.D.N.Y. Aug. 4, 1989) (ordering corrective advertising, "to counteract the false impression that may have been placed by the [defendant's] ad in consumer's minds"). Here, advertising is necessary to correct the false impression that Whirlpool placed in consumers' minds that its dryer injects a hot steam into the drum and that its "steam" is something different than that which exists in all conventional dryers.

### C.    The Injunction Should be Nationwide in Scope.

An injunction must be broad enough to be effective. *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 306-07 (7th Cir. 2010). This Court has broad discretion to

fashion an injunction to enjoin Whirlpool's deceptive advertising.  *See Id.* at 307; *see also PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995).  This includes the authority to issue an injunction that has nationwide effect.  The Court "has personal jurisdiction over [Whirlpool] and therefore undoubtedly has the 'power' to enjoin [Whirlpool's] activity outside Illinois."  *Instrumentalist Co. v. Marine Corps League*, 509 F. Supp. 323, 340 (N.D. Ill. 1981) (citing Restatement of the Law (Second) of Conflict of Laws § 53.)  *See also Hyatt Corp. v. Hyatt Legal Servs.,* 736 F.2d 1153, 1159-60 (7th Cir. 1984) (remanding with instruction to grant a nationwide injunction for violation of Illinois anti-dilution statute); *Polaroid Corp. v. Polaraid, Inc.*, 319 F.2d 830 (7th Cir. 1963) (granting multistate injunction under Illinois' unfair competition and anti-dilution laws); *Carson v. Here's Johnny Portable Toilets, Inc.*, 810 F.2d 104, 105 (6th Cir. 1987) (enjoining defendant from using the phrase "Here's Johnny" anywhere in the United States under Michigan's right of publicity law).[14]

In cases where courts have been hesitant to enjoin conduct nationwide on the basis of a violation of a state statute, the issue has invariably been that other states either fail to prohibit or expressly authorize the conduct at issue.  For example, in *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 327 (6th Cir. 2001), the Sixth Circuit reversed the issuance of a nationwide injunction in a right to publicity case because a number of states had

---

[14] *See also United Healthcare Ins. Co. v. AdvancePCS,* No. Civ 01-2320, 2002 WL 432068 at *17 (D. Minn. March 18, 2002) (issuing nationwide injunction under UDTPA); *Mars, Inc. v. Standard Brands, Inc.,* 386 F. Supp. 1201, 1206 (S.D.N.Y. 1974) (finding that "[t]he Illinois court has personal jurisdiction over both defendants so that if and when it ultimately finds that plaintiff is entitled to nationwide injunctive relief, it would have the power to grant it.") (citing Pomeroy, Equity Jurisprudence § 1318 (1941 ed.)); *Nat'l Football League Prop., Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 26 Ill. App. 3d 820, 823-25, 327 N.E. 2d 247, 250-51 (Ill. App. Ct. 1975) (granting preliminary injunction on state law claims of "trademark infringement, unfair competition and deceptive practices" and enjoining a Texas corporation from manufacturing certain products); McCarthy on Trademarks and Unfair Competition § 30.15 (4th ed. 2010) ("It is a familiar rule of Anglo-American law that once a court has obtained personal jurisdiction over a defendant, the court has power to command the defendant to do or not to do acts outside the territorial jurisdiction of the court.").

"explicitly refused to recognize a post-mortem right of publicity."  However, the court held that "[t]he injunction shall continue to apply in all states that explicitly recognize a post-mortem right of publicity as well as those states that have not addressed the issue."  *Id.* at 327 n. 16.  Likewise, in *Deere & Co. v. MTD Prods., Inc.*, No. 94 CIV 2322, 1995 WL 81299, at *15 (S.D.N.Y. Feb. 28, 1995), the court declined to issue a nationwide injunction prohibiting defendant from showing a version of plaintiff's registered trademark in its advertising, noting that only about half of states had anti-dilution laws.

Unlike anti-dilution laws, the IUDTPA is a codification of a fundamental common law. *See Knoll Pharm. v. Auto. Ins. Co. of Hartford*, 152 F. Supp. 2d 1026, 1037 (N.D. Ill. 2001) (stating that the IUDTPA "has been characterized as a codification of the common law tort of unfair competition"); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:67, 24:93 (4th ed. 2010) ("Until 1996, dilution law in the United States was almost entirely based, not on state common law, but on antidilution statutes enacted in many states.  The first federal antidilution law was enacted in 1996 and was substantially revised in 2006.")

This Court should follow the logic in *Herman Miller*, and enjoin Whirlpool's actions in all states, as all states expressly prohibit deceptive trade practices.  Indeed, this is exactly the analysis that the District of Minnesota conducted in *United Healthcare*, where the court issued a nationwide injunction based on Minnesota's UDTPA.  2002 WL 432068, at *17.  There, the court examined the proper scope for a preliminary injunction based on state statutory claims, including Minnesota's version of the Uniform Deceptive Trade Practices Act.  *Id.*  The court held that, "[h]aving jurisdiction over the Defendant's person, the Court has the power to enjoin the Defendant's conduct nationwide."  *Id.*  The court emphasized that the conduct at issue was "occurring on a nationwide basis" and a nationwide injunction would promote "[j]udicial

efficiency and economy." *Id*. at *18. The court acknowledged that only eleven other states had enacted a version of the Uniform Deceptive Trade Practices Act. *Id.* Nevertheless, "every jurisdiction either has legislation that prohibits the use of deceptive tactics in business and/or prohibits the deception of consumers or affords protection at common law for interference with existing contractual relations." *Id*. Here too, LG will suffer harm from Whirlpool's deceptive trade practices on a nationwide basis, and, because all states prohibit false advertising, judicial efficiency and economy favor a nationwide injunction. Otherwise, the parties will be left to litigate this issue state by state.

