**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., INC. | ) | |
|    a subsidiary of LG Electronics, Inc., | ) | |
|    a Korean company, | ) | |
| | ) | Civil Action No.: 08 C 242 |
|       Plaintiff, | ) | |
| | ) | Judge St. Eve |
|       v. | ) | |
| | ) | Magistrate Judge Mason |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
|       Defendant. | ) | |

**REPLY IN SUPPORT OF LG ELECTRONICS U.S.A. INC.'S**
**MOTION FOR INJUNCTIVE RELIEF AND ATTORNEY'S FEES**

# **TABLE OF CONTENTS**

Page

RESPONSE TO WHIRLPOOL'S FACTUAL BACKGROUND ....................................................1

ARGUMENT ..................................................................................................................................7

    I.    WHIRLPOOL'S CHALLENGES TO THE JURY VERDICT AND LG'S STANDING TO BRING ITS IUDTPA CLAIM ARE IMPROPER AND SHOULD BE REJECTED OUTRIGHT. ...............................................................8

        A.    This Court Has Already Held that the IUDTPA Does Not Require that Whirlpool's Conduct Occur "Primarily and Substantially" in Illinois. .......8

        B.    Whirlpool's Various Challenges to the Jury's IUDTPA Verdict Are Baseless. ................................................................................................12

    II.    WHIRLPOOL CANNOT AVOID AN INJUNCTION BY ARGUING THAT THE JURY FOUND "NO DAMAGE." ................................................................19

        A.    The Jury Did Not Make a "No Injury" Finding. .......................................19

        B.    LG Established that It Is Likely to be Damaged by Whirlpool's Deceptive Trade Practice. .........................................................................................21

    III.    LG IS ENTITLED TO AN INJUNCTION UNDER THE IUDTPA. ...................22

        A.    The Traditional Federal Injunction Requirements Do Not Apply to the IUDTPA. ................................................................................................22

        B.    LG Satisfies the Traditional Injunction Factors. .......................................24

    IV.    A NATIONWIDE INJUNCTION UNDER THE IUDTPA WOULD NOT VIOLATE THE CONSTITUTION. .......................................................................34

        A.    The Commerce Clause and Full Faith and Credit Clause Are Not Implicated in this Case. ...........................................................................35

        B.    The First Amendment Does Not Bar an Injunction on Whirlpool's Commercial Speech. ...............................................................................37

    V.    ATTORNEYS' FEES ARE WARRANTED IN THIS CASE. .............................39

CONCLUSION..............................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.*,
    90 Ill. App. 3d 817, 413 N.E.2d 1299 (Ill. App. Ct. 1980) .....................................................23

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008)............................................................................................29

*Alpo Petfoods, Inc. v. Ralston Purina Co.*,
    720 F. Supp. 194 (D.D.C. 1989), *rev'd on other grounds*, 913 F.2d 958 (D.C. Cir.
    1990) ...................................................................................................................................34

*American Libraries Ass'n v. Pataki*,
    969 F. Supp. 160 (S.D.N.Y. 1997).................................................................................36, 37

*American Taxi Dispatch , Inc. v. American Metro Taxi & Limo Co.*,
    582 F. Supp. 2d 999 (N.D. Ill. 2008) ...................................................................22, 23, 27, 31

*Anic v. DVI Fin. Servs., Inc.*,
    No. 01 C 0383, 2001 WL 477139 (N.D. Ill. May 3, 2001) .....................................................9

*Athey Prods. Corp. v. Harris Bank Roselle*,
    89 F.3d 430 (7th Cir. 1996) .................................................................................................8, 9

*August Storck K.G. v. Nabisco, Inc.*,
    59 F.3d 616 (7th Cir. 1995) ...............................................................................................32, 33

*Avery v. State Farm Mut. Auto. Ins. Co.*,
    216 Ill. 2d 100, 835 N.E.2d 801 (Ill. 2005) ...........................................................8, 9, 10, 11

*Avlon Ind. v. Robinson*,
    No. 01 C 3615, 2003 WL 22025004 (N.D. Ill. 2003)...............................................................9

*BASF Corp. v. Old World Trading Co., Inc.*,
    41 F.3d 1081 (7th Cir. 1994) ..................................................................................................39

*Bingham v. Inter-Track Partners*,
    234 Ill. App. 3d 615, 600 N.E.2d 70 (Ill. App. Ct. 1992)...........................................21, 27, 39

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996)................................................................................................35, 36, 37

*Bonner v. Westbound Records, Inc.*,
    49 Ill. App. 3d 543, 364 N.E.2d 570 (Ill. App. Ct. 1977)......................................................28

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009) ........................................................................33

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)...............................................................................................17

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)...............................................................................................17

*Capitol Records, Inc. v. Thomas-Rasset*,
  680 F. Supp. 2d 1045 (D. Minn. 2010)..................................................................30

*Carson v. Here's Johnny Portable Toilets, Inc.*,
  810 F.2d 104 (6th Cir. 1987) .................................................................................35

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
  447 U.S. 557 (1980)...............................................................................................38

*Central Ill. Light Co. v. Citizens Utility Bd.*,
  827 F.2d 1169 (7th Cir. 1987) ...............................................................................38

*Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*,
  384 Ill. App. 3d 849, 893 N.E.2d 981 (Ill. App. Ct. 2008)...................21, 22, 23, 27

*Dagley v. Armstrong Rubber Co.*,
  344 F.2d 245 (7th Cir. 1965) .................................................................................19

*Deloughery v. City of Chicago*,
  422 F.3d 611 (7th Cir. 2005) .................................................................................18

*Doctor's Assocs., Inc. v. Subway.SY LLC*,
  No. 09-CV-3148, 2010 WL 3187899 (D. Minn. July 30, 2010) ...........................30

*Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*,
  965 F.2d 1442 (7th Cir. 1992) ...............................................................................26

*Drummond Am. Corp. v. Murphy*,
  No. 87 C 5642, 1987 WL 16244 (N.D. Ill. Aug. 26, 1987).............................26, 27

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)..........................................................................................22, 23

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982).......................................................................................35, 36, 37

*Eldon Indus., Inc. v. Rubbermaid, Inc.*,
  735 F. Supp. 786 (N.D. Ill. 1990) .........................................................................31

*Energy Four, Inc. v. Dornier Med. Sys., Inc.*,
   765 F. Supp. 724 (N.D. Ga. 1991) ......................................................................33

*Evory v. RJM Acquisitions Funding L.L.C.*,
   505 F.3d 769 (7th Cir. 2007) ............................................................................15

*First Health Group Corp. v. United Payors & United Providers, Inc.*,
   95 F. Supp. 2d 845 (N.D. Ill. 2000) .............................................................15, 37

*Florists' Nationwide Tel. Delivery Network v. Florists' Tel. Delivery Assoc.*,
   371 F.2d 263 (7th Cir. 1967) ............................................................................25

*Floyd v. Laws*,
   929 F.2d 1390 (9th Cir. 1991) ..........................................................................20

*Ford Motor Co. v. Texas Dept. of Transp.*,
   264 F.3d 493 (5th Cir. 2001) ............................................................................36

*Francorp, Inc. v. Siebert*,
   211 F. Supp. 2d 1051 (N.D. Ill. 2002) ..........................................................15, 17

*Freeman v. Chicago Park Dist.*,
   189 F.3d 613 (7th Cir. 1999) ............................................................................18

*Genderm Corp. v. Biozone Labs.*,
   No. 92 C 2533, 1992 WL 220638 (N.D. Ill. Sept. 3, 1992)......................................28

*General Elec. Co. v Good Guys, Inc.*,
   No. 05 C 5763, 2006 WL 2927603 (N.D. Ill. Oct. 6, 2006) ....................................10

*General Motors Acceptance Corp. v. Synergy Corp.*,
   No. 90 C 3522, 1992 WL 77682 (N.D. Ill. Apr. 7, 1992)........................................14

*Gile v. United Airlines, Inc.*,
   213 F.3d 365 (7th Cir. 2000) ........................................................................12, 17

*Gold v. Golden G.T., LLC*,
   No. 05 C 288, 2005 WL 2465815 (N.D. Ill. 2005)..................................................9

*Gordon v. Degelmann*,
   29 F.3d 295 (7th Cir. 1994) ............................................................................18

*Hameetman v. City of Chicago*,
   776 F.2d 636 (7th Cir. 1985) ............................................................................19

*Healy v. Beer Inst.*,
   491 U.S. 324 (1989)..............................................................................35, 36, 37

*Hooker v. Columbia Pictures Indus., Inc.*,
   551 F. Supp. 1060 (N.D. Ill. 1982) ......................................................................29

*Hot Wax, Inc. v. S/S Car Care*,
   No. 97 C 6879, 1999 WL 966094 (N.D. Ill. Oct. 14, 1999) ...............................32, 33

*Houskins v. Sheahan*,
   549 F.3d 480 (7th Cir. 2008) ............................................................................12

*Hyatt Corp. v. Hyatt Legal Servs.*,
   736 F.2d 1153 (7th Cir. 1984) ..........................................................................35

*In re Sears Roebuck & Co. Tools Mktg. and Sales Practices Litig.*,
   No. MDL-1703, 05 C 4742, 05 C 2623, 2005 WL 3077606 (N.D. Ill. Nov. 14, 2005) ..........10

*Instrumentalist Co. v. Marine Corps League*,
   509 F. Supp. 323 (N.D. Ill. 1981) ..................................................................34, 35

*J.C. Penney Corp. v. Milwaukee Golf Dev. Co., LLC*,
   No. 06 C 1826, 2006 WL 1215376 (N.D. Ill. May 3, 2006) ...................................26

*Kavanaugh v. Greenlee Tool Co.*,
   944 F.2d 7 (1st Cir. 1991) ...............................................................................20

*Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*,
   152 F. Supp. 2d 1026 (N.D. Ill. 2001) .............................................................36

*Kraft Foods Holdings, Inc. v. Helm*,
   205 F. Supp. 2d 942 (N.D. Ill. 2002) ...............................................................31

*Lawyers Title Ins. Corp. v. Dearborn Title Corp.*,
   904 F. Supp. 818 (N.D. Ill. 1995) ...................................................................21

*Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*,
   748 F. Supp. 344 (M.D.N.C. 1990) .................................................................17

*Linotype Co. v. Varityper, Inc.*,
   No. 89 CIV. 4747, 1989 WL 94338 (S.D.N.Y. Aug. 4, 1989) .........................33, 34

*Lorillard Tobacco Co. v. Elston Self Service Wholesale Groceries, Inc.*,
   No. 03 C 4753, 2009 WL 1635735 (N.D. Ill. 2009) ...........................................9

*Lorillard Tobacco Co. v. Reilly*,
   84 F. Supp. 2d 180 (D. Mass. 2000) ...............................................................37

*Luckie v. Ameritech Corp.*,
   389 F.3d 708 (7th Cir. 2004) ..........................................................................19

*Mars, Inc. v. Standard Brands, Inc.*,
   386 F. Supp. 1201 (S.D.N.Y. 1974) .......................................................................35

*Mary Kay, Inc. v. Weber*,
   661 F. Supp. 2d 632 (N.D. Tex. 2009) ....................................................................29

*McGraw-Edison Co. v. Walt Disney Prods.*,
   787 F.2d 1163 (7th Cir. 1986) ................................................................................29

*McMurray v. Deere and Co., Inc.*,
   858 F.2d 1436 (10th Cir. 1988) ..............................................................................19

*Mead Johnson & Co. v. Abbott Labs*,
   201 F.3d 883 (7th Cir. 2000) ............................................................................16, 17

*Mead Johnson & Co. v. Abbott Labs*,
   209 F.3d 1032 (7th Cir. 2000) ................................................................................16

*Mead Johnson & Co. v. Abbott Labs*,
   41 F. Supp. 2d 879 (S.D. Ind. 1999) .......................................................................16

*Microsoft Corp. v. McGee*,
   490 F. Supp. 2d 874 (S.D. Ohio 2007) ...................................................................29

*Midland Funding LLC v. Brent*,
   No. 3:08 CV 1434, 2009 WL 3086560 (N.D. Ohio Sept. 23, 2009) ......................22

