# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LG ELECTRONICS U.S.A., INC., | ) | |
| a subsidiary of LG Electronics, Inc., | ) | |
| a Korean company, | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 242 |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

After an approximately three-week trial, a jury returned a verdict largely in favor of

Defendant Whirlpool Corporation ("Whirlpool") and against Plaintiff LG Electronics U.S.A.,

Inc., ("LG"). Specifically, the jury found in favor of Whirlpool and against LG on LG's claim of

false advertising under the Lanham Act. The jury also found in favor of Whirlpool and against

LG on LG's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act

("the CFA"). The jury did find in favor of LG and against Whirlpool on LG's claim under the

Illinois Uniform Deceptive Trade Practices Act ("the IUDTPA"), which provides only for

injunctive relief. 815 ILL. COMP. STAT. 510/3. The jury also specifically found that LG had

failed to prove by a preponderance of the evidence that it was entitled to lost profits, price

erosion, or to Defendant's profits. LG now seeks a nationwide injunction against Whirlpool

based on the jury's verdict. For the reasons discussed below, the Court denies LG any injunctive

relief.[1]

<h1 style="text-align:center">BACKGROUND</h1>

LG brought this case against Whirlpool in connection with the latter's advertising of its steam dryers. LG sued Whirlpool for false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), regarding its steam dryers. LG's Lanham Act claim pursued three separate theories: 1) Whirlpool's advertisements are literally false; 2) Whirlpool's advertisements are literally false by necessary implication; and 3) Whirlpool's advertisements are impliedly false. In addition, LG brought a claim against Whirlpool alleging that it violated the CFA and a claim that it violated the IUDTPA. The gravamen of each of LG's claims was that Whirlpool uses the word "steam" in its advertisements and in the name of its Duet Steam Dryer, and that such use is literally false and misleading because the Duet Steam Dryer does not use steam, but instead uses a mist of cold water sprayed into a warm dryer drum. According to LG's theory at trial, this method is not "true steam" and thus Whirlpool's advertising is false and misleading. As noted above, the jury rejected all of LG's claims except its claim under the IUDTPA. Plaintiff premised its IUDTPA claim on the same evidence that the jury considered and rejected on its Lanham Act and CFA claims.

During trial, LG called 16 witnesses, including one witness via deposition testimony. Whirlpool called seven witnesses, including four witnesses by deposition testimony. LG called three expert witnesses to testify: 1) Anthony Jacobi, a thermodynamics expert; 2) Dr. Mohan

---

[1] Whirlpool argues that the IUDTPA claim fails as a matter of law because LG did not establish that Defendant's objected-to behavior occurred "primarily and substantially" in Illinois. (R. 644 at 13-25; R. 653 at *passim*.) The Court will address this important—and potentially meritorious—argument when it rules on the parties' post-trial motions.

Rao, LG's damages expert; and 3) Robert Reiter, LG's survey expert. Whirlpool called Dr. Subbaiah Malladi, a mechanical engineer, who opined that Whirlpool's dryer creates steam.

At the injunction hearing, LG submitted declarations from Dr. Rao; Dr. Jerry Wind, Professor of Marketing at the Wharton School of the University of Pennsylvania; and Mr. John Herring, Vice President of Sales for Home Appliances National Accounts who has responsibility for, among other products, LG's washer and dryer sales. (R. 641-1 at 1.) Whirlpool submitted a declaration from Pamela Klyn, who is the General Manager for Whirlpool Cooking for the North America region, but was the Product Development Director for Defendant's front-load washer and dryer platforms during the development of the Whirlpool steam dryer. (R. 644-19 at 2.) At the hearing, Mr. Herring testified for LG and Ms. Klyn testified for Whirlpool.

## I.      Steam Dryers

The dispute in this case focused on steam dryers and on the definition of steam. LG and Whirlpool are fierce competitors in the steam-dryer market. In fact, they are the main competitors in that market. LG asserted and argued throughout trial that Whirlpool's "steam" dryers do not actually employ steam, and thus Whirlpool's advertising of its "steam" dryer is false.

During trial, the evidence showed that Whirlpool announced its intention to launch its steam dryer in the fall of 2007. Whirlpool then introduced its steam dryer in the fall of 2007 and was the first company in the industry to market a steam dryer. (Trial Transcript "Tr." at 313; R. 641 at 30; R. 644 at 15.) Whirlpool developed the dryer to serve the needs of its laundry customers who wanted the benefits of wrinkle reduction and odor removal in the clothing placed in the dryer. (*Id.* at 2459.) Whirlpool also demonstrated that it began researching the use of

steam in its laundry products as early as March of 2005. (*Id.* at 2460-61.) In fact, as of October

2006, Whirlpool had eight engineers committed to the steam project. (*Id.* at 2465-66.)

LG introduced its steam washer into the marketplace in early 2006. (Injunction Hearing

Transcript ("Inj. Hr'g") at 7.) LG did not introduce its steam dryer into the marketplace until

December 2007 – two months after Whirlpool. (*Id.* at 14.)

## II.   The Dryers

The evidence at trial revealed that LG's and Whirlpool's respective steam dryers use

different methods of creating steam. LG's dryer makes steam through an external boiler that

boils water and then injects hot vapor into the dryer drum. As Professor Jacobi testified:

> That steam goes through a tube and it's injected into the dryer drum. It enters the dryer
> drum, which is a cooler environment full of air, and it forms that kind of billowy white
> cloud that's something like what the teapot makes.

(Tr. at 454.) The steam is injected into the dryer drum for a seven-minute cycle. (*Id.* at 458.)

Whirlpool designed its dryer to create steam through a system that injects a mist of water

into a hot dryer drum, where the mist combines with the heated air and tumbling clothes to create

steam. (Tr. at 328, 333, 364-65, 390-93, 641-42, 766-67, 2471-73). Ms. Klyn explained:

> Water was automatically delivered to the dryer through the nozzle in the back, and the
> mist was combined with the heat from the dryer and created steam.

(Tr. at 2472.) Dr. Malladi testified that the Whirlpool dryer drum attains a temperature far in

excess of 212-degrees Fahrenheit, and even reaches close to 300-degrees Fahrenheit at times.

(*Id.* at 1939.) Dr. Malladi opined:

> Steam is created when the spray enters in the hot region -- some of it is entering a region
> where it's substantially higher than 212 degrees Fahrenheit and there is an evaporation
> and the resulting vapor is this elevated temperature.
>
> And steam is also created by evaporation from heated substance; that is, the drum and,

4

then, the clothing and also by the hot air in the dryer.

(Tr. at 1940.)

LG's expert, Dr. Jacobi, opined that the Whirlpool dryer does not create or use scientific or thermodynamic steam which he defined as "pure water vapor." (Tr. at 451-52.) He did acknowledge, however, that the Whirlpool dryer contains "water vapor mixed with air." (*Id.* at 469.)

LG did not introduce any evidence that Whirlpool ever represented that it created steam in its dryers by boiling water. Further, LG did not introduce any evidence that Whirlpool ever advertised that the creation of steam in Whirlpool's steam dryer is similar to the creation of steam in LG's steam dryer.

## III.    Testimony Regarding Confusion in the Marketplace

LG also called Robert Reitter, the Senior Vice President of the consultancy Guideline, as an expert in consumer surveys. Mr. Reitter testified about a consumer survey he conducted using a Whirlpool advertisement referred to as the "Blue World commercial." The commercial advertised the Whirlpool Duet Steam Dryer. Although it informed consumers that the dryer created steam to reduce wrinkles and odors, it did not explain how the dryer created that steam. It is undisputed, however, that Whirlpool has not run that commercial for the past 18 to 24 months. (Inj. Hr'g at 30.)

Mr. Reitter testified that he conducted a survey of consumers in 12 market areas.[2] Reitter opined at trial that he found a "very distinct deception" in the Blue World commercial "in that it conveyed to people the idea that it is a hot steam that – that takes place in the dryer and that does

_____

[2] For a more detailed discussion of the study conducted by Mr. Reitter, see *LG Electronics v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952-56 (N.D. Ill. 2009).

its work, rather than a mist of cold water that is heated by the regular action of the dryer." (Tr. at 1622.) Reitter did not conduct any surveys regarding whether consumers associate steam inside the dryer with boiled steam. Nor did he conduct any consumer surveys with respect to Whirlpool's other advertising, its promotional materials that consumers review on Whirlpool's website, its point of purchase materials in the showrooms where the dryers are sold, or its printed advertising. He also did not conduct any surveys of Whirlpool's advertising that describes how the Whirlpool dryer creates steam. (Tr. at 1659-60.)

Whirlpool's promotional materials and website explain how its dryer creates steam. (R. 644 at 20 (citing the pertinent parts of the record).) Kirk Dunsbergen, who was responsible for the design and development of Whirlpool's dryer, testified that Whirlpool, in its operator's manual and in print advertising, "tells the consumers that [it] spray[s] a fine mist of cold water into the hot air inside of the drum of the Whirlpool steam dryer." (Tr. at 333.) LG did not offer any evidence of actual confusion on the part of any of Whirlpool's customers.