## IV. LG SHOULD BE AWARDED ITS ATTORNEY'S FEES AND COSTS FOR WHIRLPOOL'S WILLFUL VIOLATION OF THE IUDTPA.

The IUDTPA allows for an award of costs and attorney's fees where the offending party willfully engaged in the deceptive trade practice it was found liable for at trial. 815 ILCS § 510/3 ("Costs or attorneys' fees or both may be assessed against a defendant only if the court finds that he has willfully engaged in a deceptive trade practice."); *see also Bingham v. Inter-Track Partners*, 234 Ill. App. 3d 615, 619-20, 600 N.E. 2d 70, 74-5 (Ill. App. Ct. 1992). Willful conduct has been found under the IUDTPA where it was shown that the defendant had actual knowledge of the deception caused by its conduct but disregarded the effects of that conduct. *Id*. at 620, 600 N.E. 2d at 75.

In *Bingham*, the court awarded attorney's fees when it found that the defendant had actual knowledge of plaintiffs' prior use of a trade name and nonetheless disregarded plaintiffs' common law rights in the name. *Id.* The court found that the facts of the case demonstrated that the defendant made a "reasoned, deliberate business decision to proceed" with its conduct, despite knowing that plaintiff had rights in the trade name at issue. *Id.* Thus, willfulness under the IUDTPA only requires a finding of actual knowledge and disregard of the deception. It

should not be confused with the showing of "willful and wanton conduct" under the Illinois Consumer Fraud Act, which requires a finding of the actual intent to harm. *See* Ill. Pattern Jury Instructions 14.01. Willfulness under the ICFA is a higher standard used to prove entitlement to punitive damages and it requires a plaintiff to demonstrate a defendant's conduct was "wilful, intentional and egregious." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1097 n.14 (7th Cir. 1994) (quoting *Crowder v. Bob Oberling Enterprises, Inc.*, 148 Ill. App. 3d 313, 318, 499 N.E. 2d 115, 119 (Ill. App. Ct. 1986).

In this case, Whirlpool had actual knowledge that its steam advertising was deceptive, yet it nonetheless utilized the word "steam" in its advertising. (*See supra* at 11-12.) Ms. Lesauskis, who worked in the Whirlpool legal department, wrote: "Suggest deleting the term 'benefit of steam' wherever it occurs as this could be construed by the consumer as that the dryer actually produces steam." (Trial Tr. at 1193:3-7; *see also id.* at 1193:14-20; 1194:8-15.) Ms. Voss said "[w]e never, ever say we create steam (or at least we shouldn't be." (PX288.) And Mr. Doll stated that Whirlpool's legal department instructed that: "we must never suggest we are using steam in the process (because we don't)". (PX137; Trial Tr. at 1226:7-1227:4.). Despite knowing that the Whirlpool dryer did not make or use steam, Whirlpool's marketing department made a reasoned, deliberate business decision to advertise its dryer as a steam dryer in order to capitalize on consumer's perceptions of the word. (Trial Tr. at 1434:13-22.) Whirlpool must now bear the consequences of its decision to deceive consumers as to the existence and use of steam in its dryers.[15]

---

[15] LG will provide a report of its attorneys' fees and costs upon a finding of willfulness, and within the 90 days required by LR 54.

## CONCLUSION

Whirlpool built a dryer with a cold water spray function and was content to call its dryer a mist dryer until it realized it could cash in on consumers' positive perceptions of the word "steam." In fact, the "steam" in Whirlpool's dryer is no different than what occurs in a conventional dryer—the evaporation of water from wet clothing. But Whirlpool knew that it could not compete with LG's true steam dryer if it accurately described its product. Whirlpool's advertising of its dryer as a "steam" dryer is misleading and confusing, and Whirlpool knew it. The jury saw through Whirlpool's artifice, and returned a verdict in LG's favor on its IUDTPA claim.

Whirlpool's deception continues to harm LG, Whirlpool's main competitor in the steam dryer market. Accordingly, LG respectfully requests that a nationwide injunction issue prohibiting Whirlpool from using the word "steam" in connection with cold water spray dryers, or, at a minimum, requiring a meaningful qualification to the word "steam" each time it is used, and that LG be awarded attorney's fees and costs for Whirlpool's willful violation of the IUDTPA.

Dated: December 3, 2010

Respectfully submitted,

**LG ELECTRONICS U.S.A., INC.**

By: /s/ Bryna J. Dahlin
One of its attorneys

Ronald Y. Rothstein - rrothstein@winston.com
Bryna J. Dahlin - bdahlin@winston.com
Eric Broxterman - ebroxterman@winston.com
John Marfoe - jmarfoe@winston.com

WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600 – telephone
(312) 558-5700 – facsimile

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on December 3, 2010, I filed the above and foregoing with the Court's ECF system and by doing so served a copy on all the parties.

/s/ Bryna J. Dahlin
ATTORNEY FOR LG ELECTRONICS
U.S.A., INC