*Minnesota, Mining & Mfg. Co. v. Pribyl*,
   259 F.3d 587 (7th Cir. 2001) ("*3M*") .....................................................................28

*Multiut Corp. v. Yehuda Draiman*,
   359 Ill. App. 3d 527, 834 N.E.2d 43 (Ill. App. Ct. 2005) ......................................21

*National Fed'n of the Blind v. Target Corp.*,
   452 F. Supp. 2d 946 (N.D. Cal. 2006) ..............................................................36, 37

*Newark Morning Ledger Co. v. United States*,
   507 U.S. 546, 555 (1993) ........................................................................................26

*Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*,
   970 F.2d 273 (7th Cir. 1992) ..................................................................................34

*People v. Fiorini*,
   143 Ill. 2d 318, 574 N.E.2d 612 (Ill. 1991) ...........................................................22

*Pilates, Inc. v. Current Concepts, Inc.*,
   120 F. Supp. 2d 286 (S.D.N.Y. 2000) ....................................................................26

*Polaroid Corp. v. Polaroid, Inc.*,
   319 F.2d 830 (7th Cir. 1963) ............................................................35

*Re/Max N. Cent., Inc. v. Cook*,
   272 F.3d 424 (7th Cir. 2001) ...........................................................30

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133 (2000)........................................................................13

*Republic Tobacco L.P. v. North Atl. Trading Co.*,
   2007 U.S. Dist. LEXIS 38079 (N.D. Ill. May 10, 2007) ........................23

*Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*,
   93 F.3d 511 (8th Cir. 1996) .............................................................39

*Rockstar, Inc. v. Rap Star 360 LLC*,
   No. 2:10-CV-00179, 2010 WL 2773588 (D. Nev. July 8, 2010) ...................29, 30

*Rust Environment & Infrastructure, Inc. v. Teunissen*,
   131 F.3d 1210 (7th Cir. 1997) ....................................................15, 23

*S.C. Johnson & Son, Inc. v. Lever Bros. Co.*,
   No 88-C-1327, 1991 WL 217665 (E.D. Wis. Feb. 26, 1991)................27

*SB Designs v. Reebok Int'l Ltd.*,
   338 F. Supp. 2d 904 (N.D. Ill. 2004) ...................................................18

*Schwarz v. Nat'l Van Lines, Inc.*,
   375 F. Supp. 2d 690 (N.D. Ill. 2005) ...................................................11

*SMC Corp., Ltd. v. Lockjaw, LLC*,
   481 F. Supp. 2d 918 (N.D. Ill. 2007) ..............................................25, 26

*Snider v. Consolidation Coal Co.*,
   973 F.2d 555 (7th Cir. 1992) ...........................................................25

*Solon v. Midwest Med. Records Ass'n, Inc.*,
   No. 04 CH 7119, 2004 WL 5660589 (Cook Cty. Chancery Div. Oct. 25, 2004)....................21

*Specht v. Google, Inc.*,
   660 F. Supp. 2d 858 (N.D. Ill. 2009) ............................................10, 12

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
   646 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................28

*Storck USA, L.P. v. Levy*,
   No. 90 C 5382, 1991 WL 60562 (N.D. Ill. Apr. 15, 1991)....................32

*Sullivan v. Vallejo City Unified School Dist.*,
  731 F. Supp. 947 (E.D. Cal. 1990)......................................................22

*Super Wash, Inc. v. Sterling*,
  No. 04 C 4618, 2006 WL 533362 (N.D. Ill. Mar. 2, 2006) ....................11

*Taubman Co. v. Webfeats*,
  319 F.3d 770 (6th Cir. 2003) ...............................................................38

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)..............................................................................39

*Ty, Inc. v. Jones Group, Inc.*,
  237 F.3d 891 (7th Cir. 2001) ................................................................30

*Union Carbide Corp. v. Ever-Ready, Inc.*
  531 F.2d 366 (7th Cir..........................................................................27

*United Healthcare Ins. Co. v. AdvancePCS*,
  No. Civ. 01-2320, 2002 WL 432068 (D. Minn. Mar. 18, 2002) .......35, 36

*Upjohn Co. v. Riahom Corp.*,
  641 F. Supp. 1209 (D. Del. 1986).....................................................33, 34

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976)..........................................................................38, 39

*West v. State*,
  212 S.W. 3d 513 (Tex. App. 2006).......................................................22

*White v. Grinfas*,
  809 F.2d 1157 (5th Cir. 1987) .............................................................20

*Williams v. Wal-Mart Stores, Inc.*,
  922 F.2d 1357 (8th Cir. 1990) .............................................................19

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985)..............................................................................38

### STATUTES

815 ILCS 505/1 .........................................................................................10

815 ILCS 505/1(f).......................................................................................10

815 ILCS 510/1 et seq.......................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50 ................................................................................................................12, 13

First Amendment ..............................................................................................................37, 38, 39

The jury in this case found that Whirlpool violated the Illinois Uniform Deceptive Trade Practices Act.  Whirlpool cannot now silence the jury's verdict and continue its deceptive practices.  An injunction is necessary for the deception to stop.

Two propositions pervade Whirlpool's Response, both of which are false.  First, Whirlpool claims that there was no evidence of consumer confusion in this case.  But LG presented classic survey evidence of confusion, and the jury in fact found that Whirlpool had created a likelihood of confusion regarding its steam dryers.  Second, Whirlpool claims that the jury found LG was not likely to be damaged by Whirlpool's conduct.  The jury made no such finding, and the law is clear that no such finding can be inferred by the jury's general findings regarding the Lanham Act and Consumer Fraud Act claims.

Without these false propositions, all that is left are Whirlpool's attempts to rehash arguments it has already lost, a premature, inappropriate and baseless request for judgment as a matter of law, and unfounded arguments that an injunction would somehow be unconstitutional and will somehow hamper free competition.  The Constitution, however, does not protect deceptive trade practices.  And requiring Whirlpool to correct its deceptive advertising will not limit competition; indeed, Whirlpool would still be able to sell its dryer, and competition will remain as fierce as it ever was in the steam dryer market.  LG welcomes fair competition, but competition based on misleading advertising cannot stand.  An injunction is required to bring Whirlpool's deceptive trade practices to an end.

## RESPONSE TO WHIRLPOOL'S FACTUAL BACKGROUND

None of the "facts" set forth in Whirlpool's Response has any bearing on whether an injunction should issue in this case.  It is undisputed that LG, not Whirlpool, pioneered the use of steam in laundry appliances.  (Mem. in Support of LG Electronics U.S.A.'s Motion for

Injunctive Relief and Attorney's Fees ("LG Br.") at 20.) That Whirlpool invested resources in developing its water spray feature—a feature that ***no one*** contemporaneously referred to as steam—does not give Whirlpool license to deceive consumers. (LG Br. at 3.)

Whirlpool's claim that the evaporative process occurring in its dryer meets myriad dictionary definitions of steam results in a completely unbounded definition of the term. To accept Whirlpool's position is to accept that clothes drying on a clothesline, water evaporating from a glass, and indeed the constant invisible evaporation of water from the human body all create steam as well. (LG Br. at 5-6; Ex. A, Trial Transcript ("Tr.") at 468:6-25.) As Dr. Jacobi explained:

> Q. Is there steam [in the Whirlpool dryer] as vapor arising from some heated substance?
>
> A. No.
>
> Q. Why not?
>
> A. Well, I mean, when you think of this, I might think of examples such as a hot road that has been rained on and, then, you can watch it after that and you see a billowy white substance rising from the road.
> Another, let's say, very extreme example might be vapors rising from hot lava rocks, or something like that, where you can see a vapor coming up. That doesn't happen in the Whirlpool dryer.
> What happens in the Whirlpool dryer is more like spraying water on the lawn in the summer and, then, it evaporates or hanging clothes -- wet clothes -- on a clothesline and, then, the water evaporates from the clothing. And in the extreme case, this might be my skin right now. My skin is warmer than the surrounding air and water is evaporating from me right now. And I certainly wouldn't call that steam.

(Tr. at 468:6-25.) Dr. Jacobi concluded that the Whirlpool dryer does not use steam in any way:

> Q. Professor Jacobi, does the Whirlpool dryer create steam in any way?

A. No.

Q. What is happening in the Whirlpool dryer?

A. Cool water is injected into the dryer and then it operates
   like a regular dryer.

(Tr. at 474:6-11.)LG also presented evidence that Whirlpool knew exactly what steam was, but

rejected the use of steam in favor of a water spray system. For example, in a document

comparing the benefits of using steam versus a water spray, Whirlpool's engineers define steam

as "all water vapor, no air, @ 100 C," just as Dr. Jacobi testified. (LG Br. Ex. B, PX13 at

WHR093261; Tr. at 452:1-16.) Whirlpool cited the advantages of steam as "uniform

condensation" and "energy transfer"—advantages its cold water spray system does not possess.

(*Id.; see also* LG Br. at 9.) LG also presented abundant evidence that Whirlpool itself did not

believe there was steam in its dryer. (LG Br. at 3-5; 10-11.)

LG further established that the environments in the LG dryer and the Whirlpool dryer are

not remotely "similar." (WP Br. at 12.) One dryer injects a hot steam, and the other sprays in

cold water, which is evaporated just as the water in any dryer would be evaporated. The

environments are wholly different in appearance; LG's dryer is filled with white, billowy steam,

while in Whirlpool's dryer one sees a water spray, and then "nothing." (Tr. at 64:17-25, 83:6-

11.) The opposite thermodynamic processes occur in the drums. In LG's dryer, the steam

condenses, releasing its latent heat and energy, whereas in Whirlpool's dryer, evaporation

occurs. (Tr. at 473:2-8.) There is no heat release or energy transfer. Dr. Jacobi testified that the

dryer environments are indeed quite different:

Q. Let's compare the environment of the two drums if we
   may. Visually, what's the difference?

A. When you look into the LG drum, you see a kind of a wispy,
   billowy cloud. When you look into the LG drum, you see a --
   sorry, when you look into the Whirlpool drum, you see a water

spray.

Q.  And what is the difference in the processes that are going
on in the two drums?

A.  Thermodynamically they're opposite to each other. In the
LG drum, you have the condensation of water vapor to form a
liquid. In the Whirlpool drum, you have the evaporation of a
liquid to form a vapor.

Q.  And when you say "condensation," what is going on with
that condensation process?

A.  Condensation is the process through which vapor molecules
coalesce and release energy and form liquid.

(Tr. at 465:25-467:15.)  It is undisputed that this release of energy from condensation does not

occur in the Whirlpool dryer.  Whirlpool's own engineers recognized that only a true steam

system could provide the benefits of "uniform condensation" and "energy transfer."  (LG Br. Ex.

B, PX13 at WHR093261.)

Whirlpool's claim that its steam dryers include cycles that are different from

conventional dryers misses the point—it is undisputed that the "steam" in the Whirlpool dryer is

the same as the hot vapor that exists in any conventional dryer.  Kirk Dunsbergen, who was

responsible for the design and development of the Whirlpool dryer, testified that under

Whirlpool's preferred definition of steam, any Whirlpool dryer could be called a "steam dryer,"

and in fact any dryer at all could be called a "steam dryer."  (Tr. at 305:24-306:2; 306:10-13.)

This testimony was confirmed by Dr. Malladi, who admitted that, as a scientific matter, there is

no steam in the Whirlpool dryer.  (Tr. at 2196:22-2197:8; 2199:21-23.)  Only under Dr.

Malladi's own broad, unbounded, and ultimately unscientific definition of steam—a definition

that encompasses the evaporation of water from clothes hung on a clothesline and water

evaporating from a glass—does the Whirlpool dryer create "steam."  (Tr. at 2213:14-24.)  This

was confirmed by comments Whirlpool received from consumers who had operated the

Whirlpool dryer steam cycles:

- ***"My dryer could do the same on tumble dry cycle. I saw no difference with the test dryer Refresh Cycle."***

- ***"Thought it would do something different than my own dryer. . . ."***

(Ex. B, DX 978 at MR000555 (emphasis added).)[1]

Whirlpool does not dispute that it accurately named its dryer "Myst" but changed the

name to "Steam" so it could capitalize on consumers' perceptions of steam. Whirlpool also does

not dispute that these perceptions—that steam is powerful, penetrating and potent—have nothing

to do with the evaporative process occurring in Whirlpool's dryer. (LG Br. at 8.)