## IV. Jury Verdict

After the Court instructed the jury on the law pertaining to LG's Lanham Act, CFA, and IUDTPA claims, the jury returned general verdicts in favor of Defendant on the first two claims. (R. 631 at 1-2.) Specifically, the jury found for Whirlpool on LG's claim of false advertising under the Lanham Act, and for Whirlpool on LG's claim that Whirlpool violated the CFA. The jury thus rejected LG's three theories that Whirlpool's advertisements are literally false, are literally false by necessary implication, or are impliedly false for the purpose of the Lanham Act.[3] (R. 629 at 23.) By finding for Whirlpool on the Illinois CFA claim, the jury also found

_____

[3] More specifically, the jury's finding reveals that LG failed to carry its burden of proof with respect to one or more of the requisite elements of its Lanham Act claim: (1) Whirlpool

6

that Plaintiff had failed to prove by a preponderance of the evidence that (1) Whirlpool engaged

in a deceptive act or unfair practice; (2) Whirlpool intended for the consuming public to rely on

the deception; (3) the deception occurred in the course of conduct involving trade or commerce;

(4) LG sustained actual damages; or that (5) such damages were proximately caused by

Whirlpool's deception.  (R. 629 at 33.)

In addition, the jury addressed the monetary damages LG sought in the case.  It rendered

a verdict that LG had failed to prove by a preponderance of evidence that it is entitled to lost

profits, price erosion, or Whirlpool's profits.  (R. 631 at 3.)

The jury found for LG on its IUDTPA claim against Whirlpool.[4]  (R. 631 at 2.)  In so

finding, the jury determined that Plaintiff had established by a preponderance of the evidence

that Whirlpool (1) represented that goods or services have characteristics, uses, or benefits that

they do not have; (2) represented that goods or services are of a particular standard, quality, or

grade or that goods are a particular style or model, if they are of another; or (3) engaged in any

other conduct [that] similarly creates a likelihood of confusion or misunderstanding."  (R. 629 at

---

made a false or misleading statement of fact in a commercial advertisement about the nature and
characteristics of its own product; (2) the statement actually deceived or had the tendency to
deceive a substantial segment of Whirlpool's audience; (3) the deception was likely to influence
the purchasing decisions of consumers; (4) Whirlpool caused the false statement to enter
interstate commerce; and (5) LG has been or is likely to be injured as a result of the false
statement.  (R. 629 at 24.)

[4] During closing argument, LG focused on its Lanham Act claim for false advertising.
(*Id.* at 2590-99.)  LG made no more than a passing reference to its other claims at closing,
stating: "Now, we have also brought claims under an Illinois law called the Illinois Consumer
Fraud and Deceptive Trade Practices Act.  That law also prohibits false advertising, and her
Honor will instruct you . . . about those laws also at the end of our closing arguments."  (*Id.* at
2599-600.)  Plaintiff did not mention or draw the jury's attention to its IUDTPA claim.  In
rebuttal closing argument, LG concluded by asking the jury to render "a verdict in LG's favor in
the amount of 83 -- $85.3 million here."  (*Id.* at 2681.)

36.)  The jury, however, returned a general verdict, and so the jury did not explain the basis for its finding.  *See, e.g.*, *Sanchez v. Miller*, 792 F.2d 694, 701 n.11 (7th Cir. 1986) (observing that juries do not explain the basis of their verdict when they render general verdicts).

## VI.     Injunction Hearing

Following the jury verdict, LG filed a motion seeking a permanent injunction against Whirlpool's ongoing advertising of its dryers as using steam.  (R. 640.)  Plaintiff argues that the jury's finding of a violation of the IUDTPA requires "an injunction to bring Whirlpool's deceptive advertising practices to an end."  (R. 641 at 10.)

The Court held an injunction hearing on February 17, 2011.  (R. 661.)  At the hearing, Plaintiff called John Herring, who joined LG in June 2006 and whom the company made Vice President of National Accounts in August 2009.  (Inj. Hr'g at 5-6.)  Mr. Herring, who has responsibility for, among other products, LG's washer and dryer sales, testified that LG launched its steam washer in early 2006 which put "LG on the map in terms of a major player in the appliance business."  (*Id.* at 8.)  He testified that "consumers buy washers and dryers together frequently, and front-load washers have a higher attachment rate or a higher likelihood the customer buys the washer and dryer together.  And as the price goes up on the product, the likelihood that they buy a dryer and a washer together go up dramatically."  (*Id.* at 12.)  According to Herring, the introduction of the steam washer improved LG's sales of its dryers.  In fact, Herring explained that, within a year of LG's launch of its steam washer, the company's market share had "virtually doubled in excess of 9 percent."  (*Id.*)

Herring testified that Whirlpool launched its steam dryer around October 2007, and that LG followed with its own steam dryer in approximately December 2007.  (*Id.* at 14.)  He

explained that LG was disappointed with the modest impact of its steam dryer on the company's position and market share, the latter of which grew by slightly over half a point. (*Id.* at 16.) Herring opined that Whirlpool's launching its steam dryer first explained LG's negligible gain in market share. (*Id.* at 17.) He then stated that Whirlpool's marketing of steam both reduced LG's price premium, thus impacting its profitability, and harmed Plaintiff's competitive position, brand equity, and goodwill. (*Id.* at 19-23.) In his opinion, Whirlpool's "deceptive" advertising that its dryers used "steam" caused consumers to purchase Whirlpool's dryers rather than LG's dryers. He explained:

> And every time a consumer, you know, purchases a so-called steam dryer from Whirlpool, it's one less steam dryer opportunity that we have to sell, which we know we have extremely positive feedback from our customer through surveys, Net Promoter Scores. Consumers have high -- very high – likelihood of repurchasing our product and recommending our product to family and friends.

(Inj. Hr'g at 23.) Herring did not do any surveys of customers or interview any customers in preparation for his testimony. (*Id.* at 25.) Instead, his analysis was based on figures showing that, for "Dryer Market Shares 2006," LG's market share for steam washers was approximately 4.5% for summer 2006. (*Id.* at 12-13.) This figure doubled to in excess of 9% in summer 2007. (*Id.* at 13.) At the time Whirlpool launched its stream dryer in October 2007, LG's market share for all dryers was 7.97% and Whirlpool's was 32.04%.[5] (*Id.* at 26.) By December 2007, when LG launched its steam dryer, LG's market share of the same had gone up to 10.66% and Whirlpool's had increased to 34.51%. (*Id.*) By November 2008, Plaintiff's market share had increased slightly over half a point to 11%. (*Id.* at 16.) LG's market share at the date of the hearing was 12.46%, while Whirlpool's was 40.65%. (*Id.* at 17-18.)

---

[5] It bears noting that companies beyond LG and Whirlpool operate in the U.S. dryer market, including GE, Samsung, Frigidaire, Bosch, and Electrolux. (R. 641-39 at 8.)

Defendant called Ms. Klyn, who is general manager of the cooking business for North America and was previously product-development director for front-load laundry and, prior to that, category director for Whirlpool brand laundry. (*Id.* at 28-29, 41-42; Tr. at 836-37.) She testified that Whirlpool no longer runs the "Blue World" and "Geyser" commercials on which Mr. Reitter based this survey and offered opinion, and explained that the company ceased airing them between 18 and 24 months before the February 17, 2011, hearing. (Inj. Hr'g at 29-30.) She also explained that none of Defendant's advertisements purports to convey information as to how LG's steam dryers create or use steam, and none compares the way LG and Whirlpool create steam in their respective dryers. (*Id.* at 31.) Ms. Klyn further opined that Whirlpool's advertising of steam benefitted all manufacturers of steam-dryer products, including LG. (*Id.* at 40.) In addition, she testified that, had it wanted to, LG could have put point-of-purchase materials on its retailers' floors that explained how its steam dryer operates and how it works differently from Whirlpool's. (*Id.* at 61-62.) She subsequently acknowledged, however, that retailers ultimately control what happens on their floors and so they could reject point-of-purchase materials if they chose. (*Id.* at 62-63.)

## ANALYSIS

LG asks the Court to enter a nationwide injunction barring Whirlpool from using the word "steam" in describing its dryers. (R. 640.) In the alternative, LG asks the Court to enter an injunction requiring Whirlpool to "make clear each time it uses the term 'steam' in connection with its water spray dryers – especially on the panel of the dryer itself – that this 'steam' refers to a cold-water spray function which results in an evaporative process no different than the one used in any conventional dryer." (*Id.*; R. 641 at 12.) Below, the Court discusses the applicable

evidence in light of the jury's verdict and reaches factual determinations consistent with that

verdict. In making these factual determinations, the Court assessed the credibility of the

witnesses, including their respective demeanors while testifying. For the reasons discussed

below, the Court denies LG's motion.

I.      **LG Is Not Entitled to an Injunction Because Whirlpool's Duet Dryers Use Steam**
        **and so LG Has Failed to Establish Conduct by Whirlpool that Violates the IUDTPA**
        **and Is Likely to Damage It**

Section 3 of the IUDTPA provides that "[a] person likely to be damaged by a deceptive

trade practice of another may be granted injunctive relief upon terms that the court considers

reasonable." 815 ILL. COMP. STAT. 510/3. The jury found that Defendant had violated the

IUDTPA, and LG now seeks injunctive relief. (R. 640.)