Not surprisingly, consumers are misled into believing that a hot steam is injected into the

Whirlpool dryer drum. This was established at trial through the testimony and consumer survey

of Robert Reitter, which Whirlpool did not rebut at trial and now barely addresses in its

Response. (LG Br. at 9-10.) Mr. Reitter has undergraduate and master's degrees from Yale.

(Tr. at 1619:5-9.) He has conducted more than 500 surveys in his career, 200 of which dealt

---

[1] Whirlpool's cherry-picking of positive consumer comments during field testing has nothing to do with whether consumers are misled by Whirlpool's advertising and conveniently disregards consumer comments that Whirlpool's cold water spray was not effective:
- "It didn't remove the wrinkles as well as I thought it should, some of the fabrics worked better than others and I thought it would do well on everything."
- "Garments were not wrinkle free. Needed to iron them. . . ."
- "On some loads it barely got any wrinkles out . . . ."
- "I didn't think it took out the odors as well as I thought it should. . . ."
- "The smoke odor didn't come out of the jacket or suit coat."
- "Some of the clothes were not ready to wear, so I just rewashed them."
- "I expected them to come out ready to wear and they weren't." (Ex. B, DX 978.)

Regardless, Whirlpool's claim that its water spray feature provides the same benefits as steam is wrong. LG presented evidence, unchallenged by Whirlpool, that the odor removal benefits of its steam dryer are superior to Whirlpool's water spray system. (Tr. at 1106:17-18.) In fact, steam has physical properties that allow it to reduce odor and remove wrinkles more evenly than Whirlpool's evaporation, and using steam can reduce static, make ironing easier, and save energy. (Tr. at 1107:17-1107:23; Ex. C, PX 755.)

with consumer deception. (Tr. at 1619:20-1620:2.) Mr. Reitter explained that the purpose of surveys is to "test to see what messages consumers actually do take away from advertising." (Tr. at 1621:18-21.) The Reitter survey was based on a mall intercept study, where consumers at malls in 12 metropolitan markets across the country were interviewed. (Tr. at 1625:5-21.) Consumers were selected for the survey only if they belonged to the relevant universe—that is, they are the decision makers in their households when it comes to appliance purchases and have purchased a dryer in the past 12 months or plan to do so in the next 12 months. (Tr. at 1625:22-1626:5.) Any consumer with special knowledge, such as those who work in advertising, was excluded. (Tr. at 1626:10-14.) Altogether, 400 people in the relevant universe were interviewed; 200 people in the test group and 200 in the control group. (Tr. at 1626:24-1627:1.) The control group was used to eliminate "noise," such as pre-existing opinions consumers may have had about the dryers or the effect of the questions themselves. (Tr. at 1627:2-23.) After viewing either the test commercial or control commercial (which had eliminated references to steam), consumers were asked if the commercials describe:

> Dryer A, a mist of cold water is injected into the heated dryer drum. The dryer then heats the water and tumbles the clothes until dry.
>
> Or
>
> Dryer B, a hot vapor is injected onto clothes inside the dryer drum. The dryer then heats the clothes until dry.

(Tr. at 1637:6-11.) For those consumers viewing the test commercial, 66 percent rejected the notion that Whirlpool's dryer could be Dryer A, a dryer that injects a mist of cold water into the heated dryer drum which is then heated and the clothes tumble until dry. (Tr. at 1651:13-18.) Likewise, 56 percent believed that Whirlpool's dryer was one that injected a hot vapor onto clothes inside the drum. (Tr. at 1649:22-25.) These findings far surpass the 10-20 percent threshold for deception. (Tr. at 1644:5-13.) The Reitter survey was corroborated by the

Insperience Studio evidence, where the number one question from consumers regarding the Whirlpool dryer was, "is it actually steam?" (LG Br. at 10.) Based upon this evidence of substantial consumer confusion, the jury found that Whirlpool "created a likelihood of confusion or misunderstanding regarding the nature, quality or characteristics of Whirlpool's steam dryers." (Dkt. 629 at 37.)[2]

## ARGUMENT

Whirlpool presents no reason for this Court to deny LG the relief it requests. As an initial matter, most of Whirlpool's Response is spent challenging the jury's verdict and addressing issues this Court has already ruled upon. Those arguments may be rejected outright, as they are inappropriate at this stage of the proceeding. As LG's opening brief explains, the jury verdict alone is sufficient to warrant an injunction in this case. But even if this Court applies the federal injunction standards, an injunction is still warranted because LG will suffer irreparable harm from the likely consumer confusion that the jury found, the public will benefit from the cessation of Whirlpool's deceptive advertising, and any cost Whirlpool will incur in remedying its deception is the price it must pay for violating the Illinois Uniform Deceptive Trade Practices Act (the "IUDTPA"), 815 ILCS 510/1 et seq. Moreover, Whirlpool's claim that any injunction would violate the Constitution has no basis in law or fact. Finally, an award of attorneys' fees is appropriate here, where there is ample evidence that Whirlpool knew its "steam" claims were misleading.

---

[2]Whirlpool's claim that the Reitter survey should be disregarded because it is based on a commercial that is no longer aired flies in the face of well-established survey methodology. (Tr. at 1623:25-1624:19; 1626:15-21.) Whirlpool plainly still advertises its steam dryer as such, and admits that it still runs television advertisements for the dryer. (WP Br. at 36.)

I.    **WHIRLPOOL'S CHALLENGES TO THE JURY VERDICT AND LG'S STANDING TO BRING ITS IUDTPA CLAIM ARE IMPROPER AND SHOULD BE REJECTED OUTRIGHT.**

Whirlpool begins with a series of arguments that are both baseless and inappropriate, as they constitute premature challenges to the verdict itself and do not address the question at hand—whether, given the jury's verdict, an injunction should issue. This Court should ignore these arguments. To the extent any of the issues still need to be resolved, Whirlpool will have the opportunity to raise them later, in post-judgment motions. The Court need not and should not entertain them now.

Moreover, even if the Court were to consider these arguments now, it should reject them. As this Court has already held, whether Whirlpool's advertising occurred "primarily and substantially" in Illinois is irrelevant to this case. Further, the IUDTPA verdict was based on abundant evidence at trial demonstrating that Whirlpool's "steam" dryer advertising created a likelihood of confusion or misunderstanding. Finally, even if the IUDTPA verdict were inconsistent with the Lanham Act and Consumer Fraud Act verdicts—as Whirlpool claims—the remedy would be a new trial, not judgment in Whirlpool's favor.

A.    **This Court Has Already Held that the IUDTPA Does Not Require that Whirlpool's Conduct Occur "Primarily and Substantially" in Illinois.**

This Court has already rejected Whirlpool's argument that the IUDTPA does not apply to the misconduct here, and properly so. For this reason alone, the Court should reject Whirlpool's argument. However, should the Court entertain Whirlpool's repackaged claim, it should reach the same conclusion. Whirlpool has provided no basis for the Court to change it.

The "primarily and substantially" test annunciated in *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 835 N.E.2d 801 (Ill. 2005), a consumer class action, has no application to this case. (Tr. at 2377:10-14.) Rather, *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430

(7th Cir. 1996) is controlling.  (Tr. at 2377:7-9.)  In *Athey*, the Seventh Circuit, relying on Illinois appellate cases, held that in order for a *competitor* to maintain a deceptive trade practices claim under the Illinois Consumer Fraud Act ("ICFA"), it must demonstrate a "consumer nexus," *i.e.* that the complained trade practices were "directed to the market generally or otherwise implicate[] consumer protection concerns."*Id.* at 436.  Specifically, the *Athey* court affirmed a district court's grant of summary judgment on an ICFA claim that "failed to allege the necessary nexus between the complained of conduct and consumer protection concerns."  *Id. Athey* is still controlling law on this issue.  (Tr. at 2377:7-9.)  In *Anic v. DVI Fin. Servs., Inc.*, No. 01 C 0383, 2001 WL 477139 (N.D. Ill. May 3, 2001)[3], a Northern District court explicitly adopted the consumer nexus holding of *Athey* and applied it to an IUDTPA claim: "Non-consumers may establish claims under the Deceptive Trade Practices Act, 815 ILCS 510/1 et seq., where the alleged misconduct 'involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.'"  *Id.* at *5 (quoting *Athey*, 89 F.3d 430 at 436).[4]

As this Court has already held, "the Illinois nexus that is discussed in *Avery* applies to individual consumers, not to businesses who are not consumers of each other's goods."  (Tr. at 2377:10-14.)  The "primarily and substantially" requirement of *Avery* was fashioned to deal exclusively with class action claims brought by consumer-plaintiffs alleging fraudulent transactions that had no relation to Illinois.  835 N.E.2d 854-55.  The plaintiffs in *Avery* included

---

[3] A Compendium of Unreported Cases is attached as Exhibit D.

[4] In support of its contention that this Court should not follow the precedent set forth in *Athey*, Whirlpool cites to dictum in three district court cases, none of which explicitly addressed the issue in this case.  *See Lorillard Tobacco Co. v. Elston Self Service Wholesale Groceries, Inc.*, No. 03 C 4753, 2009 WL 1635735, at *1 (N.D. Ill. 2009); *Gold v. Golden G.T., LLC*, No. 05 C 288, 2005 WL 2465815, at *3 (N.D. Ill. 2005); *Avlon Ind. v. Robinson*, No. 01 C 3615, 2003 WL 22025004, at *3 (N.D. Ill. 2003).  Two of these cases, *Lorillard* and *Avlon*, do not even mention *Athey*.  The *Gold* opinion clearly supports application of *Athey*:  "To state a claim as a non-consumer, a business plaintiff can allege that the defendant undertook trade practices directed to the market generally."  2005 WL 2465815 at *3.

non-residents of Illinois who alleged their automobile insurer engaged in fraudulent acts when it supplied inferior substitute parts for repairs covered under the plaintiffs' insurance policies. 216 Ill. 2d at 177-78, 835 N.E.2d at 848-49. The trial court had certified a nationwide class of consumers that included policyholders who had no contact with Illinois other than holding insurance policies with State Farm, which was located in Illinois. *Id.* at 188-90, 835 N.E.2d at 854-55. The *Avery* court specifically concluded that while the ICFA was not intended "to apply to *fraudulent transactions* which take place outside of Illinois," *Id.* at 185, 835 N.E.2d at 853 (emphasis added), non-resident consumer-plaintiffs may nonetheless pursue claims under the ICFA "if the circumstances that relate to the *disputed transaction* occur primarily and substantially in Illinois." *Id.* at 187, 835 N.E.2d at 854 (emphasis added). None of those critical facts is present here.

Unlike the plaintiffs in *Avery*, LG did not seek to certify a class, nor did it seek compensation based upon any fraudulent transactions occurring between the litigants. LG has not contracted any business with Whirlpool and is certainly not its consumer. Whirlpool does not and cannot cite to any case applying *Avery* to dismiss a false advertising claim brought by a party under the IUDTPA against a competitor whose advertising reached consumers in Illinois. That is so because *Avery* does not apply to such claims.[5] The cases cited by Whirlpool in its response brief do not support its contention that LG cannot maintain its IUDTPA claim against Whirlpool. Neither *General Elec. Co. v Good Guys, Inc.*, No. 05 C 5763, 2006 WL 2927603

---

[5] A primary reason for the *Avery* court's adoption of the "primarily and substantially" requirement under the ICFA was the statute's definition of "'trade' and 'commerce,'" and in particular, the portion of the definition referencing "any trade or commerce directly or indirectly affecting the people of this State."*See Avery*, 216 Ill. 2d at 180-84, 835 N.E.2d at 850-52; *see also* 815 ILCS 505/1(f). Notably, the IUDTPA does not contain similar language restricting its application to commerce "affecting the people of [Illinois]."Compare 815 ILCS 505/1 with 815 ILCS 510/1 *et seq.* Accordingly, even if *Avery* changed the law with respect to actions brought by competitors, there is no basis for extending any such change to the IUDTPA.