Plaintiff presents two broad arguments why the law entitles it to injunctive relief. LG

first submits that, because the jury found that Whirlpool's challenged practices violated the

IUDTPA, the law presumes irreparable harm, such that an injunction should follow.[6] (R. 641 at

23; Inj. Hr'g at 66.) Such a finding, LG contends, is sufficient under Illinois law to warrant entry

of an injunction. (R. 641 at 23.) Second—in the event that the Court nevertheless exercises its

---

[6] The Seventh Circuit has observed that, "[w]hen . . . the issue is whether to grant a
permanent injunction, not whether to grant a temporary one, the burden is to show that damages
are inadequate, not that the denial of the injunction will work irreparable harm. 'Irreparable' in
the injunction context means not rectifiable by the entry of a final judgment. It has nothing to do
with whether to grant a permanent injunction, which, in the usual case anyway, *is* the final
judgment." *Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir. 1992) (emphasis
in original). Nevertheless, a party that has established an IUDTPA violation is not automatically
entitled to a permanent injunction because damages, being unavailable under the statute, are
inadequate. Such a party must establish a likelihood of harm to obtain permanent injunctive
relief, under both the explicit provisions of the IUDTPA and pertinent Seventh Circuit precedent.
*See 3M v. Pribyl*, 259 F.3d 587, 608 (7th Cir. 2001) (finding no error from district court's denial
of a permanent injunction "because the company had not established the likelihood of any future
damages").

discretion and informs the same through the traditional four-factor test in equity—LG argues that the evidence satisfies that standard. (*Id.* at 31-37.)

Three discrete questions underlie Plaintiff's first argument. Did the jury actually find that LG is "likely to be damaged by a deceptive trade practice"? 815 ILL. COMP. STAT. 510/3. If not, has Plaintiff independently established a likelihood of such damage? If the answer to either of these two questions is yes, does the law oblige the Court to grant injunctive relief?

The Court answers each of these questions in the negative. The jury's general verdict does not amount to a finding that Whirlpool's challenged practice is likely to damage LG. Furthermore, LG has failed independently to prove a likelihood of such harm. Even if this were not the case, the Court has discretion whether to award injunctive relief and would decline to exercise it in this case.

**A.    Because LG Did Not Have to Prove Harm to Establish a Violation of the IUDTPA, the Jury's General Verdict for Plaintiff under that Statute Does Not Establish that LG Faces a Likelihood of Harm Sufficient to Entitle It to an Injunction**

In returning a verdict for LG under the IUDTPA, the jury found that Whirlpool had:

(1) represented that goods or services have characteristics, uses, or benefits that they do not have; (2) represented that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; or (3) engaged in any other conduct [that] similarly creates a likelihood of confusion or misunderstanding.

(R. 629 at 36.) Because it was a general verdict, however, the jury did not specify which practice or practices it found to create a likelihood of confusion or misunderstanding.[7]

_____

[7] With respect to the IUDTPA claim, the Court instructed the jury as follows: "LG has the burden to prove by a preponderance of the evidence that Whirlpool created a likelihood of confusion or misunderstanding regarding the nature, quality or characteristics of Whirlpool's steam dryers. If you find for LG on its Illinois Uniform Deceptive Trade Practices Act claim, you should not consider the question of damages. The Court will determine what

It is clear, however, that the jury did not have to find that any conduct by Whirlpool damaged LG or was likely to damage LG. The jury instructions did not make harm—be it past, present, or future—a requisite of an IUDTPA violation. (R. 629 at 36-37.) Thus, LG cannot rely on the jury verdict in its favor under the IUDTPA alone to establish a likelihood of harm. Indeed, the Court explicitly instructed the jury that it "should not consider the question of damages." (*Id.* at 37.) Furthermore, the jury returned specific findings that LG did not prove, by a preponderance of the evidence, that LG is entitled to lost profits, price erosion, or Whirlpool's profits. The jury's general verdict does not reveal that it necessarily, or even probably, made a finding as to a likelihood of harm.[8]

---

damages, if any, to award LG under the Illinois Uniform Deceptive Trade Practices Act." (R. 629 at 37.)

[8] The Court instructed the jury as follows on LG's Lanham Act claim:
"LG claims that Whirlpool engaged in false advertising in violation of the Lanham Act. To succeed on this claim, LG must prove five things by a preponderance of the evidence: (1) Whirlpool made a false or misleading statement of fact in a commercial advertisement about the nature and characteristics of its own product. A statement is misleading if it conveys a false impression and actually misleads a consumer. A statement can be misleading even if it is literally true or ambiguous. (2) The statement actually deceived or had the tendency to deceive a substantial segment of Whirlpool's audience. (3) The deception was likely to influence the purchasing decisions of consumers. (4) Whirlpool caused the false statement to enter interstate commerce. A false statement enters interstate commerce if Whirlpool's products are advertised and sold across state lines. (5) LG has been or is likely to be injured as a result of the false statement. Injury includes direct diversion of sales from itself to Whirlpool. If you find that LG has proved each of these things, then you must find for LG. If, on the other hand, you find that LG has failed to prove any of these things, then you must find for Whirlpool." (R. 629 at 24.)

The Court instructed the jury as follows on LG's CFA claim:
"LG alleges that Whirlpool violated an Illinois statute called the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"). This Illinois statute prohibits deceptive practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission. To prove a violation of the Consumer Fraud Act, LG must prove by a preponderance of the evidence that (1) Whirlpool engaged in a deceptive act or unfair practice; (2) Whirlpool intended for the

Plaintiff nevertheless contends that, when "a defendant is found to have created a likelihood of confusion under the IUDTPA, there is necessarily a likelihood that a plaintiff will be damaged by defendant's action." (R. 641 at 23.) LG asserts that the Court should presume a likelihood of harm based on the verdict, and thus grant it injunctive relief.

To support this assertion, LG relies on *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd.*, 893 N.E.2d 981, 996 (Ill. App. Ct. 2008). That case, however, does not support LG's position. In *Chicago's Pizza*, the trial court had found *actual* confusion by customers. *Chicago's Pizza*, 893 N.E.2d at 997. The Illinois Court of Appeals did not hold that a likelihood of confusion under the IUDTPA, in itself, necessarily entitles a plaintiff to a presumption of harm or injunctive relief. *Id.* at *passim*. Indeed, it noted that the defendant "plans to reopen his business under the name 'Chicago's Pizza,' thus perpetuating the potential for confusion. Therefore, we find that plaintiffs are entitled to injunctive relief." *Id.* at 998. In the present case, by contrast, not only is it unclear whether the jury found actual confusion, its general verdict does not reflect a finding that LG is likely to suffer any harm from Whirlpool's objected-to trade practice.[9] 815 ILL. COMP. STAT. 510/3. Furthermore, LG's own expert did not present any evidence or opinion of actual consumer confusion.

Plaintiff also relies on *Multiut Corp. v. Yehuda Draiman*, 834 N.E.2d 43, 51 (Ill. App. Ct.

_____

consuming public to rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; (4) LG sustained actual damages; and (5) such damages were proximately caused by Whirlpool's deception. The deception must have been material to the consumer. Deception is material where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." (R. 629 at 33.)

[9] Indeed, as explained below, the jury made an implied finding that the Duet Dryer uses steam, which forecloses LG's argument that Whirlpool's steam-based advertising is likely to damage it, thus entitling it to an injunction.

2005), and *Bingham v. Inter-Track Partners*, 600 N.E.2d 70, 74 (Ill. App. Ct. 1992). Neither of these decisions holds, however, that a person can satisfy the IUDTPA's requirement that a person be "likely to be damaged" by demonstrating a likelihood of confusion or misunderstanding alone. *Multiut*, which found that the "trial court's ruling was not contrary to the manifest weight of the evidence," merely upheld the lower court's finding that the defendant had violated the IUDTPA. *Multiut*, 834 N.E.2d at 51. *Bingham* noted that "injunctive relief is warranted when a party's trade practice creates a likelihood of confusion or misunderstanding." *Bingham*, 600 N.E.2d at 74. It is far from clear, however, that the Illinois Court of Appeals held that a plaintiff need not show an independent likelihood of damage. *Id.* at *passim*. Indeed, *Bingham* emphasized that "the trial court was presented with substantial evidence of *actual* confusion." *Bingham*, 600 N.E.2d at 74 (emphasis added). In the present case, LG did not introduce expert testimony or credible evidence of even a single Whirlpool customer, retailer, or trade representative who expressed confusion. Nor, as the Court explains below, does the record support a finding that Plaintiff faces a likelihood of damage on account of Whirlpool's challenged practice.