(N.D. Ill. Oct. 6, 2006), *In re Sears Roebuck & Co. Tools Mktg. and Sales Practices Litig.*, No. MDL-1703, 05 C 4742, 05 C 2623, 2005 WL 3077606 (N.D. Ill. Nov. 14, 2005), nor *Specht v. Google, Inc.*, 660 F. Supp. 2d 858 (N.D. Ill. 2009) dealt with a competitor bringing a false advertising claim under the IUDTPA.

Similarly, Whirlpool's claim that *Avery* prevents extraterritorial application of the IUDTPA is flawed because the Illinois Supreme Court's holding in *Avery* dealt with **standing**, not the extraterritorial effect of a remedy under the ICFA.  *See* 216 Ill. 2d at 179-90, 835 N.E.2d 849-55.  Even if this Court were to conclude its injunction should not enjoin Whirlpool's advertising outside of Illinois—and there is ample authority that any injunction should be nationwide[6]—that determination has no bearing on whether LG has brought a cognizable IUDTPA claim against Whirlpool.  Whirlpool cites *Schwarz v. Nat'l Van Lines, Inc.*, 375 F. Supp. 2d 690 (N.D. Ill. 2005) for the proposition that federal courts making "predictive" judgments about unsettled state law issues should favor narrow interpretations that restrict liability.  But the law pertaining to this case is not unsettled; *Avery* does not apply here, so this Court need not make a predictive judgment.  It need only follow the law as it exists in Illinois.  Consistent with this interpretation, this Court already concluded that LG can maintain its IUDTPA claim against Whirlpool.  (Tr. at 2377:5-2378:6.)  Whirlpool has not presented any reason for this Court to depart from its earlier ruling.[7]

---

[6] *See* LG Br. at 32-35.

[7] Whirlpool also cites *Super Wash, Inc. v. Sterling*, No. 04 C 4618, 2006 WL 533362 (N.D. Ill. Mar. 2, 2006), a trademark infringement case, for the proposition that at least one district court has suggested that it is unlikely Illinois courts would recognize claims under the IUDTPA based on conduct outside of Illinois after *Avery*.  First, the *Super Wash* court was merely expressing its thoughts in textbook dictum that had no bearing on its actual ruling.  *See id.* at *2 n10.  Second, the context for the court's comments was its observation that "there is no evidence that defendants used the marks in Illinois," *id.*, suggesting that the IUDTPA claim would have survived had the infringement occurred, at least in part, in Illinois.

Even if this Court were to extend *Avery*'s primarily and substantially requirement to single competitor false advertising IUDTPA claims, LG readily satisfies this requirement. Here, LG is a single plaintiff with significant ties to Illinois, suing its competitor, Whirlpool, for false advertising that took place in Illinois and reached Illinois consumers.[8] LG maintains an office/testing facility in Lincolnshire, Illinois. (Tr. at 156:6-8.) Whirlpool conducted business in Illinois through (i) its extensive relationship with Kenmore (headquartered in Hoffman Estates, Illinois) during the time in which Whirlpool manufactured Kenmore's steam dryer for Sears (Tr. at 1216:8-12, 1219:2-4, 1220:10-14), and (ii) its sales of dryers in Illinois. Moreover, Whirlpool has never challenged this Court's personal jurisdiction over it, and it admitted in its Answer that venue was proper in this judicial district. (Dkt. 117 at 4.) On these facts alone, LG can maintain its IUDTPA claim.

### B.     Whirlpool's Various Challenges to the Jury's IUDTPA Verdict Are Baseless.

Whirlpool's argument that this Court should silence the jury's voice and find for Whirlpool under Fed. R. Civ. P. 50 is inappropriate and premature, and there is no need for the Court to consider Whirlpool's arguments. Regardless, Whirlpool's assertions are unsupported by the record and wholly without merit. On a Rule 50 renewed motion for judgment as a matter of law, the court's task is simply "to assure that the jury had a legally sufficient evidentiary basis for its verdict." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (internal quotations and

---

Accordingly, even under *Super Wash,* LG's IUDTPA claim regarding false advertising that Whirlpool broadcast in Illinois remains appropriate. *Id.* at *1.

[8] Both LG and Whirlpool have trade partners such as Sears, Best Buy and Home Depot in Illinois, where their steam dryers are sold to Illinois consumers. (Tr. at 202:23-24, 1520:9-15, 1563:19-20, 1297:9-11.) Whirlpool admitted to transacting business in Illinois in its Memorandum in Support of its Motion to Transfer Venue. (Dkt. 26 at 5.) Also, Whirlpool's false advertising plainly reached Illinois consumers through the internet (*see* Tr. at 1503:24-1507:24) and other materials such as national print magazines (*see id.* at 1480:16-1481:5), POP displays used on retail floors in "stores all over the country" (*see id.* at 1487:10-1489:4), and television (*see id.* at 1495:16- 1501:16). *See Specht ,* 660 F. Supp. 2d at 866 (presuming that an international presence on the internet necessarily entailed a presence in Illinois).

citation omitted). The moving party's burden has been described as "herculean" in nature, as the jury's verdict ***must be upheld*** unless no rational juror could have found for the prevailing party. *Gile v. United Airlines, Inc*., 213 F.3d 365, 372 (7th Cir. 2000). In ruling on a Rule 50 motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."*Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150 (2000). A review of the record makes it abundantly clear that any Rule 50 motion Whirlpool makes will fail. The evidence was more than sufficient to support the conclusion that Whirlpool's advertising was deceptive.

1. <u>In Light of the Evidence, Judgment as a Matter of Law is Inappropriate in this Case.</u>

   a. *LG established that Whirlpool's dryers do not use steam any differently than a conventional dryer.*

As the evidence showed, Whirlpool's dryers do not use steam any more than a conventional dryer does. Whirlpool states that its dryers use steam because "hot vapor is immediately created upon injection of water mist into the hot drum of Whirlpool's dryers." (WP Br. at 22.) This contention is wrong and completely unsupported by the record. Dr. Malladi, Whirlpool's technical expert, did not testify that "hot vapor is immediately created" after cold water is sprayed into the dryer drum. Instead, Dr. Malladi stated only that the cold water sprayed into the dryer drum eventually evaporates:

Q. Now, we've established that you think that steam that's being created inside the Whirlpool dryer is because water evaporates in the dryer; is that correct?

A. Yes, sir, that is one definition.

(Tr. at 2212:21-24.)

It is undisputed that this "hot vapor" is the product of the cold water evaporating by normal action of the dryer, and thus it is the same hot vapor that is created in any conventional

dryer. LG presented evidence from Dr. Jacobi that even under Whirlpool's preferred definition of steam – a "vapor arising from a heated substance" – no steam is created in Whirlpool's dryer. (*See supra* at 3-4.) LG also presented evidence that Whirlpool knows exactly what steam is, but rejected the use of steam in favor of a water spray system. (*See supra* at 4.)

LG also established that the environments in the LG dryer and the Whirlpool dryer are not remotely "similar." (WP Br. at 12.) (*See supra* at 4-5.) Given the abundance of evidence at trial, there was ample basis for the jury to conclude that the Whirlpool dryer does not create steam, but instead merely evaporates water.

Whirlpool's claim that its steam dryers include different cycles misses the point; it is undisputed that the "steam" in the Whirlpool dryer is the same as the hot vapor that exists in any conventional dryer. (*See supra* at 5-6, 14.) There was thus ample basis for the jury to conclude that Whirlpool violated the IUDTPA because its "steam" is no different than the "steam" that occurs in any conventional dryer.

> b. *Whirlpool's disclosures do not correct the misleading nature of its advertising claims.*

Whirlpool claims that its misleading advertising is cured by the few instances where it says it explains how its dryers actually work. (WP Br. at 23.) But Whirlpool's explanation— "injecting a mist of water that combines with heat in the dryer drum to create steam"—is still misleading: The jury considered this "notice" evidence, and nevertheless found that Whirlpool violated the IUDTPA.

> c. *LG presented significant evidence of consumer confusion and misunderstanding.*

Whirlpool also attacks the jury's verdict on the ground that "LG presented no evidence that a single actual customer (trade or consumer) was confused by Whirlpool's advertising." (WP Br. at 23.) This was not LG's burden. The IUDTPA provides for the issuance of injunctive

relief against conduct that creates a "likelihood of confusion or misunderstanding." 815 ILCS 510/2(12); s*ee also General Motors Acceptance Corp. v. Synergy Corp.*, No. 90 C 3522, 1992 WL 77682 at *3 (N.D. Ill. Apr. 7, 1992) ("To prevail under the [IUDTPA], plaintiff need not prove actual confusion or misunderstanding."); *Francorp, Inc. v. Siebert*, 211 F. Supp. 2d 1051, 1055 (N.D. Ill. 2002) ("The [IUDTPA] only requires a reasonable likelihood of confusion or misunderstanding, not proof of actual confusion.").

In any event, Whirlpool's contention—a contention that underlies its entire opposition—is simply false. LG presented ample evidence of actual confusion at trial. (*See* LG Br. at 9-10.) Most notably, LG offered the testimony of Robert Reitter, who concluded from his survey that consumers take away the impression that (1) steam is used to remove wrinkles and odors in Whirlpool's dryer, and (2) that consumers are deceived that Whirlpool's dryers use "hot steam … rather than a mist of cold water that is heated." (Tr. at 1622:10-22.) (*See also supra* at 6-7.) Litigants routinely rely on consumer surveys to establish confusion. *See Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007) (describing use of consumer surveys to show confusion as "routine"); *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997) ("Actual confusion can be shown . . . by survey evidence."); *First Health Group Corp. v. United Payors & United Providers, Inc.*, 95 F. Supp. 2d 845, 848 (N.D. Ill. 2000) ("Survey evidence is the customary way of proving significant actual deception . . .."). Mr. Reitter's survey and his conclusions were not rebutted by Whirlpool at trial, and Whirlpool offered no competing survey. As a matter of law, the jury was entitled to rely upon this evidence of actual confusion and conclude that Whirlpool violated the IUDTPA because it "created a likelihood of confusion or misunderstanding regarding the nature, quality or characteristics of Whirlpool's steam dryers." (Dkt. 629 at 37.)

15

2. Whirlpool's Arguments for JMOL based on Inapposite Authority Should Be Rejected as Well.

    a. *This case is about Whirlpool's deception, not the mere "misunderstanding" by consumers articulated in Mead Johnson.*

As the Seventh Circuit recognized, "a 'misunderstood' statement is not the same as one designed to mislead." *Mead Johnson & Co. v. Abbott Labs*, 201 F.3d 883, 886 (7th Cir. 2000). Consumers believe Whirlpool's dryers inject hot steam into the dryer drum. Consumers expect steam to be powerful, penetrating and potent, a hot injection directly into the drum, and rightly so: condensing steam releases heat and energy. (LG Br. at 8.) Whirlpool's decision to change the name of its dryer from Myst to Steam was "designed to mislead"; it was intended to capitalize on these consumer perceptions, even though the evaporation of Whirlpool's cold water spray possesses none of these qualities. (*Id.*)

The jury's IUDTPA verdict does not run afoul of *Mead Johnson*. In that case, the phrase "1st Choice of Doctors" appeared on the packaging of a product that enjoyed only plurality support among physicians. The district court found that the phrase constituted false advertising under the Lanham Act because a survey showed that consumers understood the phrase "1st Choice" to mean a majority rather than a plurality. *Id.* at 884, 885 (citing *Mead Johnson & Co. v. Abbott Labs*, 41 F. Supp. 2d 879 (S.D. Ind. 1999)). On appeal, the Seventh Circuit reversed, holding that the district court erred "[b]y using [a] survey to define the meaning of the phrase '1st Choice of Doctors' and then insisting that verification meet the standards thus established." *Id.* at 887. The Seventh Circuit reasoned that the Lanham Act targets misleading claims, not "factual propositions that are susceptible to misunderstanding." *Mead Johnson & Co. v. Abbott Labs*, 209 F.3d 1032, 1034 (7th Cir. 2000).

*Mead Johnson* is thus wholly distinguishable. Unlike the survey in *Mead Johnson*, the Reitter Survey did not ask consumers what the word "steam" meant to them. 201 F.3d at 886.