At the February 17, 2011, hearing, LG also directed the Court's attention to *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883 (7th Cir. 2000); *Lincoln Diagnostics, Inc. v. Panatrax, Inc.*, No. 07-CV-2077, 2009 WL 3010840 (C.D. Ill. Sept. 16, 2009), and *Bonner v. Westbound Records, Inc.*, 364 N.E.2d 570 (Ill. App. Ct. 1977). (Inj. Hr'g at 66-68.) Plaintiff proffers the *Mead* and *Lincoln* decisions for the principle that a presumption exists that false or misleading advertising gives rise to irreparable harm. (*Id.* at 67.) *Mead* involved the distinct setting of a violation of the Lanham Act, however, and so it does not control in this case. *Mead*,

201 F.3d at 883, *passim*. The same holds true of *Lincoln*.[10] *Lincoln*, 2009 WL 3010840, at

*passim*. Indeed, the jury in the present case returned a verdict on LG's Lanham Act claim in

Whirlpool's favor, and thus these cases do not convince the Court that an established IUDTPA

violation conclusively demonstrates a presumption of a likelihood of future harm sufficient to

entitle a plaintiff to injunctive relief.

*Bonner* does not compel a contrary result. There, the Illinois Court of Appeals held that,

"[h]aving already found a likelihood of success on the merits in proof of a deceptive trade

practice, it necessarily follows that irreparable harm has been demonstrated." *Bonner*, 364

N.E.2d at 576. As an initial matter, that 34-year-old case involved a distinct procedural setting,

namely that of a preliminary injunction where the court assessed the likelihood of success on the

merits before trial. In contrast, this case proceeded to trial and the Court has the benefit of the

jury's verdict, including its finding that LG failed to establish that it was entitled to any

monetary damages. *See, e.g.*, *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C.

Cir. 2009) (In assessing a preliminary injunction, "[i]f the movant makes an unusually strong

showing on one of the factors, then it does not necessarily have to make as strong a showing on

another factor. For example, . . . if substantial harm to the nonmovant is very high and the

showing of irreparable harm to the movant very low, the movant must demonstrate a much

greater likelihood of success."). As explained in greater detail below, LG's showing of future

irreparable harm is weak, indeed. This counsels strongly against an award of injunctive relief.

*See Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 375-76 (2008) ("We agree . . . that

---

[10] Although the plaintiff in *Lincoln* also sought relief for violation of the IUDTPA, the court determined that the plaintiff had "not shown that it [was] entitled to any relief . . . that Plaintiff [had] not already been awarded under the Lanham Act." *Lincoln*, 2009 WL 3010840, at *13.

the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon clear showing that the plaintiff is entitled to such relief.").

Further, the Court does not read *Bonner* or the other cases cited by Plaintiff as depriving it of the discretion that the IUDTPA explicitly bestows upon it in fashioning injunctive relief. See 815 ILL. COMP. STAT. 510/3 ("A person likely to be damaged by a deceptive trade practice of another *may* be granted injunctive relief upon terms that the court considers reasonable.") (emphasis added). Furthermore, the IUDTPA clearly requires that the relevant plaintiff face a likelihood of harm in order to obtain an injunction. *Id.* A finding that a practice gave rise to "a likelihood of confusion" does not in itself satisfy this condition. *See Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 909 N.E.2d 848, 857 (Ill. App. Ct. 2009) ("To be eligible for injunctive relief under [the IUDTPA], a plaintiff must show that the defendant's conduct will likely cause it to suffer damages in the future."); *see also 3M*, 259 F.3d at 608.

Because the jury did not find that Whirlpool's practices are likely to damage LG, Plaintiff's argument that the jury verdict in its favor under the IUDTPA automatically entitles it to injunctive relief fails.

**B.      LG Has Not Established That It Is "Likely to Be Damaged" by Defendant's Challenged Practices and so the Law Does Not Entitle LG to an Injunction**

In order to obtain injunctive relief pursuant to the IUDTPA, LG must establish that a

17

"deceptive trade practice" by Whirlpool is likely to harm it. *See* 815 Ill. Comp. Stat. 510/3 ("A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief[.]"). The Seventh Circuit has explained that "[t]he standard for a permanent injunction is the same as for a preliminary injunction except that the plaintiff must show actual success on the merits" and "the burden is on the plaintiff to show that damages are inadequate." *Chi. Teachers Union, Local No. 1 Am. Fed'n of Teachers v. Bd. of Educ. of the City of Chi.*, -- F.3d --, 2011 WL 1126037, at *8 (7th Cir. Mar. 29, 2011). Nevertheless, LG faces a higher burden of proof than if it were seeking a preliminary injunction.[11] *See, e.g.*, *Chi. Teachers Union v. Bd. of Educ. of the City of Chi.*, No. 10-CV-4852, 2010 WL 3927696, at *2 (N.D. Ill. Oct. 4, 2010) (observing that "a permanent injunction carries a higher burden of proof" than a preliminary injunction); *see also Hamer Holding Grp., Inc. v. Elmore*, 560 N.E.2d 907, 915 (Ill. App. Ct.), *app. den.*, 657 N.E.2d 331 (1991) ("The burden of proof is heavier for obtaining permanent, as compared to preliminary, injunctive relief."). Furthermore, Plaintiff must establish what the deceptive trade practice is. *See* Fed. R. Civ. P. 65(d)(1) ("Every order granting an injunction . . . must . . . describe in reasonable detail . . . the act or acts restrained[.]").

LG has requested that "the Court enjoin the further use of 'steam' as it relates to any advertising for the Whirlpool dryer -- dryers at issues in this lawsuit." (Inj. Hr'g at 72-73.) As a violation of the IUDTPA does not, in itself, establish a likelihood of damage to a plaintiff, the Court must determine whether LG has established a likelihood of harm by a preponderance of the evidence. Plaintiff has failed to meet its burden. The Court finds that Whirlpool's dryers do

---

[11] It bears emphasizing, however, that LG has failed to meet it burden of proof to obtain a permanent injunction, even if the Court were to apply the burden of proof associated with a motion for a preliminary injunction.

in fact use steam. It inexorably follows that LG has failed to demonstrate a likelihood of future

harm sufficient to entitle it to relief under the IUDTPA. Further, Plaintiff has failed to identify

any other practice that Whirlpool is engaging in that violates the IUDTPA and that the Court

could therefore enjoin.

> **1. Because Whirlpool's Dryers Use "Steam," LG Cannot Establish a Likelihood of Future Harm**

The Court finds that Whirlpool has established that its dryers do, in fact, use steam. As a

result, Whirlpool's advertising its dryers as using steam neither violates the IUDTPA nor is

likely to harm LG in a manner cognizable under that Act. This finding is consistent with the

jury's finding for Whirlpool on the CFA claim and against Whirlpool on the broader IUDTPA

claim, which required only a finding that Whirlpool engaged in "conduct" that created "a

likelihood of confusion or misunderstanding."

> **i. Whirlpool's Dryers Use Steam**

LG spends much of its briefing still arguing that Whirlpool's dryer is not a steam dryer

and that the jury's verdict supports this argument. (R. 641 at 12-16.) Based on the evidence

submitted at trial, which established that the Duet Dryer uses steam, the Court disagrees. The

jury's verdict is consistent with this holding.

LG contends that Whirlpool's dryer is merely a cold-water spray dryer, and that its use of

such spray precludes one from accurately characterizing it as a steam dryer. (R. 641 at 12-16.)

The Court rejects Plaintiff's argument, and finds that Defendant's dryer uses "steam." The

evidence clearly established that the drum in Whirlpool's dryer is hot, and in some places hotter

than the boiling point of water at the moment the dryer injects mist. (Tr. at 462-64, 2001.) As a

result, steam unquestionably results and permeates the drum, thus reaching the tumbling clothes.

(Tr. at 641-42, 1950-52, 317-318, 327-328, 421, 1939-40, 1957, 1980, 607-10, 500-01, 2512.)

Strong evidence supports this conclusion. In the first place, Ms. Klyn, an engineer, explained in detail the design and operation of the Duet Steam Dryer, credibly concluding that Whirlpool "absolutely" makes steam in its steam dryer. (Tr. at 2488, 2512.) Furthermore, Dr. Malladi, who has a Ph.D. in mechanical engineering from the California Institute of Technology, echoed this conclusion. Looking to Webster's Third New International Dictionary, Dr. Malladi convincingly testified that multiple definitions of "steam" found in that dictionary encapsulate what occurs in the Whirlpool dryer and drum. (Tr. at 1966-68.) Specifically, he explained that Defendant's dryer uses steam, as defined both by "a vapor arising from some heated substance" and by "water in the state of vapor." (*Id.*) He testified, however, that one definition—"the invisible vapor into which water is converted when heated to the boiling point"—does not apply to the Whirlpool drum because no boiling occurs. (*Id.*) He nevertheless concluded —convincingly—that there is steam in the Whirlpool drum under the other definitions. (*Id.*)

Dr. Malladi further testified that he had reviewed the American Heritage Dictionary of the English Language, which defines steam as "the vapor phase of water." (*Id.* at 1968-69.) He credibly concluded that the vapor phase of water exists in the Whirlpool drum. (*Id.* at 1969.) Dr. Malladi also reviewed the Encyclopedia of Chemical Technology, which discusses steam and provides that "it can be generated by evaporation of water at subcritical pressures, by heating water above the critical pressure, and by sublimination of ice."[12] (*Id.* at 1970-71.) He then testified that Whirlpool's dryer uses "steam" because it evaporates water at subcritical

---

[12] Dr. Malladi explained subcritical pressure as follows: "the ordinary pressures that we experience. There is a technical term called a critical point when the pressure gets really high, like 220 atmospheres. Then above that, it is supercritical. Anything below that is subcritical. So for all practical purposes, the pressures we experience are all subcritical." (*Id.* at 1971.)

pressures." (*Id.* at 1973.)  He credibly concluded with respect to Whirlpool's dryer that "fine

droplets are sprayed into a heated environment and they are evaporated by the heated substances,

in this case, the air, the clothing, and the drum itself." (*Id.*)  He explained that this evaporation is

rapid, and results in the production of steam, which fills the entire drum. (*Id.* at 1980, 1999.)