16

Rather, it properly tested consumer confusion, just as Mr. Reitter has done in hundreds of prior surveys. *See id.* Such surveys are appropriate for probing consumer confusion, "for confusion depends on the effect of a phrase or trade dress on the consumer." *Id.*

### b. *Brooke Group is inapplicable here.*

Whirlpool also relies on the Supreme Court's decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) to claim that a JMOL should issue in this case. But *Brooke Group* is not an IUDTPA case, nor is it even a false advertising case. Instead, it is an antitrust case under the Robinson-Patman Act involving allegations of predatory pricing. *Id.* at 216-17. Antitrust law exists to protect competition in the marketplace, not to protect competitors from false and deceptive advertising. Indeed, as the Supreme Court stated in *Brooke Group*: "it is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'"*Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). Unlike the Robinson-Patman Act's requirement of injury *to competition*, liability under the IUDTPA requires only that a plaintiff show that it is likely to be harmed in the future by the defendant's unlawful conduct. *Francorp, Inc. v. Siebert*, 211 F. Supp. 2d 1051, 1055 (N.D. Ill. 2002). Actual market proof is not required. *Id.*[9] Thus, Whirlpool's reliance on *Brooke Group* is misplaced.

---

[9] The district court in *Brooke Group* held that "no injury to competition ... was possible unless there had been tacit coordination of prices in the economy segment of the cigarette market." 509 U.S. at 219 (citing *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*, 748 F. Supp. 344 (M.D.N.C. 1990)). Based on the state of the cigarette market at the time, "tacit coordination [was] unmanageable," and expert testimony presented by the plaintiff did not address this fact. *Id.* at 238-39. Thus, despite the fact that the *Brooke Group* plaintiff's "theory of liability, as an abstract matter, [was] within the reach of the statute," the Supreme Court held that no reasonable juror could have found for the plaintiff absent evidence of tacit coordination. *Id.* at 230, 240-41.

In short, Whirlpool's attempt to suppress the jury's verdict in this case must be rejected. The verdict was well-founded, and Whirlpool's arguments fall far short of the "herculean" effort required to overturn it. *Gile*, 213 F.3d at 372.

### 3. If the Jury Verdicts Were Truly Inconsistent, the Remedy Would Be a New Trial, not Judgment in Whirlpool's Favor.

Whirlpool also argues that judgment should be entered under the IUDTPA because such claims "rise or fall" with Lanham Act claims. (Br. at 21.) But the cases cited by Whirlpool stand only for the proposition that IUDTPA and Lanham Act claims are to be resolved according to the same "principles." *See, e.g., SB Designs v. Reebok Int'l Ltd.,* 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004). None of the cases cited by Whirlpool stand for the proposition that the elements of a Lanham Act claim are identical to the elements of an IUDTPA claim. Indeed, this Court already rejected a similar argument advanced by Whirlpool and instructed the jury separately on LG's various claims.

Nor do any of the cases cited by Whirlpool stand for the proposition that a verdict under the Lanham Act necessarily must quash a jury's finding and dispose of an IUDTPA claim. Even if the ***elements*** for a Lanham Act claim and an IUDTPA claim were identical—and they are not—it is inappropriate to attach any priority to one verdict over the other. *Deloughery v. City of Chicago,* 422 F.3d 611 (7th Cir. 2005) ("A party claiming that inconsistent verdicts have been returned is not entitled to a new trial unless no rational jury could have brought back the verdicts that were returned.") (internal quotation omitted); *Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994) ("there is no priority among inconsistent verdicts."). If the verdicts are truly inconsistent, the remedy is not judgment in Whirlpool's favor. The remedy is a new trial. *Id.* ("A new trial on all claims is the appropriate remedy (rather than judgment as a matter of law) in a case in which the jury has returned inconsistent verdicts."); *Freeman v. Chicago Park Dist.,*

189 F.3d 613, 615 (7th Cir. 1999) (holding that "there is no priority of one answer over another when the verdicts are inconsistent" and that "[t]he proper remedy for inconsistent verdicts is a new trial.").

## II. WHIRLPOOL CANNOT AVOID AN INJUNCTION BY ARGUING THAT THE JURY FOUND "NO DAMAGE."

Instead of addressing the abundant evidence in this case that LG is likely to be damaged by Whirlpool's violation of the IUDTPA, Whirlpool claims that the jury found LG was not injured. This is plainly wrong, as set forth below. In fact, the record here amply supports a finding that Whirlpool's deception is likely to harm LG.

### A. The Jury Did Not Make a "No Injury" Finding.

The verdict form in this case was a general one; the jury made no specific findings. Rather, it found that Whirlpool engaged in deceptive conduct in violation of the IUDTPA. Whirlpool's repeated assertion that the jury *found* no competitive injury is belied by the fact that the damages element was but one element of the Lanham Act and Consumer Fraud Act claims. *See, e.g., Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (failure of proof on any one element is fatal to a claim). Because the jury returned general verdicts, it is impossible to infer the basis upon which it rejected liability under the Lanham Act and ICFA. *See Hameetman v. City of Chicago*, 776 F.2d 636, 644 (7th Cir. 1985) ("Juries, when they render general verdicts, do not explain the basis of the verdict."); *Dagley v. Armstrong Rubber Co.*, 344 F.2d 245, 250 (7th Cir. 1965) ("Since the jury returned a general verdict on the negligence counts, we cannot determine the basis of its verdicts for defendants."); *Williams v. Wal-Mart Stores, Inc.*, 922 F.2d 1357, 1362 (8th Cir. 1990) (court had "no way of knowing from the general verdict returned by the jury which element of appellant's . . . action the jury did not find"); *McMurray v. Deere and Co., Inc.*, 858 F.2d 1436, 1444 (10th Cir. 1988) ("The general verdict frustrates a determination

19

of the basis of the jury's decision."). Whirlpool's position is impossible to reconcile with the jury instruction that "[t]he Court will determine what damages, if any, to award LG under the Illinois Uniform Deceptive Trade Practices Act." (Dkt. No. 629 at 37.)[10]

Moreover, the jury's responses to Question 6 of the verdict form do not establish a finding of no competitive injury. Because the jury found for Whirlpool on the Lanham Act and Consumer Fraud Act claims, it was explicitly instructed *not* to assess damages. (Dkt. No. 629 at 29) ("If you decide for Whirlpool on the question of liability, then you should not consider [damages]."); Dkt. No. 629 at 35, regarding the Consumer Fraud Act (same).) There was no instruction on the verdict form to skip Question 6 if no liability was found on the Lanham Act and ICFA claims. The jury therefore did not leave the answers to Question 6 blank; rather it indicated that LG was not entitled to lost profits, price erosion, or Whirlpool's profits, consistent with the jury instruction not to assess damages if no liability was found. (Verdict Form at 3.) Accordingly, the jury's answers to Question 6 are not a finding of no damages and cannot be given any weight. *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991) (finding that the trial court properly ignored as surplusage the jury's answer to a special verdict question on damages where the jury's answer to an earlier question obviated the need for a damage finding); *Kavanaugh v. Greenlee Tool Co.*, 944 F.2d 7, 10-11 (1st Cir. 1991) (finding that the district court properly ignored the jury's response to a question it was instructed not to answer); *White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir. 1987) (finding it proper to ignore a jury's answer to questions where the jury's answer to a previous question was supposed to terminate the inquiry).

Whirlpool claims that because the jury found no injury under the Lanham Act and ICFA, the jury must have found that some "lesser conduct" other than Whirlpool's national steam dryer

---

[10] Indeed, Whirlpool's argument—essentially that the IUDTPA verdict cannot stand alone, and can only survive if the Lanham Act claim survives—would render the IUDTPA instructions completely superfluous.

advertising created a likelihood of confusion or misunderstanding in violation of the IUDTPA.

(WP Br. at 20.)  That argument makes no sense.  This case is about Whirlpool's use of the word

"steam," and LG presented evidence at trial that Whirlpool's use of the word caused substantial

confusion among consumers.  The jury in turn found that Whirlpool created a likelihood of

confusion or misunderstanding regarding its steam dryers.  There is no basis for concluding that

the jury's verdict must have been based on some sort of "lesser" conduct that was never

presented at trial.

> **B.    LG Established that It Is Likely to be Damaged by Whirlpool's Deceptive Trade Practice.**

It is for the Court to determine any injunctive relief, not the jury.  815 ILCS 510/3 ("A

person likely to be damaged by a deceptive trade practice of another may be granted injunctive

relief upon terms that the court considers reasonable.  Proof of monetary damage, loss of profits

or intent to deceive is not required.").  "Likely to be damaged" is a *standing* requirement, and

competitors are routinely found to have standing under the IUDTPA.[11]

LG has already established consumer confusion, and this fact alone warrants injunctive

relief.  *See Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA,* 384 Ill. App. 3d 849,

868, 893 N.E.2d 981, 998 (Ill. App. Ct. 2008); *Multiut Corp. v. Yehuda Draiman,* 359 Ill. App.

3d 527, 537, 834 N.E.2d 43, 51 (Ill. App. Ct. 2005) (injunction warranted where defendant

created likelihood of confusion or misunderstanding); *Bingham v. Inter-Track Partners*, 234 Ill.

App. 3d 615, 621, 600 N.E.2d 70, 74 (Ill. App. Ct. 1992)  ("[I]njunctive relief is warranted when

---

[11] *See Solon v. Midwest Med. Records Ass'n, Inc.*, No. 04 CH 7119, 2004 WL 5660589 (Cook Cty. Chancery Div. Oct. 25, 2004) ("Where a statute expressly authorizes injunctive relief, such as in the Deceptive Trade Practices Act, 815 ILCS 510/3, a plaintiff need only show defendant's violation of the Act and that plaintiff has standing to pursue the cause."); *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 904 F. Supp. 818, 822 (N.D. Ill. 1995) (The IUDTPA "limit[s] standing to 'a person likely to be damaged by a deceptive trade practice.'") (quoting 815 ILCS 510/3); *Storck USA, L.P. v. Levy*, No. 90 C 5382, 1991 WL 60562, at *3 (N.D. Ill. Apr. 15, 1991) ("[I]t was the likelihood of injury to the plaintiff . . . that provided standing.").

a party's trade practice creates a likelihood of confusion or misunderstanding."). Furthermore, LG set forth at length the myriad ways it will suffer likely damage by Whirlpool's deceptive conduct, including loss of sales, price erosion, loss of market share, and loss of goodwill, brand value and competitive position. (LG Br. 17-22.)[12] Thus, Whirlpool's argument that LG is not likely to be damaged must fail.

## III. LG IS ENTITLED TO AN INJUNCTION UNDER THE IUDTPA.

### A. The Traditional Federal Injunction Requirements Do Not Apply to the IUDTPA.

Whirlpool cites no case where a court in this district applied the traditional federal injunction factors (as announced in *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006)) in determining whether to issue an injunction under ***state***, and only state, law, as is the case here. In fact, in addressing injunctions solely under state law, courts do not apply the traditional federal injunction standards. *See Midland Funding LLC v. Brent*, No. 3:08 CV 1434, 2009 WL 3086560, at *2 (N.D. Ohio Sept. 23, 2009) (holding that "[s]ince the remedy of injunctive relief is statutory, it may be granted upon a showing the [Ohio Consumer Sales Protection Act] has been violated, without regard to equitable principles that must ordinarily be demonstrated when a plaintiff seeks an injunction, such as irreparable injury or the absence of an adequate remedy at law.").[13] The cases relied upon by Whirlpool do not hold otherwise. In *American Taxi Dispatch,*

---

[12] *See also* LG's Response to Whirlpool's Declaration Objections, filed herewith.