Ultimately, it would be nonsensical to assert that one does not create, and use, "steam"

when one injects cold water or "mist" into a hot drum within which it indisputably evaporates.

Because Whirlpool's dryer uses steam when drying clothes, consumers would not be confused or

misled by Defendant's accurate representation that its dryer is a steam dryer.  As Whirlpool's

dryer uses steam, Plaintiff cannot establish a likelihood of future injury.  Indeed, LG's

explanation why it is likely to suffer future harm from Whirlpool's advertising of steam dryers is

based on the value that consumers place on steam. (R. 641 at 26-31.)  It follows that, because

Defendant's dryers do in fact use steam, Plaintiff's contention as to future harm of a type

relevant to the IUDTPA fails.[13]

For reasons explained immediately below, the Court's finding that Whirlpool's Duet

Dryer uses steam is consistent with the jury's general verdicts.

ii.     **The Finding that Whirlpool's Dryers Use Steam Is Consistent
with the Jury's Verdict and Does Not Violate any Implied
Finding by the Jury**

The jury returned general findings with respect to the Lanham Act, CFA, and IUDTPA

---

[13] It also bears noting that the objected-to practice does not purport to make a qualitative
comparison between LG's and Whirlpool's steam dryers, but seeks only to describe Defendant's
steam dryers.  For the purpose of establishing a likelihood of future harm, this is a material
difference.  *Cf. Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 161-62 (2d Cir. 2007)
("[A] false 'comparison to a specific competing product necessarily diminishes that product's
value in the minds of the consumer.").

claims, and so it did not explain the basis for its decision.[14]  *See, e.g.*, *Hameetman v. City of Chi.*, 776 F.2d 636, 644 (7th Cir. 1985) ("Juries, when they render general verdicts, do not explain the basis of the verdict."); *Dagley v. Armstrong Rubber Co.*, 344 F.3d 245, 250 (7th Cir. 1965) ("Since the jury returned a general verdict on the negligence counts, we cannot determine the basis of its verdicts for defendants.").

Although a court may not always be able to determine the basis for a jury's general verdict, it can make factual findings that are *consistent* with the jury's verdict.  *See Porter v. Natsios*, 414 F.3d 13, 21 (D.C. Cir. 2005) ("During the remedial stage of the proceedings, the district court may make factual findings . . . as long as the findings are consistent with the jury verdict[.]").  In making such findings, however, the Court must take care not to contradict factual determinations that the jury impliedly made.  *See Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912-13 (10th Cir. 2004) ("[I]n fashioning equitable relief, a district court is bound both by a jury's explicit findings of fact and those findings that are necessarily implicit in the jury's verdict."); *Kimbrew v. Advocate Health & Hosps. Corp.*, No. 10-CV-4531, 2010 WL 5135908, at *2 (N.D. Ill. Dec. 8, 2010) ("[T]he Court must respect the findings implied by the jury's verdict."); *see also Pals v. Schepel Buick & GMS Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000) (""[J]uries don't draft injunctions. . . .  When assessing back pay . . . the judge must respect the findings implied by the jury's verdict.  But whatever discretion the facts allow with respect to back pay and front pay belongs to the judge rather than the jury.") (citations omitted); *Higdon v. Entenmann's Sales Co.*, No. 01-CV-6972, 2002 WL 1821666, at *5 (N.D. Ill. Aug. 8, 2002)

---

[14] The fact that the jury returned general verdicts, however, does not prevent the Court from determining from the verdicts, the jury instructions, and the evidence introduced at trial that the jury made implied factual findings.  Indeed, as explained below, the jury likely made an implied finding of fact that Whirlpool's dryers use steam.

("[T]he court must respect the findings implied by the jury's verdict in fashioning equitable remedies.") (citing *Dranchak v. Akzo Nobel, Inc.*, 88 F.3d 457, 458-59 (7th Cir. 1996)); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1359 (Fed. Cir. 2001) ("We must . . . imply . . . factual findings, under the legal presumption that the jury found all facts necessary to support its [general] verdict[.]") (citing *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1516 (Fed. Cir. 1984) ("[W]hen a jury returns a general verdict, the law presumes the existence of fact findings implied from the jury's having reached that verdict.")).

In the present case, the jury's verdicts imply that it found that the Duet Dryer uses steam. It is important to emphasize that, in making this determination, the Court must not construe the jury's general verdict under the IUDTPA in isolation of the jury's other verdicts, the instructions that the jury considered, and the evidence that the parties presented to the jury at trial. *See United States v. Calabrese*, No. 02-CR-1050-10, 2007 WL 3037124, at *1 (N.D. Ill. Oct. 17, 2007) ("A jury's verdict should be read in light of the way the case was argued and, although this does not always allow a trial judge to reach a clear conclusion about what the jury did, this reading often allows a reliable judgment about what the verdict meant."); *see also El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1074 (9th Cir. 2005) ("[T]he court 'must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and the consistency of the jury verdicts must be considered in light of the judge's instructions to the jury.") (quoting *Toner ex rel. Toner v. Lederle Labs.*, 828 F.2d 510, 512 (9th Cir. 1987)); *cf. United States v. Etimani*, 328 F.3d 493, 504 (9th Cir. 2003) ("Read together, the verdict and the instructions might have shown what the jury necessarily found[.]").

Here, had the jury determined that the Duet Dryer does not use steam, the jury would

most likely have found for LG under its CFA claim in light of the evidence that the parties introduced at trial. In this respect, the jury's verdict in favor of LG under the IUDTPA, but against LG under the CFA, implies a factual finding that Whirlpool's Duet Dryer uses steam.

### a. Had the Jury Found that the Duet Dryer Does Not Use Steam, LG Would Have Prevailed on its CFA Claim

There was and is no dispute that Whirlpool advertises its dryers as using steam. Had the jury agreed with LG that Whirlpool's dryers do not use steam, then Whirlpool's advertisements to the contrary would have constituted "a deceptive act" for the purpose of the CFA. (R. 629 at 33.) This would satisfy the first element that LG needed to prove to establish a CFA violation. (R. 629 at 24.)

The second element is that "Whirlpool intended for the consuming public to rely on the deception." (*Id.* at 33.) Substantial evidence introduced at trial reveals that Whirlpool was aware that consumers valued steam and that Whirlpool expected that its advertising of steam would attract consumers. (Tr. at 458-461, 855, 1006, 1287-88, 1434.) Indeed, Whirlpool admitted that it wanted to be the first company to launch a steam dryer, knowing that consumers would value the same. (*Id.* at 273, 278, 893-94, 1000-01.) Thus, in light of a finding that the Duet Dryer does not use steam, LG would have satisfied the requisite showing that "Whirlpool intended for the consuming public to rely on the deception." (R. 629 at 33.)

The third element is that "the deception occurred in the course of conduct involving trade or commerce." (*Id.*) There is no dispute that Whirlpool's advertising satisfies this element.

The last elements under the CFA require a showing that LG sustained actual damages and that Whirlpool's deception proximately caused such damages. (R. 629 at 33.) In the present case, the existence of harm to LG caused by Whirlpool's steam-based advertisements is

dependent on Whirlpool's Duet Dryer's not using steam. If the jury found that Whirlpool's dryers did not use steam, it would have likely found damage to Plaintiff. Given the abundant evidence in the record that the parties are fierce competitors in the same market (R. 641 at 30; R. 644 at 11), and that consumers place considerable value on steam, the jury would surely have found that any false representation on Whirlpool's part that its dryers used steam harmed LG. Importantly, this element does not require a determination as to a particular magnitude of harm. It merely requires that LG actually sustained damage. (R. 629 at 33.)[15]

It thus follows that the jury's general verdict under the IUDTPA, read in light of the CFA verdict, the evidence introduced at trial, and the instructions, strongly implies that the jury found that Whirlpool's dryers use steam.

   **b.**  **The Jury Was Consistent in Returning a General Verdict that Whirlpool Violated the IUDTPA and in Impliedly Finding that the Duet Dryer Uses Steam**

Importantly, it would have been consistent for the jury to impliedly find that Whirlpool's Duet Dryer uses steam and to return a general verdict that Whirlpool violated the IUDTPA. This follows from the fact that the jury could have made a number of factual findings consistent with its ultimate verdicts *without* finding that Whirlpool's dryers do not use steam.