[13] *See also People v. Fiorini*, 143 Ill. 2d 318, 346, 574 N.E.2d 612, 623 (Ill. 1991) ("[W]here a statute expressly authorizes injunctive relief to enforce the provisions of the statute, the general rules of equity requiring a showing of a lack of an adequate remedy at law and irreparable injury need not be shown."); *Chicago's Pizza*, 384 Ill. App. 3d at 866-68, 893 N.E.2d at 996-98 (awarding injunction under IUDTPA without considering traditional injunctive relief factors); *West v. State*, 212 S.W. 3d 513, 519 (Tex. App. 2006) ("[W]hen an applicant relies upon a statutory source for injunctive relief, such as the DTPA, the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law."); *Sullivan v. Vallejo City Unified School Dist.*, 731 F. Supp. 947, 956 (E.D. Cal. 1990) ("Where federal courts are called upon to adjudicate a claim predicated on state law, under either its diversity or pendent claim jurisdiction, there appears to be no

*Inc. v. American Metro Taxi & Limo Co.*, 582 F. Supp. 2d 999 (N.D. Ill. 2008), this Court issued an injunction under a federal statute as well as a state statute, and application of *eBay* was therefore appropriate. *Id*. at 1005. That is not the case here, where an injunction would issue under state, and only state, law.

Whirlpool's reliance on *ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App. 3d 817, 413 N.E.2d 1299 (Ill. App. Ct. 1980) for the proposition that an injunction should not issue is likewise misplaced. The claims in *ABC Trans* were for breach of fiduciary duty, fraud, and interference with contractual relations, and the plaintiff sought a permanent injunction barring the defendant from dealing with plaintiff's former customers. The court determined that such an injunction was inappropriate because plaintiff had recovered from defendant's harmful acts and its business was now profitable. *Id.* at 833, 413 N.E.2d at 1312. That is not the case here; Whirlpool's advertising is obviously ongoing and will continue to harm LG without an injunction. Moreover, the injunction sought in *ABC Trans*, which sought to bar the defendant from dealing with certain former customers of plaintiff, was far more restrictive than the one sought by LG. An injunction in this case would still leave Whirlpool free to sell dryers to whomever it wants, wherever it wants. LG's proposed injunction is therefore not comparable to the one sought in *ABC Trans*.

Whirlpool's attempts to distinguish the cases supporting an injunction are equally ineffective. Whirlpool claims that *Chicago's Pizza*, which found a showing of likely confusion under the IUDTPA was sufficient for an injunction to issue, is inapplicable because there was actual consumer confusion in that case. (WP at Br. 27.) But there is actual confusion in this case as well. *See Rust Env't*, 131 F.3d at 1218 ("Actual confusion can be shown . . . by survey

question that the ultimate issue of whether injunctive relief may issue must be decided under applicable state law.").

23

evidence."); *Republic Tobacco L.P. v. North Atl. Trading Co.,* 2007 U.S. Dist. LEXIS 38079, at

*12 (N.D. Ill. May 10, 2007) ("Actual confusion is shown by either direct evidence or survey

evidence."). The observations made by the hundreds of participants in the Reitter survey, as well

as the consumer comments found in the Insperience documents, prove that consumers are

confused and deceived by Whirlpool's steam advertising.[14] (*See supra* at 6-8.) This case is not

about confusion over the source of a product; it is about whether consumers are likely to be

confused and deceived by Whirlpool's "steam" dryer advertising, and LG presented copious

evidence that consumers are indeed confused and deceived. (*See supra* Section I.A.1.c.) In

short, traditional federal injunction standards simply do not apply to this request for an injunction

under state law.

      **B.**     **LG Satisfies the Traditional Injunction Factors.**

     Even if the Court were to apply federal injunction standards to a state statute, LG is

entitled to an injunction, as set forth below.

        1.   <u>LG Continues to Suffer Irreparable Harm from Whirlpool's Deceptive
Advertising.</u>

     As set forth in LG's opening brief, LG has established irreparable harm because the

jury's likelihood of confusion necessitates a finding of irreparable harm. (LG Br. at 23-24.)

Nothing more is required. However, LG also established that it will continue to lose market

share, goodwill, and brand value as a result of Whirlpool's deceptive advertising. (LG Br. at 24-

27.) Whirlpool's claim that LG suffers no irreparable harm is premised upon the erroneous

assertion that the jury made a "no-injury" finding and "rejected LG's lost-market share, price-

---

[14] Whirlpool's claim that the consumer confusion reflected in the Insperience documents was planted by
LG is ludicrous on its face. Sales associates at the Insperience Studio were instructed to provide the top
comments that they heard from consumers. (Tr. at 1835:4-6.) It was clear that the comments were
coming from consumers and not from some other unknown source. (*See* LG Br. Ex. B, PX5
("***Consumers have a lot of questions about steam***, the #1 question: 'Is it actually steam?'") (emphasis
added).) Whirlpool's baseless conspiracy theory must be rejected.

erosion, and lost-'goodwill' arguments." (WP Br. at 29, 30.) But as set forth *supra* at Section II.A, the jury made no such findings. Whirlpool's argument is based on an illusory factual premise that crumbles upon even the slightest of scrutiny.

Whirlpool's argument is also premised on misconstrued case law. Whirlpool cites *Snider v. Consolidation Coal Co.*, 973 F.2d 555 (7th Cir. 1992) for the proposition that the district court's equitable determinations must comport with the jury's findings on common factual issues based on the same evidence. (WP Br. at 29.) In *Snider*, a jury decided the tort claims at issue, but the plaintiff's Title VII claim was tried by the court. As a result, the court heard the testimony of an expert witness outside the jury's presence because the testimony was deemed prejudicial with respect to the tort claims, but not with respect to the Title VII claim. *Snider*, 973 F.2d at 557-58. While the jury returned verdicts for the defendants on the tort claims, the court found in favor of the plaintiff on the Title VII claim. *Id.* at 558. The Seventh Circuit held that the Court was not bound by the jury's tort claim findings because the expert testimony not heard by the jury was sufficient to support the judge's decision. *Id.* at 559-60. Unlike *Snider*, the jury in this case was responsible for trying each of LG's claims and ***found*** that Whirlpool violated the IUDTPA. An injunction under the IUDTPA would thus plainly align with the jury's findings of fact.[15]

---

[15] The defendants in *Florists' Nationwide Tel. Delivery Network v. Florists' Tel. Delivery Assoc.*, 371 F.2d 263 (7th Cir. 1967), also relied upon by Whirlpool, were found liable for violations of the Sherman Act, but the district court denied the plaintiff's request for injunctive relief. On appeal, the Seventh Circuit determined that the ***denial*** of an injunction was contrary to the findings made by the jury on the same issue. *Id.* at 271. On remand, the district court was instructed to reconsider plaintiff's claim for injunctive relief. *Id.* Here, the jury never made a finding regarding injury, but did make a finding that Whirlpool violated the IUDTPA. The denial of an injunction in *Florists*, meanwhile, was reversed because it conflicted with the jury's finding of liability. *Florists* thus supports LG's contention that the jury's finding of liability requires an injunction.

Whirlpool wrongly claims that *SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 928 (N.D. Ill. 2007) stands for the proposition that "proof of irreparable harm to goodwill requires proof of 'the loss of customers and damage to its reputation,'" although LG has demonstrated both. (WP Br. at 31; LG Br. at 18-22.) Rather, the *SMC* court observed that, on a motion for preliminary injunction, plaintiff had "made a strong showing that, absent injunctive relief, it will suffer irreparable harm to its business goodwill through the loss of customers and damage to its reputation." *Id.* at 927-28. And in *J.C. Penney Corp. v. Milwaukee Golf Dev. Co., LLC*, No. 06 C 1826, 2006 WL 1215376 (N.D. Ill. May 3, 2006), also relied upon by Whirlpool, plaintiff claimed that it would suffer loss of goodwill because J.C. Penney customers would not be able to park if an OTB facility opened elsewhere in the mall. Plaintiff's goodwill argument, however, made no sense. The court pointed out that the OTB facility was taking over an empty space at the mall and that the contract between J.C. Penney and the mall required that a certain percentage of parking spots be available for J.C. Penney customers. *Id.* at *2. The court noted that "[t]here are no specifically designated parking spaces for particular tenants" and "[t]he fact that the OTB Parlor's patrons may use parking spaces, just like the patrons of the establishment that previously occupied the OTB Parlor's space, does nothing to alter the mathematical ratio that is provided in the J.C. Penney Lease." *Id.* Accordingly, the court rejected plaintiff's lost goodwill claim. That is not the case here. LG created the steam laundry market. The hot steam that LG injects into its dryer drum is what consumers expect from a steam dryer. But the goodwill LG can gain from its "constant or habitual customers" and "buyer momentum" is necessarily affected when its main competitor falsely markets the conventional evaporation of water as the same innovative steam that LG pioneered. *See generally Newark Morning Ledger*

*Co. v. United States,* 507 U.S. 546, 555 (1993); *Pilates, Inc. v. Current Concepts, Inc.,* 120 F. Supp. 2d 286, 310 (S.D.N.Y. 2000).[16]

Whirlpool also claims that the absence of consumer confusion weighs against an irreparable harm finding. (WP Br. at 32.) But LG succeeded on its IUDTPA claim, which **requires** a likelihood of consumer confusion. As discussed above, the jury's finding in this regard was well-supported by the evidence. Robert Reitter surveyed hundreds of consumers, and 66% percent of them were deceived by Whirlpool's advertising. This was confirmed by Whirlpool's own documents. (*See supra* at 6-8.)[17]

*S.C. Johnson & Son, Inc. v. Lever Bros. Co.*, No 88-C-1327, 1991 WL 217665 (E.D. Wis. Feb. 26, 1991), cited by Whirlpool, supports a finding of consumer confusion in this case. In *S.C. Johnson*, the plaintiff failed to submit **any** survey establishing confusion, and defendant submitted survey evidence establishing that there was no confusion. The court observed that "the Lever survey was conducted in accord with the 'now standard survey format used to prove

---

[16] Whirlpool's remaining cases likewise have no application here. *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir. 1992) was concerned with evidence sufficient to support a **monetary** award for damages to goodwill. And *Drummond Am. Corp. v. Murphy*, No. 87 C 5642, 1987 WL 16244, at *7 (N.D. Ill. Aug. 26, 1987), a restrictive covenant case, concerned the simple allegation that "it is beyond dispute that Drummond will suffer irreparable harm if the goodwill it has spend years cultivating in twenty-one Georgia counties is pirated by Murphy." Plaintiff offered nothing to support this statement, and "it appears that it was not Drummond, but Murphy himself who spent time cultivating the goodwill." *Id.* Therefore, plaintiff's request for a temporary restraining order was denied. *Id.*

[17] Whirlpool criticizes LG for failing to submit the type of consumer confusion evidence found in *Chicago's Pizza, Bingham,* and *American Taxi.* But these were cases where the defendant was infringing plaintiff's trademark, and consumers therefore believed that defendant's company was plaintiff's company. That type of confusion—where consumers believe one entity is another—is simply not required here. *See Chicago's Pizza,* 384 Ill. App. at 858, 893 N.E.2d at 990; *Bingham,* 234 Ill. App. 3d at 620, 600 N.E.2d at 74; *American Taxi,* 582 F. Supp. 2d at 1006. Moreover, none of the cases cited by Whirlpool state a preference for anecdotal evidence of individual confusion over survey evidence of consumer confusion, and LG is unaware of any such authority. Indeed, it appears that the courts in the cases cited by Whirlpool were forced to rely on such anecdotal evidence because they lacked any comprehensive survey evidence demonstrating confusion.