---

[15] The Court cannot determine that the jury would have necessarily found a Lanham Act violation if it had determined that the Duet Dryer does not use steam. This is because the second element of the Lanham Act claim requires proof that "[t]he statement actually deceived or had the tendency to deceive *a substantial segment* of Whirlpool's audience." (R. 629 at 24) (emphasis added). As noted above, however, LG did not introduce evidence of even a single customer whom Whirlpool deceived. The only credible evidence of actual consumer confusion—let alone deception—was Mr. Reitter's survey, which focused on only a single televised commercial: the "Blue World" advertisement. Whirlpool has since discontinued that particular commercial. In light of LG's failure to introduce evidence that Whirlpool's advertising of steam, even if false, actually deceived or had the tendency to deceive "a substantial segment" of Whirlpool's audience, it would not have been likely to prevail under the Lanham Act, even in the event of a jury finding that the Duet Dryer does not use steam.

The jury could have determined that, although the Duet Dryer uses steam, the Blue World commercial, which was the subject of Mr. Reitter's survey, invited the impression that its dryers create steam by boiling. The evidence is such that the jury likely found that this advertisement created a likelihood of confusion or misunderstanding as to how the Duet Dryer operates, but also concluded that this was immaterial in light of the fact that the dryer does use steam. Such a finding would have supported a violation of the broad IUDTPA claim, but would not have supported a violation of either the Lanham Act or CFA. With respect to the latter claim, the likelihood of misunderstanding would not have translated into a more-serious "deceptive act" and, given the misunderstanding's immaterial nature, it would not have caused LG to sustain actual damages. (R. 629 at 33.) As to the Lanham Act claim, the immateriality of the likelihood of misunderstanding means that it would not constitute deception likely to influence the purchasing decisions of consumers.[16]

In this respect, the jury may well have found—indeed, it likely found—that, although Whirlpool's dryers use steam, a particular advertisement that Whirlpool ran created a likelihood of confusion or misunderstanding, but did not violate the Lanham Act or CFA. This is especially probable because the only credible evidence of confusion that LG introduced related to the Blue World commercial.[17] Further, the Blue World commercial is the only Whirlpool commercial that

_____

[16] As explored in greater detail below, such a violation of the IUDTPA would not support injunctive relief because it would not give rise to "a likelihood of harm" for the purposes of the act.

[17] Plaintiff also points to surveys conducted at Whirlpool's Insperience Studio. (*Id.* at 19.) The Court puts little weight on the Insperience surveys because Whirlpool has introduced credible evidence that the statements made in these surveys reflected comments made by LG's representatives. (Tr. at 1872-73, 1877, 1892-3, 1899-1900.) Indeed, Whirlpool's Senior Marketing Manager, Angela Seger, credibly testified that she did not receive *any* complaints of confusion or deception regarding Whirlpool's steam-dryer advertising. (*Id.* at 1591-92.)

the parties aired at trial.

Mr. Reitter introduced this evidence. He conducted a survey about an advertisement run by Whirlpool for its Duet Steam dryer, seeking to establish "to what extent . . . consumers take away the impression . . . that the dryer uses steam rather than a mist of cold water that is injected onto clothes and then heated by the normal action of the dryer afterwards." (Tr. at 1619, 1622.) Mr. Reitter concluded that "about two-thirds of consumers took away the message that it is a hot vapor in the Whirlpool dryers and not a mist of cold water that is heated up; and, in fact, about two-thirds of consumers emphatically rejected the image of a mist of cold water as describing the operation of the dryer that they saw [the] advertisement for." (*Id.* at 1622-23.)

Mr. Reitter put two-hundred people in a test group, and created a matched sample of two-hundred similar people whom he put in a control group. (*Id.* at 1626-27.) He then showed the test group an actual commercial used by Whirlpool for the Duet Steam Dryer. (*Id.* at 1628.) He played a different commercial issued by Whirlpool around the same time for the Duet Steam Dryer. (*Id.* at 1629.) The latter commercial mentioned steam less frequently than the former one, which allowed Mr. Reitter to remove the steam message without corrupting the nature of the advertisement. (*Id.* at 1629-31.) Mr. Reitter observed that sixty-eight percent of the test group said something about steam, whereas "in the control commercial where we edited out references to steam, you can see that steam mentions are almost non-existent." (*Id.* at 1641-42.)

Mr. Reitter then testified that, "if you compare the two first choices in the test group and the control group, you can see that hot vapor outnumbers cold water mist by more than 5 to 1 among those who saw the test commercial, whereas for the control commercial, the cold water mist slightly outnumbers the hot vapor perception." (*Id.* at 1651.)

Having viewed the relevant commercial, the jury could have found that it created a likelihood of confusion or misunderstanding, even if it also found that the Duet Dryer uses steam. In this respect, the jury could have found an IUDTPA violation if it perceived the commercial as implicitly suggesting that the particular kind of steam in the Duet Steam dryer was boiled and injected into the chamber.[18] The jury could have found that the advertisement did not invite confusion as to the question whether the dryer uses steam, but nevertheless have found that the commercial did invite confusion or misunderstanding with respect to the manner in which the dryer creates steam. The evidence would have strongly supported such a finding because the test commercial shows a burst of steam blowing over a dry, wrinkled blue shirt, which has the effect of removing all the wrinkles. The commercial gives the impression that the dryer creates steam by boiling. Indeed, Mr. Reitter's consumer survey revealed that the advertisement resulted in the test group's reporting by more than five to one that the Duet Steam dryer used hot vapor rather than cold water that became steam in the drum

For the preceding reasons, the jury's implied factual finding that LG's Duet Dryer uses steam is consistent with its general verdict in favor of LG under the IUDTPA.

### iii.   LG's Evidence only Demonstrates Harm if Whirlpool's Duet Dryer Does Not Use Steam

Because the Court determines, consistent with the jury's implied finding, that Whirlpool's Duet Dryer uses steam, the law does not entitle LG to an injunction under the IUDTPA enjoining Whirlpool from advertising that its dryers use steam. To nevertheless obtain an injunction pursuant to the IUDTPA, LG would have to establish conduct that violates that Act

---

[18] This holds true even though Mr. Reitter testified at his deposition that his testing sought only to test the question whether the advertisement suggests that Whirlpool's dryer "contains steam or uses steam, not the manner in which it's created." (Tr. at 1694-95.)

and that is likely to damage LG.  It has failed to do so.  As explained immediately hereafter, LG

limited the evidence of harm that it introduced at trial and at the post-trial hearing to damage that

would befall it in the event that Whirlpool's statements that its Duet Dryer uses steam are false

or deceptive.  As Whirlpool's dryers do use steam, LG's evidence fails to establish a likelihood

of damage.[19]

        a.    **Dr. Rao's declaration fails to establish that LG will face a likelihood of harm on account of Whirlpool's practices**

LG relies on the trial testimony and declaration of its expert economist, Dr. Mohan Rao,

in support of its motion for an injunction.[20]  (R. 641-39.)  This reliance is unavailing in light of

the Court's factual findings, which are consistent with the jury's verdicts.  Dr. Rao explicitly

premised his analysis on the assumed fact that Whirlpool's Duet Dryer does not use steam, such

that Whirlpool's steam-based advertising takes sales away from LG, thus harming it.  (Tr. at

---

[19] It bears noting that, in its post-hearing memorandum in support of its motion for a permanent injunction, LG attempted to introduce new evidence, which the Court did not admit at trial or at the injunction hearing, in the form of declarations by Pyoung Hwan Kim, Michael P. Baniak, Brendan F. Barker, and Adam J. Heer.  (R. 665.)  This evidence sought to counter Ms. Klyn's testimony that retailers' point-of purchase materials explain how Whirlpool' dryers create steam.  (R. 671.)  Because LG does not adequately explain why it could not have introduced such evidence previously, and because the Court did not grant either party leave to file additional evidence after the hearing, the Court grants Whirlpool's motion to strike testimony and evidence submitted by LG.  (R. 666.)

[20] Dr. Rao testified at trial, offering his expert opinion on whether LG suffered damage as a result of what he assumed to be Whirlpool's false advertising.  (Tr. at 1281, 1284-85.)  On the basis of that assumption, Dr. Rao concluded that LG lost approximately $46.4 million in profits on account of Whirlpool's challenged advertising.  (*Id.* at 1281.)

In determining causation between Defendant's advertising of steam and ensuing harm to Plaintiff, Dr. Rao offered an opinion on (1) whether consumers care about steam, (2) whether consumers can differentiate steam and mist; (3) whether, based on differentiation, consumers end up buying steam dryers; and (4) whether LG lost sales as a result of Whirlpool's making more sales.  (*Id.* at 1286.)  On the basis of consumer surveys carried out by Whirlpool, Dr. Rao concluded that purchasers of dryers place significant value on steam.  (*Id.* at 1287-1303.)