. . . likely confusion.'" *Id.* at *13 (citing 2 McCarthy, *Trademarks and Unfair Competition*, §32:50 at 778 (1984) (citing *Union Carbide Corp. v. Ever-Ready, Inc.* 531 F.2d 366 (7th Cir. 1976))).  Here, LG did present survey evidence of consumer confusion, and that evidence was unrebutted by Whirlpool.[18]

   *Minnesota, Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587 (7th Cir. 2001) ("*3M*") is also wholly inapplicable.  The defendants in *3M* were found guilty of trade secret misappropriation, but the district court refused to enjoin them from continuing to use the misbegotten trade secrets. The court reasoned that defendants would have been able to independently develop the trade secrets in a period of less than two years; consequently, the defendants would have discovered the trade secrets on their own by the time the court was determining whether or not to enjoin the defendants' actions.  *Id.* at 609.  In other words, the judge determined that the plaintiff would not have suffered an ongoing harm because the defendants would have eventually discovered the trade secrets on their own.  That analysis does not apply to deceptive advertising, which by its nature causes harm so long as it continues.  LG presented abundant evidence of irreparable harm in this case.  (LG Br. at 23-27.)  An injunction here would remedy that harm, unlike in *3M,* where "there would nothing be nothing further gained by enjoining Accu-Tech from using the trade secret which they would have by that time developed."  *Id.*

   Finally, LG does not rely solely on Lanham Act cases to support its argument that because the jury found Whirlpool created a likelihood of confusion, irreparable harm necessarily follows from that finding.  Both *Genderm Corp. v. Biozone Labs.*, No. 92 C 2533, 1992 WL

---

[18] *Stokely-Van Camp, Inc. v. Coca-Cola Co.,* 646 F. Supp. 2d 510, 523 (S.D.N.Y. 2009) likewise involved a plaintiff that performed no survey.  The only irreparable harm evidence plaintiff offered was defendant's internal survey that showed consumers preferred a sports drink with four electrolytes (which defendant's drink contained) as opposed to two electrolytes (which plaintiff's drink contained).  However, plaintiff did not present evidence that consumer's preference for four electrolytes over two harmed plaintiff in any way.

220638 (N.D. Ill. Sept. 3, 1992) and *Bonner v. Westbound Records, Inc.*, 49 Ill. App. 3d 543, 364 N.E.2d 570 (Ill. App. Ct. 1977) are IUDTPA cases.  That they are also preliminary injunction cases is of no consequence, because the jury here necessarily found a likelihood of consumer confusion in this case in finding that Whirlpool violated the IUDTPA.  *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1173-74 (7th Cir. 1986) ("Under the Illinois Deceptive Trade Practices Act a defendant is liable only if the plaintiff can establish a likelihood of confusion between the parties' products."); *Hooker v. Columbia Pictures Indus., Inc.*, 551 F. Supp. 1060, 1064 (N.D. Ill. 1982). ("Essential to the maintenance of an action under [the IUDTPA] are well-pleaded allegations indicating the existence of a 'likelihood of confusion.'"). Irreparable harm has been demonstrated in this case, both by the jury's verdict and the evidence.

## 2.    The Balance of Harms Favors LG.

Given the irreparable harm to LG discussed above, there can be no doubt that the balance of harms favors entering the injunction.  To be sure, an injunction will cost Whirlpool money, because it will have to alter its dryers and because an injunction may have a potential impact on Whirlpool's sales while it makes those alterations.[19]  But this fact is not persuasive; courts routinely impose injunctions that impose significant costs on parties that act unlawfully.  "[A]ny harm to Defendant in forcing it to comply with the requirements of the law merits little equitable consideration."  *Rockstar, Inc. v. Rap Star 360 LLC*, No. 2:10-CV-00179, 2010 WL 2773588, at *4 (D. Nev. July 8, 2010) (granting plaintiff's motion for permanent injunction in Lanham Act case).  *See also Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 640 (N.D. Tex. 2009) (granting permanent injunction under the Lanham Act, and finding that balance of harms analysis favored

---

[19] Whirlpool's argument that an injunction would pose obstacles for its trade customers is without merit; "the balance [of hardships] considered is only between a plaintiff and a defendant, and thus the effect on customers…is irrelevant under this prong of the injunction test."*Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (citing *eBay*, 547 U.S. at 391).

plaintiff because "a permanent injunction will only require the defendants to bring their business

into line with the requirements of the law"); *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 883

(S.D. Ohio 2007) (finding that "a permanent injunction is warranted because there is no harm to

the Defendant inasmuch as an injunction will merely require Defendant to comply with the

Copyright Act and Lanham Act"); *Doctor's Assocs., Inc. v. Subway.SY LLC*, No. 09-CV-3148,

2010 WL 3187899, at *2 (D. Minn. July 30, 2010) (citing *Capitol Records, Inc. v. Thomas-

Rasset*, 680 F. Supp. 2d 1045, 1060 (D. Minn. 2010)) ("There is no cognizable harm to defendant

from being [permanently] enjoined from doing something that is against the law and for which

[it] has already been found liable.").

Courts regularly grant preliminary injunctions against defendants who will incur

significant costs to comply with the injunction as well.  *See Ty, Inc. v. Jones Group, Inc.*, 237

F.3d 891, 902-04 (7th Cir. 2001) (affirming grant of preliminary injunction where defendant

manufactured "Beanie Racers" that allegedly infringed on plaintiff's "Beanie Babies" trademark,

even though defendant would be forced to either stop selling the infringing products or to

"rename the product, which would involve changing the hang tags, displays, promotional

material, and the NASCAR license agreement").[20]  *See also Re/Max N. Cent., Inc. v. Cook*, 272

F.3d 424, 432-33 (7th Cir. 2001) (upholding preliminary injunction in a Lanham Act case that

forced defendant to remove infringing logo from her real estate business, even though defendant

claimed it would "put [her] out of business").

The injunction requested by LG would affect Whirlpool's conduct only to the extent that

it is in violation of the IUDTPA.  As the *Rockstar* court observed, any expenditures Whirlpool

---

[20] Part of the court's reasoning was that the defendant decided to use the infringing name after being sent
a cease and desist letter from the plaintiff, "knowing full well it may face legal challenges to its product
and in turn negative financial consequences," as was the case here.  *Id.* at 903; see also Docket No. 12 at 3
n.1 (noting that "LG USA sent a cease and desist letter to Whirlpool on December 17, 2007 . . . .").

must make to bring its conduct into legal compliance merit little consideration. Like the defendant in *Ty*, Whirlpool understood that it could face legal challenges and negative financial consequences because of its use of the word "steam." Whirlpool, like any party found to have violated a statute, must be prepared to accept certain costs as the consequence of its activity. Further, Whirlpool is still free to determine the best way to comply with any injunction. Whirlpool contends that all its dryers must be shipped back to it, that dryer consoles must be removed and replaced, and LED screens must be reprogrammed, but it does not explain why less onerous measures, such as the use of decals for those dryers already in the distribution channel, cannot be used.

Moreover, Whirlpool's damages expert, Raymond Sims, testified that "none of the documents that I reviewed indicate that there's any value to Whirlpool's use of the name or the word 'steam' in its advertising or in connection with the name of its dryer." (Tr. at 2390:15-18.) Mr. Sims' statement establishes that Whirlpool's fear of competitive hardship is unfounded. Whirlpool's attempt to rehabilitate Mr. Sims' testimony is fruitless; it cannot argue that there is no evidence to "indicate that there's any value to Whirlpool's use of the name or the word 'steam'" at trial and subsequently avoid penalty for its IUDTPA violation by alleging that the word is crucial to its competition in the dryer market. *See Kraft Foods Holdings, Inc. v. Helm*, 205 F. Supp. 2d 942, 951 (N.D. Ill. 2002) (defendant's testimony that infringing name "plays no role in the sales of his goods and services, and that the artwork, and not the name, sells itself" weighed in favor of plaintiff for the purposes of balancing hardships).

Whirlpool's cited authority is inapposite, as LG's proposed injunction would not cause Whirlpool to discontinue a product like in *Eldon Indus., Inc. v. Rubbermaid, Inc.*, 735 F. Supp. 786 (N.D. Ill. 1990). The effect of the injunction would be far more comparable to the one

imposed by this Court in *American Taxi,* where the defendant was made to bear a hardship because of its wrongdoing, but was not forced out of business. 582 F. Supp. 2d at 1007. Under LG's proposed injunction, the Whirlpool would bear the cost of altering its dryers and advertisements to correct the consumer confusion it caused. This cost is justified in light of Whirlpool's behavior in violation of the IUDTPA. Thus, the balance of harms is decidedly in favor of LG. (*See also* LG Br. at 16-22.)[21]

> 3. An Injunction Correcting Whirlpool's Deceptive Advertising Will Benefit the Public.

Whirlpool's claim that an injunction will hamper competition and consumer choice is a red herring that must be rejected. An injunction would leave Whirlpool free to compete and consumers will have the same choice that they have now among dryers. In fact, the elimination of consumer confusion will improve competition. Consumers will be able to make a better-informed choice between dryers that inject hot steam and those that use a water spray, and pricing will be more appropriately based on a consumer who is better informed with the competing technologies. An injunction would only correct the consumer confusion and force Whirlpool to cease its deceptive advertising. Consumers unquestionably benefit from the elimination of deceptive advertising. *Hot Wax, Inc. v. S/S Car Care,* No. 97 C 6879, 1999 WL 966094, at *8 (N.D. Ill. Oct. 14, 1999).

Whirlpool relies on *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616 (7th Cir. 1995) to claim that the interest of the public favors no injunction where there is no confusion. In *Storck*, plaintiff moved to preliminarily enjoin defendant's use of plaintiff's mark in comparing

---

[21] Whirlpool complains that it will be harmed while competitors who may or may not make similar steam compete in the market, but cites no cases that stand for the proposition that this is a relevant factor. LG or Whirlpool can bring suit against these competitors. Regardless, this Court has already ruled that competitor conduct is irrelevant. (*See* Dkt. 324 at 12.)

plaintiff's and defendant's candies.  Plaintiff made Werther's Originals candy, and defendant

manufactured Life Savers Delites.  Defendant advertised that its Life Savers Delites were "25%

lower in calories than Werther's Original Candy."  *Id*. at 617.  Plaintiff claimed, rather

incredibly, that consumers would see its mark on defendant's advertising and believe that they

were purchasing Werther's instead of Life Savers.  *Id*.  Plaintiff, however, did not develop any

evidence of confusion.  *Id*.  In this regard, the court observed that "to this day ***no one has***

***conducted the surveys*** customary in trademark cases . . . ."  *Id*. at 618-19 (emphasis added).

Thus, the court denied plaintiff's bid for a preliminary injunction.  *Id*. at 620.  Here, LG did

perform the survey that is customarily used to demonstrate consumer confusion, and the jury

***found*** that Whirlpool created a likelihood of confusion or misunderstanding regarding its steam

dryers.

  Whirlpool correctly explains that *Hot Wax* holds that there is a strong interest in

eliminating false advertising because "the consumer does not receive what the consumer believes

he or she is paying for."  (WP Br. at 41-42 (citing *Hot Wax*, 1999 WL 966094, at *8).)  This is

exactly the problem with Whirlpool's dryers; consumers do not receive what they believe they

are paying for.  Consumers believe that Whirlpool's steam dryer inject a hot steam into the dryer

drum.  That is not what they receive.  (*See supra* at 3-6.)

  Finally, Whirlpool's claims that this Court cannot issue an injunction ordering a

modification of advertising copy must be rejected.  It is well established that a court can dictate

the terms of a disclaimer or corrective advertising ordered as a part of injunctive relief in a

deceptive advertising case.  *See Upjohn Co. v. Riahom Corp.*, 641 F. Supp. 1209, 1226 (D. Del.

1986); *Linotype Co. v. Varityper, Inc.*, No. 89 CIV. 4747, 1989 WL 94338, at *3 (S.D.N.Y. Aug.

4, 1989); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 479 (D.N.J.

2009); *Energy Four, Inc. v. Dornier Med. Sys., Inc.*, 765 F. Supp. 724, 735 (N.D. Ga. 1991);

*Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F. Supp. 194, 215 (D.D.C. 1989), *rev'd on other*

*grounds*, 913 F.2d 958 (D.C. Cir. 1990).

Whirlpool fails to address any of the cases cited by LG in support of this point. Instead,

Whirlpool cites *Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies,*

*Ltd.*, 970 F.2d 273 (7th Cir. 1992) for its contention that this Court should not issue an injunction

requiring continued supervision. (WP Br. at 42.) The Seventh Circuit determined that the

injunction in *Original Cookie* required an unwarranted level of ongoing supervision by the court

over a complicated business relationship between two hostile parties, a very different and far

more complex scenario than the one presented here. *Id.* at 277. Moreover, an injunction here

would not require "continued" supervision unless Whirlpool plans on not complying with it.

LG's proposed injunction is comparable to those granted in *Upjohn*, *Linotype*, and numerous

other cases where it was necessary for the court to enjoin deceptive advertising, and the Court is

well within its power to issue such an injunction.