1281, 1284-85, 1305.)  He did not offer an opinion whether Defendant's advertising was in fact false.  (*Id.* at 1281.)  Nor did he offer any opinion as to the harm, if any, that LG would suffer if Defendant's Duet Dryer does in fact use steam.  (*Id.*)  In light of the Court's finding that that product does use steam, Dr. Rao's testimony and declaration are moot.  Therefore, Plaintiff cannot proffer his testimony or declaration to establish that any practice of Whirlpool will harm it.  For this reason, LG cannot establish a likelihood of harm, or otherwise establish its entitlement to injunctive relief, on this basis.

> **b.      Mr. Herring's testimony does not establish that Whirlpool's marketing of "steam" is likely to harm LG**

Mr. Herring was the sole witness whom LG called at the February 17, 2011, hearing to establish that Whirlpool's marketing of "steam" is likely to harm LG.  Mr. Herring testified that Whirlpool launched its steam dryer around October 2007, that LG followed with its own steam dryer in approximately December 2007, and that Plaintiff was surprised by the limited impact its steam dryer had on its position and market share.  (Hr'g Tr. at 14-16.)  He explained that LG was disappointed with the modest effect of its steam dryer on LG's position and market share, the latter of which grew by slightly over half a point.  (*Id.* at 16.)  Mr. Herring further opined that it was the fact that Whirlpool launched its steam dryer first that explained LG's negligible gain in market share.  (*Id.* at 17.)  He then stated that Whirlpool's marketing of steam both reduced LG's price premium, thus impacting its profitability, and harmed Plaintiff's competitive position, brand equity, and goodwill.  (*Id.* at 19-23.)  Mr. Herring ultimately opined that Whirlpool's use of the term "steam" in its advertising of its dryer "absolutely" harms LG.

Herring's testimony does not satisfy LG's burden, by virtue of this Court's (and the jury's likely implied) finding that Whirlpool's Duet Dryer uses steam.  Herring premised his

testimony as to the "harm" that LG suffered on the impact that Whirlpool's advertising of steam had on LG's sales and market position. It follows that, because Defendant's advertising of steam was accurate, Herring's testimony is irrelevant to the issue of harm.[21]

### c. The jury's general verdicts are consistent with a finding of no harm to LG

In light of the Court's determination that Whirlpool's dryers use steam, which mirrors the jury's likely implied finding of fact to the same effect, it follows that the jury also made an implied finding that Whirlpool's practices did not harm LG. As explained above, the only evidence of harm that LG introduced at trial concerned the negative effect that Whirlpool's steam-based advertising had on LG's sales. Because the jury likely impliedly found that the

---

[21] It also bears noting that the Court sustained objections to many of Herring's purported opinions. These include his assertions that LG's market share is "absolutely" still being affected today by Whirlpool's steam dryer (Inj. Hr'g at 17); that "Whirlpool's deceptive use of the word 'steam' in their dryer leads customers to believe that they're going to get true steam technology" (*id.*); that "every time the consumer's deceived by the use of Whirlpool steam dryers is one less opportunity that LG has to sell that customer" (*id.* at 18); and his attempted answer to the question "how is Whirlpool's advertising of its dryer as a steam dryer harming LG's competitive position?" (*id.* at 20.)

Furthermore, Herring's testimony was unconvincing. He testified that Whirlpool's first-mover advantage accounted for LG's disappointing results when Plaintiff subsequently marketed its own steam dryer. He failed to address other factors, however, that could potentially have contributed to the parties' respective market-based performance. Nor did he attempt to measure, or offer an opinion on, the extent of the marginal value that consumers place directly on "steam" in dryers. In addition, Herring testified that Whirlpool's advertising of steam in its dryers negatively affects LG's pricing premium, competitive position, and brand equity, but never purported to offer a view on the magnitude of that effect or to exclude the explanatory relevance of other factors.

Ultimately, Herring contends that Whirlpool's use of the "steam" in its advertising of its dryer "absolutely" harms LG. (Hr'g Tr. at 13). This conclusion, however, instead of being the result of careful research founded on experiential data, amounts to little more than a subjective opinion. On cross-examination, Herring admitted that he had not conducted his own empirical surveys of consumers or interviewed even a single consumer. (*Id.* at 25-26.) In addition, and as noted, LG failed to establish that he had the requisite foundation to offer many of these opinions. Even if the Duet Steam did not use steam, such evidence would be insufficient to establish that LG is likely to suffer harm from Whirlpool's ongoing advertising of its dryers as using "steam."

Duet Dryer uses steam—a conclusion that the evidence strongly supports—then LG necessarily failed to demonstrate harm.

This conclusion is strengthened by the fact that Plaintiff did not prevail on its Lanham Act and CFA claims, both of which required LG to establish harm, and yet Plaintiff succeeded on its IUDTPA, which did not require a showing of injury. (R. 631 at 1-2.) Further, the jury specifically found that Plaintiff failed to prove that it was entitled to lost profits, price erosion, or Whirlpool's profits.[22] (*Id.* at 3.)

> ### iv. Because Whirlpool's dryers use steam, LG has failed to establish a practice by Whirlpool that violates the IUDTPA and creates a likelihood of harm

LG requests "a nationwide injunction . . . prohibiting Whirlpool from using the word 'steam' in connection with cold water spray dryers, or, at a minimum, requiring a meaningful qualification to the word 'steam' each time it is used[.]" (R. 641 at 46.) Because Defendant's Duet Dryer uses steam, however, the law does not entitle LG to this relief. Whirlpool's advertising of "steam" does not violate the IUDTPA, and so LG is not entitled to enjoin Whirlpool from using the term in connection with the Duet Dryer.

---

[22] Of course, the jury's specific finding that LG had not proved by a preponderance of the evidence that it was entitled to lost profits, price erosion, or Whirlpool's profits—though illuminative—does not conclusively mean that Defendant's challenged behavior did not injure LG. The jury's finding that Whirlpool did not violate the Lanham Act or the CFA necessarily meant that LG was not entitled to monetary damages, as the jury instructions made clear. (R. 629 at 29 ("If you decide for Whirlpool on the question of liability, then you should not consider [damages]."); *id.* at 35 (same).) The jury instructions also explained that, "[i]f you find for LG on its [IUDTPA] claim, you should not consider the question of damages." (*Id.* at 37.) The jury's specific finding, therefore, is in itself not determinative because it could merely reflect the fact that LG, having failed on its Lanham Act and CFA claims, though having succeeded on its IUDTPA claim, was not entitled to pecuniary damages. In other words, the specific finding is consistent with both the jury's verdicts as to Plaintiff's three claims and the jury instructions. Nevertheless, the Court considers the jury's specific verdict as to lost profits, price erosion, or Whirlpool's profits to be both relevant and consistent with this ruling.

In addition, and as explained in the previous section, LG does not present any evidence of harm independent of injury resulting from Whirlpool's statements regarding steam. Because Whirlpool's dryers do in fact use steam, LG has failed to introduce evidence of harm. This, too, requires the Court to deny injunctive relief to LG. *See* 815 ILL. COMP. STAT. 510/3 ("A person likely to be *damaged* by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable.").

As explained above, the jury's general verdict does not in itself establish future harm sufficient to entitle LG to injunctive relief. Indeed, the Court explained that the jury likely found an IUDTPA violation based on advertising that it perceived to create a likelihood of misunderstanding with respect to how the Duet Dryer creates steam (as distinct from whether the Duet Dryer uses steam, which it does).

In this respect, the only credible evidence of consumer confusion that LG introduced pertained to a single aired advertisement, which Whirlpool has since discontinued.[23] Even if that advertisement had created a material likelihood of confusion or misunderstanding, it would not create a likelihood of future harm to LG in light of the fact that it no longer airs. 815 ILL. COMP. STAT. 510/3 ("A person likely *to be damaged* by a deceptive trade practice of another may be granted injunctive relief[.]") (emphasis added). Moreover, LG has not presented any evidence that any of Defendant's ongoing advertisements represent that the Duet Dryer creates steam by

---

[23] Ms. Klyn testified that Whirlpool no longer runs the commercial that the jury may have found to create a likelihood of confusion or misunderstanding. (Inj. Hr'g Tr. at 29-30.) She further testified that the company ceased airing the advertisement between 18 and 24 months before the February 17, 2011, hearing. (*Id.* at 29-30.) She also explained that none of Defendant's advertisements purports to convey information as to how LG's steam dryers create or use steam. (*Id.* at 31.) The Court found Ms. Klyn's testimony to be highly credible.

boiling water before injecting it into the drum.[24]  Plaintiff has failed to establish by a preponderance of the evidence that any other practice by Whirlpool constitutes a deceptive trade practice, let alone one that creates a likelihood of harm to LG.[25]

As a result, the Court finds that Plaintiff has failed to establish a likelihood of future harm.  For that reason, the IUDTPA, by its explicit terms, does not authorize the Court to award injunctive relief to LG.