## IV. A NATIONWIDE INJUNCTION UNDER THE IUDTPA WOULD NOT VIOLATE THE CONSTITUTION.

Whirlpool's argument that a nationwide injunction would violate the Constitution is

wholly unfounded and contrary to established authority on the issue. Whirlpool's argument

ignores *all* of the existing authority relating to the extraterritorial effect of the IUDTPA. (LG Br.

at 32-35.) It is well established that courts have the power to issue nationwide injunctions

affecting defendants over whom they have personal jurisdiction, even when the defendant's

conduct is enjoined pursuant to a violation of a state statute. *Instrumentalist Co. v. Marine*

*Corps League*, 509 F. Supp. 323, 340 (N.D. Ill. 1981) (citing Restatement of the Law (Second)

of Conflict of Laws § 53) ("It would be the height of absurdity to hold that Illinois had a

legitimate interest in protecting vested rights…but that, having acquired jurisdiction over an offender, courts sitting in Illinois would be helpless to deal with dilutive acts once they crossed state lines.") *See also Hyatt Corp. v. Hyatt Legal Servs.*, 736 F.2d 1153, 1159-60 (7th Cir. 1984); *Polaroid Corp. v. Polaroid, Inc.*, 319 F.2d 830, 837 (7th Cir. 1963); *Carson v. Here's Johnny Portable Toilets, Inc.*, 810 F.2d 104, 105 (6th Cir. 1987); *United Healthcare Ins. Co. v. AdvancePCS*, No. Civ. 01-2320, 2002 WL 432068, at *17-18 (D. Minn. Mar. 18, 2002); *Mars, Inc. v. Standard Brands, Inc.*, 386 F. Supp. 1201, 1206-07 (S.D.N.Y. 1974).

A.     **The Commerce Clause and Full Faith and Credit Clause Are Not Implicated in this Case.**

The Commerce Clause and Full Faith and Credit Clause[22] do not bar the issuance of a nationwide injunction in this case.  Neither *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996), nor any other decision cited by Whirlpool purports to overturn *Instrumentalist* or any of the other cases holding a district court has the authority to issue a nationwide injunction aimed at preventing deceptive trade practices.  Notably, not one of Whirlpool's cases deals with either Illinois' or another state's UDTPA.  *Gore*, on which Whirlpool primarily relies, dealt with whether a punitive damage award was excessive because it took into account conduct that was unlawful in Alabama but expressly made lawful in other states, and because the punitive damages award was 500 times the size of the compensatory damages award.  This is not a case where some states expressly disallow certain acts and other states expressly allow them, and it is not a case about a punitive damage award.

Similarly, the Illinois statute at issue in *Edgar v. MITE Corp.*, 457 U.S. 624 (1982) regulated the steps that a company had to follow in order to take over a company, while the

_____

[22] Curiously, Whirlpool devotes half of a page to describing the Full Faith and Credit Clause, but then fails to make a single argument explaining how a nationwide injunction in this case would violate that clause.

Connecticut liquor statute in *Healy v. Beer Inst.*, 491 U.S. 324 (1989) regulated pricing in the state. In both cases, the Court determined that the ***statutes themselves*** were unconstitutional because their effect was to control interstate commerce. Here, however, the IUDTPA has not been found to be unconstitutional; indeed, Whirlpool does not attempt to argue this.

Whirlpool is unable to identify any authority with respect to the IUDTPA. Unlike the statutes at issue in *Gore, Edgar*, and *Healy*, the IUDTPA is a codification of fundamental common law that covers behavior prohibited in every state and is not unconstitutional. *See Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 152 F. Supp. 2d 1026, 1037 (N.D. Ill. 2001); *United Healthcare*, 2002 WL 432068, at *17-18. *United Healthcare* remains the most illustrative authority in this case. The Minnesota DTPA is virtually identical to the IUDTPA, and the fact that a preliminary injunction was at stake did not affect the court's analysis of the statute's extraterritorial effect. *Id.*

Whirlpool's claim that the Constitution bars this Court from issuing a statewide-only injunction fairs no better. The only case Whirlpool cites, *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) dealt with a statute that criminalized the use of a computer to disseminate obscene material to minors. One of the bases on which the court ruled the law unconstitutional was that any regulation of the internet by the states subjected internet users to inconsistent regulation. *Id.* at 169. According to this reasoning, then, any state regulation that would affect the internet would be a violation of the Commerce Clause. *Pataki's* analysis, unsurprisingly, has been rejected by other courts. *See National Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 961-62 (N.D. Cal. 2006); *Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 504-05 (5th Cir. 2001). As the *Target* court explained, the argument that an Illinois-specific injunction would force Whirlpool to modify its website for all customers

nationwide (or worldwide) is not sustainable. *Target*, 452 F. Supp. 2d at 961. *Pataki* "rests on an incorrect understanding of the internet." *Id.* (citing Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause,* 110 Yale L.J. 785, 882 (2001)). In fact, it is "technically feasible … for a website to tailor its content based on the location of its users." *Id.* at 962. Whirlpool is perfectly capable of designing an Illinois-only website, if it so chooses.

Furthermore, even if Whirlpool "chooses to change its entire website in order to comply" with the IUDTPA, this does not mean that Illinois is regulating out-of-state conduct. *Id.* at 961. "Courts have held that when a defendant chooses to manufacture one product for a nationwide market, rather than target its products to comply with state laws, defendant's choice does not implicate the commerce clause." *Id.* (citing *Lorillard Tobacco Co. v. Reilly*, 84 F. Supp. 2d 180, 199-200 (D. Mass. 2000)). Finally, like *Gore*, *Edgar*, *Healy*, and other cases cited by LG, *Pataki* does not overturn any of the cases holding that a district court can issue a nationwide injunction based on a violation of the IUDTPA. Any such injunction therefore does not violate the Constitution.[23]

### B. The First Amendment Does Not Bar an Injunction on Whirlpool's Commercial Speech.

Whirlpool's First Amendment argument fails for similar reasons. *First*, this case does not involve merely a "***remote*** possibility of consumer confusion." (WP Br. at 49 n. 24 (emphasis added).) After a trial that lasted for over two weeks, the jury ***found*** that "Whirlpool created a

---

[23] Whirlpool also claims that the National Conference of Commissioners on Uniform State Laws (the "NCCUSL") revoked its recommendation of the UDTPA as a uniform law for the states. Whirlpool's only support for this claim is that the UDTPA no longer appears on a list of statutes on the NCCUSL's website. But the UDTPA in fact remains on the NCCUSL's website, and a review of the NCCUSL's Executive Committee's meeting minutes going back to 2001 shows no indication that the committee ever voted to revoke its recommendation for the UDTPA. (*See* http://www.nccusl.org/nccusl/uniformacts-subjectmatter.asp (the UDTPA remains on the NCCUSL's list of uniform laws); http://www.nccusl.org/nccusl/uniformact_factsheets/uniformacts-fs-udtpa.asp.)

likelihood of confusion or misunderstanding regarding the nature, quality or characteristics of Whirlpool's steam dryers." (Dkt. 629, Jury Inst. at 37.) Whirlpool cannot escape this verdict, no matter how often it attempts to diminish its significance. Whirlpool admits that misleading speech may be restricted, and that is what LG is requesting the Court do in the instant case. (WP Br. at 47.)

*Second*, the speech at issue here is commercial speech, which is entitled to reduced protections under the First Amendment. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563 (1980). Commercial speech that has been established as confusing is misleading commercial speech and is outside the First Amendment. *Taubman Co. v. Webfeats*, 319 F.3d 770, 774-75 (6th Cir. 2003) (citing *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)). LG is asking the Court to prevent the furtherance of the confusion that the jury already found, not to establish "property rights in language." (WP Br. at 47.)

Whirlpool similarly mischaracterizes the issue when it describes this case as being about word choice. (*Id.*) The issue in front of the Court is how to remedy Whirlpool's deceptive advertising; LG is not seeking to dictate affirmative disclosures through judicial decree like in *Central Ill. Light Co. v. Citizens Utility Bd.*, 827 F.2d 1169 (7th Cir. 1987). The behavior that was ruled unconstitutional in *Central Ill. Light* was the practice (authorized by statute) of requiring plaintiff to permit defendant to solicit membership and dues through enclosures that were mailed alongside regular billings. The court held that "the utilities' freedom of speech is burdened because they are compelled to give access to their billing materials to a group that regularly opposes them in regulatory proceedings." *Id.* at 1174. The injunction proposed by LG would do no such thing. Instead, it would merely correct Whirlpool's deceptive speech, a

practice condoned by the *Central Ill. Light* court. *Id.* at 1173 (discussing *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), which held that "sellers can be forced to declare information about themselves needed to avoid deception").[24] Whirlpool's First Amendment argument has no merit and must be disregarded.[25]

## V. ATTORNEYS' FEES ARE WARRANTED IN THIS CASE.

Whirlpool confuses the standards for punitive damages and an award of attorneys' fees under the IUDTPA. While this Court ruled that LG's punitive damages request could not go to the jury, it also ruled that LG's request for a willfulness finding—necessary to support an award of attorneys' fees—*could* go to the jury. *See* 815 ILCS 510/3; Jury Inst. at 32. The proper focus is whether Whirlpool had actual knowledge of the deception caused by its conduct and disregarded the effects of that conduct. *Bingham*, 234 Ill. App. 3d at 621, 600 N.E.2d at 74-75. This is a lower threshold than the "willful, intentional and egregious" conduct required for a punitive damages award. *See BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1097 n.14 (7th Cir. 1994). Here, Whirlpool was aware that use of the term "steam" in its advertising

---

[24] *Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511 (8th Cir. 1996) is also distinguishable, as it explicitly dealt with a standard for a specific type of comparative advertising claim, where the defendant's advertising alleged that "tests prove that my product is better than yours." *Id.* at 514. The partial language quoted by Whirlpool was in reference to the application of this "tests prove" standard, and reads in full that "courts applying [the "tests prove" standard] should give advertisers a fair amount of leeway . . . ."*Id.* at 515. Such a standard does not apply to this case. The court further held that such "leeway" should be afforded only "in the absence of a clear intent to deceive or substantial consumer confusion."*Id.* Here, there is both clear intent to deceive and substantial consumer confusion.

[25] In the event that this Court decides that a modification to Whirlpool's use of the word "steam" is the most appropriate relief in this case, Whirlpool's constitutional arguments hold even less weight. The Supreme Court has noted that special attributes of commercial speech may "make it appropriate to require that a commercial appear in such a form, or include such additional information, warnings, and disclaimers as are necessary prevent its being deceptive."*Virginia Bd. of Pharmacy*, 425 U.S. at 772 n. 24. The modification requested by LG would have the opposite effect of the disclosure policy at issue in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976); instead of burying potential customers "in an avalanche of trivial information," LG's proposed modification clarifies that the "steam" produced in Whirlpool's dryer is derived from a cold water spray and is consistent with Whirlpool's own materials.

was deceptive, yet it chose to use the term anyway. (*See* LG Br. at 10-11.) As a result, an award of attorneys' fees is appropriate in this case.

## CONCLUSION

For the foregoing reasons, LG respectfully requests that a nationwide injunction issue prohibiting Whirlpool from using the word "steam" in connection with cold water spray dryers, or, at a minimum, requiring a meaningful qualification to the word "steam" each time it is used, and that LG be awarded attorney's fees and costs for Whirlpool's willful violation of the IUDTPA.

Dated: January 26, 2011        Respectfully submitted,

**LG ELECTRONICS U.S.A., INC.**

By: s/   Bryna J. Dahlin   
           One of its attorneys

Ronald Y. Rothstein - rrothstein@winston.com
Bryna J. Dahlin - bdahlin@winston.com
Eric Broxterman - ebroxterman@winston.com
John Marfoe - jmarfoe@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600 – telephone
*Counsel for LG Electronics U.S.A., Inc.*

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that on January 26, 2011, I filed the REPLY IN SUPPORT OF LG

ELECTRONICS U.S.A. INC.'S MOTION FOR INJUNCTIVE RELIEF AND ATTORNEY'S

FEES with the Court's ECF system and by doing so served a copy on all the parties.


/s/ Bryna J. Dahlin_____
ATTORNEY FOR LG ELECTRONICS
 U.S.A., INC.