**C.      Even if LG Had Established a Likelihood that a Particular Business Practice of Defendant Will Harm It, the Court Would Decline to Grant an Injunction Under the Four-Factor Test in Equity**

LG is not entitled to an injunction.  Whirlpool's Duet Dryer uses steam, and so Whirlpool's advertising of that fact is not a practice that this Court could enjoin pursuant to the IUDTPA.  LG has pointed to no other ongoing practice of Defendant that creates a likelihood of confusion or misunderstanding.  To the extent that the Blue World commercial created such a likelihood by creating the impression that the Duet Dryer creates steam by boiling, such a fact would not give LG a right to injunctive relief because Whirlpool has since discontinued that advertisement.  Plaintiff has failed to identify any other business practice of Whirlpool that this Court could enjoin.

Plaintiff's only other argument is that the jury's general verdict in its favor under the IUDTPA in itself entitles it to an injunction.  (R. 641 at 23-41.)  Above, the Court explained that

---

[24] Ms. Klyn credibly testified that Whirlpool's advertising does not say that its product makes steam by boiling water.  (Inj. Hr'g Tr. at 30.)

[25] Mr. Reitter's study, which was the only credible evidence of consumer confusion, was therefore based on a commercial that Whirlpool no longer plays.  There was no evidence that Whirlpool's other advertising that uses the word "steam" creates confusion.  Indeed, Plaintiff has failed to introduce evidence of even a single purchaser of Whirlpool's Duet Steam dryer who expressed confusion or misunderstanding.

this verdict did not require the jury to make an express or implied finding of harm to LG, such as would entitle it to injunctive relief under the IUDTPA.  *See* 815 ILL. COMP. STAT. 510/3 (providing that a court may grant injunctive relief to a person "likely to be damaged" by a deceptive trade practice); *see also 3M*, 259 F.3d at 608 ("[W]hen a plaintiff has demonstrated no actual damages nor [*sic*] a likelihood of future damages a permanent injunction . . . is inappropriate.").  In addition, LG must connect the IUDTPA violation to a particular practice that this Court could enjoin.  *See* Fed. R. Civ. P. 65(d)(1)(C) ("Every order granting an injunction . . . must describe in reasonable detail . . . the act or acts restrained[.]")  It has not done so.  Therefore, the jury's general verdict for LG under the IUDTPA does not in itself entitle LG to an injunction.

The preceding facts are fatal to LG's motion for a permanent injunction.  Even if LG could point to a particular practice of Whirlpool that violates the IUDTPA and that is likely to damage LG, however, the Court, in exercising its discretion, would still decline to award an injunction.

LG contends that the Court need not apply the traditional four-part test under Federal Rule of Civil Procedure 65 for injunctive relief because LG is asking for an injunction under the state-law violation.  (*Id.* at 31.)  The Court does not agree.  It is black-letter law that, "[i]n ascertaining the meaning of a statute, we begin with the plain language."  *Barma v. Holder*, -- F.3d --, 2011 WL 1237608, at *3 (7th Cir. Apr. 5, 2011).  In construing a statute, the Court may look to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *United States v. LaFaive*, 618 F.3d 613, 616 (7th Cir. 2010) (quotations omitted).

The IUDTPA provides that "[a] person likely to be damaged by a deceptive trade practice of another *may* be granted injunctive relief . . ." 815 ILL. COMP. STAT. 510/3 (emphasis added). By its express terms, this statutory provision imparts discretion on the Court to decide whether to grant injunctive relief in the event of an established violation of the IUDTPA. In this respect, the statute makes clear that an injunction is a possible, but not a mandatory, form of relief. LG's argument would impermissibly render the "may" language meaningless. *See generally Beard v. C.I.R.*, 633 F.3d 616, 621 (7th Cir. 2011) (observing that a standard rule of statutory construction is to avoid "rendering parts of the language superfluous").

As a result, and contrary to LG's position, a federal court would not grant a person who establishes a violation of the IUDTPA an injunction as a matter of course. *Accord eBay*, 547 U.S. at 392-93 ("As in our decision today, this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."). Furthermore, the Court agrees with Whirlpool that the traditional four-factor test in equity applies in deciding whether a federal court should grant permanent injunctive relief for a violation of the IUDTPA. *See DeVry, Inc. v. Int'l Univ. of Nursing*, 638 F. Supp. 2d 902, 910-11 (N.D. Ill. 2009); *Am. Taxi Dispatch, Inc. v. Am. Metro Taxi & Limo. Co.*, 582 F. Supp. 2d 999, 1005 (N.D. Ill. 2008).

The Supreme Court has made clear that, "[a]ccording to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay*, 547 U.S. at 391. A plaintiff satisfies that test if (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the plaintiff and defendant

warrants a remedy in equity; and (4) a permanent injunction would not disserve the public interest. *Id.*

Even if LG had demonstrated a likelihood of harm related to a specific business practice that Defendant engages in, the Court would decline to grant an injunction under the four-factor test in equity because Plaintiff cannot satisfy that four-factor test. As noted, LG has not demonstrated past injury or a likelihood of future harm, and so Plaintiff necessarily fails the first factor of the relevant test. *Accord 3M*, 259 F.3d at 608 ("[W]hen a plaintiff has demonstrated no actual damages nor [*sic*] a likelihood of future damages a permanent injunction . . . is inappropriate."). Even if Plaintiff had established such damage from an identifiable deceptive trade practice—and even if LG is correct that irreparable harm would necessarily follow from the same (Inj. Hr'g Tr. at 67)—Plaintiff has failed to demonstrate that the balance of hardships warrants an injunction.

LG implausibly argues that Whirlpool is "indifferent with regard to whether it calls its dryers steam dryers or something else." (R. 641 at 36.) To the contrary, Defendant explains in detail the considerable costs that an injunction would subject it to. (R. 644 at 46-50.) Whirlpool observes that it markets and prominently advertises all thirty-one models of its steam dryers as using steam. (*Id.* at 46.) Defendant further explains that its advertising of steam dryers appears in a number of different outlets, and asserts that it has invested millions of dollars in effecting the same. (*Id.* at 46-47.) Defendant estimates that there are approximately 160,000 Whirlpool dryers on trade customers' floors, in inventory, or in various distribution channels. (*Id.* at 47.) Whirlpool submits that an injunction, in addition to being costly, would adversely impact its credibility and goodwill and would damage its commercial relationship with its trade customers.

(*Id.* at 47-48.)  Defendant also points out the various difficult steps it would have to undertake to comply with LG's sought-after injunction, including changing the product name, the "steam" header for the steam cycles, the LCD or LED screen for the steam cycles, and the product literature provided with each dryer.  (*Id.* at 48.)

Conversely, and as explained above, Plaintiff has introduced only weak evidence, at best, that Whirlpool's steam-dryer advertising has injured it.  Indeed, there is no evidence that Whirlpool is representing that its Duet Dryer uses boiled steam.  (Inj. Hr'g at 30.)  Nor is there evidence that Whirlpool's advertising purports to explain how LG's steam dryer creates steam.  (*Id.* at 31.)  As a result, the Court concludes that the balance of hardships weighs against granting an injunction.

## II.     LG is Not Entitled to Attorneys' Fees and Costs

The IUDTPA provides that "[c]osts or attorneys' fees or both may be assessed against a defendant only if the court finds that he has wilfully engaged in a deceptive trade practice."  815 ILL. COMP. STAT. 510/3.  *See Tarin v. Pellonari*, 554 625 N.E. 2d 739, 747 (Ill. App. Ct. 1993) (plaintiff "must demonstrate to the satisfaction of the court that the defendants had wilfully engaged in deceptive trade practices" in order to recover fees and costs).  The evidence in this case falls far short of the requisite showing of wilfulness.

LG argues that Whirlpool had actual knowledge that its steam advertising was deceptive, yet it continued to use the word "steam" in its advertising.  (R. 641 at 45-46.)  In support of its motion for attorneys' fees, LG focuses on the statements of certain members of Whirlpool's legal department that Defendant should say that its dryer creates steam.  (*Id.* at 45.)  The Court has already determined, however, consistent with the jury's likely implied finding, that Whirlpool's

dryer does indeed produce steam. Therefore, Defendant's marketing of steam does not violate the IUDTPA.[26] The Court thus denies LG's request for its attorneys' fees.

Furthermore, LG premises its IUDTPA claim on the same conduct upon which it based its Lanham Act and CFA claims. The jury rejected both these claims. In addition, the Court found that LG had failed to establish any basis for punitive damages and therefore did not send this issue to the jury. (Tr. at 2380-82 (explaining why there was "not enough evidence to send that to the jury").)

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff' motion for injunctive relief and attorneys' fees (R. 640). Furthermore, the Court grants Whirlpool's motion to strike testimony and evidence submitted by LG (R. 666).

**Dated:** May 9, 2011

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**

---

[26] Furthermore, Plaintiff's reliance on *Bingham v. Inter-Track Ptrs.*, 600 N.E. 2d 70, 74-5 (Ill. App. Ct. 1992), is misplaced. In *Bingham*, the Illinois Appellate court found the trial court's ruling that it "found 'no evidence of bad faith intent by defendant to benefit from [plaintiffs] goodwill and reputation . . . and therefore insufficient proof of willful infringement justifying an award of attorneys fees'" to be "against the manifest weight of the evidence." *Id.* at 74-75. In the present case, the evidence does not support a finding that Whirlpool wilfully engaged in a deceptive trade practice.